# EXHIBIT C

## LEXINGTON INSURANCE COMPANY

Administrative Offices:  100 Summer Street, Boston, Massachusetts 02110-2103
(hereinafter called the Company)

DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY
Declarations
EXCESS LIABILITY POLICY - FOLLOW FORM

THIS IS A CLAIMS-MADE POLICY. PLEASE READ CAREFULLY.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE OR RETENTION AMOUNT.

Policy Number:  1620924                                              Renewal of:  NEW

NAMED CORPORATION:       REFCO LLC:
MAILING ADDRESS:         55 W JACKSON BLVD
                         SUITE 1300
                         CHICAGO    IL  60661

STATE OF INCORPORATION OF NAMED CORPORATION:  ILLINOIS

SECTION I-EXCESS INSURANCE

(a)       POLICY PERIOD:
          FROM:      08/11/05        TO:     08/11/06
          (12:01 A. M. Standard Time at the address stated in Item 1)

(b)       Coverage:    Follow Form Excess Directors and Officers Liability
(c)       Limits of Liability:   $7,500,000 Excess of $10,000,000
(d)       Premium:     Annual Minimum Premium              Minimum Earned Premium At Inception
                       $251,813                            $88,135
(e)       Retroactive Date:
(f)       Endorsements:         SEE ATTACHED FORMS SCHEDULE

SECTION II-UNDERLYING INSURANCE

(a)       Endorsements made part of this Policy:
(b)       Coverage:            Directors & officers Liability Insurance Policy
          Underlying Company:  HCC Global Financial
          Policy Number:       24-MGU-05-A10821
          Policy Limit:        $10,000,000
          Policy Period:       from: 08/11/05    to:    08/11/06
          Retroactive Date:

Total Limits of all underlying insurance including the underlying policies in excess of which this policy applies, whether recoverable or not  $10,000,000  each policy year, subject to retentions of          per loss Corporation Reimbursement,    per Director or Officer, subject to a maximum of  per loss.

                                                      _Steve C. Stake, Jr._
                                                      Authorized Representative
                                                      Countersignature (In states where applicable)

LEX-DO-CMFP(Ed.2/91)

LX2004

PLAINTIFF'S
EXHIBIT
C

10/25/2005  01:47    617-330-8332           AIG                    PAGE  02

## FORMS SCHEDULE

Named Insured:   REFCO LLC                              Effective Date:  08/11/2005

Policy No: 1620924

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| LEXDOCMFF | 05/04 | 00 | CLAIMS MADE DO EXCESS FF DEC |
| LEXDOCMFFT | 02/91 | | CLAIMS MADE DO EXCESS FF TXT |
| LX0940 | 05/96 | 1 | DISCOVERY CLAUSE-AMENDED |
| LX0958 | 05/96 | 2 | MINIMUM EARNED PREMIUM END |
| LX7100 | 02/02 | 3 | NUCLEAR ENERGY EXCL CU 21 23 |
| LX9827 | 01/05 | 4 | TERRORISM PREMIUM CHARGE END |
| FSE073 | 02/91 | 5 | PRIOR/PENDING LIT. HIGHER LIM. |

DOC018(Ed.12/87)
LX0295

# LEXINGTON INSURANCE COMPANY
Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103
(hereinafter called the Company)

### Following Form - Excess Liability Policy

I.   **Insuring Agreements**

Lexington Insurance Company (hereinafter called the "Company") in consideration of the payment of premium and in reliance upon the statements in the Declarations made a part thereof, hereby agrees to indemnify the Insured named in the Declarations (hereinafter called the "Insured") in accordance with the applicable insuring agreements, terms, conditions and exclusions of the Underlying Policy (and renewals thereof on the same basis) specified in Section II(a) of the Declarations (hereinafter called the "Underlying Policy") to the extent not inconsistent with the exclusions, conditions and other terms of this policy or endorsement(s) attached hereto, which shall prevail in the event and to the extent of any such inconsistency, against "loss" which is excess of the total limit(s) of all Underlying Insurance specified in Section II(b) of the Declarations subject to the limit of liability stated in Section I(c) of the Declarations.

The provision of the Underlying Policy.

except as regards the premium, the obligation to investigate and defend (and for costs and expenses incident to the same), the amount and limits of liability, the renewal agreement, if any, additional coverage provided by a discovery period provision, and any other provision therein inconsistent with this policy.

are hereby incorporated as part of this policy.

Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits.

II.   **EXCLUSIONS - This policy does not apply:**

A)  1)  to bodily injury, personal injury or property damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2)  to any loss, costs or expense of any nature, arising out of any:

a)  request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b)  claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

B)  Nuclear Energy Liability Exclusions:

1)  Under any Liability Coverage, to injury, sickness disease, death or destruction:

a)  with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or

- 1 -

LEX-DO-CM-FFT(Ed.2/91)
LX2057

any law amendatory thereof, or (2) the Insured is, or had this policy not been issued would be, entitled to indemnify from the United States of America, or agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2) Under any Medical Payments Coverage, or under any Supplementary Payments provisions relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of a nuclear facility by any person or organization.

3) Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

   a) the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of an Insured, or (2) has been discharged or dispersed therefrom;

   b) The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

   c) The injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possession or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear materials" means source material, special nuclear material or by-product material;

"source material", "special nuclear material" and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means:

   a) any nuclear reactor,

   b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

   c) any equipment or device used for the processing, fabrication or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

   d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

C) to any liability of the Insured due to war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization

~ 2 ~

LEX-DO-CM-FFT(Ed.2/91)
LX2057

or requisition or destruction  ..amage to property by or under the order    any government or public or local authority.

