# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                     :     **REDACTED**
UNITED STATES OF AMERICA                             :
                                                     :
        -v-                                          :     **INDICTMENT**
                                                     :
                                                     :     S1 05 Cr. 1192 (NRB)
PHILLIP R. BENNETT and                               :
ROBERT C. TROSTEN,                                   :
                                                     :
              Defendants.                            :
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>**COUNT ONE**</u>

(Conspiracy To Commit Securities Fraud, Wire Fraud,
    And To Make False Filings With The SEC)

        The Grand Jury charges:

<u>**RELEVANT ENTITIES AND PERSONS**</u>

        1.  At certain times relevant to this Indictment,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York.  From at least the mid-1990s,

the business of Refco, Inc. and its predecessor entities included

providing execution and clearing services for exchange-traded

derivatives and providing prime brokerage services in the fixed

income and foreign exchange markets.  Refco, Inc. held its

initial public offering of common stock on or about August 10,

2005.  Prior to on or about August 10, 2005, Refco, Inc.'s

predecessor entities were privately held.  Refco, Inc. and its

predecessor entities are referred to herein collectively as

"Refco."

                                    1.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____ OCT 2 4 2006



2.    At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, both directly and indirectly.

3.    At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.  Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2000 until in or about August 2004, when he left the company.

4.    At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that was controlled by PHILLIP R. BENNETT, the defendant, and at various times owned in whole or in part by BENNETT.  At all times relevant to this Indictment, RGHI held a substantial ownership interest in Refco.

## THE SCHEME TO DEFRAUD

5.    From at least as early as in or about the late 1990s, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, together with others known and unknown, sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets.  To that end, the defendants transferred losses from

2

Refco to a company controlled by BENNETT, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to distribute false and fraudulent financial statements to purchasers of Refco's securities.  This fraudulent scheme resulted in, among other things, the August 2004 leveraged buy- out of Refco by Thomas H. Lee Partners, financed in part by approximately $600 million in notes issued by Refco that were sold based on false financial statements, and the August 2005 initial public offering of stock ("IPO") in Refco, in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

<u>Sources Of The RGHI Receivable</u>

6.    During the 1990s, Refco extended credit to customers, allowing customers to trade securities and commodities in accounts held at Refco.  During this time, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of market losses in their Refco accounts. When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Rather than write off these losses on Refco's books, PHILLIP R. BENNETT, the defendant, caused these and other losses to be transferred to RGHI, with the result that Refco's books showed a large

3

receivable owed by RGHI.

**Hiding The Related Party Transactions And Indebtedness**

7.    Throughout the period covered by this Indictment, Refco's books were audited by an independent auditing firm on an annual basis, with a fiscal year-end on the last day of February. Among the items the auditing firm examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT, the defendant.  Refco and RGHI were related parties.

8.    Beginning in or about 1999, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, directed others known and unknown to hide the RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down the receivable from RGHI over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT.  BENNETT and, while he remained at Refco, TROSTEN, caused the RGHI receivable to be temporarily transferred to one or more customer accounts not affiliated with BENNETT at every fiscal year-end through the fiscal year-end on February 28, 2005.

9.    Beginning in or about 2004, BENNETT and TROSTEN directed others known and unknown to carry out similar series of transactions to hide the RGHI receivable over the end of each

4

quarter.

10.  For example, at the close of Refco's fiscal year ending in February 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, caused Refco to carry out the following transactions that temporarily moved all or part of the RGHI receivable to a Refco customer:

a.  On or about February 20, 2004, Refco Capital Markets, Ltd., a Bermuda corporation controlled by Refco, loaned a customer approximately $720 million.  The loan was to be repaid on March 4, 2004.

b.  On or about the same day, February 20, 2004, the customer loaned approximately $720 million to RGHI.  The repayment date was on or about March 4, 2004.  The loan agreement for this loan was executed by PHILLIP R. BENNETT on behalf of RGHI.  The interest rate on this loan was approximately 75 basis points higher than the interest rate on the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit.

c.  On or about the same date, PHILLIP R. BENNETT signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., assuring the customer that, should RGHI default on its approximately $720 million obligation to the customer, Refco Group, Ltd. would make the customer whole.

