47.  Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.  On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.  On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.  On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

26

result of the transactions.  The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. PHILLIP R. BENNETT signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

50.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for

the year ended February 28, 2005 on Form 10K. PHILLIP R. BENNETT signed the annual report on or about July 19, 2005 in New York, New York. BENNETT also signed two certifications regarding the annual report. In those certifications, BENNETT attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company." As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

51. On or about August 8, 2005, Refco filed an S-1 registration statement with the SEC in connection with its initial public offering of common stock. PHILLIP R. BENNETT signed that registration statement on or about August 8, 2005, in New York, New York.

52. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or

28

indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

53. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54. On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock. PHILLIP R. BENNETT, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in

29

Refco. Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

55. In or about late August 2005, after the completion of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer. After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were unwound.

### Public Disclosure Of The Related Party Debt

56. In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by PHILLIP R. BENNETT, who repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

57. On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

30

believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

58. Following Refco's announcement of its discovery of this related party receivable, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

59. On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York. Refco's common stock was subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

60. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely: (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and

31

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b)
to make and cause to be made false and misleading statements of
material fact in reports and documents required to be filed with
the SEC under the Securities Exchange Act of 1934, and the rules
and regulations promulgated thereunder, in violation of Title 15,
United States Code, Sections 78o(d) and 78ff; (c) to make and
cause to be made false statements in a registration statement
filed under the Securities Act of 1933, in violation of Title 15,
United States Code, Section 77x; (d) to commit wire fraud, in
violation of Section 1343 of Title 18, United States Code; (e) to
make and cause to be made false statements and omissions to
Refco's auditors, in violation of Title 15, United States Code,
Sections 78m and 78ff; Title 17, Code of Federal Regulations,
Section 240.13b2-2; (f) to commit bank fraud, in violation of
Section 1344 of Title 18, United States Code; and (g) to commit
money laundering, in violation of Section 1957(a) of Title 18,
United States Code, Section 1957.

### OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly, by the use of the means and instrumentalities of
interstate commerce, the mails, and facilities of national

32

securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

62.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

33

**False Statements In SEC Filings – Securities Act**

63.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

**Wire Fraud**

64.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

**Material Misstatements To Auditors**

65.  It was further a part and object of the conspiracy

34

that PHILLIP R. BENNETT, the defendant, being an officer and
director of Refco, an issuer obligated to file reports pursuant
to section 15(d) of the Securities and Exchange Act of 1934 and
subsequently with a class of securities registered pursuant to
section 12 of the Securities Exchange Act of 1934, unlawfully,
willfully and knowingly, directly and indirectly, (a) made and
caused to be made materially false and misleading statements; and
(b) omitted to state, and caused others to omit to state,
material facts necessary in order to make statements made, in
light of the circumstances under which they were made, not
misleading to accountants in connection with (i) audits, reviews
and examinations of the financial statements of Refco required to
be filed under the Securities and Exchange Act of 1934; and (ii)
the preparation and filing of documents and reports required to
be filed with the SEC pursuant to rules and regulations
promulgated by the SEC.

### Bank Fraud

66.  It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, unlawfully, willfully and knowingly, would and
did execute, and attempt to execute, a scheme and artifice to
defraud a financial institution, to wit, HSBC, and to obtain
moneys, funds, credits, assets, securities and other property
owned by, and under the custody and control of, a financial

35

institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

## Money Laundering

67.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

68.  Among the means and methods by which PHILLIP R. BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.    PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public the size of customer losses for which Refco was responsible.

b.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

c.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

d.    PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

e.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators, made and caused to be made material false statements and omissions to Refco's auditors.

f.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

37

## Overt Acts

69.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.   On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.   On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.   On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

38

approximately $720 million loan from a Refco customer to RGHI.

     e.  On or about April 27, 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

     f.  On or about May 17, 2004, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

     g.  On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to ROBERT C. TROSTEN, the defendant, approximately $48 million.

     h.  On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $4 million.

     i.  On or about August 8, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $12 million.

     j.  On or about February 23, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $345 million loan from a Refco customer to RGHI.

     k.  On or about April 6, 2005, in New York, New

39

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4 registration statement.

   l. On or about May 25, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $450 million loan from a Refco customer to RGHI.

   m. On or about July 19, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's annual report on Form 10K.

   n. On or about August 8, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1 registration statement.

   (Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

   The Grand Jury further charges:

   70. The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

   71. From in or about the mid-1990s up to in or about 2004, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce,

the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

73.  From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

### COUNT FOUR

(False Filing With The SEC - Exchange Act)

The Grand Jury further charges:

74. The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

75. On or about July 19, 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's Form 10-K.

> (Title 15, United States Code, Sections 78o(d) and 78ff; Title 17, Code of Federal Regulations, Section 240.15d-2; and Title 18, United States Code, Section 2.)

### COUNTS FIVE AND SIX

(False Filing With The SEC – Securities Act)

The Grand Jury further charges:

76.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

77.  On or about the dates specified below, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York,

43

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

<u>COUNTS SEVEN THROUGH THIRTEEN</u>

(Wire Fraud)

The Grand Jury further charges:

78.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

44

| Count | Defendant | Approximate Date | Wire Communication |
|---|---|---|---|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.  From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT, the defendant, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Securities and Exchange Act of 1934 and subsequently with a class of securities registered pursuant to section 12 of the Securities Exchange Act of 1934, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Securities and Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC.

(Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if

46

fully set forth herein.

