# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CONFIDENTIAL—PORTIONS OF
THIS DOCUMENT HAVE BEEN
REDACTED**

———————————————————

In re REFCO, INC. SECURITIES
LITIGATION

———————————————————

: MASTER FILE NO.
: 05 Civ. 8626 (GEL)
:
: JURY TRIAL DEMANDED
:
:
:
:

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
John P. Coffey  (JC-3832)
Salvatore J. Graziano (SG-6854)
John C. Browne (JB-0391)
Jeremy P. Robinson
David Webber (DW-3876)
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400
Facsimile:    (212) 554-1444

**GRANT & EISENHOFER  P.A.**
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
Jonathan D. Margolis (JM-1128)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501

- and -

Megan D. McIntyre
Jeff A. Almeida
Peter B. Andrews
Christine M. Mackintosh
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone:    (302) 622-7000
Facsimile:    (302) 622-7100

*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific
Investment Management Company LLC and Co-Lead Counsel for the Putative Class*

## TABLE OF CONTENTS

                                                                                        Page

I.      NATURE OF THE ACTION ................................................................................... 1

II.     JURISDICTION AND VENUE .............................................................................. 7

III.    PARTIES AND RELEVANT NON-PARTIES ....................................................... 8

        A.      Plaintiffs ...................................................................................................... 8

        B.      The Company ............................................................................................... 9

        C.      The Defendants ........................................................................................... 13

                1.      The Bennett Shell-Entity Defendants ........................................... 13

                2.      The Officer Defendants................................................................... 14

                3.      Defendant Trosten........................................................................... 18

                4.      Defendant Grant.............................................................................. 18

                5.      The Audit Committee Defendants .................................................. 19

                6.      The Defendants Affiliated with Thomas H. Lee Partners............. 20

                7.      Defendant Grant Thornton.............................................................. 23

                8.      The Underwriter Defendants........................................................... 24

                9.      The Mayer Brown Defendants........................................................ 31

IV.     CLASS ALLEGATIONS ...................................................................................... 33

V.      FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF
        UNDER THE SECURITIES ACT .......................................................................... 36

        A.      Historical Background Regarding the Company .................................... 36

        B.      Early Efforts to Sell the Company ......................................................... 40

        C.      The THL Partner Defendants' Investment and the 2004 Recapitalization ........... 41

        D.      The Bond Offering..................................................................................... 43

                1.      The Offering Memorandum ........................................................... 45

(a)    The Financial Statements in the Offering Memorandum
       Contained Untrue Statements of Material Facts ........................... 48

(b)    The Description of Customer Receivables and Related-Party
       Transactions in the Offering Memorandum Contained Untrue
       Statements and Omissions of Material Fact................................. 57

(c)    The Offering Memorandum Misrepresented the Reasons for
       the Company's Purported Success................................................ 59

(d)    The Offering Memorandum Misrepresented the Company's
       Ability to Access the Cash It Needed to Service Its Debt ............ 60

(e)    The Offering Memorandum Misrepresented That the Company
       Had Taken Adequate Steps to Protect Itself From the Risk of
       Customer Defaults ...................................................................... 62

(f)    The Offering Memorandum Misrepresented That the Company
       Maintained Excess Regulatory Capital ........................................ 64

(g)    The Offering Memorandum Failed to Disclose BAWAG's Full
       Ownership Interest in Refco Group ............................................ 65

2.     Presentations to Ratings Agencies............................................. 65

3.     The Bond Road Show ............................................................... 67

4.     The Bond Registration Statement .............................................. 69

E.  The August 2005 Initial Public Offering ............................................ 80

1.     The IPO Registration Statement ............................................... 82

(a)    The Financial Statements in the IPO Registration Statement
       Contained Untrue Statements of Material Facts ........................... 83

(b)    The Description of Customer Receivables and Related-Party
       Transactions in the IPO Registration Statement Contained Untrue
       Statements and Omissions of Material Fact................................. 92

(c)    The IPO Registration Statement Misrepresented That the
       Company Had Taken Adequate Steps to Protect Itself From the
       Risk of Customer Defaults........................................................... 95

(d)    The IPO Registration Statement Misrepresented That The
       Company Maintained Excess Regulatory Capital ........................ 96

(e)    The IPO Registration Statement Failed to Disclose BAWAG's
       Full Ownership Interest in Refco Group....................................... 97

| | F. | The Truth Begins to Emerge and the Company Collapses | 98 |
| VI. | | THE COMPANY'S VIOLATIONS OF GAAP | 103 |
| VII. | | GRANT THORNTON'S VIOLATIONS OF AUDITING STANDARDS | 108 |
| | A. | Violations of General Standards | 109 |
| | B. | Violations of Standards of Fieldwork | 110 |
| | | 1. Standard of Fieldwork No. 1 – Audit Planning | 110 |
| | | 2. Standard of Fieldwork No. 2 – Evaluation of Internal Controls | 114 |
| | | 3. Standard of Fieldwork No. 3 – Obtaining Evidential Matter | 115 |
| | C. | Violations of Reporting Standards | 119 |
| | D. | Violations of CFTC Rules and Regulations | 121 |
| VIII. | | DEFENDANTS' NEGLIGENCE | 122 |
| | A. | The Offering Memorandum and the Bond Registration Statement | 122 |
| | B. | The IPO Registration Statement | 125 |
| IX. | | ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY | 127 |
| | A. | The Officer Defendants | 127 |
| | B. | RGHI and the Bennett Trust | 131 |
| | C. | Robert C. Trosten | 132 |
| | D. | The THL Partner Defendants | 133 |
| | E. | The THL Individual Defendants | 135 |
| | F. | The Audit Committee Defendants | 137 |
| X. | | CLAIMS FOR RELIEF UNDER THE SECURITIES ACT | 139 |
| | | COUNT ONE | 139 |
| | | COUNT TWO | 143 |
| | | COUNT THREE | 146 |

COUNT FOUR ................................................................................................ 149

COUNT FIVE ................................................................................................. 152

COUNT SIX ................................................................................................... 154

COUNT SEVEN .............................................................................................. 157

COUNT EIGHT ............................................................................................... 159

XI.   DEFENDANTS' FRAUDULENT SCHEME ............................................... 161

    A.   Refco and Its Customers Suffer Hundreds of Millions of Dollars in Trading
       Losses.................................................................................................. 162

    B.   Bennett Becomes CEO and, With the Aid of Collins, Mayer Brown and
       Maggio, Transfers Uncollectible Receivables Off Refco's Books .................... 165

    C.   Refco Conceals the Uncollectible Receivable Through a Series of Fraudulent
       "Round Trip" Loan Transactions .................................................................. 171

       1.   The Fraudulent Transactions With Customer X ...................................... 173

          (i)   The February 2002 Transaction .................................................. 173

          (ii)   The February 2003 Transaction .................................................. 173

          (iii)   The February 2004 Transaction ................................................. 1739

          (iv)   The May 2004 Transaction ....................................................... 173

          (v)   The August 2004 Transaction .................................................... 173

          (vi)   The November 2004 Transaction ............................................... 173

          (vii)   The December 2004 Transaction ............................................... 173

          (viii)   The May 2005 Transaction ...................................................... 173

          (ix)   The August 2005 Transaction ................................................... 173

       2.   The Fraudulent Transactions With BAWAG ........................................ 188

          (i)   The February 2000 Transaction .................................................. 173

          (ii)   The February 2001 Transaction .................................................. 173

          (iii)   The February 2002 Transaction .................................................. 173

(iv)     The February 2003 Transaction ................................... 173

(v)      The February 2004 Transaction ................................... 173

(vi)     The February 2005 Transaction ................................... 173

3.     The Fraudulent Transactions With CIM Ventures.................................. 197

(i)      The February 2000 Transaction ................................... 173

(ii)     The February 2001 Transaction ................................... 200

(iii)    The Aborted February 2002 Transaction ................................ 20173

4.     The Fraudulent Transactions With EMF and Delta Flyer ..................... 202

(i)      The February 2000 Transaction ................................... 202

(ii)     The February 2001 Transaction ................................... 203

(iii)    The February 2002 Transaction ................................... 204

(iv)     The February 2003 Transaction ................................... 204

5.     The Fraudulent Transaction With Beckenham ........................... 205

6.     The Fraudulent Transaction With CS Land ........................... 205

D.     Summary and Form of Transactions................................................ 206

E.     Material Impact on Financial Statements ........................................ 209

XII.    FALSE AND MISLEADING STATEMENTS .............................................. 213

A.     The May 2005 Press Release and May 2005 8-K.............................. 213

B.     The Year End 2005 Press Release and 2005 10-K ........................... 215

C.     The First Quarter 2006 Press Release, July 2005 8-K, and First Quarter
       2006 10-Q ...................................................................................... 218

XIII.   ADDITIONAL ALLEGATIONS OF SCIENTER......................................... 221

A.     Circumstantial Evidence of Scienter.............................................. 222

B.     Motive and Opportunity.................................................................. 244

C.     Additional Allegations of Scienter As to the Audit Committee ........................ 255

      D.     Additional Allegations of Scienter Against the THL Defendants ...................... 261

      E.     Additional Allegations of Scienter Against Mayer Brown and Collins ............. 271

             1.     Motive and opportunity.......................................................................... 271

             2.     Knowledge and/or reckless disregard of the fraud ................................. 274

XIV.  LOSS CAUSATION............................................................................................... 277

XV.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 279

XVI.  PRESUMPTION OF RELIANCE............................................................................. 280

      A.     Reliance Should Be Presumed With Respect to Defendants' Omissions........... 280

      B.     Reliance Upon the Offering Memorandum and Road Show Should Be Presumed For All Purchasers of 144A Bonds in the Initial Offering................................... 280

      C.     Reliance Should Be Presumed Because Fraud Created the Market for the Company's Securities ....................................................................................... 281

      D.     Reliance Should Be Presumed Under the Fraud-on-the-Market Doctrine ......... 283

XVII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT......................................... 287

      COUNT NINE ......................................................................................................... 287

      COUNT TEN ........................................................................................................... 290

      COUNT ELEVEN .................................................................................................... 290

      COUNT TWELVE ................................................................................................... 294

      COUNT THIRTEEN ................................................................................................ 297

      COUNT FOURTEEN ............................................................................................... 302

      COUNT FIFTEEN ................................................................................................... 305

      COUNT SIXTEEN .................................................................................................. 308

JURY DEMAND ............................................................................................................... 309

PRAYER FOR RELIEF ..................................................................................................... 309

RH Capital Associates LLC, Pacific Investment Management Company LLC and

PIMCO Funds: Pacific Investment Management Series – PIMCO High Yield Fund bring this

federal securities law class action on behalf of themselves and all other persons and entities,

other than Defendants and their affiliates as specified in ¶ 81 below, who purchased or acquired

publicly traded shares, bonds or notes of Refco Inc., its predecessors and affiliates (including, but

not limited to, Refco Group Ltd., LLC, Refco Finance Holdings LLC, and Refco Finance Inc.)

(collectively, with Refco Inc., the "Company" or "Refco") between July 1, 2004 and October 17,

2005 (the "Class Period"), and based on conduct asserted herein, were injured thereby.[1]

I.    **NATURE OF THE ACTION**

1.    This is a case about a company that suffered one of the most precipitous corporate

meltdowns in U.S. history, and the well-compensated professional gatekeepers who utterly failed

in their responsibilities to the investing public. That company is Refco, and the gatekeepers who

failed to do their jobs include one of this country's largest auditing firms, fifteen Wall Street

investment banks, a large and well-known law firm and one of its partners, an audit committee, a

board of directors and corporate officers more intent on lining their own pockets than with

ensuring that the company they ran reported accurate information to investors. As explained

below, a little more than two months after completing a highly lucrative initial public offering,

Refco admitted that its financial statements "should no longer be relied upon" because the

Company had concealed hundreds of millions of dollars of uncollectible receivables owed to the

Company by an off-balance sheet entity owned by its Chief Executive Officer ("CEO"). While

this admission only partially revealed the true extent of the problems at the Company, it set into

---

[1]    For the convenience of the reader, Lead Plaintiffs attach hereto a glossary of definitions
(Exhibit 1) and a table of Defendants and claims (Exhibit 2).

motion a chain of events and subsequent disclosures that – over the span of just a few days – led to Refco's abrupt collapse into bankruptcy.

2.      Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency and futures markets. An integral component of Refco's business model was to extend credit to its customers so that they could trade on "margin" and leverage their capital into larger trades. These larger trades, in turn, generated larger commissions, revenues and profits for Refco. Unknown to investors, however, Refco regularly extended credit to its customers based on little or no assessment of the customers' credit-worthiness. These "no questions asked" loans exposed the Company to the very same trading risks undertaken by its customers, some of whom were willing to make large and speculative wagers with Refco's money. Thus, Refco had, unbeknownst to the public, adopted a business model that sought to increase the Company's fees by gambling its very survival on the ability of its customers to make successful trades in the volatile currency, commodities and derivatives markets around the world.

3.      As described in more detail below, the inherent dangers posed by this business model materialized – though were not revealed to the public – in the late 1990s, when a number of Refco's most significant customers suffered massive trading losses and were unable or unwilling to repay hundreds of millions of dollars of margin loans extended to them by Refco. Rather than properly account for these uncollectible receivables on Refco's books, Refco and its CEO, Phillip Bennett ("Bennett")—with the direct and active participation of Refco's outside lawyers at Mayer Brown LLP ("Mayer Brown"), including Mayer Brown partner Joseph P. Collins ("Collins")—hid them from public view by transferring these "IOUs" to Refco Group Holdings, Inc. ("RGHI"), an entity controlled by Bennett. RGHI had no operational functions,

2

but simply served as an empty vessel for Bennett and another former CEO of Refco to stash their large personal holdings of Refco stock.

4.     Once these uncollectible debts were transferred off of Refco's balance sheet, Refco was left with a multi-hundred million dollar receivable owed to it by RGHI, a non-operating company with no conceivable means of repaying the receivable. Moreover, because RGHI was a "related-party" to Refco, the mere existence of the receivable would have raised numerous red flags to any potential investor or candid professional who was aware of it. To conceal the true nature of this receivable, Bennett and others, including Mayer Brown and Collins, devised a series of transactions whereby the receivable was shifted from RGHI to unrelated third parties just before the end of Refco's financial reporting periods, thus creating the illusion that they were legitimate (and collectible) third party receivables.

5.     As was ultimately revealed, this scheme was simple to perpetrate and even easier to detect, had the gatekeepers for the investing public not averted their eyes. As described in more detail below, the scheme involved the manipulation of huge sums of money – as much as 75% of Refco's annual revenue and 900% of its reported annual net income – yearly and sometimes quarterly for at least five years. Like clock-work, a few days before Refco closed its books for the pertinent period, from at least 1999 until the scheme was discovered in October 2005, the Company loaned huge sums of money – as much as $970 million on one occasion – from one of its subsidiaries to one of its members and to certain third parties, which simultaneously loaned the same amount to RGHI. RGHI, in turn, used the proceeds from the member and third-party loans to pay down temporarily the uncollectible receivable it owed to Refco, while neither the uncollectible receivable nor the related-party transactions were disclosed to investors. Promptly after the close of each financial period, the circular transactions were

3

"unwound," the loans were repaid, and the uncollectible receivable from RGHI was returned to Refco's books, where it was apparent to anyone who had bothered or wanted to look.

6.    The scheme allowed Refco to project the appearance of growth and success, which inflated the price of Refco's securities and enabled the Company's insiders to enrich themselves by hundreds of millions of dollars at investors' expense. For instance, in June 2004, Refco engaged in a Leveraged Buyout ("LBO") with the THL Partner Defendants (defined below). In conjunction with the LBO, Refco – with the direct assistance of some of Wall Street's most powerful investment banks – issued and sold $600 million worth of bonds to public investors. Although Refco's senior officers received tens of millions of dollars in cash payouts from the LBO and the bond offering, this was just the beginning of a feeding frenzy designed to further enrich the Company's insiders. Following the LBO, Refco issued tens of millions of dollars' worth of stock options to Refco's officers, audit committee members, and directors. Thus, Refco's insiders were perfectly positioned for the ultimate prize: taking their fraud-ridden company public through a lucrative initial public offering.

7.    There was no shortage of professionals eager to help Refco sell itself to the public. On August 10, 2005, with the aid of fifteen Wall Street investment banks acting as underwriters, Refco conducted a $670 million initial public offering (the "IPO"). Defendant Bennett made over $118 million by selling a portion of his Refco holdings in the IPO; the THL Partner Defendants and their passive co-investors made nearly $170 million; and, through the exercise of a "green shoe" option built into the IPO, an additional $82,203,000 "special dividend" was paid to Refco's shareholders of record before the IPO (including Defendant Bennett and the THL Partner Defendants).

4

8.    Bolstered by Refco's false financial statements, the IPO was an unqualified success for Refco's insiders. Indeed, on September 9, 2005, Bennett – a newly minted billionaire – was invited to ring the opening bell on the New York Stock Exchange ("NYSE"). With the Company's supposed gatekeepers ignoring their responsibilities, the price of Refco's common stock, issued at $22 per share, quickly rose above $28 per share, further enriching the Company's insiders. Just a short time later, however, the scheme unraveled when the huge related-party receivable was brought to light – not by the professional gatekeepers who had been associated with the Company for years, but rather by an employee who had been working at Refco for only two months.

9.    On October 10, 2005 – a mere forty-two trading days after Refco's IPO – Refco publicly disclosed the existence of a multi-hundred million dollar uncollectible receivable that had previously been concealed, and admitted that its financial statements for the years ended February 28, 2002 ("fiscal year 2002"), February 28, 2003 ("fiscal year 2003"), February 29, 2004 ("fiscal year 2004"), February 28, 2005 ("fiscal year 2005"), and the quarter ended May 31, 2005 – all of which were integral to the IPO offering documents blessed by the underwriters, auditors, officers and directors just weeks earlier – should no longer be relied upon. This announcement set into motion a series of events and subsequent disclosures that culminated in Refco filing for bankruptcy just one week later.

10.    In the days following the October 10, 2005 disclosure, the market learned that the problems at Refco were even more severe than those disclosed in that initial announcement, as Bennett was arrested and charged with securities fraud; Refco disclosed that its "liquidity . . . [was] no longer sufficient to continue operations;" the NYSE suspended trading in Refco shares; and Refco filed for bankruptcy in this District. These disclosures caused the prices of Refco's

publicly traded securities to collapse. Refco's bonds declined at least 80% in a single week, from 108.625% of par on October 7, 2005 to approximately 16% of par on October 14, 2005. Refco's publicly-traded stock declined from a closing price of $28.56 on October 7, 2005 to 65 cents on October 18, 2005 – a stunning drop of nearly 98% in little more than a week. Thus, in virtually the blink of an eye, unsuspecting investors who had relied on the truth and accuracy of the statements made by Refco and others in purchasing the Company's publicly-traded stock and bonds suffered hundreds of millions of dollars of damages.

