transactions and uncollectible receivables as legitimate customer receivables; and its financial statements did not disclose all material information necessary for creditors and investors to make informed investment decisions.

## VII.    GRANT THORNTON'S VIOLATIONS OF AUDITING STANDARDS

262.    Public companies rely on independent registered public accounting firms to audit financial statements and review other public disclosures, assess internal controls, and gain the trust of the creditors and investors who will rely on the auditors' reports when deciding whether to invest in a company. The Public Company Accounting Oversight Board ("PCAOB"), which was established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing standards that are required to be followed by all auditors for public companies. The PCAOB initially adopted as its Interim Professional Auditing Standards all the auditing standards that had previously been issued by the AICPA. The auditing standards issued or adopted by the PCAOB, together with the auditing standards issued by the AICPA, are herein encompassed by the term GAAS. The PCAOB and the AICPA have codified the professional auditing standards (represented herein as "AU") to ensure that audits are conducted in accordance with GAAS. See AU § 150.

263.    There are ten GAAS provisions, which are divided into three types of standards: (1) general standards, which provide guidelines for auditor training and maintaining independence from the client; (2) standards of fieldwork, which provide guidelines for audit planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) standards of reporting, which are primarily concerned with ensuring that financial statements are presented in accordance with GAAP. As explained in detail below, Grant Thornton violated almost every one of these provisions during its tenure as the Company's purportedly independent auditor.

**A.**     **Violations of General Standards**

264.     GAAS General Standard No. 3 states: "Due professional care is to be exercised in the performance of the audit and the preparation of the report." The exercise of due care includes the application of professional skepticism in lieu of mere acceptance of representations made by management. Grant Thornton audited the Company's financial statements and provided audit reports thereon for the years ended February 28, 2003, February 29, 2004, and February 28, 2005. Grant Thornton failed to exercise due professional care and professional skepticism in the performance of its audits and in the preparation of its audit reports. Among other things, Grant Thornton repeatedly failed to detect huge, nine-figure sham transactions whereby the Company avoided disclosing related-party transactions and uncollectible receivables in its financial statements. After an extensive review, the Examiner concluded that Grant Thornton "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

265.     GAAS General Standard No. 2 states that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." Prior to 2002, Arthur Andersen served as the Company's independent auditor under the leadership of Mark Ramler ("Ramler"), Arthur Andersen's lead partner assigned to the Refco account. When Arthur Andersen began to collapse under the pressure of the Enron debacle, Ramler moved to Grant Thornton and took the Refco engagement with him. At Grant Thornton, Ramler remained the lead partner assigned to the Refco account. According to the Examiner's Report, Ramler's personnel file at Arthur Andersen states that his relationship with Refco was so

109

close that he believed its management did not engage in any transactions without soliciting his thoughts and advice, and that Bennett and other senior Refco executives called him almost daily to discuss transactions and business issues. Ramler's longstanding and close relationship with the Company and its management prevented him from maintaining the necessary independence in mental attitude.

### B.   Violations of Standards of Fieldwork

#### 1.   Standard of Fieldwork No. 1 – Audit Planning

266.   GAAS Standard of Fieldwork No. 1 requires audits to be "adequately planned," and provides that particular attention should be paid to matters that, if inaccurately reported in a financial statement, could materially alter a company's financial situation.

267.   GAAS requires that auditors pay significant attention to related-party transactions due to the inherent conflict of interest of such transactions. As noted above, SFAS No. 57, Related Party Disclosures, requires that all related-party transactions be disclosed in the company's financial reports, including the nature of the relationship, a description of the transaction, and the amount of the transaction. SFAS No. 57 warns that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis," and therefore require auditor substantiation.

268.   Similarly, AU § 334, Related Parties, prescribes that independent auditors should be particularly aware of transactions that can be designed or manipulated to obscure related-party transactions, such as those used here to hide the Company's uncollectible receivables from RGHI. As noted in AU § 334.02, the auditor should recognize that the substance of a related party transaction could be significantly different from its form, and that the financial statements should reflect the substance of the transaction and not merely its form.

269.   In planning its audits, an auditor must consider the audit risk posed by related-party transactions and then design and apply appropriate substantive tests to evaluate management's assertions.  According to AU § 9334.19:

> The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be.  For example, the auditor's tests regarding valuation of a receivable from an entity under common control might be more extensive than for a trade receivable of the same size because the common parent may be motivated to obscure the substance of the transaction.

270.   Pursuant to AU § 334.08, the following procedures should be followed to identify material transactions with related parties:

> f.  Consider whether transactions are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge or a major stockholder absorbing corporate expenses.
>
> g.  Review accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period.
> \*      \*      \*
> i.  Review invoices from law firms that have performed regular or special services for the company for indications of the existence of related party transactions.

271.   Once related-party transactions are identified, GAAS provides that the auditor should apply those procedures to obtain satisfaction as to the purpose, nature, and extent of those transactions and their effect on the financial statements, and should not simply rely on management's assertions.

272.   Grant Thornton was well aware that Refco engaged in at least some "significant related party transactions" and that Refco had affiliates that were not audited by Grant Thornton, as reflected in the "Evaluation of Proposed Client Form" that Ramler filled out when Grant Thornton took Refco on as an audit client in 2002.  Nonetheless, Grant Thornton violated the

111

foregoing GAAS provisions by failing to implement procedures for identifying and ensuring full

disclosure of the Company's related-party transactions, such as:

- Procedures for obtaining the names of all related parties, such as requesting the names from management personnel, reviewing the Company's filings with the SEC and other regulatory agencies, and identifying guarantors for large receivables;

- Procedures for identifying related party transactions, such as those set forth in AU § 334.08;

- Procedures for determining the trustworthiness of related-party transactions, such as assessing the extent and nature of the transactions, confirming the amounts and terms of the transactions, and evaluating the probability of repayment of uncollected balances; and/or

- Procedures for reviewing the Company's accounting process for the large and unusual transactions that were taking place at the end of each reporting period.

273.    Grant Thornton's failure to implement appropriate procedures when auditing

Refco's related-party transactions allowed the Company to implement a scheme to offload

uncollectible receivables to RGHI, a related party, and to hide the existence of these related-party

transactions from Plaintiffs and the investing public through round trip loan transactions with

(among others) BAWAG, another related party.

274.    GAAS also required Grant Thornton to identify "fraud risk factors," or

circumstances that could lend themselves to fraudulent and/or illegal activities, as part of the

audit planning process. AU § 316, Consideration of Fraud in a Financial Statement Audit, serves

as a roadmap for uncovering accounting fraud by providing examples of "risk factors relating to

misstatements arising from fraudulent financial reporting," and requires that independent

auditors utilize professional skepticism. There were numerous red flags and "fraud risk factors"

at the Company, including:

- "significant related-party transactions" and "significant, unusual, or highly complex transactions, especially those close to period end that pose difficult 'substance over form' questions," including large unsecured receivables from

RGHI that decreased significantly just before the end of each fiscal year and returned a few weeks later, and loans of hundreds of millions of dollars to BAWAG and other parties that were made and then unwound simultaneously with the decrease and return of the RGHI receivable;

- repeated journal entries made at every quarter-end and year-end over a period of several years to reflect loans being made to the customer and other entities to conceal the related-party loans to RGHI, and which were then reversed as the loans to the customer were "paid off" just after the end of the quarter;

- "pressure to perpetrate fraud," including significant pressure to avoid write-offs of bad debts which would have wiped out the Company's profits and members' equity and rendered the Company unable to satisfy its minimum regulatory capital requirements;

- "unusual or unexpected analytical relationships," specifically that the Company's financial statements indicated significant increases in receivable balances without corresponding decreases in uncollectible receivables reserves;

- "domination of management by a single person or small group," being that Bennett was the President, CEO, Chairman of the Board and 43% shareholder, while the THL Partner Defendants and their passive co-investors owned 57% of the Company and the THL Partner Defendants nominated half of the Company's board of directors;

- "significant financial interests in the entity" by management;

- management's desire and intention to sell their stakes in the Company to public investors through the Bond Offering and the IPO;

- "weaknesses in internal control," including an ineffective accounting and internal audit staff and the lack of formal procedures for closing the books;

- the Company's "history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations," including that the Company had been under SEC investigation for stock short sales and aiding money managers in cheating municipalities, that the Company was fined approximately $7 million in a proceeding before the CFTC concerning inadequate record keeping, and that Maggio was under SEC investigation for stock manipulation;

- the resignation of Trosten as the Company's CFO shortly after the Bond Offering, and his receipt of a remarkably rich $45 million severance payment;

- the Company's high debt-to-equity ratio, with long-term debt being eight times greater than its reported members' equity; and

- "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate," in that the Company's allowance for bad debts was dependent on significant and sensitive assumptions, such as its customers' financial condition, the likelihood of payment on receivables, and the value of the underlying securities, of which the slightest change would materially alter the Company's financial results.

275.    While Grant Thornton failed to recognize all of these red flags, it was aware of sufficient risks of fraud that, according to the Examiner's Report, it categorized Refco as a "high-risk client" in 2005 and an internal Grant Thornton email dated June 7, 2005 described the engagement as having "mucho issues/risks." Among the risk factors identified by Grant Thornton were the fact that it engaged in significant and complex related party transactions, its lack of an internal audit function, and its domination by a small number of executives who had personal interests in maximizing the Company's apparent financial health. Nonetheless, Grant Thornton failed to design or apply appropriate audit procedures to counteract those risks.

