into a receivable owed from RGHI to Refco.

441.    As Collins and Mayer Brown knew, Refco's transfer of the Niederhoffer receivable to RGHI was a sham transaction that lacked any legitimate business purpose. As an initial matter, the Niederhoffer debt was unenforceable pursuant to written documents Collins himself prepared. There was no legitimate reason for RGHI to agree to pay $71 million to Refco in return for the "right" to collect an unenforceable debt of the same amount. To the contrary, the transaction reeked of fraud and there is only one rational inference as to why the transfer was made: to remove the problematic debt from Refco's books and replace it with one that appeared collectible.

442.    Because Collins and Mayer Brown represented both Refco *and* RGHI in these transactions, and because Bennett was a principal of both entities, they knew that RGHI was a non-operating company without significant cash flow and that it was unable to pay the receivable it owed to Refco. Likewise, Bennett knew – and Mayer Brown and Collins either knew or recklessly disregarded -- that Refco could (and did) use RGHI as an off-balance sheet entity to hide uncollectible debts. Nonetheless, Collins and Mayer Brown participated in the transaction, collected their legal fees, and for years concealed the transaction and the uncollectibility of the receivable from public view in their drafting and review of Refco's public disclosures.

443.    Collins and Mayer Brown remained involved with the Niederhoffer debts after the initial arrangements were made to fraudulently transfer them off of Refco's books. According to the Examiner's Report, and based on the Examiner's review of Mayer Brown's time records, in connection with dealing with various investigations initiated by commodities regulators regarding the Niederhoffer debts, Collins (a) reviewed Refco's financial statements and (b) revised footnotes to financial statements that were being delivered to regulators.

444.    Collins and Mayer Brown also were involved in certain tax issues relating to the losses, which were being handled by Ernst & Young LLP ("E&Y").  Under the tax laws, if the receivable representing the Niederhoffer losses became worthless after it was "sold" to RGHI, it would have to be reflected as a loss on Refco's books.  To avoid recognizing the loss, Refco repeatedly represented to E&Y that the receivable for the Niederhoffer losses was not worthless. A handwritten document prepared by E&Y and dated November 20, 1997—only a few weeks after Collins had finished the documentation used to remove the Niederhoffer loan from Refco's book—states that an E&Y employee had discussed the Niederhoffer debts with another E&Y employee and questioned:

> Whether we could be viewed as somehow being an accessory to some type of fraud.  [E&Y employee] felt that as long as we never give them any accounting advice and our tax returns are prepared correctly we should not have a concern.

(Emphasis added.)  This note, prepared by E&Y employees far less familiar with Refco than Collins, demonstrates that a sophisticated professional possessing the level of familiarity with Refco that Collins did, must have known that the treatment of the Niederhoffer losses was garden-variety fraud.

445.    Collins and Mayer Brown continued to be involved in issues relating to the Niederhoffer losses into 1999.  For instance, an internal E&Y Memorandum dated February 9, 1999 states:

> I communicated to [Refco executive] Steve Rossi today that we did not agree with the representations in the loan, pledge, and purchase agreements which stated that there were no undisclosed liabilities on the audited RGL [Refco Group] financial statements and that all tax returns and withholding taxes had been filed/paid.  I also told him that if asked by Mayer Brown or BAWAG we would need to express our views . . . On February 10th [sic] Jim Barry of Mayer Brown asked if I was okay with Section 2.16 of the agreement regarding Taxes . . . I told Jim that we were not making any representations regarding that Section . . . I also told him that there

may very well be material tax issues and that he should discuss
these with the client and with Joe Collins who is already aware of
some of them.

(Emphasis added.)  According to the Examiner's Report, in March 1999, Collins billed extensive

time on the Niederhoffer matter discussing issues such as "bad debt analysis" and conversations

with "SR" [Rossi] regarding background arguments for bad debt treatment.

446.    During this same time frame, E&Y sent several memoranda to Refco that

explained the treatment of the RGHI receivable, including one dated March 8, 1999 that stated

"[Refco] will not write this receivable off on its separate audited income statement on the theory

that this receivable will be satisfied by... [RGHI] at some point, perhaps upon a sale of the

business." The Examiner concluded that "[b]ecause Mayer Brown and E&Y were working in

tandem on these issues, it could be inferred that Mayer Brown was aware of the matters

contained in the memoranda E&Y sent to Refco."

447.    Documents in Collins' handwriting demonstrate that by no later than October

1999, Collins and Mayer Brown had knowledge of more than one receivable owed by RGHI to

Refco. An October 15, 1999 letter from Bennett to Collins, attaching Refco's unaudited balance

sheet as of May 31, 1999 and its consolidated and audited financial statements for the fiscal year

ended February 28, 1999, and sent to Collins at his New York office, states that RGHI's "capital

(i.e., net worth) is represented by the value of its investment in [Refco]." This statement is

bracketed, and in handwriting that the Examiner determined was consistent with Collins', the

statement *"Minus Loans to RGH[I]"* is written.  These handwritten notes demonstrate that

Collins knew that RGHI owed money to Refco, and Collins' use of the plural "loans"

demonstrates that he was aware of more than just the Niederhoffer bad debts that he helped

transfer to RGHI.

448.    By June 2002, Mayer Brown was aware that the RGHI receivable totaled at least

$350 million.  In a memorandum to files dated February 11, 2002, a Mayer Brown attorney

discussed a possible sale of a portion of RGHI to a third-party, and noted that the sale price

would be approximately $700 million with "$350,000,000 to be paid by the assumption of

liabilities of [RGHI]."  Moreover, a purchase agreement drafted by Mayer Brown and dated June

11, 2002, states:

> The Company agrees that $350 million of the Purchase Price for
> the Participation Right shall be used or caused to be used for the
> retirement of inter-company debt of [RGHI].

(Double Underline in Original.)  According to the Examiner's Report, Mayer Brown time

records reflect that on June 11, 2002, Collins spoke with Bennett regarding, among other things,

revisions to documents and a price adjustment and revised the purchase agreement in respect of

credits to the purchase price.

449.    Upon information and belief, Defendant Maggio was also directly involved with

developing and implementing this scheme to transfer the customer receivables to RGHI.

### C.    Refco Conceals the Uncollectible Receivable Through a Series of Fraudulent "Round Trip" Loan Transactions

450.    Defendants Bennett and Maggio and others knew that, under applicable

accounting rules and regulations, the existence of a multi-hundred million dollar receivable owed

to the Company by a related-party entity such as RGHI would have to be disclosed as a "related

party transaction."  This disclosure, in turn, would attract the attention of, among others,

investors and regulators, who view related-party transactions with suspicion because they are

often used to carry out financial statement manipulations.  These Defendants knew that such a

huge related-party receivable could be recognized for what it was: uncollectible debt that had to

be written off, and compelling evidence that the Company's business model was much less

robust than previously perceived.

451.    In order to avoid this result, Bennett and Maggio—again with help from their "go to guy" Collins and Mayer Brown—devised a remarkably simple scheme that should have been obvious to all of the other Defendants (all of whom had unfettered access to the Company's books and records at and before the time of their securities law violations). As described below, pursuant to documents negotiated and drafted by Mayer Brown, Refco engaged in a series of "loan" transactions at the end of each fiscal year from 2000 through 2005, and several fiscal quarters as well, to temporarily pay down the receivable owed to Refco from RGHI and replace it on the Company's books with receivables purportedly owed by BAWAG or third-party customers. More specifically, a few days before Refco closed its books for each financial period, it "loaned" hundreds of millions of dollars from its subsidiary Refco Capital to BAWAG and/or third parties which simultaneously "loaned" the same amount to RGHI (though in point of fact, as discussed below, no money actually changed hands in these "loans"). Refco itself served as the guarantor of the loans between the third parties and RGHI. RGHI then used the proceeds from the "loans" to temporarily pay off the uncollectible receivables it owed to Refco. Then, just days after the financial period ended and Refco closed its books, these transactions were reversed, the "loans" were repaid, the third parties were paid a fee for their participation in the risk-free "loans," and the uncollectible receivables from RGHI were returned to Refco's books.

452.    The scheme involved the repeated manipulation of huge sums of money, and occurred with clockwork-like regularity straddling the end of each of Refco's financial reporting periods. Each of these sham transactions followed a similar format, and each was designed so that the Company could fraudulently avoid taking hundreds of millions of dollars of write-offs for receivables that could not be collected. Mayer Brown was directly involved in no less than seventeen of these sham transactions between 2000 and 2005, sixteen of which were timed to

172

occur within a few days bracketing the ends of Refco's financial periods. Mayer Brown's involvement included negotiating the terms of the loans, drafting and revising the documents relating to the loans, transmitting the documents to the participants, and retaining custody of and distributing the executed copies of the documents. In at least one instance, Mayer Brown even represented the counterparty to the loans, in addition to representing Refco and RGHI.

453.    The counterparties to Refco's round-trip loan transactions included Customer X, BAWAG, CIM Ventures, EMF, Delta Flyer, Beckenham, and CS Land. The transactions with each of these parties are described in detail below.

### 1.    The Fraudulent Transactions With Customer X

454.    Lead Plaintiffs have obtained and reviewed numerous loan agreements, guarantees, correspondence and other documents relating to the transactions described herein. Lead Plaintiffs have also interviewed representatives of Customer X, which was involved in at least ten of these transactions with Refco between February 2002 and August 2005. These representatives include the founder and principal of Customer X (referred to herein as "Principal A"). Principal A has direct knowledge of the origin and structure of approximately ten transactions that took place between Refco and Customer X between February 2002 and August 2005.

455.    Principal A has informed Lead Counsel that, beginning in or about 1999, Customer X used Refco as its prime broker, and conducted hundreds of millions of dollars of business with the Company in that capacity.