D) 1)  to any liability for property damage, bodily injury, sickness. disease, occupational disease, disability, shock, death, mental anguish mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, or

2)  to any obligation of the Insured to indemnify any party because of damages arising out of such property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, mining of, use of, sales of, installation of, re-moval of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3)  to any obligation to defend any suit or claim against the Insured alleging bodily injury or property damage and seeking damages, if such suit or claim arises from bodily injury or property damage resulting from or contributed to, by any and all manufacture of, mining of. use of, sales of, installation of, removal of, dis-tribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

III.  LIMITS OF LIABILITY

Regardless of the number of Insureds under this policy, persons or organization who sustain injury or damage, or claims made or suits brought on account of injury or damage covered hereby, the Company's limit of liability for "loss" excess of the Underlying Insurance shall be limited to the amount stated in Section I (c) of the Decla-rations as applicable to "each occurrence" or "each claim"; provided, however, that the Company's liability shall be further limited to the amount stated in Section I (c) of the Declarations stated as "aggregate" with respect to "loss" excess of the Underlying Insurance which occurs during each annual period while this policy is in force.

IV.  INSURED'S DUTIES

The Insured named in the Declarations hereby agrees to promptly furnish the Company with a copy of the Underlying Policy and all endorsements thereto which in any way effect this excess insurance. Written notice of any "loss" likely to give rise to a claim hereunder shall be given to the Company by or on behalf of the Insured named in the Declarations, containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstance of the "loss"

V.  SETTLEMENT AND DEFENSE

Anything in the Underlying Insurance to the contrary notwithstanding, the Company shall not be obligated to as-sume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the In-sured, but the Company, at its option but not being requried to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim. suit or proceeding which appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding. In the event costs are incurred by the Company with respect to such claim, suit or proceeding, the Company shall pay it incurred costs and such expenses incurred by the Insured with the approval of the Company.

VI.  MAINTENANCE OF UNDERLYING INSURANCE

The underlying insurance referred to in paragraph (b) of Section II of the Declarations page and renewal or re-placement thereof on terms and conditions not more restrictive, shall be maintained by the Named Insured in full effect during the currency of this policy without such alteration of terms or conditions except for any reduction of the aggregate limit of limits contained therein solely by payment of claims. Failure of the Named Insured to comply with the foregoing shall not invalidate the policy, but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Named Insured so maintained such underlying in-surance.

Further, the receivership, the insolvency and/or inability to pay by an underlying insurer for any reason shall not be deemed to render the funds which would have been otherwise available from an underlying insurer to be un-available, unrecoverable, reduced or exhausted for the purposes of determining the Company's liability under this policy, it being understood that the liability of the Company under this policy shall in no way be increased or ex-panded as a result of such receivership, insolvency or inability to pay underlying insurer.

- 3 -

**VII.  AGGREGATE POLICY PERIOD**

If the period of the Underlying Insurance is not concurrent with the policy period of this policy, it is agreed that for the purpose of determining the Company's liability for "loss" excess of the aggregate limits of the Underlying Insurance, only "loss" or "losses" which take place during the policy period of this policy shall be included.

**VIII. SUBROGATION**

In the event of any payment under this policy, the Company may participate with the Insured in the exercise of all the Insured's rights of recovery against any person or organization liable therefor.

**IX.  PREMIUM**

It is agreed that should any alteration be made in the premium for the Underlying Policy during the period of this policy, or if there is an increase in the risk assumed by the Company, then the premium hereon may be adjusted accordingly.

If this policy is subject to audit adjustment, the premium will be based upon the rating base as set forth in the Declarations.  Upon notice to the Named Insured of the earned premium due, such premium in excess of the advance premium shall become due and payable.  If the total earned premium is less than the premium previously paid, the Company shall return to the Insured the unearned portion paid by the Insured, subject however to any minimum premium stated in the Declarations.

**X.  CANCELLATION**

It is understood and agreed that the terms of Condition X, Cancellation, of this policy are deleted in their entirety and are replace by the following:

This policy may be cancelled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective.  The policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective; provided, however, if such cancellation is for non-payment of premium, the Company is required to give only at least ten (10) days notice.  Proof of the mailing of the notice shall be sufficient proof of notice.  The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period.  Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing.  If the named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure for the period this policy is in effect, applied to the premium developed in accordance with the Premium Condition of this policy, subject to the short rate amount of the Minimum Annual Premium stated in this policy but in no event shall the earned premium be less than the Minimum Earned Premium stated in this policy.  If the Company cancels, earned premium shall be computed pro rata of the premium developed in accordance with the Premium Condition of this policy subject to the pro rata amount of the Minimum Annual Premium stated in this policy; provided, however, if the Company cancels for non-payment of premium, the premium shall be computed on the same basis as if the Named Insured cancels.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.  The check of the Company mailed or delivered, shall be sufficient tender of any refund due the Named Insured.

If this policy insures more than one Named Insured, cancellation may be effected by the one first named for the account of all Insureds.  Notice of cancellation by the Company to such first Named Insured shall be notice to all Insureds.  Payment of any unearned premium to such first Named Insured shall be for the account of all Insureds.

**XI.  SERVICE OF SUIT**

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United states.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA 02110-2103,

– 4 –

LEX-DO-CM-FFT(Ed.2/91)
LX2057

or his or her representative, and ...at in any suit instituted against the Com... .y upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this policy of insurance, and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XII.  DEFINITIONS

The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs.

The work "Costs" shall be understood to mean interest on judgements, investigations, adjustments and legal expenses (excluding all expenses for salaried employees of the Insured or any of the Underlying Insurer's permanent employees).

The term "Underlying Policy" shall be understood to mean the policy indicated in Section II(a) of the Declarations.

The term "Underlying Insurance" shall be understood to mean the total limits of all insurance including the Underlying Policy and/or any self-insured retentions excess of which this policy is written, whether recoverable or not recoverable.

The term "Insured" shall be understood to mean the Insured named in the Declarations, any Insured under the Underlying Policy, and any additional Insured added to the policy by endorsement attached hereto.

IN WITNESS WHEREOF,  the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.

_Elizabeth M. Tuck_                         _L. H. Kelley_

      Secretary                         Chairman of the Board and CEO

- 5 -

ENDORSEMENT # 1

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

DISCOVERY CLAUSE-AMENDED

In consideration of the premium charged, it is understood and agreed that Section 10, Discovery Clause, is deleted in its entirety and replaced with the following:

If the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 150%   of the one year premium, to a period of 365 days following the effective date of such cancellation or non-renewable (herein referred to as the Discovery Period) in which to give written notice to the Insurer of claim('s) first made against the Insured(s) during said Discovery Period for any Wrongful Act committed before the effective date of such cancellation or non-renewal and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within ten (10) days of the effective date of cancellation or non-renewal. The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. If the policy is cancelled due to nonpayment of premium, the Insured(s) and/or the Company shall not have the option to purchase the Discovery Period described above.