5

d.    The approximately $720 million loaned by the customer to RGHI on or about February 20, 2004 was used to pay down RGHI's debt to Refco. These loans were unwound on or about March 4, 2004, with the result that the approximately $720 million debt was again owed by RGHI to Refco on Refco's books.

### The 2004 Leveraged Buyout Transaction

11. In or about August 2004, Thomas H. Lee Partners, L.P. through an affiliate, purchased a majority interest in Refco for approximately $1.9 billion. That purchase was financed in part by the August 5, 2004 issuance of $600 million in notes by Refco.

12. Both Thomas H. Lee Partners, L.P., and the purchasers of the Refco bonds were provided audited financial statements that did not disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above.

### Continued Hiding Of The Related Party Transactions And Indebtedness

13. At the close of Refco's fiscal year ending in February 2005, PHILLIP R. BENNETT, the defendant, caused Refco to carry out the following transactions that temporarily moved all or part of the RGHI receivable to a Refco customer:

a.    On or about February 23, 2005, Refco Capital Markets, Ltd. loaned a customer approximately $345 million. The loan was to be repaid on or about March 8, 2005.

6

b.  On or about the same date, February 23, 2005, the customer loaned RGHI approximately $345 million.  The repayment date was on or about March 8, 2005.  The loan agreement for this loan was executed by PHILLIP R. BENNETT on behalf of RGHI.  The interest rate on this loan was approximately 75 basis points higher than the interest rate on the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit.

c.  On or about the same date, PHILLIP R. BENNETT signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., assuring the customer that, should RGHI default on its approximately $345 million obligation to the customer, Refco Group, Ltd. would make the customer whole.

d.  The approximately $345 million loaned by the customer to RGHI on or about February 23, 2005 was used to pay down RGHI's debt to Refco.  The loans were unwound on or about March 8, 2005, with the result that the approximately $345 million debt was again owed by RGHI to Refco on Refco's books.

14.  At the end of Refco's first quarter in 2005, three months before the planned initial public offering of Refco's common stock, PHILLIP R. BENNETT, the defendant, caused Refco to carry out the following transactions that temporarily moved all or part of the RGHI receivable to a Refco customer:

7

a.    On or about May 25, 2005, Refco Capital Markets, Ltd. loaned a customer approximately $450 million. The loan was to be repaid on or about June 6, 2005.

b.    On or about the same date, May 25, 2005, the customer loaned RGHI approximately $450 million. The repayment date was on or about June 6, 2005. The loan agreement for this loan was executed by PHILLIP R. BENNETT on behalf of RGHI. The interest rate on this loan was approximately 75 basis points higher than the interest rate on the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit.

c.    On or about the same date, PHILLIP R. BENNETT signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., assuring the customer that, should RGHI default on its approximately $450 million obligation to the customer, Refco Group, Ltd. would make the customer whole.

d.    The approximately $450 million loaned by the customer to RGHI on or about May 25, 2005 was used to pay down RGHI's debt to Refco. The loans were unwound on or about June 6, 2005, with the result that the approximately $450 million debt was again owed by RGHI to Refco on Refco's books.

### Refco's Public Filings And Publicly Traded Securities

15.    In 2005, Refco registered certain of its securities with the United States Securities and Exchange Commission ("SEC") and, with that registration, was required to

8

make certain additional public filings with the SEC.

16.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the notes originally issued in August 2004 for $600 million of notes registered under the Securities Act of 1933.  PHILLIP R. BENNETT, the defendant, signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.

17.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K.  PHILLIP R. BENNETT, the defendant, signed the annual report on or about July 19, 2005 in New York, New York.  BENNETT also signed two certifications regarding the annual report.  In those certifications, BENNETT attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of

9

the Company."

    18. On or about August 8, 2005, Refco filed an S-1 registration statement with the SEC in connection with its initial public offering of its common stock. PHILLIP R. BENNETT, the defendant, signed that registration statement on or about August 8, 2005, in New York, New York.

    19. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT, the defendant, each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

    20. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT, the defendant, each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005

by which RGHI temporarily paid down its debt to Refco, the
guaranties by Refco of the third party lenders' loans to RGHI,
and the subsequent re-assumption of the debt by RGHI, each of
which was a related party transaction required to be disclosed in
the public filings.