83.  On or about August 5, 2004, in the Southern District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

### COUNTS SIXTEEN THROUGH TWENTY

(Money Laundering)

The Grand Jury further charges:

84.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

85.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

48

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOURTEEN

86.   As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six and Fourteen; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Two, Seven, and Eight), and TONE GRANT, the defendant (as to acts alleged in Counts One, Two, and Eleven) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following:

a.   At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendants are jointly and severally liable, including but not limited to:

1.   The contents of Account No. ██████6752,

49

in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

2.  The contents of Account No. ▆▆▆2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

3.  The contents of Account No. ▆▆▆5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

4.  All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc. (approximately $974,533.91);

5.  The contents of Account No. ▆▆▆0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

6.  The contents of Account No. ▆▆▆▆0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

7.  The contents of Account No. ▆▆▆7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

8.  The contents of Account. No. ▆▆▆ ▆▆▆10-19, in the name of Zahava R. Trosten, held at JP Morgan

50

Chase Bank, New York (approximately $30,024,148.66);

    9.  The contents of Account No. ██████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

    10.  The contents of Account No. ██████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

    11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

    12. Any and all right, title and interest in the real property and appurtenances known as ██████████, Sarasota, Florida 34236; and

    13.  A sum of at least $1,900,000.00 from Account Nos. █████4805 and █████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

    87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Fifteen, Seventeen, and Eighteen), and TONE GRANT, the defendant (as to acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

     a.   At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 in the forfeiture allegation above; and

     b.   At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 of the forfeiture allegation above.

<u>SUBSTITUTE ASSETS PROVISION</u>

     88.   If any of the above-described forfeitable

52

property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

1.  Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

2.  Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ██████ ████████, New York, New York 10028; and

3.  Any and all right, title and interest in the

53

real property and appurtenances known as 

 Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)


_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

54

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### PHILLIP R. BENNETT,
### ROBERT C. TROSTEN,
### TONE N. GRANT

**Defendants.**

### INDICTMENT

S3 05 Cr. 1192 (NRB)

(18 USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff; 17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Foreperson.

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                              :

UNITED STATES OF AMERICA        :
                              :

     -v-                    :
                              :   S3 05 Cr. 1192 (NRB)

PHILLIP R. BENNETT,           :
ROBERT C. TROSTEN, and      :
TONE N. GRANT,              :
                              :

            Defendants.    :
                              :

------------------------------------x


### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GRANT'S MOTION FOR A SEVERANCE


MICHAEL J. GARCIA,

United States Attorney for the
Southern District of New York,
Attorney for the United States
of America

David C. Esseks
Neil M. Barofsky
Assistant United States Attorneys,

    - Of Counsel -


PLAINTIFF'S
EXHIBIT

## TABLE OF CONTENTS

I. BACKGROUND. . . . . . . . . . . . . . . . . . . 2

A. The Indictment. . . . . . . . . . . . . . . . . 2

B. Grant's Role in the Fraud. . . . . . . . . . . .6

C. The Current Motion.. . . . . . . . . . . . . . .9


II. ARGUMENT. . . . . . . . . . . . . . . . . . . 10

A. Applicable Law. . . . . . . . . . . . . . . . .10

B. Discussion. . . . . . . . . . . . . . . . . . .13

        1. Prejudicial Spillover. . . . . . . . . . .13

        2. Antagonistic Defenses. . . . . . . . . . .21

        3. Evidence Regarding Bennett's Statements to Maggio. .26

Conclusion. . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

**Cases**                                                      Page

<u>Bruton</u> v. <u>United States</u>, 391 U.S. 123 (1968) . . . . .  12

<u>Richardson</u> v. <u>Marsh</u>, 481 U.S. 200 (1987) . . . . . . .  11

<u>Zafiro</u> v. <u>United States</u>, 506 U.S. 534 (1993) . . . . .  10

<u>United States</u> v. <u>Aloi</u>, 511 F.2d 585
  (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . .16

<u>United States</u> v. <u>Aulicino</u>, 44 F.3d 1102
  (2d Cir. 1995). . . . . . . . . . . . . . . . . . 13, 25

<u>United States</u> v. <u>Bari</u>, 750 F.2d 116
  (2d Cir. 1984). . . . . . . . . . . . . . . . . . . 14

<u>United States</u> v. <u>Beverly</u>, 5 F.3d 633
  (2d Cir. 1993). . . . . . . . . . . . . . . . . . . 12

<u>United States</u> v. <u>Burke</u>, 7000 F.2d 70
  (2d Cir. 1983). . . . . . . . . . . . . . . . . . . 13

<u>United States</u> v. <u>Cardascia</u>, 951 F.2d 474
  (2d Cir. 1991). . . . . . . . . . . . . . . 11, 13, 24

<u>United States</u> v. <u>Carson</u>, 702 F.2d 351
  (2d. Cir. 1983) . . . . . . . . . . . . . . . . . 16

<u>United States</u> v. <u>Casamento</u>, 887 F.2d 1141
  (2d Cir. 1989). . . . . . . . . . . . . . . . . 13, 24

<u>United States</u> v. <u>Columbo</u>, 418 F. Supp. 2d 385
  (S.D.N.Y. 2005). . . . . . . . . . . . . . . . .11, 17

<u>United States</u> v. <u>Darden</u>, 70 F. 3d 1507
  (8th Cir. 1995). . . . . . . . . . . . . . . . . 28

–ii–

TABLE OF AUTHORITIES        (Continued)

Cases                                                        Page

United States v. DeVillio, 983 F.2d 1185
   (2d Cir. 1993) . . . . . . . . . . . . . . . . . .    18

United States v. Flemmi, 402 F.3d 79
   (1st Cir. 2005) . . . . . . . . . . . . . . . . . .   28

United States v. Friedman, 854 F.2d 535
   (2d Cir. 1988) . . . . . . . . . . . . . . . . . .    12

United States v. Fevrer, 333 F.3d 110
   (2d Cir. 2003) . . . . . . . . . . . . . . . . . .    12

United States v. Gallo, 668 F. Supp. 736
   (E.D.N.Y. 1987) . . . . . . . . . . . . . . . . .     20

United States v. Gilbert, 504 F. Supp. 565
   (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . .     20

United States v. Harwood, 998 F.2d 91
   (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 12, 22

United States v. Haynes, 16 F.3d 29
   (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 22

United States v. Hernandez, 85 F.3d 1023
   (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 17

United States v. Jefferson, 215 F.3d 820
   (8th Cir. 2000) . . . . . . . . . . . . . . . . . . 28

United States v. Kelley, 349 F.2d 720
   (2d Cir. 1965) . . . . . . . . . . . . . . . . . . 19

United States v. LsSanta, 978 F.2d 1300,
   (2d Cir. 1992) . . . . . . . . . . . . . . . . . . 13