11.    On July 11, 2007, the examiner appointed in Refco's bankruptcy proceedings (the "Examiner") issued a lengthy report (the "Examiner's Report") describing in detail the Refco debacle, and the roles of certain of Refco's professional advisors therein. After reviewing a substantial volume of documents and interviewing numerous witnesses, the Examiner concluded, among other things, that there was evidence that Mayer Brown and Refco's outside auditor, Grant Thornton LLP, had knowledge of improprieties at Refco prior to the Bond Offering and the IPO. The Examiner did not evaluate the potential culpability of the other defendants named herein.

12.    In this complaint, Plaintiffs assert two different sets of claims. The first set of claims (Counts One through Eight) asserts a series of strict liability and negligence claims based on the Securities Act of 1933 ("Securities Act"); these claims are asserted against the Defendants who are statutorily responsible for the untrue statements in the prospectuses and registration statements pursuant to which Refco issued securities to the public. Plaintiffs specifically disclaim any allegations of fraud in these non-fraud claims. In the second set of claims (Counts Nine through Sixteen), Plaintiffs assert a number of fraud-based claims under the Securities Exchange Act of 1934 ("Exchange Act") against those Defendants who directly participated in

the fraudulent scheme and those who knew about or were reckless with respect to discovering the fraud. In an opinion dated April 30, 2007, this Court denied the Defendants' motions to dismiss most of the claims asserted herein.[2]

## II.    JURISDICTION AND VENUE

13.    Certain non-fraud claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Certain other claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, Section 22 of the Securities Act, 15 U.S.C. §§ 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

15.    Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa and Section 22 of the Securities Act, 15 U.S.C. §§ 77v. Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

16.    In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

---

[2] The claims that the Court sustained are not being amended in any way that would alter the Court's denial of the motions to dismiss those claims. Rather, this Second Amended Complaint (a) adds Mayer Brown and Collins as defendants and incorporates the allegations that Lead Plaintiffs had made against those defendants in a separate complaint filed in this Court on October 1, 2007 under the caption *RH Capital Associates LLC, et al. v. Mayer Brown LLP, et al.*; (b) asserts additional claims against certain previously-named defendants (namely, a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against the THL Defendants (defined below)); and (c) adds allegations and factual details to replead certain claims that the Court dismissed in its April 30, 2007 opinion (namely, claims against defendant Robert Trosten pursuant to Sections 10(b) and 20(a) of the Exchange Act and claims against the Bond Underwriter Defendants pursuant to Section 11 of the Securities Act).

limited to, the United States mails, interstate telephone communications and the facilities of
national securities exchanges.

### III.    PARTIES AND RELEVANT NON-PARTIES

#### A.    Plaintiffs

17.    RH Capital Associates LLC ("RH Capital") is a Delaware limited liability
company with its principal office and place of business located at 139 W. Saddle River Road,
Saddle River, New Jersey.  Founded in 1983, RH Capital is an investment firm that manages in
excess of $600 million in assets.  RH Capital is the attorney-in-fact for its investment clients and
is vested with the authority to initiate legal action on their behalf.  In addition, during the Class
Period, RH Capital had full investment discretion on behalf of its clients and was solely
responsible for making all investment decisions with respect to transactions in Refco securities.
During the Class Period, RH Capital purchased or acquired Refco securities in and/or traceable
to the IPO, and suffered millions of dollars in damages as a result of the violations of the federal
securities laws alleged herein.  On February 3, 2006, the Honorable Gerard E. Lynch appointed
RH Capital as Co-Lead Plaintiff for this consolidated litigation.

18.    Pacific Investment Management Company LLC ("PIMCO") is an investment
manager and advisor for numerous institutional and individual clients worldwide, with its
headquarters in Newport Beach, California.  Founded in 1971, PIMCO has grown to become one
of the world's leading fixed-income institutional money managers, currently managing over
$600 billion in assets and overseeing numerous funds and accounts invested in such financial
instruments as corporate bonds, emerging markets debt, municipal bonds, mortgage-backed
securities, and other fixed income securities.  During the Class Period, PIMCO had full
investment discretion on behalf of its clients and was solely responsible for making all
investment decisions with respect to transactions in the Company's securities.  PIMCO

8

purchased $87,245,000 par amount of the Company's 9% Senior Subordinated Notes due 2012 during the Class Period. These purchases included $49,300,000 par amount of 144A Bonds (defined below) in the initial offering, $22,165,000 par amount of 144A Bonds in the secondary market, and $15,780,000 par amount of Registered Bonds (defined below). As a result of these purchases of Refco securities and the violations of the federal securities laws alleged herein, PIMCO suffered millions of dollars in damages. On February 3, 2006, the Honorable Gerard E. Lynch appointed PIMCO as Co-Lead Plaintiff for this consolidated litigation.

19.    Plaintiff PIMCO Funds: Pacific Investment Management Series - PIMCO High Yield Fund (the "PIMCO High Yield Fund") is an investment fund that invests in a diversified portfolio of high yield securities. The PIMCO High Yield Fund is one of the numerous investment funds and accounts managed by PIMCO, and for which PIMCO has sole discretion to make investment decisions. PIMCO purchased $28,720,000 par amount of Bonds on behalf of the PIMCO High Yield Fund during the Class Period, including $20,000,000 par amount of 144A Bonds in the initial offering, $4,320,000 par amount of 144A Bonds in the secondary market, and $4,400,000 million par amount of Registered Bonds. As a result of these purchases of Refco securities and the violations of the federal securities laws alleged herein, PIMCO High Yield Fund suffered millions of dollars in damages. PIMCO High Yield Fund, which is not a Lead Plaintiff, has joined in this action as a Named Plaintiff and proposed Class Representative.

20.    RH Capital, PIMCO, and the PIMCO High Yield Fund are collectively referred to herein as "Plaintiffs."

B.    **The Company**

21.    Refco Inc. is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its

subsidiaries, was in the business of providing execution and clearing services for exchange-trade derivatives, and providing prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with the IPO, and was the issuer of the stock sold pursuant to the IPO. At all relevant times after the IPO, 44% of Refco Inc.'s stock was owned by the THL Partner Defendants and their passive co-investors, 36.4% was owned by Defendant Bennett, and 19.6% was owned by public investors. Refco Inc. was a Delaware corporation with its principal offices located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. At all relevant times, the financial results of Refco Inc.'s operating subsidiaries – Refco Securities, LLC; Refco, LLC; and Refco Capital Markets Ltd. – were consolidated on Refco Inc.'s financial statements for financial reporting purposes.

22.     Refco Group Ltd., LLC ("Refco Group") is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Refco Group, which was formed in 1999, is a Delaware limited liability company with its principal offices at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. Prior to the formation of Refco Inc., the Company's business was conducted through Refco Group as the parent company. Refco Group was the co-issuer of the Company's Registered Bonds (defined below) and was a signatory to the Company's Bond Registration Statement (defined below). Refco Group filed a Form 10-K Annual Report and a Form 10-K/A Annual Report with the SEC in July 2005. At all relevant times, the financial results of Refco Group's operating subsidiaries – Refco Securities, LLC; Refco, LLC; and Refco Capital Markets Ltd. – were consolidated on Refco Group's financial statements for financial reporting purposes.

10

23.    New Refco Group Ltd., LLC ("New Refco") is a non-party that is not named as

a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the

Bankruptcy Code on October 17, 2005. Upon completion of the Bond Offering (defined below),

New Refco became the parent of, and owned all of the outstanding membership interests in,

Refco Group. At that time, the THL Partner Defendants and Defendant RGHI owned

approximately 57% and 43%, respectively, of New Refco. Upon completion of the IPO, Refco

became the public company parent of New Refco.

24.    Refco Finance Holdings LLC ("Refco Finance Holdings") is a non-party that is

not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter

11 of the Bankruptcy Code on October 17, 2005. Refco Finance Holdings was a co-issuer of the

Company's 144A Bonds (defined below). On the date of the issuance of those bonds, August 5,

2004, Refco Finance Holdings merged with and into Refco Group.

25.    Refco Finance Inc. ("Refco Finance") is a non-party that is not named as a

defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the

Bankruptcy Code on October 17, 2005. Refco Finance was a co-issuer of the 144A Bonds

(defined below) and, at the time those bonds were issued, was a wholly-owned subsidiary of

Refco Finance Holdings. Upon completion of the Bond Offering (defined below), Refco

Finance became a wholly-owned subsidiary of Refco Group. Refco Finance was also a co-issuer

of the Company's Registered Bonds and was a signatory to the Company's Bond Registration

Statement. Refco Finance, together with Refco Group, filed a Form 10-K Annual Report and a

Form 10-K/A Annual Report with the SEC in July 2005.

26.    Refco Capital Markets Ltd. ("Refco Capital") is a non-party that is not named as a

defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the

11

Bankruptcy Code on October 17, 2005. Refco Capital, a Bermuda-based Refco subsidiary, was

an offshore securities and foreign exchange broker that traded over-the-counter derivatives

contracts in a largely unregulated market. Refco Capital was one of the Company's three

principal operating subsidiaries, and its financial results were consolidated on the Company's

consolidated financial statements at all relevant times. Refco's senior executives were directly

involved in the management and oversight of the business of Refco's subsidiaries, including

Refco Capital. In a criminal complaint against Bennett filed by the United States Attorney for

this District on October 12, 2005, Refco Capital was named as one of the entities utilized by

Bennett to help hide the Company's uncollectible receivables.

27.     Refco Managed Futures LLC ("Refco Futures") is an entity that was named as a

defendant in Plaintiffs' Amended Complaint, but is not named as a defendant in this Second

Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of the

Bankruptcy Code on June 5, 2006. Refco Futures, a Delaware limited liability company, was a

subsidiary of Refco with its principal offices located at the Company's headquarters in New

York. Refco Futures was a guarantor and co-registrant of the Registered Bonds. At all relevant

times, Bennett was a Manager of Refco Futures, Joseph J. Murphy was President and Principal

Executive, Financial, and Accounting Officer of Refco Futures, and Philip Silverman was the

company Secretary.

28.     Westminster-Refco Management LLC ("Westminster-Refco") is an entity that

was named as a defendant in Plaintiffs' Amended Complaint, but is not named as a defendant in

this Second Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of

the Bankruptcy Code on June 5, 2006. Westminster-Refco, a Delaware limited liability

company, was a subsidiary of Refco with its principal offices located at the Company's

12

headquarters in New York. Westminster-Refco was a guarantor and co-registrant of the
Registered Bonds. At all relevant times, Bennett was a Manager of Westminster-Refco, Joseph
J. Murphy was its President and Principal Executive, Financial, and Accounting Officer, and
Philip Silverman was the company Secretary.

29.     Lind-Waldock Securities LLC ("Lind-Waldock") is an entity that was named as a
defendant in Plaintiffs' Amended Complaint, but is not named as a defendant in this Second
Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of the
Bankruptcy Code on June 5, 2006. Lind-Waldock, a Delaware limited liability company, is an
online retail derivatives brokerage primarily serving individual traders. At all relevant times,
Lind-Waldock was a subsidiary of Refco Group, with its principal offices located at the
Company's headquarters in New York. Bennett was President, Manager, and Principal
Executive, Financial, and Accounting Officer of Lind-Waldock, and Silverman was its corporate
Secretary. Lind-Waldock was a guarantor and co-registrant of the Registered Bonds.

### C.     The Defendants

30.     The term "Defendants" as used herein shall refer to RGHI, The Phillip R. Bennett
Three Year Annuity Trust, the Officer Defendants (as defined below), Robert C. Trosten, Tone
N. Grant, the Audit Committee Defendants (as defined below), the THL Defendants (as defined
below), Grant Thornton LLP, the Underwriter Defendants (as defined below), Mayer Brown and
Collins.

#### 1.     The Bennett Shell-Entity Defendants

31.     Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware corporation that
was wholly owned and controlled by Refco's CEO, Bennett, at all relevant times after August 5,
2004. Prior to that date, RGHI was owned 50% by Bennett and 50% by Refco's former CEO,
Defendant Tone Grant. RGHI lacked any business or operational function other than to serve as

13

a "parking" vehicle for Bennett (and, before the LBO, Tone Grant) to hold their personal holdings of Refco stock. RGHI was involved in the related-party transactions that concealed as much as $970 million worth of uncollectible debts owed to Refco, as alleged herein.

32.    Defendant The Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust") is a U.S. domestic trust organized and existing under the laws of the State of Delaware. At all relevant times, Defendant Bennett was both trustee and beneficiary of the Bennett Trust. The Bennett Trust was another vehicle through which Bennett held his Refco stock.

### 2.    The Officer Defendants

33.    Defendant Phillip R. Bennett was the President, Chief Executive Officer ("CEO") and Chairman of Refco Group from September 1998 until he was forced to resign in October 2005. He also served as President, CEO, and Chairman of Refco, and as President and CEO of New Refco, at all relevant times. Prior to becoming CEO of Refco Group, Bennett held the position of Chief Financial Officer ("CFO") since 1983. Bennett joined Refco Group in 1981 from Chase Manhattan Bank, where he had held various positions involving credit and commercial lending since 1970. Bennett prepared and approved the Offering Memorandum (defined below) for the 144A Bonds. Bennett also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments), the Company's IPO Registration Statement, and the Company's Forms 10-K and 10-K/A for fiscal year 2005. In October 2005, Bennett was asked by the Board of Directors to take a leave of absence. He did so, then subsequently resigned from all posts at the Company on January 12, 2006. On November 10, 2005, a grand jury sitting in this District indicted Bennett, charging him with a massive securities fraud scheme as a result of the acts alleged herein.

34.    Defendant Gerald M. Sherer ("Sherer") joined Refco Group as its Executive Vice President and CFO in January 2005. From 1997 through 2004, Sherer held various positions at

14

Deutsche Bank, including Deputy Global Head of Controlling, CFO of the Investment Bank, CFO of the Americas, and the Global Head of Internal Controls. From 1995 to 1997, Sherer was CFO of CIBC Woody Gundy's U.S. operations. Sherer also served as Senior Vice President of the Finance Division for Goldman Sachs from 1982 to 1995. Sherer prepared, approved and signed the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Refco recently requested permission of the Bankruptcy Court to terminate and reject its employment agreement with Sherer.

35.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer ("COO") of Refco Group beginning in August 2004 and was responsible for information technology, operations, accounting and finance, credit, margins, and risk control for Refco's futures businesses. As COO of Refco Group, Sexton was responsible for overseeing these functions with respect to each of the Company's operating subsidiaries, including Refco Capital, at all relevant times. He joined Refco Group in April 1999 and served as Executive Vice President and COO of Refco, LLC, a Refco Group subsidiary, from July 2001 until August 2004. After Bennett was forced to resign by the Board of Directors, Sexton served as CEO of Refco for a brief period of time before he resigned on November 11, 2005. From 1991 to 1997, Sexton served in various capacities for Chase Manhattan Bank, including financial controller for the U.S. Foreign Currency Markets, institutional sales for marketing derivatives, and for exchange and treasury products. Sexton prepared and approved the Company's Offering Memorandum for the Bonds, the Company's IPO Registration Statement, and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Sexton also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

15

36.    Defendant Santo C. Maggio ("Maggio"), also known as "Sandy" Maggio, joined the Company in 1985, and was Executive Vice President of Refco Group and President and CEO of Refco Securities, LLC, the Company's NASD broker-dealer subsidiary, since 1991. Maggio was also President of the Refco Capital subsidiary, since 2001. Maggio prepared and approved the Offering Memorandum for the Bonds, the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Maggio also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments). Like Bennett, Maggio was asked by Refco's Board of Directors to take a leave of absence in October 2005. He did so, then subsequently resigned from the Board.

37.    Defendant Joseph J. Murphy ("Murphy") was Executive Vice President of Refco Group and responsible for global marketing since 1999. Murphy was also President of various Refco subsidiaries, including Refco Futures and Westminster Refco during the same period. From 1994 to 1999, Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation of New York and held management positions in the Treasury Department of the Chase Manhattan Bank. Murphy prepared and approved the Offering Memorandum for the Bonds, the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Murphy also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

38.    Defendant Phillip Silverman ("Silverman") began serving as Secretary of the Company in at least 1999, and held numerous high-level executive positions within Refco and its subsidiaries, including Controller of Refco Group and, beginning in 2005, Director of Internal

16

Audit at Refco. Silverman was also Secretary of RGHI and of numerous Refco subsidiaries. Silverman has been a certified public accountant ("CPA") since 1982, was a close confidant of Bennett, and, on information and belief, was Bennett's personal accountant. Silverman prepared and approved the Offering Memorandum for the Bonds, the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Silverman also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments). Silverman was asked by the Board of Directors to resign, and did resign, at or about the same time as Bennett and Maggio.

39.    Defendant Dennis A. Klejna ("Klejna") began serving as Executive Vice President and General Counsel of Refco Group in 1999. Prior to joining Refco Group, Klejna was in private law practice in the Washington, D.C. firm of Vinson & Elkins, L.L.P. from 1996 to 1998, where his practice focused on derivatives trading regulations. Klejna was Director of the Division of Enforcement of the Commodity Futures Trading Commission ("CFTC") from 1983 to 1995. Klejna prepared and approved the Offering Memorandum for the Bonds, and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Klejna also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments), and he prepared and approved the Company's IPO Registration Statement. As General Counsel of Refco Group, his duties included supervising the Company's outside legal counsel on all significant legal matters, and reviewing and approving bills received from outside counsel.

40.    Defendants Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, and Klejna shall be collectively referred to herein as the "Officer Defendants."

17

### 3.   Defendant Trosten

41.   Defendant Robert C. Trosten ("Trosten") was Executive Vice President and CFO of Refco Group from 2001 until October 2004, when he abruptly resigned. Prior to becoming CFO, Trosten was a member of the Company's corporate finance team from 1997 until 2001. He is a CPA, and before joining the Company he served as Vice President of Corporate and Regulatory Accounting at Lehman Brothers Inc. As CFO of the Company, Trosten's responsibilities included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level. In the years leading up to his departure, Trosten received salary and bonuses totaling $2.2 million in fiscal year 2005, $3.1 million in fiscal year 2004, $2.8 million in fiscal year 2003, and $2.2 million in fiscal year 2002. According to his sworn testimony in an unrelated case, Trosten received a $45 million severance payment when he left the Company, after serving only three years as CFO. The Company did not publicly disclose to its investors this huge payment to Trosten, but instead simply announced that he had resigned in order to "pursue other financial interests." Trosten prepared and approved the Offering Memorandum for the Bonds and, along with Bennett and others, participated in the nationwide road show to market the Bonds to institutional investors. On October 24, 2006, Trosten was indicted by a grand jury sitting in this District on charges that include securities fraud and conspiracy to commit securities fraud in connection with the collapse of Refco.

### 4.   Defendant Grant

42.   Defendant Tone N. Grant ("Grant") was the CEO of Refco Group prior to Bennett's promotion to that position in September 1998. Upon information and belief, Grant continued to have direct involvement in the management of the Company even after stepping down as CEO. Indeed, prior to the LBO and Bond Offering (defined below), Grant owned 50%

18

of RGHI, which in turn owned approximately 43% of Refco Group. Grant was cashed out of his interest in RGHI effective as of the date of the Bond Offering, leaving Bennett as the sole owner of RGHI. On January 16, 2007, Grant was indicted by a grand jury sitting in this District on charges that include securities fraud and conspiracy to commit securities fraud in connection with the collapse of Refco.