### 2.    Standard of Fieldwork No. 2 – Evaluation of Internal Controls

276.    GAAS Standard of Fieldwork No. 2 and AU § 319 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls. "Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated." AU § 312. 02, Audit Risk and Materiality in Conducting an Audit. "Internal control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." AU § 319.06, Consideration of Internal Control in a Financial Statement Audit – Definition of Internal Control. For financial

statement audits, internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions."

277.    Grant Thornton's audits of the Company's financial statements were devoid of an adequate assessment of the Company's internal controls. Specifically, although such problems existed at least as early as 2002, it was not until October 2004 – after the Bond Offering – that Grant Thornton identified and reported "significant deficiencies" in the Company's financial reporting internal controls, including the need to increase financial department resources to ensure the Company's reports were in compliance with SEC regulations and a lack of formalized procedures for closing the Company's books. Even then, however, Grant Thornton did not adjust its audit procedures to compensate for the risk created by these significant deficiencies.

278.



279.    Despite having identified the same significant deficiencies in Refco's internal controls for two straight years, Grant Thornton still did not adjust its audit procedures to account for the risks associated with those deficiencies.

### 3.    Standard of Fieldwork No. 3 – Obtaining Evidential Matter

280.    GAAS Standard of Fieldwork No. 3 states that "[s]ufficent competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a

reasonable basis for forming an opinion regarding the financial statements under audit." AU §

326, Evidential Matter, explains that the evidential matter collected and evaluated by auditors is

central to a proper audit and serves as the foundation for the auditor's opinion report. Thus,

Grant Thornton was required to investigate and obtain supporting evidential documentation for

the assertions made by the Company in its financial statements, and could not merely take the

word of the Company's management about the accuracy of their financial statements.

281.    For related-party transactions, AU § 334.09 provides that an auditor should obtain

competent evidential matter regarding the purpose, nature and extent of the transactions, and

their impact on the financial statements.

282.    As noted on Ramler's "Evaluation of Proposed Client" form in 2002, Grant

Thornton was aware from the inception of its engagement that Refco has "significant related

party transactions," that Refco had approximately $170 million in unsecured receivables from its

parent, RGHI, that dated back to the 1980s; that RGHI was a "shell entity with no operations;"

that Bennett had promised Arthur Andersen that the RGHI receivable "would no longer increase

and would be paid down over a period of seven years" (including $50 million in fiscal 2003);

and that if the receivable was not paid down it would have to be written off. According to the

Examiner's Report, Grant Thornton "does not appear to have made any meaningful effort to

determine that payments were actually made," and "appears to have simply accepted its client's

false representation as to the true amount of [the RGHI] receivable."

283.    After an intensive investigation and review of Grant Thornton's workpapers, the

Examiner concluded that Grant Thornton did not review the loan documents, payments, or

customer statements for RGHI's account, but instead "ignored its consistently high assessment of

the risks attendant to related party transactions and relied primarily on the representations of

management personnel within Refco." As the Examiner explained:

> ... [T]he auditors took virtually no steps to perform procedures designed to obtain competent evidential matter concerning the nature, substance and amount of the high-risk, related-party transactions in order to satisfy themselves that related party transactions were adequately disclosed in the financial statements.
>
> Significantly, during the 2003 audit (the first year in which [Grant Thornton] had the engagement), [Grant Thornton] auditor Yonah Dahan e-mailed a list of document requests to Frank Mutterer at [Refco Capital LLC] indicating that [Grant Thornton] needed a list of payments made during the year by RGHI on the $71 million balance in its customer account at [Refco Capital LLC] and that [Grant Thornton] would need to trace some of those payments to Refco's bank statements. There is no evidence, however, that such procedure was ever actually performed. Indeed, if it had been, [Grant Thornton] likely would have discovered the fraud. [Grant Thornton] could have conducted a simple tracing of payments to bank statements for any of the years in question but did not. In addition, given the auditors' consistently high assessment of the audit risk arising from related-party transactions and the possibility that management could override controls, the auditors should have obtained and scrutinized the customer statements for RGHI's accounts at [Refco Capital] and [Refco Capital LLC], which would have revealed key aspects of the fraud, but did not do so.

284.    The Examiner concluded that a review of RGHI's account statements at Refco

Capital would also have alerted Grant Thornton that the RGHI accounts were being used to

manipulate Refco's income and expenses.

117

285. Grant Thornton also failed to obtain competent evidential matter regarding the nature and purpose of Refco's related-party transactions with BAWAG. Grant Thornton noted a large debit balance in BAWAG's Refco Capital account at the end of fiscal 2003 and sent a confirmation notice to BAWAG, with an account statement attached that showed that the debit balance was primarily the result of a large, $175 million transfer made within a few days before the end of the fiscal year. This transfer was materially greater than the other inflows and outflows in the account, and it appeared on the account statement as a different type of transaction than the others in the account. Yet, according to the Examiner's Report, "there is no indication in the audit workpapers that [Grant Thornton] inquired as to where the cash had gone, or how the debit balance was secured, or why the transaction had occurred, despite the large amount of this extension of credit to a related party. [Grant Thornton] merely confirmed the account ending balance with BAWAG and moved on."

286. Grant Thornton was also aware of significant transactions with unrelated parties that occurred at the end of Refco's financial reporting periods – which appeared on Refco's books as either "repo" transactions or "time deposits" but were really round-trip loans – yet Grant Thornton made no effort to obtain evidential matter to verify the legitimacy of those transactions. Rather, as with BAWAG, it confined its analysis to a confirmation of certain account balances, without delving into the underlying transactions giving rise to those balances as required by relevant auditing standards.

287. AU § 342, Auditing Accounting Estimates, explains that an "auditor's objective when evaluating accounting estimates is to obtain sufficient competent evidential matter to provide reasonable assurance that . . . [a]ll accounting estimates that could be material to the financial statements have been developed." See AU § 342.07. Grant Thornton did not obtain

competent evidential matter to provide reasonable assurance of the reasonableness of the Company's estimate of its uncollectible receivables, which had a material effect on the Company's financial statements and was underestimated by more than $400 million.

288.    Additionally, Grant Thornton did not obtain evidential support for the claims in the Company's public filings and statements concerning the Company's internal controls, risk management procedures, and accounting policies. Obtaining documentation to support these claims would have revealed that the Company had been re-characterizing uncollectible receivables as related-party receivables that were "collected" prior to each quarter-end, and that Refco had not implemented sufficient internal controls or accounting policies.

289.    Had Grant Thornton adequately planned and conducted its audit in accordance with GAAS, it would have discovered these defects, as well as the massive misstatement of the Company's financial statements over many years that ultimately caused the Company's demise. As the Examiner concluded, Grant Thornton "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

**C.    Violations of Reporting Standards**

290.    GAAS Standard of Reporting No. 1 states: "The [audit] report shall state whether the financial statements are presented in accordance with [GAAP]." Grant Thornton issued unqualified audit reports stating that the Company's financial statements were presented fairly and in accordance with GAAP. In reality, however, the Company's financial statements violated GAAP, as the Company was improperly inflating its assets and earnings by exchanging

uncollectible customer receivables for receivables with a related party and laundering money by round-tripping funds with Bennett, BAWAG, and other intermediaries.

291.    GAAS Standard of Reporting No. 3 provides that "[i]nformative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." Grant Thornton violated this standard by failing to recognize and/or state in its report that the disclosures in the financial statements were not only inadequate, but materially incorrect.

292.    GAAS Standard of Reporting No. 4 and AU § 508, Reports on Audited Financial Statements, provide that an auditor can only give an unqualified audit report if the company's "financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with [GAAP]," and the audit was conducted in accordance with GAAS. Section 508 further provides that if an auditor cannot give an unqualified audit report, the circumstances may require the auditor to give the company an adverse opinion or to include explanatory language in the audit opinion report to explain non-conformities.

293.    In violation of the foregoing provisions, Grant Thornton issued unqualified audit opinions for each of the years ended February 28, 2003, February 29, 2004, and February 28, 2005, indicating that the Company's financial statements complied with GAAP, when in fact they did not. Rather than issuing unqualified audit reports, Grant Thornton should have issued either adverse audit reports noting the Company's non-compliance with GAAP, or issued qualified audit reports highlighting the fact that Refco's financial statements contained untrue statements of material fact and omitted facts necessary to make the statements contained therein not misleading. Grant Thornton did neither.

294.    GAAS Standard of Reporting No. 3 states: "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." Thus, if the auditor does not qualify its audit report with details of non-compliance or inaccuracies in the financial statements' informative disclosures, investors and creditors will assume that those disclosures are accurate. As alleged herein, the disclosures in the Company's financial statements were not adequate, and were materially untrue, because, among other reasons, they failed to disclose the Company's uncollectible receivables, or the related-party transactions with RGHI and BAWAG that were being used to conceal those receivables.

295.    Despite the Company's internal control problems, untrue statements of financial results, and non-disclosure of related-party transactions and uncollectible receivables, Grant Thornton continued to issue unqualified audit reports, which wrongly signified to creditors and investors that Grant Thornton had confirmed that the Company's financial statements were prepared in accordance with GAAP, that Grant Thornton had confirmed via evidential matter the claims made in the Company's financial statements, and that the Company's financial statements did not contain any materially untrue statements.