456.    According to Principal A, in or about early February 2002, he received a telephone call from Peter McCarthy ("McCarthy"), an executive officer of Refco and Customer X's primary contact at the Company. McCarthy asked Principal A whether Customer X would be interested in participating in a "trade." McCarthy stated that a group of other people were

already involved with these trades, and Refco wanted to get Customer X involved as well. As for the details of the "trade," McCarthy told Principal A to "talk to Sandy Maggio."

457.    Shortly thereafter, Principal A spoke with Defendant Maggio, who explained some, but not all, of the details of the proposed transaction. Maggio stated that the transaction involved a loan from Refco Capital to Customer X and a simultaneous loan from Customer X to RGHI, which would then be reversed several days later. For its participation in this transaction, Maggio explained, Customer X would be entitled to a "spread" – the difference between the interest rate that would be paid by Customer X to Refco Capital, and the slightly higher rate that would be paid by RGHI to Customer X. Maggio told Principal A to speak with Refco's attorneys at Mayer Brown for additional information on the structure and terms of the loan.

458.    Maggio put Principal A in touch with Koury, a senior associate who worked in Mayer Brown's "Derivatives Practice Group" under the supervision of Collins. Koury explained in detail the structure of the transactions suggested by Maggio, and provided Principal A a set of transaction documents, including loan agreements and promissory notes. Principal A has told Lead Counsel that he was intent on obtaining some guarantees for Customer X's participation in the transaction, particularly given that Customer X would make a relatively small profit in a transaction in which it would have several hundred million dollars at risk. Among the documents Mayer Brown drafted and provided to Principal A on or about February 25, 2002 was a side letter from Refco Group, whereby it "unconditionally and absolutely guarantee[d]" to Customer X "the prompt and complete payment and performance when due, whether by acceleration or otherwise, of all obligations and liabilities" of RGHI pursuant to the loan agreement and related note. The guarantee was signed by Defendant Bennett, as President and CEO of Refco Group.

459.    As described below, between February 2002 and August 2005, Customer X

participated in ten separate transactions among itself, Refco, Refco Capital and RGHI.  Mayer

Brown drafted all of the documentation for these transactions, and indeed most of the documents

bear a "footer" identifying the documents as being prepared by Mayer Brown.

### i.  The February 2002 Transaction

460.    The first set of round-trip "loan" transactions involving Customer X occurred

shortly before the close of the Company's fiscal year 2002.  These transactions are

memorialized in documents prepared by Mayer Brown and enclosed with a February 26, 2002

cover memorandum (the "February 26, 2002 Memorandum") from Mayer Brown to Principal A.

The deal documents pertain to four components of an integrated transaction.

461.    *First*, on or about February 25, 2002, Refco Capital loaned Customer X the sum

of $325,000,000.  The loan was to be repaid within two weeks, that is, by March 4, 2002.  This

loan is reflected in a "Loan Agreement" and "Note," each dated February 25, 2002, between

Refco Capital and Customer X (here, and for each succeeding transaction, the "Refco

Capital/Customer X Loan Agreement").  The agreement provided that "interest shall accrue on

the Loan Amount outstanding from time to time at a rate per annum equal to 1.8375%, calculated

on the basis of a year consisting of 360 days and paid for actual days elapsed."  David Weaver,

the Chief Administrative Officer at Refco Capital, signed the Refco Capital/Customer X Loan

Agreement.

462.    Principal A has told Lead Counsel that neither Refco nor Mayer Brown ever

informed him that RGHI was not a Refco corporate entity but, rather, a separate holding

company 100% owned by Defendants Bennett and Grant with no corporate relationship with

Refco.  To the contrary, the Refco Capital/Customer X Loan Agreement drafted by Mayer

Brown (and the papers for each succeeding set of loans), specifically defined the term "Refco

175

Parties" to include RGHI, even though Mayer Brown frequently provided substantial legal services to Bennett and RGHI and knew it was not a Refco entity.

463.    The purpose and function of this loan to Customer X was plain from the face of the loan document. The Refco Capital/Customer X Loan Agreement (and each of the succeeding Refco Capital/Customer X Loan Agreements) contained an affirmative "use of proceeds" covenant that obligated Customer X to "[u]se the Loan proceeds only for funding a corresponding loan to [RGHI]."

464.    *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement they signed a loan agreement between Customer X and RGHI (here, and for each succeeding transaction, the "Customer X/RGHI Loan Agreement"), for the same principal amount of $325,000,000. As with the Refco Capital/Customer X loan, the repayment date was set as March 4, 2002.

465.    The Customer X/RGHI Loan Agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 2.8375% calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Thus, the interest rate on this loan was 100 basis points higher than the interest rate on the loan from Refco Capital to Customer X.

466.    The Customer X/RGHI Loan Agreement also defined RGHI as one of the "Refco Parties." Further, and consistent with what Principal A told Lead Counsel regarding his understanding that RGHI was, in fact, a Refco affiliate, the agreement provided that legal notices to RGHI were to be sent to Refco Capital (care of Refco Capital's then-Chief Administrative Officer). Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

467.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group

pursuant to a guaranty dated February 25, 2002, and signed by Bennett. The guaranty assured Customer X that Refco would make it whole if RGHI defaulted on the $325,000,000 loan.

468.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

469.    The $325,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company, and the loans were unwound on or about March 4, 2002, such that the $325,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company. Among other evidence, Lead Counsel has reviewed an internal Refco document confirming that the Company credited $325,000,000 to the account of Customer X on February 25, 2002.

470.    According to Principal A, Customer X never physically received the principal proceeds of this loan (or any of the loans described below). To the contrary, the funds never left Refco. Rather, on the date the loan agreements were signed, Refco Capital caused the funds to be transferred into an account maintained in Customer X's name at Refco, and then the funds were immediately transferred from that account to RGHI. When the repayment date on this loan (and those that followed) arrived, this pattern was reversed so that the funds were transferred from RGHI back into Customer X's account, and then immediately transferred from that account back to Refco Capital. As confirmed by Principal A, Customer X received its fee -- the 100 basis point "spread" on the first loan and, as described below, 75 basis points in connection with the later loans – separately. Notably, in each instance, those payments of net interest to Customer X were made by *Refco Capital*, not RGHI.

177

### ii. The February 2003 Transaction

471.    This series of transactions was repeated at the close of the Company's fiscal year ended February 28, 2003, pursuant to documents prepared by Mayer Brown.

472.    *First*, on or about February 21, 2003, Refco Capital loaned Customer X the sum of $500,000,000. The loan was to be repaid within two weeks, that is, by March 4, 2003. This loan is reflected in a "Loan Agreement" and "Note," each dated February 21, 2003, between Refco Capital and Customer X. The Refco Capital/Customer X Loan Agreement provides that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 1.31%, calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Notices to Refco Capital under the Refco Capital/Customer X Loan Agreement were to be addressed to Defendant Maggio, who signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

473.    *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement, they signed a loan agreement between Customer X and RGHI, for the same principal amount of $500,000,000. The repayment date on this loan was also March 4, 2003. The Customer X/RGHI Loan Agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 2.06% calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Thus, the interest rate on this loan was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement provided that legal notice to RGHI be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

474.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated February 21, 2003, and signed by Bennett.

178

475.   The $500,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about March 4, 2003, such that the $500,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### iii. The February 2004 Transaction

476.   This series of transactions was repeated at the close of the Company's fiscal year ended February 29, 2004, pursuant to documents prepared by Mayer Brown.

477.   *First*, on or about February 20, 2004, Refco Capital loaned Customer X the sum of $720,000,000. The loan was to be repaid within two weeks, that is, by March 4, 2004. This loan is reflected in a "Loan Agreement" and "Note," each dated February 20, 2004, between Refco Capital and Customer X. The Refco Capital/Customer X Loan Agreement provides for interest of 1.06% per annum for the days the loan was outstanding. Notices to Refco Capital under the Refco Capital/Customer X Loan Agreement were to be addressed to Defendant Maggio, who signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

478.   *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement they signed a loan agreement between Customer X and RGHI, for the same principal amount of $720,000,000. The repayment date on this loan was also March 4, 2004. The Customer X/RGHI Loan Agreement provided for interest at an annual rate of 1.81%, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement provided that legal notice to RGHI be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

479.   *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated February 20, 2004, also signed by Defendant Bennett.

480.    *Fourth,* Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

481.    The $720,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about March 4, 2004, such that the $720,000,000 once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### iv.  The May 2004 Transaction

482.    This series of transactions was repeated at the close of the Company's fiscal quarter ended May 31, 2004, pursuant to documents prepared by Koury of Mayer Brown. Upon information and belief, this was done with intent by Defendants Bennett, Maggio and others to generate false financial statements for use in connection with the Bond registration process.

483.    *First,* on or about May 27, 2004, Refco Capital loaned Customer X the sum of $700,000,000. The loan was to be repaid within two weeks, that is, by June 7, 2004. The Refco Capital/Customer X Loan Agreement contained substantially similar provisions, including the "use of proceeds" covenant obligating Customer X to loan the $700,000,000 to RGHI, the interest rate spread, the definition of "Refco Parties," and notice provisions as contained in the Refco Capital/Customer X Loan Agreements described above.

484.    *Second,* as in the prior transactions, the parties signed a Customer X/RGHI Loan Agreement, also dated May 27, 2004, whereby Customer X loaned RGHI the same principal amount of $700,000,000, with the same repayment date of June 7, 2004. The interest rate for this loan was 1.81% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement provided that

legal notice to RGHI be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

485.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated May 27, 2004, and signed by Bennett.