The offer by the Insurer of renewal terms, conditions, the Limit of Liability and/or premiums different from those of the expiring policy shall not constitute non-renewal.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (In states where applicable)

LX0940 (05/96)

ENDORSEMENT # 2

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is terminated or cancelled prior to the  expiration of the policy period for any reason other than cancellation by the Insurer, it is agreed that the premium charged shall be $ 88,135 earned upon the inception of the policy or computed in accordance  with the customary short-rate table and procedure, whichever is greater.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (In states where applicable)

LX0958 (05/96)

POLICY NUMBER:  1620924      ENDORSEMENT # 3                CU 21 23 02 02

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

I. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

II. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Includes copyrighted information of the Insurance Services Offices, Inc., with its permission. All rights reserved.

CU 21 23 02 02

ENDORSEMENT # 4

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

## TERRORISM PREMIUM CHARGE ENDORSEMENT

The "Terrorism" charge is $ 4,938          and is included in the Policy Premium shown on the Declarations Page of this policy.

DEFINITION - The following definition of terrorism shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

  (1) A government;
  (2) The civilian population of a country, state or community; or
  (3) To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the "Act") is in effect, "Terrorism" includes a certified act of terrorism defined by Section 102. Definitions, of the Act and any revisions or amendments thereto.

All other terms and conditions of the policy are the same.

_____
Authorized Representative OR
Countersignature (In states where applicable)

LX9827 (01/05)

10/25/2005  01:47    617-330-8332              AIG                    PAGE  13

## ENDORSEMENT # 5

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.: 1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### PENDING AND PRIOR LITIGATION EXCLUSION FOR HIGHER LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with respect to the Limit of Liability $7,500,000     excess of $10,000,000    , exclusion 4(h) is amended to indicate that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers alleging, arising out of, based upon or attributable to any pending or prior litigation as of JUNE 4, 2004      or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (In states where applicable)

FSE073(Ed.2/91)
LX2029

# EXHIBIT D

## D'AMATO & LYNCH

LAWYERS

| | | |
|---|---|---|
| GEORGE G. D'AMATO | WILLIAM C. BURTON | 70 PINE STREET |
| LUKE D. LYNCH (1999) | CHARLES BRAHHAH | |
| KENNETH A. SAGAT | BILL V. RAKOULLIS | NEW YORK, N.Y. 10270-0110 |
| LUKE D. LYNCH, JR. | THOMAS W. HANLON | |
| ROBERT E. KUSHNER | JOHN H. FITZSIMONS | TELEPHONE 212-269-0927 |
| RICHARD F. RUSSELL | MICHAEL L. MANIRE | WWW.D-AMATO-LYNCH.COM |
| RONALD H. ALCHSTEIN | KEVIN J. WINDELS | CABLE ADDRESS |
| HARRY J. ARNOLD, JR. | SAMUEL F. PANICCIA | DAMCOSH |
| ROBERT W. LANG | ROBERT S. FRASER | TELEX 960085 DCOS UI NYK |
| NEAL H. OLAZER | STEPHEN F. WILLIG | TELECOPIER: 212-269-3559 |
| ANDREW R. SIHNONDS | DEBORAH H. COLLINS | |
| JOHN P. HIGGINS | NEIL H. MORRISON | |
| THOMAS F. BREEN | PETER A. STROLI | LONDON OFFICE |
| ALFRED A. D'AGOSTINO, JR. | FRANCES BUCKLEY | LLOYD'S |
| WILLIAM P. LARSEN, III | DAVID J. KUFFLER | ONE LINE STREET |
| ROBERT D. LANG | | LONDON EC3M 7HA, ENGLAND |
| DAVID A. BOYAR | LLOYD J. HERMAN | |
| MARY JO BARRY | KEVIN P. CARROLL | TELEPHONE 0207 816 5977 |
| BARBARA R. SEYMOUR | LAURIE P. BEATUS | TELECOPIER 0207 816 7257 |
| HARVEY BARRISON | LIZA A. CHAFIIAN | |

| | |
|---|---|
| JAN H. DUFFALO | JOHN C. MUCCIFORI |
| JAMES E. TOLAN, II | MOLLY Z. BROWN |
| CATHERINE L. CASAVANT | MAXINE K. NAKAMURA |
| ROY CAPLINGER | GERARDO LAPETINA |
| ANNEMARIE J. MAZZONE | LAURA S. WEINER |
| EDWARD M. ROTH | DAVID BERGENFELD |
| MARIA T. EHRLICH | E. REYNOLDS WILSON |
| RICHARD F. FERRIGNO | JASON B. GRANT |
| DEEANNA M. GALLA | GAVIN J. CURLEY |
| JUDY Y. CHUNG | BRIAN M. MARGOLIES |
| R. DAVID ADES | ASSAF RONEN |
| JONATHAN L. KRANZ | ALEXANDER H. RAZI |
| ARTURO H. BOUTIN | ANITA G. BAKER |
| WENDY J. KALNICK | SOTHEARY JOHNMAR |
| | HELEENA H. BOWERS |

COUNSEL

| | |
|---|---|
| ROBERT H. MAKLA | VICTOR F. HUSTELIER |
| ALBERT D. LEWIS | ROBERT GILROY |
| PETER J. THUMSER | RICHARD G. McGAHREN |

July 26, 2006

<u>Via Facsimile (212)-345-3706</u>
Mr. R. Damian Brew
Managing Director
Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036

| Re: | Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy | | |
|---|---|---|---|
| | Insured | : | REFCO, LLC ("REFCO") |
| | Claimant | : | Various |
| | Policy No. | : | 1620924 |
| | Claim No. | : | 209128 |
| | Our File No. | : | 108-73096 |

Dear Damian:

     We are in receipt of your email dated June 16, 2006. We write to respond to your email with respect to the issue of the availability of Defense Costs under the Lexington Excess Policy No. 1620924 (the "Excess Policy") referenced above issued to REFCO.