### Refco's August 2005 IPO

21.  On or about August 10, 2005, in reliance on, among
other things, Refco's public filings and the accompanying audited
financial statements, the public bought approximately $583
million of Refco's common stock.  PHILLIP R. BENNETT, the
defendant, directly and indirectly, sold Refco stock in the IPO
valued at more than $100 million, while retaining a substantial
ownership interest in Refco.  Following the initial public
offering, Refco's common stock was listed on the New York Stock
Exchange under ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

22.  In or about late August 2005, after the completion
of Refco's IPO, PHILLIP R. BENNETT, the defendant, caused Refco
to carry out the following transactions that temporarily moved
all or part of the RGHI receivable to a Refco customer:

a.  On or about August 26, 2005, Refco Capital
Markets, Ltd. loaned a customer approximately $420 million.  The
loan was to be repaid on or about September 6, 2005.

11

b.  On or about the same date, August 26, 2005, the customer loaned RGHI approximately $420 million.  The repayment date was on or about September 6, 2005.  The loan agreement for this loan was executed by PHILLIP R. BENNETT on behalf of RGHI.

c.  On or about the same date, PHILLIP R. BENNETT signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., assuring the customer that, should RGHI default on its approximately $420 million obligation to the customer, Refco Group, Ltd. would make the customer whole.

d.  The approximately $420 million loaned by the customer to RGHI on or about August 26, 2005 was used to pay down RGHI's debt to Refco.  The loans were unwound on or about September 6, 2005, with the result that the approximately $420 million debt was again owed by RGHI to Refco on Refco's books.

### Public Disclosure Of The Related Party Debt

23.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by PHILLIP R. BENNETT, the defendant, who repaid Refco approximately $430 million on or about October 10, 2005.

24.  On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity

12

controlled by Phillip R. Bennett, Chief Executive
Officer and Chairman of the Board of Directors, in
the amount of approximately $430 million. Mr.
Bennett today repaid the receivable in cash,
including all accrued interest. Based on the
results of the review to date, the Company
believes that the receivable was the result of the
assumption by an entity controlled by Mr. Bennett
of certain historical obligations owed by
unrelated third parties to the Company, which may
have been uncollectible. The Company believes that
all customer funds on deposit are unaffected by
these activities. Independent counsel and forensic
auditors have been retained to assist the Audit
Committee in an investigation of these matters.

25.  Following Refco's announcement of its discovery of
this related party receivable, the market price of Refco stock
plummeted, resulting in a loss of well more than $1 billion in
market capitalization.

26.  On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

27.  From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and
others known and unknown to the Grand Jury, unlawfully,
willfully, and knowingly did combine, conspire, confederate, and
agree together and with each other to commit offenses against the

13

United States, namely: (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act of 1933, in violation of Title 15, United States Code, Section 77x; and (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

28.   It was a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of

14

Federal Regulations, Section 240.10b-5, by: (a) employing

devices, schemes, and artifices to defraud; (b) making untrue

statements of material facts and omitting to state material facts

necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; and

(c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon a person,

in connection with the purchase and sale of notes and common

stock issued by Refco, all in violation of Title 15, United

States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

29.  It was further a part and object of the conspiracy

that PHILLIP R. BENNETT, the defendant, and others known and

unknown, unlawfully, willfully, and knowingly, in reports and

documents required to be filed with the SEC under the Exchange

Act, and the rules and regulations promulgated thereunder, would

and did make and cause to be made statements which were false and

misleading with respect to material facts, in violation of Title

15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

30.  It was further a part and object of the conspiracy

that PHILLIP R. BENNETT, the defendant, and others known and

unknown, unlawfully, willfully, and knowingly would and did make

and cause to be made, in a registration statement filed with the

SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

### Wire Fraud

31.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### MEANS AND METHODS OF THE CONSPIRACY

32.  Among the means and methods by which PHILLIP R. BENNETT, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

a.   PHILLIP R. BENNETT, the defendant, and his coconspirators transferred losses incurred by Refco to BENNETT's company, RGHI.

b.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, lied to Refco's auditors about the existence and size of related party debts and transactions between RGHI and Refco.

c.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

d.    PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

e.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

## OVERT ACTS

33.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to

17

Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

b. On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $720 million loan from a Refco customer to RGHI.

c. On or about April 27, 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d. On or about August 5, 2004, PHILLIP R. BENNETT caused RGHI to transfer to ROBERT C. TROSTEN approximately $48 million.

e. On or about February 23, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $345 million loan from a Refco customer to RGHI.

f. On or about April 6, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4 registration statement.

g. On or about May 25, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter

18

on behalf of Refco Group Ltd., LLC. regarding an approximately $450 million loan from a Refco customer to RGHI.

   h.   On or about July 19, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's annual report on Form 10K.

   i.   On or about August 8, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1 registration statement.