–iii–

**TABLE OF AUTHORITIES**    (Continued)

Cases                                                                 Page

United States v. Lanza, 790 F.2d 1015
  (2d Cir. 1986) . . . . . . . . . . . . . . . . . 12

United States v. Locasio, 6 F.3d 924
  (2d Cir. 1993). . . . . . . . . . . . . . . . . 16

United States v. Mason, 2007 WL 541653
  (S.D.N.Y. Feb. 16. 2007). . . . . . . . . . . . 17

United States v. Muscarella, 2004 WL 2186561
  (S.D.N.Y. Sept. 28, 2004). . . . . . . . . . . 11, 14, 15

United States v. Neresian, 824 F.2d 1294
  (2d Cir. 1987). . . . . . . . . . . . . . . . . 13

United States v. Panza, 750 F.2d 1141
  (2d Cir. 1984). . . . . . . . . . . . . . . . . 12

United States v. Romero, 54 F.3d 56
  (2d Cir. 1995). . . . . . . . . . . . . . . . . 17

United States v. Rosa 11 F.3d 315
  (2d Cir. 1993). . . . . . . . . . . . . . . . . 10, 13, 18

United States v. Salameh, 152 F.3d 88
  (2d Cir. 1998). . . . . . . . . . . . . . . . . 11

United States v. Thai, 29 F.3d 785
  (2d Cir. 1994). . . . . . . . . . . . . . . . . 27

United States v. Torres, 901 F.2d 205
  (2d Cir. 1990). . . . . . . . . . . . . . . . . 13

<u>TABLE OF AUTHORITIES</u>    (Continued)

Cases                                                                    Page

<u>United States</u> v. <u>Rahme</u>, 813 F.2d 31
   (2d Cir. 1987). . . . . . . . . . . . . . . . . 28

<u>United States</u> v. <u>Rivera</u>, 22 F.3d 430
   (2d Cir. 1994). . . . . . . . . . . . . . . . . 28

<u>United States</u> v. <u>Rucker</u>, 586 F.2d 899
   (2d Cir. 1978). . . . . . . . . . . . . . . . 14

<u>United States</u> v. <u>Simmons</u>, 923 F.2d 934
   (2d Cir. 1991). . . . . . . . . . . . . . . . . 28

<u>United States</u> v. <u>Tracy</u>, 12 F.3d 1186
   (2d Cir. 1993). . . . . . . . . . . . . . . . 13

<u>United States</u> v. <u>Turoff</u>, 853 F.2d 1037
   (2d. Cir. 1988). . . . . . . . . . . . . . . . 11

<u>United States</u> v. <u>Victor Teicher & Co. LLP</u>,
   726 F. Supp. 1424 (S.D.N.Y. 1989). . . . . . . . . 21

<u>United States</u> v. <u>Villegas</u>, 899 F.2d 132
   (2d Cir. 1991). . . . . . . . . . . . . . . . 14

<u>United States</u> v. <u>Upton</u>, 856 F. Supp. 727
   (E.D.N.Y. 1994). . . . . . . . . . . . . . . . 20

<u>United States</u> v. <u>Zafiro</u>, 945 F.2d 881,
   (7th Cir. 1991). . . . . . . . . . . . . . . . 11, 15


**Statutes, Rules and Other Authorities**

Fed. R. Evid. 801 (d) (2) (E). . . . . . . . . . . . 14

Leonard B. Sand et al. Modern Federal Jury
Instructions ¶ 19-9 (1997). . . . . . . . . . . . 13

–vi–

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :
    -v-                             :
                                    :  S3 05 Cr. 1192 (NRB)
PHILLIP R. BENNETT,                 :
ROBERT C. TROSTEN,  and             :
TONE N. GRANT,                      :
                                    :
              Defendants.           :
                                    :
------------------------------------x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GRANT'S MOTION FOR A SEVERANCE

Through a series of mischaracterizations of positions taken by the Government, and a distorted version of the anticipated proof at trial, defendant Tone N. Grant seeks severance from his codefendants on the grounds that: (1) he would be prejudiced by the differing levels of proof due to his alleged "minor role" in the offense; (2) he and one of his codefendants would present antagonistic defenses; and (3) certain prejudicial evidence would be admitted at a joint trial that would otherwise be inadmissible against him.  Grant's arguments have little support in either fact or law.  Indeed, as set forth below, far from being the exiled minor participant described in his brief, the evidence will show that Grant had full knowledge and was a willing participant in the fraud from its very beginnings, and stood to reap benefits on par with or greater than those of his

codefendants had the fraud been successful.  As a result, there is precious little evidence that will be introduced at a joint trial that would not be admissible against Grant in a trial against only him.  Second, Grant's antagonistic defense theory is simply not availing -- not only is his professed defense fall far short of the exacting standard for a severance based on antagonistic defenses, it is largely inadmissible.  Finally, his evidentiary argument (e.g., that certain evidence would only be admissibie in a joint trial) is without merit, and, as discussed below, in the unlikely event that the Court found that the proffered evidence was inadmissible against Grant, the Government would forego seeking its introduction at a joint trial.

## I. Background

### A.  The Indictment

On January 16, 2007, a third superseding indictment (hereinafter, "the Indictment") was returned by a Grand Jury sitting in this district, charging Grant, the former President and indirect partial owner of Refco, Phillip R. Bennett, Refco's former CEO and indirect partial owner, and Robert Trosten, Refco's former CFO, with securities fraud and related offenses.  In particular, the Indictment includes twenty counts against the defendants, of which Grant is charged in five, namely one count

-2-

of conspiracy to commit securities fraud, wire fraud, bank fraud, to make material misstatements to auditors, to make false filings with the SEC, and money laundering (Count One); one count of securities fraud in connection with $600 million in notes offered by Refco in August 2004 (Count Two); one count of wire fraud in connection with the scheme to defraud Thomas H. Lee Partners ("Lee"), who paid approximately $500 million as part of its leveraged buyout ("LBO") of Refco in August 2004 (Count Eleven); one count of bank fraud in connection with the $800 million in financing Refco raised in August 2004 as part of the LBO (Count 15); and one count of money laundering relating to Grant's receipt of approximately $4 million in proceeds of the charged frauds (Count 19). While the Indictment spans from the mid 1990s to October 2005 and charges multiple crimes, Grant and his codefendants are charged with the single core fraud described in the conspiracy count: disguising the true financial state of Refco by (1) hiding its losses and ever-growing related party debt owed to Refco by Bennett and Grant's company, Refco Group Holdings, Inc. ("RGHI"), and (2) padding Refco's revenues and hiding its expenses so that the company would appear to be more profitable than it was, all for the purpose of enriching Refco's owners, Grant and Bennett. As described in the Indictment:

-3-

7.    From at least as early as in or about the mid
1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE
N. GRANT, the defendants, together with others known
and unknown, schemed to hide the true financial health
of Refco from its banks, counterparties, auditors, and
investors.  Starting at least as early as the mid
1990s, BENNETT and GRANT embarked on a strategy to mask
the true performance of Refco's business in order to
sell the company for their own benefit and that of
Refco's other owners.  To that end, over the ensuing
years, BENNETT, TROSTEN, GRANT and others known and
unknown systematically (1) covered up both Refco's own
losses and customer losses for which Refco became
responsible; (2) moved Refco operating expenses off the
company's books; and (3) padded Refco's revenues, all
in an effort to mislead Refco's banks, counterparties,
auditors and investors, with the goals of keeping Refco
in business and then selling it for the maximum benefit
to its owners and senior management.

8.    In furtherance of this scheme, PHILLIP R.
BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, and others
known and unknown made and caused Refco and others on
its behalf to make false and fraudulent statements to
Refco's banks, counterparties, customers, auditors, and
investors, and to create false audited financial
statements and false public filings with the United
States Securities and Exchange Commission ("SEC").  The
scheme included obtaining, through fraud, the
following:  lines of credit for Refco; the private sale
of notes prior to 2004; the sale of 57% of Refco to a
group headed by Thomas H. Lee Partners in 2004; the
sale of approximately $600 million of notes to the
public in 2004; approximately $800 million of bank
financing obtained in 2004; and the August 2005 initial
public offering of stock ("IPO") in Refco, Inc., in
which the public purchased approximately $583 million
of Refco common stock based on a false and fraudulent
registration statement.

-4-

(Indictment ¶¶ 7-8). The Indictment sets forth the early origins
of Refco's financial problems in the mid-1990's, setting forth
three different sources of the growing debt: losses from the
Asian Debt Crisis, those from a specific customer (Victor
Neiderhoffer, described in the Indictment as "Customer 1"), and
Refco's own proprietary trading losses. (Indictment ¶¶ 9-15,
33). In particular, the Indictment describes Grant's role in
deceiving the public as to losses incurred by Refco. The
Indictment also sets forth how Refco moved these losses to
related parties, including RGHI, so that they appeared on Refco's
books and records as a receivable, thus disguising their true
nature. (Id.). The Indictment further explains how the
defendants, with Grant's full knowledge and approval, shifted
certain Refco expenses off of Refco's books and onto the books of
RGHI, including, as an example, more than $46 million in computer
expenses (Indictment ¶¶ 16, 32), and covered these losses and
expenses by using customer funds (Indictment ¶ 18), soliciting
funding from the Austrian bank Bawag (Indictment ¶¶ 19, 29),
selling notes based on fraudulent financial information
(Indictment ¶ 26), and borrowing money from financial
institutions. (Indictment ¶ 27).

The Indictment also sets forth the mechanics of the fraud, including each of the year- and quarter-end loan transactions in which Refco, in order to deceive its auditors, temporarily moved the growing debt owed to Refco by RGHI off of its books and onto the books of willing customers and BAWAG (Indictment ¶¶ 20-24, 46, 55), lies told to auditors (Indictment ¶ 25); and lies told to each of the participants in the LBO.  (Indictment ¶¶ 36-42).

The Indictment further sets forth Bennett's efforts to take Refco public after the LBO (Indictment ¶¶ 46-47), Refco's fraudulent public filings (Indictment ¶¶ 48-53), details of Refco's IPO (Indictment ¶ 54), the eventual public disclosure of the related party debt, and the catastrophic result of that disclosure.  (Indictment ¶¶ 56-59).

**B.    Grant's Role In The Fraud**

Contrary to the assertions of counsel, the Government anticipates that the proof of trial will demonstrate that Grant was a key member of the fraud from its inception, and stood on par with Bennett to reap its benefits had the fraud not been detected.[1]

---

[1]    In his brief, Grant makes a series of wild assertions about the proof in this case, including various supposed "concessions" by the Government and the unsupported claim that before receiving certain handwritten notes produced by Grant of a meeting he had with Bennett, "the government was not considering

-6-

As set forth in the Indictment, Grant was part of the discussions in October 1997 when Refco suffered a more than $70 million loss resulting from the trading of Victor Neiderhoffer, and assisted Refco in covering up those losses by knowingly making false public announcements that Refco was not affected by the market collapse.  The proof will also demonstrate that Grant misrepresented to potential customers that Refco did not engage in proprietary trading, when in fact it had suffered significant losses from such trading.  The evidence will also show that Grant made misrepresentations to Refco's auditors, signing a representation letter that falsely claimed that Refco had fully disclosed its losses, when Refco had in fact moved $71 million of losses from Neiderhoffer's trading off of its books and onto those of a related party.  While Grant suggests in his brief that this was mere "puffery" (D. Br. 12), this is precisely the nature of the charged fraud -- lying to the public and its auditors in order to keep the firm afloat and make it attractive to potential purchasers and investors.

---

indicting Mr. Grant." (D. Br. 5).  This claim is both untrue and irrelevant to any issue before this Court.  Rather than rebut every single one of these mischaracterizations and misrepresentations, the Government simply sets forth below a brief summary of some of the evidence it anticipates it will develop at trial.