### 5.   The Audit Committee Defendants

43.     Defendant Ronald L. O'Kelley ("O'Kelley") was at all relevant times a director of the Company and a member of the Company's audit committee. O'Kelley has been Chairman and CEO of Atlantic Coast Venture Investments, Inc., a private investment company, since 2002. O'Kelley previously served as Executive Vice President, CFO and Treasurer of State Street Corporation from 1995 to 2002, as CFO of Douglas Aircraft Company from 1991 to 1995, and as CFO of Rolls Royce, Inc. from 1983 to 1991. Prior to his tenure at Rolls-Royce, O'Kelley held several senior financial positions at Citigroup from 1975 to 1983, and at Texas Instruments, Inc. from 1969 to 1975. O'Kelley approved and signed the Company's IPO Registration Statement. O'Kelley also approved the Company's financial statements for all relevant periods, the October 12, 2004 Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

44.     Defendant Leo R. Breitman ("Breitman") was at all relevant times a director of the Company and a member of its audit committee. Breitman was Chairman and CEO of Fleet Bank, Massachusetts, from 1991 through March 2004, and also served as Senior Lending Officer of FleetBoston Financial Corporation from 2002 through March 2004. From 1996 to 2002, Breitman was Managing Director of the Commercial Banking Division of FleetBoston Financial Corporation. Breitman approved and signed the Company's IPO Registration Statement. Breitman also approved the Company's financial statements for all relevant periods, the October

19

12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

45.    Defendant Nathan Gantcher ("Gantcher") was at all relevant times a director of the Company and a member of its audit committee. Gantcher was Co-Chairman, President and CEO of Alpha Investment Management L.L.C. from 2002 until August 2004. Prior to joining Alpha, Gantcher was a private investor from 1999 to 2001. Gantcher served as Vice Chairman of CIBC Oppenheimer Corp. from 1997 to 1999, and prior to that served as Co-CEO of Oppenheimer & Co., Inc. Gantcher approved and signed the Company's IPO Registration Statement. Gantcher also approved the Company's financial statements for all relevant periods, the October 12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

46.    Defendants O'Kelley, Breitman and Gantcher are collectively referred to herein as the "Audit Committee Defendants." Prior to the August 2005 IPO, the Audit Committee Defendants comprised the audit committee of New Refco, which performed the functions of an audit committee of Refco Group. After the IPO, the Audit Committee Defendants comprised the audit committee of Refco Inc. At all times (and as described more fully below), the Audit Committee Defendants were responsible for overseeing, among other things, the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the engagement, independence and qualifications of the outside auditor; and the performance of the outside auditor.

### 6.    The Defendants Affiliated with Thomas H. Lee Partners

47.    Defendant Thomas H. Lee Partners, L.P. ("Thomas H. Lee Partners") is a private equity investment fund headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management, which focuses on the acquisition of substantial equity stakes in

mid- to large-capitalization companies. In June 2004, as part of the LBO, Thomas H. Lee

Partners and its affiliates and other related parties purchased a 57% equity stake in the Company

for approximately $507 million. These affiliates and other related parties, whose interests in the

Company were at all times beneficially owned by Thomas H. Lee Partners, include:

        a.     THL Refco Acquisition Partners, THL Refco Acquisition Partners II, and

THL Refco Acquisition Partners III, each of which was, until its dissolution at or about the time

of the IPO, a Delaware general partnership indirectly owned by Defendants Thomas H. Lee

Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman)

Fund V, L.P., which in turn are Delaware limited partnerships whose general partner is

Defendant THL Equity Advisors V, LLC. Thomas H. Lee Partners is the sole member of THL

Equity Advisors V, LLC, and thus controlled THL Refco Acquisition Partners, THL Refco

Acquisition Partners II, and THL Refco Acquisition Partners III;

        b.     Defendant Thomas H. Lee Investors Limited Partnership, a Massachusetts

limited partnership controlled by Defendant Thomas H. Lee; and

        c.     Defendant The 1997 Thomas H. Lee Nominee Trust, a trust over which

Defendant Thomas H. Lee has voting and investment control.

     48.     Defendants Thomas H. Lee Partners, Thomas H. Lee Equity Fund V, L.P.,

Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas

H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are

collectively referred to herein as the "THL Partner Defendants."

     49.     At all relevant times, the THL Partner Defendants managed and controlled the

Company. One year after the LBO, the THL Partner Defendants brought Refco public in the

IPO. The THL Partner Defendants and their co-investors were paid $210 million in the deal, while still maintaining a controlling ownership stake of 38% of the Company's stock.

50.    Defendant Thomas H. Lee ("Lee") was at all relevant times a director of the Company. Lee founded the Thomas H. Lee Company, the predecessor of Thomas H. Lee Partners, in 1974 and served as its Chairman and CEO from its inception until reportedly leaving that entity after the events giving rise to this litigation. Lee approved and signed the Company's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Lee also approved. Lee also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

51.    Defendant David V. Harkins ("Harkins") was at all relevant times a director of the Company. Harkins is Vice Chairman and Managing Director of Private Equity Funds of Thomas H. Lee Partners, and has also served as President of Thomas H. Lee Partners. Harkins approved and signed the Company's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Harkins also approved. Harkins also prepared and approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

52.    Defendant Scott L. Jaeckel ("Jaeckel") was at all relevant times a director of the Company. Jaeckel is a Managing Director of Thomas H. Lee Partners. Jaeckel previously served as Vice President of Thomas H. Lee Partners from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Prior to his affiliation with Thomas H. Lee Partners, Jaeckel worked at Morgan Stanley in the Corporate Finance Department from 1992 to

22

1994. Jaeckel approved and signed Refco's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Jaeckel also approved. Along with Bennett and others, Jaeckel participated in the nationwide road show to market the Company's bonds to institutional investors. Jaeckel also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

53.    Defendant Scott A. Schoen ("Schoen") was at all relevant times a director of the Company. Schoen joined Thomas H. Lee Partners in 1986 and currently serves as its Co-President. He previously served as a Managing Director of Thomas H. Lee Partners from 1992 to 2004 and Vice President from 1988 to 1992. Prior to joining Thomas H. Lee Partners, Schoen was in the Private Finance Department of Goldman Sachs. Schoen approved and signed Refco's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Schoen also approved. Schoen also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

54.    Defendants Lee, Harkins, Jaeckel and Schoen are collectively referred to herein as the "THL Individual Defendants," and, together with the THL Partner Defendants, are collectively referred to herein as the "THL Defendants."

### 7.    Defendant Grant Thornton

55.    Defendant Grant Thornton LLP ("Grant Thornton") is the Chicago-based U.S. member firm of Grant Thornton International, one of six global accounting, tax and business advisory organizations with member firms in 111 countries. Grant Thornton is one of the largest U.S. accounting concerns outside of the "Big Four." Grant Thornton served as the Company's purportedly independent auditor at all relevant times since 2002, when it replaced Arthur

23

Andersen LLP ("Andersen") in that role. In addition to auditing the Company's consolidated financial statements for fiscal 2003, 2004 and 2005 and issuing clean and unqualified audit opinion letters thereon, Grant Thornton materially assisted in the preparation of those financial statements.

56.    Grant Thornton also provided auditing and accounting services to the Company prior to and in connection with the LBO, the Bond Offering and the IPO. For the LBO and Bond Offering, these services included advice regarding the structure of the LBO, a review and/or re-audit of Refco's financial statements for the fiscal year ended February 28, 2002, and reviews of Refco's financial statements for the quarters ended May 31, 2003 and May 31, 2004. For the IPO, these services included reviews of Refco's financial statements for the quarters ended August 31, 2003, November 30, 2003, August 31, 2004, and November 30, 2004.

57.    After the LBO, Grant Thornton conducted quarterly reviews of the Company's financial statements and, upon information and belief, also participated in the preparation of those financial statements.

58.    In addition to serving as the auditor for Refco, Grant Thornton performed personal tax accounting services for Bennett.

### 8.    The Underwriter Defendants

59.    Defendant Credit Suisse Securities (USA) LLC (known at the time of the IPO as Credit Suisse First Boston LLC) ("Credit Suisse"), a subsidiary of Credit Suisse Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. Its headquarters are located at 11 Madison Avenue, New York, New York. Credit Suisse was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a joint bookrunning manager of Refco's IPO of 26,500,000 shares of common stock. It sold and distributed Bonds to investors in the

24

Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant

to the registration statement and prospectus filed with the SEC in connection with the IPO

(together, the "IPO Offering Materials"). As part of its duties as an underwriter, Credit Suisse

was required to conduct, prior to the offerings of the Company's securities, a reasonable

investigation of the Company to ensure that the statements contained in the Offering

Memorandum for the Bonds and the IPO Offering Materials contained no misstatement or

omission of material fact. Credit Suisse purchased and agreed to sell to the investing public at

least $150,822,100 in common stock in connection with the IPO.

60.    Defendant Banc of America Securities LLC ("BAS"), a subsidiary of Bank of

America Corporation, is an investment banking firm that provides securities underwriting,

financial advisory, capital raising, sales and trading, and financial products and services. Its

headquarters are located at 9 W. 57th Street, New York, New York. BAS was a lead placement

agent, underwriter, and initial purchaser for the Company's Bond Offering, and a joint

bookrunning manager of the IPO. It sold and distributed Bonds to investors in the Bond

Offering, and it sold and distributed Refco common stock to the investing public pursuant to the

IPO Offering Materials. As part of its duties as an underwriter, BAS was required to conduct,

prior to the offerings, a reasonable investigation of the Company to ensure that the statements

contained in the Offering Memorandum for the Bonds and in the IPO Offering Materials

contained no misstatement or omission of material fact. BAS purchased and agreed to sell to the

investing public at least $118,640,500 in common stock in connection with the IPO.

61.    Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank"), a subsidiary of

Deutsche Bank AG, is an investment banking firm that provides securities underwriting,

financial advisory, capital raising, sales and trading, and financial products and services. Its

25

headquarters are located at 60 Wall Street, New York, New York. Deutsche Bank was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a co-manager of the IPO. It sold and distributed Bonds to investors in the Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Deutsche Bank was required to conduct, prior to the offerings, a reasonable investigation of the Company to ensure that the statements contained in the Offering Memorandum for the Bonds and in the IPO Offering Materials contained no misstatement or omission of material fact. Deutsche Bank purchased and agreed to sell to the investing public at least $37,778,400 in common stock in connection with the IPO.

62.     Defendant Goldman, Sachs & Co. ("Goldman Sachs"), a subsidiary of The Goldman Sachs Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its global headquarters are located at 85 Broad Street, New York, New York. Goldman Sachs was a joint bookrunning manager of the IPO. It sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Goldman Sachs was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Goldman Sachs purchased and agreed to sell to the investing public at least $124,062,400 in common stock in connection with the IPO.

63.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 4 World Financial Center, New York, New York. Merrill Lynch was a co-manager of the IPO. It sold

26

and distributed Refco common stock to the investing public pursuant to the IPO Offering

Materials. As part of its duties as an underwriter, Merrill Lynch was required to conduct, prior to

the offering, a reasonable investigation of the Company to ensure that the statements contained

in the IPO Offering Materials contained no misstatement or omission of material fact. Merrill

Lynch purchased and agreed to sell to the investing public at least $53,927,500 in common stock

in connection with the IPO.

     64.    Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan"), a subsidiary of J.P.

Morgan Chase & Co., is an investment banking firm that provides securities underwriting,

financial advisory, capital raising, sales and trading, and financial products. Its headquarters are

located at 270 Park Avenue, New York, New York. J.P. Morgan was a co-manager of the IPO.

It sold and distributed Refco common stock to the investing public pursuant to the IPO Offering

Materials. As part of its duties as an underwriter, J.P. Morgan was required to conduct, prior to

the offering, a reasonable investigation of the Company to ensure that the statements contained

in the IPO Offering Materials contained no misstatement or omission of material fact. J.P.

Morgan purchased and agreed to sell to the investing public at least $37,778,400 in common

stock in connection with the IPO.

     65.    Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") is an investment

banking firm that provides securities underwriting, financial advisory, capital raising, sales and

trading, and financial products. Its headquarters are located at 919 Third Avenue, New York,

New York. Sandler O'Neill was a co-manager of the IPO. It sold and distributed Refco

common stock to the investing public pursuant to the IPO Offering Materials. As part of its

duties as an underwriter, Sandler O'Neill was required to conduct, prior to the offering, a

reasonable investigation of the Company to ensure that the statements contained in the IPO

Offering Materials contained no misstatement or omission of material fact. Sandler O'Neill purchased and agreed to sell to the investing public at least $16,207,400 in common stock in connection with the IPO.

66.    Defendant HSBC Securities (USA) Inc. ("HSBC"), a subsidiary of The HSBC Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 2700 Sanders Road, Prospect Heights, Illinois. HSBC was a co-manager of the IPO. It sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, HSBC was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. HSBC purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the IPO.

67.    Defendant William Blair & Company, L.L.C. ("William Blair") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 222 West Adams Street, Chicago, Illinois. William Blair sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, William Blair was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. William Blair purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the IPO.

68.     Defendant Harris Nesbitt Corp. ("Harris Nesbitt"), a subsidiary of the Bank of Montreal, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 111 West Monroe St., Chicago, Illinois. Harris Nesbitt sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Harris Nesbitt was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Harris Nesbitt purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the IPO.

69.     Defendant CMG Institutional Trading LLC ("CMG") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 123 North Wacker Drive, Chicago, Illinois. CMG sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, CMG was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. CMG purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

70.     Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez & Co.") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 61 Broadway, Suite 2924, New York, New York. Ramirez & Co. sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter,

29

Ramirez & Co. was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Ramirez & Co. purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

71.    Defendant Muriel Siebert & Co. Inc. ("Seibert & Co.") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 885 Third Avenue, New York, New York. Seibert & Co. sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Seibert & Co. was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Seibert & Co. purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

72.    Defendant The Williams Capital Group, L.P. ("Williams Capital") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 650 Fifth Avenue, 10th Floor, New York, New York. Williams Capital sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Williams Capital was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Williams Capital purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

73.     Defendant Utendahl Capital Partners, L.P. ("Utendahl") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 30 Broad Street, New York, New York. Utendahl sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Utendahl was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Utendahl purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

74.     References herein to the "Bond Underwriter Defendants" refer collectively to Defendants Credit Suisse, BAS, and Deutsche Bank.

75.     References herein to the "Stock Underwriter Defendants," refer collectively to Defendants Credit Suisse, BAS, Deutsche Bank, Goldman Sachs, Merrill Lynch, J.P. Morgan, Sandler O'Neill, HSBC, William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl.

### 9.     The Mayer Brown Defendants

76.     Defendant Mayer Brown LLP ("Mayer Brown"), an Illinois limited liability partnership, is a large, sophisticated law firm. Along with its affiliate Mayer Brown International LLP, Mayer Brown employs more than 1,500 lawyers and has offices in more than a dozen major cities worldwide, including New York. From 1994 until the Company's collapse, Mayer Brown and/or its predecessor firms were Refco's primary outside legal counsel.

77.     Defendant Joseph P. Collins ("Collins") is a partner of Mayer Brown who works out of Mayer Brown's New York and Chicago offices. According to his profile on "Chambers and Partners," Collins has multiple years of experience representing "brokerage firms,

31

investment management clients, trading and investment advisors, hedge fund operators, investment companies, banks and pension plans" and regularly practices in areas such as "securities, futures, forwards, swaps, options and hybrid securities." From 1994 through the end of the Class Period, Collins was the primary contact between Mayer Brown and Refco and the billing partner in charge of the Refco account at Mayer Brown. Collins' relationship with Refco goes back nearly twenty years and began while Collins was an attorney at another law firm, Schiff Hardin & Waite ("SH&W"). At SH&W, Collins formed a close working relationship with Refco's former CEO, Thomas Dittmar. When Collins moved to Mayer Brown in 1994, he brought Refco to Mayer Brown as a client. Collins has been described in press reports as the "go-to-guy at Refco," and the vast majority of important transactions and deals at Refco were cleared through Collins or Mayer Brown attorneys who worked under the direct supervision of Collins.

78.     From 1994 forward, Refco was an extremely lucrative client for Mayer Brown and Collins' largest personal client. Mayer Brown attorneys, with Collins as the primary contact and billing partner, provided a broad range of legal services to Refco, and Mayer Brown collected approximately $5 million in legal fees annually from Refco, which constituted nearly half the total billings for which Collins was responsible at Mayer Brown. As set forth in the Examiner's Report, as the billing partner on the Mayer Brown account, Collins reviewed Refco bills on a monthly basis and was therefore aware of the work that everyone at Mayer Brown performed for Refco.

79.     As described in more detail below, Mayer Brown was intimately familiar with Refco's operations and finances and played a significant and direct role in designing, implementing and effecting the transactions by which Refco's uncollectible receivables were

32

concealed from the investing public, and they also prepared and edited Refco's misleading

financial statements and other public disclosures including the Offering Memorandum for the

Bonds and the IPO Registration Statement, which specifically identified Mayer Brown as

counsel for Refco.

80.    Other Mayer Brown attorneys referenced herein who played a significant role in

Mayer Brown's representation of Refco include:

(a)    Paul K. Koury. Paul K. Koury ("Koury") is a former Mayer Brown

associate who worked out of Mayer Brown's New York office. Koury worked extensively for

Collins and performed substantial work on the Refco account prior to his departure from Mayer

Brown in May 2005.

(b)    Robert Monk. Robert Monk ("Monk") is a former Mayer Brown associate

who worked out of Mayer Brown's Chicago office. Monk worked extensively for Collins and

performed substantial work on the Refco account prior to his departure from Mayer Brown in

February 2001.

## IV.    CLASS ALLEGATIONS

81.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant

to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the

"Class") consisting of all persons and entities who purchased or otherwise acquired Refco

Finance Holdings 9% Senior Subordinated Notes due 2012 (CUSIP numbers 75866HAA5 and

75866HAC1) (the "Bonds") and/or Refco common stock during the Class Period, either in the

respective initial offering, pursuant to a registration statement, or in the secondary market, and

who, upon disclosure of certain facts alleged herein, were injured thereby. Excluded from the

Class are: (a) Refco, BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische

33

Postsparkasse Aktiengesellschaft ("BAWAG"),[3] and their subsidiaries and affiliates; (b) the

Defendants; (c) members of the families of the individual Defendants; (d) the subsidiaries and

affiliates of the Defendants; (e) any person or entity who is a partner, officer, director, employee,

or controlling person of Refco or BAWAG (including any of their subsidiaries or affiliates) or of

any Defendant; (f) any entity in which BAWAG or any Defendant has a controlling interest; (g)

the directors' and officers' liability insurance carriers for Refco or any Defendant, and any

affiliates or subsidiaries thereof; and (h) the legal representatives, heirs, successors and assigns

of any such excluded party.

82.     The members of the Class are so numerous that joinder of all members is

impracticable. During the Class Period, the Company issued $600 million par amount of debt

securities and consummated an initial public offering of over 30 million shares of common stock.