### D.    Violations of CFTC Rules and Regulations

296.    In addition to issuing auditors' reports included in filings with the SEC, Grant Thornton issued reports that were included in filings with the CFTC. CFTC rules and regulations require that audits conducted pursuant to the CFTC regulations be conducted in accordance with GAAS. These rules and regulations also provide that the CFTC may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the CFTC to have engaged in unethical or improper professional conduct either in the course of an adjudicatory, investigative, rulemaking or other proceeding before the

CFTC or otherwise. Grant Thornton failed to comply with the CFTC regulations by failing to perform its audits in accordance with GAAS, as set forth above.

## VIII.    DEFENDANTS' NEGLIGENCE

### A.    The Offering Memorandum and the Bond Registration Statement

297. The Bond Underwriter Defendants did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading. In particular, the Bond Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the textual descriptions in the Offering Memorandum and the Bond Registration Statement relating to, among other things, the Company's past performance, operations, business condition, and future prospects. Nor did the Bond Underwriter Defendants conduct a reasonable investigation into the accuracy of the financial information included in the Offering Memorandum and the Bond Registration Statement, including the financial information contained in the textual portions of those documents, as well as that contained in the attached audited and unaudited financial statements.

298. In addition, the Offering Memorandum and Bond Registration Statement contained risk factors relating to, among other things, the Company's substantial indebtedness; its exposure to customer credit risks; its compliance with regulatory requirements; its internal controls over financial reporting; and risks relating to employee misconduct. Having identified these factors as risks for potential investors, the Bond Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the Offering Memorandum and Bond Registration Statement were true and not misleading.

299.    Even after identifying potential discrepancies between the Offering Memorandum and the Company's true financial condition with respect to customer receivables, the Bond Underwriter Defendants did not ensure that the Offering Memorandum was corrected. ▮



300.

301.    Despite being aware of significant customer losses dating back more than five years, the Bond Underwriter Defendants did not investigate why the Company had not written those losses off. Had they done so, they likely would have discovered that the receivables were not only uncollectible, but were far in excess of the reserves that had been set up.

302.    The Bond Underwriter Defendants' failure to conduct a reasonable investigation into the unaudited financial statements in the Bond Registration Statement was particularly negligent given the recent seminal opinion in this District, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628 (DLC) (S.D.N.Y. 2004), which reiterated and confirmed that underwriters

123

cannot simply rely on an auditors' work when investigating the accuracy of unaudited financial statements. Rather, because "the public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed" (id. at 685), underwriters must conduct their own, independent (and reasonable) investigation into the accuracy of unaudited financial statements.

303.  Defendants Bennett, Trosten, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, the THL Defendants, O'Kelley, Gantcher, and Breitman, each of whom prepared, approved, and/or signed the Offering Memorandum and/or the Bond Registration Statement, did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading.

304.  Grant Thornton, which materially assisted in the preparation of Refco's fiscal 2003 and 2004 financial statements and consented to the inclusion in the Offering Memorandum and Bond Registration Statement of its audit opinions on those financial statements, performed its audits of the Company's financial statements in a negligent manner, which did not comply with GAAS and did not constitute a reasonable investigation of whether the Company's financial statements were accurate and in compliance with GAAP. As set forth above, Grant Thornton acted negligently in that its audit of Refco's financial statements violated, among others, the following basic principles of GAAS:

(a)  General Standard No. 3, in that Grant Thornton failed to exercise due professional care in the performance of its audit and the preparation of its reports;

(b)  Standard of Field Work No. 1, in that Grant Thornton failed to adequately plan and supervise its audit;

124

(c)    Standard of Reporting No. 1, in that Grant Thornton's reports incorrectly stated that Refco's financial statements were presented in conformity with GAAP; and

(d)    Standard of Reporting No. 4, in that Grant Thornton had an insufficient basis for expressing its unqualified opinions, for its audits had not been conducted in accordance with GAAS.

### B.    The IPO Registration Statement

305.    The Stock Underwriter Defendants did not conduct a reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the statements in the IPO Registration Statement were true and not misleading. In particular, the Stock Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the textual descriptions in the IPO Registration Statement relating to, among other things, the Company's past performance, operations, business condition, and future prospects. Nor did the Stock Underwriter Defendants conduct a reasonable investigation into the accuracy of the financial information included in the IPO Registration Statement, including the financial information contained in the textual portions of the IPO Registration Statement, as well as that contained in the attached audited and unaudited financial statements.

306.    The Stock Underwriter Defendants were aware prior to the IPO that Grant Thornton had identified significant deficiencies in Refco's internal controls, including a lack of resources and expertise in the accounting department. Grant Thornton's final management letter dated October 15, 2004 was circulated to representatives of Credit Suisse, BAS and Goldman Sachs on March 30, 2005.

███████████████████████████████████████████████

███████████████████████████████████████████████

Upon information and belief, the Stock Underwriter Defendants' counsel requested a response to Grant Thornton's management letter from Bennett and Sherer. ███████████████████

████████████████████████████████████████████████

████████████████████████████

307.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

308.    The Stock Underwriter Defendants' failure to conduct a reasonable investigation into the unaudited financial statements in the IPO Registration Statement was particularly negligent given the recent seminal opinion in this District, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628 (DLC) (S.D.N.Y. 2004), which reiterated and confirmed that underwriters cannot simply rely on an auditors' work when investigating the accuracy of unaudited financial statements. Rather, because "the public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed" (id. at 685), underwriters must conduct their own, independent (and reasonable) investigation into the accuracy of unaudited financial statements.

309.    In addition, the IPO Registration Statement contained risk factors relating to, among other things, the Company's substantial indebtedness; its compliance with regulatory requirements; its internal controls over financial reporting; and risks relating to employee misconduct. Having identified these factors as risks for potential investors, the Stock

126

Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the IPO Registration Statement were true and not misleading.

310.     Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Harkins, and Schoen, each of whom prepared, approved, and/or signed the IPO Registration Statement, did not conduct a reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the statements in the IPO Registration Statement were true and not misleading.

311.     Grant Thornton, which consented to the inclusion in the IPO Registration Statement of its audit opinions for the Company's fiscal year 2003, fiscal year 2004, and fiscal year 2005 financial statements, performed its audits of the Company's financial statements in a negligent manner, which did not comply with GAAS and did not constitute a reasonable investigation of whether the Company's financial statements were accurate and in compliance with GAAP. Among other things, Grant Thornton violated the GAAS provisions set forth above by failing to properly plan and conduct its audits of the Company's financial statements.

## IX.     ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY

312.     Plaintiffs incorporate and reallege the allegations set forth above. In addition to the allegations set forth above, the following allegations demonstrate the control that certain Defendants exercised over Refco and related entities.

### A.     The Officer Defendants

313.     The Officer Defendants had control of Refco by virtue of their executive positions with the Company, the key roles each played in the Company's management, and their direct involvement in its day-to-day operations, including its financial reporting and accounting functions. Facts demonstrating the Officer Defendants' control of Refco include:

(a)    The Officer Defendants held the top management positions within the Company and thereby controlled the Company individually and collectively. Specifically:

(i)    Bennett was Refco's President, CEO and Chairman from September 1998 through at least October 10, 2005.

(ii)    Maggio was Executive Vice President of Refco, President and CEO of Refco Securities, LLC and President of Refco Capital from 1991 until at least October 10, 2005.

(iii)    Sexton was Executive Vice President and COO of Refco from August 2004 through at least October 10, 2005, whereupon he assumed the position of CEO until at least the end of the Class Period.

(iv)    Murphy was Executive Vice President of Refco and President and CEO of Refco Global Futures, LLC from March of 1999 until at least the end of the Class Period.

(v)    Klejna was Executive Vice President and General Counsel of Refco from January 1999 through at least the end of the Class Period.

(vi)    Sherer was the Executive Vice President and CFO of Refco from January 2005 until at least the close of the Class Period;

(vii)    Silverman was Secretary of the Company from 1999 until at least October 10, 2005. Silverman also held numerous other high-level executive positions within Refco, including Controller of Refco Group during 2004 and the first half of 2005, and Director of Internal Audit at Refco Group at the time of the IPO. As Controller, Silverman was directly responsible for the closing of the

Company's books, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate accounting policies for the Company.

(b)     The Offering Memorandum, Bond Registration Statement, and the IPO Registration Statement touted the key role played by the Officer Defendants in the Company's operations and purported success. For example, the Bond Registration Statement discussed the potential departure of the Officer Defendants in a risk disclosure, emphasizing that:

> ***Our business operations could be significantly disrupted if we lost the members of our management team.***
>
> Our future success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependent on our ability to retain and motivate them. [...] The loss of the services of any member of our management team...could adversely affect our ability to manage our business effectively or to execute our business strategy.

(Bold and italics in original, as heading). The Offering Memorandum and IPO Registration Statement each contained substantially similar discussions of the Officer Defendants' importance to the Company's affairs. In connection with the risk disclosure, the Bond Registration Statement further assured investors that Officer Defendants Bennett, Murphy, Sherer, Sexton, Maggio and Klejna were all subject to non-compete agreements with the Company in the event of their departure.