486.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

487.    The $700,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about June 7, 2004, such that the $700,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### v.    The August 2004 Transaction

488.    This series of transactions was repeated at the close of the Company's fiscal quarter ended August 31, 2004, pursuant to documents prepared by Mayer Brown. Upon information and belief, this was done by Defendants Bennett and Maggio and others with intent to generate false financial statements for use in connection with the Bond registration process.

489.    *First*, on or about August 25, 2004, Refco Capital loaned Customer X the sum of $485,000,000. The loan was to be repaid within two weeks, that is, by September 7, 2004. The Refco Capital/Customer X Loan Agreement for this transaction has a typewritten amount of $475,000,000, but that amount was crossed out and replaced in handwriting with the amount of $485,000,000, and initialed by Principal A. The Refco Capital/Customer X Loan Agreement provided for interest of 1.50% per annum, and contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provision as the Refco Capital/Customer X Loan

181

Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

490.    *Second,* as in the prior transactions, the parties signed a Customer X/RGHI Loan Agreement, also dated August 25, 2004, whereby Customer X loaned RGHI the same principal amount of $485,000,000, with the same repayment date of September 7, 2004. The interest rate for this loan was 2.25% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Customer X/RGHI Loan Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

491.    The Customer X/RGHI Loan Agreement and accompanying note have a typewritten date of August 26, 2004, but that date was crossed out and replaced in handwriting with the date of August 25, 2004. As with the Refco Capital/Customer X Loan Agreement, the Customer X/RGHI Loan Agreement has a typewritten amount of $475,000,000, but that amount was crossed out and replaced in handwriting with the amount of $485,000,000. These changes were initialed both by Principal A and Defendant Bennett, as were a number of other handwritten changes to the document.

492.    *Third,* the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guarantee dated August 25, 2004, and signed by Bennett. This guaranty has a typewritten date of August 26, 2004, which was crossed out and replaced with August 25, 2004. This change was initialed by both Principal A and Bennett.

493.    The $485,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were

unwound on or about September 7, 2004, such that the $485,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### vi. The November 2004 Transaction

494.    This series of transactions was repeated at the close of the Company's fiscal quarter ended November 30, 2004, pursuant to documents prepared by Mayer Brown.  Upon information and belief, this was done with intent to generate false financial statements for use in connection with the Bond registration process.

495.    *First*, on or about November 26, 2004, Refco Capital loaned Customer X the sum of $545,000,000.  The loan was to be repaid within two weeks, that is, by December 3, 2004. The Refco Capital/Customer X Loan Agreement for this transaction provides for interest of 2.00% per annum and contained the same notice provision as contained in the Refco Capital/Customer X Loan Agreements described above.  Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

496.    *Second*, also on November 26, 2004, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $545,000,000.  The repayment date on this loan was also December 3, 2004.  The interest rate for this loan was to be 2.75% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X.  The Customer X/RGHI Loan Agreement contained the same notice provisions as the Customer X/RGHI Loan Agreements described above.  Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

497.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated November 26, 2004, and signed by Bennett.

498.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement

183

or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

499. The $545,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about December 3, 2004, such that the $545,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### vii. The December 2004 Transaction

500. This series of transactions was repeated in December 2004, pursuant to documents prepared by Mayer Brown.

501. *First,* on or about December 30, 2004, Refco Capital loaned Customer X the sum of $550,000,000. The loan was to be repaid within one week, that is, by January 4, 2005. The Refco Capital/Customer X Loan Agreement for this transaction provided for interest of 2.25% per annum, and contained the same notice provisions as the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

502. *Second,* also on December 30, 2004, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $550,000,000. The repayment date on this loan was also January 4, 2005. The interest rate for this loan was to be 3.00% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement was signed by Bennett on behalf of RGHI.

503. *Third,* the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated December 30, 2004, and signed by Bennett.

504. *Fourth,* Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement

or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

505.    The $550,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about January 4, 2004 such that the $550,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### viii.    The February 2005 Transaction

506.    This series of transactions was repeated at the close of the Company's fiscal year 2005, pursuant to documents prepared by Mayer Brown.

507.    *First*, on or about February 23, 2005, Refco Capital loaned Customer X the sum of $345,000,000. The loan was to be repaid within two weeks, that is, by March 8, 2005. This loan is reflected in a "Loan Agreement," "Note," and "First Amendment to Loan Agreement," each dated February 23, 2005, between Refco Capital and Customer X. The Refco Capital/Customer X Loan Agreement provided for an interest rate of 2.50% per annum. The original Refco Capital/Customer X Loan Agreement stated that the amount of the loan was $335,000,000, but pursuant to the First Amendment To Loan Agreement, the amount was increased to $345,000,000. The Refco Capital/Customer X Loan Agreement contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provisions as the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement and First Amendment To Loan Agreement on behalf of Refco Capital.

508.    *Second*, also on February 23, 2005, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $345,000,000. The repayment date on this loan was also March 8, 2005. The Customer X/RGHI Loan Agreement provided for interest at a rate of

3.25% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The original Customer X/RGHI Loan Agreement stated that the amount of the loan was $335,000,000, but, as with the Refco Capital/Customer X loan documents, the amount was increased to $345,000,000. The Customer X/RGHI Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Customer X/RGHI Loan Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement and First Amendment To Loan Agreement on behalf of RGHI.

509.    *Third,* the loan from Customer X to RGHI was guaranteed by Refco Group pursuant to a guaranty dated February 23, 2005, and signed by Bennett.

510.    *Fourth,* Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

511.    The $345,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about March 8, 2005, such that the $345,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### ix.  The May 2005 Transaction

512.    This series of transactions was repeated at the close of Refco's fiscal quarter ending May 31, 2005, pursuant to documents prepared by Mayer Brown. Upon information and belief, this was done with intent to generate false financial statements for use in connection with the upcoming IPO. According to testimony and/or documents apparently presented to the grand jury and as confirmed to Lead Counsel in substance by Principal A:

(a)    On or about May 25, 2005, Defendant Bennett caused the Company,

186

through Refco Capital, to loan Customer X approximately $450 million. The loan was to be repaid within two weeks, that is, by June 6, 2005.

(b)     On the same day that the parties signed the Loan Agreement between Refco Capital and Customer X, they signed a loan agreement between Customer X and RGHI, for the same principal amount of $450 million. The repayment date on this loan was also June 6, 2005.

(c)     The loan from Customer X to RGHI was signed by Bennett on behalf of RGHI. The interest rate on the loan was 75 basis points higher than the interest rate on the loan from the Company to Customer X.

(d)     The loan between Customer X and RGHI was guaranteed by the Company pursuant to a guaranty signed by Bennett.

(e)     The loans were unwound on or about June 6, 2005.

513.     According to testimony and/or documents apparently presented to the grand jury that returned the indictment against Bennett, the $450,000,000 loan that originated with Refco Capital was used to pay down the receivable owed from RGHI to the Company. After it was unwound, the $450,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

## x. The August 2005 Transaction

514.     This series of transactions was repeated at the close of Refco's quarter ending August 31, 2005, the first quarter close after the Company completed the IPO. All of the documentation for the transactions was prepared by Mayer Brown.

515.     *First*, on or about August 26, 2005, Refco Capital loaned Customer X the sum of $420,000,000. The loan was to be repaid within two weeks, that is, by September 6, 2005. The Refco Capital/Customer X Loan Agreement for this transaction provided for an interest rate of

3.50% per annum and contained the same "use of proceeds" covenant, definition of "Refco Parties," and notice provisions as the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

516.    *Second*, also on August 26, 2005, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $420,000,000. The repayment date on this loan was also September 6, 2005. The interest rate for this loan was to be 4.25% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement contained the same notice provisions as the Customer X/RGHI Loan Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

517.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated August 26, 2005, and signed by Bennett.

518.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

519.    The $420,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about September 6, 2005, such that the $420,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

## 2.    The Fraudulent Transactions With BAWAG

520.    BAWAG was directly involved in at least six sham "loan" transactions with Refco and RGHI, which occurred at the end of each of Refco's fiscal years from February 2000

through February 2005.

521.     These fraudulent transactions consisted of four components.  First, Refco Capital

would transfer hundreds of millions of dollars to BAWAG, which BAWAG then immediately

"loaned" (apparently without any of the formal loan documentation utilized in the Customer X

transactions) to RGHI.  Second, BAWAG would extend an additional smaller "loan" – between

$40 million and $90 million (again, apparently without any formal documentation) – directly to

RGHI at a nominal interest rate.  Third, RGHI would use these funds to temporarily pay down a

portion of the outstanding receivable it owed to the Company.  Finally, after Refco closed its

books for the relevant fiscal year, the "loans" would be unwound, with the funds from the first

component of the "loan" being returned through BAWAG from RGHI to Refco Capital, and the

funds from the second component of the "loan" being repaid to BAWAG, along with a nominal

interest rate.

522.     As described below, these multi-hundred million dollar "loans" were total shams

designed for the purpose of concealing RGHI's mammoth obligations to the Company.  For

instance, the transactions were not memorialized with formal loan agreements or promissory

notes, but instead were documented on an informal "wink and nod" basis through various e-

mails, letters and, on information and belief, telephone calls between executives at BAWAG and

Defendants Bennett, Maggio, Trosten and others at Refco.  Further, as described below, the

majority of these so-called "loans" simply involved shuttling money, through BAWAG, from

Refco Capital to RGHI, and therefore were extended on a net interest free basis.

### i.     The February 2000 Transaction

523.     Shortly before the close of the Company's fiscal year 2000, Defendants Bennett,

BAWAG, RGHI and others participated in a series of transactions designed to remove at least

part of the RGHI receivable from the Company's books and temporarily convert a substantial

part of it into a receivable from BAWAG.