     Lexington does not agree with your stated position and Lexington maintains its position as set forth in our prior correspondence. Nevertheless and still subject to a complete reservation of rights, Lexington will agree to provide Defense Costs coverage under its Excess Policy to the Directors and Officers of REFCO once the U.S. Specialty Primary Policy limit of liability has been eroded and while Lexington continues its investigation into the Excess Policy. Such undertaking is done with the agreement that if it is finally determined that any Defense Costs paid by Lexington under its Excess Policy are not covered either under the U.S. Specialty Primary Policy or the Lexington Excess Policy, the Insureds agree to repay such non-covered Defense Costs to Lexington. Once the U.S. Specialty Primary Policy is eroded, before making any advancement of Defense Costs, Lexington will request that all insured Directors and Officers execute an advancement and undertaking of repayment.



PLAINTIFF'S EXHIBIT
D

Mr. R. Damian Brew
Managing Director
Marsh USA Inc.
July 26, 2006
Page 2

Again, Lexington will do so pursuant to a reservation of all of its rights and defenses under the Excess Policy, at law and in equity, including the right to deny coverage for Defense Costs and incorporates all its rights expressed in all the letters it has previously issued. Additionally, Lexington continues to reserve its rights with respect to the reservations expressed by the primary carrier U.S. Specialty.

Please convey this position to your clients. Thank you for your time.

Sincerely,

Barbara R. Seymour

JET/sdv

CC:
**Via Facsimile (312) 627-6272  and U.S. Mail w/out encl.**
Ms. Andrea Lieberman
Marsh USA Inc.
500 West Monroe Street
Chicago, IL 60661

**Via Facsimile:  (202) 719-7049 w/out encl.**
Daniel J. Standish, Esq.
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, D.C.  20006

**Via Facsimile (888) 325-9109 w/out encl.**
John D. Hughes, Esq.
Edwards Angell Palmer & Dodge LLP
101 Federal Street
Boston, Massachusetts 02110-1800

**Via Facsimile (212)-980-9291 and U.S. Mail w/out encl.**
Robert Benjamin, Esq.
Kaufman, Borgeest & Ryan LLP
200 Summit Lake Drive
Valhalla, New York 10595

# EXHIBIT E

◗ REFCO

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

  a. No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

*See attached.*

  b. No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: *Refco Group Ltd. LLC*

Signature: _____

Title: _____ PRESIDENT & CEO.
(Chairman of the Board or President)

Date: _____ Jan 21. 2005.



MEMORANDUM

TO:         Phillip Bennett

FROM:       Ellen Brooks

SUBJECT:    Directors and Officers Coverage

DATE:       January 14, 2005

Axis Reinsurance Company is one of three insurance carriers for our present D&O coverage that was placed August 5, 2004. Due to the $30,000,000 total limit that T.H. Lee required us to purchase, we had to layer the coverage. Axis is the 2nd layer with $10,000,000 limit. They are requiring you to sign a warranty letter confirming that we currently do not have a claim against our D&O policy.

We did not reveal this case at the time the Axis underwriter was reviewing our application, therefore, they are now asking for a copy of the complaint and also a copy of the court filing of the dismissal. The complaint is attached, but we are still waiting on the court to send Herrick, Feinstein LLP the dismissal order.

If you have any questions, please do not hesitate to give me a call.

Thank you.

HERRICK, FEINSTEIN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP INCLUDING NEW YORK PROFESSIONAL CORPORATIONS

2 PARK AVENUE
NEW YORK, NY 10016-9301

TELEPHONE: (212) 592-1400
FACSIMILE: (212) 592-1500

WEB: www.herrick.com

104 CARNEGIE CENTER
PRINCETON, NJ. 08540-6232

2 PENN PLAZA
NEWARK, N.J. 07105-2245

WRITER'S DIRECT DIAL:

(212) 592-1588

E-MAIL: gcoms@herrick.com

January 14, 2005

BY E-MAIL

Ms. Ellen Brooks
Refco, LLC
550 West Jackson Boulevard
Suite 1300
Chicago, Illinois 60661

Re:    Louis Capital Markets, L.P., v. Refco Group Ltd., LLC, et al.

Dear Ms. Brooks:

Pursuant to your request to Therese Doherty for the status of the above-referenced litigation, please be advised of the following:

This matter is pending in the Supreme Court of the State of New York, County of New York, and is filed under Index No. Case No. 04601028/04. On April 14, 2004, plaintiff filed a complaint against Refco Group ltd., LLC, an employee of Refco Securities SA, and four registered representatives and employees of Refco Securities, LLC. The complaint arises out of the termination of employment by four of the individual defendants with plaintiff and alleges that Refco Group Ltd., LLC, "acting through its subsidiaries" and "their agents," (a) tortiously interfered with contractual relationships between plaintiff and several of its employees; (b) aided and abetted breach of fiduciary duty by each of several former employees of plaintiff; (c) committed unfair business practices; (d) breached an implied-in-fact contract with plaintiff; and (e) tortiously interfered with plaintiff's economic advantage. The complaint seeks damages as follows: (a) on the first three causes of action, "not less than $4.5 million per year in lost profits" plus 9% interest, as well as future profits to be determined; (b) on the fourth cause of action, "not less than $4.5 million per year" plus 9% interest per year; and (c) on the fifth cause of action, "an amount in excess of $18 million"; together with 9% interest, punitive damages and other relief. On September 23, 2004, the court granted the defendants' motion to dismiss the complaint. We have been advised by the Court to expect an order to be issued before the next conference date of January 27, 2005.

HFNY2: 2809103 v.1 605704-0000

HERRICK, FEINSTEIN LLP

Ms. Ellen Brooks
January 14, 2005
Page 2

As you requested, we have attached a copy of the complaint with exhibits. We will forward to you a copy of the court order as soon as we receive it. Please feel free to contact me if we can be of further assistance.

Very truly yours,

Grant R. Cornehls

cc:    Therese M. Doherty

HFNY2:#309103 v.1 #05704-0000

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART

**ORIGINAL**

---------------------------------------------------------------x

LOUIS CAPITAL MARKETS, LP, Successor to
LOUIS CAPITAL MARKETS, LLC,

Index No.