   (Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

34.  The allegations contained in paragraphs 1 through 26, 32, and 33 of this Indictment are repeated and realleged as if fully set forth herein.

35.  From in or about the mid-1990s up to in or about 2004, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

19

(a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

36. The allegations contained in paragraphs 1 through 26, 32, and 33 of this Indictment are repeated and realleged as if fully set forth herein.

37. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities,

20

manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

> (Title 15, United States Code, Sections 78j(b) and 78ff; Title
> 17, Code of Federal Regulations, Section 240.10b-5; and
> Title 18, United States Code, Section 2).

## COUNT FOUR

(False Filing With The SEC - Exchange Act)

The Grand Jury further charges:

38.  The allegations contained in paragraphs 1 through
26, 32, and 33 of this Indictment are repeated and realleged as
if fully set forth herein.

39.  On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused
to be made statements in a report and document required to be
filed with the SEC under the Exchange Act, and the rules and
regulations promulgated thereunder, which statements were false

21

and misleading with respect to material facts, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's Form 10-K.

(Title 15, United States Code, Sections 78o(d) and 78ff; Title 17, Code of Federal Regulations, Section 240.15d-2; and Title 18, United States Code, Section 2.)

### COUNTS FIVE AND SIX

(False Filing With The SEC – Securities Act)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 26, 32, and 33 of this Indictment are repeated and realleged as if fully set forth herein.

41.   On or about the dates specified below, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., the following Forms:

| COUNT | APPROXIMATE DATE | FORM |
|-------|------------------|------|
| FIVE  | April 6, 2005    | S-4  |

22

| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x; and Title 18, United States Code, Section 2.)

## COUNTS SEVEN THROUGH ELEVEN

(Wire Fraud)

The Grand Jury further charges:

42.   The allegations contained in paragraphs 1 through 26, 32, and 33 of this Indictment are repeated and realleged as if fully set forth herein.

43.   On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

| COUNT | DEFENDANT | APPROXIMATE DATE | WIRE COMMUNICATION |
|-------|-----------|------------------|--------------------|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |

23

| COUNT | DEFENDANT | APPROXIMATE DATE | WIRE COMMUNICATION |
|---|---|---|---|
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## FORFEITURE ALLEGATION

44.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five and Six; and wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine, Ten and Eleven of this Indictment, PHILLIP R. BENNETT, the defendant, and ROBERT C. TROSTEN, the defendant (as

24

to the acts alleged in Counts One, Two, Seven and Eight) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following:

a. At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, including but not limited to:

1. The contents of Account No. ████6752, in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

2. The contents of Account No. ████2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

3. The contents of Account No. ████5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

4. All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc.

25

(approximately $974,533.91);

     5.   The contents of Account No. ████0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

     6.   The contents of Account No. ██████0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

     7.   The contents of Account No. ████7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

     8.   The contents of Account. No. ██████10-19, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $30,024,148.66);

     9.   The contents of Account No. ██████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

     10.   The contents of Account No. ██████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

     11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

     12. Any and all right, title and interest in the real property and appurtenances known as ██████████,

26

Sarasota, Florida 34236; and

13.  A sum of at least $2,800,000.00 from Account

Nos. ███4805 and ███0709, in the name of Phillip R.

Bennett, held at Commerce Bank, Mount Laurel, New Jersey; and

14.  The contents of Account No., in the name of

Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New

Jersey (approximately $2,501,825.24).