-7-

We expect that the evidence will further demonstrate that by February 1999,[2] prior to the close of Refco's fiscal year, Grant was fully briefed, in Refco's offices, on the core issues of the fraud: the round-trip loan transactions set forth in the Indictment; that Refco had covered up several of the large losses set forth in the Indictment; and that Refco had been moving expenses (including a large portion of its computer expenses) off of Refco's books and on to the parent company's books. The evidence will further show that Grant maintained an indirect ownership in Refco (through RGHI) from the inception of the fraud through August of 2004 that was never less than 24.5%, and was as high as 50%. Indeed, contrary to the defense assertion that Grant had been banished or exiled from Refco starting in late 1998, we expect the evidence to demonstrate that in the Summer of 1999, Grant's ownership interest in RGHI actually *increased*, from a minority 24.5% owner to a 50% partner with Bennett. During the interval between 1999 and 2004, the evidence will show that Grant continued to discuss with Sandy Maggio, a Refco executive, the

---

[2]    Grant claims in his brief that since he left the presidency of Refco in 1998, he was therefore a minor participant in the fraud. (D. Br. 2). Grant, of course, continued to have a significant ownership interest in Refco in the following years, and the LBO could not have occurred without his consent.

-8-

continuing financial problems at Refco, including continued rolling fails, where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors. (See Indictment ¶ 18).

The evidence at trial will further demonstrate that in May 2004, prior to the LBO, Bennett met with Grant for the purpose of fully discussing with him the structure of the LBO and how, through the LBO, Bennett and Grant were going to deal with the more than $1 billion debt that they (as owners of RGHI) owed to Refco. The evidence will also demonstrate that Lee insisted, as a condition of the LBO, that Grant's ownership interest be eliminated, and that the LBO would not have gone forward absent Grant's agreement to terminate his interest in RGHI. As a result, the evidence will demonstrate that Grant agreed to give up his 50% interest in RGHI in return for $16 million and 50% of the profits that would be reaped by Bennett (up to $275 million) in the event that Bennett sold his surviving interest in Refco.

C.    **The Current Motion**

Grant seeks severance from his codefendants, claiming prejudicial spillover and antagonistic defenses. Grant has failed to meet his burden on any of these grounds.

-9-

**II. ARGUMENT**

**A.    Applicable Law**

Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14.

"There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); accord United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993). The strong institutional concerns underlying this settled principle have been explained by the Supreme Court:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative

-10-

> culpability—advantages which sometimes
> operate to the defendant's benefit. Even
> apart from these tactical considerations,
> joint trials generally serve the interests of
> justice by avoiding the scandal and inequity
> of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987).

As this Court has further noted, "Joint trials frequently promote efficiency by conserving judicial resources, alleviating the burden on jurors, and avoiding repetition of witness testimony in multiple trials." United States v. Columbo, 418 F. Supp. 2d 385, 389 (S.D.N.Y. 2005). This presumption in favor of joint trials is particularly strong where the defendants to be jointly tried are alleged to have been members of the same conspiracy. United States v. Zafiro, 945 F.2d 881, 885 (7th Cir. 1991), aff'd, 506 U.S. 534 (1993). See also United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998); United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991); United States v. Turoff, 853 F.2d 1037, 1042 (2d Cir. 1988); United States v. Muscarella, 2004 WL 2186561, at *9 (S.D.N.Y. Sept. 28, 2004).

Under the Supreme Court's decision in Zafiro, a severance should be granted "only if there is a serious risk that a joint trial would [1] compromise a specific trial right of one of the defendants," 506 U.S. at 539, such as a right to cross-examine

-11-

witnesses, e.g., Bruton v. United States, 391 U.S. 123 (1968), or "[2] prevent the jury from making a reliable judgment about guilt or innocence," Zafiro, 506 U.S. at 539.

Indeed, the Court in Zafiro emphasized that severance is not required even where a defendant is able to demonstrate prejudice from a joint trial. Rather, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. at 539.  Courts thus look to see whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (citing United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984)).  The decision regarding what relief is warranted, if any, is thus committed to the sound discretion of the district court.  Zafiro, 506 U.S. at 539; accord United States v. Beverly, 5 F.3d 633, 637-38 (2d Cir. 1993); United States v. Harwood, 998 F.2d 91, 95 (2d Cir. 1993).  The district court's exercise of its broad discretion to grant or deny a severance is "'virtually unreviewable'" on appeal. United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988); accord United States v. Feyrer, 333 F.3d

-12-

110, 114 (2d Cir. 2003) (citations omitted); <u>United States</u> v.

<u>Cardascia</u>, 951 F.2d 474, 482-83 (2d Cir. 1991).[3]

B.    **Discussion**

    1.    **Prejudicial Spillover**

      Grant argues that if tried together with Bennett and

Trosten, he will be unfairly prejudiced by evidence that will be

admitted against them, but which would be inadmissible in a trial

against Grant alone.  As an initial matter, Grant is legally

mistaken.  As set forth above, nearly every piece of evidence

that will be introduced against Trosten and Bennett will also be

admissible against Grant, as evidence of the conspiracy charged

in Count One of the Indictment.  It is axiomatic that all acts

_____

[3]     Accordingly, a defendant challenging the denial of a
severance motion faces the "extremely difficult burden," <u>United
States</u> v. <u>Casamento</u>, 887 F.2d 1141, 1149 (2d Cir. 1989), of
showing that he was so prejudiced by the joinder that he was
denied a constitutionally fair trial. <u>United States</u> v. <u>Torres</u>,
901 F.2d 205, 230 (2d Cir. 1990); <u>United States</u> v. <u>Burke</u>, 700
F.2d 70, 83 (2d Cir. 1983).  It is not sufficient for a defendant
to show that he suffered some prejudice, or that he would have
had a better chance for acquittal at a separate trial. <u>Zafiro</u>,
506 U.S. at 540; <u>Torres</u>, 901 F.2d at 230; <u>Friedman</u>, 854 F.2d at
563.  Instead, the defendant must show that he suffered prejudice
so substantial that a "miscarriage of justice" occurred.  <u>United
States</u> v. <u>Aulicino</u>, 44 F.3d 1102, 1117 (2d Cir. 1995); <u>accord
United States</u> v. <u>Rosa</u>, 11 F.3d 315, 341 (2d Cir. 1993); <u>United
States</u> v. <u>Tracy</u>, 12 F.3d 1186, 1194 (2d Cir. 1993); <u>United States</u>
v. <u>Lasanta</u>, 978 F.2d 1300, 1306 (2d Cir. 1992).