While Plaintiffs do not know the exact number of purchasers of those securities, Plaintiffs

believe that Class members number in the thousands.

83.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs

and the other members of the Class acquired Bonds and/or Refco common stock in the initial

offerings, pursuant to a registration statement, and/or in the secondary market, and sustained

damages as a result of Defendants' wrongful conduct complained of herein.

84.     Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class and securities litigation.

Plaintiffs have no interests that are adverse or antagonistic to the Class.

85.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Because the damages suffered by individual members of the

---

[3]  BAWAG was formerly a defendant in this action, but all claims against it have been settled with the approval of
the Court.

Class may be relatively small, the expense and burden of individual litigation make it

impracticable for Class members individually to seek redress for the wrongful conduct alleged

herein.

    86.    Common questions of law and fact exist as to all members of the Class, and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

        (a)    Whether the federal securities laws were violated by Defendants' conduct
               as alleged herein;

        (b)    Whether the registration statements and prospectuses for the Company's
               securities contained material misstatements or omitted to state material
               information;

        (c)    Whether the S.E.C. filings, press releases, reports, and other public
               statements disseminated to the investing public during the Class Period
               contained material misstatements or omitted to state material information;

        (d)    Whether and to what extent the Company's financial statements failed to
               comply with generally accepted accounting principles ("GAAP") during
               the Class Period;

        (e)    Whether Grant Thornton's audits of the Company's financial statements
               during the Class Period were conducted in accordance with generally
               accepted auditing standards ("GAAS");

        (f)    Whether and to what extent the market prices of the Company's securities
               were artificially inflated during the Class Period due to the non-disclosures
               and/or misrepresentations complained of herein;

        (g)    With respect to Plaintiffs' claims under the Section 10(b) of the Exchange
               Act, whether the Defendants named in those claims acted with scienter;

        (h)    With respect to Plaintiffs' claims under the Securities Act, whether the
               Defendants named in those claims can sustain their burden of establishing
               an affirmative defense pursuant to the applicable statute;

        (i)    With respect to Plaintiffs' claims pursuant to Section 15 of the Securities
               Act and Section 20(a) of the Exchange Act, whether the Defendants
               named in those counts are controlling persons of the Company;

(j)  Whether reliance may be presumed pursuant to the fraud-on-the-market rule and/or the fraud-created-the-market rule; and

(k)  Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

87.  In addition to the common questions of law and fact, there are certain undisputed material facts that are common to the claims of all Class members. These undisputed facts, which Refco has publicly admitted or which are directly derived from Refco's public admissions, include that:

(a)  Certain related-party receivables involving hundreds of millions of dollars had been omitted from the Company's financial statements prior to October 10, 2005;

(b)  The Company's financial statements for the fiscal years 2002, 2003, 2004 and 2005, and for the quarter ended May 31, 2005, taken as a whole, should no longer be relied upon; and

(c)  With respect to Plaintiffs' claims under the Securities Act, the offering materials for the Bond Offering and IPO contained material misstatements and omissions.

88.  The names and addresses of those persons and entities who purchased securities in the Bond Offering and the IPO, and/or of the record owners of the Company's securities, are available from the Company's transfer agent(s) and/or from the Underwriter Defendants. Notice may be provided to such purchasers and/or record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## V.  FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### A.  Historical Background Regarding the Company

89.  Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency and futures markets. Essentially,

Refco provided financial services by executing trades on behalf of its customers and then recording and "clearing" those trades. Refco offered these services to a wide variety of customers – ranging from individuals to corporations, hedge funds, financial institutions, retail clients and professional traders – on a broad spectrum of derivatives exchanges and over-the-counter, cash and securities markets.

90.     Refco's revenues were primarily comprised of (i) transaction fees earned from executing and clearing customer orders; and (ii) interest income earned on cash balances in its customers' trading accounts and from providing financing through repurchase transactions. The latter element of Refco's business model took on greater significance towards the end of the 1990s because it allowed Refco's customers to trade on "margin" and leverage their capital into larger trades, which generated larger commissions, revenues and profits for Refco.

91.     By 2004, the Company had secured a dominant position in the burgeoning derivatives market. In fact, in that year it processed 461 million derivatives contacts, a volume comparable to that processed by the Chicago Board of Trade and greater than that processed by both the Chicago Board Options Exchange and the New York Mercantile Exchange that year.

92.     However, the very practice that fueled Refco's success – extending margin loans to its trading customers – would prove to be disastrous when, on information and belief, a number of its customers defaulted in the wake of international financial crises that occurred in late 1997 and 1998. The Asian financial crisis began on July 2, 1997, when the Thai government was forced to devalue the Thai baht following months of speculative attacks on the currency. The collapse of the baht sparked economic decline in several Asian nations and led to similar devaluations of the Philippine peso, the Malaysian ringgit, the Indonesian rupiah and the Singaporean dollar. The Hong Kong stock market crashed in the wake of these currency

devaluations, suffering a staggering 40% loss in October 1997. The aftershocks of this collapse were felt far and wide, causing declines in markets in Brazil, Argentina and Mexico.

93.    The Asian financial crisis hit the United States on October 27, 1997. The Dow Jones Industrial Average suffered the third largest point loss in its 109-year history that day, dropping by 7%. This "mini-crash" was so severe that it halted trading on the New York Stock Exchange for the first time ever.

94.    A number of the Company's customers suffered extensive trading losses in the crisis and were unable to repay the credit the Company had extended to them. For example, Victor Niederhoffer ("Niederhoffer") lost nearly $100 million on investments made in part with improperly collateralized "margin" loans from Refco, and was unable or unwilling to repay over $70 million of the debt. According to media reports, these customers may have also included Ross Capital; Devonshire Strategic Holdings; RGF Ltd.; Kipler Investments; Hazelhurst Investments; Helford Resources; East Client Services Ltd.; Luhur; and/or several other entities. In particular, based on Lead Plaintiffs' investigation to date, and on information and belief, it appears that Ross Capital, the hedge fund run by Wolfgang Flottl, incurred considerable losses.

95.    Not only did Refco's customers sustain trading losses during the late 1990s, but Refco itself sustained more than $40 million in losses on proprietary trades (trades carried out on its own behalf) during that period.

96.    Faced with the unwelcome prospect of having to write off these extensive customer and proprietary trading losses, Defendant Bennett and others formulated a way to hide these bad debts from consumers of Refco's financial statements. First, the receivables were consolidated and transferred from the Company to RGHI, an entity controlled by Bennett. The Company's books then reflected a large receivable from RGHI. Knowing that RGHI lacked the

ability to pay that receivable, and concluding that such a large receivable would be less likely to draw attention if its character as a debt from a related-party were obscured, Bennett and others orchestrated a series of transactions whereby the RGHI receivable was temporarily paid off at the end of each of the Company's financial reporting periods and replaced on the books with receivables from unrelated entities, including BAWAG. These transactions – which were repeated yearly from 2000 and at the end of every quarter from at least 2004 until August 2005 – enabled the Company to hide from the investing public the existence of uncollectible debts and losses.

97.    According to a complaint filed by counsel for Refco's Litigation Trustee on October 9, 2007, in a case captioned *VR Global Partners, L.P., et al. v. Bennett, et al.*, 07-CIV-8686 (S.D.N.Y.) (the "VR Complaint"), Bennett used RGHI as a means to manipulate Refco's financial statements in other ways as well, including:

(a)    having Refco Capital and RGHI engage in fifty U.S. Treasury Note transactions on November 17, 2004, with RGHI losing $7.8 million on the transactions and Refco Capital gaining the same amount;

(b)    shifting over $100 million in expenses from Refco to RGHI, including approximately $46.3 million in computer expenses between fiscal 2000 and fiscal 2006, thereby increasing Refco's net income and increasing the amount of the RGHI receivable by the same amount;

(c)    causing Refco to accrue bogus interest income on the RGHI receivable – *i.e.*, interest that was purportedly received from RGHI on the amount of the receivable, but that was never actually paid – in the amounts of $62.75 million on January 28, 2004 and $12 million on or about February 11, 2005;

(d)    causing Refco and RGHI to engage in certain so-called "transactions" that served no economic purpose and were merely designed to artificially inflate Refco's net income, including two "Transfers" totaling $13 million on January 28, 2004; fifty transactions in United States Treasury Notes on November 17, 2004 that resulted in gains to Refco and losses to RGHI of approximately $7.8 million; and over thirty fictitious foreign currency exchange transactions whereby RGHI lost $5 million (which was added to the RGHI receivable) and Refco recognized $5 million in revenue.

**B.    Early Efforts to Sell the Company**

98.    The above-described manipulations of Refco's financial results were designed to allow RGHI – owned by Bennett and Grant – to sell its interests in the Company at artificially inflated prices.  Mayer Brown and Collins were closely involved in the efforts of the Company's insiders to sell Refco.

99.    The Examiner concluded that by no later than February 6, 2002, Mayer Brown knew that the ultimate goal of Bennett and Grant was to sell the entire Company and monetize their ownership interests.  A purchase agreement drafted by Mayer Brown on or about February 6, 2002 stated that the parties to the agreement (Refco, RGHI and an unnamed purchaser) agreed that the "Company's board of managers shall endeavor to sell ownership of the Company or its assets."  Collins had discussed the terms of the purchase with Bennett and others and had personally revised prior drafts of the agreement.  The Examiner also noted that, based on a review of Mayer Brown's time records, Collins may have been aware of the plan to sell the Company as early as May 1999.  Indeed, Mayer Brown had represented Refco in the transaction whereby BAWAG purchased its interest in the Company in 1999.

C.    The THL Partner Defendants' Investment and the 2004 Recapitalization

100.    In November 2003, after numerous aborted efforts to sell all or parts of the Company, including unsuccessful efforts led by Credit Suisse to launch an IPO and/or locate a commercial bank interested in buying Refco, Bennett and others at Refco began to negotiate with the THL Defendants to enter a leveraged buyout transaction whereby a large portion of the Company would be sold to public investors.

101.    On June 8, 2004, the THL Partner Defendants and their passive co-investors entered into an equity purchase and merger agreement (the "Merger Agreement") with Refco Group and RGHI. Pursuant to the Merger Agreement, as amended on July 9, 2004, New Refco would become the parent company of Refco Group, and the THL Partner Defendants and their co-investors would acquire a 57% equity stake in New Refco. The remaining 43% of New Refco was to be held by RGHI, which would then be wholly-owned by Bennett. Grant and BAWAG were to be cashed out of their respective ownership interests in Refco Group. Mayer Brown negotiated, drafted and reviewed the Merger Agreement on behalf of both Refco and RGHI. As the Examiner concluded, "Mayer Brown represented Refco and RGHI in connection with the LBO and was deeply involved in the LBO." The Merger Agreement took effect on August 5, 2004.

102.    The THL Partner Defendants and their passive co-investors paid $507 million in cash for their share of New Refco while Bennett (through RGHI) rolled over $382.5 million of his Refco Group stock to pay for his share. To raise the remaining funds needed to cash-out the existing equity holders (approximately $1.4 billion) and repay existing debt (including debt owed to RGHI), the Company took out $800 million in term loans pursuant to a senior credit facility, opened a $75 million revolving line of credit, and issued $600 million of 9% Senior Subordinated Notes due in 2012 (the "144A Bonds").

41

103.    On August 5, 2004, as part of the recapitalization of Refco, Refco Group and

Refco Finance transferred more than $1.325 billion and an asset management business,

Forstmann-Leff International Associates, LLC (valued at approximately $231 million), to RGHI.

On the same date, RGHI transferred $1.342 billion to BAWAG through a series of transactions

which extinguished BAWAG's ownership interest in the Company.

104.    Defendants BAS, Credit Suisse and Deutsche Bank acted as co-lead arrangers and

joint book running managers for the senior credit facility, and as lead underwriters and

placement agents, joint book-running managers, and initial purchasers for the offering of 144A

Bonds (the "Bond Offering"). Defendants Credit Suisse and Deutsche Bank also acted as

syndication agent and documentation agent for the senior credit facility, respectively, while Bank

of America, N.A., an affiliate of Defendant BAS, acted as administrative agent, swingline lender

and letter of credit issuer.

105.    Refco Finance Holdings and Refco Finance were co-issuers of the 144A Bonds.

Upon completion of the Bond Offering, Refco Finance Holdings merged into Refco Group.

Refco Finance, which was a wholly-owned subsidiary of Refco Finance Holdings at the time of

the Bond Offering, thus became a subsidiary of Refco Group.

106.    The chart below (taken from the Bond Registration Statement and the IPO

Registration Statement) summarizes the structure of the Company upon completion of the LBO

and the Bond Offering:

42



D.    **The Bond Offering**

107.    The 144A Bonds were issued in the same manner as much high yield debt.  The

issuance involved two steps, constituting a single plan of financing.  The general purpose of the

plan was to obtain rapid access to the public capital markets in order to obtain funds at a cost of

capital corresponding to registered, freely tradable securities.  The first step, pursuant to which

the issuers actually obtained the funds, was to issue the 144A Bonds through underwriters

pursuant to an offering memorandum (the "Offering Memorandum").  The second step,

mandated by the Offering Memorandum and the underwriting contracts, was for the issuers of

the 144A Bonds to offer to exchange the bonds issued in the first step for identical bonds issued

pursuant to a registration statement (the "Registered Bonds") (together with the 144A Bonds, the

"Bonds").  The second step was merely an exchange of bonds issued without prior registration

43

for identical bonds issued pursuant to a registration statement and for which the issuers had already received funds in the first step (the "Exchange Offer"). Accordingly, no new funds flowed to the issuer in the second step. The entire two-step process constituted a public offering of the Bonds.

108.    This two-step procedure is known in the investment banking industry as a "Rule 144A/Exxon Capital Exchange Offer." The reference to "Rule 144A" relates to the first step of the transaction, by which the initial purchasers (the Bond Underwriter Defendants) purchase the securities from the issuers and resell them pursuant to an SEC regulation providing a safe harbor for resales of unregistered securities to "Qualified Institutional Buyers." The second step, the "Exxon Capital Exchange Offer," is the means by which the 144A bonds are converted into registered, freely tradable securities. In practice, the Rule 144A/Exxon Capital framework does not differ from registration. High yield issuers and their underwriters prepare the offering memoranda for Rule 144A offerings in contemplation of the Exxon Capital Exchange Offer and, accordingly, prepare such documents to conform in all material respects with the requirements for a prospectus included in a registration statement on SEC Form S-1.

109.    The Bond Underwriter Defendants purchased the 144A Bonds from the issuers and resold them to investors with the understanding and expectation that the 144A Bonds would later be exchanged for freely tradeable Registered Bonds in the second step Exchange Offer. The Bond Underwriter Defendants were compensated for their underwriting services by a discount between the price at which they initially purchased the 144A Bonds from the issuers and the offering price. Further, the Bond Underwriter Defendants obtained from the issuers a purported obligation to indemnify them from certain liabilities, including liabilities under the Securities Act.

44

110.    As is the case with all high yield debt issued in such two-step offerings, the 144A

Bonds were priced from the outset as registered, freely tradable securities. Because the co-

issuers undertook to use their best efforts to offer the Registered Bonds in exchange for the 144A

Bonds within 450 days after the Bond Offering, the market accepted such pricing and did not

demand the substantially higher yield that would otherwise be expected in the purchase of

unregistered securities. Indeed, the Exchange Offer was consummated in April 2005, only eight

months after the 144A Bonds were issued.

111.    Upon the occurrence of certain events, including failure of the issuers to have the

Bond Registration Statement declared effective within 450 days after the issuance of the 144A

Bonds, or failure to consummate the Exchange Offer within 40 days after the Bond Registration

Statement became effective, the issuers would be obligated to increase the interest payments due

to the holders of 144A Bond by 0.25% *per annum* for the first 90-day period following such

failure, plus an additional 0.25% *per annum* for each subsequent 90-day period in which the

failure was not cured, up to a maximum additional interest rate of 1.0% *per annum*.

112.    PIMCO, the PIMCO High Yield Fund, and other members of the Class would not

have purchased the 144A Bonds without the understanding that they would have an opportunity

to exchange them for Registered Bonds. Indeed, the funds and accounts for which PIMCO and

many other class members purchased the 144A Bonds were subject to restrictions on the amount

of unregistered securities they could hold, since, among other reasons, they required flexibility

and liquidity to respond to investors' redemption requests.

### 1.    The Offering Memorandum

113.    The 144A Bonds were marketed to PIMCO, other Qualified Institutional Buyers

and other members of the Class pursuant to the Offering Memorandum, which was first

disseminated on or about July 12, 2004. The Offering Memorandum described the terms of the

45

Bonds, provided information concerning the Company's operations and finances, and contained the Company's audited financial statements for the fiscal years ended February 28, 2004 and February 28, 2003. The Offering Memorandum contained all the information required to be set forth in a prospectus included in a registration statement filed with the SEC.

114.    The Offering Memorandum, which described and provided for the entire two-step process by which the Bonds were transmitted into the market, constituted a prospectus for the Bonds, and was used by the Bond Underwriter Defendants, Bennett, Trosten, Jaeckel, and the THL Partner Defendants to solicit PIMCO, the PIMCO High Yield Fund, and other members of the Class not only to participate in the first step of the offering, but also to participate in the second step exchange by which the 144A Bonds achieved their status as registered, freely tradable securities. The two steps of the offering were inseparable, and each and every communication soliciting the participation of any person in the first step necessarily also solicited participation in the second step.

115.    The Offering Memorandum was created by, among others, Defendants Credit Suisse, BAS, Deutsche Bank, Bennett, Trosten, Jaeckel, the THL Partner Defendants, Mayer Brown, and Collins. Defendant Grant Thornton reviewed the Offering Memorandum prior to its issuance, helped prepare the financial statements and other financial data contained therein, and consented to the inclusion of its audit opinion therein. ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████    ██████████████████████████████



116.    The Offering Memorandum states that Mayer Brown represented Refco Group in connection with the Bond Offering. In that role, Mayer Brown was heavily involved in the process of issuing the 144A Bonds and preparing and disseminating the Offering Memorandum to investors. According to the Examiner's Report, Collins participated in numerous conferences with Bennett and others and "reviewed, revised and reviewed revisions to the offering circular to be submitted in connection with the exchange of the privately purchased notes for publicly traded notes." Other Mayer Brown attorneys, including partners Angela Lang ("Lang") and Edward Best ("Best"), attended numerous drafting sessions where the content of the Offering Memorandum was discussed, drafted and revised, and successive drafts of the Offering Memorandum were routinely circulated to and reviewed and revised by Collins and other Mayer Brown attorneys. Additionally, Collins and other Mayer Brown attorneys personally drafted certain sections of the Offering Memorandum, including the Management Discussion & Analysis ("MD&A") section which was drafted by Best and reviewed by Collins. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████ As described below, the MD&A section of the Offering Memorandum contained a number of material untrue statements and omitted to state facts that were needed to make it not misleading.