(c)     The Executive Employment and Non-Competition Agreements pursuant to which Officer Defendants Bennett, Maggio, Sexton, Murphy, Klejna, and Sherer were employed gave each substantial authority over the day-to-day management and operation of the Company. Each of their agreements explicitly stated that they were employed "in a key capacity with the Company," and that they had access to "confidential information

regarding the organization, business and finances of the Company." Each of their employment agreements also placed non-competition, non-solicitation and no-hire restrictions on these defendants. Defendant Bennett's employment agreement, in particular, sets forth in detail his duties and responsibilities, which included:

> (i) formulating and executing the Company's business strategy; (ii) providing senior level counsel as to the business and operations of the Company; (iii) directing the day-to-day management of the Company's affairs; (iv) representing Company in relationships and business dealings within the financial services industry; and (v) participating in and supporting the activities of the Board.

(d)     According to a former senior operating officer of a Europe-based Refco affiliate (the "Former Refco Officer"), who met frequently with Defendants Bennett, Sexton, Murphy, Maggio, and Trosten, those five officers were known to Refco staffers in the Company's offices abroad as the "New York Five" – a reflection of their control and domination of the Company's day-to-day operations from its headquarters in New York.

(e)     Defendant Bennett also controlled Refco because he was one of the Company's largest shareholders. At the time of the Bond Offering, Bennett owned approximately 43% of the equity interests of Refco through RGHI. Following the IPO, Bennett owned 33.8% of Refco's outstanding common stock through RGHI and the Bennett Trust.

(f)     Defendant Silverman also exercised control by virtue of his close relationship with Defendant Bennett. Silverman was a CPA and a close confidant of Bennett, to whom Bennett turned for advice and guidance on accounting matters. Upon information and belief, Silverman had significant influence over Bennett's decision-making on behalf of the Company with respect to accounting-related issues.

B.    **RGHI and the Bennett Trust**

314.    Facts demonstrating Defendant RGHI's and the Bennett Trust's control of Refco include:

(a)    At all relevant times, RGHI and the Bennett Trust were instrumentalities of Defendant Bennett, wholly dominated and controlled by Bennett, and with no ability to take any action independent of Bennett. The Offering Memorandum, for example, disclosed that RGHI would be "wholly owned" by Bennett following the LBO. The IPO Registration Statement similarly disclosed that RGHI was "wholly-owned" by Bennett and that he was "both Trustee and Beneficiary" of the Bennett Trust. RGHI and the Bennett Trust had control of Refco by virtue of Defendant Bennett's pervasive control of the Company (discussed above), which was at all times exercised through RGHI and/or the Bennett Trust.

(b)    Bennett used RGHI and the Bennett Trust as instrumentalities to hold and exercise his controlling equity interest in Refco. At the time of the Bond Offering, Defendant Bennett used RGHI as a vehicle to hold his approximately 43% equity interest in Refco. As a result of the IPO, and as set forth in the IPO Registration Statement, "[o]wnership by Phillip R. Bennett, which constitutes 33.8% of our outstanding common stock following the offering, represents direct ownership and indirect ownership through each of Refco Group Holdings, Inc. and the Phillip R. Bennett Three Year Annuity Trust." Following the IPO, RGHI held approximately 60% of Bennett's equity interests in Refco and the Bennett Trust held approximately 40% of Bennett's equity interests in Refco.

(c)    As an instrumentality Bennett used to exercise control of Refco, RGHI

131

was party to numerous contracts pursuant to which the LBO and consequent securities offerings were achieved. Specifically, RGHI was party to the Equity Purchase and Merger Agreement dated June 8, 2004 (and as amended on July 9, 2004), which provided for the series of transactions forming the LBO, and the Securityholders Agreement, dated August 5, 2004, which governed the rights of Refco's equityholders in advance of the IPO. RGHI became contractually bound to these agreements by virtue of Defendant Bennett's signature.

(d)    As an instrumentality Bennett used to exercise control of Refco, RGHI had the unrestricted right, pursuant to the Securityholders Agreement, to appoint two members of the Board of Directors, one of which was required to be Bennett, and the right to appoint a third jointly with the THL Partner Defendants.

(e)    In addition, Refco has itself admitted that it was a "controlled company" within the meaning of NYSE rules by virtue of Bennett's and the THL Partner Defendants' collective post-IPO position in Refco stock, which consisted of Bennett's 33.8% (held through RGHI and the Bennett Trust) and the THL Partner Defendants' approximate 42.7% interest in Refco's outstanding shares. Refco benefited substantially from its status as a "controlled company" because the boards of directors of controlled companies are exempt from normal NYSE rules requiring that boards of directors, corporate governance committees, and compensation committees be independent.

C.    **Robert C. Trosten**

315.    Facts demonstrating Defendant Trosten's control of Refco include:

(a)    Trosten was Executive Vice President and CFO of Refco from 2001 until his sudden resignation in October 2004. As CFO, Trosten was directly responsible for the preparation of Refco's financial statements, the closing of its books, its adoption and

compliance with appropriate accounting policies, and its maintenance of adequate internal financial controls.

(b)    The Offering Memorandum and the Bond Registration Statement highlighted Trosten's importance to the Company's success as a central member of Refco's management team. The Bond Registration Statement stated that:

> *Our business operations could be significantly disrupted if we lost members of our management team.*
>
> Our future success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependant on our ability to retain and motivate them. [...] The loss of any member of our management team...could adversely affect our ability to manage our business effectively or execute our business strategy.

(bold and italics in original; as heading). The Offering Memorandum contained a substantially similar discussion of Trosten's importance to the Company.

(c)    As noted above, according to the Former Refco Officer, Defendant Trosten was among the senior officers known to Refco staffers in the Company's offices abroad as one of the "New York Five" -- a moniker reflecting his predominance of the Company's affairs from its headquarters in New York.

**D.    The THL Partner Defendants**

316.    The following facts further evidence the THL Partner Defendants' control of Refco:

(a)    From the time of the LBO until the IPO, the THL Partner Defendants and their affiliates and passive co-investors held a controlling 57% interest in Refco shares. After the IPO, the THL Partner Defendants and their co-investors continued to hold a dominant 42.7% interest. Thomas H. Lee Partners was, at all times, the beneficial owner of all interests held by the THL Partner Defendants and their co-investors.

133

(b)      The THL Partner Defendants dominated Refco's Board of Directors.
Specifically, half of Refco's eight member Board of Directors (and prior to the IPO, fully
half of New Refco's Board of Managers) was filled by the THL Partner Defendants'
designees.  These designees – the THL Individual Defendants – each held high-level
positions within Thomas H. Lee Partners' upper management team, as set forth above.
Indeed, the THL Partner Defendants had the unrestricted right, pursuant to a
Securityholders Agreement, dated August 5, 2004, entered into in connection with the
LBO, to appoint four of the eight members of the Company's Board, and the right to
appoint a fifth jointly with RGHI.

(c)      The Offering Memorandum acknowledged that the THL Partner
Defendants would, upon consummation of the LBO, "have the ability to control all
aspects of [the Company's] business."

(d)      THL Managers V, LLC ("THL Managers"), of which Thomas H. Lee
Partners is the Managing Member, was party to a Management Agreement, dated August
5, 2004, with Refco, pursuant to which it provided management and consulting services
to Refco.  As set forth in the Management Agreement, THL Managers was specifically
retained because Refco required its "special skills and management advisory services in
connection with [Refco's] business operations and execution of its strategic planning,"
and because THL Managers was "specifically skilled in corporate finance, strategic
corporate planning, and other management skills and advisory services."  The
Management Agreement also states that THL Managers was retained to advise Refco "in
connection with the negotiation and consummation of agreements, contracts, documents
and instruments related to [Refco's] or any of its subsidiaries finances or relationships

134

with banks or other financial institutions," and "with respect to the development and
implementation of strategies for improving the operating, marketing and financial
performance of [Refco] and other senior management matters related to the business,
administration and policies of [Refco] and its subsidiaries." Thus, at the same time that
the THL Partner Defendants held a dominant position on Refco's Board of Directors and
maintained a controlling interest in Refco stock, an entity controlled by Thomas H. Lee
Partners was obligated by the Management Agreement to become deeply involved in the
day-to-day management of Refco.

     (e)    In addition, Refco has characterized itself as a "controlled company"
within the meaning of NYSE rules by virtue of the THL Partners Defendants' and
RGHI's collective post-IPO position in Refco stock, which consisted of an approximate
42.7% interest of the THL Partner Defendants and their passive co-investors and RGHI's
33.8% interest in Refco's outstanding shares. Refco benefited substantially from its
status as a "controlled company" because the boards of directors of controlled companies
are exempt from normal NYSE rules requiring that boards of directors, corporate
governance committees, and compensation committees be independent.

     E.    **The THL Individual Defendants**

317.   Facts demonstrating Defendant Lee's control of Refco include:

     (a)    From the time of the LBO through at least the Class Period, Lee was a
member of Refco's Board of Directors.

     (b)    Lee was the Chairman, CEO, and founder of Thomas H. Lee Partners,
which itself controlled Refco.

(c)     Lee provided services to Refco pursuant to the Management Agreement described in ¶ 316(d) above, and was therefore deeply involved in the day-to-day management of Refco.

(d)     Lee was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

318.   Facts demonstrating Defendant Harkins' control of Refco include:

(a)     From the time of the LBO through at least the Class Period, Harkins was a member of Refco's Board of Directors.