524.    The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 24, 2000, Refco Capital transferred approximately $225 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $225 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions filed in Refco's bankruptcy proceedings. RGHI used the $300 million in proceeds to temporarily reduce a portion of the outstanding receivable it owed to the Company.

525.    On information and belief, Bennett, RGHI, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 2, 2000. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year ending February 28, 2000, where they served to conceal part of RGHI's obligations to Refco.

526.    In addition, the parties agreed that the $225 million transfer from Refco Capital to BAWAG and the subsequent $225 million transfer from BAWAG to RGHI would bear the exact same interest rate, such that BAWAG would not earn any net interest on its $225 million "loan" to RGHI. On information and belief, the parties agreed that the second component of the transaction, the $75 million "loan," would bear a nominal interest rate.

527.    The "unwinding" of these transactions is reflected in a RGHI "Monthly Account Statement" that shows (1) a wire transfer from RGHI to "1ST UNION INTL BK/BAWAG," dated March 2, 2000, in the amount of $75 million, and (2) a wire transfer described as "WT TO RE-ALLOCATE FUNDS," also dated March 2, 2000, in the amount of $225 million. The Monthly Account statement also reflects the interest payment to BAWAG on the $75 million

190

dollar portion of the transaction. Specifically, the Monthly Account statement shows a

$93,333.73 million payment on March 8, 2000, which is described as "WT TO 1ST

UNION/BAWAG INT. ON 75MM."

### ii.     The February 2001 Transaction

528.     This series of sham transactions was repeated at the close of the Company's fiscal

year 2001. Again, the Counterclaim and financial records filed in connection with the Refco

bankruptcy proceeding demonstrate that, on or about February 26, 2001, Refco Capital

transferred approximately $225 million to BAWAG. On the same day, BAWAG made two

separate transfers to RGHI, one in the amount of $225 million and another in the amount of $75

million. These transfers are reflected in wire transfer instructions filed in Refco's bankruptcy

proceedings. RGHI used the $300 million to temporarily reduce a portion of the outstanding

receivable it owed to the Company.

529.     On information and belief, Bennett, RGHI, BAWAG and others agreed in

advance that these transfers would be unwound approximately seven days later, on March 5,

2001. Thus, the transfers were in effect for approximately a one week period bracketing the

Company's fiscal year end of February 28, 2001, where they served to conceal part of RGHI's

obligations to Refco.

530.     In addition, the parties agreed that the $225 million transfer from Refco Capital to

BAWAG and the subsequent $225 million transfer from BAWAG to RGHI would bear the exact

same interest rate, such that <u>BAWAG would not earn any net interest on its $225 million "loan"</u>

<u>to RGHI.</u> On information and belief, the parties agreed that the second component of the

transaction, the $75 million "loan," would bear a nominal interest rate.

531.     The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger

Report" that shows (1) a wire transfer from RGHI to "1ST UNION INTL BK/BAWAG," dated

March 5, 2001 in the amount of $75 million, and (2) a $225 million wire transfer described as "XFER FOR CREDIT RGF," also dated March 5, 2001.

### iii. The February 2002 Transaction

532. This series of sham transactions was repeated at the close of the Company's fiscal year 2002. The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2002, Refco Capital transferred approximately $210 million to BAWAG. On the same day, BAWAG made a single transfer to RGHI in the total amount of $300 million, consisting of the $210 million "loan" received from RGHI and an additional $90 million "loan" from BAWAG to RGHI. These transfers are reflected in, among other things, e-mails filed in the Refco bankruptcy proceedings. For instance, at 11:04 a.m. on February 21, 2002, Defendant Maggio sent an e-mail to Thomas Hackl, who was then a Managing Director and head of Treasury at BAWAG (and who joined Refco three months later), stating:

> Good Morning Thomas:
>
> This e-mail is to confirm the wire instruction for the following:
>
> 1.  BAWAG will wire 300 million (USD) for value 2/25/02:
>
> * * *
>
> 2.  REFCO will wire 210 million (USD) for value 2/25/02:
>
> * * *
>
> If you have any questions, please contact me at (212) 693-7077.
>
> Regards,
>
> Sandy

533. RGHI used the $300 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

534.     Bennett, Maggio, RGHI, BAWAG and others agreed that these transfers would be unwound approximately seven days later, on March 4, 2002.  At 12:23 p.m. on March 1, 2002, Defendant Maggio sent an e-mail to executives at BAWAG, stating:

> Good Morning:
>
> This e-mail is to confirm the following wire instruction
>
> 1.     BAWAG will wire to Refco USD 210,075.133,33 value 04.03.2002
>
> * * *
>
> 2.     REFCO will wire to BAWAG USD 210,075.133,33 value 04.03.2002
>
> * * *
>
> 3.     REFCO will wire to BAWAG USD 90,040.950, value 04.03.2002
>
> * * *
>
> If you have any questions, please contact me at (212) 693-7077.
>
> Regards,
>
> Sandy

535.     Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2002, where they served to conceal part of RGHI's obligations to Refco.

536.     The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a wire transfer from RGHI to "1ST UNION-BAWAG," dated March 4, 2002 in the amount of approximately $90 million, and (2) an approximate $210 million wire transfer described as "WT TO 1ST UNION-BAWAG," also dated March 4, 2002.

### iv.     The February 2003 Transaction

537.     This series of sham transactions was repeated at the close of the Company's fiscal year 2003.  The Counterclaim and financial records filed in connection with the Refco

bankruptcy proceeding demonstrate that, on or about February 25, 2003, Refco Capital transferred approximately $175 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $175 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings. RGHI used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

538. Bennett, Trosten, RGHI, BAWAG and others agreed that these transfers would be unwound approximately seven days later, on March 4, 2003. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2003, where they served to conceal part of RGHI's obligations to Refco.

539. In addition, the parties agreed that the $175 million transfer from Refco Capital to BAWAG and the subsequent $175 million transfer from BAWAG to RGHI would bear the exact same interest rate, such that <u>BAWAG would not earn any net interest on its $175 million "loan" to RGHI.</u> At 9:37 a.m. on March 3, 2003, executives at BAWAG sent an e-mail to Defendant Trosten (later forwarded to Defendant Maggio), stating "USD 175.00.00: <u>flat – no payments</u>." (Emphasis added.) These documents also reflect that the parties agreed that the second component of the "loan," the $75 million transfer, would bear a nominal interest rate.

540. The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a $75 million wire transfer to BAWAG from RGHI, dated March 4, 2003, and described as "WT TO BAWAG," and (2) a $175 million wire transfer described simply as "TRANSFER," also dated March 4, 2003. On information and belief, this Monthly Account Statement also shows the interest payment on the $75 million component of the "loan," in the form of a $26,486.98 payment dated March 4, 2003 and described as "WT TO BAWAG."

#### v.    The February 2004 Transaction

541.    This series of sham transactions was repeated at the close of the Company's fiscal year 2004.  Again, the Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2004, Refco Capital transferred approximately $210 million to BAWAG.  On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $210 million and another in the amount of $40 million.  These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings.  RGHI used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

542.    Bennett, Trosten, RGHI, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 4, 2004.  At 6:06 a.m. on February 24, 2004, Monika Weinhengst, a BAWAG executive, sent an e-mail to Defendant Trosten, copying two other BAWAG executives, that stated:

> good morning Rob,
>
> I refer to the following trades dealt 23.02.2004
>
> 1.    we take from Refco Capital Bermuda USD 210,000.000,
>
> * * *
>
> 2.    we place on deposit with Refco Group Holding USD 40,000.000
>
> * * *
>
> 3.    we place on deposit with Refco Group Holding USD 210,000.000,
>
> * * *
>
> for Repayment value 04.03.2004 . . . .

543.    Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 29, 2004, where they served to conceal part of

RGHI's obligations to Refco.

544.    This e-mail further demonstrates that the parties agreed that the $210 million transfer from Refco Capital to BAWAG and the subsequent $210 million transfer from BAWAG to RGHI would bear the exact same interest rate – 1.08% – such that BAWAG would not earn any net interest on its $210 million "loan" to RGHI. In addition, this e-mail reflects that the parties agreed that the second component of the "loan," the $40 million transfer, would bear a nominal interest rate of 1.58%.

545.    The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a $40,014,044.44 wire transfer to BAWAG from RGHI, dated March 4, 2004, and described as "WT TO BAWAG," and (2) a $210 million wire transfer described simply as "TRANSFER," also dated March 4, 2004. On information and belief, the additional $14,044.44 reflected in this document comprises the interest payment from Refco to BAWAG on the $40 million component of the transaction.

### vi.    The February 2005 Transaction

546.    This series of sham transactions was repeated at the close of the Company's fiscal year 2005. The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 23, 2005, Refco Capital transferred approximately $175 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $175 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings. RGHI used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

547.    The nature and structure of these transactions is set forth in a February 14, 2005 letter sent from Defendant Bennett to Selcuk Sari of BAWAG. Among other things, the letter

196

stated:

> Dear Mr. Sari:
>
> I am pleased you had a nice holiday . . . I am glad to have confirmed the arrangements for later this month. As we discussed, the proposed transaction will be executed for value Wednesday, February 23, with an expiration Tuesday, March 8. Confirming the mechanical arrangements these will be as follows:
> 1. A sum of U.S. $250 million is to be placed on deposit with Refco Group Holdings, Inc. and wired for value Wednesday, February 23, 2005 . . .
>
> * * *
>
> 2. The sum of US$175 million is to be placed on deposit with BAWAG by Refco Capital Markets and wired for value February 23, 2005 . . .
>
> * * *
>
> 3. the sum of US$250 million will be repaid for value Tuesday, March 8, 2005 . . . . We understand that *the rate to be paid to Refco Capital Markets will be the same as the rate charged on the deposits placed with Refco Group Holdings, Inc. with a separate rate to be paid by Refco Group Holdings Inc. on the difference of $75 million.*
>
> (Emphasis added.)