Plaintiff,

04601028

— against —

**COMPLAINT**

REFCO GROUP LTD., LLC, ALAIN FELLOUS,
MICHAEL BENISTY, HENRI CONDRON,
BENJAMIN CHOUCHANE, LIONEL MELLUL and
MARCOS PAGANI,

Defendants.

---------------------------------------------------------------x

Plaintiff, LOUIS CAPITAL MARKETS, LP, successor to LOUIS

CAPITAL MARKETS, LLC ("LCM"), by its attorneys Bolin & Boone, for its Complaint

alleges as follows:

**FILED**

APR 14 2004

NEW YORK
COUNTY CLERK'S OFFICE

<u>THE NATURE OF THE ACTION</u>

1.      This is an action for: (1) tortious interference with employment

agreements, (2) aiding and abetting the breach of LCM's employees' fiduciary duties to

LCM; (3) unfair business practices; (4) breach of implied-in-fact contract; and (5)

tortious interference with LCM's expectancy of an economic advantage, against REFCO

Group Ltd., LLC, (acting through its subsidiaries, such as Refco Overseas Ltd., and

Refco Securities Paris, S.A., and their agents, such as Alain Fellous) (the "REFCO

Defendants"); and for: (6) conversion and misappropriation of intangible business assets

1

and opportunities, (7) breach of agreement, and (8) breach of fiduciary duties by and among LCM's former employees (the "Former LCM Employees").

2. The action arises out of the REFCO defendants' attempts in 2001 to form a business combination with LCM, and the REFCO defendants' scheme, deliberately and methodically carried out over the ensuing years, to steal LCM's proprietary business through corporate espionage, to interfere with LCM's agreements with its Former Employees, and to misappropriate through them and by other means LCM's trade secrets and business opportunities.

## THE PARTIES

3. Louis Capital Markets, LP is a limited partnership organized in 2003 and existing under the laws of the State of New York. It is the successor to Louis Capital Markets LLC (collectively "LCM"). LCM is a broker-dealer registered with the Securities and Exchange Commission (the "SEC") and it is a member of the National Association of Securities Dealers, Inc. It is principally engaged in retailing corporate equity securities "over-the-counter." Its principal place of business is located at 67 Wall Street, New York, New York.

4. Upon information and belief, REFCO Group Ltd., LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. It is a global financial giant which offers a broad range of financial products and services through its subsidiaries and affiliates

2

throughout the world including Refco Overseas Ltd. and REFCO Securities Paris, S.A.
(collectively "REFCO").

5.    At all relevant times, Alain Fellous was President of REFCO
Securities Paris, S.A., which, upon information and belief, is owned or controlled by
REFCO Group Ltd., LLC.

6.    Michael Benisty is now employed by REFCO as an Executive
Vice President in New York. Before 2002, he was also employed by REFCO. In
February 5, 2002, he resigned from REFCO and started work as a Senior Vice President
at LCM. As alleged in the paragraphs that follow, Benisty was a corporate "mole" or spy
for RECFO while he was employed at LCM. He was fired by LCM on December 6,
2002, after LCM discovered he intended to return to REFCO to set up and duplicate
LCM's unique equity trading business for REFCO in New York City.

7.    Benjamin Chouchane was hired by LCM on May 20, 2002 as a
Sales Assistant. On December 9, 2002, he suddenly resigned from LCM to join Benisty
at REFCO.

8.    Henri Condron was hired by LCM on March 24, 2002 as a Middle
and Front Office Operator. On December 31, 2002, he suddenly resigned from LCM to
join Benisty and Chouchane at REFCO.

9.    Lionel Mellul was hired by LCM on July 1, 2002, as a Vice
President. On February 14, 2003, he accepted the offer from LCM to become a Senior
Vice President to develop LCM's Institutional Sales Department. On February 4, 2004,
he suddenly resigned from LCM to join Benisty and the other Former LCM Employees at

3

REFCO the next day. A copy of Mellul's Employment Agreement with LCM is attached as Exhibit "A."

10.   Marcos Pagani was hired by LCM in August 2001. On February 14, 2003, he accepted the offer from LCM to become a Director to develop its Institutional Sales Office. On February 4, 2004, he suddenly resigned with Mellul to join the other Former Employees at REFCO the next day. A copy of Pagani's Employment Agreement with LCM is attached as Exhibit "B."

## THE FACTS

11.   Success in the business of trading securities or commodities of any kind depends in large measure on two key capabilities: (a) cultivation and maintenance of relationships with customers; and (b) familiarity with specific markets and the development and execution of trading strategies carefully tailored to those markets. Both capabilities are intangible. But both capabilities constitute crucial components of the intellectual capital employed by Firms engaged in the trading business. Like any other service business, this intellectual "know how" is usually the decisive key to success or failure in the trading industry.

12.   Prior to 2000, REFCO was best known in the financial community as a global giant in the international commodities markets. In particular, REFCO was (and is) known as a dominant presence in the trading of such commodities as metals, agricultural products, energy, and currencies – and with instruments and contracts related to the exchange of such commodities.

4

13.   Prior to 2000, REFCO had only a relatively small presence and participation (and then only derivatively) in the markets for equity securities – especially the equity markets in the United States.

14.   Prior to 2000, REFCO participated in the U.S. equity markets primarily through its relationship with Raymond James & Company.

15.   In or about August 2000, defendant Fellous, then President of Refco Securities, S.A., met with Michael Benamhou, one of the Managing Partners of LCM, during a dinner in Saint Tropez.

16.   Over the following months, the relationship begun in August 2000 between the principals of LCM and Fellous ripened and grew.

17.   Upon information and belief, in or about March 2001, REFCO terminated its relationship with Raymond James.

18.   The growing relationship between LCM and REFCO culminated in a "Piggy Back" Clearing Agreement on about March 27, 2001, between REFCO and LCM in which LCM agreed to handle and execute equity security transactions for REFCO's European customers.

19.   LCM and REFCO began conducting business under their Clearing Agreement and asked their attorneys to draw up papers to formalize their agreement.