### Substitute Assets Provision

b.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of

due diligence;

(ii)  has been transferred or sold to, or

deposited with, a third party;

(iii)  has been placed beyond the

jurisdiction of the court;

(iv)  has been substantially diminished in

value; or

(v)  has been commingled with other property

which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendants up to the value of the

forfeitable property described above including but not limited to

27

the following:

      1.  Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

      2.  Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ██████ ████████, New York, New York 10028; and

      3.  Any and all right, title and interest in the real property and appurtenances known as ███████████████ ██████, Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 1343 and Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2; Title 21, United States, Section 853(p); Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### PHILLIP R. BENNETT,
### ROBERT C. TROSTEN,

**Defendants.**

### INDICTMENT

S1 05 Cr. 1192 (NRB)

18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

*Roy E Feldman*

Foreperson.

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
                                  :
UNITED STATES OF AMERICA          :
                                  :
        -v-                       :
                                  :
PHILLIP R. BENNETT,               :
ROBERT C. TROSTEN and             :
TONE N. GRANT,                    :
                                  :
            Defendants.           :
                                  :
----------------------------------x

**REDACTED**

<u>INDICTMENT</u>

S3 05 Cr. 1192 (NRB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
D....FILED: 1-16-07

<u>COUNT ONE</u>

(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)

The Grand Jury charges:

<u>RELEVANT ENTITIES AND PERSONS</u>

1.    At certain times relevant to this Indictment,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

PLAINTIFF'S
EXHIBIT
J

2.    At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco. At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.    At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco. Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.    At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco. From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco. At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.    At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft, ("BAWAG"), was the fourth largest bank in Austria. BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB). At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.   At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

### THE SCHEME TO DEFRAUD

7.   From at least as early as in or about the mid 1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the mid 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners. To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

8.   In furtherance of this scheme, PHILLIP R. BENNETT,

3

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC"). The scheme included obtaining, through fraud, the following: lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57% of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9.    In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N. GRANT and one other partner. As of early 1997, RGHI owed Refco at least approximately $106 million. Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business. In response to these losses, at various times between in or about May 1997 and in or about October 2005, BENNETT and

4

his coconspirators, including TONE N. GRANT and ROBERT C. TROSTEN, moved losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners. This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion. The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

    10.  As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco. In the later 1990s, certain

Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco. When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts. Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million. These customer losses included the following:

### Asian Debt Crisis Customers

11. In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis. When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business. By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

12. In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME"). When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call

6

from the CME, using the proceeds of an intra day loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the intra day loan.

13. Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses. In addition, BENNETT, GRANT and ROBERT C. TROSTEN significantly misrepresented the size of the loss to Refco's auditors.

14. PHILLIP R. BENNETT and TONE N. GRANT, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1 from the trading losses to be transferred to become a debt from RGHI to Refco.

*Proprietary Trading Losses*

15. In the late 1990s, Refco also incurred substantial losses from proprietary trades, or trades carried out on its own behalf. For example, in or about 1998, Refco suffered a loss of at least approximately $40 million on its investment in Russian

7

bonds after the Russian Government defaulted on its obligations. PHILLIP R. BENNETT, so as to avoid having to acknowledge this loss on Refco's books, caused Refco to inflate the value of the bonds in Refco's books and records to hide the full magnitude of the loss. Eventually, BENNETT caused those losses to be transferred to RGHI, so that they appeared as a debt from RGHI to Refco.

### *Refco Expenses Moved To RGHI*

16. Beginning at least as early as 1999, PHILLIP R. BENNETT and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI. For example:

a. From at least as early as February 1999, and continuing until at least in or about February 2002, BENNETT and others caused a total of approximately $46.3 million of computer systems expenses incurred by Refco to be transferred to RGHI, in the following years in the following amounts:

8

| Fiscal Year End | Amount Transferred to RGHI |
|---|---|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,895,030.92 |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17. The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

9

<u>Refco's Losses Funded By Use Of Customer Funds</u>

18.  Starting at least in or about 1997, PHILLIP R.
BENNETT and TONE N. GRANT caused Refco to use customer funds to
cover its losses.  As a result, Refco was perpetually short of
cash, and was often unable to cover settlement of its customers'
transactions.  Accordingly, BENNETT, GRANT and others caused
Refco to systematically fail to meet settlement on its customer
transactions, often on a daily basis, in amounts that exceeded,
at times, $100 million a day.  BENNETT, GRANT and others then
caused Refco to repeatedly misrepresent to the financial
institutions to whom Refco owed money to settle Refco's
customers' transactions that its failure to make settlement was
an error, when in fact Refco purposefully selected, on a rotating
basis, institutions with whom it would fail to make settlement,
and attempted to stagger its failures to make settlement with
each institution so as not to arouse suspicion from the
institutions that Refco was in fact unable to fulfill its daily
settlement obligations.