and statements committed by one coconspirator in furtherance of
the conspiracy are properly admissible against all members of the
conspiracy. See, e.g., United States v. Bari, 750 F.2d 1169, 1178
(2d Cir. 1984); 1 L. Sand, Modern Federal Jury Instructions,
Instr. 19-9 (1997); see also Fed. R. Evid. 801(d)(2)(E); see
United States v. Neresian, 824 F.2d 1294, 1304 (2d Cir. 1987)
(where there is sufficient evidence to show the existence of a
conspiracy, the government is "entitled to show the entire range
of evidence of the conspiracy against each [defendant]").  Hence,
even if Grant is tried alone, the acts and statements of Trosten
and Bennett in furtherance of the conspiracy would properly be
admissible against him.  See United States v. Villegas, 899 F.2d
1324, 1347 (2d Cir. 1991) (finding no prejudicial spillover where
"all of the evidence as to each of the other defendants' acts in
furtherance of the conspiracy" would be "admitted at a single-
defendant trial because of the alleged conspiratorial nature of
the illegal activity"); Muscarella, 2004 WL 2186561, at *9 ("the
existence of a sizable common element of proof" supports a joint
trial).  Furthermore, even if there are some statements or facts
that are not admissible against Grant, this, standing alone, does
not entitle Grant to a separate trial. See United States v.
Rucker, 586 F.2d 899, 902 (2d Cir. 1978) ("The fact that evidence

-14-

may be admissible against one defendant but not against others
does not require separate trials."). The Court can easily
instruct the jury that certain evidence is admissible only
against a certain defendant, and that they are required to
evaluate separately the evidence against each defendant on each
charge, thereby curing any potential prejudice, as this Court has
recognized. See Zafiro, 506 U.S. at 541; Muscarella, 2004 WL
2186561, at *9 ("The potential for spillover prejudice, if any,
can be mitigated by jury instructions") (citing cases).

     To defeat this rule, Grant attempts to minimize his role in
the conspiracy. Far from being a tangential or peripheral member
of the scheme, the evidence will demonstrate that Grant was a
knowing and active participant from as early as 1997, had full
knowledge of the means used to hide Refco's losses as of at least
February 1999, and stood to reap a 50% share of the rewards of
the fraud if it were successful.  Between 1999 and 2004, while
Grant had no day-to-day role in running Refco, he was
intermittently briefed by Bennett and Santo Maggio, another Refco
executive, on the status of Refco's ongoing economic troubles,
including on the status of the massive debt from RGHI to Refco.
Finally, the evidence will show that in 2004, when Lee made it a
condition precedent of the LBO that Grant's interest in RGHI be

-15-

redeemed, Grant and Bennett met at a Marriott hotel to negotiate the terms of his sale of his interest in RGHI.  In that discussion, Bennett outlined for Grant in detail the size of the RGHI debt to Refco, which was not known to the LBO purchasers. Grant's stake in the fraud included a cash payout of $16 million and the right to half of the future proceeds of Bennett's sale of Refco stock, up to $275 million.  While Grant may have played a different role in the offense than Bennett or Trosten, he was no minor participant and the evidence against the other defendants will be admissible against him at a joint trial.

Of course, even if the Court were to accept Grant's self-serving description of his role as marginal, the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." United States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993); see United States v. Carson, 702 F.2d 351, 366-367 (2d Cir. 1983) (fact that defendant played a less prominent role in the conspiracy than many of his coconspirators was not a sufficient ground for a separate trial); United States v. Aloi, 511 F.2d 585, 598 (2d Cir. 1975) (individual trials are not warranted merely because of "differences in degree of guilt and possibly degree of notoriety

-16-

of defendants" and the "likelihood that proof admitted as to one
or more defendants will be harmful to others"). Moreover, to the
extent there might be some possibility of prejudicial "spillover"
of evidence concerning one defendant onto the other, it would be
insufficient grounds under these circumstances to sever the
trials, a fact that this Court has recognized on multiple
occasions. United States v. Mason, 2007 WL 541653, at * 7
(S.D.N.Y. Feb. 16, 2007) (rejecting severance argument for
prejudicial spillover where defendant spent seven years of the
charged conspiracy in prison, recognizing that differing levels
of proof are present "in any multidefendant trial") (internal
quotations and citations omitted); United States v. Columbo, 418
F. Supp. 2d 385, 389 (S.D.N.Y. 2005) ("differing levels of
culpability and proof are inevitable in any multi-defendant trial
and are insufficient grounds for separate trials") (internal
quotations and citations omitted). It has been repeatedly
recognized that any such potential prejudice can easily be cured
by instructions to the jury that they must consider separately
each individual defendant and each charge, and consider only the
evidence that has been admitted against each defendant. See
Zafiro, 506 U.S. at 540-41; United States v. Romero, 54 F.3d 56,
60 (2d Cir. 1995); United States v. Hernandez, 85 F.3d 1023,

-17-

1029-30 (2d Cir. 1996); see also United States v. Rosa, 11 F.3d
at 342 (despite evidence of violent acts, including murder,
committed by non-moving defendants, joinder was proper where
"[t]he trial court instructed the jury that it should consider
the evidence as to each count of the indictment separately and
advised it that the fact that it found any one defendant guilty
on a given count 'should not control your verdict as to any other
offenses charged"); United States v. DeVillio, 983 F.2d 1185 (2d
Cir. 1993) (upholding denial of severance motion where
appellants, who were charged in one burglary, moved to sever from
defendants charged with racketeering, racketeering conspiracy,
six other burglaries and an attempted murder; Court upheld
district court's denial of severance motion citing district
court's "explicit limiting instruction that testimony [concerning
violence] could not be used against" appellants).

Furthermore, although Grant argues that separate trials
would preserve judicial economy, the opposite is true. The core
events at issue (the lies to the public and auditors, the
shifting of losses and expenses to the parent company, the round-
trip loan transactions, the circumstance of the LBO, and the
circumstances of Bennett's meeting with Grant) all would be
proven at either trial. And even the other types of accounting

-18-

fraud in which Grant did not *directly* participate (such as
certain revenue enhancing transactions) are attributable to Grant
as a member of the conspiracy.   To hold two trials in this case
would necessarily require the Government to prove essentially the
exact same set of facts and transactions twice, which would
amount to an enormous waste of judicial (as well as Government)
resources, as this Court has recognized in similar factual
circumstances.  Mason, 2007 WL 541653, at * 7; see Muscarella,
2004 WL 2186561, at *10 (rejecting defense arguments that
judicial economy would be enhanced in separate trials when the
same core of facts would have to be proven in each case).