117.    As noted by the Examiner, in the midst of these efforts to sell a large portion of Refco to public investors, Collins also sent Refco a billing statement on behalf of Mayer Brown which described time charged to "revision to [Customer X] loan documents." Thus, at the same time Mayer Brown was drafting and reviewing an Offering Memorandum containing representations regarding Refco's financial condition that Mayer Brown knew would be relied upon by potential investors, Mayer Brown was collecting legal fees for its substantial role in transactions that rendered those representations materially false and misleading.

118.    As set forth below, the Offering Memorandum pursuant to which PIMCO, the PIMCO High Yield Fund, and other members of the Class were induced to purchase the Bonds contained a number of untrue statements of material facts and omitted to state material facts needed to make it not misleading.

(a)    The Financial Statements in the Offering Memorandum
Contained Untrue Statements of Material Facts

119.    The Offering Memorandum contained financial statements and other statements regarding the Company's financial performance that purported to demonstrate the Company's soundness, but which in reality contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. These statements were made in several contexts, including (1) in the audited financial statements included in the Offering Memorandum; (2) in the discussion of certain historical consolidated financial data derived from the Company's audited consolidated financial statements; (3) in the unaudited financial statements included in the Offering Memorandum; (4) in the discussion of

48

certain historical consolidated financial data derived from the Company's unaudited consolidated financial statements; and (5) in statements made in the Management Discussion & Analysis ("MD&A") and other textual portions of the Offering Memorandum.

120.    Refco Group's Consolidated Balance Sheets, as audited and certified by Grant Thornton and as included in the Offering Memorandum, stated that Refco Group and its subsidiaries had receivables from customers in the amounts of $1,827,190,000 and $1,795,445,000 for fiscal years 2004 and 2003, respectively; total assets of $33,332,172,000 and $19,215,429,000 for fiscal years 2004 and 2003, respectively; and members' equity of $616,084,000 and $566,361,000 for fiscal years 2004 and 2003, respectively.

121.    Further, Refco Group's Consolidated Statements of Income, as audited and certified by Grant Thornton and as included in the Offering Memorandum, stated that Refco Group and its subsidiaries incurred general, administrative and other expenses in the amounts of $200,902,000 and $167,464,000 for fiscal years 2004 and 2003, respectively; and earned net income of $187,156,000 and $140,119,000 for fiscal years 2004 and 2003, respectively.

122.    Grant Thornton gave its written consent to the inclusion of its audit opinion on the Company's fiscal years 2003 and 2004 financial statements in the Offering Memorandum. In the audit opinion, Grant Thornton certified that those financial statements had been prepared in accordance with GAAP. Grant Thornton's report stated:

### REPORT OF INDEPENDENT REGISTERED
### PUBLIC ACCOUNTING FIRM

To the Members of
**Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheets of Refco Group Ltd., LLC (the "Company") (a Delaware limited liability company) and subsidiaries (the "Group") as of February 29, 2004 and February 28, 2003, and the related consolidated statements of income,

49

changes in members' equity and cash flows for each of the two years then ended....

We conducted our audits in accordance with the auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America.

Grant Thornton LLP
New York, New York
April 27, 2004

123.    In addition to the financial statements audited by Grant Thornton, the Offering

Memorandum presented certain historical consolidated financial data derived from the

Company's consolidated financial statements. Based on the audited financial statements for

fiscal years 2003 and 2004, respectively, the Offering Memorandum reflected EBITDA (that is,

earnings before interest, income tax, depreciation and amortization) for those years of $211

million and $258 million, respectively. Based on the Company's unaudited consolidated

financial statements for fiscal years 2000, 2001 and 2002, the Offering Memorandum reported:

(a)     general, administrative and other expenses in the amounts of $104 million,

$174 million and $172 million for the fiscal years ended February 29, 2000 ("fiscal year

2000"), February 28, 2001 ("fiscal year 2001"), and fiscal year 2002, respectively;

(b)    net income of $45 million, $72 million and $93 million for fiscal years 2000, 2001, and 2002, respectively;

(c)    EBITDA of $92 million, $140 million, and $179 million for fiscal years 2000, 2001, and 2002, respectively;

(d)    total assets of $17.7 billion, $18.2 billion and $22.6 billion for fiscal years 2000, 2001, and 2002, respectively; and

(e)    members' equity of $441 million, $500 million and $522 million for fiscal years 2000, 2001, and 2002, respectively.

124.    The Offering Memorandum also included unaudited financial results for the three month period ended May 31, 2004, which was the first quarter of the Company's fiscal year 2005. For that quarter, the Offering Memorandum reported general, administrative and other expenses in the amount of $57,502,000; net income of $59,270,000; EBITDA of $78 million; total assets of $55,229,109,000; receivables from customers of $2,290,621,000; and members' equity of $671,100,000.

125.    Further, the Offering Memorandum included Unaudited Pro Forma Consolidated Statements of Operations for fiscal year 2004; the twelve months ended May 31, 2004; and the three months ended May 31, 2004. The Unaudited Pro Forma Consolidated Statements of Operations treated the Bond Offering and related transactions as if they had occurred on March 1, 2003. For fiscal year 2004, the Offering Memorandum reflected, on a pro forma basis, general, administrative and other expenses of $188 million and net income of $108 million. For the twelve months ended May 31, 2004, the Offering Memorandum reflected, on a pro forma basis, general, administrative and other expenses of $199 million and net income of $116 million. For the three months ended May 31, 2004, the Offering Memorandum reflected, on a

51

pro forma basis, general, administrative and other expenses of $52 million and net income of $35 million.

126.    In addition, the Offering Memorandum included an Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2004, which treated the Bond Offering and related transactions as if they had occurred on May 31, 2004. As of May 31, 2004, the Offering Memorandum reflected, on a pro forma basis, members' equity of $76 million; receivables from customers of $2.26 billion; and total assets of $55.6 billion.

127.    The textual portions of the Offering Memorandum also included a significant amount of financial information. For example, the MD&A section—which Mayer Brown drafted—contains the following statements:

(a)    "General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2004 increased $14.8 million, or 34.7%, to $57.5 million from $42.7 million for the three months ended May 31, 2003."

(b)    "General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $33.5 million, or 20.0%, to $200.9 million from $167.4 million for the year ended February 28, 2003."

(c)    "Operating profit on a consolidated basis for the three months ended May 31, 2004 increased $21.2 million, or 44.9%, to $68.4 million from $47.2 million for the three months ended May 31, 2003."

(d)    "Operating profit on a consolidated basis for the year ended February 29, 2004 increased $42.9 million, or 27.2%, to $200.6 million from $157.7 million for the year ended February 28, 2003."

(e)    "We currently have no off balance sheet arrangements."

52

(f)     "We generated significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period."

(g)     "[O]ur management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x."

128.    The statements set forth above were materially untrue because Refco failed to disclose the existence of hundreds of millions of dollars of uncollectible receivables, proprietary trading losses, related-party transactions, and guarantees. Additionally, Refco had inappropriately shifted expenses from Refco to RGHI and recorded income on Refco's books that Refco had neither received nor earned, and/or that was the result of "transactions" with RGHI that lacked economic substance and were solely for the purpose of inflating Refco's net income. Among other things, the reported results for receivables from customers, net assets, members' equity, net income and EBITDA discussed above were materially overstated, and the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated. Further, the pro forma financial statements were based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts.

129.   The Company and the THL Partner Defendants have publicly admitted that Refco's reported financial information for fiscal years 2002, 2003 and 2004, as contained in the Offering Memorandum, was untrue and should not be relied upon. Specifically, on October 10, 2005, Refco announced that the Company's financial statements for fiscal years 2002, 2003, and 2004, among other periods – taken as a whole – could no longer be relied upon. The THL Partner Defendants have also conceded, in a complaint filed in this District on November 14, 2005, and styled Thomas H. Lee Equity Fund V., L.P., et al. v. Phillip R. Bennett, et al., No. 05 Civ. 9608 (S.D.N.Y.) (the "THL Complaint"), that the Company's financial statements for these periods (and others) contained untrue statements of material facts.

130.   In addition to the foregoing admissions of Refco and the THL Partner Defendants, Lead Plaintiffs have, in the course of their ongoing investigation, gathered substantial evidence concerning the scope of the untrue statements in the financial statements contained in the Offering Memorandum. Lead Plaintiffs have reviewed documents and conducted witness interviews pertaining to several sets of transactions between Refco and third party customers of Refco which show, among other things, that the financial statements and description of the Company's historical performance contained in the Offering Memorandum contained material statements and omissions of material fact because:

(a)     For a twelve-day period bracketing February 28, 2000, the final day of Refco's fiscal year 2000, a receivable from RGHI to Refco in the amount of $610,000,000 was temporarily replaced with (1) a receivable in the amount of $300,000,000 from BAWAG, (2) a receivable in the amount of $150,000,000 from an entity called CIM Ventures, Inc. ("CIM Ventures"), which was a subsidiary of Ingram Micro, Inc. ("Ingram"), (3) a receivable in the amount of $110,000,000 from an entity

called CS Land Management LLC ("CS Land"), and (4) a receivable in the amount of $50,000,000 from EMF Core Fund Limited ("EMF"), an affiliate of hedge fund manager EMF Financial Products, LLC;

(b)    For a twelve-day period bracketing February 28, 2001, the final day of Refco's fiscal year 2001, a receivable from RGHI to Refco in the amount of $750,000,000 was temporarily replaced with (1) a receivable in the amount of $250,000,000 from CIM Ventures, (2) a receivable in the amount of $300,000,000 from BAWAG, and (3) a receivable in the amount of $200,000,000 from a subsidiary of EMF Financial Products, LLC called Delta Flyer Fund, LLC ("Delta Flyer");

(c)    For a twelve-day period bracketing February 28, 2002, the final day of Refco's fiscal year 2002, a receivable from RGHI to Refco in the amount of $925,000,000 was temporarily replaced with (1) a receivable in the amount of $325,000,000 from a third-party customer of Refco ("Customer X"), (2) a receivable in the amount of $300,000,000 from BAWAG, (3) a receivable in the amount of $175,000,000 from Delta Flyer, and (4) a receivable in the amount of $125,000,000 from Beckenham Trading Company, Inc. ("Beckenham");

(d)    For a sixteen-day period bracketing February 28, 2003, the final day of Refco's fiscal year 2003, a receivable from RGHI to Refco in the amount of $900,000,000 was temporarily replaced with (1) a receivable in the amount of $500,000,000 from Customer X, (2) a receivable in the amount of $250,000,000 from BAWAG, and (3) a receivable in the amount of $150,000,000 from Delta Flyer;

(e)    For a seventeen-day period bracketing February 29, 2004, the final day of Refco's fiscal year 2004, a receivable from RGHI to Refco in the amount of

55

$970,000,000 was temporarily replaced with (1) a receivable in the amount of $720,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from BAWAG; and

     (f)    For a twelve-day period bracketing May 31, 2004, the final day of Refco's first quarter for fiscal year 2005, a receivable from RGHI to Refco in the amount of $700,000,000 was temporarily replaced with a receivable in the amount of $700,000,000 from Customer X.

131.    The Offering Memorandum also contained materially untrue statements by the Company's outside auditor, Defendant Grant Thornton, in addition to those contained within the financial statements that Grant Thornton helped prepare. Grant Thornton's statements that it had "conducted [its] audits in accordance with the auditing standards generally accepted in the United States of America" and that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and its subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America" constituted untrue statements of material facts. Grant Thornton, as set forth more fully below, had not conducted its audits in accordance with GAAS. Further, the Company's financial statements as of February 29, 2004 and February 28, 2003 and the results of its operations and cash flows for each of the two years then ended did not present fairly, in all material respects, the Company's financial position in accordance with GAAP.

        **(b)**    **The Description of Customer Receivables and**
                **Related-Party Transactions in the**
                **Offering Memorandum Contained Untrue**
                <u>**Statements and Omissions of Material Fact**</u>

132.    To assure investors that the Bonds were a sound investment, the Offering

Memorandum stressed that the Company had adequately accounted for doubtful accounts and

related-party transactions. With respect to receivables from and payable to customers, the Notes

To Consolidated Financial Statements stated:

> **Receivables from and payable to customers**
>
> These balances primarily pertain to margin and open contractual
> commitments related to customer futures, foreign currencies and securities
> transactions. ... For certain receivables that are not fully secured and
> where the Group deems appropriate, the Group pursues collection of these
> receivables through various means, including legal action, and provides
> reserves when, in the opinion of management, such reserves are
> appropriate. Reserves of $65.2 million and $42.7 million have been
> provided against receivables from customers as of February 29, 2004 and
> February 28, 2003, respectively.

133.    Similarly, the MD&A section of the Offering Memorandum stated:

> **Receivables from customers-provisions for doubtful accounts.** Our
> receivables are generally collateralized with marketable securities. For
> certain customer receivables that are not fully secured, we establish
> reserves when, in the opinion of management, such reserves are
> appropriate. Reserves of $65.2 million and $42.7 million have been
> provided against receivables from customers as of February 29, 2004 and
> February 28, 2003, respectively.

134.    Further, the Offering Memorandum stated the following regarding related-party

transactions:

> The Group may loan money to and may borrow money from its affiliates,
> members, affiliated companies and other related parties. Interest is
> generally charged at prevailing market rates. The $105 million due from
> Refco Group Holdings, Inc., included in receivables from customers at
> February 28, 2003, was received by February 29, 2004.
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit
> with BAWAG Overseas, Inc., a third party financial institution who is a

member, of $210 million and $175 million, respectively. These balances
were included in "Receivables from customers" and liquidated shortly
after each year-end.

135.    These statements contained untrue statements and omissions of material facts

because they failed to account for the existence of material related-party transactions and related-

party indebtedness between the Company, RGHI and BAWAG, or that the reserves provided

against receivables from customers as of February 29, 2004 and February 28, 2003 were grossly

insufficient, given the hundreds of millions of dollars in uncollectible receivables that the

Company was carrying on its books. As of February 29, 2004 and February 28, 2003, the

Company had $970 million and $900 million in undisclosed uncollectible receivables,

respectively, of which $720 million and $650 million, respectively, were concealed through loan

transactions involving Collins and Mayer Brown.

136.    Further, the Offering Memorandum stated that RGHI owed $105 million to Refco

Group as of February 28, 2003, when in fact that figure would have been much larger were it not

for the temporary shifting of certain RGHI debts to third parties through round trip transactions

arranged by Collins and Mayer Brown just prior to the end of Refco Group's fiscal year. The

Offering Memorandum also failed to disclose that the receivable from RGHI was "paid" by

February 29, 2004 only because the Company had loaned RGHI several hundred million dollars

through BAWAG and Customer X to facilitate that "payment." Moreover, as the SEC would

later remark when reviewing a draft of the Bond Registration Statement containing a similar

characterization (see ¶ 185 below), the inclusion of amounts due from RGHI in "receivables

from customers" was inappropriate. Collins and Mayer Brown participated in the drafting and

review of the Offering Memorandum and were well aware, given their representation of Refco

Group and RGHI and their direct involvement in transactions to conceal the RGHI receivable,

that the descriptions of Refco Group's related party transactions and "receivables from customers" were not accurate.

137.    The Offering Memorandum also mischaracterized and failed to disclose the full extent of the related-party transactions between Refco and BAWAG, by stating that the Company had "deposits" with BAWAG Overseas, Inc. (a wholly-owned BAWAG affiliate) of $210 million and $175 million as of February 29, 2004 and February 28, 2003, respectively, without disclosing any of the loan transactions referenced above.

(c)    **The Offering Memorandum Misrepresented the Reasons for the Company's Purported Success**

138.    The Offering Memorandum portrayed the Company as a rising star in the derivatives market led by a team of dedicated and talented executives.  For example, the Offering Memorandum stated:

> From fiscal year 2000 through fiscal year 2004, our net revenues and EBITDA . . . have increased at a compound annual growth rate of 20.6% and 29.4%, respectively, as a result of organic growth and acquisitions. For the twelve months ended May 31, 2004 ("LTM") on a pro forma basis after giving effect to the Transactions, we generated $1,008.0 million and $269.0 million of net revenues and EBITDA, respectively.

139.    The Company attributed these remarkable results to its "proven and committed management team," stating:

> We are led by a senior management team that has an average of 22 years of industry experience.  Phillip Bennett, who has been with us for 23 years, became our President and CEO in 1998 and formed a new senior management team comprised of well respected industry professionals. Under the leadership of our senior management team, net revenues and EBITDA have grown at a compound annual growth rate of 20.6% and 29.4%, respectively, from fiscal year 2000 through fiscal year 2004.

140.    These statements contained untrue statements of material facts because the Company's financial statements for fiscal years 2002, 2003 and 2004 materially overstated the Company's EBITDA.  Thus, the Company's purported financial results in fiscal years 2000

through 2004 were not due to the "leadership" of its "proven and committed management team," but rather were the result of the failure to disclose uncollectible receivables and related-party transactions, which rendered the Company's financial results for fiscal years 2000 through 2005 materially untrue.

> **(d)      The Offering Memorandum Misrepresented the Company's Ability to Access the Cash It Needed to Service Its Debt**

141.    As discussed above, the Company incurred significant debt in connection with the 2004 recapitalization. As a result, its operations were highly leveraged. The Offering Memorandum emphasized that ready access to cash was critical to the Company's ability to service this debt:

> **To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.**
>
> Our ability to make payments on and to refinance our indebtedness, including the notes and amounts borrowed under our senior credit facilities, and to fund our operations, will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors beyond our control.

(Emphasis in original.)

142.    Because ready access to cash was essential to its business, the Company had an interest in maintaining its high credit rating. The Offering Memorandum disclosed that a reduction in the Company's credit rating could cause a host of unwelcome problems:

> **Liquidity Risk**
>
> Ready access to cash is essential to our business. ... Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties

> could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

(Emphasis in original.)

143.    The Company's ability to access cash to service its debt was of crucial importance to potential Bond investors, because the Bonds were subordinated to the Company's senior indebtedness, including $800 million in term loans and up to $75 million in borrowings that could be incurred under the revolving credit facility.

144.    Because PIMCO, the PIMCO High Yield Fund, and other members of the Class understood when they purchased the Bonds that the Company's ability to make required payments on the Bonds was subject to its ability to generate sufficient cash, any facts that could affect the Company's ability to access the cash it needed to service its senior debt were of special significance to PIMCO, the PIMCO High Yield Fund, and other members the Class.

145.    Accordingly, the Company and those Defendants who prepared the Offering Memorandum, including Mayer Brown and the Underwriter Defendants, took steps to assure PIMCO, the PIMCO High Yield Fund, and other members of the Class that the Company was generating sufficient cash to service its debt and, thus, would be in a position to make required payments on the Bonds. For example, the Offering Memorandum stated:

> We generate significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period. In addition, our management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x.

61

146.    The statements identified above contained untrue statements and omissions of

material facts. The Company had severely jeopardized its credit rating and had overstated its

ability to generate the cash that it needed to service its debt (and, accordingly, its ability to make

the payments that would come due on the Bonds) by including untrue material statements of fact

in its financial statements, and by failing to disclose the existence of hundreds of millions of

dollars in uncollectible receivables and the guarantees Refco Group had given to third parties in

connection with the round-trip loans. If the truth had been disclosed, it would have shown that

Refco failed to comply with its minimum capital requirements and thus impaired its ability to

conduct its business. In addition, the EBITDA results and leverage ratios discussed above were

materially overstated because they were based on the untrue financial statements.