(b)     Harkins was the Vice Chairman and Managing Director of Thomas H. Lee Partners, which itself controlled Refco.

(c)     Harkins provided services to Refco pursuant to the Management Agreement described in ¶ 316(d), and was therefore deeply involved in the day-to-day management of Refco.

(d)     Harkins was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

319.   Facts demonstrating Defendant Jaeckel's control of Refco include:

(a)     From the time of the LBO through at least the Class Period, Jaeckel was a member of Refco's Board of Directors.

(b)     Jaeckel was a Managing Director of Thomas H. Lee Partners, which itself controlled Refco.

(c)     Jaeckel provided services to Refco pursuant to the Management Agreement described in ¶ 316(d) above, and was therefore deeply involved in the day-to-day management of Refco.

(d)      Jaeckel was deemed to beneficially own the THL Partner Defendants'
controlling interest in Refco shares.

320.   Facts demonstrating Defendant Schoen's control of Refco include:

(a)      From the time of the LBO through at least the Class Period, Schoen was a
member of Refco's Board of Directors.

(b)      Schoen was a Co-President of Thomas H. Lee Partners, which itself
controlled Refco;

(c)      Schoen provided services to Refco pursuant to the Management
Agreement described in ¶ 316(d) above, and was therefore deeply involved in the day-to-
day management of Refco;

(d)      Schoen was deemed to beneficially own the THL Partner Defendants'
controlling interest in Refco shares.

F.      **The Audit Committee Defendants**

321.   Facts demonstrating the Audit Committee Defendants' control of Refco include:

(a)      Each of the Audit Committee Defendants was a member of the Audit
Committee of New Refco's Board of Managers and subsequently of Refco's Board of
Directors;

(b)      As stated in the IPO Registration Statement, the Audit Committee
Defendants were specifically responsible for overseeing:

(i)      the integrity of Refco's financial statements;

(ii)     Refco's compliance with legal and regulatory requirements;

(iii)    Refco's independent auditors' qualifications and independence;
and

137

(iv)    the performance of Refco's independent auditors and Refco's internal audit function;

(c)    As stated in the IPO Registration Statement, the Audit Committee Defendants were also specifically responsible for preparing the report required to be prepared by the Audit Committee pursuant to SEC rules;

(d)    The Charter of the Audit Committee articulated the Audit Committee's responsibilities in even greater detail.  In addition to the duties disclosed in the IPO Registration Statement, the responsibilities discussed in the Charter demonstrate the Audit Committee's pervasive involvement in the Company's auditing and financial reporting processes.  These additional responsibilities include:

(i)    Reviewing and discussing with management, internal audit and the independent auditor the adequacy and effectiveness of Refco's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, through inquiry and discussions with the independent auditors, management and head of internal audit;

(ii)    Discussing guidelines and policies governing the process by which senior management of Refco and the relevant departments of the Company, including the internal auditing department, assess and manage the Company's exposure to risk, as well as Refco's major financial and other risk exposures and the steps management has taken to monitor and control such exposures;

(iii)    Reviewing and discussing with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by

138

the Audit Committee, assigning additional internal audit projects to the head of

internal audit;

(iv)    Reviewing and discussing with management the Company's

administrative, operational and accounting internal controls, including special

audit steps adopted in light of the discovery of any significant and material

control deficiencies;

(v)    Meeting periodically with the general counsel, and outside counsel

when appropriate, to review legal and regulatory matters, including (i) any

matters that may have a material impact on the financial statements of the

Company and (ii) any matters involving potential or ongoing material violations

of law or breaches of fiduciary duty by the Company or any of its directors,

officers, employees or agents or breaches of fiduciary duty to the Company; and

(vi)    Reviewing and discussing with management, the Company's

independent auditors and the head of internal audit, material financial

arrangements of the Company which do not appear on the financial statements of

the Company.

## X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT ONE

**For Violations of Section 12(a)(2) of the Securities Act,
On Behalf of Those Who Purchased or Otherwise
Acquired 144A Bonds in the Bond Offering,
Against Bennett, Trosten, Jaeckel, the THL Partner Defendants,
and the Bond Underwriter Defendants**

322.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein, except allegations that the Defendants made the untrue statements of material facts and

omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict

liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

323.    This Claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Bond Underwriter Defendants and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants, on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased or otherwise acquired 144A Bonds in the Bond Offering and were damaged by acts alleged in detail herein (collectively, the "Section 12(a)(2) Bond Plaintiffs").

324.    The Offering Memorandum for the 144A Bonds contained all of the information required to be contained in a Section 10 prospectus, and constituted a prospectus for purposes of Section 12(a)(2) of the Securities Act.  Further, the Bond Offering was a public offering of exempt-from-registration securities.

325.    The Bond Underwriter Defendants were underwriters of the public offering of the Bonds.  Although the Bonds were exempt-from-registration pursuant to Rule 144A, the Bond Underwriter Defendants performed functions identical to those they would have performed if the Bonds were registered.

326.    The Bond Underwriter Defendants sold the 144A Bonds to the Section 12(a)(2) Bond Plaintiffs in the Bond Offering.

327.    Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants, as well as Refco Group, Refco Finance Holdings and the Bond Underwriter Defendants, solicited the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering.  Their actions of solicitation included preparation and distribution of the Offering Memorandum, inviting the Section 12(a)(2) Bond Plaintiffs to attend the Bond Road Show, and setting up and

attending the Bond Road Show, where they aggressively marketed the Bonds to the Section
12(a)(2) Bond Plaintiffs through written and oral presentations.

328.    In soliciting the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in
the Bond Offering, Refco Group, Refco Finance Holdings, the Bond Underwriter Defendants,
and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants were motivated by
their own or the security owner's financial interests.

329.    The Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and
Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants sold and/or offered to sell
the 144A Bonds to the Section 12(a)(2) Bond Plaintiffs by means of the Offering Memorandum
and oral communications at the Bond Road Show, all of which contained untrue statements of
material fact, including, but not limited to, the financial statements of Refco Group and its
subsidiaries, and discussions thereof.  In addition, as alleged in detail herein, the Offering
Memorandum and oral communications at the Bond Road Show omitted to state material facts
necessary to make the statements, in the light of the circumstances in which they were made, not
misleading, including the significant related-party transactions between the Company, BAWAG
and RGHI, and the uncollectibility of hundreds of millions of dollars of the Company's
receivables due to high levels of customer credit losses in prior years.  The facts misstated and
omitted would have been material to a reasonable person reviewing the Offering Memorandum
or hearing the oral representations.

330.    The Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and
Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants each owed the Section
12(a)(2) Bond Plaintiffs the duty to make a reasonable and diligent investigation of the
statements contained in the Offering Memorandum and of the oral and written statements made

at the Bond Road Show, to ensure that they did not include untrue statements of material facts or omit to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading.

331.    As alleged in detail herein, the Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds for believing that the statements in the Offering Memorandum and the oral and written statements presented at the Bond Road Show did not include untrue statements of material facts or omit to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading.

332.    At the time the Section 12(a)(2) Bond Plaintiffs purchased Bonds in the Bond Offering, they did not know, nor in the exercise of reasonable diligence could they have known, of any of the untruths or omissions alleged in detail herein.

333.    The Section 12(a)(2) Bond Plaintiffs suffered injury as a result of Defendants' actions in violation of Section 12(a)(2) of the Securities Act.

334.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Bond Offering.

335.    The Section 12(a)(2) Bond Plaintiffs hereby tender their Bonds to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

142

## COUNT TWO

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of 144A Bonds in the Bond Offering,
Against the THL Partner Defendants, Lee, Bennett,
RGHI, Grant, Murphy, Trosten, Sexton, Silverman, and Maggio
(Based on Violations of Section 12(a)(2) of the Securities Act
by Refco Group, Refco Finance Holdings, and Refco Finance)**

336.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

337.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Partner Defendants and Defendants Lee, Bennett, Grant, RGHI, Murphy, Trosten, Sexton, Silverman, and Maggio, on behalf of PIMCO, the PIMCO High Yield Fund, and the other Section 12(a)(2) Bond Plaintiffs.

338.    As alleged in detail herein, Refco Group, Refco Finance Holdings, and Refco Finance violated Section 12(a)(2) of the Securities Act by soliciting the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering by means of a prospectus (the Offering Memorandum) and oral statements that included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.  In soliciting these purchases, Refco Group, Refco Finance Holdings, and Refco Finance were motivated by their own financial interests.  Refco Group, Refco Finance Holdings, and Refco Finance failed to exercise reasonable care regarding the accuracy and completeness of the Offering Memorandum and oral statements.  The facts misstated and omitted would have been material to a reasonable person.

143

But for the fact that Refco Group, Refco Finance Holdings, and Refco Finance have filed for bankruptcy protection, they would be named as defendants on the Section 12(a)(2) claims alleged herein.

339.    As a direct and proximate result of the violations of Section 12(a)(2) of the Securities Act by Refco Group, Refco Finance Holdings, and Refco Finance, the Section 12(a)(2) Bond Plaintiffs suffered damages in connection with their purchases of 144A Bonds in the Bond Offering and were damaged by the acts alleged in detail herein.