548.    Thus, Bennett, RGHI, BAWAG and others agreed in advance that these transfers would be unwound approximately two weeks later, on March 8, 2003, and that BAWAG would not earn any net interest on its $175 million "loan" to RGHI. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2005, where they served to conceal part of RGHI's obligations to Refco. The "unwinding" of these transactions is reflected in documents filed in the Refco bankruptcy proceedings.

### 3.    The Fraudulent Transactions With CIM Ventures

549.    Another customer that was involved in at least two round-trip loan transactions with Refco was CIM Ventures. CIM Ventures was a subsidiary of Ingram, an information-technology distributor based in Santa Ana, California. According to the Examiner's Report,

197

Ingram had a pre-existing account with Refco Capital by virtue of a 1999 transaction – in which Collins and Mayer Brown represented Refco – whereby Refco provided financing to Ingram's overseas subsidiaries.

### i.    The February 2000 Transaction

550.    On February 1, 2000, Refco's then-Chief Administrative Officer, David Weaver, contacted Ingram to discuss a "back-to-back loan" involving Ingram and/or CIM Ventures. Weaver also discussed the transaction with Collins on that date, and Collins' handwritten notes make it clear that he understood the nature, structure and timing of the proposed loans. Those notes state that the principal amount of the loans would be $150 million, that there would be a "15 basis point spread/fee" paid to CIM Ventures, and the loans would be of "one month" duration and would bracket the end of Refco's fiscal year end, "Feb 15 – March 15." Collins' notes also make clear that he was aware that CIM Ventures was simply a conduit that would funnel the proceeds of the loans directly from Refco Capital to RGHI, stating "Refco Capital Markets → CIM" and "CIM – Refco Group Holdings."

551.    During the next several weeks, Mayer Brown prepared documentation for two loans in the amount of $150 million: one from Refco Capital to CIM Ventures, and one from CIM Ventures to RGHI. These documents included the specific loan documents as well as a guarantee by Refco of RGHI's obligation to repay CIM Ventures, and an indemnification agreement whereby Refco agreed to indemnify CIM Ventures against any loss or liability arising out of the transactions. A 15 basis point spread was to be paid to CIM Ventures. The loan agreement between CIM Ventures and Refco Capital made specific reference to the related loan agreement between CIM Ventures and RGHI, and vice versa.

552.    In a February 22, 2000 letter to Monk of Mayer Brown, James F. Ricketts ("Ricketts"), an officer of Ingram and CIM Ventures, described the nature of the transaction as

follows:

> It is planned that RCM [Refco Capital] will deposit the loan
> proceeds in CIM's account (No. 6800-10101) at RCM on February
> 25, 2000. CIM will then fax a letter to RCM instructing them to
> move the funds to RGHI with a 15 basis point uplift in the interest
> rate. RCM then will withdraw the funds from CIM's account and
> deposit them in RGHI's account, thereby completing the back-to-
> back loan transaction. The steps will be reversed on March 9,
> 2000. *RCM will then transfer the CIM spread on the transaction
> to its [CIM's] Royal Bank of Canada account in the Cayman
> Islands.*

(Emphasis added.) Thus, by February 2000, it is clear that Collins, Monk and Mayer Brown

knew the nature of the round trip loan transaction and also understood that Refco Capital would

be paying the interest "spread" on the loans to CIM Ventures.

553.    The parties executed the loan agreements on or about February 25, 2000, and

Refco Group executed a guaranty of CIM Ventures' loan to RGHI. The $150,000,000 in

proceeds that originated with Refco Capital was used to pay down a portion of the receivable

owed from RGHI to the Company. On or about March 9, 2000, after the close of Refco's fiscal

year, the loans were unwound, the net profit was transferred to CIM Ventures' bank account, and

the $250 million debt was once again shown on the Company's books as being owed by RGHI to

the Company.

554.    A March 10, 2000 letter from Monk to Ricketts, and copying Collins, further

confirms Mayer Brown's involvement in this transaction, providing:

> I am enclosing for your files executed originals of the following
> documents:
>
> 1. Loan Agreement between Refco Capital Markets, Ltd., as
>    lender and CIM Ventures Inc. as Borrower
>
> 2. Loan Agreement between CIM Ventures Inc. as lender
>    and Refco Group Holdings, Inc. as borrower
>
> 3. Indemnification letter from Refco Group Holdings, Inc.

4. Guarantee of Refco Group Ltd., LLC

In addition, I enclose the original promissory note of CIM Ventures Inc.
to Refco Capital Markets, Ltd., endorsed as paid in full.

The documents enclosed with the letter include a promissory note between CIM Ventures and

Refco Capital that was marked "paid in full" and signed on behalf of Refco Capital by Mayer

Brown attorney Monk as Refco Capital's "authorized agent."

## ii.    The February 2001 Transaction

555.    On or about February 23, 2001, Refco Capital loaned CIM Ventures the sum of

$250,000,000. On the same day, CIM Ventures loaned $250,000,000 to RGHI. The repayment

date for both loans was two weeks later, March 6, 2001. Mayer Brown prepared the

documentation for these loans. The loan agreement between CIM Ventures and Refco Capital

made specific reference to the related loan agreement between CIM Ventures and RGHI, and

vice versa.

556.    A letter dated February 16, 2001 from Ingram to Collins described these "back-to-

back loan transactions" as follows:

It is planned that RCM [Refco Capital] will deposit the loan
proceeds in CIM's account (No. 6800-10101) at RCM on February
23, 2001. CIM will then fax a letter to RCM instructing them to
move the funds to RGHI with a 15 basis point uplift in the interest
rate. RCM then will withdraw the funds from CIM's account and
deposit them in RGHI's account, thereby completing the back-to-
back loan transaction. The steps will be reversed on March 6,
2001. RCM will transfer the CIM spread on the transaction to
CIM's Royal Bank of Canada account (Acct. No. 2003895) in the
Cayman Islands. The account details are the same as used for the
back-to-back loan done in 2000.

557.    The $250,000,000 in proceeds that originated with Refco Capital was used to pay

down a portion of the receivable owed from RGHI to the Company, and the loans were unwound

on or about March 6, 2001, such that the $250 million debt was once again shown on the

200

Company's books as being owed by RGHI to the Company. When the loans were unwound, the

promissory note, marked "Paid in full," was sent to CIM Ventures with a copy to Collins.

558.



### iii.    The Aborted February 2002 Transaction

559.    Collins and Mayer Brown were also directly involved in a contemplated—but

never executed—round trip loan transaction between Refco and Ingram in February 2002.

560.    In January 2002, Ricketts agreed to participate in a $250 million loan transaction

with Refco Capital and RGHI substantially similar to the transactions the two entities had

engaged in during prior years. Ricketts made some minor mark-ups to the loan documents and

sent them to Collins at Mayer Brown.

561.    The increasing awareness of securities fraud in the wake of the highly-publicized

Enron scandal, however, apparently caused Ingram's CFO to have second thoughts about

proceeding with the transaction. The CFO notified Ricketts that Ingram should not do the

transaction, stating in a January 30, 2002 email that:

> [I] wouldn't take the chance at this point. . . . [G]iven the
> environment and amounts involved, [I] just wouldn't take the risk
> or go to the trouble . . . *[I'd] think [Refco] should really be
> reviewing this area anyways.*

(Emphasis added.)

562.    On January 30, 2002, Ricketts sent an email to executives at Refco stating that Ingram would not be involved in the transaction but, in apparent recognition of the significant role that Mayer Brown had played in connection with the contemplated transaction, Ingram offered to pay Mayer Brown's legal expenses. The January 30, 2002 email was titled "CIM Back-To-Back Loan," and stated in relevant part:

> [T]he Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like IM . . . I spoke with Tom Madden, our worldwide CFO, in Europe and briefed him again on the details of our planned late-February transaction, and we jointly concluded that we should put a hold on the transaction. . . . [W]e would not be taking this step unless we felt strongly that the disclosure risks were too high . . . *Please be assured that CIM will reimburse Refco for reasonable legal expenses with Mayer Brown in preparing the documents for the back-to-back loan. Send the invoices to me and I will get them paid promptly.*

(Emphasis added.)

### 4.    The Fraudulent Transactions With EMF and Delta Flyer

563.    At the end of each of Refco's fiscal years ended February 2000, 2001, 2002 and 2003, the Company engaged in round-trip loan transactions with two affiliates of EMF Financial, LLC: EMF and Delta Flyer.

### i.    The February 2000 Transaction

564.    On February 25, 2000, Refco engaged in a round-trip loan transaction with EMF. On that date, Refco Capital loaned $50,000,000 to EMF, and EMF loaned $50,000,000 to RGHI. The $50,000,000 in proceeds that originated with Refco Capital was used to pay down a portion of the receivable owed from RGHI to the Company, and the loans were unwound on or about March 3, 2000, such that the $50 million debt was once again shown on the Company's books as being owed by RGHI to the Company. Mayer Brown attorney Monk drafted the documents for the sham transactions and sent the executed documents to EMF. Additionally, once the

202

setting

transactions were unwounded, a "Paid in full" notation was added to the promissory note for

EMF's loan from Refco Capital, and Monk signed that notation on behalf of Refco Capital as its

"authorized agent."

### ii.     The February 2001 Transaction

565.     Through loan agreements dated February 26, 2001, which were prepared by

Mayer Brown and were substantially identical to the loan agreements used in connection with the

other round trip loan transactions discussed herein, Refco Capital loaned $200,000,000 to Delta

Flyer and Delta Flyer loaned $200,000,000 to RGHI.  The loan agreement between Delta Flyer

and Refco Capital made specific reference to the related loan agreement between Delta Flyer and

RGHI, and vice versa.