20.   During the following year and a half, the attorneys for LCM and REFCO exchanged many drafts of a definitive Introducing Broker Agreement (the "Broker Agreement") to formalize and fill in the details of the then existing Clearing Agreement under which LCM and REFCO were conducting their business relationship.

21.   Prominent among the drafts of the Broker Agreement exchanged

5

between the parties' attorneys for many months was a non-solicitation clause in which REFCO agreed not "…to hire, contract with, or solicit to hire or contract with, any person who has performed services…" by LCM for REFCO under the Broker Agreement.

22.    By November 19, 2001, REFCO itself requested a reciprocal "non-solicitation/non-compete" clause from LCM regarding REFCO's clients introduced to LCM by REFCO.

23.    The mutual "non-solicitation/non-compete" clauses were intended to memorialize and confirm a vital and essential aspect of the business relationship and business practices then existing between REFCO and LCM which LCM honored in all respects.

REFCO's New Overtures to LCM in 2001

24.    The new business relationship between REFCO and LCM proved to be mutually gratifying, so much so, that during the months while negotiations regarding the definitive Broker Agreement were still in progress, Fellous floated the idea that LCM and REFCO might form a Joint Venture under LCM's name to give REFCO an even more direct presence in the U.S. equity securities markets in order to better service REFCO's European accounts.

25.    The principals of LCM did not greet this overture with unbridled enthusiasm. They saw the overture as a proposal to take over LCM. They wanted, instead, to maintain LCM's independence as entrepreneurial equity traders on Wall Street with a growing reputation for success in the domestic securities industry. Nevertheless, the principals at LCM and Fellous discussed the idea of some sort of Joint Venture on

6

many occasions over the following months, but the discussions of such an arrangement essentially ended by December 2001.

### REFCO's "Mole" Benisty

26.    At about the same time in the winter of 2001, while negotiations of the definitive Broker Agreement were still in progress, Benisty (who was then employed as a sales representative at Refco Securities Paris, S.A.) approached LCM about the possibility of employment with LCM in New York. Benisty professed to have a strong interest in leaving France and working in the equity securities business in New York City.

27.    The principals of LCM immediately told Benisty they could not even begin to entertain such an idea because it would violate the terms of the draft Broker Agreement as well as the spirit of LCM's existing business relationship with REFCO.

28.    Surprisingly, Fellous called LCM shortly afterwards in early 2002 and urged LCM to employ Benisty in New York, ostensibly so that Benisty would not accept other employment in New York City and "go to work for the competition."

29.    As an accommodation to Fellous, LCM hired Benisty on February 5, 2002, as Senior Vice President as alleged before.

30.    After he was hired in 2002, Benisty acquired first hand knowledge of LCM's trading strategies, became well acquainted with LCM's key marketing and operations employees, and he thereby acquired essentially all of the "intellectual capital" of LCM's business.

31.     Upon information and belief, throughout 2002, however, Benisty maintained almost daily contact with Fellous at REFCO (although none of his responsibilities at LCM required any such contact with Fellous).

32.     Upon information and belief, Fellous and REFCO were plotting throughout 2002 to duplicate for themselves LCM's equity trading business in New York City.

33.     By early December 2002, Benisty had so insinuated himself into the heart of LCM's business and had so gained the trust of the principals of LCM that decided to offer him a partnership interest in the Firm.

34.     In the meantime, negotiations regarding the Broker Agreement finally concluded after more than 18 months, and LCM sent REFCO the final execution copy of the Broker Agreement for signature on or about December 3, 2002.

35.     After over eighteen months of negotiations, LCM assumed the signing would be perfunctory.

36.     To the astonishment of LCM, however, Fellous and REFCO refused to sign the final definitive Broker Agreement, primarily because of the "non-solicitation/non-compete" clause which, by then, had been included in the drafts of the Broker Agreement previously exchanged between the parties' attorneys for months.

37.     Three days later, Benisty was forced to reveal to the principals of LCM that REFCO intended to essentially duplicate LCM's business in New York City.

38.     LCM fired Benisty on the spot on December 6, 2002.  A copy of LCM's termination letter to Benisty, dated December 6, 2002, stating the reasons for his termination is attached as Exhibit "C."

8

REFCO Completes its Theft of LCM's Business

39.    As alleged before, throughout 2002, REFCO through Benisty essentially was engaged in corporate espionage and theft against LCM by appropriating LCM's intellectual capital.

40.    The remaining step in the scheme involved REFCO's systematic recruitment of LCM's marketing staff – the individuals whose job it was to develop and maintain LCM's account relationships and who were, for all practical business purposes, LCM's public "face" to its accounts and customers.

41.    Almost immediately after LCM discovered REFCO's plot and fired Benisty on December 6, 2002, REFCO recruited two of LCM's key employees: Benjamin Chouchane was hired by REFCO three days later on December 9, 2002 and Henri Condron was hired within the month on December 31, 2002. Both quit LCM and went directly to REFCO.

42.    To say the least, LCM was alarmed at the discovery of the REFCO plot and quickly acted to require its other key employees (such as Mellul and Pagani) including all of its seven sales traders and 14 other employees to sign new employment agreements to try to stop the raid in progress by REFCO.

43.    The employment agreements were specifically intended to stop the raid as clearly shown by Exhibits "A" and "B" under the first heading entitled "Terms and Conditions of Employment with LCM" and elsewhere in other provisions of the agreements.

44.    It was now obvious that REFCO intended to buy the remaining part of LCM's business it had not already stolen from LCM by offering LCM's already

9

well-compensated employees extraordinarily lucrative compensation packages (all out of proportion to their nominal jobs) instead of forthrightly offering to buy the business directly and outright from LCM's owners.

45.    Upon information and belief, REFCO quickly learned about the new employment agreements and temporarily suspended its raid.

46.    After a relatively brief interval, presumably for cosmetic purposes, REFCO resumed its raid on LCM employees in early February 2004. It began by hiring both Mellul and Pagani on February 5, 2004.

47.    Since the departure of Benisty and the other key LCM employees, LCM has lost many of its accounts and untold opportunities to further grow their business.