<u>BAWAG Invests In Refco</u>

19.  By the end of 1998, Refco was in a precarious
financial condition, in light of the significant customer and
proprietary trading losses it had absorbed and the resulting
daily failure to make settlement on customer transactions.  In
order to address that problem, in or about late 1998, PHILLIP R.

10

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria. In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

### Hiding The RGHI Receivable

20. Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February. Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT. Refco and RGHI were related parties.

21. Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

11

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end. BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004. BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
| --- | --- |
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

12

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard patterns.  For example, in or about February 2000, PHILLIP R. BENNETT caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i).    On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million. The loan was to be repaid on March 9, 2000.

(ii).    On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000. The loan agreement for this loan was executed by BENNETT on behalf of RGHI. The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).    On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.    At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

15

### Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes.  These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.  In particular, BENNETT and TROSTEN caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and

16

obtained credit from banks and other financial institutions,
including a revolving line of credit from a number of financial
institutions, including JP Morgan Chase, beginning in or about
1998, that eventually grew to more than $300 million. For each
such transaction, including the annual renewal of the revolving
line of credit, Refco submitted to the proposed creditor the
fraudulent financial statements and made other false statements
which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28. Between 2000 and 2005, while BAWAG assisted
PHILLIP R. BENNETT in hiding the RGHI receivable in the manner
described above, BENNETT caused Refco to assist BAWAG in hiding
its own balance sheet problem. In or about early 2000, BAWAG
entrusted approximately €350 million of BAWAG's funds to an
investment advisor, who by the end of 2000 reported to the bank
that he had lost substantially all of those funds. In order to
disguise this loss on its balance sheet, BAWAG arranged through
BENNETT to hold in an account at Refco certain worthless bonds
and other investments that Refco, at BENNETT's direction,
maintained at a false value that, over time, reached at least
approximately €500 million. These fake assets were purportedly
housed at Refco and maintained at an inflated value for BAWAG's
benefit until 2005.

17

## BAWAG Invests Further In Refco

29.   In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

## BENNETT's "Exit Strategy" Develops

30.   In or about 2003, PHILLIP R. BENNETT caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.  BENNETT asked CSFB to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, BENNETT directed CSFB to look for other purchasers for the company, with the understanding that it would be taken public.

31.   In connection with PHILLIP R. BENNETT's plan to sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by BENNETT and others to disguise the ongoing operational problems at the company.

32.   For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI. In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33. In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

34. In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

19

35.    As a precursor to this transaction, PHILLIP R. BENNETT purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by BENNETT in a future sale of BENNETT's interest in Refco.  As a result of their agreement, GRANT was no longer responsible for RGHI's debt to Refco, which as of February 2004 totaled more than approximately $1 billion, and BENNETT controlled all of RGHI immediately prior to the sale to the Lee entities.

*Lies To Thomas H. Lee Partners*

36.    In connection with the leveraged buyout transaction, on or about July 9, 2004, PHILLIP R. BENNETT executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior fiscal year, BENNETT owned a substantial interest in RGHI, which had engaged in transactions worth more than $1.5 billion during the year-end cover-up transactions with Refco, and which owed Refco more than $1 billion as of late February 2004.

37.    In connection with the leveraged buyout transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed an officer's questionnaire in which he falsely certified, among

20

other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the Offering Circular provided to you or which you believe may be inaccurately stated therein," even though TROSTEN knew that the related party and expense shifting transactions had not been disclosed in the offering documents related to the transaction.

38. In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners. Those audited financial statements were false and misleading in the following respects, among others:

a. The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b. The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

39. In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

21

falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

*Lies To The Note Purchasers*

40.  In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.  Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.  BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.  BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

*Lies To The Bank Syndicate*

41.  In connection with the leveraged buyout

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

        a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

        b.    BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

        c.    BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

        42.    The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

23

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43. In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout. In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG. At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44. In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

### BENNETT Plans To Take Refco Public

45.  After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46.  Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances:  At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

25