   Given the above-referenced facts, the cases relied upon by
Grant are inapposite.  For example, in the 42-year old United
States v. Kelley, 349 F.2d 720 (2d Cir. 1965), the Court looked
to the fact that there was no evidence presented whatsoever
against one of the defendants during the first three months of
the trial, and that post-conspiracy statements of other
defendants inculpating that same defendant were admitted with
only limited cautionary instructions.  Here, of course, the
entire trial will be significantly less than three months (the
Government anticipates that its case-in-chief will take between 4
and 6 weeks), the evidence against Grant will be woven throughout

-19-

the evidence, and there will no post-conspiracy statements from other defendants that implicate Grant. Similarly, in <u>United States</u> v. <u>Gilbert</u>, 504 F.Supp. 565 (S.D.N.Y. 1980), the severed defendants were on the periphery of the crime and were late arrivers to the conspiracy; in <u>United States</u> v. <u>Upton</u>, 856 F. Supp. 727, 736-37 (E.D.N.Y. 1994), the District Court found that there were essentially two different sets of defendants with two different sets of proof "involving different schemes, evidences and witnesses."; and in <u>United States</u> v. <u>Gallo</u>, 668 F. Supp. 736, 750 (E.D.N.Y. 1987), <u>aff'd</u> 863 F.2d 185 (2d Cir. 1988), a RICO prosecution against 14 defendants, several of the defendants where only subject to a minimal amount of evidence, were found to be "peripheral," were charged with discrete non-violent crimes (compared to the violent crimes of their codefendants) and were readily severed into component parts.

Obviously, the current facts are readily distinguishable. Grant was not on the periphery of the fraud, he was a founding member and had full knowledge of its methods by 1999. Similarly, unlike the severed defendants in the cases cited by counsel, Grant was a partial owner of Refco whose remaining interest in 2005 put him in a position to earn hundreds of millions of

-20-

dollars should the fraud have been successful.[4] Grant also
argues that the fact that he is only named in five of the twenty
counts of the Indictment warrants a severance.  But this
disparity in counts is not reflective of his role in the offense
or the proof admissible against him.  Notably, he is named with
Bennett in every one of the five counts, and with Trosten in
three of them.  Obviously, this is not a case, such as Upton or
the others cited above, where the case against Grant can be
neatly broken off.  See United States v. Victor Teicher & Co.
LLP, 726 F. Supp. 1424, 1439 (S.D.N.Y. 1989) (Judge Haight
denying severance motion and distinguishing facts from his prior
decision in Gilbert as well as Gallo where defendant, although
charged in fewer substantive counts than other defendants,
"directly conspired with the [other] defendants and with
furthering the goal of the conspiracy in significant respects"
and had not "joined the conspiracy late in the game and then
played a minor role in it").

   2.  **Antagonistic Defenses.**

   Grant next claims that a severance is required because his
defense will be antagonistic to Bennett's defense.  In

---

[4]    In the aftermath of the IPO, RGHI's interest in Refco was
worth approximately $1.3 Billion.

-21-

particular, Grant claims that his production of a particular document -- notes of his 2004 meeting with Bennett about the structure of the LBO -- to the SEC in response to a subpoena demonstrates his innocence, in that a guilty man, knowing the meaning of those notes, would have obstructed justice rather than produce them.  Whatever the merits of such an argument, it is not in tension with any defense by Bennett and provides no basis for a severance.

In light of the strong preference for joint trials, particularly in conspiracy cases, the Supreme Court held that "[m]utually antagonistic defenses are not prejudicial per se." Zafiro, 506 U.S. at 538.  The mere fact that the defenses of two defendants may be antagonistic or conflicting does not establish prejudice sufficient to require a severance. Id. at 539-40; accord, United States v. Haynes, 16 F.3d 29, 32 (2d Cir. 1994); United States v. Beverly, 5 F.3d 633, 638 (2d Cir. 1993); United States v. Harwood, 998 F.2d 91, 95-96 (2d Cir. 1993).

The facts in Zafiro are instructive.  There, four defendants (Garcia, Soto, Martinez and Zafiro) were indicted and tried jointly for drug offenses.  Law enforcement agents had seized cocaine from a box and a suitcase inside an apartment, and two of the defendants sought a severance, arguing that their defenses

-22-

(namely that their co-defendants, but not they themselves) knew of the contents of the box and suitcase, were antagonistic and warranted severance. The Supreme Court affirmed their subsequent convictions after a joint trial, holding that "petitioners do not articulate any specific instances of prejudice." The Court rejected the defendants' theory that when two defendants claiming innocence accuse one another of having committed the charged crime, a jury will conclude that at least one of the two must be guilty without regard to whether the Government had proved its case beyond a reasonable doubt. The Court held that given the sufficiency of the Government's evidence against each of the defendants, it was not clear that the defendants had incurred any prejudice. Moreover, the Court noted, even if some risk of prejudice existed, the district court's instructions to the jury operated to cure "any possibility of prejudice." Id. at 541. [5]

Thus, courts have held that "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant

---

[5]     The Court noted that the district court instructed the jury that the Government had the burden of proving its case against each defendant beyond a reasonable doubt, and that the jury give separate consideration to each defendant and consider only the evidence against that defendant. Also, the district court instructed the jury that arguments are not evidence. Id.

-23-

conspiracy trials would ensue since coconspirators raise many different and conflicting defenses." <u>United States</u> v. <u>Cardascia</u>, 951 F.2d at 484. Mere "fingerpointing" by one defendant seeking to shift the blame to his co-defendant is not the sort of antagonism that commands a severance. <u>United States</u> v. <u>Casamento</u>, 887 F.2d at 1154.

Here, the proffered defense is simply not antagonistic. Grant contends that he would not have produced the notes of the Bennett meeting to the SEC if they meant what the Government will contend they mean - that Grant knew of the RGHI debt and that it was hidden from the LBO victims. Nothing about that argument implicates Bennett in any wrongdoing, and therefore it cannot provide a ground for severance.