(e)     **The Offering Memorandum Misrepresented
That the Company Had Taken Adequate Steps to
Protect Itself From the Risk of Customer Defaults**

147.    The Company's exposure to customer defaults further compounded the risks

associated with its high degree of leverage. As the Offering Memorandum explained:

> We act on behalf of our customers for all trades consummated both on
> exchanges and in OTC markets. Accordingly, we are responsible for our
> customers' obligations with respect to these transactions, which exposes
> us to significant credit risk. Our customers may default on their
> obligations due to bankruptcy, lack of liquidity, operational failure or
> other reasons. A substantial part of our working capital is at risk if
> customers default on their obligations to us and their margin and security
> deposits are insufficient to meet all of their obligations. We cannot assure
> you that we will not be materially and adversely affected in the event of a
> significant default by our customers.

148.    To allay potential investors' fears that these credit risks would prevent the

Company from making required payments on the Bonds, the Company touted the steps it had

taken to minimize the risk of customer default. In fact, the Company named its "Attractive Risk

Profile" as a "Competitive Strength," stating:

62

We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. We only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading. In order to mitigate customer and counterparty risk, we implement margin technologies, mark-to-market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

149.   Further, the MD&A Section of the Offering Memorandum stated:

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. ... Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's ability to pay margin. We perform frequent stress tests to our customers' positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

150.   These statements contained untrue statements and omissions of material facts because, contrary to the statement that Refco was "not exposed to market risk as a result of proprietary trading," Refco had suffered significant proprietary trading losses. Additionally, contrary to the Company's espoused commitment to safeguarding itself against customer defaults, the Company had experienced significant customer defaults that were not disclosed to the investing public, and that materially impaired the Company's working capital. Further, the Company's financial statements contained untrue material statements and material omissions concerning its hundreds of millions of dollars in uncollectible debt, which was inaccurately reflected on the Company's books as a "customer receivable." This uncollectible debt, if properly disclosed, would have jeopardized the Company's credit rating and its ability to pay

down the senior indebtedness described above, and been a material fact weighed in the

investment decisions of PIMCO, the PIMCO High Yield Fund, and other members of the Class.

> (f)    The Offering Memorandum Misrepresented That
> the Company Maintained Excess Regulatory Capital

151.    The Company operated in a heavily regulated environment that imposed unique

requirements on its business operations.  Among other things, the Company was required to

carry a certain amount of regulatory capital on its books as a condition of its continued operation.

In fact, the Offering Memorandum acknowledged that the Company's failure to maintain

adequate capital levels could be fatal to its continued existence:

> The SEC, NASD, CFTC and various other regulatory agencies have
> stringent rules with respect to the maintenance of specific levels of net
> capital by securities broker-dealers and FCMs.  Our failure to maintain the
> required net capital could result in suspension or revocation of our
> registration by the SEC and our suspension or expulsion by the NASD,
> and could ultimately lead to our liquidation.

152.    To assure potential Bond purchasers that the Company's operations were not at

risk of being shut down due to failure to comply with regulatory capital requirements, the

Offering Memorandum reported that the Company "maintain[ed] excess regulatory capital to

provide liquidity during periods of unusual market volatility."  Specifically, the Offering

Memorandum stated that the Company's regulated subsidiaries, Refco LLC and Refco

Securities, LLC, exceeded their minimum regulatory capital requirements by $95.6 million and

$61.9 million, respectively.

153.    These statements contained untrue statements of material facts because the

Company's reported regulatory capital was overstated and the Company failed to disclose that

Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco

Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason.

Upon information and belief, the Company would not have satisfied its regulatory capital

64

requirements during the Class Period if the true facts were disclosed regarding its hundreds of millions of dollars of uncollectible receivables. To the extent the Company did maintain excess regulatory capital, the excess amounts were materially less than the figures reported in the Offering Memorandum and were not sufficient to "provide liquidity during periods of unusual market volatility," as represented in the Offering Memorandum.

### (g) The Offering Memorandum Failed to Disclose BAWAG's Full Ownership Interest in Refco Group

154.    In describing the Company's ownership, the notes to the financial statements contained in the Offering Memorandum stated that the Company was 90% owned by RGHI, and 10% owned by "BAWAG Overseas, Inc., a third party financial institution." This statement was materially incomplete and misleading, because the Offering Memorandum failed to disclose that BAWAG – the parent entity of BAWAG Overseas – also held a security interest in another 27% of the Company's equity by virtue of various loans by BAWAG to DF Capital and other Bennett-controlled entities.

155.    As a result, investors were led to believe that BAWAG's interest in Refco was limited to 10%, when in fact it held interests in approximately 37% of the Company's equity and therefore was in a position to exercise significant influence and control over the Company. In addition, the description of BAWAG Overseas as a "third-party financial institution" was materially misleading because it failed to disclose the true extent of the business dealings and interlocking relationships between BAWAG, Refco, Bennett, RGHI and other Defendants throughout the Class Period.

### 2.    Presentations to Ratings Agencies

156.    At the same time they were preparing materials to disseminate to potential Bond investors, the Bond Underwriter Defendants, Refco, and the THL Partner Defendants were

working on presentations to Standard & Poor's ("S&P") and Moody's in an effort to achieve the best possible ratings for the 144A Bonds, and thereby to make the Bonds more attractive to investors. The Bond Underwriter Defendants – led by Credit Suisse – drafted the ratings agency presentations and played a central role in communicating with those agencies.



157.    On July 12, 2004, S&P issued a "B" rating on the 144A Bonds, stating that the rating was "based on Refco's strong and well-established franchise" and its "strong and well-seasoned management team and ... good earnings track record." A week later, on July 19, 2004, Moody's assigned a "B3" rating to the 144A Bonds, stating that the rating "reflect[ed] Refco's business franchise and its operating risks" and the fact that – at least as represented by Refco – "[t]he firm takes very limited market risks and almost no unsecured credit risk." These ratings were based in significant part upon the information provided to the ratings agencies by the Bond Underwriter Defendants, Refco, and the THL Defendants.

### 3.    The Bond Road Show

158.    Defendants Bennett, Trosten and Jaeckel, together with representatives of the Bond Underwriter Defendants, led a nationwide road show in July 2004 in an effort to convince investors to purchase the Bonds (the "Bond Road Show"). The Bond Road Show was organized by the Bond Underwriter Defendants, who identified and contacted potential investors and invited them to attend. Representatives of the Bond Underwriter Defendants attended each Road Show meeting and introduced Refco's management team to investors. Those representatives varied from meeting to meeting, but included Credit Suisse representatives Joseph Molluso, Laurence Goldberg, Paul Kromwyk, Lori Finkel, Diron Jebejian and Tiffany Gallo. The Bond Road Show made stops in various cities across the United States and visited numerous institutional investors, including a visit to PIMCO's Newport Beach, California office on July 16, 2004.

159.    During the Bond Road Show, Defendants Bennett, Trosten, Jaeckel and representatives of the Bond Underwriter Defendants made numerous standardized oral statements relating to the Offering Memorandum and to the Company's financial condition and results, including liberal use of the financial statements contained in the Offering Memorandum, which, as explained above, contained untrue statements of material facts.

160.    Among other things, Defendants Bennett and Trosten told investors during the Bond Road Show that the Company had experienced only about $1 million in customer credit losses in the preceding five years (1999-2003), and had suffered no such losses in 1998. These statements were materially untrue and omitted to state material facts because they did not disclose the hundreds of millions of dollars in customer credit losses that the Company had suffered in 1997 and 1998, which had been hidden from the Company's books.

67

161.    Investors were also presented with slide and/or written presentations at the Bond

Road Show which, upon information and belief, were prepared by Defendants Bennett, Trosten,

Jaeckel, and the Bond Underwriter Defendants▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

162.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  The slides also incorrectly

stated that the Company had achieved EBITDA of $208 million and $256 million for fiscal years

2003 and 2004, respectively, and $269 million for the twelve months ending May 31, 2004.

These figures were materially untrue because of Defendants' failure to write off hundreds of

millions of dollars in losses and uncollectible receivables, inappropriate shifting of expenses

from Refco to RGHI, recording of bogus income on Refco's books, and failure to disclose that

Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco

Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason.

The Bond Road Show slides similarly contained statements regarding the Company's revenues,

pre-tax operating income, and leverage that were untrue for the same reasons they were untrue in

the Offering Memorandum.

163.    Based on feedback received at the Bond Road Show, as well as the ratings given

to the 144A Bonds by Moody's and S&P, the Bond Underwriter Defendants – together with

Refco management and representatives of the THL Partner Defendants – determined the pricing

of the 144A Bonds. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

████████████████████████████████████

████████████████████████████████████

██████████████████████

164.   In reliance on the information received during the Bond Road Show, the information contained in the Offering Memorandum (including the untrue financial statements contained therein, which, as set forth above, contained untrue statements of material fact), and the Company's commitment to complete the Exchange Offer, PIMCO, the PIMCO High Yield Fund, and numerous other institutional investors purchased the 144A Bonds.

### 4.   The Bond Registration Statement

165.   Pursuant to the Registration Rights Agreement, the Company filed a Form S-4 Registration Statement with the SEC on October 12, 2004, which was subsequently amended through Form S-4/A filings dated December 10, 2004; January 12, 2005; February 23, 2005; March 11, 2005; April 5, 2005; and April 6, 2005 (collectively, the "Bond Registration Statement"). The filing of the Bond Registration Statement allowed for the exchange of the 144A Bonds for Registered Bonds, as originally contemplated in the Offering Memorandum.

166.   The Bond Registration Statement became effective, and Registered Bonds were issued pursuant thereto, on or about April 13, 2005. The Exchange Offer remained open until May 10, 2005, at which time PIMCO and the PIMCO High Yield Fund exchanged their 144A Bonds for Registered Bonds.

167.   The co-issuers of the Registered Bonds were Refco Group and its wholly-owned subsidiary, Refco Finance. Additionally, there were a number of co-registrants for the Registered Bonds, including, among others, Lind-Waldock, Refco Futures, and Westminster-Refco.

69

168.    Defendant Bennett signed the Bond Registration Statement on behalf of Refco Group. In addition, Defendants Sherer, Murphy, Sexton, Maggio, Silverman and Klejna (through their attorney-in-fact Defendant Bennett) signed the Bond Registration Statement on behalf of Refco Group. Other signatories on the Bond Registration Statement included Refco Finance (through Bennett and Silverman), Lind-Waldock (through Bennett and Silverman), Refco Futures (through Bennett, Silverman and Murphy), and Westminster-Refco (through Bennett, Silverman and Murphy).

169.    The Offering Memorandum was used as the foundation for preparing the Bond Registration Statement, and, therefore, the two documents were substantially similar in content. This fact was understood and expected by the parties that prepared the Offering Memorandum, including Mayer Brown and the Bond Underwriter Defendants, and thus those parties knew when they were preparing the Offering Memorandum that they were also preparing statements which would be repeated in the Bond Registration Statement.

170.    The Bond Underwriter Defendants, Collins, and Mayer Brown also participated in the preparation of the Bond Registration Statement itself. The drafting of the Bond Registration Statement was an iterative process, involving several rounds of comments from the SEC staff and responsive changes by Refco. It was only after six amendments to the Bond Registration Statement that the SEC was satisfied with the disclosures and the Bond Registration Statement became effective. The Bond Underwriter Defendants and Mayer Brown received and reviewed the SEC comment letters and the amendments of the Bond Registration Statement that addressed those comments, and participated in drafting sessions for amendments of the Bond Registration Statement. Moreover, the amendment of the Bond Registration Statement occurred hand-in-hand with the preparation of the IPO Registration Statement, and Mayer Brown (which

70

represented Refco in connection with the IPO) and the Bond Underwriter Defendants (which were also underwriters and joint bookrunners of the IPO) participated in both processes simultaneously.

171. 

172.    Drafts of Refco's response to the SEC's November 10 comment letter and of Amendment No. 1 to the Bond Registration Statement were circulated to the Bond Underwriter Defendants in early December 2004.

71



173.

Among other comments, Cravath suggested that the description of Refco's credit risk be supplemented with examples of events that had given rise to the Company's reserves against receivables from customers, such as the Asian economic crisis. Cravath's comments on the Bond Registration Statement also make reference to Cravath's having participated in an earlier drafting session for that document on behalf of the Bond Underwriter Defendants.

174.    On December 9, 2004, following the drafting session, another draft was circulated which Cravath again reviewed and heavily edited on behalf of the Bond Underwriter Defendants, including making significant revisions to the MD&A section. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

175.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████

176.    ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

██████████████████████

177.    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

 Those comments included significant revisions and edits.

178. ███████████████████████████████████████████████████████████████████████ On or about February 23, 2005, Refco filed a third amendment to the Bond Registration Statement, incorporating the comments received from the Bond Underwriter Defendants' counsel, as modified by CSFB.

179. ███████████████████████████████████████████████████████████████████████

180. ███████████████████████████████████████████████████████████████████████

181.    The final Bond Registration Statement, which was filed on or about April 6, 2005, contained material untrue statements substantially similar to those set forth above from the Offering Memorandum, including but not limited to the statements set forth in ¶¶ 132-153 above

regarding the Company's reserves for customer receivables, its purported non-participation in proprietary trading, and its maintenance of "excess regulatory capital." These statements were untrue for the same reasons as in the Offering Memorandum. In particular, like the Offering Memorandum, the Bond Registration Statement failed to disclose either the existence of the multi-hundred million dollar receivable owed by RGHI to Refco, or the round-trip "loan" transactions whereby that receivable had been removed from Refco's books at the end of its financial reporting periods.

182.    The Bond Registration Statement contained the Company's audited financial statements for fiscal years 2003 and 2004, as well as Grant Thornton's audit report thereon. In the original Form S-4 filed on October 12, 2004, these audited financial statements and audit opinion were identical to those in the Offering Memorandum, and contained untrue statements of material facts for the same reasons.

183.    In the amendments to the Form S-4, although the figures for net income, total assets, and members' equity were the same as in the Offering Memorandum, different figures were reported for certain line items on the financial statements, including, but not limited to, cash and cash equivalents; receivables from customers; payables to customers; total revenues (as well as all component items of total revenues); and general, administrative and other expenses. In the December 2004 and subsequent amendments of the Bond Registration Statement, the Company reported customer receivables of $1,591,385,000 and $1,490,380,000 for fiscal years 2004 and 2003, respectively (net of $65.2 million and $42.7 million in reserves, respectively); and $170,415,000 and $142,585,000 in general, administrative and other expenses for those periods, respectively. In addition, the December 2004 and subsequent amendments of the Bond

Registration Statement reflect $210 million and $280 million in receivables from equity members, whereas the Offering Memorandum and the original Form S-4 disclosed none.

184.    The audited financial statements in the amendments to the Bond Registration Statement, though different from those in the Offering Memorandum, contained untrue statements of material facts for the same reasons as those in the Offering Memorandum, including the failure of the Company to disclose that Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason.  Specifically, the reported results for members' equity and net income were materially overstated, while the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated.

185.    The related-party disclosures in the amendments to the Bond Registration Statement also contained untrue statements of material facts.  Specifically, the related-party disclosures in the amendments to the Bond Registration Statement stated:

> The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties.  Interest is generally charged at prevailing market rates.  *The $105.3 million due from Refco Group Holdings, Inc., included in "Receivables from equity members" at February 28, 2003, was received by February 29, 2004.*
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210.2 million and $175.2 million, respectively.  *These balances were also included in "Receivables from equity members" and liquidated shortly after each year-end.*

(Emphasis added.)  Thus, the same receivables that were characterized as "receivables from customers" in the Offering Memorandum had been recharacterized in the Bond Registration Statement as "receivables from equity members."  This change was a result of the SEC's November 10, 2004 comment letter on the Company's October 12, 2004 draft of the Bond

Registration Statement, wherein the SEC questioned why amounts due from equity members (including RGHI) were being characterized as receivables from customers. Collins received a copy of the SEC's comment letter no later than November 11, 2004, the day after it was released. Collins and Mayer Brown, given their intimate knowledge of these receivables, knew or recklessly disregarded well before the SEC reviewed the Bond Registration Statement that those receivables were not customer receivables, yet they had reviewed and given their approval to the Offering Memorandum, which characterized them as customer receivables. Certainly after learning of the SEC's comments and the resulting change in this language, they were aware that the RGHI receivable was being mischaracterized.

186. Even as modified based on the SEC's comments, the related-party disclosures in the Bond Registration Statement contained untrue statements and omissions of material facts because Defendants failed to disclose the existence and full extent of the related-party transactions and the related-party indebtedness between the Company, RGHI and BAWAG described herein. Further, the Bond Registration Statement failed to disclose the Refco Group guarantees to Customer X and Delta Flyer, or the fact that the receivable from RGHI was "paid" by February 29, 2004 only because the Company had loaned RGHI several hundred million dollars through BAWAG and Customer X to facilitate that "payment" (which was unwound a few days later).

187. Despite the differences in the financial statements and disclosures contained in the October 12, 2004 Form S-4 filing and the subsequent amendments of the Bond Registration Statement, the same audit report from Grant Thornton, dated October 8, 2004, accompanied each. The audit report in the Bond Registration Statement, which was included with Grant Thornton's consent, contained untrue statements of material facts for the same reasons as set

77

forth above with respect to the audit report in the Offering Memorandum, namely, it inaccurately represented that Grant Thornton conducted its audits in accordance with GAAS and that the Company's financial statements "present[ed] fairly, in all material respects, the financial position of [the Company] ... in conformity with accounting principles generally accepted in the United States of America."

188.    The Notes To Consolidated Financial Statements in the Bond Registration Statement contained the following disclosures concerning customer receivables and payables:

Receivables from customers at each year end are as follows:

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| Futures transactions | $ 212,299 | $ 209,629 |
| Foreign currency and other OTC derivative transactions | 38,724 | 364,711 |
| Securities transactions | 1,340,362 | 916,040 |
| | $ 1,591,385 | $ 1,490,380 |

***

These receivables are generally collateralized with marketable securities. The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies, and generally does not charge-off any of these receivables. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

189.    These disclosures omitted to state material facts, because they failed to disclose that the reserves provided against receivables from customers as of February 29, 2004 and February 28, 2003 were grossly insufficient, given the (at least) $900 million in uncollectible

receivables – amounting to nearly half of the Company's reported receivables – that the Company was carrying on its books. They also failed to disclose that Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason.

190.    The Bond Registration Statement also contained unaudited financial information relating to periods post-dating the Offering Memorandum. Specifically, the Company reported that it had incurred general, administrative and other expenses in the amounts of $97 million and $76 million for the periods from March 1, 2004 through August 5, 2004 and from August 6, 2004 through November 30, 2004, respectively; that it had earned net income of $98 million and $43 million in those same periods, respectively; and that it had members' equity of $127 million as of November 30, 2004.