340.    Defendants Bennett, Murphy, Trosten, Sexton, Silverman and Maggio were controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance due (among other reasons alleged in detail herein) to their executive positions with Refco Group and Refco Finance Holdings (of which Refco Finance was a wholly-owned subsidiary at the time of the Bond Offering); their direct involvement in the day-to-day business and operations of each entity, including the preparation of their financial statements; their participation in the Bond Road Show where the Bonds were marketed to investors and the contents of the Offering Memorandum were discussed; and/or their participation in the preparation and dissemination of the inaccurate Offering Memorandum for the Bonds. By virtue of the foregoing, each of these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, Refco Finance Holdings, and Refco Finance, including the content and dissemination of their financial statements and the Offering Memorandum.

341.    Defendant Bennett was also a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to his substantial ownership

interest (through his ownership interest in RGHI) in New Refco, the sole member of Refco Group.

342.    Defendant RGHI was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to its approximate 43% ownership interest in New Refco, the sole member of Refco Group.

343.    The THL Partner Defendants were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to their approximate 57% ownership interest in New Refco, the sole member of Refco Group.

344.    Defendant Lee was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to his position as Chairman and CEO of Thomas H. Lee Partners, and the fact that Thomas H. Lee Partners or Lee controlled each of the other THL Partner Defendants, which in turn controlled Refco Group.

345.    The THL Partner Defendants and Defendants Lee, Bennett, RGHI, Murphy, Trosten, Sexton, Silverman, and Maggio acted negligently and without reasonable care regarding the accuracy of the information contained in the prospectus for the Bonds, and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

346.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Bond Offering.

347.    Pursuant to Section 15 of the Securities Act, the THL Partner Defendants and Defendants Lee, Bennett, RGHI, Murphy, Trosten, Sexton, Silverman, and Maggio are jointly and severally liable with, and to the same extent as, Refco Group, Refco Finance Holdings, and Refco Finance, for those entities' violations of Section 12(a)(2) of the Securities Act.

## COUNT THREE

### For Violations of Section 11 of the Securities Act,
### On Behalf of Purchasers of Registered Bonds,
### Against the Section 11 Bond Defendants

348.  Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

349.   This Claim is brought pursuant to Section 11 of the Securities Act against Defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, Harkins, Jaeckel, Schoen, O'Kelley, Gantcher, Breitman, Grant Thornton, and the Bond Underwriter Defendants (collectively, the "Section 11 Bond Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and all other members of the Class who purchased or otherwise acquired Registered Bonds during the Class Period and were damaged by acts alleged herein (collectively, the "Section 11 Bond Plaintiffs").

350.   The Registered Bonds were issued pursuant to the Bond Registration Statement. All purchases of Registered Bonds are traceable to the Bond Registration Statement.

351.   The Bond Registration Statement contained untrue statements of material facts, including, but not limited to, the financial statements of Refco Group and its subsidiaries and other statements regarding Refco Group's business operations and financial results.  In addition, the Bond Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements made not misleading, including the significant related-party transactions between the Company and RGHI and the uncollectibility of hundreds of millions of

146

dollars of the Company's receivables. The facts misstated and omitted would have been material to a reasonable person reviewing the Bond Registration Statement.

352. Refco Group and Refco Finance were the co-issuers of the Bonds pursuant to the Bond Registration Statement, and would be strictly liable for the untrue statements of material fact and omissions to state material facts therein, but for their filing for bankruptcy court protection.

353. Defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, and Klejna each signed the Bond Registration Statement.

354. At the time the Bond Registration Statement was filed, Defendants Bennett, Lee, Harkins, Jaeckel, Schoen, O'Kelley, Gantcher, and Breitman were managers of New Refco, which managed and was the sole member of Refco Group. As such, these Defendants performed similar functions to those of directors of Refco Group, a co-issuer of the Bonds.

355. Defendant Grant Thornton was the auditor for Refco Group and its subsidiaries, and consented to being named in the Bond Registration Statement as a party who certified the audited financial statements contained therein. Grant Thornton's audit report, which was contained in the Bond Registration Statement, incorrectly stated that Grant Thornton's audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

356. The Bond Underwriter Defendants were underwriters for the Bonds. They served as underwriters in connection with the Bond Offering with the understanding and expectation that the Rule 144A Bonds would later be exchanged for Registered Bonds, and that the Registered Bonds would be registered pursuant to a registration statement that was substantially similar to the Offering Memorandum prepared by the Bond Underwriter Defendants for the

Bond Offering. The Bond Registration Statement, which was prepared with significant participation from the Bond Underwriter Defendants – including participation in drafting sessions by the Bond Underwriter Defendants both individually and through their counsel – included untrue statements of material fact and material omissions, as alleged in detail herein.

357. The Section 11 Bond Defendants owed the Section 11 Bond Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Bond Registration Statement, to ensure that they did not contain untrue statements of material fact or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

358. As alleged in detail herein, the Section 11 Bond Defendants did not make a reasonable investigation of the statements contained in the Bond Registration Statement, and did not possess reasonable grounds for believing that the Bond Registration Statement did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

359. The Section 11 Bond Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Bond Registration Statement when they purchased or acquired those Bonds.

360. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Exchange Offer pursuant to the Bond Registration Statement..

361. By reason of the foregoing, the Section 11 Bond Defendants are liable to the Section 11 Bond Plaintiffs for violations of Section 11 of the Securities Act.

## COUNT FOUR

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of the Section 11 Bond Plaintiffs,
Against the THL Defendants, Bennett, RGHI,
the Bennett Trust, Murphy, Sherer, Sexton, Silverman,
Maggio, Klejna, O'Kelley, Gantcher, and Breitman
(Based on Violation of Section 11 of the Securities Act by Refco Group)**

362.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

363.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman, on behalf of the Section 11 Bond Plaintiffs.

364.    As alleged herein, Refco Group violated Section 11 of the Securities Act by signing and issuing the Bond Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person. But for the fact that Refco Group has filed for bankruptcy protection, it would be named as a defendant on the Section 11 claims alleged in detail herein.

365.    As a direct and proximate result of Refco Group's violation of Section 11 of the Securities Act, the Section 11 Bond Plaintiffs suffered damages in connection with their purchase and/or acquisition of Registered Bonds during the Class Period and were damaged by the acts alleged in detail herein.

366.   The THL Partner Defendants were controlling persons of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to the approximate 57% ownership interest that those Defendants, together with their passive co-investors, had in New Refco, the sole member of Refco Group.

367.   The THL Individual Defendants were controlling persons of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to their positions as four of the Company's eight managers, and their executive positions with the THL Partner Defendants, which controlled Refco Group.

368.   Defendant Bennett was a controlling person of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to his approximate 43% ownership interest (through his sole ownership of RGHI and control of the Bennett Trust) in New Refco, the sole member of Refco Group.

369.   Defendants RGHI and the Bennett Trust were controlling persons of Refco Group when the Bond Registration statement was filed and became effective due (among other reasons alleged in detail herein) to the approximate 43% ownership interest that these Defendants had in New Refco, the sole member of Refco Group.

370.   Defendants Bennett, Murphy, Sherer, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco Group due (among other reasons alleged herein) to their executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Bond Registration Statement.

371.   Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco Group due (among other reasons alleged herein) to their service on the Audit Committee of New

150

Refco, which also performed the functions of an audit committee for Refco Group. As members of the Audit Committee, these Defendants were responsible for overseeing Refco Group's financial reporting, accounting, and internal controls; overseeing the activities of Refco Group's outside auditors and reviewing the scope and results of those audits with the auditors; and meeting with and making recommendations to the managers of Refco Group concerning the foregoing activities.

372.    By virtue of the foregoing, the THL Defendants, Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, including the content of its financial statements and of the Bond Registration Statement.

373.    The THL Defendants, Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman acted negligently and without reasonable care regarding the accuracy of the information contained in the Bond Registration Statement, and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

374.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Exchange Offer pursuant to the Bond Registration Statement.

375.    Pursuant to Section 15 of the Securities Act, the THL Defendants, Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman are jointly and severally liable with, and to the same extent as, Refco Group for its violation of Section 11 of the Securities Act.

## COUNT FIVE

**For Violations of Section 11 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock,
Against the Section 11 Stock Defendants**

376.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

377.    This Claim is brought pursuant to Section 11 of the Securities Act against Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Grant Thornton, and the Stock Underwriter Defendants  (collectively, the "Section 11 Stock Defendants"), on behalf of RH Capital and other members of the Class who, during the Class Period, purchased or otherwise acquired Refco common stock issued pursuant and/or traceable to the IPO Registration Statement and were damaged by acts alleged herein (collectively, the "Section 11 Stock Plaintiffs").

378.    Refco issued common stock pursuant to the IPO Registration Statement.  All purchases of Refco common stock are traceable to the IPO Registration Statement.

379.    The IPO Registration Statement contained untrue statements of material fact, including, but not limited to, the financial statements of Refco and its subsidiaries and other statements regarding Refco's business operation and financial results.  In addition, the IPO Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the significant related-party transactions between the Company and RGHI and the uncollectibility of hundreds of millions of dollars of the Company's receivables.  The facts misstated and omitted would have been material to a

reasonable person reviewing the IPO Registration Statement.

380.     Refco issued stock pursuant to the IPO Registration Statement, and would be strictly liable for the untrue statements of material fact and omissions to state material facts therein, but for its filing for bankruptcy court protection.