566.     The $200,000,000 in proceeds that originated with Refco Capital was used to pay

down a portion of the receivable owed from RGHI to the Company, and the loans were unwound

on or about March 2, 2001, such that the $200 million debt was once again shown on the

Company's books as being owed by RGHI to the Company.  Delta Flyer was compensated for its

role in the transactions with a 100 basis point "spread."

567.     Collins himself reviewed and edited the documentation for these loans and was

involved in negotiating their terms.  For instance, a draft Loan Agreement dated February 26,

2001, which was substantially identical to the loan agreements used in connection with the other

round trip loan transactions discussed herein, contains Collins' handwritten "mark-up" making

numerous changes that identify the counterparty as Delta Flyer.  Similar changes are made in

Collins' handwriting to a guaranty in favor of Delta Flyer from Refco.

568.     According to the Examiner's report, the CFO at Delta Flyer stated that Delta Flyer

opened an account at Refco Capital shortly before these transactions were executed, and the

account was used solely to facilitate the transactions (rather than for any legitimate business

purpose). Further, the CFO acknowledged that Delta Flyer did not have sufficient funds to cover the loan it agreed to make to RGHI, and that the loan was funded solely by the amounts wired to Delta Flyer's Refco account by Refco Capital. The CFO also stated that—consistent with the other round trip loans described herein—he understood that no funds would actually be exchanged in connection with the transactions other than the net interest profit to Delta Flyer.

### iii.    The February 2002 Transaction

569.    Delta Flyer engaged in a $175 million round trip loan with Refco between February 25, 2002 and March 4, 2002. The structure and terms of this transaction were the same as the prior year's transaction except that the agreements provided for specified interest rates rather than LIBOR-based rates. However, Delta Flyer still received a 100 basis point "spread" as in the prior year. Refco Group provided a guaranty of Delta Flyer's loan to RGHI, and further agreed to indemnify Delta Flyer against third party claims arising out of these round trip loans. Mayer Brown prepared all of the documentation for these loans, and transmitted those documents to Refco by way of a February 13, 2002 memorandum from Collins and Koury to David Weaver. Mayer Brown also sent the final executed transaction documents to Delta Flyer. The loan agreement between Delta Flyer and Refco Capital made specific reference to the related loan agreement between Delta Flyer and RGHI, and vice versa.

### iv.    The February 2003 Transaction

570.    Between February 21, 2003 and March 4, 2003, Refco engaged in a $150 million round-trip loan transaction with Delta Flyer. Mayer Brown attorney Koury again drafted the documents for this loan, and the transaction documents were virtually identical to the previous year's loan, except that Maggio signed on behalf of Refco Capital and the loans had different interest rates. Delta Flyer received a 75 basis point "spread" on the loans. The loan agreement between Delta Flyer and Refco Capital made specific reference to the related loan agreement

204

between Delta Flyer and RGHI, and vice versa.  Bennett signed the promissory note, guaranty and indemnification agreement on behalf of Refco Group, and Maggio signed the loan documents on behalf of Refco Capital.

### 5.    The Fraudulent Transaction With Beckenham

571.    Between February 25, 2002 and March 4, 2002, Refco Capital and RGHI engaged in $125 million round-trip loan transactions with Beckenham, a hedge fund specializing in futures and foreign currency trading.  The transaction documents were similar to those for the other transactions, and provided for Beckenham to pay interest to Refco Capital at a rate of 1.8375% and receive interest from RGHI at a rate of 2.8375%, thus earning a 100 basis point "spread."  Refco Group executed a guaranty of Beckenham's loan to RGHI, and further agreed to indemnify Beckenham against third party claims arising out of these round trip loans.  Mayer Brown prepared all of the documentation for these loans, and transmitted drafts of those documents to Refco by way of a February 13, 2002 memorandum from Collins and Koury to David Weaver.  The loan agreement between Beckenham and Refco Capital made specific reference to the loan agreement between Beckenham and RGHI, and vice versa.

### 6.    The Fraudulent Transaction With CS Land

572.    At the end of Refco's fiscal year 2000, Refco Capital and RGHI engaged in $110 million round-trip loan transactions with CS Land.  These transactions were structured substantially identically to the February 2000 transaction with CIM Ventures, with the loans being initiated on February 25, 2000 and unwound on March 3, 2000.  CS Land received a 15 basis point "spread" on the transactions.  According to the Examiner's Report, on February 23, 2000, when representatives of CS Land raised a question regarding the enforceability of the loan agreements, Maggio contacted Collins to discuss the issue.  Mayer Brown attorney Monk drafted all of the transaction documents for the $110 million round trip "loan" involving CS Land.

**D.**    **Summary and Form of Transactions**

573.    The chart below sets forth a summary of the transactions described above:

| Loan Date | Financial Period End | Repayment Date | Total Amount of Loans |
|---|---|---|---|
| February 24, 2000[B]<br>February 25, 2000[CS]<br>February 25, 2000[EMF]<br>February 25, 2000[CIM] | February 29, 2000 | March 2, 2000 ($300 Million)<br>March 3, 2000 ($110 Million)<br>March 3, 2000 ($50 Million)<br>March 9, 2000 ($150 Million) | $610 Million |
| February 23, 2001[CIM]<br>February 26, 2001[B]<br>February 26, 2001[DF] | February 28, 2001 | March 6, 2001 ($250 Million)<br>March 5, 2001 ($300 Million)<br>March 2, 2001 ($200 Million) | $750 Million |
| February 25, 2002[X]<br>February 25, 2002[B]<br>February 25, 2002[DF]<br>February 25, 2002[BH] | February 28, 2002 | March 4, 2002 ($325 Million)<br>March 4, 2002 ($300 Million)<br>March 4, 2002 ($175 Million)<br>March 4, 2002 ($125 Million) | $925 Million |
| February 21, 2003[X]<br>February 25, 2003[B]<br>February 25, 2003[DF] | February 28, 2003 | March 4, 2003 ($500 Million)<br>March 4, 2003 ($250 Million)<br>March 4, 2003 ($150 Million | $900 Million |
| February 20, 2004[X]<br>February 25, 2004[B] | February 29, 2004 | March 4, 2004 ($720 Million)<br>March 4, 2004 ($250 Million) | $970 Million |
| May 27, 2004[X] | May 31, 2004 | June 7, 2004 ($700 Million) | $700 Million |
| August 25, 2004[X] | August 30, 2004 | Sept. 7, 2004 ($485 Million) | $485 Million |
| November 26, 2004[X] | November 30, 2004 | Dec. 3, 2004 ($545 Million) | $545 Million |
| December 30, 2004[X] | End of Calendar 2004 | January 4, 2005 ($550 Million) | $550 Million |
| February 23, 2005[X]<br>February 23, 2005[B] | February 28, 2005 | March 8, 2005 ($345 Million)<br>March 8, 2005 ($250 Million) | $595 Million |
| May 25, 2005[X] | May 31, 2005 | June 6, 2005 ($450 Million) | $450 Million |

| Loan Date | Financial Period End | Repayment Date | Total Amount of Loans |
|---|---|---|---|
| August 26, 2005(X) | August 30, 2005 | Sept. 6, 2005 ($420 Million) | $420 Million |

(X) Denotes transaction involving Customer X
(CIM) Denotes transaction involving CIM Ventures
(B) Denotes transaction involving BAWAG
(CS) Denotes transaction involving CS Land
(EMF) Denotes transaction involving EMF
(DF) Denotes transaction involving Delta Flyer
(BH) Denotes transaction involving Beckenham

574.     With the exception of the transactions involving BAWAG, Mayer Brown documented all of the foregoing round-trip transactions and, as observed by the Examiner, these transactions were specifically noted in the monthly billing statements Collins prepared and/or reviewed and sent to Refco.

575.     The following chart sets forth the known interest rates on the loans between the third party customers, Refco Capital, and RGHI described above:

| Loan Date | Customer & Loan Amount | Interest Rate (Loan from Refco Capital to Customer) | Interest Rate (Loan from Customer to RGHI) | Spread |
|---|---|---|---|---|
| February 2000 | CS Land - $110 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| | EMF - $50 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| | CIM Ventures - $150 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| February 2001 | CIM Ventures - $250 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| | Delta Flyer - $200 Million | LIBOR | LIBOR plus 1.0% | 1.0% |
| February 2002 | Customer X - $325 Million | 1.8375% | 2.8375% | 1.0% |
| | Delta Flyer - $175 Million | 1.8375% | 2.8375% | 1.0% |
| | Beckenham - $125 Million | 1.8375% | 2.8375% | 1.0% |
| February 2003 | Customer X - $500 Million | 1.31% | 2.06% | 0.75% |
| | Delta Flyer - $150 Million | 1.31% | 2.06% | 0.75% |
| February 2004 | Customer X - $720 Million | 1.06% | 1.81% | 0.75% |
| May 2004 | Customer X - $700 Million | 1.06% | 1.81% | 0.75% |
| August 2004 | Customer X - $485 Million | 1.50% | 2.25% | 0.75% |
| November 2004 | Customer X - $545 Million | 2.00% | 2.75% | 0.75% |

| Loan Date | Customer & Loan Amount | Interest Rate (Loan from Refco Capital to Customer) | Interest Rate (Loan from Customer to RGHI) | Spread |
|---|---|---|---|---|
| December 2004 | Customer X - $550 Million | 2.25% | 3.00% | 0.75% |
| February 2005 | Customer X - $345 Million | 2.50% | 3.25% | 0.75% |
| May 2005 | Customer X - $450 Million | -- | -- | -- |
| August 2005 | Customer X - $420 Million | 3.50% | 4.25% | 0.75% |

576.    Each of the sham transactions described above followed a similar format, and each was designed so that the Company could fraudulently avoid taking hundreds of millions of dollars of write-offs for receivables that could not be collected. The following chart represents the form of the transactions as structured by Refco:



577.    As described herein, after the Company closed its books for the pertinent period,

the fraudulent transaction would be "unwound" and the receivable from RGHI would be reinstated on the Company's books, where it would remain until the close of the next financial period. The following chart represents the form that the "unwinding" of the transactions took after each financial period:



**"Unwinding" The Transactions**
(Days After Pertinent Financial Period End)

E.     **Material Impact on Financial Statements**

578.     In addition to undermining the validity of the descriptions of the Company's business model, historical performance, and operational parameters, the financial manipulations above (including those that took place prior to February 2002) rendered the Company's financial results materially false and misleading. These manipulations involved huge related-party transactions between various Refco entities and RGHI, as well as enormous guarantees by Refco Group to third parties and transfers to and from BAWAG. These related-party transactions and

guarantees were required to be disclosed under GAAP and other applicable accounting rules and regulations of the SEC and other regulatory bodies. The result (indeed, the goal) of the fraudulent transactions was to materially overstate the Company's net capital, members' equity and net income while materially understating its reserves for doubtful accounts.