48.    Before Benisty's termination and the beginning of REFCO's raid of LCM's employees, LCM's operating income had grown at an ever accelerating annual rate of over 35% per year. Within two weeks of the sudden departure of Mellul and Pagani, LCM's weekly operating income plunged by more than 50%.

49.    The REFCO Defendants deceptive acts and practices in the conduct of their business violate the New York State General Business Law §349, especially §§349(a) and (h).


## AS AND FOR A FIRST CAUSE OF ACTION
### (Tortious Interference With Contractual Relations
Against the REFCO Defendants and Benisty)

50.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 49.

10

51.   As alleged before, the REFCO defendants and Benisty were well aware and knew of the employment agreements between LCM and its employees.  In fact, Benisty knew all about the agreements first hand.

52.   The REFCO defendants and Benisty nevertheless actively enticed, encouraged, and ultimately succeeded in the causing the defendants Mellul and Pagani to breach their employment agreements with LCM.

53.   As a result of these defendants' interference with LCM's contractual relationships, LCM has sustained and will continue to sustain pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Aiding and Abetting the Breach of Fiduciary Duties
### Against the REFCO Defendants and Benisty)

54.   LCM repeats and realleges the allegations contained in ¶¶ 1 through 53.

55.   At all relevant times, the Former LCM Employees, including Benisty, were privy to the private and confidential workings of LCM's business.

56.   At the time of their employment with LCM, the Former LCM Employees (including Benisky) stood in a fiduciary relationship with their employer, LCM, and at all times they owed LCM the duty of loyalty and the duty of utmost good faith and fair dealing.

57.   By deserting LCM and absconding with its confidential information, the Former LCM Employees breached their fiduciary duties to LCM.

11

58.    The REFCO defendants and Benisty knowingly and deliberately encouraged, enticed, aided and abetted the Former LCM Employees to breach their fiduciary duties to LCM.

59.    As a result of these defendants' acts, LCM has suffered and will continue to suffer lost revenue, the benefit of the loyalty of its key employees and their productivity, has lost business opportunities, has incurred costs and has otherwise been damaged while the Former LCM Employees and the REFCO defendants continue to benefit from their wrongful acts, all to LCM's injury and detriment.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unfair Business Practices Against the REFCO Defendants and Benisty)

60.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 59.

61.    The REFCO Defendants' acts alleged before, including most particularly their deliberate piracy of the Former LCM employees *en masse* as a means of appropriating to themselves LCM's business, constitute devious, malicious, unscrupulous and Unfair Business Practices, crippling LCM's business in the process.

62.    LCM has suffered and will continue to suffer ever-mounting damage to its business as a result, including, but not limited to, lost profits now flowing to the REFCO defendants which must be disgorged, as well as lost business opportunities.

12

## AS AND FOR A FOURTH CAUSE OF ACTION
(Breach of Implied-In-Fact Contract Against the REFCO Defendants)

63.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 62.

64.    As alleged before, the successive drafts of the Broker Agreement prepared and exchanged by the parties' attorneys over the course of many months accurately reflected the actual agreement and business practices carried on between LCM and REFCO.

65.    Central to the business arrangement and practice between LCM and REFCO was the agreement not to "poach" or solicit employees or business from one another.

66.    By their consistent course of conduct and dealing spanning many months, LCM and REFCO manifested their agreement and confirmed its existence in fact.

67.    REFCO's piracy of LCM's employees, and through them a substantial portion of LCM's business, constituted a breach of their long-standing, implied-in-fact agreement.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Tortious Interference with an Economic Advantage
Against the REFCO Defendants)

68.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 67.

13

69.     Founded in April 1999, LCM until February 2002, had quickly established itself on Wall Street as a thriving, prospering, and rapidly growing entrepreneurial broker dealer.

70.     Since its operations began in February 2002, LCM experienced accelerating operating income growth, almost doubling every year.

71.     LCM had every reason to expect to continue maintain its revenue and income growth derived from its brokerage business at comparable or accelerating rates well into the future, having survived the costs and dangers typical of a small business in its "start up" stages, and LCM was finally poised and well-positioned to begin to compound the rate of its income growth based upon the solid revenue base it had developed.

72.     LCM had developed and established a customer base and a reputation for their skills and savy in the equity markets that appeared to assure that the Firm would meet or surpass its expectations for business growth.

73.     In addition to, and to the piracy of the Former LCM Employees, its violations of New York General Business Law §349, and other malicious and wrongful acts, the REFCO Defendants tortiously interfered with LCM's customer base and intentionally undermined the financial underpinnings of its anticipated business growth, a collateral effect of which will be to deprive LCM of future opportunities for business growth.

74.     As a result of these defendants' wrongful conduct, LCM has suffered and will continue to suffer pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

14

## AS AND FOR A SIXTH CAUSE OF ACTION
(Conversion of Intangible Business Assets and Property
Against the Former LCM Employees and Benisty)

75.     LCM repeats and realleges the allegations contained in ¶¶ 1
through 74.

76.     As alleged more extensively before, the Former LCM Employees
and Benisty during the course of their employment at LCM were exposed and thus came
into possession of valuable intangible intellectual property including customer and
account relationships and LCM's trading and other business strategies (collectively, the
"Assests").

77.     The Former LCM Employees and Benisty appropriated the Assests
to their own use and effectively sold them to REFCO in exchange for lucrative
employment arrangements with REFCO which the could nver have obtained without
having first appropriated and offered the Assets to REFCO.

78.     The Former LCM Employees and Benisty thus converted the
Assets to their own personal use and benefit.

79.     As a result of the conversion of LCM's Assets by the Former LCM
Employees and Benisty to their own use and benefit, those benefits must be disgorged
and surrendered to LCM in their entirety.

15

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of Agreements Against Defendants Mellul and Pagani)

80.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 79.

81.    Defendants Mellul and Pagani voluntarily signed agreements (Exhibits "A" and "B") with LCM and agreed to abide by "The Terms and Conditions of Employment with LCM," as well as the other provisions contained in the agreements.

82.    By suddenly quitting work at LCM and immediately accepting "employment" with REFCO (in addition to appropriating LCM's Assets for themselves), Mellul and Pagani knowingly and deliberately breached their agreements with LCM, including the provisions of ¶¶ 1, 2, 3 and 4 thereof.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duties Against the Former LCM Employees and Benisty)

83.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 82.