Grant, however, argues that, in order to make out this defense, he must demonstrate his "belief, at the time that he turned over the two pages of notes to the government, that Mr. Bennett had pulled off, over the course of several years, a financial fraud of dizzying proportions." (D. Br. at 15). But the force of Grant's argument, to the extent it has any, comes from the notion that *if Grant were guilty,* he would not have produced the notes. The argument proposed by the defense, namely that *if Grant thought Bennett were guilty,* he would not have

-24-

produced the notes, makes no sense: the premise is whether Grant knew the meaning of the notes when he produced them, not whether he knew or believed that Bennett was guilty. Therefore, Grant may make full use of the fact that he produced these notes to the SEC in defending himself at a joint trial, and is not prejudiced by the joinder. His use of that defense will not affect Bennett, and therefore there is no basis for a severance here.

Moreover, Grant's belief in 2006 that Bennett was guilty is not relevant to any issue the jury must decide, and is therefore simply not admissible at trial. Even were the Court to find such evidence relevant in a joint trial, it would be properly precluded under Fed. R. Evid. 403 because of its minimal relevance and undue prejudice to Bennett. At best, evidence of Grant's beliefs about Bennett's guilt in 2006 is a point of such minor relevance that Grant would suffer no real prejudice from a joint trial where that notion was excluded, let alone a "miscarriage of justice." United States v. Aulicino, 44 F.3d 1102, 1117 (2d Cir. 1995).

Finally, even if Grant's defense is viewed as antagonistic, he has not identified any substantial prejudice that *he* would suffer as a result from a joint trial, and no "specific trial right" that will be compromised; nor has he made the requisite

-25-

showing that "the jury [will be prevented] from making a reliable judgment about his guilt or innocence." Zafiro, 506 U.S. at 539.

### 3.  Evidence Regarding Bennett's Statements To Maggio

Grant argues that he would be prejudiced in a joint trial because statements made by Bennett to Maggio regarding the conversations he had with Grant would not be admissible in a trial against Grant alone.  (D. Br. 16).  Grant is wrong.

At trial, the Government intends to introduce, as statements in furtherance of the conspiracy, testimony that Bennett told Santo Maggio, a coconspirator, about Bennett's discussions and meetings with Grant.  In substance, we expect that Maggio will testify that on several occasions prior to the May 2004 meeting between Grant and Bennett, Maggio expressed concern to Bennett about the increasingly dire financial circumstances at Refco.  In response, Bennett told Maggio, in substance and in part, that he was keeping Grant abreast of ths situation at Refco (including that the company's situation was not as reflected on its books), and that Maggio was not alone in that he, Grant and Bennet were /in it together.6  Bennett further stated, in substance, that if the fraud were to be discovered, Bennett told Grant that Bennett

---

6  Maggio will further testify that he also had conversations with Grant during which similar topics were discussed.

-26-

was not going to be alone (e.g., Grant would be responsible as
well).  Shortly prior to the May 2004 meeting, Bennett told
Maggio that he would be meeting Grant at a hotel, and after the
meeting, Bennett told Maggio that Grant was not being realistic
about the money that was coming out of the LBO.  After the LBO,
Bennett told Maggio that Bennett continued to let Grant know how
much of the related party debt remained at Refco.  These crucial
statements are plainly admissible against both Bennett and Grant,
as statements in furtherance of the conspiracy.    Fed. R. Crim.
P. 801(d)(2)(E).  These statements, told to one coconspirator to
keep him apprized of what was happening in the conspiracy, to
assure cohesiveness, and to reassure Maggio that Grant was fully
on board, are precisely the type of statements which courts
routinely permit to be introduced under Fed. R. Crim. P.
801(d)(2)(E).  Russo, 302 F.3d 37, 46 (2d Cir. 2002) (statement
furthered conspiracy to maintain organized crime syndicate by
"giving associated persons information about its membership");
Gigante, 166 F.3d 75, 82 (2d Cir. 1995) (statements between
coconspirators that "provide reassurance," or "serve to foster
trust and cohesiveness," or "inform each other as to the progress
or status of the conspiracy," further the conspiracy) (citation
omitted); United States v. Thai, 29 F.3d 785, 814 (2d Cir.

-27-

1994)("statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy, such as to promote[ ] cohesiveness")(internal quotations omitted); United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994) (statement is "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy."); United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991) (statements between coconspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (admitting statements "that apprise a coconspirator of the progress of the conspiracy,"). Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000)(quoting United States v. Darden, 70 F.3d 1507, 1529 (8th Cir. 1995)); see United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005)(stating same).

In any event, such an evidentiary issue is properly raised in a motion in limine. In the unlikely event that the Court

-28-

found that Maggio's testimony regarding his conversations with Bennett about Grant inadmissible against Grant, the remedy would not be severance, the Government would simply not seek to introduce the testimony at all.  Accordingly, this is not a justification for a severance.

### CONCLUSION

For the foregoing reasons, Grant's motion for a severance should be denied.

Dated:  New York, New York
        March 30, 2007

                    Respectfully submitted,

                    MICHAEL J. GARCIA,
                    United States Attorney

By: _____
                    David C. Esseks
                    Neil M. Barofsky
                    Assistant United States Attorneys
                    Telephone: (212) 637-2328/2333

-29-

<u>CERTIFICATE OF SERVICE</u>

NEIL M. BAROFSKY, deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York,

And that on March 30, 2007, he caused a copy of the attached Government's Memorandum of Law in Response In Opposition To Defendant Grant's Motion For A Severance, to be served, by ECF and First Class Mail on:

Christopher Morvillo, Esq.
Morvillo, Abramowitz, Grand, Iason, Bohrer & Anello, P.C.
565 Fifth Ave, New York, NY 10017

Darren LaVerne, Esq.
Kramer, Levin, Naftalis and Frankel
1177 Avenue of the Americas, New York, NY 10036

Aitan D. Goelman, Esq.
Zuckerman & Spaeder
1800 M Street NW
Washington, DC 20036

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       March 30, 2007

NEIL M. BAROFSKY