191.    Further, the Company provided Unaudited Pro Forma Consolidated Statements of Income for fiscal year 2004, and for the nine months ended November 30, 2004. The Unaudited Pro Forma Consolidated Statements of Income treated the Bond Offering and related transactions as if they had occurred on March 1, 2003. For fiscal year 2004, the Bond Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $190,323,000 and net income of $114,769,000. For the nine months ended November 30, 2004, the Bond Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $181,015,000 and net income of $105,478,000.

192.    The pro forma financial data contained in the Bond Registration Statement was based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts.

79

193.   In addition to the admissions of Refco and the THL Partner Defendants and other evidence concerning the financial statements in the Offering Memorandum discussed above, Lead Plaintiffs' investigation has revealed that the additional financial statements contained in the Bond Registration Statement contained materially untrue statements and omissions of material fact because:

> (a)   For a fourteen-day period bracketing August 31, 2004, the final day of Refco's second quarter for fiscal year 2005, a receivable from RGHI to Refco in the amount of $485,000,000 was temporarily replaced with a receivable in the amount of $485,000,000 from Customer X; and

> (b)   For an eight-day period bracketing November 30, 2004, the final day of Refco's third quarter for fiscal year 2005, a receivable from RGHI to Refco in the amount of $545,000,000 was temporarily replaced with a receivable in the amount of $545,000,000 from Customer X.

194.   Based on the untrue statements in the Bond Registration Statement, the issuers were able to consummate the Exchange Offer and exchange Registered Bonds for the outstanding 144A Bonds. Had the issuers been unable to have the Bond Registration Statement declared effective by the SEC, they would have been unable to consummate the Exchange Offer, and the holders of the 144A Bonds would have been entitled to receive an increased rate of interest on their bonds.

> E.   **The August 2005 Initial Public Offering**

195.   With the consummation of the LBO and the successful Bond Offering under their belts, Refco's insiders (which included the THL Defendants) were perfectly positioned to cash out by taking the Company public. On or about August 10, 2005, Refco sold approximately 20% of its shares to RH Capital and other members of the Class in the IPO. Defendants Credit Suisse,

Goldman Sachs, and BAS acted as Joint Book-Running Mangers of the IPO. Defendants

Deutsche Bank, J.P. Morgan, Sandler O'Neill, and HSBC acted as Co-Managers of the IPO.

Defendants William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams

Capital, and Utendahl acted as underwriters of the IPO.

196.    To market the IPO to investors, Refco's management conducted an extensive road

show – arranged by the Stock Underwriter Defendants – ███████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.

197.    In order to issue stock to the investing public, Refco formed a new holding

company. The chart below (taken from the IPO Prospectus) summarizes the structure of the

Company upon completion of the IPO:



1.    **The IPO Registration Statement**

198.    In the IPO, Refco offered approximately $670 million worth of stock to the

investing public as follows: (1) 26,500,000 shares as part of the initial IPO, and (2) an additional

3,975,000 shares issued pursuant to an option (known as the "green shoe option") granted to the

Stock Underwriter Defendants by Refco to cover over-subscriptions of shares.  The IPO was

conducted pursuant to a Form S-1 registration statement dated April 8, 2005, a Form-S-1/A

registration statement dated May 27, 2005, a Form S-1/A registration statement dated July 1,

2005, a Form S-1/A registration statement dated July 20, 2005, a Form S-1/A registration

statement dated July 25, 2005, a Form S-1/A registration statement dated August 8, 2005, a Form

S-1/A registration statement dated August 10, 2005, and a Form 424B1 prospectus dated August

10, 2005 (the "IPO Prospectus" or the "Prospectus") (collectively, the "IPO Registration

Statement"), which were filed with the SEC.

199.    Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley,

and Schoen signed the IPO Registration Statement.

200.    The Underwriter Defendants played a central role in the drafting of the IPO

Registration Statement.  According to the organizational materials for the IPO that were prepared

by Credit Suisse, Goldman Sachs and BAS, the Underwriter Defendants shared "principal

drafting" responsibility for numerous sections of the IPO Registration Statement, including the

Prospectus Summary, the Risk Factors, the Selected Financial Data, and the MD&A.

201.    Collins and Mayer Brown likewise were directly involved in reviewing and

drafting the IPO Registration Statement, and the IPO Registration Statement specifically

disclosed that Mayer Brown acted as counsel to Refco in connection with the transactions.

According to the Examiner's Report, Mayer Brown (through Collins) "received and presumably

82

reviewed the SEC's comments [to the initial S-4 and S-1 filings], Weil's responses, the SEC's replies, and the amended S-1s."

202.    The IPO Registration Statement includes the Company's audited financial statements for fiscal years 2003, 2004, and 2005, which were prepared with substantial assistance and participation by Grant Thornton. These audited financial statements include the Company's audited consolidated statements of income, statement of changes in members' equity and consolidated statements of cash flows, as of February 28, 2005, February 29, 2004, and February 28, 2003, and the Company's audited consolidated balance sheet as of February 28, 2005 and February 29, 2004.

203.    As set forth below, the IPO Registration Statement pursuant to which RH Capital and other members of the Class were induced to purchase Refco stock contained a number of untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. In particular, like the Offering Memorandum for the Bonds and the Bond Registration Statement, the IPO Registration Statement failed to disclose the existence of the multi-hundred million dollar receivable owed by RGHI to Refco, or the round-trip "loan" transactions by which that receivable was systematically removed from Refco's books at the end of its financial reporting periods.

(a)    **The Financial Statements in the IPO Registration Statement Contained Untrue Statements of Material Facts**

204.    The IPO Registration Statement contained financial statements and other statements regarding the Company's financial performance that purported to demonstrate the Company's soundness, but which in reality contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. These statements were made in several contexts, including (1) in the audited

83

financial statements included in the IPO Registration Statement; (2) in the discussion of certain historical consolidated financial data derived from Refco's audited consolidated financial statements; (3) in the unaudited financial statements included in the IPO Registration Statement; (4) in the discussion of certain historical consolidated financial data derived from Refco's unaudited consolidated financial statements; and (5) in statements made in the MD&A and other textual portions of IPO Registration Statement.

205.    Refco's Consolidated Balance Sheets, as audited and certified by Grant Thornton and as included in the IPO Registration Statement, stated that the Company had receivables from customers (net of $61,190,000 in reserves) of $2,081,968,000 and $1,591,385,000 (net of $65,200,000 in reserves) for fiscal years 2005 and 2004, respectively; total assets of $48,765,349,000 and $33,332,172,000 for fiscal years 2005 and 2004, respectively; and members' equity of $150,250,000 and $616,084,000 for fiscal years 2005 and 2004, respectively.

206.    Refco's Consolidated Statements of Income contained in the IPO Registration Statement reported that the Company had net income of $176,287,000, $187,156,000 and $140,119,000 for fiscal years 2005, 2004, and 2003, respectively; and general, administrative and other expenses of $243,546,000. $170,415,000 and $142,585,000 for fiscal years 2005, 2004, and 2003, respectively.

207.    Grant Thornton gave its written consent to the incorporation of its audit opinion on the Company's fiscal years 2003, 2004, and 2005 financial statements into the IPO Registration Statement. In the audit opinion, Grant Thornton certified that those financial statements had been prepared in accordance with GAAP. Grant Thornton's report stated:

## REPORT OF INDEPENDENT REGISTERED
## PUBLIC ACCOUNTING FIRM

To the Members of
**New Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheet of New Refco Group Ltd., LLC (the "Successor" or "Company") (a Delaware limited liability company) and subsidiaries as of February 28, 2005 and the related consolidated statements of income, changes in members' equity and cash flows for the period from August 6, 2004 through February 28, 2005....

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement...

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New Refco Group Ltd., LLC and subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note H(1)(i), the notes to the consolidated financial statements have been restated to include summarized financial information related to a significant equity method investment.

Grant Thornton LLP
New York, New York
May 24, 2005 (except for Note H(1)(i) as to which the date is
July 19, 2005)

In a second audit opinion letter incorporated in the IPO Registration Statement, Grant Thornton gave the same opinion regarding the Company's financial statements for Refco's consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in the members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for fiscal years 2003 and 2004.

85

208.    In addition to the financial statements audited by Grant Thornton, the IPO

Registration Statement presented certain historical consolidated financial data derived from the

Company's audited consolidated financial statements for fiscal years 2002, 2003, 2004, and

2005, including the information set forth in the following chart (in millions):

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| Total Assets | $22,611 | $19,215 | $33,332 | $48,765 |
| Members Equity | $515 | $566 | $616 | $150 |

209.    The IPO Registration Statement also included the Company's unaudited financial

statements for the three month periods ending May 31, 2005 and May 31, 2004.  These

unaudited financial statements included the Company's consolidated balance sheets for the three

months ended May 31, 2005, and its consolidated statements of income, consolidated statements

of changes in members' equity and consolidated statements of cash flows for the three months

ended May 31, 2005 and May 31, 2004.  The unaudited financial statements included in the IPO

Registration Statement stated that Refco had:

      (a)     Total assets of $74,317,191,000 for the three months ended May 31, 2005;

      (b)     Members' equity of $185,427,000 and $671,100,000 for the three months

ended May 31, 2005 and May 31, 2004, respectively;

      (c)     Receivables from customers of $1,807,446,000 (net of reserves of

$62,107,000) and $2,081,968,000 (net of reserves of $61,190,000) for the three months

ended May 31, 2005 and fiscal year 2005, respectively; and

      (d)     Net income of $42,587,000 and $59,270,000 for the three months ended

May 31, 2005 and May 31, 2004, respectively.

210.    The IPO Registration Statement also included Unaudited Pro Forma Consolidated Statements of Income for the year ended February 28, 2005 and the three months ended May 31, 2005. The Unaudited Pro Forma Consolidated Statements of Income treated the Bond Offering and related transactions as if they had occurred on March 1, 2004. For fiscal year 2005, the IPO Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $247,239,000 and net income of $105,681,000. For the three months ended May 31, 2005, the IPO Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $61,456,000 and net income of $31,920,000.

211.    Further, the IPO Registration Statement included an Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2005. The Unaudited Pro Forma Consolidated Balance Sheet treated the Bond Offering and related transactions as if they had occurred on May 31, 2005. As of May 31, 2005, the IPO Registration Statement reflected, on a pro forma basis, receivables from customers (net of reserves) of $1,807,446,000; total assets of $74,413,468,000; and members' equity of $491,704,000.

212.    In addition, the IPO Registration Statement included financial information derived from the Company's unaudited consolidated financial statements for fiscal year 2001. For example, the IPO Registration Statement reported that the Company had net income of $72 million; total assets of $18,277 million; and members' equity of $500 million for that fiscal year.

213.    The IPO Registration Statement also included a significant amount of financial information set forth in the textual portions of the IPO Prospectus, including the MD&A section. For instance, the IPO Prospectus stated: "[F]or the year ended February 28, 2005, we generated … $176.3 million of net income and for the three months ended May 31, 2005, we generated …

87

$42.6 million of net income." The Prospectus also makes the following statements, among others, regarding the Company's financial results and business operations:

(a)    "operating profit has increased from $61.0 million in fiscal year 2000 to $150.6 million in fiscal year 2005, a compound annual growth rate of 19.8%";

(b)    "Derivatives Brokerage & Clearing Operating profit for the three months ended May 31, 2005 decreased $5.4 million, or 13.2%, to $35.5 million from $40.9 million for the three months ended May 31, 2004."

(c)    "Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2005 increased $18.5 million, or 58.5%, to $50.1 million from $31.6 million for the three months ended May 31, 2004."

214.    In addition, the IPO Registration Statement included certain information regarding Refco's purported compliance with its credit covenants, including the statement that the Company's Consolidated EBITDA for the twelve months ended May 31, 2005 was $296,747,000 and that its Actual Leverage Ratio was 3.03x.

215.    These statements were materially untrue because Refco failed to disclose the existence of hundreds of millions of dollars worth of uncollectible receivables, losses and related-party transactions, and failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any reason. Among other things, the reported results for receivables from customers, net assets, members' equity, net income and EBITDA discussed above were materially overstated, and the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated. Further, the pro forma financial statements were based on the

88

Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts. On October 10, 2005, Refco admitted that, because of this uncollectible receivable and the undisclosed related-party transactions, the Company's financial statements for fiscal years 2002, 2003, 2004, 2005 and the quarter ended May 31, 2005, each of which was included in the IPO Registration Statement, could no longer be relied upon. The THL Partner Defendants have likewise admitted in the THL Complaint that the Company's financial statements for each of these periods contained untrue statements of material facts.

216.    In addition to the foregoing admissions of Refco and the THL Partner Defendants, Lead Plaintiffs have gathered substantial evidence concerning the scope of the untrue statements in the financial statements contained in the IPO Registration Statement. As describe above, Lead Plaintiffs have reviewed documents and conducted witness interviews relating to several sets of transactions between Refco and third-party customers of Refco and/or BAWAG, which show, among other things, that the financial statements and description of the Company's historical performance contained in the IPO Registration Statement contained material statements and omissions of material fact because:

(a)    For a twelve-day period bracketing February 28, 2000, the final day of Refco's fiscal year 2000, a receivable from RGHI to Refco in the amount of $610,000,000 was temporarily replaced with (1) a receivable in the amount of $300,000,000 from BAWAG, (2) a receivable in the amount of $150,000,000 from CIM Ventures, (3) a receivable in the amount of $110,000,000 from CS Land, and (4) a receivable in the amount of $50,000,000 from EMF;

(b)    For a twelve-day period bracketing February 28, 2001, the final day of
Refco's fiscal year 2001, a receivable from RGHI to Refco in the amount of
$750,000,000 was temporarily replaced with (1) a receivable in the amount of
$250,000,000 from CIM Ventures, (2) a receivable in the amount of $300,000,000 from
BAWAG, and (3) a receivable in the amount of $200,000,000 Delta Flyer;

(c)    For a twelve-day period bracketing February 28, 2002, the final day of
Refco's fiscal year 2002, a receivable from RGHI to Refco in the amount of
$925,000,000 was temporarily replaced with (1) a receivable in the amount of
$325,000,000 from Customer X, (2) a receivable in the amount of $300,000,000 from
BAWAG, (3) a receivable in the amount of $175,000,000 from Delta Flyer, and (4) a
receivable in the amount of $125,000,000 from Beckenham;

(d)    For a sixteen-day period bracketing February 28, 2003, the final day of
Refco's fiscal year 2003, a receivable from RGHI to Refco in the amount of
$900,000,000 was temporarily replaced with (1) a receivable in the amount of
$500,000,000 from Customer X, (2) a receivable in the amount of $250,000,000 from
BAWAG, and (3) a receivable in the amount of $150,000,000 from Delta Flyer;

(e)    For a seventeen-day period bracketing February 29, 2004, the final day of
Refco's fiscal year 2004, a receivable from RGHI to Refco in the amount of
$970,000,000 was temporarily replaced with (1) a receivable in the amount of
$720,000,000 from Customer X; and (2) a receivable in the amount of $250,000,000
from BAWAG;

(f)    For a twelve-day period bracketing May 31, 2004, the final day of Refco's
first quarter for fiscal 2005, a receivable from RGHI to Refco in the amount of

$700,000,000 was temporarily replaced with a receivable in the amount of $700,000,000 from Customer X;

(g)    For a fourteen-day period bracketing August 31, 2004, the final day of Refco's second quarter for fiscal 2005, a receivable from RGHI to Refco in the amount of $485,000,000 was temporarily replaced with a receivable in the amount of $485,000,000 from Customer X;

(h)    For an eight-day period bracketing November 30, 2004, the final day of Refco's third quarter for fiscal 2005, a receivable from RGHI to Refco in the amount of $545,000,000 was temporarily replaced with a receivable in the amount of $545,000,000 from Customer X;

(i)    Between December 30, 2004 and January 4, 2005, a receivable from RGHI to Refco in the amount of $550,000,000 was temporarily replaced with a receivable in the amount of $550,000,000 from Customer X;

(j)    For a sixteen-day period bracketing February 28, 2005, the final day of Refco's fiscal year 2005, a receivable from RGHI to Refco in the amount of $595,000,000 was temporarily replaced with (1) a receivable in the amount of $345,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from BAWAG; and

(k)    For a twelve-day period bracketing May 31, 2005, the final day of Refco's first quarter for fiscal year 2006, a receivable from RGHI to Refco in the amount of $450,000,000 was temporarily replaced with a receivable in the amount of $450,000,000 from Customer X.

217.    Defendant Grant Thornton's statements that it had "conducted [its] audits in accordance with the auditing standards generally accepted in the United States of America" and that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and its subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America" also constituted untrue statements of material facts.  Grant Thornton's second audit opinion letter gave the same opinion regarding the Company's financial statements for Refco's consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in the members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for fiscal years 2003 and 2004.  Grant Thornton, as set forth more fully below, had not conducted its audits in accordance with GAAS.  Further, the Company's financial statements for the periods mentioned above and the results of its operations and cash flows for those same periods did not present fairly, in all material respects, the Company's financial position in accordance with GAAP.

> (b)    **The Description of Customer Receivables and Related-Party Transactions in the IPO Registration Statement Contained Untrue Statements and Omissions of Material Fact**

218.    To assure investors that the Company was sound, the IPO Registration Statement stated that the Company had adequately accounted for doubtful accounts and related-party transactions.  With respect to receivables from and payable to customers, the Notes to the Company's Consolidated Financial Statements state:

> **Receivables from and payable to customers**
>
> These balances primarily pertain to margin and open contractual commitments related to customers' futures, foreign currency forward and

securities transactions. Receivables from and payable to customers in connection with futures and foreign currency forward transactions include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions include amounts due on cash and margin transactions.

\* \* \*

The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies. Reserves of $61.2 million and $65.2 million have been provided against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. The Group generally nets receivables and payables related to its customers' futures, foreign currency forwards and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

(Emphasis in original.)

219.    In addition, the MD&A section of the IPO Registration Statement provided:

**Receivables from Customers-Provisions for Doubtful Accounts.** Our receivables are generally collateralized with marketable securities. For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion of management, such reserves are appropriate. We have established reserves of $61.2 million and $65.2 million against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers. The allowance is assessed to reflect best [sic] estimate of probably losses that have been incurred as of the balance sheet date.

(Emphasis in original.)

220.    Further, the Prospectus included the following statement regarding related-party

transactions:

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates.

As of February 29, 2004, the Group had a deposit with BAWAG Overseas, Inc., a third-party financial institution who was a member, of $210.2 million. This balance was also included in "Receivables from Customers" and liquidated shortly after each year-end.

221.    These statements were untrue and omitted material facts because they failed to disclose the existence of the related-party transactions or the related-party indebtedness between the Company, RGHI and BAWAG. Although early versions of the Form S-1 had included the $105 million receivable from RGHI that had been reflected in the Offering Memorandum and Bond Registration Statement, and had characterized that receivable as being owed by "equity members," the final IPO Registration Statement omitted any reference to that receivable. Collins and Mayer Brown, who participated in the drafting and review of the IPO Registration Statement, knew or recklessly disregarded that RGHI owed the Company not only $105 million but substantially more, yet that receivable was not disclosed.