381.     Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen each signed the IPO Registration Statement.

382.     At the time the IPO Registration Statement was filed, Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen were directors of Refco.

383.     Defendant Grant Thornton was the auditor for Refco and its subsidiaries, and consented to being named in the IPO Registration Statement as a party who certified the audited financial statements contained therein.  Grant Thornton's audit report, which was contained in the IPO Registration Statement, incorrectly stated that Grant Thornton's audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

384.     The Stock Underwriter Defendants sold shares of Refco stock in the IPO, participated in the preparation of the IPO Registration Statement and were responsible for the contents and dissemination of the IPO Registration Statement.

385.     The Section 11 Stock Defendants owed to the Section 11 Stock Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the IPO Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

386.     As alleged in detail herein, the Section 11 Stock Defendants did not make a

153

reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the IPO Registration Statement did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

387.   The Section 11 Stock Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the IPO Registration Statement when they purchased or acquired the stock.

388.   By reason of the foregoing, the Section 11 Stock Defendants are liable to the Section 11 Stock Plaintiffs for violations of Section 11 of the Securities Act.

**COUNT SIX**

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock
Against The Section 15 Stock Defendants
(Based on Violations of Section 11 of the Securities Act
by Refco)**

389.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

390.   This Claim is brought pursuant to Section 15 of the Securities Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Maggio, Klejna, Breitman, Gantcher, and O'Kelley (collectively, the "Section 15 Stock Defendants"), on behalf of RH Capital, and the other members of the Class who purchased who purchased or acquired the stock issued in or traceable to the IPO, and were damaged by acts alleged herein (the "Section 15 Stock Plaintiffs").

154

391.    As alleged in detail herein, Refco violated Section 11 of the Securities Act with respect to the IPO by an issuing the IPO Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Registration Statement.  But for the fact that Refco has filed for bankruptcy protection, it would be named as a Defendant on the Section 11 claims alleged in detail herein.

392.    The Section 15 Stock Defendants had a duty to disseminate accurate and truthful information with respect to Refco's financial condition and results of operations.

393.    The THL Partner Defendants were controlling persons of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to the approximate 42.7% ownership interest that these Defendants, together with their passive co-investors, had in Refco.

394.    The THL Individual Defendants were controlling persons of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to their positions as four of the Company's eight managers, and their executive positions with the THL Partner Defendants, which controlled Refco.

395.    Defendant Bennett was a controlling person of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to his approximate 33.8% ownership interest (through his sole ownership of RGHI and control of the Bennett Trust) in Refco.

155

396.    Defendants RGHI and the Bennett Trust were controlling persons of Refco when the IPO Registration statement was filed and became effective due (among other reasons alleged in detail herein) to the approximate 33.8% ownership interest that these Defendants had in Refco.

397.    Defendants Bennett, Murphy, Sherer, Sexton, Maggio and Klejna, were controlling persons of Refco due (among other reasons alleged herein) to their executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the IPO Registration Statement.

398.    Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco due (among other reasons alleged herein) to their service on the Audit Committee of Refco. As members of the Audit Committee, these Defendants were responsible for overseeing Refco's financial reporting, accounting, and internal controls; overseeing the activities of Refco's outside auditors and reviewing the scope and results of those audits with the auditors; and meeting with and making recommendations to the managers of Refco concerning the foregoing activities.

399.    By virtue of the foregoing, the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Maggio, Klejna, O'Kelley, Gantcher, and Breitman each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco, including the content of its financial statements and of the IPO Registration Statement.

400.    Lead Plaintiff RH Capital and the Section 15 Stock Plaintiffs purchased Refco securities issued in, or traceable to, the IPO and were damaged thereby. The IPO was conducted pursuant to the IPO Registration Statement.

401.    The Section 15 Stock Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in the IPO Registration Statement and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

402.    The Section 15 Stock Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the IPO Registration Statement.

403.    The Section 15 Stock Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the IPO Registration Statement, for which they are entitled to compensation.

404.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the IPO pursuant to the IPO Registration Statement.

405.    Pursuant to Section 15 of the Securities Act, the Section 15 Stock Defendants are jointly and severally liable with and to the same extent as Refco, for its violations of Section 11 of the Securities Act.

## COUNT SEVEN

**For Violations of Section 12(a)(2) of the Securities Act,
On Behalf of Those Who Purchased or Otherwise Acquired
Refco Common Stock in the IPO,
Against the Stock Underwriter Defendants**

406.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

407.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Stock Underwriter Defendants on behalf of RH Capital and other members of the Class who purchased or otherwise acquired Refco common stock in the IPO and were damaged by the acts alleged in detail herein.

408.    The Stock Underwriter Defendants sold shares of Refco stock in the IPO and were responsible for the contents and dissemination of the Prospectus. As alleged in detail herein, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. The untrue statements of material fact in the Prospectus included, but were not limited to, the financial statements of Refco and other statements regarding Refco's business operation and financial results. In addition, the Prospectus omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, including the significant related-party transactions between the Company and RGHI, and the uncollectibility of hundreds of millions of dollars of the Company's receivables due to high levels of customer credit losses in prior years. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

409.    The Stock Underwriter Defendants owed to the purchasers of Refco stock, including Plaintiff RH Capital, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that it was true and that there was no omission to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

410.    As alleged in detail herein, the Stock Underwriter Defendants did not make a

reasonable and diligent investigation and did not possess reasonable grounds for believing that the Prospectus did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

411.    Plaintiff RH Capital and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus at the time they acquired Refco stock.

412.    By reason of the foregoing, the Stock Underwriter Defendants are liable to Plaintiff RH Capital and other members of the Class who purchased or otherwise acquired stock issued in the IPO pursuant to the Prospectus for violations of Section 12(a)(2) of the Securities Act, each of whom has been damaged by reason of such violations.

413.    Plaintiff RH Capital and other members of the Class who purchased or otherwise acquired stock issued in the IPO pursuant to the Prospectus hereby tender their shares of Refco stock to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT EIGHT

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock
Against the Section 15 Stock Defendants
(Based on Violations of Section 12(a)(2) of the Securities Act
by Refco)**

414.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

415.    This Claim is brought pursuant to Section 15 of the Securities Act against the Section 15 Stock Defendants on behalf of the Section 15 Stock Plaintiffs.

416.    As alleged in detail herein, Refco violated Section 12(a)(2) of the Securities Act by soliciting the Section 15 Stock Plaintiffs' purchases of Refco's common stock by means of the IPO Prospectus, which included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. In soliciting these purchases, Refco was motivated by its own financial interests. Refco failed to exercise reasonable care regarding the accuracy and completeness of the IPO Prospectus. The facts misstated and omitted would have been material to a reasonable person. The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Prospectus. But for the fact that Refco has filed for bankruptcy protection, it would be named as defendants on the Section 12(a)(2) claims alleged herein.

417.    The Section 15 Stock Defendants had a duty to disseminate accurate and truthful information with respect to Refco's financial condition and results of operations.

418.    As alleged above, the Section 15 Stock Defendants at all relevant times either (i) participated in the operation and management of the Company, and/or (ii) conducted and participated, directly and indirectly, in the conduct of Refco's business affairs, and/or (iii) exerted controlling influence over the Company through the nature of their relationships with Bennett and others. Because of their positions of control and authority over Refco, the Section 15 Stock Defendants were able to, and did, control the contents of the IPO Prospectus.

419.    Lead Plaintiff RH Capital and the Section 15 Stock Plaintiffs purchased Refco securities issued in, or traceable to, the IPO and were damaged thereby. The IPO was conducted pursuant to the IPO Prospectus.

420.    The Section 15 Stock Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in the IPO Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

421.    The Section 15 Stock Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the IPO Prospectus.

422.    The Section 15 Stock Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the IPO Prospectus, for which they are entitled to compensation.

423.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years of the IPO.

424.    Pursuant to Section 15 of the Securities Act, the Section 15 Stock Defendants are jointly and severally liable with and to the same extent as Refco, for those entities' violations of Section 12(a)(2) of the Securities Act.

XI.    **DEFENDANTS' FRAUDULENT SCHEME**

425.    The allegations that follow describe the acts, practices, and a course of conduct engaged in by various Defendants that operated as a fraud on the investing public. As described in more detail below, Defendants Bennett, Maggio, Trosten, Grant, Mayer Brown, Collins and others devised and participated in a fraudulent scheme consisting of a series of sham related-party "loans" that were timed to occur at the end of Refco's financial periods from 1999 through 2005. This scheme was designed to (and did) enable Refco to temporarily transfer uncollectible

161

debt off of the Company's books by shifting it between wholly-owned Company subsidiaries, related-party companies owned and controlled by Bennett, and several third party customers of Refco. The goal of this scheme was to disguise hundreds of millions of dollars of uncollectible receivables owed to the Company so that the Company could fraudulently avoid taking hundreds of millions of dollars in write-offs.

426.    As these Defendants knew, such large write-offs would have been catastrophic to the Company because, among other things, they would have (a) eliminated the Company's members' equity (and thus eliminated any chance for Refco's insiders to accumulate huge personal fortunes); (b) revealed that the Company's business plan and operations exposed the Company to the very same enormous trading and market risks undertaken by its customers; (c) created a host of regulatory capital problems for the Company; and (d) wiped out the Company's income and profits by revealing that the numbers the Company reported as <u>positive</u> were actually <u>negative</u>.