579.    The following chart details the impact that the Company's financial manipulations had on the Company's pre-tax income, net income, and members' equity, for fiscal years 2002, 2003, 2004 and 2005 (in millions):

| Fiscal Year | (In Millions) | | | | | |
| | Pre-Tax Income | | Net Income | | Members' Equity | |
| | Reported | Adjusted | Reported | Adjusted | Reported | Adjusted |
| 2002 | $ 116.2 | $ (808.8) | $ 93.6 | $ (743.5) | $ 515.1 | $ (322.1) |
| 2003 | 154.8 | (745.2) | 140.1 | (674.4) | 566.4 | (248.1) |
| 2004 | 189.5 | (780.5) | 187.2 | (690.7) | 616.1 | (261.8) |
| 2005 | 150.6 | (444.4) | 176.3 | (362.2) | 150.3 | (388.2) |

580.    Of the foregoing amounts, the following financial impacts were the result of financial manipulations involving Collins and Mayer Brown:

| Fiscal Year | (In Millions) | | | | | |
| | Pre-Tax Income | | Net Income | | Members' Equity | |
| | Reported | Adjusted | Reported | Adjusted | Reported | Adjusted |
| 2002 | $ 116.2 | $ (508.8) | $ 93.6 | $ (472.0) | $ 515.1 | $ (50.5) |
| 2003 | 154.8 | (495.2) | 140.1 | (448.2) | 566.4 | (21.9) |
| 2004 | 189.5 | (530.5) | 187.2 | (464.4) | 616.1 | (35.5) |
| 2005 | 150.6 | (194.4) | 176.3 | (135.9) | 150.3 | (161.9) |

581.    The following chart details the impact that the Company's financial manipulations had on the Company's pre-tax income, net income, and members' equity on a quarterly basis for fiscal year 2005 and the first quarter of fiscal 2006 (ended May 31, 2005):

| Quarters | Pre-Tax Income | | Net Income | | Members' Equity | |
|----------|----------|----------|----------|----------|----------|----------|
| 2005 | Reported | Adjusted | Reported | Adjusted | Reported | Adjusted |
| Q1 | $ 58.4 | $(641.6) | $ 59.3 | $ (574.2) | $ 671.0 | $ 37.5 |
| Q2 | 49.0 | (436.0) | 45.2 | (393.7) | 81.5 | (357.4) |
| Q3 | 21.3 | (523.7) | 36.1 | (457.1) | 126.7 | (366.5) |
| 2006 | | | | | | |
| Q1 | 43.8 | (406.2) | 42.6 | (364.7) | 185.4 | (221.9) |

582.    Mayer Brown was involved in all of the transactions giving rise to the foregoing financial impacts for these quarterly periods.

583.    The following chart details the impact that the Company's financial manipulations had on the Company's reserves for net capital, maintained pursuant to CFTC and other regulatory requirements for fiscal years 2004 and 2005 (in millions):

| Fiscal CFTC Net Capital | | |
|----------|----------|----------|
| Year | Reported | Adjusted |
| 2004 | 223.6 | (654.3) |
| 2005 | 283.9 | (254.6) |

584.    Of the foregoing amounts, the following financial impacts were the result of financial manipulations involving Collins and Mayer Brown:

| Fiscal CFTC Net Capital | | |
|---|---|---|
| Years | Reported | Adjusted |
| 2004 | 223.6 | (428.0) |
| 2005 | 283.9 | (28.3) |

585.   The following chart details the impact that the Company's financial manipulations had on the Company's reserves for net capital, maintained pursuant to CFTC and other regulatory requirements on a quarterly basis for the first, second and third quarters of 2005 and the first quarter of 2006 (in millions):

| CFTC Net Capital | | |
|---|---|---|
| Quarter | Reported | Adjusted |
| Q1 2005 | 242.7 | (390.8) |
| Q2 2005 | 282.0 | (156.9) |
| Q3 2005 | 301.7 | (191.5) |
| Q1 2006 | 354.5 | (52.8) |

586.   Mayer Brown was involved in all of the transactions giving rise to the foregoing financial impacts for these quarterly periods.

587.   For each period reflected in the preceding charts, the adjusted pre-tax and net income figures are based on the assumption that the uncollectible receivables were first discovered and corrected in that period, and the adjusted net capital figures are based on the assumption that the uncollectible receivables were included as assets when calculating the Company's reported net capital figures.

212

## XII.    FALSE AND MISLEADING STATEMENTS

588.    In connection with the Bond Offering, the Company and its representatives (including the Officer Defendants, the Audit Committee Defendants, Trosten, Mayer Brown, and Collins) as well as the THL Defendants, the Bond Underwriter Defendants, and Grant Thornton, made numerous false and misleading statements of material fact and omitted to disclose material facts in the Bond Offering Memorandum and/or at the Bond Road Show. These false and misleading statements and omissions are detailed above at ¶¶ 118-155 and 159-162, which allegations are incorporated herein by reference.

589.    Following the Bond Offering in August 2004, the Company's securities began to trade publicly and the Company became subject to the filing requirements of the Exchange Act. From that point forward, in regular press releases and in periodic filings with the SEC, the Company and the Defendants made numerous materially false and misleading statements, including the untrue statements in the Bond Registration Statement and the IPO Registration Statement as discussed above, as well as statements by the Company and its officers and directors in press releases and in SEC filings on Form 8-K, Form 10-Q, and Form 10-K, as discussed below.

### A.    The May 2005 Press Release and May 2005 8-K

590.    On May 27, 2005, the Company announced the results of its operations for the year and quarter ended February 28, 2005 and filed a Form 8-K (the "May 2005 8-K"), which was signed by Bennett. A press release dated May 27, 2005 (the "May 2005 Press Release"), which included the Company's consolidated financial statements for the year and quarter ended February 28, 2005, was attached as an exhibit to the May 2005 8-K.

591.    The May 2005 Press Release contained numerous false statements of material fact about the Company's financial results and performance, including the following statement by Bennett:

> Refco Group Ltd., LLC's fourth quarter performance concluded a transforming and successful year for Refco, which reported strong performance in its key operating businesses. Refco's transaction volume growth in derivative brokerage, foreign exchange and fixed income equaled or exceeded the strong secular and cyclical growth trends enjoyed by these global markets and drove revenues to record levels. This is indicative of the key attributes of the Company's business model, its financial performance and cash flows . . . . In summary, fiscal 2005's performance maintained excellent growth in net revenue, net income and cash flow of our business segments.

592.    The May 2005 Press Release stated that the Company's:

(a)    "net income for the fourth quarter decreased by 23.6% to $35.7 million from $46.8 million for the same quarter a year ago"; and

(b)    "net income for the year ended February 28, 2005 decreased by 5.8% to $176.3 million from $187.2 million compared with the year ended February 29, 2004."

593.    The May 2005 Press Release also stated that (a) the Company had established $61.190 million and $65.2 million in reserves for doubtful accounts (for the periods ending February 28, 2005 and February 29, 2004, respectively); (b) the Company's "regulated subsidiaries reported excess regulatory capital of $170.4 million;" (c) the Company's total assets were $48.8 billion; and (d) the Company's "members' equity was $152.8 million."

594.    These statements were materially false and misleading because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, and similarly failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that RGHI used to "pay off" some or all of the receivable days before the close of the

period. As discussed above, Refco and the THL Partner Defendants have admitted that this receivable should have been, but was not, disclosed as a related-party transaction on the Company's reported financial statements. Further, the fraudulent scheme set forth above was designed to, and did, manipulate Refco's financial information such that the Company overstated its (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders equity; and materially understated Refco's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Bennett and Refco.

**B.    The Year End 2005 Press Release and 2005 10-K**

595.    On July 1, 2005, Refco Group filed its Annual Report for fiscal year 2005 on Form 10-K (as amended through a Form 10-K/A filing on July 20, 2005) (collectively, the "2005 10-K"). Bennett and Sherer signed the 2005 10-K.

596.    The 2005 10-K included the Company's audited consolidated financial statements for fiscal years 2003, 2004 and 2005, which the Company's management had prepared with significant assistance and input from Grant Thornton. The consolidated financial statements were accompanied by two unqualified audit opinion letters signed by Grant Thornton on May 24, 2005, which were included in the 2005 10-K, stating that Grant Thornton had conducted audits in accordance with GAAS and opining that the consolidated financial statements included in the 2005 10-K presented fairly, in all material respects, the financial position of the Company for the relevant dates and time periods "in conformity with accounting principles generally accepted in the United States of America."