84.    As alleged before, the Former LCM Employees and Benisty as employees stood in a fiduciary relationship with LCM and owed to LCM the duty of the utmost good faith and fair dealing.

85.    As alleged more extensively before, the Former LCM Employees and Benisty breached their duties of loyalty, good faith and fair dealing, and instead they deliberately betrayed the trust reposed in them for their own selfish gains and benefit all to the great damage of LCM.

16



## LOUIS CAPITAL MARKETS, LLC

Monday, July 31ˢᵗ 2002    Feb 14ᵗʰ, 2003  MK

Attention:  Lionel Melhul

Dear Lionel:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

### Your Compensation and Benefits are as follows:

1. A minimum draw against future commission of $10,000 per month (up to march 31ˢᵗ 2003);

2. An incentive of 25% of the gross commissions generated by the customers you will bring in to LCM (with a minimum of 1.25c/ share to be eligible);

3. An incentive of 35% of the net profit you will bring to your department;

4. A fully paid health insurance plan[1];

5. A fully paid dental insurance plan[2]; and

6. Two weeks of vacation per year the first year, three weeks after two years of employment.

---

[1] Does not include a family plan

[2] Does not include a family plan

1122582.2

87 WALL STREET, SUITE 1805 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 809-4400, FACSIMILE (212) 809-8274

## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (I) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

1122582.2

APR-18-94 12:57 FROM:DENNIS KLEJNA                ID:12123988850           PAGE 5/11

1.    **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.    **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries; which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries.  You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

APR-18-04 12:57 FROM:DENNIS KLEJNA          ID:12123888853          PAGE  8/11

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.  **Non-Compete.**  While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries) within the or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.  **Work Product/Business Opportunities.**  You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

11223822

APR-18-04 12:59 FROM:DENNIS KLEJNA          ID:12123888858          PAGE  7/11

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries.  You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended.  If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever.  You further acknowledge that, unless LCM, its affiliates or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product.  You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter.  You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control.  You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.    Protection of Company's Name.  You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Lenis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2



APR-19-04 12:58 FROM:DENNIS KLEJNA    ID:12123898850    PAGE 8/11

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

APR-19-04 12:59 FROM:DENNIS KLEJNA                ID:1212388686          PAGE  9/11

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

1122182.2

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
    Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____          02.20.2002
Signature                        Date

11225822

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

Marie-Laure HERVET (CIC)
Nicolas Mercier (CIC)
Patrice FLAMBA (CIC)
Chafik YASSINE (CIC)
Yasmia BOUBA (CIC)
Karin Bergnigni (Cpn Nossy)
Christian FLEURY (Cpn Nossy)
Michel Habyousef (First NY)
Dan LANE (First NY)
Michel PALANTE (First NY)
Marc de LIMA (First NY)
Roger MUELLER (Swissfd)
Stephane Roffler (UNR-BSL)

_____
_____
_____
_____
_____
_____

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible
for introducing to Louis Capital Markets, LLC.

MELLUL Lionel                    _____
(Name of Employee)                Date

11225822



APR-19-04 13:01 FROM:DENNIS KLEJNA                    ID:12123000000                    PAGE   3/11

# LOUIS CAPITAL MARKETS, LLC

MEMBER NASD/SIPC

Monday November 17~~th~~ 2002   feb 14^M, 2005   MB

**Attention:** Mr. Marcos Pagani-Toledano

Dear Mr. Pagani-Toledano:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

**Your Compensation and Benefits are as follows:**

- A guaranteed draw against commission of $10,000/month until the end of 2003

- An incentive of 25% of the gross commission generated by the customers you will bring in to LCM

- An incentive of 35% of the net profit generated on mark-up

- A fully paid health insurance plan[1]; (eligible after 2 months)

- A fully paid dental insurance plan[2]; (eligible after 2 months)

- Three weeks of vacation per year

- An E2 working permit

- Sponsorship for Series 7 & 63

---

[1] Does not include a family plan

[2] Does not include a family plan                                      MB   DP

1122582.2

57 WALL STREET, SUITE 1808 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 509-4400, FACSIMILE (212) 509-9274



### Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

1122382.2



APR-19-04  13:01  FROM:DENNIS KLEJNA          ID:12123998860              PAGE  5/11

1.    **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.    **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personal files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries. You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

APR-18-04 13:02 FROM-DENNIS KLEJNA                    ID:12123808850                    PAGE  8/11

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries.  You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.  **Non-Compete.**  While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise.  You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission.  You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other than Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.  **Work Product/Business Opportunities.**  You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be.  You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

1225822

APR-18-04 13:02 FROM:DENNIS KLEJNA          ID:12123300050          PAGE   7/11

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.    Protection of Company's Name. You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2

APR-18-04 13:03 FROM:DENNIS KLEJNA          ID:12123888850          PAGE  8/11

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

APR-10-04 13:03 FROM-DENNIS ELEJNA          ID-12123806050          PAGE  8/11

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Beshamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

1122522

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____        02/15/03
Signature                        Date

1122582.2

APR-18-04 13:24 FROM:DENNIS KLEJNA          ID:12123808860          PAGE 11/11

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

| | |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible for introducing to Louis Capital Markets, LLC.

_____          _____
(Name of Employee)                Date

1122582.2

APR-19-04  13:05  FROM:DENNIS KLEJNA                    ID:12123900860        PAGE  3/3



# Louis Capital Markets, LLC

To: Michael Benisty                          December 6, 2002
    530 Park Avenue Apt. 11C
    New York N.Y. 10021

As of today Friday December 6th 2002, I Laurent Imbert Managing Partner of Louis Capital Markets, LLC.
Here by inform Michael Benisty he is immediately terminated.  We cannot carry on our business relationship since
we found out Mr. Benisty is in the process of setting up a competing business and has taken proprietary and
confidential information out of the office for that purpose.  Moreover, his attitude has been unprofessional and
contrary to Louis Capital Markets policies.

Laurent B. Imbert
Managing Member
Louis Capital Markets, LLC