222.    The IPO Registration Statement also failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any reason, or that the reserves provided against receivables from customers as of February 28, 2005 and February 29, 2004 were grossly insufficient given the hundreds of millions of dollars of uncollectible receivables that the Company was carrying on its books. As of February 28, 2005 and February 29, 2004, the Company had $345 million and $970 million in undisclosed uncollectible receivables, respectively, of which the entire $345 million for 2005 and $720 million for the preceding year were removed from Refco's books through round-trip "loan" transactions involving Mayer Brown.

94

223.    The IPO Registration Statement also mischaracterized and failed to disclose the

full extent of the related-party transactions between Refco and BAWAG, by stating that the

Company had a "deposit" with BAWAG Overseas, Inc. of $210.2 million as of February 29,

2004, without disclosing any of the transactions referenced above.

> (c)    **The IPO Registration Statement Misrepresented**
> **That the Company Had Taken Adequate Steps to**
> **Protect Itself From the Risk of Customer Defaults**

224.    The IPO Registration Statement explained Refco's exposure to customer and

counter-party risks as follows:

> We are exposed to the risk that third parties that owe us money, securities
> or other assets will not perform their obligations. These parties may
> default on their obligations to us due to bankruptcy, lack of liquidity,
> operational failure or other reasons. As a clearing broker, we generally
> bear the risk of the defaults or misconduct of our customers. In addition,
> we have experienced, due to competitive factors, pressure to extend credit
> and to price more aggressively the credit risks we take. Although we
> regularly review credit exposures to specific customers and counterparties
> and to specific industries, countries and regions that we believe may
> present credit concerns, default risk may arise from events or
> circumstances that are difficult to detect or foresee. In addition, concerns
> about, or a default by, one institution could lead to significant liquidity
> problems, losses or defaults by other institutions, which in turn could
> adversely affect us.

225.    To allay potential investors' concerns over these potential risks, the IPO

Registration Statement touted the Company's supposed ability to "manage risk prudently,"

stating: "We plan to continue to monitor and improve our exposure to customer and

counterparty risk throughout our operations using our comprehensive risk management system."

In addition, the IPO Registration Statement stated:

> As a matter of policy, we continue to upgrade our risk management
> procedures and systems to improve our ability to monitor actual and
> projected risk associated with customer positions. Our Global Risk
> Management department is responsible for the systematic review of
> customer exposure in both regulated and nonregulated markets. Our

current system provides the ability to project the impact of market
volatility on price movement.

226.     These statements contained untrue statements and omissions of material facts

because, contrary to the Company's espoused commitment to safeguarding itself against

customer defaults, the Company had experienced significant customer defaults which were not

disclosed to the investing public, and failed to disclose that Refco had given Customer X a

written guarantee, signed by Bennett, assuring Customer X that Refco Group would

unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any

reason, and which materially impaired the Company's working capital.  Further, the Company's

financial statements contained untrue material statements and material omissions concerning its

hundreds of millions of dollars in uncollectible debt.  This uncollectible debt, if properly

disclosed, would have jeopardized the Company's credit rating and its ability to pay down the

senior indebtedness described above, and been a material fact weighed in the investment

decisions of RH Capital and other members of the Class.

> ### (d)     The IPO Registration Statement Misrepresented That
> ### The Company Maintained Excess Regulatory Capital

227.     The IPO Registration Statement disclosed:

> We are extensively regulated by the Commodity Futures Trading
> Commission; the SEC; the National Association of Securities Dealers, our
> designated self-regulatory organization with respect to our registration as a
> broker-dealer; the Chicago Mercantile Exchange, our designated self-
> regulatory organization with respect to our registration as a Futures
> Commission Merchant; the National Futures Association; other exchanges
> of which we are a member; state regulatory agencies; and other domestic
> and foreign clearing organizations.  If we fail to comply with applicable
> laws, rules or regulations, we may be subject to criminal conviction,
> increased reporting requirements, censure, fines, cease-and-desist orders,
> suspension of our business, removal of personnel, civil litigation or other
> sanctions, including revocation of our operating licenses.

228.     To assure potential stock purchasers that the Company was complying with

regulatory capital requirements, the IPO Registration Statement stated that "[a]s a matter of

policy, we maintain excess regulatory capital to provide liquidity during periods of unusual

market volatility, and this has been sufficient in the past to absorb volatile market events."

229.    The IPO Registration Statement also stated:  "[A]s of May 31, 2005, Refco, LLC

had net capital of $354.5 million, which was $167.7 million in excess of required net capital . . .

As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of

aggregate debit balances and $49.6 million in excess of required net capital . . . ."

230.    These statements contained untrue statements of material fact because the

Company's reported regulatory capital was overstated and the Company failed to disclose that

Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that

Refco Group would unconditionally repay RGHI's various loans from Customer X if RGHI were

to default for any reason.  Upon information and belief, the Company would not have satisfied its

regulatory capital requirements during the Class Period if the true facts were disclosed regarding

its hundreds of millions of dollars in uncollectible receivables.  To the extent that the Company

did maintain excess regulatory capital, the excess amounts were materially less than the figures

reported in the IPO Registration Statement and were not sufficient "to absorb volatile market

events," as represented in the IPO Registration Statement.

(e)    The IPO Registration Statement Failed to Disclose
        BAWAG's Full Ownership Interest in Refco Group

231.    In describing the Company's historical ownership structure, the notes to the

financial statements as contained in the IPO Prospectus stated that the Company was 90% owned

by RGHI, and 10% owned by "BAWAG Overseas, Inc., a third party financial institution." This

statement was materially incomplete and misleading, because the IPO Prospectus failed to

disclose that BAWAG had also held a security interest in another 27% of the Company's equity,

97

by virtue of its secret loans to DF Capital and other Bennett-controlled entities. As a result,

investors were led to believe that BAWAG's prior interest in Refco was limited to 10%, when in

fact it held interests in approximately 37% of the Company's equity and therefore was in a

position to exercise significant influence and control over the Company. In addition, the

description of BAWAG Overseas as a "third-party financial institution" was materially

misleading because it failed to disclose the true extent of the business dealings and interlocking

relationships between BAWAG, Refco, Bennett, RGHI and other Defendants throughout the

Class Period.

### F.     The Truth Begins to Emerge and the Company Collapses

232.    The existence of the related-party loans between the Company, RGHI, and others,

the massive uncollectible receivable that they concealed, and Refco Group's written guarantees

to the third parties went undisclosed for years. The truth did not begin to emerge until a newly-

hired Controller of the Company, who had begun working at Refco on August 3, 2005,

discovered the true nature of these receivables after less than two months on the job.

233.    Refco issued a press release on October 10, 2005 announcing that it had

discovered an "undisclosed affiliate transaction." The press release stated, in relevant part, that

Refco had:

> discovered through an internal review a receivable owed to the Company
> by an entity controlled by Phillip R. Bennett, Chief Executive Officer and
> Chairman of the Board of Directors, in the amount of approximately $430
> million. Mr. Bennett today repaid the receivable in cash, including all
> accrued interest. Based on the results of the review to date, the Company
> believes that the receivable was the result of the assumption by an entity
> controlled by Mr. Bennett of certain historical obligations owed by
> unrelated third parties to the Company, which may have been
> uncollectible. The Company believes that all customer funds on deposit
> are unaffected by these activities.

98

234.    Although it gave only sparse detail about the receivable, the October 10, 2005 press release conceded that the transaction had not been disclosed in the Company's previously-filed financial statements and, therefore,

> the Company determined, on October 9, 2005, that its financial statements, as of and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. *should no longer be relied upon.*

(Emphasis added.)

235.    In addition, the October 10, 2005 press release disclosed that the Company's Board of Directors had essentially fired Defendants Bennett and Maggio, stating that "at the request of the Board of Directors Mr. Bennett has taken a leave of absence .... Also at the request of the Board, Santo C. Maggio ... has taken a leave of absence."

236.    The market's reaction to this startling announcement – just two months after Refco had sold over $670 million worth of stock to the investing public and just one month after Bennett rang the opening bell on the New York Stock Exchange – was swift. On October 10, 2005, the price of Refco's stock dropped from a closing price of $28.46 the previous trading day to close at $15.60 – a 45% drop in a single day – on unprecedented volume of over 24.2 million shares, which was over fifty times the average daily volume. Also on October 10, 2005, S&P lowered its rating on the Bonds from "B" to "B-" and placed the securities on CreditWatch with negative implications, while Moody's downgraded the Bonds' rating from "B3" to "Caa1."

237.    However, the October 10, 2005 press release did not disclose the full extent of the problems facing Refco and the price of Refco securities remained artificially inflated despite the correction caused by this partial disclosure. For example, the press release downplayed the probable impact that the matters described in the press release would have on Refco's financial results and business operations. For instance, Refco stated that it "believes that all customer

99

funds on deposit are unaffected by these activities." In a further effort to assuage investor

concerns, the press release quoted Defendant Sexton as stating, "I am staying at Refco because I

believe in our employees, customers and franchise. I am excited about the opportunities ahead

and am eager to work with our management team to help the Company achieve even greater

success." Similarly, Defendant Murphy was quoted as stating, "We continue to see strong

momentum across our businesses with record derivative contract and foreign exchange volume

in the quarter."

238.    In addition, the October 10, 2005 press release stated that "Mr. Bennett today

repaid the receivable in cash, including all accrued interest." This statement did not disclose that

Bennett had in fact obtained the funds to repay the debt from BAWAG, which had loaned him

the money in the hours before the October 10, 2005 press release was issued, taking Bennett's

shares of Refco as security. The press release also did not disclose that BAWAG, the source of

this eleventh-hour loan, was also an entity whose trading losses the circular transactions were

designed to conceal, and that BAWAG had repeatedly acted as a conduit for funds in the circular

transactions. The October 10, 2005 press release thus omitted to state material facts necessary to

make the statements included therein not misleading, and the market price of Refco securities

remained artificially inflated as a consequence, such that the price of Refco's securities did not

accurately reflect the value of the Company.

239.    On October 11, 2005, the SEC announced commencement of a formal

investigation of Refco. On that same day, Refco issued another press release stating that the

"Company confirms that it has adequate liquidity to run the business in the ordinary course,"

even though, as the investing public would learn only two days later, the Company had actually

begun to experience liquidity problems grave enough to threaten its ability to operate. The

October 11, 2005 press release also stated that the "receivable in the amount of $430 million was repaid yesterday in full," again failing to disclose the fact that Bennett had obtained the funds to repay the debt through an eleventh-hour loan from BAWAG. The October 11, 2005 press release thus omitted to state material facts necessary to make the statements included therein not misleading. The partial disclosure prompted a further partial correction of the trading prices of Refco securities, causing Refco stock to slide to close at $13.85 on a trading volume of 17.35 million shares and the Bonds – which were trading at 108.625% of par on October 7, 2005 and had never traded below 103% of par in the preceding twelve months – fell to 91.50%.

240.    On October 12, 2005, the Company's securities prices dropped again following news that the United States Attorney for this District had arrested Bennett because he was considered a "flight risk." This news partially disclosed the serious nature of the financial improprieties at the Company – including the previously undisclosed news that Bennett had signed a letter of guaranty to Customer X on behalf of Refco Group for hundreds of millions of dollars – and caused the price of Refco's securities to decline again, with its stock closing at $10.85 on October 12, 2005, on volume of 35 million shares, and its Bonds dropping to approximately 76% of par on the same date.

241.    The truth continued to leak into the market on October 13, 2005, when Refco announced – in a statement that was directly contrary to statements in the October 10 and 11, 2005 press releases – that:

> in light of recent events, the liquidity within the Company's non regulated subsidiary Refco Capital Markets, Ltd., which represents a material portion of the business of the Company is no longer sufficient to continue operations. The Company has therefore imposed a 15 day moratorium on all activities of Refco Capital Market, Ltd. to protect the value of the enterprise.

242.    In response to this news, both Moody's and S&P lowered their ratings on the

Bonds on October 13, 2005. S&P's rating was reduced from "B-" to "CCC," while Moody's

downgraded the Bonds from "Caa1" to "Ca."

243.    On October 13, 2005, with the price of Refco's shares having fallen to $7.90, the

NYSE halted all trading in Refco shares. Trading in Refco stock did not resume for four days.

The Bonds continued to trade throughout this period, with the price dropping as low as 16% of

par by October 14, 2005, representing a loss of at least 80% of the Bonds' value in only four

days. On October 14, 2005, S&P reduced its rating on the Bonds yet again, from "CCC" to "C."

244.    On October 17, 2005, Refco publicly announced that it was filing for bankruptcy

court protection in this District. With the trading restrictions lifted following Refco's bankruptcy

filing, Refco's stock traded on a massive volume of 28.5 million shares on October 18, 2005,

opening at 75 cents and closing at 65 cents per share. Thus, the price of Refco's publicly-traded

stock had plummeted from $28.56 to 65 cents in little more than a week -- a stunning decline of

nearly 98% that resulted in a loss of market capitalization of more than $854 million.

245.    On October 18, 2005, an article in *The Street.com* discussed Mayer Brown's role

in the collapse of Refco, noting that "all of the loan documents used in the transactions were

drafted by lawyers at the Chicago-based law firm" and that "Mayer Brown is one of the law

firms that worked for Refco in the broker's $583 million IPO in August." The article also

reported that "the real story" behind the disintegration of the Company was "how a cadre of

well-paid accountants, Wall Street bankers and corporate lawyers failed to notice that CEO

Phillip Bennett was allegedly cooking the books for the better part of a decade."

246.    The dramatic fall in the prices of the Company's securities from October 10, 2005

to October 18, 2005, and the damages suffered by Plaintiffs and members of the Class, were a

direct result of the disclosure to investors and the market of the untrue statements and omissions

of material facts described herein.

247.    Refco and many of the Defendants named herein are currently under investigation

by numerous criminal, civil and regulatory bodies, including the SEC, the NASD, and the CFTC.

## VI.    THE COMPANY'S VIOLATIONS OF GAAP

248.    GAAP are those principles recognized by the accounting profession as the

conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time.  GAAP principles are the official standards accepted by the SEC and

promulgated in part by the American Institute of Certified Public Accountants ("AICPA").

GAAP consists of a hierarchy of authoritative literature.  The highest authority is comprised of

Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards

("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions

("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB").  GAAP provides other

authoritative pronouncements including, among others, the FASB Concept Statements

("FASCON").

249.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial

statements filed with the SEC which are not prepared in accordance with GAAP will be

presumed to be false or misleading, despite footnote or other disclosures.

250.    The financial statements issued by the Company for fiscal years 2002, 2003,

2004, and 2005, and the financial statements for the fiscal quarters therein, did not fairly and

accurately represent the Company's financial position and the results of its operations because

they violated key provisions of GAAP.

251.    By failing to disclose recurring, significant related-party transactions between the

Company and RGHI, the Company violated SFAS No. 57, Related Party Disclosures, which

states in relevant part:

> Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include:
>
> a.     The nature of the relationship(s) involved;
>
> b.     A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;
>
> c.     The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]
>
> d.     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

252.     SFAS No. 57 requires the disclosure of relationships between companies under common ownership or management control, when "the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous." Defendant Bennett, as the CEO, Chairman of the Board, and 43% owner of the Company prior to the IPO, exercised control over the Company. Bennett also controlled RGHI, as its sole stockholder. Because the Company and RGHI were clearly under common control, GAAP required full disclosure of all the transactions that took place between these entities.

253.     The Company's related-party transactions with RGHI were not disclosed. At the end of each fiscal quarter, the Company engaged in off balance sheet transactions that removed receivables from RGHI (representing uncollectible customer receivables) from the Company's

books. To accomplish this feat, Defendants Bennett, Maggio and others contacted one or more customers of Refco, and suggested that the customers could borrow money from the Company and then loan that money to RGHI. RGHI used those funds to pay off its loan from the Company, thereby allowing the Company to remove a huge related-party receivable from its books. To ensure that the customer did not suffer any economic risk in the transaction, the Company guaranteed repayment of the customer's loan to RGHI.

254.    When the reporting period for each fiscal period was over, the Company would re-loan the money to RGHI, which would pay off the loan from the customer, which would then repay its loan from the Company. These transactions allowed the Company to re-characterize bad debts as collectible receivables from unrelated parties, thereby materially misleading creditors and investors.

255.    The Company did not fully disclose the nature and amounts of the round-tripping transactions involving RGHI and its customers, in violation of GAAP. The Company's obligation to disclose the related-party transactions was not alleviated when the outstanding balance was paid; it was still a related-party transaction that should have been disclosed to Refco's creditors and investors. Further, Refco's receivables from RGHI were outstanding on Refco's books for all but the first and last few days of each financial reporting period.

256.    The Company also violated SFAS No. 5, Accounting for Contingencies, by failing to take a charge for the uncollectible customer receivables described herein. SFAS No. 5 establishes standards for reporting loss contingencies and requires that an estimated loss from a loss contingency be accrued as a charge to income if a liability has been incurred at the date of the financial statement and the amount of loss can be reasonably estimated. The receivables that were assumed by RGHI were known to be uncollectible since at least 2001, if not earlier, and a

105

charge should have been taken by 2001 at the latest.

257.    Refco also failed to disclose that it guaranteed the multi-hundreds of millions of loans made by third parties to RGHI in the round-tripping transactions. This material omission violated FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others. Even if the likelihood that Refco might have to make payment pursuant to the guarantee was remote, the Company was still required to disclose the details of such a material transaction, including the nature of the guarantee, the term of the guarantee, how the guarantee arose, and any circumstances that would require Refco to perform under the guarantee. The Company failed to disclose even the existence of the transaction that led to the guarantee, making its financial disclosures non-compliant with GAAP.

258.    The Company also violated APB Opinion No. 22, Disclosure of Accounting Policies, which instructs companies to report changes in accounting policies. Accounting policies adopted by a company significantly affect the presentation of the company's financial position and results of operations. Accordingly, the usefulness of financial statements for purposes of making investment decisions depends significantly upon the investor's understanding of the accounting policies utilized by the company.

259.    The Company devoted several pages of its SEC filings to "Significant Accounting Policies" and "Critical Accounting Policies," yet failed to disclose that it did not comply with those policies. Instead of following these policies, the Company repeatedly concealed uncollectible receivables through undisclosed related-party transactions. These recurring transactions, in effect, became Refco's accounting policy. However, the Company did not report this substantially varied accounting policy because it would have revealed the untruths in its financial statements.

106

260.    Refco's financial statements also violated several general principles of GAAP,

including:

- FASCON No. 1 ¶ 34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1 ¶ 40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1 ¶ 50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2 ¶ 58-59: "That information should be reliable as well as relevant is a notion that is central to accounting . . . . The reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

- FASCON No. 2 ¶ 79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

- FASCON No. 2 ¶ 95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- FASCON No. 6 ¶ 145: "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities– including matching of costs and revenues, allocation, and amortization–is the essence of using accrual accounting to measure performance of entities."

261.    The Company's financial statements were not prepared in accordance with these

general principles of GAAP because, among other reasons, the Company had not recognized

losses that should have been recognized; its financial statements mischaracterized related-party