427.    Bennett, Trosten and Grant have been indicted by a Grand Jury for their roles in this fraudulent scheme, and are awaiting trial on numerous criminal charges, including securities fraud and conspiracy to commit securities fraud.

### A.    Refco and Its Customers Suffer Hundreds of Millions of Dollars in Trading Losses

428.    During the 1970s, Bennett was employed by several international commercial banks and developed significant experience in arranging financing for commodities investors. When Bennett was hired as the Company's CFO in 1983, he put his experience into practice by creating a customer finance unit at Refco. Formed in 1982, the customer finance unit extended loans from the Company to its trading clients. These loans allowed the Company's customers to operate on "margin" and leverage their operating capital into increasingly larger trades in the

commodities, derivatives, and futures markets. These larger trades, in turn, generated larger commissions for the Company and led to dramatic increases in its revenues, income and profits.

429.  The Company soon became dependent upon the increased flow of commissions, revenues and profits that these loans generated. In order to continue increasing its revenues and profits, the Company started extending credit to its customers based on little or no assessment of the customer's credit-worthiness. As reported in <u>Bloomberg Markets</u> in February 2006, a Refco broker stated that "Refco was like a used-car dealer: no money down, no credit, no problem."

430.  While these "no questions asked" loans allowed the Company to increase its commissions, revenues and profits, they also exposed it to the severe trading risks undertaken by its clients – clients who often took huge positions in the volatile financial markets around the globe. Thus, if the Company's clients suffered significant trading losses rendering them unable to repay their loans to the Company, the Company would be forced, according to applicable accounting rules and regulations, to "write off" the amounts of the loans from its books. In short, by extending easily-obtained financing to its customers, the Company had created a business model that depended in large part upon the success its own customers achieved making trades in various financial markets around the world.

431.  The inherent dangers posed by this business model materialized – though were not revealed to the public – in 1997 and 1998 when a number of the Company's most significant customers (and the Company itself) suffered massive trading losses in a number of worldwide market collapses. First, in what became known as the "Asian Financial Crisis," two rounds of currency devaluations in Southeast Asia caused the Company and its customers to suffer severe losses. In July 1997, the Thai baht, Malaysian ringgit, Philippine peso, and Indonesian rupiah suffered sharp declines in value. In late 1997, the Taiwan dollar, South Korean won, Brazilian

163

real, Singaporean dollar, and Hong Kong dollar suffered similar sharp declines. Several of the

Company's customers had made large speculative trading "bets" that these currencies would be

supported by their respective governments and kept at a fixed value against the United States

dollar. When these gambles failed, the customers lost huge sums of money and were unable to

repay hundreds of millions of dollars worth of loans they had received from the Company. For

instance, as reported in <u>Bloomberg Markets</u> in February 2006, "a person familiar with an internal

review that Refco conducted" in October 2005 noted that Refco was unable to collect more than

$300 million in amounts owed from eight customers who suffered severe losses in connection

with the Asian Financial Crisis.

432.     Second, in early 1998, international prices for oil, copper, gold and aluminum

began to decline. The Russian economy was hit especially hard by these price declines because

nearly two-thirds of Russia's hard currency earnings depended on exports of oil and non-ferrous

metals. As the Russian economy weakened, its tax revenues declined and the Russian

government was forced to increase the interest rates on its domestic bonds in order to attract

foreign capital. By July 1998, the interest rates on Russian ruble-backed domestic bonds had

increased to a staggering 70% and, notwithstanding the increasing risk that the Russian

government would default on its repayment obligations, foreign speculators, including Refco and

many of its customers, took large positions in those bonds. In addition, many Refco customers

purchased hundreds of millions of dollars in "ruble futures" that were due to mature in the Fall of

1998. To fund these purchases, many of the Company's customers drew down on the credit lines

extended to them by the Company itself.

433.     In essence, Refco and its customers were speculating that the Russian government

would honor its debt obligations and keep the ruble at a fixed value relative to the U.S. dollar.

This speculation proved ill-founded. On August 17, 1998, the Russian government defaulted on its domestic debt <u>and</u> devalued the ruble. These actions caused huge financial reversals and hundreds of millions of dollars in losses for Refco and many of its customers. Refco itself lost $50 million in a single transaction in 1998 on an investment in Russian bonds.

434.    In addition to the foregoing, BAWAG has publicly disclosed that it experienced approximately $1.2 billion in trading losses in accounts maintained at Refco. According to published reports, and confirmed by Lead Plaintiffs' independent investigation, these losses occurred primarily in the trading accounts of Ross Capital, where Wolfgang Flottl had engaged in high-risk currency speculation which resulted in huge losses when the Japanese yen declined for eight straight weeks in 2000. Upon information and belief, a material percentage of the capital employed by Flottl in this speculation was provided by BAWAG and further extended on margin loans by Refco, thus creating both a significant loss for BAWAG and a significant bad debt owed to Refco.

435.    In the wake of these financial reversals, many of Refco's customers were unwilling or unable to repay the huge "margin" loans that had been extended to them by Refco— often with little or no investigation into the customer's creditworthiness. Coupled with the huge trading losses that Refco had suffered in its own proprietary trading accounts, the uncollectible margin loans created a dire financial crisis for Refco. The Company now had hundreds of millions of dollars in unrecoverable debt and losses that would need to be "written off." However, revealing these losses and properly accounting for them as write-offs would have threatened the Company's very survival.

**B.      Bennett Becomes CEO and, With the Aid of Collins, Mayer Brown and Maggio, Transfers Uncollectible Receivables Off Refco's Books**

436.    In September 1998, on the heels of the two world-wide financial catastrophes

described above, Bennett was promoted from CFO to the Chairman and CEO of the Company. As a former CFO with over seventeen years of experience at the Company and over twenty-eight years of experience in the fields of commodity and commercial lending, Bennett knew that revealing the uncollectible loans and the huge trading losses would be catastrophic to the Company he now led. Indeed, as Bennett knew, if these loans and trading losses were revealed and properly accounted for, the resulting write-offs would threaten the Company's very survival.

437.    The "life threatening" nature of the financial problems facing Refco at this time is discussed in a lawsuit filed on August 5, 2004 in the Northern District of Illinois by Thomas H. Dittmer, a former CEO of Refco, against Edwin L. Cox, Jr., a commodities trader with extensive dealings with Refco, captioned <u>Thomas H. Dittmer v. Edwin L. Cox, Jr.</u>, No. 5185 (N.D. Ill.). In that lawsuit, Dittmer alleges that "Cox undertook to evaluate Refco's financial status in connection with accounts at Refco co-owned by Cox and Dittmer." According to that complaint:

> Prior to August 1999, Cox advised Dittmer that Dittmer's <u>continued ownership of equity interests in Refco would cause Dittmer to suffer significant financial loss and that it would be in Dittmer's best interest to sell his interests in Refco as quickly as possible.</u>

(Emphasis added.) In a facsimile attached to Dittmer's Complaint and dated August 4, 2004, Cox wrote to Dittmer and stated:

> I am shocked that at this point in time you suddenly take the position that I have no claim involving Refco. You have an awfully short memory! I took risk, put in capital, endured a lot of grief, spent the time, hired the people, negotiated resolutions to your CFTC problems, and generally attempted to protect you from liabilities, <u>which we both know were life threatening.</u>

(Emphasis added.)

438.    Not only was the situation dire for Refco, but as Collins and Mayer Brown knew, the collapse of Refco—Collins' crown jewel client—would have drastically reduced the annual "billings" that Collins generated at Mayer Brown, and would have had negatively impacted

Collins' personal compensation.

439.    Beginning no later than 1997, Bennett, Collins and Mayer Brown, among others,

embarked on a scheme to conceal the losses the Company had suffered and the uncollectible

receivables owed to it by its customers. Rather than write off these losses, they simply

transferred the uncollectible receivables owed to the Company onto the books of RGHI, which

Bennett owned and controlled. These uncollectible receivables were then recorded on the

Company's books as a receivable owed to it by RGHI, instead of as uncollectible receivables

owed by the Company's customers.

440.    For example, as discussed above and in the Examiner's Report, Victor

Niederhoffer was one of the Refco customers that sustained significant trading losses in the

Asian Financial Crisis and was unwilling or unable to repay the margin loans extended to him by

Refco. In October 1997, Collins, Mayer Brown and Bennett negotiated and documented a

"settlement" with Niederhoffer whereby Niederhoffer would liquidate his accounts at Refco and

turn over the proceeds to the Company. In return, Refco committed in writing—in documents

prepared by Collins and Mayer Brown—to release Niederhoffer from liability for the much

larger, uncollectible amounts owed by Niederhoffer to Refco (approximately $71 million). In

order to conceal the Niederhoffer losses and remove them from Refco's books, Collins, Mayer

Brown and Bennett then caused Refco to assign to RGHI the "receivable" representing

Niederhoffer's uncollectible debt (which Collins and Mayer Brown knew that Refco had agreed

not to pursue). In exchange for receiving this worthless receivable, RGHI agreed—in documents

drafted by Mayer Brown—to pay Refco the amount of the uncollectible debt. Through these

machinations, the scheme designed and implemented by Collins, Mayer Brown and Bennett

fraudulently transferred Niederhoffer's uncollectible debt off of Refco's books and converted it