597.    The Company's audited financial statements included in the 2005 10-K reported, among other things:

(a)    net income of $176,287,000, $187,156,000 and $140,119,000 for fiscal years 2005, 2004 and 2003, respectively;

215

    (b)    receivables from customers (net of reserves) of $2,081,968,000 and

$1,591,385,000 as of February 28, 2005 and February 29, 2004, respectively;

    (c)    reserves against receivables from customers of $61.2 million and $65.2

million as of February 28, 2005 and February 29, 2004, respectively;

    (d)    total assets of $48,767,849,000 and $33,332,172,000 as of February 28,

2005 and February 29, 2004, respectively; and

    (e)    members' equity of $152,750,000 as of February 28, 2005.

598.    The notes to the audited financial statements included in the 2005 10-K included

the following disclosure regarding related-party transactions:

> [The Company] may loan money to and may borrow money from its
> affiliates, members, affiliated companies and other related parties.  Interest
> is generally charged at prevailing market rates.

599.    The 2005 10-K also included the following statements regarding the Company's

allowance for doubtful accounts in respect to receivables from customers:

### Receivables from Customers–Provisions for Doubtful Accounts

Our receivables are generally collateralized with marketable securities.
*For some customer receivables that are not fully secured, we establish
reserves for doubtful accounts when, in the opinion of management,
such reserves are appropriate.  We have established reserves of
$61.2 million and $65.2 million against receivables from customers as of
February 28, 2005 and February 29, 2004, respectively.  Our allowance
for doubtful accounts is based upon management's continuing review
and evaluation of the factors such as collateral value, aging and the
financial condition of our customers.  The allowance is assessed to
reflect best estimate of probable losses that have been incurred as of the
balance sheet date.*  Any changes are included in the current period
operating results.  We pursue collection of these receivables through
various means, including legal action and collection agencies, and
generally do not charge-off any of these receivables.  Although these
reserves have been adequate historically, the default of a large customer or
prolonged period of weakness in global financial markets could adversely
affect the ability of our customers to meet their obligations.  We do not

> establish reserves for unidentified losses, which may be inherent in our
> customer base.

(Emphasis added.)

600.    The 2005 10-K contained the following statements, among others, about the

Company's compliance with regulatory capital requirements:

> As of February 28, 2005, Refco Securities, LLC had net capital of $82.0
> million, which was 24.7% of aggregate debit balance and $75.4 million in
> excess of required net capital. . . . [A]s of February 28, 2005, Refco, LLC
> had net capital of $283.9 million, which was $95.0 million in excess of
> required net capital.

601.    The 2005 10-K also included representations from the Company's management,

including Defendants Bennett, Murphy, Sherer, Sexton and Maggio, that:

> Our management evaluated, with the participation of our principal
> executive and principal financial officer, the effectiveness of our
> disclosure controls and procedures . . . as of December 31, 2004.  Based
> on their evaluation, our principal executive and principal financial officer
> concluded that our disclosure controls and procedures were effective as of
> February 28, 2005.

602.    Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Exchange Act, Defendants

Bennett and Sherer each certified that "the financial statements, and other financial information

included in [the 2005 10-K], fairly present in all material respects the financial condition, results

of operations and cash flows of the registrants as of, and for, the periods presented in this report."

They also certified that the 2005 10-K:

> does not contain any untrue statement of a material fact or omit to state a
> material fact necessary to make the statements made, in light of the
> circumstances under which such statements were made, not misleading
> with respect to the period covered by this report.

603.    Defendants Bennett and Sherer further certified that they had disclosed to the

Company's auditors and its audit committee "[a]ny fraud, whether or not material, that involves

management or other employees who have a significant role in the registrants' internal control over financial reporting."

604.    Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Bennett and Sherer further certified that (1) "the [2005 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and (2) "the information contained in the [2005 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

605.    As set forth above, these statements were materially false and misleading at the time they were made because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, and similarly failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that RGHI used to "pay off" some or all of the receivable days before the close of the period.  Specifically, these misstatements materially overstated the Company's (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders equity and materially understated the Company's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Defendant Bennett and the Company.

C.    **The First Quarter 2006 Press Release, July 2005 8-K, and First Quarter 2006 10-Q**

606.    On July 15, 2005, the Company announced its results of operations for the quarter ended May 31, 2005 and filed a Form 8-K (the "July 2005 8-K"), which was signed by Defendant Bennett.  A press release dated July 15, 2005 (the "First Quarter 2006 Press Release") containing the Company's consolidated financial statements for the quarter ended May 31, 2005 was attached as an exhibit to the July 2005 8-K.

218

607.    The First Quarter 2006 Press Release contained numerous false statements of material facts about the Company's financial results and performance, including the following statement by Defendant Bennett:

> Refco continues to report solid growth on a sequential basis following its recapitalization in August 2004. The Company's global footprint and core competence in transaction processing has enabled it to capitalize on the continuing growth trends in exchange traded derivatives as well as the significant growth in foreign exchange brokerage volumes . . . In summary, it has been an encouraging start to the year.

608.    The First Quarter 2006 Press Release stated that:

(a)    "Net income for the first quarter decreased by 28.2% to $42.6 million from $59.3 million for the same quarter a year ago and increased by 19.3% from $35.7 million for the quarter ended February 28, 2005";

(b)    Refco held reserves against receivables from customers in the amount of $62,107,000 as of May 31, 2005;

(c)    the Company's "regulated subsidiaries reported excess regulatory capital of $170.4 million";

(d)    the Company's total assets were $48.8 billion; and

(e)    the Company's "members' equity was $152.8 million."

609.    On July 15, 2005, the Company filed its quarterly report with the SEC on Form 10-Q (the "First Quarter 2006 10-Q"), which was signed by Defendants Bennett and Sherer and contained the Company's unaudited consolidated financial statements for the quarter ended May 31, 2005. The First Quarter 2006 10-Q reiterated the Company's financial results reported in the First Quarter 2006 Press Release including the statements regarding the Company's (i) income, (ii) total assets, (iii) regulatory capital reserves, (iv) shareholders' equity, and (v) reserves for

doubtful accounts. The First Quarter 2006 10-Q reported that members' equity was $187,927,000.

610.    The First Quarter 2006 10-Q contained the following statements, among others, about the Company's compliance with regulatory capital requirements:

> As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balances and $49.6 million in excess of required net capital . . . As of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital.

611.    The First Quarter 2006 10-Q included the following representation:

> Our management evaluated, with the participation of our principal executive and principal financial officer, the effectiveness of our disclosure controls and procedures . . . as of May 31, 2005. Based on their evaluation, our principal executive and principal financial officer concluded that our disclosure controls and procedures were effective as of May 31, 2005.

612.    Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Exchange Act, Defendants Bennett and Sherer each certified that "the financial statements, and other financial information included in [the First Quarter 2006 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report." They also certified that the First Quarter 2006 10-Q:

> does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

613.    Defendants Bennett and Sherer further certified that they had disclosed to the Company's auditors and its audit committee "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting."

614.    Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Bennett and Sherer further certified that (1) "the [First Quarter 2006 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and (2) "the information contained in the [First Quarter 2006 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

615.    The statements set forth above were materially false and misleading because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that RGHI used to "pay off" some or all of the receivable days before the close of the period, and failed to disclose the multi-hundred million dollar guarantees of Refco Group.  Specifically, these misstatements materially overstated the Company's (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders' equity and materially understated the Company's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Defendant Bennett and the Company.

## XIII.    ADDITIONAL ALLEGATIONS OF SCIENTER

616.    The Officer Defendants, Trosten, and the Audit Committee Defendants (collectively, the "Inside Defendants"), the THL Defendants, Mayer Brown, Collins, and Grant Thornton each acted with scienter with respect to the materially false and misleading statements discussed herein, in that they had actual knowledge that the statements were false or misleading, or acted with reckless disregard for the truth or falsity of these statements.  These Defendants' intent to deceive and/or reckless disregard for the truth is demonstrated both by circumstantial evidence supporting a strong inference of scienter, as well as by the fact that these Defendants had motive and the opportunity to commit fraud.

A.     **Circumstantial Evidence of Scienter**

617.     There is substantial circumstantial evidence supporting a strong inference that the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton acted with scienter.

618.     Grant Thornton's Violations of GAAS.  As discussed above in ¶¶ 262-295, which paragraphs are incorporated herein by reference, Grant Thornton failed to follow GAAS when conducting its audits.  Among other things, Grant Thornton considered Refco a "high risk client," was aware of "significant deficiencies" in Refco's internal controls and of the existence of "significant related party transactions" and of the RGHI receivable, yet made no effort to confirm the nature or purpose of Refco's related party transactions or conduct any meaningful audit of Refco's financial statements.  Grant Thornton's violations of GAAS were so egregious that they amount to a reckless disregard for the truth of Refco's financial statements and of Grant Thornton's own audit opinions.

619.     In fact, Grant Thornton deliberately or recklessly ignored information in its possession that should have alerted it to the fraud.  For instance, as discussed in detail below, Grant Thornton was aware of large end-of-period transactions between Refco and certain customers – including Customer X, Delta Flyer, and Beckenham – yet despite red flags that should have led to further inquiry, it recklessly failed to examine the nature or legitimacy of those transactions.  Had Grant Thornton made even the most basic of inquiries into these matters, it would have discovered that these were sham loan transactions with no purpose other than to manipulate Refco's financial statements.

620.     For example, on April 16, 2003, at Grant Thornton's request in connection with its audit of Refco's fiscal 2003 financial statements, Refco sent requests to Customer X and Delta Flyer for confirmation of certain transactions reflected on their Refco Capital account