statements. The account statements that were attached to the confirmation requests showed a $500 million deposit to Customer X's account and a $150 million deposit to Delta Flyer's account, both in connection with purported "reverse repo" transactions on February 21, 2003. A "reverse repo" is an agreement whereby securities are sold subject to an agreement to repurchase them at a specified future date and price, and such transactions are typically collateralized by the underlying securities. The account statements for Customer X and Delta Flyer reflected that the repurchase date for both transactions was March 4, 2003, and thus these multi-hundred million dollar transactions suspiciously straddled the end of Refco's fiscal year 2002.

621.    Although Grant Thornton was plainly aware of the massive, round-dollar values attached to these purported "reverse repos" and the added highly suspicious circumstance that they both occurred on the same days straddling the end of Refco's fiscal year, Grant Thornton did not review the documentation for the transactions or otherwise do anything to confirm that they were what they purported to be, or that they were supported by collateral. Had Grant Thornton made appropriate inquiries, it would have discovered that these deposits were not from "reverse repo" transactions at all, but were the proceeds of the first leg of the round-trip loans that were being used to conceal Refco's uncollectible receivables. Moreover, had Grant Thornton made any effort whatsoever to obtain the documentation underlying either of these deposits (i.e., the loan agreements between Refco Capital and the customers), it would have readily discovered the other side of the round-trip loans because each loan agreement made specific reference to the customer's separate loan agreement with RGHI. The same was true of all the other round-trip loan agreements alleged herein.

622.    In 2004, Refco retained Grant Thornton to conduct a re-audit of Refco Group's February 2002 year end consolidated financial statements for inclusion in the Bond Registration

Statement. During the course of that re-audit, Grant Thornton noted significant year-end balances in the Refco Capital accounts of Customer X, Delta Flyer, and Beckenham, respectively. Identifying these as "individually significant confirms," Grant Thornton had Refco Capital send confirmation requests to Customer X, Delta Flyer, and Beckenham, asking them to confirm certain information to Grant Thornton. The confirmation requests stated that Refco Group was "in the process of registering public debt," and that this process required audited financial statements for the year ended February 28, 2002. They further explained that Refco Group's fiscal year 2002 financial statements "had been audited by an accounting firm that ceased operations," that is, Arthur Andersen, and "accordingly, a re-audit of [Refco's] fiscal 2002 consolidated financial statements is necessary." The confirmation requests asked Customer X, Delta Flyer, and Beckenham to send its confirmation directly to Grant Thornton.

623.    Attached to each of the September 2004 confirmation requests was a Statement of Account for the customer's account at Refco Capital as of February 28, 2002. The Statements of Account indicated that Customer X, Delta Flyer and Beckenham had year-end account balances of $325 million, $175 million, and $125 million, respectively, which the Statements described as "time deposits." In addition to showing the balance as of February 28, 2002, however, each Statement of Account also showed recent transaction activity in the account. These Statements of Account showed clearly that all three of these customers' account balances were the result of "time deposits" from Refco Capital on February 25, 2002, just three days prior to the end of Refco's fiscal year.

624.    "Time deposits" are loans Refco Capital extended to its customers for purposes of trading, secured by the customers' trading positions. Although the Statements of Account showed on their face that these "time deposits" were not collateralized, Grant Thornton did not

inquire into the lack of collateral or the legitimacy of these massive transactions. Had Grant Thornton performed its audits in a non-reckless manner by making some basic inquiries into the purpose and substance of these "time deposits," it would have readily discovered that there was no collateral, that these loans from Refco Capital occurred simultaneously with loans by these same customers to RGHI, and that these customers were merely serving as middlemen for transfers of hundreds of millions of dollars from Refco Capital to RGHI in the days immediately before Refco closed its books. Additionally, had Grant Thornton reviewed the same customers' account statements for the month of March 2002, it would have seen reversals of these "time deposits" on March 4, 2002, just after the close of the fiscal year.

625.    During the course of their investigation, Lead Plaintiffs discussed Grant Thornton's September 2004 confirmation request with Customer X's operations manager and with Principal A. According to Customer X's operations manager, on October 5, 2004, after confirming within his office that Customer X did in fact owe $325,000,000 to Refco Capital as of February 28, 2002, he signed the confirmation and sent it, along with the Statement of Account, to Grant Thornton. While the Statement of Account should have alerted Grant Thornton to the fact that Refco Capital's $325 million, $175 million, and $125 million debts to Customer X, Delta Flyer and Beckenham were each created a mere three days before the end of the fiscal year, Grant Thornton did not ask any of these customers for any additional information or documents. Customer X's Principal A has told Lead Counsel that if Grant Thornton had requested any documents relating to the February 25, 2002 transaction, he would have first suggested that Grant Thornton ask Mayer Brown for them but, if Grant Thornton asked Customer X to provide them, Principal A would have done so. Grant Thornton's failure to make further inquiries as to the nature of the transactions that created these "individually significant"

account balances, and why Refco Capital had made three such enormous loans on the same date and so close to the end of the fiscal year, raises a strong inference of scienter.

626.    A few months later, during its review of Refco's financial statements for the quarter ended November 30, 2004, Grant Thornton obtained a "Funding Product Accrued Interest Report" that showed not only a purported $545 million "time deposit" to Customer X's Refco Capital account on November 26, 2004, but also – *on the line right above it* – a "time deposit" in the same amount and on the same date in RGHI's Refco Capital account. The existence of these two transactions on the same date and for the same amount was a bright red flag and should have led to further inquiry by Grant Thornton, but it did not. Moreover, according to the Examiner, "it does not appear that [Grant Thornton] questioned why Refco entered into a $545 million reverse repo with an affiliated party or scrutinized the circumstances of that transaction" and "it does not appear that [Grant Thornton] questioned why – if RGHI had indeed paid down its debt to Refco as [Grant Thornton] had been told – Refco appeared to be extending additional unsecured loans or advances to RGHI in such massive amounts." Grant Thornton's failure to make such inquiries is particularly egregious because Customer X—as Grant Thornton knew or recklessly failed to discover—was owned by a single individual, had assets of only a few hundred thousand dollars, was not regularly engaged in the business of securities trading, and utterly lacked any ability to repay "loans" of hundreds of millions of dollars.

627.    The Size and Unusual Nature of the Sham Loans:  The sheer size of the related-party receivable hidden by the transactions described herein and in the following chart raises a strong inference that the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton knew or recklessly disregarded the truth about the transactions.

226

| Loan Date | Loan Amount | Reported Net Income (Relevant Financial Period) | Percentage of Net Income |
|---|---|---|---|
| February 2002 | $925 Million | $93.6 Million (Year ended February 28, 2002) | 988% |
| February 2003 | $900 Million | $140.119 Million (Year ended February 28, 2003) | 642% |
| February 2004 | $970 Million | $187.156 Million (Year ended February 29, 2004) | 518% |
| May 2004 | $700 Million | $59.270 Million (Quarter ended May 31, 2004) | 1,180% |
| August 2004 | $485 Million | $44.20 Million (Quarter ended August 31, 2004) | 1,097% |
| November 2004 | $545 Million | $17.9 Million (Quarter ended November 30, 2004) | 3,045% |
| December 2004 | $550 Million | Not applicable | Not applicable |
| February 2005 | $595 Million | $176.3 Million (Year ended February 28, 2005) | 337% |
| May 2005 | $450 Million | $42.587 Million (Quarter ended May 31, 2005) | 1,056% |
| August 2005 | $420 Million | (Financial Statements delayed because of 10/10/05 Disclosure of Uncollectible Receivable) | Not applicable |

That the sums hidden by these sham transactions dwarfed the Company's net income raises a strong inference that the transactions should not have escaped notice. Indeed, Refco's net proceeds from the IPO were only $254,000,000, yet in the circular transaction that took place

only two weeks later, Refco Capital "loaned" its third-party customer the far larger sum of $420,000,000 as part of Refco's fraudulent scheme. The sheer magnitude of the sums hidden by the sham transactions raises a strong inference of scienter.

628.    Not only were the round-trip loan transactions large in comparison to Refco's net income, but – as Grant Thornton knew – they were large in comparison to other loans Refco Capital extended to its customers. For example, Grant Thornton's audit workpapers for the fiscal 2004 and 2005 audits contain lists of Refco Capital's largest "time deposits" into customers' accounts for those years – *i.e.*, loans to customers for purposes of trading – including purported "time deposits" to Customer X's account of $720 million and $345 million for those years, respectively. ███████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ The tremendous size of these purported "time deposits" in comparison to others made by Refco Capital was a bright red flag that should have led to further inquiry into the reasons for those deposits – inquiry that would have led directly to the revelation that these were not time deposits for trading purposes, but rather were transfers in connection with sham round-trip loans. Particularly for Grant Thornton, which <u>knew</u> of the huge magnitude of these loans in comparison to other purportedly similar loans, failure to make that inquiry was reckless at best.

629.    <u>The Timing and Recurrent Nature of the Transactions</u>. The timing of the circular transactions also raises a strong inference of scienter. As discussed above, at the end of every fiscal year from at least 2000 to 2005, and at the end of each fiscal quarter from at least 2004

until August 2005, Refco Capital would "loan" substantial sums to unrelated middlemen and/or

BAWAG, which simultaneously loaned that money to RGHI. RGHI, in turn, would use the sum

to temporarily extinguish its outstanding obligation to Refco. At the beginning of the subsequent

period, and once the financial reporting benefit of this circular arrangement had been realized,

the money would find its way back the way it had come, and Refco Capital would receive

"repayment" of its massive "loan" of several weeks prior. These transactions took place for at

least five years and each involved substantial sums that were unlikely to go unnoticed. Mayer

Brown negotiated and drafted the documentation for seventeen of these sham loan transactions.

The Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton all

knew when Refco's financial periods ended, and understood the requirement that Refco file

financial statements as of the end of those periods. The regularity and suspicious timing of these

transactions raises a strong inference that these Defendants knew or recklessly disregarded the

truth about these transactions. Moreover, because these transactions were conducted on only an

annual basis prior to 2004, a simple review of the Company's quarterly financial statements prior

to 2004 would have revealed the significant receivables from RGHI, and would have caused

these Defendants to question why those receivables vanished at year-end. Their failure to do so

was, at best, reckless. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

630.    The Unusual Nature of the Transactions. The transactions described above were

highly unusual transactions for Refco and, on their face, raise a strong inference of scienter. The

first step in each of Refco's circular quarter-end transactions involved Refco Capital "lending"

sums far in excess of its net earnings to an outside customer or to BAWAG. A "loan" transferring sums greater than Refco's net income away from the Company should have drawn substantial scrutiny from the Inside Defendants, the THL Defendants, Mayer Brown, Collins and Grant Thornton.

631.    The Guarantees by Refco. Further, the transactions were unusual in that Refco provided guarantees -- drafted by Mayer Brown -- for RGHI's obligations to Customer X and other third parties. The third parties were therefore subject to no economic risk, yet they received "interest" on the "loans." This is additional evidence that the loans were simply a sham designed to benefit Refco. Moreover, various loan and note documents that Mayer Brown drafted for Refco contained covenants prohibiting Refco from incurring additional indebtedness beyond set limits and, in certain instances, expressly prohibited the Company from entering into any guarantees. For instance, Refco Group was a party to a Note Agreement dated June 29, 2000, which was drafted by Mayer Brown and provided that "the Company will not become or be liable in respect of any Guaranty of Indebtedness of [its subsidiaries] and will not permit any [of its subsidiaries] to become or be liable in respect of any Guaranty of Indebtedness of [Refco Capital]." But for their deliberate intent and/or recklessness, these facts would have alerted the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton to the fraudulent scheme.

632.    Refco Capital Paid the Interest Owed by RGHI. The net interest to the third-party customers was paid by Refco Capital, even though this amount was owed by RGHI. Thus, Defendants Bennett, Maggio and others were forcing Refco, through Refco Capital, to pay the interest on a loan extended to a purportedly separate entity owned by Bennett and Grant. The Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton either knew

230

or recklessly failed to discover that Refco was paying interest on a loan extended to an entirely

separate entity, RGHI.

633.    No Proceeds Changed Hands. For the majority of the round-trip loan

transactions, no funds actually changed hands other than the "interest" paid to the third-party

participant. As described above, the third-party customers never actually received the proceeds

of the multi-hundred million dollar "loans" purportedly extended to them by Refco Capital.

Rather, the proceeds would never leave Refco and would be transferred directly from Refco

Capital to RGHI and then the pattern was reversed so that they would be transferred from RGHI

back to Refco Capital. That no principal actually changed hands in these "loans" should have

alerted the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton

to their fraudulent nature.

634.    Lack of Business Purpose. The circular transactions also raise a strong inference

of scienter because, on their face, they serve no legitimate business purpose. At their core, these

transactions involved nothing more than funneling money from Refco through a third-party or

BAWAG and RGHI to Refco (and back again), with intermediary steps intended to create the

appearance that the funds had a different source. On their face, the transactions were shams with

no economic justification. There is no conceivable legitimate reason for Refco to arrange for and

guarantee payments for hundreds of millions of dollars of loans (timed to occur at Refco's

financial period ends) from third-parties to RGHI, and then have the proceeds of those loans

transferred to Refco. The obvious lack of a legitimate business purpose for Refco's circular

transactions also raises a strong inference of scienter with respect to the Inside Defendants, the

THL Defendants, Mayer Brown, Collins, and Grant Thornton.

635.    <u>Insider Status and Access to Inside Information</u>.  The Inside Defendants, the THL
Defendants, and Grant Thornton held positions in or with respect to the Company which gave
them access to inside information, thus raising a strong inference that they knew or recklessly
disregarded the truth about the transactions discussed above.  The Officer Defendants were
responsible for the Company's operations and played a critical role in its management.  The IPO
Registration Statement, for example, highlighted the critical role played by Refco's management
in the Company's operations, stating that the Company's "success depends to a significant
degree upon the continued contributions of our management team, particularly our President and
Chief Executive Officer, Phillip Bennett."  Similarly, the IPO Registration Statement makes
clear that the Audit Committee Defendants were responsible for "the integrity of [the
Company's] financial statements."  As Refco's auditor, Grant Thornton was also responsible for
the accuracy of Refco's financial statements and had unfettered access to the Company's inside
information.  The THL Defendants had an obligation to obtain and review inside information of
Refco in connection with their due diligence process for the LBO, and following the LBO, these
defendants had unfettered access to Refco's books as a result of their direct role in the day-to-day
management of the Company.  In light of the size, timing, unusual nature, and lack of any
business purpose for these transactions discussed above, these Defendants' access to, and
obligation to monitor, all the underlying facts and circumstances of these transactions raises a
strong inference of scienter with respect to the Inside Defendants, the THL Defendants, and
Grant Thornton.

636.    <u>The Refco/RGHI Relationship</u>.  The close relationship between Refco and RGHI
– the related party in which Refco's uncollectible receivables were stashed – was well-known to
the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton, as was

232

the fact that RGHI was controlled by Bennett. The IPO Registration Statement and the Bond Registration Statement each plainly state that RGHI is wholly owned by Bennett and disclose numerous ties between RGHI and Refco, the Audit Committee Defendants, and the Officer Defendants. These ties include RGHI's massive ownership of Refco stock (larger than the total number of shares issued in the IPO); RGHI's power to appoint several members to Refco's board of directors; and RGHI's direct payment of over $37.5 million to Officer Defendants Murphy, Maggio, Sexton, and Klejna for their interest in a Company-endorsed profit-sharing agreement in connection with the LBO. Additionally, Mayer Brown represented both RGHI and Refco in each of the round-trip transactions, a fact which confirms Mayer Brown's and Collins' knowledge that the entities were related and that the loans between them were not made at arms'-length. The Inside Defendants the THL Defendants, Mayer Brown, Collins, and Grant Thornton were therefore familiar with RGHI and had every reason to know that it was a related party controlled by Refco's President and CEO. The close relationship between Refco and RGHI, and these Defendants' knowledge thereof, also raises a strong inference of scienter.

637.    Bennett Involved on Both Sides. By virtue of their involvement in the drafting of the loan transaction documents and their receipt of the executed documents, Mayer Brown, Collins, and the other Mayer Brown employees who worked on the round trip transactions (including Koury and Monk) knew that Bennett was involved on both sides of most of the transactions, signing the guarantees on behalf of Refco and the loan documents on behalf of RGHI. These facts were also known by Bennett, and were known or recklessly disregarded by the THL Defendants and Grant Thornton, who should have reviewed the documentation for these significant, recurring transactions.

638.   RGHI Had No Liquid Assets. The Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton knew that RGHI was not only a related party of Refco, but also that it was simply an off balance-sheet holding company that Bennett and Grant used to "park" their significant personal holdings of Refco stock. These Defendants also knew that RGHI had no liquid assets and no operational functions, thereby making it highly suspicious that RGHI would repeatedly need to "borrow" hundreds of millions of dollars (at each of Refco's financial period ends) for any legitimate purpose. It was particularly suspicious that RGHI would need this money at exactly the same time that Refco was closing its books.

639.   Line-Item Records of the Round Trip Transactions. Internal statements of RGHI's accounts at Refco Capital contained line-items reflecting the flow of funds in the circular transactions used to conceal the outstanding receivable. In particular, the account statements clearly show massive inflows of cash to RGHI in the days immediately before Refco's fiscal year end, and massive outflows of like (and often identical) sums of cash several days after the fiscal year end. The fund transfers recorded in these account statements were at all times for material amounts far in excess of Refco's net income for the given year and could, therefore, not have escaped notice. The highly suspicious size and timing of this documented flow of funds should have alerted Grant Thornton to the likelihood of financial manipulation and raises a strong inference of scienter. For example:

(a)   Account statements for February and March of 2002 reflect two wire transfers from "1ST Union – BAWAG" to RGHI on February 25, 2002 in the amounts of $90,000,000 and $210,000,000. The same document contains entries for March 4, 2002 showing wire transfers from RGHI back to "1ST Union – BAWAG" in the amounts of $90,040,950 and $210,075,133.33. Significantly, this roughly $300,000,000 round-trip

234

was for an amount over three times the size of Refco's reported net income of $93,634,000 for the fiscal year ended February 28, 2002.

(b)     Account statements for February and March of 2003 reflect two wire transfers from "Wachovia NY INTL" to RGHI on February 25, 2003 in the amounts of $75,000,000 and $175,000,000. Supporting documentation attached to these statements make clear that the funds from "Wachovia NY INTL" are funds from the accounts of "BANK FUER ARBEIT UND WIRTSCHAFT"—*i.e.*, from BAWAG. The same account statements also contain entries for March 4, 2003 showing a wire transfer from RGHI back to "BAWAG" in the amount of $75,000,000. The very next line contains an entry for a transfer of $175,000,000 labeled only "TRANSFER." Upon information and belief, this $175,000,000 was transferred directly to Refco Capital (its original source) rather than routing the funds back to Refco Capital through BAWAG, which was unnecessary now that the financial reporting benefit of the circular loans had been achieved. Significantly, this $250,000,000 round trip was for an amount over $100 million greater than Refco's reported net income of $140 million for the fiscal year ended February 28, 2003.

(c)     Account statements for February and March of 2004 reflect two wire transfers from "Wachovia NY INTL" to RGHI on February 25, 2004 in the amounts of $40,000,000 and $210,000,000. Supporting documentation attached to these statements make clear that the funds from "Wachovia NY INTL" are funds from the accounts of "BANK FUER ARBEIT UND WIRTSCHAFT"—*i.e.*, from BAWAG. The same account statements also contain entries for March 4, 2004 showing a wire transfer from RGHI back to "BAWAG" in the amount of $40,014,044.44. The same date contains an

entry for a transfer of $210,000,000 labeled only "TRANSFER." Upon information and belief, this $210,000,000 was transferred directly to Refco (its original source) rather than routing the funds back to Refco through BAWAG, which was unnecessary now that the financial reporting benefit of the circular loans had been achieved. Significantly, this $250,000,000 round trip was for an amount over $60 million greater than Refco's reported net income of $187 million for the fiscal year ended February 28, 2004.

640. _Maggio's Control of Refco Capital._ Defendant Maggio's control of Refco Capital raises a strong inference of scienter. The funds used in the circular transactions originated with Refco Capital, of which Maggio was the President. Maggio signed several of the Refco Capital/Customer X Loan Agreements (specifically those dated February 21, 2003; February 20, 2004; August 25, 2004; November 26, 2004; December 30, 2004; February 23, 2005; and August 26, 2005), and was listed as the person to receive legal notices for both Refco Capital _and_ RGHI for all transactions with Customer X from February 2003 onward. Maggio was forced from his position at Refco as a result of the disclosure of the circular transactions.

641. _Defendants Bennett, Maggio, Trosten, Mayer Brown, and Collins' Direct Involvement in the Blatantly Fraudulent Transactions._ As set forth above, e-mails and letters by and between BAWAG, Bennett, Maggio and Trosten relating to the blatantly fraudulent BAWAG transactions unequivocally demonstrate that those defendants had knowledge of, and participated in, the scheme to conceal the receivable owed by RGHI to the Company. These so-called "loan" transactions did not involve collateral, formal loan documentation or, in large part, interest payments. Thus, these "loan" transactions served no legitimate purpose and were on their face obvious shams designed to further the scheme to misstate Refco's financials. Similarly, as set forth above, Defendants Bennett, Maggio, Collins, and Mayer Brown had

236

knowledge of, and participated in, the scheme to conceal the receivable owed by RGHI to the Company. Defendants Collins and Mayer Brown negotiated and drafted the documentation for the sham round-trip "loan" transactions at the request of Bennett and Maggio, who signed the documents.

642.    Silverman's Close Connections to Both Refco and RGHI. In addition to serving as Controller and Secretary of Refco, Defendant Silverman was Secretary of RGHI, the Bennett-owned entity that was used to carry out the fraudulent "Round-Robin" transactions. Silverman, a close confidant of Bennett, was placed on leave at or about the same time as Bennett and Maggio. According to a November 16, 2005 article on www.thestreet.com, sources have indicated that Silverman's leave was due to his involvement in the bookkeeping that allowed Bennett to conceal Refco's customer trading losses. Silverman's close ties to Bennett, his knowledge of accounting, his role as Controller of the Company (which included the recording of entries on the Company's books), and his being placed on leave amidst rumors of his involvement in the booking of the fraudulent transactions, are all facts that raise a strong inference of his scienter.

643.    Severance Payment to Trosten. Within a few months of the LBO, Trosten received a severance payment of at least $45 million when he resigned as CFO in October 2004 at the age of 35, after serving in that position for only three years. This severance payment was not disclosed by the Company, and became public only after Trosten was forced to admit receiving it during testimony in an arbitration proceeding in the summer of 2005. Notably, Trosten's resignation and the severance payment occurred at the same time he knew that Grant Thornton was reviewing and/or re-auditing the Company's fiscal year 2002 financial statements.

237

The Former Refco Officer was one of many who viewed the size of the severance and the timing of Trosten's resignation – just as the IPO planning had begun – as very suspicious.

644.    The approximately $45 million severance payment was exponentially greater than Trosten's annual compensation of $3,139,000 in salary and bonuses for fiscal year 2004 and was grossly disproportionate to his level of experience and expertise. It also far exceeded the severance package disclosed on page 88 of the Offering Memorandum, which would have entitled him to eighteen months of his base salary and annual bonus as of the date of termination. Trosten's extraordinarily lucrative $45 million severance package, which was one of many that was concealed from the public and was paid while the scheme to conceal the Company's uncollectible debts was actively ongoing and at the same time Grant Thornton was reviewing the Company's 2002 financial statements, raises a strong inference of scienter. In particular, it raises a strong inference that Trosten knew about the scheme to defraud the Company's investors, and that Bennett and the Company, including the Inside Defendants and the THL Defendants who approved his severance package, paid him off in an effort to buy his silence when he left the Company.

645.    History of Legal Violations. Refco had a history of legal violations and improprieties that should also have alerted the Inside Defendants and Grant Thornton to the risk of financial manipulation. Indeed, from the time Bennett became the Company's chief financial officer in 1983, the CFTC penalized Refco at least 140 times for violations that included filing false trading reports, inadequate record-keeping, and inadequate supervision of its traders – the worst record in the industry. As reported in Bloomberg Markets in February 2006, a former CFTC official involved in regulating Refco explained that "Refco was a firm that said 'Show us where the edge is,' and then they played just over it." Refco's culture of rule-breaking and

repeated legal troubles should have, and but for their recklessness would have, alerted Grant

Thornton, the THL Defendants, Mayer Brown, Collins and the Inside Defendants (who, unlike

outside investors, had unfettered access to Refco's managers, books, and records) to Refco's

fraudulent financial reporting.

646.    For example, Refco was implicated in a SEC investigation related to a

manipulative scheme involving shares of Sedona Corp., an Arizona technology company whose

stock price had collapsed as a result of illegal short selling conducted through Refco. As late as

May 2005, Refco had received a "Wells Notice" from the SEC, recommending civil enforcement

proceedings against Refco for violations of the Securities Act and the Exchange Act – including

violations of the Rule 10b-5 anti-fraud provisions promulgated thereunder. The investigation

also focused on Defendant Maggio, then the President and CEO of Refco Securities, the Refco

subsidiary through which the illegal short sales of Sedona stock had been cleared. The

investigation was still ongoing at the time of Refco's IPO and the bankruptcy filing that occurred

shortly thereafter. Mayer Brown represented Refco in connection with the matter.

647.    Refco was also implicated in CFTC and SEC enforcement actions where Refco

was accused of improperly shifting client funds between related party accounts – the same type

of transactions that Refco used to hide the fraud in this case. For instance, Refco was directly

involved in an enforcement action arising out of the conduct of S. Jay Goldinger ("Goldinger"), a

Beverly Hills-based money manager who was accused of defrauding his clients by hiding losses

in client accounts with Refco's assistance. Functioning much like a Ponzi scheme, the fraud was

achieved by shifting funds between client accounts with losses and gains – profits were placed in

the accounts of clients who asked for their money back while losses were stashed in accounts

that appeared dormant. Refco participated in that scheme by allocating funds among Goldinger's

clients' accounts at the close of each trading day in accordance with Goldinger's instructions. As the Inside Defendants and Grant Thornton knew well before the Class Period, Refco paid $8 million in 1999 to settle charges brought by the CFTC and the Chicago Board of Trade and over $40 million in arbitration awards to defrauded investors.

648.    In yet another forerunner of the circular transactions Refco used to hide its massive related-party receivable, Refco was fined $1.2 million by the CFTC in 1994 for using funds in client accounts to pay off its own debts. As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital. Refco settled the CFTC action without admitting or denying guilt, but with a promise to stop unlawfully commingling funds. Aspects of this matter sufficient to put the Inside Defendants and Grant Thornton on notice of potential improprieties at Refco were well known to these Defendants before the Class Period.

649.    In another instance involving the improper manipulation of related accounts, Refco hid losses in a client's account from the CFTC and Chicago Board of Trade by depositing its own funds into the client's depleted account and obtaining a promissory note from the client on the side. During the late 1990s, the Eastern Trading Company, a bullion trading company based in Dubai, suffered massive speculative losses resulting in a debit balance of $28 million in their account. Such a debit would have triggered reporting requirements. In order to avoid these requirements, Refco "repaid" the debit balance with its own funds and took a promissory note from the Eastern Trading Company for the same amount. As Judge Richard Posner explained in an opinion issued in 2000 by the United States Court of Appeals for the Seventh Circuit, "it is true that for reasons having to do with reporting requirements imposed by the commodities

exchanges, Refco did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate." Eastern Trading Co. v. Refco, Inc., 229 F.3d 617, 626 (7th Cir. 2000). Although holding that Refco was entitled to performance on the promissory note, Judge Posner concluded that the arrangement existed "for the disreputable purpose of fooling the Board of Trade and the Commodities Futures Trading Commission." Id. Aspects of this matter sufficient to put the Inside Defendants and Grant Thornton on notice of potential improprieties at Refco were well known to these Defendants before the Class Period.

650.    Refco's history of regulatory violations was also well known to the THL Defendants, even before the LBO. ███████████████████████ ████████████████████████████████████████████ ████████████████████████  ██████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████ The THL Defendants' knowledge of Refco's checkered past—dating back even prior to their insider status at the Company—should have caused them to exercise additional scrutiny in reviewing the Company's books and records. The THL Defendants' failure to uncover the Company's fraud, under these circumstances, was at best reckless.

651.    Accounting Department Was In "Shambles." The Former Refco Officer described above stated that the accounting department at his unit of Refco was overworked and understaffed, with the result that "the Accounts Department was an absolute shambles." This Former Refco Officer also stated that, in or about 2003-2004, it was apparent to him that Refco had "absolutely no financial controls or reporting systems;" that he had "never seen an operation

run anywhere like [he] witnessed at Refco;" and that there was a "very, very laissez faire attitude toward risk management and compliance in general." In addition, a former member of Refco's accounting group, who worked in the New York office and was responsible for management reporting within the futures business, stated that prior to the IPO there was "no internal audit" or significant accounting infrastructure of any kind. When Refco's management finally did appoint a Director of Internal Audit shortly before the IPO, they selected Defendant Silverman, whose role with RGHI and close ties to Bennett prevented him from performing that function in an objective and independent fashion.

652.    <u>Grant Thornton's Empty Threat to Walk Away From the IPO Process.</u> The deficiencies in Refco's accounting department were well known to Grant Thornton, which noted "significant deficiencies" in Refco's internal controls in October 2004, including a lack of adequate resources and expertise in Refco's accounting group. When those deficiencies had not been corrected by December 2004, Grant Thornton's audit team expressed concerns to Grant Thornton's Professional Standards Group regarding whether Grant Thornton should be involved in the IPO. Inexplicably, however, Grant Thornton provided its consent to the inclusion of its audit opinion in the Bond Registration Statement despite these concerns.



242



653. ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████ And yet,
Grant Thornton had consented to the inclusion of its audit opinion in the Bond Registration
Statement.



654. █████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████ Thus, Bennett

called Grant Thornton's bluff and indicated his intent to proceed with the IPO as quickly as possible. Unfortunately for investors, Grant Thornton did not stick to its guns and ultimately consented to the inclusion of its audit report in the IPO Registration Statement despite the Company's failure to correct the "significant deficiencies" in its internal controls – just as Grant Thornton had done in connection with the Bond Registration Statement. Grant Thornton's decision to proceed under these circumstances evinces, at best, a reckless disregard for the truth and accuracy of Refco's financial statements and of Grant Thornton's own audit opinions.

### B.    Motive and Opportunity

655.    The unique factors that motivated the Inside Defendants and the THL Defendants to conceal the Company's massive related-party receivable in order to complete the Bond Offering and the IPO also raise a strong inference of scienter. The LBO in June 2004 and the recapitalization of the Company leading up to Refco's much-anticipated IPO fostered an environment of greed and recklessness amongst Refco insiders eager to cash in on the massive amount of capital suddenly flowing into the thinly-capitalized, highly leveraged firm. Despite the fact that $2.3 billion was raised in connection with the THL Partner Defendants' recapitalization, in the year leading up to the IPO and the subsequent collapse of Refco, the Inside Defendants stripped close to $1 billion from the Company. As described below, they did so through sales of equity interests in the LBO; enormous outright grants of Refco common stock; the "green shoe" oversubscription option on the IPO, the proceeds of which were used to personally enrich RGHI and the Officer Defendants; further grants in the form of "Restricted Stock Units" ("RSU") to the Officer Defendants and the Audit Committee Defendants – awards of large blocks of stock that vest over time upon certain conditions; and several other bonus and compensation plans. Public disclosure of the related-party receivable, and the sham transactions

used to conceal it, would have prevented the LBO (which was financed via the Bond Offering) and the IPO from occurring.

656.    Cashing Out of Equity Interests in the LBO.  The feeding frenzy began in June 2004, when the THL Partner Defendants and their passive co-investors purchased a 57% stake in Refco for approximately $507 million in cash.  According to press reports, these funds were paid to RGHI, which at the time was owned by Bennett and Grant.  In connection with the transactions, Refco Group transferred $550 million in cash plus all of its equity interests in Forstmann-Leff International Associates, LLC (valued at approximately $231 million) to RGHI. According to an October 20, 2005 article on Bloomberg newswires, through an additional agreement with the THL Partner Defendants, Bennett (along with Grant) was also entitled to another $120 million, which consisted of $12 million in cash and $108 million in the form of debt forgiveness.  Additionally, Bennett (along with Grant) received $24.9 million in penalties for the early redemption of outstanding debt, plus $19.8 million due to certain change-of-control provisions.  Bennett (through RGHI) also rolled over a $383 million equity investment in the Company, representing a 43% stake.

657.    Payments to the Officer Defendants in the LBO.  Officer Defendants Trosten, Murphy, Sexton, Maggio, and Klejna also realized significant financial windfalls in connection with the LBO.  In connection with the THL Partner Defendants' investment, eight Refco executives had their interests in a Company-endorsed profit-sharing agreement liquidated by RGHI, allowing them to share in payments totaling over $100 million, with Trosten receiving $48 million, Bennett receiving $25 million, Murphy receiving $13.7 million, Sexton receiving $9 million, Maggio receiving $8.4 million and Klejna receiving $6.5 million.  This was in addition to the multi-million dollar salaries and bonuses received by these executives over the period of

245

2003 to 2005 and the generous stock option awards they received in advance of the IPO. Moreover, of these amounts, over $4 million payable to Murphy, over $2.3 million payable to Maggio, and nearly $2 million payable to Sexton was scheduled to be paid in equal installments on December 31, 2005 and December 31, 2006, but would be accelerated if an IPO were consummated before those dates. These large payments strongly indicate these Defendants' motivation and intent to use the LBO and the IPO to extract large personal payments, raising a strong inference of scienter.

658.



659.   <u>Direct Equity Interests</u>.  In the lead-up to the IPO, the Officer Defendants and the Audit Committee Defendants received unusually large grants of Refco common stock.  The benefits of these grants could only be realized through an IPO, which created a public trading market for the stock and substantially increased its trading value, thereby greatly increasing these Defendants' personal wealth.  The following chart sets forth the Officer Defendants', Audit Committee Defendants', and THL Partner Defendants' Refco stock holdings on the eve of the IPO, and the value thereof at the offering price, as set forth in the Prospectus:

| Defendant | Stock Held at IPO | Value at IPO Price |
|---|---|---|
| Bennett | 48,427,000 shares | $1,065,394,000 |
| Thomas H. Lee Equity Fund V, L.P. | 44,322,000 shares | $975,084,000 |
| Thomas H. Lee Parallel Fund V, L.P. | 11,500,000 shares | $253,000,000 |
| Thomas H. Lee Equity (Cayman) Fund V, L.P. | 611,000 shares | $13,442,000 |
| 1997 Thomas H. Lee Nominee Trust | 73,000 shares | $1,606,000 |
| Sherer | 464,000 shares | $10,208,000 |
| Sexton | 596,000 shares | $13,112,000 |
| Murphy | 534,000 shares | $11,748,000 |
| Maggio | 503,000 shares | $11,066,000 |

| Defendant | Stock Held at IPO | Value at IPO Price |
|-----------|-------------------|--------------------|
| Klejna | 261,000 shares | $5,742,000 |
| Breitman | 13,000 shares | $286,000 |
| Gantcher | 13,000 shares | $286,000 |
| O'Kelley | 13,000 shares | $286,000 |

660.    With respect to the 56,432,000 shares of Refco stock that were held by the Thomas H. Lee Equity Fund V, L.P, the Thomas H. Lee Parallel Fund V, L.P. and the Thomas H. Lee Equity (Cayman) Fund V, L.P. just prior to the IPO, the Prospectus also identifies defendants Lee, Harkins, Jaeckel, and Schoen as beneficial owners of those shares.

661.    The substantial pecuniary benefits that these Defendants received, and could only have received, through an IPO raises a strong inference that they acted with scienter. Indeed, the THL Defendants (not including their passive co-investors) collectively sold 7.72 million shares in the IPO, receiving cash proceeds of approximately $170 million while retaining a 37.8% ownership stake. Defendant Bennett (through RGHI) sold 5.375 million shares in the IPO, netting over $118 million in cash while retaining a 33.8% stake in the Company. Significantly, a "lock-up" agreement with the Stock Underwriter Defendants was the only impediment preventing the other Officer Defendants from similarly cashing in all or a portion of their equity interests in the IPO. That "lock-up" agreement prevented the other Officer Defendants and the Audit Committee Defendants from selling their shares for 180 days after the IPO – a date that was ultimately preceded by Refco's collapse. The THL Defendants', Officer Defendants' and Audit Committee Defendants' clear motivation to conduct an IPO raises a strong inference of scienter.

248

662.    The Green Shoe Option. The Officer Defendants, the THL Partner Defendants, and RGHI also stood to benefit substantially from the use of the "green shoe" option in case of oversubscription on the IPO. Refco registered nearly four million additional shares for sale in the IPO in case the 26.5 million shares planned for sale in the IPO were over-subscribed. As set forth in the Prospectus, the proceeds from the exercise of this "green shoe" option were distributed directly to the shareholders of record before the IPO, including the Officer Defendants, the THL Partner Defendants, and RGHI. In other words, by creating sufficient demand for Refco stock at the time of the IPO, these Defendants received an extra cash payment from the sale of the shares dedicated to cover the over subscription. The prospect of these cash payments further motivated these Defendants to conceal and misrepresent Refco's true financial condition. Ultimately, there was such strong demand generated around the IPO that it triggered the sale of an additional 3,975,000 shares by Refco to cover over-allotments, the extra proceeds of which went directly to Bennett (through RGHI), the THL Partner Defendants and the Officer Defendants in the form of a "dividend" totaling over $82.2 million (after deduction of the Underwriter Defendants' fees). Upon information and belief, the following chart sets forth the approximate cash payments realized by these Defendants as a consequence of the green shoe option (based on a pro-rata distribution of shares to existing shareholders):

| Defendant | Pre-IPO Interest | Pro Rata Cash Payment |
|---|---|---|
| Bennett (through RGHI) | 42.1% | $34,607,463 |
| Thomas H. Lee Equity Fund V, L.P. | 38.5% | $31,648,155 |
| Thomas H. Lee Parallel Fund V, L.P. | 10.0% | $8,220,300 |
| Thomas H. Lee Equity (Cayman) Fund V, L.P. | 0.53% | $435,676 |

| Defendant | Pre-IPO Interest | Pro Rata Cash Payment |
|---|---|---|
| 1997 Thomas H. Lee Nominee Trust | 0.06% | $49,322 |
| Sherer | 0.40% | $328,812 |
| Sexton | 0.52% | $427,456 |
| Murphy | 0.46% | $378,134 |
| Maggio | 0.44% | $361,693 |
| Klejna | 0.23% | $189,067 |

663. <u>Defendants Focused on IPO Riches</u>. By April 2005, the ground work had been laid for the Officer Defendants, the Audit Committee Defendants and the THL Defendants to sell a huge stake of the Company to the investing public through an IPO. An IPO was extremely attractive to these Defendants because it would allow them to reap huge financial rewards from their ownership stake in the Company. Not only would these Defendants collectively stand to make more than $1 billion from an IPO, but it would have other benefits as well. For example, it would (i) create a public trading market that would allow these Defendants to sell their stock for huge profits or, at a minimum, use their Refco stock as collateral for personal loans; (ii) create a significant capital infusion for the Company that would increase the book value of all Refco shares, including the millions of shares that these Defendants would retain after an IPO; and (iii) result in a huge one-time "special dividend" payment through the green shoe option that would be used to line the pockets of these corporate insiders.

664. A successful IPO would also provide additional benefits to the THL Defendants because they were in the process of marketing a new private equity fund, which required them to raise approximately $7.5 billion from institutional investors. The THL Defendants could

"leverage" the publicity provided by a high-profile IPO of Refco by touting the quick profits they and their co-investors had realized through their involvement with the Company, and thereby market their new fund and raise billions of dollars of additional capital from institutional investors. By demonstrating a quick profit on the Refco IPO, the THL Defendants greatly increased their chances of raising the capital to form a new fund in the hyper-competitive leveraged buyout community. The THL Defendants stood to make huge fees and profits from their new private equity fund.

665.    For example, the Former Refco Officer stated that Refco purchased the Company at which he previously worked because, in his view, Refco was acquiring brokerage companies solely to build volume in order to "get ready for the big payoff which was the IPO." He stated that the New York Five did not care about the quality of revenue at operating units such as the one he ran, because their only objective was to build volume by opening new offices, without evaluating whether adding these offices was a sound business decision. The Former Refco Officer communicated his concerns over these issues to the New York Five, but they did not respond. While he was at first puzzled by senior management's lack of responsiveness, over time it became clear to him that "really they didn't care, because ultimately this was all a house of cards anyway." According to this Former Refco Officer, "the five guys who were running the company were all hooked into the IPO."

666.    RSU Grants to Officers. The Officer Defendants also received huge grants of RSUs in advance of the IPO, and were consequently motivated to conceal Refco's true financial condition. Under the terms of the Restricted Stock Unit agreements, 50% of a grant would vest ratably over four fiscal years, and the other 50% would vest upon the achievements of undisclosed EBIDTA targets. Upon the closing of the LBO and the Bond Offering on August 5,

251

2004, Bennett received 1,203,365 RSUs; Murphy, Sexton and Maggio each received 701,963 RSUs; and Klejna received 350,981 RSUs. On December 6, 2004, Sherer was awarded 690,000 RSUs. These large grants of RSUs motivated the Officer Defendants to conceal Refco's true financial condition in order to conduct an IPO because the RSUs were worthless without a public market for the underlying shares. Further, the RSUs' emphasis on EBIDTA targets also motivated the Officer Defendants to conceal Refco's bad debts, because writing off those debts as required would have substantially reduced EBIDTA and prevented the relevant vesting conditions from being triggered.

667.    RSU Grants to the Audit Committee. Each of the three Audit Committee Defendants also received 20,000 RSUs in advance of the IPO. This arrangement was extremely unusual not only because of its impact on the Audit Committee Defendants' purported independence, but also because the Audit Committee Defendants were the only members of the Board to receive these RSU grants. In other words, the three board members responsible for the "integrity of [Refco's] financial statements" were specially compensated by a massive grant of RSUs that would have been rendered worthless by revelation of Refco's true financial condition because such a revelation would have prevented the IPO from occurring. Accordingly, the highly unusual grant of RSUs to the Audit Committee Defendants also raises a strong inference of scienter.

668.    Bonus Compensation. The Officer Defendants were also motivated to conceal Refco's true financial condition as a result of the Senior Management Bonus Pool Plan ("Bonus Plan"). As discussed in the Prospectus, the Bonus Plan would only pay bonuses to senior management subject to performance criteria based on EBIDTA. Had they not been concealed, the uncollectible receivables would have been written off, thereby causing a substantial reduction

252

in (if not an entire elimination of) Refco's EBIDTA. The Officer Defendants' desire to receive bonuses under the Bonus Plan also raises a strong inference of scienter.

669.    Each of the Inside Defendants had the opportunity to commit fraud, because each of them prepared, reviewed and/or approved the financial statements and other documents containing the materially false and misleading statements and omissions as alleged herein, and thus had the ability to influence and control the content of those statements. RGHI had the opportunity to commit fraud by virtue of its exercise of control over the Company, and its ability to influence and control the content of the Company's public statements, including those that were materially false and misleading as alleged herein.

670.    <u>Review and Payment of Mayer Brown Legal Fees.</u> As CFOs, Trosten and Sherer were responsible for receiving and authorizing the payment of legal bills from Mayer Brown that, on information and belief, described the legal work performed by Mayer Brown in connection with documenting the transactions described above. As General Counsel, Klejna was responsible for authorizing and supervising this outside legal work, and reviewing the subsequent bills. Accordingly, these Defendants were, or should have been, alerted to a bright red flag regarding the fraudulent activities described herein.

671.    <u>Grant Thornton's Motive to Appease Refco's Management.</u> Defendant Grant Thornton was also significantly motivated to actively conceal or recklessly disregard Refco's massive related party receivable and the circular transactions that concealed it. Refco was a prestigious client for Grant Thornton – a client that Grant Thornton did not want to antagonize with probing and thorough audit inquiries. Indeed, Refco had not always taken its auditing business to Grant Thornton. Andersen – the Big Five firm that collapsed in the wake of the notorious Enron scandal – had previously been Refco's auditor. Afterward, former Andersen

partner Mark Ramler, Andersen's engagement partner for Refco, moved to Grant Thornton and brought the Refco account with him. This new business was a major triumph for Grant Thornton, which had picked up the crumbs of Andersen's collection of former clients as it watched the (now) Big Four accounting firms take the overwhelming majority. According to a New York Times article on February 20, 2006, Grant Thornton picked up less than 5% of Andersen's former clients – and none in the S&P 500 – as the remaining firms competed over Andersen's former business. Grant Thornton was thus motivated to restrain its approach to auditing Refco in order to minimize the risk that the Company – the crown jewel former Andersen client – would take its business elsewhere. Willful blindness to Refco's false and misleading financial reporting was the result. In fact, Defendant Grant Thornton performed auditing procedures so deficient, and engaged in such an egregious refusal to see the obvious or to investigate the doubtful, that each time it audited the Company, its audit amounted to no audit at all.

672.    Moreover, Refco was a company that actively anticipated conducting an IPO. The IPO market in 2004 and 2005 had slowed substantially from previous years. At the same time, there was substantial investor interest in companies, like Refco, that dealt in derivatives. In this sluggish market environment, the prospect of acting as Refco's auditor in connection with its IPO, especially in a market eager for investment opportunities in the derivatives business, would have been seen as a major coup for Grant Thornton. Grant Thornton was thus substantially motivated to retain Refco as a client, and ensure that Refco experienced a successful IPO, in order to market itself to other clients in the derivatives industry. This powerful motive also raises a strong inference of Grant Thornton's scienter.

673. 

C.   <u>Additional Allegations of Scienter As to the Audit Committee</u>

674.   The Audit Committee Defendants acted recklessly in the performance of their

duties and, as a direct result, facilitated the fraudulent scheme described herein.  The vital

importance of an audit committee to the integrity of a company's financial reporting is

emphasized by the SEC in the rules promulgated pursuant to the Sarbanes Oxley Act of 2002:

> The audit committee, composed of members of the board of directors,
> plays a critical role in providing oversight over and serving as a check and
> balance on a company's financial reporting system.  The audit committee
> provides independent review and oversight of a company's financial
> reporting process, internal controls and independent auditors.  It provides a
> forum separate from management in which auditors and other interested
> parties can candidly discuss concerns.  By effectively carrying out its
> functions and responsibilities, the audit committee helps to ensure that
> management properly develops and adheres to a sound system of internal
> controls, that procedures are in place to objectively assess management's
> practices and internal controls, and that the outside auditors, through their

own review, objectively assess the company's financial reporting practices.

675.    The Audit Committee Defendants were responsible for assisting the entire board in the oversight of Refco's financial statements. Indeed, it is fundamental that an audit committee have a detailed understanding of the Company, and particularly the adequacy of its financial systems and internal controls, as well as the soundness of the Company's business model (including the procedures for extending "margin" loans to the Company's customers, the existence of related-party transactions, and the collectibility of the Company's receivables).

676.    The IPO Registration Statement set forth the "primary purpose of the audit committee" as:

- Assist the board's oversight of:

  - the integrity of our financial statements;

  - our compliance with legal and regulatory requirements;

  - our independent auditors' qualifications and independence;

  - the performance of our independent auditors and our internal audit function; and

  - prepare the report required to be prepared by the committee pursuant to SEC rules.

677.    The Charter of the Audit Committee also sets forth, in great detail, the duties and responsibilities of the Audit Committee Defendants. These duties included:

(a)    Reviewing and discussing with management, internal audit and the independent auditor the adequacy and effectiveness of Refco's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, through inquiry and discussions with the independent auditors, management and head of internal audit;

256

(b)     Discussing guidelines and policies governing the process by which senior management of Refco and the relevant departments of the Company, including the internal auditing department, assess and manage the Company's exposure to risk, as well as Refco's major financial and other risk exposures and the steps management has taken to monitor and control such exposures;

(c)     Reviewing and discussing with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by the Audit Committee, assigning additional internal audit projects to the head of internal audit;

(d)     Reviewing and discussing with management the Company's administrative, operational and accounting internal controls, including special audit steps adopted in light of the discovery of any significant and material control deficiencies;

(e)     Meeting periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company; and

(f)     Reviewing and discussing with management, the Company's independent auditors and the head of internal audit, material financial arrangements of the Company which do not appear on the financial statements of the Company.

These duties reflect the Audit Committee's comprehensive involvement in Refco's audit and financial reporting processes, and raise a strong inference that, but for the Audit Committee Defendants' reckless disregard for these duties, the falsehoods and misleading disclosures

described above would not have occurred.

678.    The IPO Registration Statement also stated that Defendant O'Kelley would serve as chairman of the audit committee and "qualifies as an independent 'audit committee financial expert' as such term has been defined by the SEC in Item 401(h)(2) of Regulation S-K." In order to satisfy Item 401(h)(2), Defendant O'Kelley was required to have extensive experience relating to reporting financial statements. This Item provides:

> (2) For purposes of this Item, an audit committee financial expert means a person who has the following attributes:

>> (i) An understanding of generally accepted accounting principles and financial statements;

>> (ii) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;

>> (iii) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;

>> (iv) An understanding of internal control over financial reporting; and

>> (v) An understanding of audit committee functions.

679.    Given these specific responsibilities and their supposed expertise, the Audit Committee Defendants were reckless in failing to detect, and in failing to put in measures to prevent, the fraudulent scheme described herein. Indeed, the Audit Committee's reckless failure to perform its duties is demonstrated by the fact that, as of February 28, 2005, Refco's auditors identified two significant deficiencies in the Company's internal controls. As stated in the IPO Registration Statement, a "significant deficiency" is defined as "a deficiency that results in more than a remote likelihood that a misstatement of the financial statements that is more than inconsequential will not be prevented or detected." The specific deficiencies noted were:

(a)    "the need to increase [the Company's] existing finance department resources to be able to prepare financial statements that are fully compliant with all SEC reporting guidelines on a timely basis"; and

(b)    "lack of formalized procedures for closing [the Company's] books."

680.    These two deficiencies fall squarely into the Audit Committee Defendants' area of responsibility, as described above, and should have alerted them that there was a significant risk of fraudulent activity at the Company. Moreover, these deficiencies created an environment where it was easy for Bennett, Maggio and others to fraudulently manipulate Refco's financial statements. As set forth in AU § 316, "fraud risk factors" include "domination of management by a single person or small group" and "weaknesses in internal control."

681.    The internal control deficiencies noted by Grant Thornton had existed through the entirety of fiscal year 2005, and in prior years as well. However, the existence of these deficiencies was not discovered, disclosed, or corrected by the Audit Committee Defendants. If the Audit Committee Defendants had not been reckless in the performance of their responsibilities, they would have discovered these deficiencies – which go to the heart of their oversight responsibilities – long before the auditors noted them in connection with the February 28, 2005 year-end review. Indeed, within two months after a new Controller was hired to improve the manpower in the Company's finance department, that Controller discovered and blew the whistle on the fraud.

682.    To compound their failure to identify these issues, the Audit Committee Defendants took no steps whatsoever to remedy these issues in a timely fashion. For instance, the IPO Registration Statement states that the Company was "in the process" of hiring "additional internal audit and financial personnel" as of August 10, 2005. Thus, approximately

six months after learning of these deficiencies – which they should have known about much earlier – the Audit Committee Defendants were still in the process of attempting to remedy them. While this delay would be reckless under any circumstance, it is particularly reckless here because in the intervening sixth months Refco had conducted two major transactions with respect to the issuance of public securities: the Exchange Offer for the Registered Bonds and the IPO.

683.    The reckless failure of the Audit Committee Defendants to remedy these identified deficiencies in a timely fashion can be explained, at least in part, by their motivation to effect these two transactions in the Company's securities. As explained above, each of the Audit Committee Defendants was granted 20,000 shares of RSUs that vested over a period of time. These RSUs were essentially worthless unless and until Refco conducted an IPO. Upon consummation of the IPO, these units instantly became worth hundreds of thousands of dollars, with the potential of increasing in value in the future. In order to ensure that nothing impeded them from reaping the monetary rewards of the IPO, the Audit Committee Defendants recklessly ignored their responsibilities to immediately correct the identified "significant deficiencies" in Refco's financial controls.

684.    As set forth above, the fraudulent scheme was eventually discovered by a Refco Controller who had been with the Company for only two months. If the Audit Committee Defendants had performed their duties and ensured that this Controller or other new employees had been hired in a timely fashion prior to the Exchange Offer and the IPO, it is likely that the fraud at Refco would have been revealed much earlier, saving investors hundreds of millions of dollars.

### D.    Additional Allegations of Scienter Against the THL Defendants

685.    The THL Defendants were on notice of serious problems at Refco, by virtue of their purported "diligence" process in connection with the LBO that afforded them access to significant inside information of Refco. That process began in late 2003, and involved not only the THL Defendants but also their professional advisors, including legal counsel (the law firm of Weil Gotshal & Manges LLP), a "Big Four" accounting firm (KPMG LLP) and others. However, during the course of that process, Refco and its management failed to provide the THL Defendants and their advisors with certain information requested by the THL Defendants. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

686.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Such information was critical to an understanding of the quality and strength of Refco's balance sheet.

687.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

688. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

689.    The THL Defendants knew that they had not been provided critical financial information from Refco and that Refco's management and accounting functions were of questionable strength. Despite the huge red flags that these facts should have raised, the THL Defendants proceeded to make a formal proposal to conduct the LBO. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ The THL Defendants also recognized that they lacked complete and adequate information regarding Refco's receivables, as evidenced by the list of "Pending Legal, Financing And Tax Due Diligence Requests" that was attached as Exhibit C to the letter and included "[a]nalysis of receivables as at February 28, 2002, 2003, November 30, 2003 and February 29, 2004 quantifying amounts due from ... [c]ustomers; [b]rokers and dealers; [s]hareholder loans; and [o]ther loans, etc." ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

690.    The THL Defendants' inability to obtain important information regarding Refco's receivables continued after the date of the proposal letter. 

691.    On May 17, 2004, KPMG provided a draft report to the THL Defendants which summarized its conclusions following its due diligence efforts. KPMG's report also reflected that Trosten had told KPMG of a $42 million reserve that Refco had been holding for seven years in connection with customer losses in the Asian financial crisis, thus putting the THL

Defendants on notice of long overdue receivables. Thus, the THL Defendants knew, but recklessly disregarded, that KPMG had not been given adequate information to fully assess the quality of Grant Thornton's audits of Refco's financial statements. Nonetheless, the THL Defendants forged ahead with the LBO.

692. According to the VR Complaint, although the THL Defendants at one point requested a meeting with E&Y – Refco's former tax advisor, which had resigned in 2003 due (among other reasons) to Refco's refusal to make its suggested disclosures regarding the RGHI receivables – Bennett refused to allow the meeting, and the THL Defendants simply abandoned the request. Bennett's refusal to allow the meeting—in light of the THL Defendants' knowledge of the Company's "fast and loose" reputation and of the Company's pattern of failing to provide full responses to their diligence requests—should have raised another red flag with the THL Defendants. Had the THL Defendants followed the simple step of insisting on the meeting with E&Y, they likely would have uncovered the fraud.

693. 

The THL Defendants, accordingly, knew that Refco was willing to sweep damaging information under the rug until after the LBO closed, yet they nonetheless proceeded with that transaction.

694.    In late May 2004, just as they were finalizing the documentation for the LBO and preparing to make a public announcement, the THL Defendants learned even more damaging information about Refco when Schoen received a tip from a senior investment banker at Bear Stearns whose cousin was a former Refco executive.  The investment banker reported to Schoen that his cousin, whom the THL Defendants and KPMG would later refer to as "Deep Throat," had told him that Refco had been "sloughing off" trading losses into a Refco subsidiary during the 1990s, and that all was not well with Refco.  According to the Examiner's Report, the investment banker told Schoen that Deep Throat had worked for Refco during the 1990s while this "sloughing off" of losses was occurring.  Upon information and belief, Schoen also knew that the investment banker himself was the grandson of Refco's founder, which further heightens the credibility of the information the banker provided.  ███████████ ████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ██████████████

695.    The THL Defendants conveyed the Deep Throat tip to KPMG on May 26, 2004, · and on May 28, 2004, KPMG sent Schoen a list of questions and additional diligence procedures for the THL Defendants to follow up on to investigate Deep Throat's report.  The top-priority items on the list of additional procedures were to obtain RGHI's financial statements and recent tax returns, reconcile them to Refco's books, and "[i]solate and investigate all items not flowing through from [Refco]."  KPMG also suggested that the THL Defendants "[o]btain details and understand the nature of inter-company financing arrangements, both on- and off-balance sheet."  According to the Examiner's Report, the KPMG partner who proposed these procedures told the Examiner that they would have been "likely fairly simple" to address promptly, and the Examiner "conclude[d] that these procedures, if implemented, should have detected the fraud."

696.   Incredibly, the THL Defendants never asked KPMG to perform **any** of the additional procedures that KPMG had proposed in response to the Deep Throat tip.  Instead, they simply discussed the matter with Bennett, accepted his explanations at face value without any further investigation, and dismissed the tip based solely on his verbal assurances – irrespective of the fact that the tip came from a former Refco employee who claimed to have personal knowledge of the matters he was reporting.



697.   

The THL Defendants accepted those assurances without conducting any further inquiry and without obtaining any corroboration.  By recklessly brushing the "Deep Throat" tip under the rug and failing to investigate beyond talking to Bennett—who had a clear incentive to lie if, as the tip suggested, Refco's management was involved in the inappropriate activity—the THL Defendants missed the opportunity to discover that what Deep Throat said

was true: Refco had been inappropriately "sloughing off" massive losses into related party accounts.

698.    Despite knowing that Refco and its management had refused to provide important information, and had gone so far as to try to conceal adverse information from them, and despite being warned about the precise type of fraud whose disclosure would later cause the Company's downfall, the THL Defendants recklessly went forward with the LBO and acquired a controlling 57% interest in Refco, knowing that the risk would be borne by public investors who purchased Refco's Bonds. Moreover, the THL Defendants undoubtedly took comfort in the fact that they intended to quickly monetize their interests in Refco by conducting a lucrative IPO in the near future, thereby further reducing the THL Defendants' own risk. The documentation for the LBO was signed on or about June 8, 2004 – a mere week after the THL Defendants heard (but did not verify) Bennett's explanation for the Deep Throat tip.

699.    The week after the Merger Agreement was signed, on June 17, 2004, a jury returned a verdict against Refco in a lawsuit brought by Tradewinds Financial. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

700.    Once the THL Partner Defendants' positions as controlling shareholders of Refco were solidified with the closing of the LBO, the THL Defendants had unfettered access to all of Refco's books and records and other inside information. The THL Partner Defendants appointed

four directors (the THL Individual Defendants) to Refco's seven-member board, and Thomas H.

Lee Partners executives Schoen, Jaeckel and George Taylor became President, Treasurer, and

Secretary, respectively, of Refco. Additionally, pursuant to the Management Agreement, THL

Managers (and thereby THL Partners and the THL Individual Defendants) were involved in the

day-to-day management of Refco's operations – services for which THL Managers was paid

over $31 million upon the closing of the LBO, and was to receive additional annual payments of

the greater of $25 million or 1% of Refco's EBITDA.

     701.    By virtue of their status as insiders at Refco, the THL Defendants were aware of

significant problems at the Company, including the gross inadequacy of Refco's accounting and

auditing functions, both internal and external. Yet, the THL Defendants failed to correct those

problems and instead focused their energies on rapidly unloading a significant portion of their

equity stake to unsuspecting public investors through an IPO.

     702.    For example, on or about March 31, 2005, the THL Defendants received a copy

of the letter dated October 15, 2004 from Grant Thornton to Bennett (the "Management Letter"),

describing deficiencies in Refco's internal accounting function. ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████

███████████████████████



704.    At this point, the THL Defendants were aware (if they were not before) of serious

deficiencies in Refco's internal controls which called into question the accuracy and reliability of

its financial reporting.  Nonetheless, the THL Defendants recklessly (or perhaps intentionally)

did not take action to ensure that these deficiencies were resolved prior to the IPO.

705.    The THL Defendants also documented – internally – their knowledge of deficiencies in Refco's internal accounting function. 

Despite their awareness of these deficiencies in early 2005, the THL Defendants pressed forward with the IPO without taking any steps to ensure that these problems were remedied or that the financial statements being disseminated to public investors were accurate.

706.    Similarly, the THL Defendants chose not to replace Grant Thornton as Refco's outside auditor following the LBO, despite knowing that Grant Thornton lacked the necessary competence and independence to continuing serving in that role.



707. ██████████████████████████████

███████████

708. A few months later, in February 2005, KPMG was proposing to do a risk evaluation for Refco in advance of the IPO. On February 25, 2005, Sherer informed KPMG that they would not be proceeding with that evaluation. ████████████████████



709. Thus, ultimately, the THL Defendants put their own interests in completing the IPO quickly and avoiding increased scrutiny and a potential restatement, above those of outside investors like Plaintiffs who were relying upon the accuracy of Refco's financial statements. This deliberate choice by the THL Defendants, particularly when coupled with their knowledge of deficiencies in Refco's internal controls and in its financial and accounting functions, demonstrates a blatant and reckless disregard for the accuracy of Refco's financial statements.

E. **Additional Allegations of Scienter Against Mayer Brown and Collins**

1. **Motive and opportunity**

710. Mayer Brown is a sophisticated law firm that served as primary outside counsel for Refco since at least 1994. As the partner-in-charge of the Refco account, Collins had a

longstanding relationship with the Company going back nearly twenty years. In an article published in *The Street.com* in November 2005, a Refco employee was quoted as stating that "Collins was the go-to-guy at Refco," and that all important transactions and deals were cleared through Collins or Mayer Brown attorneys who worked for Collins.

711.    Refco's dependence on the legal services provided by Mayer Brown is further confirmed by the fact that Refco had a very small in-house legal team which lacked sufficient resources to handle the numerous regulatory, litigation and transaction matters that Refco was involved in on a regular basis. As Refco disclosed in documents publicly filed with the SEC, "most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non-U.S. government agencies or regulatory bodies and exchanges." Refco was regulated domestically by, among others, the Commodity Futures Trading Commission, the SEC, the NASD, the Federal Reserve Board, and the Department of Treasury. Refco also disclosed that its foreign subsidiaries were "regulated extensively by non-U.S. governments, exchanges, self-regulatory organizations, central banks," including the Financial Services Authority in Great Britain and Euronext.liffee. In addition, Refco was involved in numerous litigations and arbitrations in federal and state courts across the country, was the subject of numerous disciplinary actions and fines levied by the various agencies who regulated the Company, and completed approximately nineteen corporate acquisitions between 1999 and 2005. In short, Refco had an enormous need for legal services, and Collins and Mayer Brown were the "go to" outside counsel for Refco from 1994 until October 2005.

712.    Examples of Mayer Brown's representation, through Collins, of Refco, Bennett, and/or Refco-related entities include:

(a)     Representing Bennett and Refco in connection with the LBO;

(b)     Representing Refco in connection with the Bond Offering;

(c)     Representing Refco in connection with the registration of the 144A Bonds;

(d)     Representing Refco in connection with the IPO;

(e)     Representing Bennett in connection with the negotiation of a June 8, 2004 Executive Employment and Non-Competition Agreement between Refco Group Ltd., LLC and Bennett (paragraph 14(ii) of the agreement states that all notices to Bennett under the contract should be directed to Collins);

(f)     Representing Refco in connection with the formation and initial financing of CIM Ventures, Inc., an entity that would later become one of Refco Capital's counterparties in the round-trip transactions;

(g)     Representing Refco in dozens of federal and state court litigations and in arbitrations throughout the world;

(h)     Providing Refco with tax advice;

(i)     Representing Refco in connection with an acquisition of a portion of the Company by BAWAG;

(j)     Representing RGHI in a March 2005 sale of assets to Bridgepoint Capital Ltd.; and

(k)     While Collins' "attorney profile" on the Mayer Brown website now omits any mention of Refco, a profile of him formerly available on "Chambers and Partners" noted that he was the "Lead attorney in Refco's acquisitions of RB&H, Lind-Waldock, LFG, and Main Street Trading Company."

273

713.   In short, the vast majority of important transactions and deals at Refco (including the LBO, Bond Offering, and IPO) were handled by Mayer Brown and billed through Collins. This unquestionably gave Mayer Brown and Collins the opportunity to commit fraud by structuring the sham transactions alleged herein, and by drafting, reviewing, and commenting upon the Company's public disclosures.

714.   Mayer Brown, Collins, and the other Mayer Brown employees who worked on the round trip transactions (including Koury and Monk) also possessed a strong motive to participate in the fraudulent scheme in order to ensure that Bennett and Refco continued to direct a steady flow of lucrative legal work to Mayer Brown. Refco was one of Mayer Brown's largest clients, accounting for approximately $5 million in billings per year. This amount represented approximately half the total amount of billings for which Collins was responsible at the firm. Mayer Brown, Collins, and other Mayer Brown attorneys knew that if they disclosed the fraud taking place at Refco, the Company would collapse and the river of fees Refco provided to them would dry up. Moreover, if the scheme was revealed at any point after Mayer Brown had worked with Refco in transferring its debts to RGHI or in documenting the round-trip transactions, Mayer Brown, Collins, and other Mayer Brown employees would face certain liability for their role (as has proved to be the case). Thus, they were motivated to perpetuate the fraudulent scheme to cover up their involvement. Further, Collins was motivated to participate in the scheme in order to retain and/or increase his salary, bonus and position as an influential partner at Mayer Brown.

## 2.     Knowledge and/or reckless disregard of the fraud

715.   Mayer Brown, Collins, and other attorneys employed by Mayer Brown, including Koury and Monk, acted with scienter with respect to the fraudulent scheme and the materially false and misleading statements discussed herein, in that they had actual knowledge that the

274

fraudulent scheme lacked any proper business purpose and was a sham designed solely to allow Refco to issue materially false and misleading financial statements and make other materially false and misleading public statements.

716.    As described above, there is abundant direct evidence that Collins and Mayer Brown were knowing and key participants in nearly every aspect of the fraudulent scheme, from the very first efforts by Refco to transfer uncollectible debts to RGHI, through the many years-long cover-up that Collins and Mayer Brown orchestrated and documented through the sham related-party loan transactions.

717.    As described above, Collins and Mayer Brown participated with Bennett and others in orchestrating one of the very first steps of the fraudulent scheme by negotiating, designing, and drafting the documentation for a plan to transfer the uncollectible Niederhoffer debts off the books of Refco and convert them into a sham receivable purportedly owed by RGHI. These activities involved Collins as well as a number of other attorneys employed by Mayer Brown, including Monk. Mayer Brown, Collins, and other Mayer Brown attorneys who participated in these activities (including Monk) knew or recklessly disregarded that the scheme to transfer these uncollectible receivables from Refco to RGHI was a blatant fraud. There was no conceivably valid business purpose for RGHI—which Collins, Monk and Mayer Brown knew was a shell entity that was controlled by Bennett and had no operational component—to agree to pay Refco $71 million for the "right" to collect on the Niederhoffer debt. This was particularly true since *Mayer Brown, through Collins, negotiated and drafted the documents whereby Refco reduced the value of that "right" to zero by releasing the right to pursue Niederhoffer to repay that debt.* Thus, Collins and Mayer Brown knew that the so-called "right" to collect on the

Niederhoffer debt was worthless, and the sole purpose for RGHI's "paying" for this debt was so Refco could avoid writing it off in accordance with applicable accounting rules and regulations.

718.    Moreover, Mayer Brown, Collins, and other Mayer Brown attorneys (including Koury and Monk) knew of the existence and increasing amount of the RGHI receivable to Refco. The same general process used to shuffle the Niederhoffer debt off Refco's books was also used to transfer hundreds of millions of dollars of additional uncollectible debt to RGHI. As discussed above, by no later than October 1999, Collins and Mayer Brown knew that the Niederhoffer debt was not the only so-called "receivable" that RGHI owed to Refco. Indeed, on or about October 15, 1999, Collins recorded in his own handwriting that RGHI's net worth was represented by the value of its investment in Refco *"Minus Loans to RGH[I]."* This handwritten note demonstrates that Collins knew that RGHI owed money to Refco, and Collins' use of the plural "loans" compels the conclusion that he was aware of more than just the Niederhoffer bad debts that he himself helped Refco transfer to RGHI.

719.    By June 2002, as discussed above, Collins and Mayer Brown had direct knowledge that the RGHI receivable totaled at least $350 million. Indeed, it appears that Collins himself inserted language into a purchase agreement that Mayer Brown drafted, which acknowledged the existence of a $350 million "inter-company debt of Refco Group Holdings, Inc."

720.    The knowledge of, and direct participation in, the fraudulent scheme by Mayer Brown, Collins, and other Mayer Brown employees is further confirmed by their well-documented involvement in the fraudulent round-trip loan transactions, *i.e.*, the "cover-up." Mayer Brown attorneys drafted all of the documentation for seventeen of those transactions and had a thorough understanding of the nature, timing and purpose of those transactions. In

276

particular, Mayer Brown, Collins, and the other Mayer Brown employees who participated in the documentation of these transactions (including Koury and Monk) knew or recklessly disregarded that these fraudulent transactions were designed solely to conceal the existence of the RGHI receivable.

721.    The Examiner concluded that "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors." The Examiner concluded that the features of the transactions indicate that the round trip loans "had no legitimate business purpose" and were "uncollateralized short-term, back-to-back loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to another Refco entity, with guarantees and indemnities by [Refco] to eliminate any risk to the third party. Thus, the transactions appeared to lack any economic substance . . . [and] appear suspicious on their face." Moreover, the Examiner's Report noted that none of the Mayer Brown witnesses interviewed by the Examiner could articulate any legitimate business purpose for the round trip loans.

## XIV.  LOSS CAUSATION

722.    Throughout the Class Period, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company, including the misrepresentations about its financial condition and results of operations.

723.    The Company's financial condition and results, including the collectibility of its receivables and the nature and extent of its transactions with related parties, were material information to Plaintiffs and the other members of the Class. Had the truth been disclosed to the market at or before the time of the Bond Offering or the IPO, Plaintiffs and the other Class

members would have been unwilling to purchase the Company's securities, and the Company would have been unable to complete those offerings.

724.    When the truth about the Company was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant losses to Plaintiffs and the other Class members. The October 10, 2005 disclosure of a $420 million related-party loan to RGHI, and that the Company's prior financial statements could not be relied upon, was a partial disclosure of the misrepresentation and omissions, and led to a flurry of trading in which Refco's stock price plunged 45%, from its $28.56 close on October 7, 2005 to its $15.60 close on October 10. The stock price continued its freefall in the ensuing days, dropping 11% to close at $13.85 on October 11, 2005 following the announcement that the SEC had launched an investigation of Refco, and falling another 22% to close at $10.85 on October 12, 2005 upon news of Bennett's arrest on securities fraud charges. As customers ran for the exits amidst the growing uncertainty caused by the revelation of Defendants' misrepresentations and omissions, Refco was forced to shut down its Refco Capital Markets unit on October 13, whereupon the stock dropped another 27% to $7.90 before trading was halted by the New York Stock Exchange. Similarly, the Bonds – which were trading at 108.625% of par on October 7, 2005 and had never traded below 103% of par in the preceding twelve months – fell to 91.50% on October 11; approximately 76% on October 12; and as low as 16% by October 14, 2005. By October 17, 2005, merely one week after the initial revelation of the previously-undisclosed $420 million loan to Bennett, Refco announced that it was filing for bankruptcy. Following that announcement, the truth was finally revealed to the market, and Refco's stock fell to a price of approximately 65 cents, nearly a 98% decline.

278

725.    The declines in the Company's securities prices following the revelations of October 11-17, 2005 and the resulting losses suffered by Plaintiffs and the other members of the Class are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's financial condition.

726.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the other members of the Class.

## XV.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

727.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. First, the statutory safe harbor does not apply to false or misleading statements that are made in connection with an initial public offering (such as the Bond Offering and the IPO) and/or are contained in financial statements which purport to have been prepared in accordance with GAAP. Second, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made. Rather, the false or misleading statements complained of in this Complaint concerned historical and/or current facts and conditions existing at the time the statements were made.

728.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because at the

time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Refco or of a Defendant who knew that the statement was materially false or misleading when made.

## XVI.  PRESUMPTION OF RELIANCE

### A.    Reliance Should Be Presumed With Respect to Defendants' Omissions

729.    Throughout the Class Period, Plaintiffs and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's securities, including in the Offering Memorandum for the Bonds, the Bond Registration Statement, the 2005 10-K, the First Quarter 2006 10-Q and the IPO Registration Statement and Prospectus. Plaintiffs and the members of the Class would not have purchased the Company's securities at artificially inflated prices if Defendants had disclosed all material information, including the nature and magnitude of its uncollectible receivables and the undisclosed related-party transactions. Thus, reliance by Plaintiffs and the Class members should be presumed with respect to Defendants' omissions of material information.

### B.    Reliance Upon the Offering Memorandum and Road Show Should Be Presumed For All Purchasers of 144A Bonds in the Initial Offering

730.    The Offering Memorandum for the Bonds instructed: "You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different." Thus, in connection with their decisions to purchase 144A Bonds in the Bond Offering, investors relied heavily on the Offering Memorandum and the financial and other information contained therein, and the information and documentation provided at the Bond Road Show (which was consistent with the information in the Offering Memorandum). Because the Company instructed investors to rely on

that information, such reliance should be presumed for all investors who purchased 144A Bonds in the initial offering.

731.    Moreover, the pricing of the 144A Bonds in the Bond Offering was determined by the Company and the Bond Underwriters, in large part based upon institutional investors' input and indications of interest following the Road Show and their review of the Offering Memoranda. The pricing of the 144A Bonds was also influenced by the ratings given to the 144A Bonds by the ratings agencies, after the Bond Underwriter Defendants, the THL Defendants and Refco presented them with substantially the same information as was presented to investors in the Bond Offering Memorandum and at the Road Show. Had truthful and accurate information been provided to the ratings agencies and to investors in the lead-up to the Bond Offering, the 144A Bond ratings would have been lower and investors in the 144A Bonds – all of whom were sophisticated investors – would have been unwilling to accept the pricing and terms at which the 144A Bonds were ultimately issued. The initial offering price of the 144A Bonds was, therefore, the product of numerous sophisticated institutions' evaluation of the information provided in the Offering Memorandum and at the Road Show, and reliance upon that information should be presumed for all initial offering purchasers of 144A Bonds.

C.    **Reliance Should Be Presumed Because Fraud
Created the Market for the Company's Securities**

732.    As alleged herein, in connection with the offer and sale of the Bonds and the Refco stock, certain Defendants entered into and participated in a scheme to employ devices, schemes, and artifices to defraud, and to engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon Plaintiffs and the other members of the Class. This scheme included the offering and sale of the Bonds and Refco stock based on materially misleading information, and without disclosing material facts.

733.    The information contained in the Offering Memorandum and disseminated at the Bond Road Show was materially false, as alleged herein. Had truthful and complete information been provided to potential investors at the time of the Bond Offering, and had investors known that Refco had been engaging in repeated round-trip transactions at the end of each fiscal year since 1999 in order to conceal the existence of hundreds of millions of dollars in uncollectible receivables, there would have been no market for the Bonds. Likewise, had Refco's true financial picture been disclosed to investors at the time of the Bond Offering, investors would have known that the credit risk associated with the Bonds was substantially greater than they otherwise believed, and Refco would have been in violation of the restrictive covenants of its loan agreements. Moreover, Refco and/or its subsidiaries likely would have been in violation of the CFTC's minimum net capital requirements and/or other regulatory capital requirements, thereby precluding Refco from conducting a primary line of business and threatening the Company's very existence. As Refco acknowledged in the Offering Memorandum itself: "Our failure to maintain the required net capital could result in suspension or revocation of our registration by the SEC and our suspension or expulsion by the NASD, and could ultimately lead to our liquidation." The Bond Registration Statement similarly stated: "*If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business.*" (Emphasis in original.) Accordingly, if the Company's true financial condition were disclosed at the time of the Bond Offering, there would have been no market for the Bonds.

734.    Similarly, had truthful and complete information been provided to potential investors at the time of the IPO, and had the fraudulent scheme alleged herein not occurred, investors would have known that the Company's financial condition was materially weaker than was represented, Refco would have been in violation of its debt covenants, and Refco and/or its

282

subsidiaries would likely have been in violation of the CFTC's minimum net capital requirements and/or other regulatory capital requirements, thereby precluding Refco from conducting a primary line of business and threatening the Company's very existence. Under these circumstances, there would have been no market for the Company's stock.

735.    The scheme described herein was intended to, and did, bring the Bonds and the Refco stock into the market fraudulently. Thus, the fraud alleged herein created a market for the Bonds and the Refco stock which would not otherwise have existed. Absent the fraud, there would have been no Bond Offering, no Exchange Offer, and no IPO.



736.    When purchasing the Company's securities in the Bond Offering, in the IPO, and in the secondary market, Plaintiffs and the Class members reasonably relied on the availability of those securities in the market as an indication of their genuineness. Plaintiffs and the Class members relied on the integrity of the market to furnish securities that were not the product of a fraudulent scheme. Thus, the reliance of Plaintiffs and the Class members on Defendants' fraudulent scheme, including their misstatements and omissions, should be presumed.

**D.    Reliance Should Be Presumed Under the Fraud-on-the-Market Doctrine**

737.    Throughout the Class Period, the Company's securities traded in an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

283

738.     Immediately after the Bond Offering, a secondary market developed for trading of the 144A Bonds, which traded in the PORTAL market and among dealers in the Over-the-Counter market.  The market for the 144A Bonds consisted exclusively of institutional investors and other sophisticated investors, known as Qualified Institutional Buyers or QIBs.  These institutional investors employed professional securities analysts who read and analyzed all relevant and publicly available information regarding the Company and the Bonds, and promptly adjusted the prices at which they were willing to buy and sell the Bonds accordingly.  There was extensive trading activity in the secondary market for the 144A Bonds between August 5, 2004 and May 10, 2005, as demonstrated by the fact that the average weekly trading volume as a percentage of the face value of the 144A Bonds was approximately 2%.  Furthermore, the estimated average bid-ask spread for the 144A Bonds was relatively low and was within a range that is indicative of market efficiency.

739.     The secondary market for the Bonds broadened with the issuance of the Registered Bonds in April 2005, which were freely tradeable in the public markets.  At all relevant times, major brokerage houses such as Credit Suisse, Bank of America, Deutsche Bank, Bank of New York, Morgan Stanley Dean Witter, Citigroup Capital Markets, Inc., and J.P. Morgan Chase Bank served as market makers and/or dealers in the Bonds, and information regarding the prices at which the 144A Bonds and Registered Bonds were trading was publicly available through pricing services including the NASD's Trade Reporting and Compliance Engine (TRACE).  There was extensive trading activity in the secondary market for the Registered Bonds between May 11, 2005 and October 7, 2005, as demonstrated by the fact that the average weekly trading volume as a percentage of the face value of the Registered Bonds was in excess of 1%, and close to 2%.  Furthermore, the estimated average bid-ask spread for the

Registered Bonds was relatively low and was within a range that is indicative of market efficiency.

740.    At all times after the Bond Offering, the Company was consistently followed by securities analysts from Moody's and S&P – who published credit ratings on the Bonds. In addition, the business press frequently reported information about the Company. During this period, Refco and the Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts, and institutional investors; assimilated into the ratings agencies' ratings for the Bonds and into analysts' and investors' analysis of the creditworthiness and the probability of default of the Bonds; and reflected in the market price of the Bonds.

741.    The market for Refco's common stock was an efficient market as well, characterized by active trading and significant institutional ownership. ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████

742.    From the time of the IPO until October 7, 2005:

(a)    Refco's stock was actively traded on the New York Stock Exchange;

(b)    The market price of Refco's stock reacted promptly to the public dissemination of new or unexpected information regarding the Company, including rapid and statistically significant reactions to significant unexpected disclosures;

285

(c)    There were at least five securities analysts who followed and published research reports regarding Refco that were publicly available to investors, including analysts from BAS; Goldman Sachs; Credit Suisse; Weeden & Co.; and Sandler O'Neill;

(d)    The average weekly trading volume for Refco's stock from August 12, 2005 through October 7, 2005 was over 3.2 million shares, or 2.5% of total outstanding shares, and in fact from August 12, 2005 through October 7, 2005 the weekly trading volume exceeded 1% of the total outstanding shares every week, while exceeding 2% in all but two weeks;

(e)    The Company's market capitalization was in excess of $3 billion;

(f)    Large and sophisticated institutions owned large blocks of Refco common stock (including, among others, Fidelity, Barclays, T. Rowe Price, Wellington Management Company, TIAA-CREF, and Oppenheimer Funds), with over 60% of the IPO shares having been allocated to the top 50 institutional shareholders in the United States; and

(g)    There was active trading of short common stock positions, as well as active trading of option contracts, demonstrating interest and participation by sophisticated investors and arbitrageurs.

(h)    The average bid-ask spread for Refco's stock was relatively low and was within a range that is indicative of market efficiency.

743.    From October 7, 2005 through the end of the Class Period on October 17, 2005, the market for Refco's securities remained efficient, as the trading prices of the Company's securities continued to reflect all publicly available information, including the partial disclosures

286

of the fraud. The indicia of market efficiency discussed above remained present during this time period.

744.    Plaintiffs and the other Class members relied on the integrity of the market price for the Company's securities and are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## XVII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT NINE

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder,
On Behalf of Plaintiffs and All Members of the Class,
Against the Officer Defendants, the Audit Committee Defendants, Trosten,
the THL Defendants, Mayer Brown, Collins, and Grant Thornton**

745.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

746.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against Defendants Bennett, Trosten, Murphy, Sherer (with respect to statements and omissions made after he joined Refco in January 2005), Maggio, Sexton, Klejna, Silverman, O'Kelley, Gantcher, Breitman, Lee, Harkins, Jaeckel, Schoen, the THL Partner Defendants, Mayer Brown, Collins, and Grant Thornton (collectively, the "Section 10b-5(b) Defendants").

747.    As alleged herein, throughout the Class Period, the Company and the Section 10b-5(b) Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. Among other things, the Offering

Memorandum, the slides for the Bond Road Show, the Bond Registration Statement, the Forms 10-K and 10-K/A, the IPO Registration Statement, and other SEC filings and press releases by Refco all contained materially false and misleading statements of fact as detailed above.

748.    The Company's and the Section 10b-5(b) Defendants' false and misleading statements and omissions were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiffs and the other members of the Class to purchase the Company's securities at inflated prices.

749.    The Company and the Section 10b-5(b) Defendants were each individually and collectively responsible for making one or more of the statements and omissions alleged herein, by virtue of having made false or misleading verbal statements during the Bond Road Show, or by virtue of having prepared, reviewed, commented on, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.  Additionally, Mayer Brown was identified in the Offering Memorandum and the IPO Registration Statement as Refco's counsel, and readers of those documents understood that Mayer Brown was involved in the preparation and review of those documents.

750.    Mayer Brown and the THL Partner Defendants are each responsible for not only their own acts, but also the acts of all of their partners and employees who violated Section 10(b) and Rule 10b-5(a) and (c), under principles of *respondeat superior*.  The acts alleged herein by Collins, Koury, and Monk and other Mayer Brown partners and employees were undertaken by those individuals as agents of Mayer Brown, were within the scope of their agency, and were calculated to facilitate or promote Mayer Brown's business.  Likewise, the acts alleged herein by

288

the THL Individual Defendants and other officers and employees of the THL Partner Defendants were undertaken by those individuals as agents of the THL Partner Defendants, were within the scope of their agency, and were calculated to facilitate or promote the THL Partner Defendants' business.

751.    As described above, the Company and the Section 10b-5(b) Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Refco securities during the Class Period.

752.    The Company's and the Section 10b-5(b) Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

753.    In ignorance of the false and misleading nature of the Company's and the Section 10b-5(b) Defendants' statements and omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

754.    The market price for Refco securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Section 10b-5(b) Defendants, as described above.

755.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT TEN

### For Violations of Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) Promulgated Thereunder, On Behalf of Lead Plaintiffs and All Members of the Class, Against RGHI

756.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

757.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class against RGHI.

758.    As alleged herein, throughout the Class Period, Bennett, the Company, RGHI and others, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for, and market prices of, Refco securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Refco securities at artificially inflated prices. In furtherance of this unlawful plan, scheme and course of conduct, the Company and RGHI took the actions described at length above.

759.    As described above, the Company and Defendant Bennett engaged in the fraudulent activity described herein knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Refco securities during the Class Period. The knowledge and scienter of Defendant Bennett, as the sole stockholder and CEO of RGHI, are imputed to RGHI. Moreover, as a party to the sham transactions alleged herein, with knowledge (through Bennett) that the purpose and effect of those transactions was to manipulate and materially misstate

290

Refco's reported financial condition, RGHI acted with scienter and is subject to liability under Section 10(b) and Rule 10b-5(a) and (c).

760.    The Company's and RGHI's fraudulent activities occurred in connection with the purchase or sale of the Company's securities.

761.    In ignorance of the Company's and RGHI's fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

762.    The market prices for Refco securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by the Company and RGHI, as described above.

763.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT ELEVEN

### Pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder, on Behalf of Plaintiffs and all Class Members Against Mayer Brown and Collins

764.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

765.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class against Collins and Mayer Brown.

766.    As alleged herein, throughout the Class Period, Collins and Mayer Brown, and others, including but not limited to Koury, Monk and other partners and employees of Mayer Brown, in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, orchestrated and carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for, and market prices of, Refco securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Refco securities at artificially inflated prices.  In furtherance of this unlawful plan, scheme and course of conduct, Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown took the actions described at length above, including designing and implementing sham transactions used by Refco to fraudulently transfer uncollectible debt and designing and participating in blatantly fraudulent sham loan transactions designed to conceal the uncollectible debt and manipulate Refco's reported financial results while at the same time allowing Mayer Brown to be publicly identified as counsel to Refco.  As described above, these "loan" transactions were shams that served no legitimate business purpose and, as Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown knew or recklessly disregarded, they were designed solely for the purpose of furthering the fraudulent scheme described herein.

767.    As described above, Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown engaged in the manipulative and deceptive acts described herein in furtherance of the scheme to materially misstate Refco's financial statements.  They directly participated in this scheme knowingly and intentionally or in such an extremely reckless manner

as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Refco securities during the Class Period.

768.    Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown acted with scienter and violated Section 10(b) and Rule 10b-5(a) and (c) in that they participated in the design, negotiation and documentation of the sham transactions alleged herein with knowledge and/or recklessly disregarding that the purpose and effect of those transactions was to manipulate and materially misstate Refco's reported financial condition.

769.    Mayer Brown is responsible for not only its own acts, but also the acts of all of its partners and employees who violated Section 10(b) and Rule 10b-5(a) and (c), including without limitation Collins, Koury, and Monk, under principles of *respondeat superior*. The acts alleged herein by Collins, Koury, and Monk and other Mayer Brown partners and employees were undertaken by those individuals as agents of Mayer Brown, were within the scope of their agency, and were calculated to facilitate or promote Mayer Brown's business.

770.    The fraudulent activities of Collins, Mayer Brown, Koury, Monk, and other employees and partners of Mayer Brown occurred in connection with the purchase or sale of the Company's securities.

771.    In ignorance of the fraudulent conduct of Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown, and relying directly or indirectly on the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

772.    The market prices for Refco securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by Collins, Mayer Brown, Koury, Monk, and others, as described above.

773.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT TWELVE

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of 144A Bonds in the Bond Offering,
Against Bennett, Grant, RGHI, the THL Partner Defendants, Lee, Murphy,
Trosten, Sexton, Silverman, and Maggio
(Based on Violations of Section 10(b) and Rule 10b-5 by Refco Group,
Refco Finance Holdings, and Refco Finance)**

774.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

775.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Bennett, Grant, RGHI, the THL Partner Defendants, Lee, Murphy, Trosten, Sexton, Silverman, and Maggio (collectively, the "Section 20(a) Bond Offering Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased 144A Bonds in the Bond Offering.

776.    As alleged herein, Refco Group, Refco Finance Holdings, and Refco Finance violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, all in connection with the Bond Offering. This fraudulent conduct was undertaken with scienter because Refco Group, Refco Finance Holdings, and Refco Finance are charged with the knowledge and scienter of

Defendant Bennett and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme. But for the fact that Refco Group, Refco Finance Holdings, and Refco Finance have filed for bankruptcy protection, they would be named as defendants on the Section 10(b) claims alleged herein.

777.    PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased 144A Bonds in the Bond Offering suffered damages in connection with their purchases of those securities, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5 by Refco Group, Refco Finance Holdings, and Refco Finance.

778.    The THL Partner Defendants were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to their approximate 57% ownership interest in New Refco, the sole member of Refco Group.

779.    Defendant Lee was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to his position as Chairman and CEO of Thomas H. Lee Partners, and the fact that Thomas H. Lee Partners or Lee controlled each of the other THL Partner Defendants, which in turn controlled Refco Group.

780.    Defendants Bennett and Grant were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to their approximate 43% ownership interest (through their ownership of RGHI) in New Refco, the sole member of Refco Group.

781.    Defendant RGHI was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to its approximate 43% ownership interest in New Refco, the sole member of Refco Group.

782.    Defendants Bennett, Murphy, Trosten, Sexton, Silverman and Maggio were controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance at the time of the Bond Offering due (among other reasons alleged herein) to their executive positions with Refco Group and Refco Finance Holdings (of which Refco Finance was a wholly-owned subsidiary at the time of the Bond Offering); their direct involvement in the day-to-day business and operations of each entity, including the preparation of their financial statements; their participation in the Bond Road Show where the Bonds were marketed to investors and the contents of the prospectus were discussed; and/or their participation in the preparation and dissemination of the false and misleading prospectus for the Bonds.

783.    By virtue of the foregoing, the Section 20(a) Bond Offering Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, Refco Finance Holdings, and Refco Finance, including the content and dissemination of their financial statements and Offering Memorandum.

784.    The Section 20(a) Bond Offering Defendants did not act in good faith in connection with the conduct at issue in this Claim. Further, these defendants directly or indirectly induced the act or acts constituting the violations of Section 10(b) and Rule 10b-5 by Refco Group, Refco Finance Holdings, and Refco Finance by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, approving and assisting in the preparation of the Offering Memorandum, and/or participating in the Bond Road Show where false statements were made to investors.

785.    The Section 20(a) Bond Offering Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless

disregard for the truth. Facts giving rise to a strong inference of Defendant Grant's culpability include: (1) that, upon information and belief, he continued to play a significant role in the management of the Company, despite leaving the Company, through the date of the Bond Offering; (2) that he received substantial proceeds from the LBO, which could not have occurred absent the Bond Offering; and (3) his indictment on criminal charges of securities fraud and conspiracy to commit securities fraud in connection with the Bond Offering. Upon information and belief, Grant and Bennett shared equally in the THL Partner Defendants' $507 million cash payment to RGHI; Refco Group's transfer of $550 million in cash plus equity interests valued at $231 million to RGHI; plus an additional $12 million in cash and $108 million in debt forgiveness. The facts giving rise to a strong inference of the other Section 20(a) Bond Offering Defendants' culpability are alleged in detail above.

786.    By virtue of their positions as controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance and their culpable participation in those entities' violations of Section 10(b) in connection with the Bond Offering, the Section 20(a) Bond Offering Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco Group, Refco Finance Holdings, and Refco Finance.

## COUNT THIRTEEN

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act, On Behalf of Purchasers of Bonds After the Bond Offering and Before the Date of the IPO, Against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Trosten, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman (Based on Violations of Section 10(b) and Rule 10b-5 By Refco Group)**

787.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

297

788.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Trosten, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman (collectively, the "Section 20(a) Pre-IPO Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased Bonds after the Bond Offering but prior to the IPO.

789.    As alleged herein, Refco Group violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, during the period between the Bond Offering and the IPO. This conduct was undertaken with scienter, because Refco Group is charged with the knowledge and scienter of Defendant Bennett and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme. But for the fact that Refco has filed for bankruptcy protection, it would be named as a defendant on the Section 10(b) claims alleged herein.

790.    PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased Bonds after the Bond Offering but prior to the IPO suffered damages in connection with their purchases of those securities, as a direct and proximate result of Refco Group's violations of Section 10(b) and Rule 10b-5.

791.    The THL Defendants were controlling persons of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to an approximate 57% ownership interest in New Refco, the sole member of Refco Group, and the THL Individual Defendants' service on New Refco's Board of Managers.

792.    Defendant Bennett was a controlling person of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to his 43% ownership interest (through RGHI and/or the Bennett Trust) in New Refco, the sole member of Refco Group.

793.    Defendant RGHI was a controlling person of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to its ownership interest in New Refco, the sole member of Refco Group.  From the completion of the Bond Offering until the fiscal quarter ended February 28, 2005, RGHI owned approximately 43% of New Refco.  During the fiscal quarter ended February 28, 2005, RGHI transferred approximately 40% of its equity interests in New Refco to the Bennett Trust, and thereafter owned approximately 26% of New Refco.

794.    Defendant Bennett Trust was a controlling person of Refco Group from the fiscal quarter ended February 28, 2005 through the date of the IPO, due to its ownership of approximately 17% of New Refco, the sole member of Refco Group.

795.    Defendants Bennett, Murphy, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to their executive positions with Refco Group; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Bond Registration Statement and other public statements by Refco Group.

796.    Defendant Trosten was a controlling person of Refco Group from the completion of the Bond Offering until his resignation in October 2004, due (among other reasons alleged herein) to his executive positions with Refco Group; his direct involvement in its day-to-day

299

operations, including his direct responsibility for its financial reporting and accounting functions;

and his participation in the preparation and/or dissemination of public statements by Refco

Group.

797.    Defendant Sherer was a controlling person of Refco Group from the time he

joined the Company in January 2005 until the date of the IPO, due (among other reasons alleged

herein) to his executive positions with Refco Group; his direct involvement in its day-to-day

operations including his direct responsibility for its financial reporting and accounting functions;

and his participation in the preparation and/or dissemination of the Bond Registration Statement

and other public statements by Refco Group.

798.    Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco

Group from the completion of the initial offering of the Bonds until the date of the IPO, due

(among other reasons alleged herein) to their service on the Audit Committee of New Refco,

which also performed the functions of an audit committee for Refco Group. As members of the

Audit Committee, these defendants were responsible for: overseeing Refco Group's financial

reporting, accounting, and internal controls; overseeing the activities of Refco Group's outside

auditors and reviewing the scope and results of those audits with the auditors; meeting with and

making recommendations to the managers of Refco Group concerning the foregoing activities;

and approving the false and misleading financial statements and other public statements as

referenced herein.

799.    By virtue of the foregoing, each of the Section 20(a) Pre-IPO Defendants had the

power to influence and control, and did influence and control, directly or indirectly, the decision-

making of Refco Group, including the content and dissemination of its financial statements and

registration statements, from the date of the completion of the initial offering of the Bonds until the date of the IPO.

800.    The Section 20(a) Pre-IPO Defendants did not act in good faith in connection with the conduct at issue in this Claim.  Further, each of these defendants directly or indirectly induced the act or acts constituting Refco Group's violations of the Exchange Act by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, and/or signing and/or approving the false and misleading statements that were issued by Refco Group.

801.    The Section 20(a) Pre-IPO Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that Refco Group's public statements were materially false or misleading, or knowingly omitted material information, or they acted with reckless disregard for the truth.

802.    Facts giving rise to the Section 20(a) Pre-IPO Defendants' culpability are alleged in detail above.

803.    By virtue of their positions as controlling persons of Refco Group and their culpable participation in Refco Group's violations of Section 10(b) and Rule 10b-5 in connection with the purchase or sale of securities after the completion of the initial offering of Bonds and before the IPO, the Section 20(a) Pre-IPO Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco Group.

## COUNT FOURTEEN

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of Bonds and/or Refco Common Stock
On and After the Date of the IPO, Against the
THL Defendants and Defendants Bennett, RGHI, the
Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna,
O'Kelley, Gantcher, and Breitman
(Based on Violations of Section 10(b) and Rule 10b-5 By Refco)**

804.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

805.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman (collectively, the "Section 20(a) IPO Defendants"), on behalf of Plaintiffs and all members of the Class who purchased Bonds and/or Refco stock during the Class Period.

806.    As alleged herein, Refco violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct in connection with the IPO and thereafter. This fraudulent conduct was undertaken with scienter, because Refco is charged with the knowledge and scienter of Defendant Bennett and others who of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.

807.    Plaintiffs and the other members of the Class who purchased Bonds or Refco stock during the Class Period suffered damages in connection with their purchases of those securities, as a direct and proximate result of Refco's primary violations of Section 10(b) and Rule 10b-5.

302

808. The THL Defendants were controlling persons of Refco from the date of the IPO through and including October 17, 2005, due (among other reasons alleged herein) to their approximate 44% direct and indirect ownership interest in Refco, and due to the service of the THL Individual Defendants on Refco's eight-member Board of Directors.

809. Defendant Bennett was a controlling person of Refco from the date of the IPO through and including October 18, 2005, due (among other reasons alleged herein) to his 34% ownership interest in Refco (through RGHI and the Bennett Trust), as well as his positions as Chairman of the Board, President, and Chief Executive Officer of Refco.

810. Defendants RGHI and the Bennett Trust were controlling persons of Refco on and after the date of the IPO due (among other reasons alleged herein) to their approximate 20% and 14% respective ownership interests in Refco, and the fact that they were controlled by Bennett and used by him to hold his interest in the Company.

811. Defendants Bennett, Murphy, Sherer, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco on and after the date of the IPO, due (among other reasons alleged herein) to their executive positions with Refco; their direct involvement in the day-to-day operations of Refco, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of Refco's false financial statements and other public statements.

812. Defendants O'Kelley, Gantcher, and Breitman were controlling persons of Refco on and after the date of the IPO, due (among other reasons alleged herein) to their service on the Audit Committee of Refco. As members of the Audit Committee, these defendants were responsible for: overseeing Refco's financial reporting, accounting, and internal controls; overseeing the activities of Refco's outside auditors and reviewing the scope and results of those

audits with the auditors; meeting with and making recommendations to Refco's Board of Directors concerning the foregoing activities; and approving the false and misleading financial statements and other public statements as referenced herein.

813.    By virtue of the foregoing, each of the Section 20(a) IPO Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco, including the content and dissemination of the false or misleading statements complained of herein.

814.    The Section 20(a) IPO Defendants did not act in good faith in connection with the conduct at issue in this Claim. Further, these defendants directly or indirectly induced the act or acts constituting Refco's violations of the Exchange Act by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, and/or signing and/or approving the false and misleading statements that were issued by Refco.

815.    The Section 20(a) IPO Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

816.    Facts giving rise to a strong inference of the Section 20(a) IPO Defendants' culpability are alleged in detail above.

817.    By virtue of their positions as controlling persons of Refco and their culpable participation in the Company's violations of the Exchange Act, the Section 20(a) IPO Defendants are each jointly and severally liable pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco, for Refco's primary violations of Section 10(b) and Rule 10b-5.

304

## COUNT FIFTEEN

### Control Person Liability Pursuant to Section 20(a) of the
### Exchange Act Against Mayer Brown on Behalf of Plaintiffs and all Class Members
### (Based on Violations of Section 10(b) and Rule 10b-5 by Collins,
### Koury, Monk, and Other Mayer Brown Partners and Employees)

818.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

819.   This Claim is brought pursuant to Section 20(a) of the Exchange Act against Mayer Brown based on violations of Section 10(b) and Rule 10b-5 by Collins, Koury, Monk, and other Mayer Brown partners and employees.

820.   As alleged herein, Collins, Koury, Monk, and other attorneys at Mayer Brown violated Section 10(b) and Rule 10b-5 by making false and misleading statements in connection with the purchase or sale of securities and/or by participating in a fraudulent scheme and course of business or conduct. This fraudulent conduct was undertaken with scienter, as alleged above.

821.   Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Refco securities during the Class Period, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5 by Collins, Koury, Monk, and other Mayer Brown partners and employees.

822.   Mayer Brown was a controlling person of Collins, Koury, Monk, and all other Mayer Brown partners and employees at the time of their violations of Section 10(b) and Rule 10b-5, due (among other reasons alleged herein) to:  the fact that Koury, Monk, and other attorneys who engaged in the conduct alleged herein were employees of Mayer Brown; the fact that Collins and other Mayer Brown partners were members of Mayer Brown's partnership and signatories to its partnership agreement and related documents; Mayer Brown's control over the compensation of Collins, Koury, Monk, and all other Mayer Brown partners and employees;

Mayer Brown's control over these individuals' ability to advance in their careers and obtain

promotions and/or partnership at Mayer Brown; Mayer Brown's direct involvement in and

control over the ability of Collins, Koury, Monk, and other Mayer Brown attorneys to accept

clients and to perform services for such clients, including Refco; Mayer Brown's direct

involvement in and control over Collins' submission of bills to clients, including Refco; and

Mayer Brown's direct supervision and control over Koury, Monk, and the other Mayer Brown

partners and employees who were assigned to assist Collins in providing services for his clients,

including Refco. Further, Mayer Brown had knowledge and possession of copies of the

documents alleged by Plaintiffs to have been used in furtherance of the plan, scheme and course

of conduct set forth herein; had knowledge of the activities of Collins, Koury, Monk, and the

other Mayer Brown attorneys who participated in the scheme through, inter alia, discussions at

departmental meetings and periodic review sessions; and had the ability to prevent the scheme

and fraudulent course of conduct.

823.    Mayer Brown's control over Collins, Koury, Monk, and the other Mayer Brown

partners and employees is further demonstrated by the existence of a Management Committee at

Mayer Brown throughout the Class Period, as well as a Policy and Planning Committee. The

Management Committee and the Policy and Planning Committee exercised control over all

Mayer Brown partners and employees and had the power to influence and/or control their

activities as alleged herein.

824.    By virtue of the foregoing, Mayer Brown had the power to influence and control,

and did influence and control, directly or indirectly, the decision-making of Collins, Koury,

Monk, and the other Mayer Brown partners and employees with respect to the conduct

constituting their violations of Section 10(b) and Rule 10b-5, including their involvement in the fraudulent scheme detailed herein.

825.    Mayer Brown did not act in good faith in connection with the conduct at issue in this Claim. Further, Mayer Brown directly or indirectly induced the act or acts constituting the violations of Section 10(b) and Rules 10b-5 by Collins, Koury, Monk, and other Mayer Brown partners and employees by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated; approving and assisting in the preparation of the Offering Memorandum, the Bond Registration Statement and the IPO Registration Statement; and permitting Mayer Brown to be identified as Refco's counsel in the Offering Memorandum and the IPO Registration Statement.

826.    Mayer Brown is a culpable participant in the matters alleged herein, because it acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or it acted with reckless disregard for the truth. Facts giving rise to a strong inference of Mayer Brown's scienter are set forth above.

827.    By virtue of its position as a controlling person of Collins, Koury, Monk, and the other Mayer Brown partners and employees who violated Section 10(b) and Rule 10b-5, and by virtue of its culpable participation in those violations, Mayer Brown is jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Collins, Koury, Monk, and the other Mayer Brown partners and employees.

## COUNT SIXTEEN

**Pursuant to Section 20A of the Exchange Act,
On Behalf of Purchasers of Refco Stock,
Against Bennett, Thomas H. Lee Equity Fund V., L.P.,
Thomas H. Lee Parallel Fund V, L.P.,
Thomas H. Lee Equity (Cayman) Fund V, L.P.,
and Thomas H. Lee Investors Limited Partnership**

828.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

829.    This Claim is brought pursuant to Section 20A of the Exchange Act against Defendants Bennett, Thomas H. Lee Equity Fund V., L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership (collectively, the "Section 20A Defendants") on behalf of all purchasers of Refco common stock pursuant to or traceable to the IPO.

830.    The Section 20A Defendants, by virtue of their positions as insiders of Refco, had access to, and were in possession of, material non-public information about Refco at the time of the IPO. As alleged above, Bennett violated Sections 10(b) and 20(a) of the Exchange Act, and Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership violated Section 20(a) of the Exchange Act.

831.    Defendant Bennett sold at least 5.375 million shares of Refco common stock in the IPO. Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, sold at least 7.719 million shares of Refco common stock in the IPO.

832.    These sales were made contemporaneously with Class members' purchases of Refco common stock in the IPO.

308

833.   All members of the Class who purchased shares of Refco common stock contemporaneously with sales of Refco common stock by the Section 20A Defendants (i) have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Refco common stock as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) would not have purchased Refco common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Section 20A Defendants' false and misleading statements and concealment. At the time of the purchases of Refco stock by members of the Class who purchased in the IPO, the fair and true market value of Refco common stock was substantially less than the price paid by these Class members.

## JURY DEMAND

834.   Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment in their favor and against Defendants as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, and for all damages sustained as a result of wrongdoing by persons controlled by Defendants and/or for whose conduct Defendants are responsible pursuant to principles of *respondeat superior*, in an amount to be proven at trial, together with interest thereon;

309

C.     Awarding rescission and/or rescissory damages in favor of Plaintiffs and the other members of the Class;

D.     Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E.     Awarding Plaintiffs and the Class the fees and expenses incurred in this action, including attorneys' fees and expert fees; and

F.     Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
     December 3, 2007

**GRANT & EISENHOFER P.A.**

By: _____
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
Jonathan D. Margolis (JM-1128)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:     (646) 722-8500
Facsimile:     (646) 722-8501

    - and -

Megan D. McIntyre
Jeff A. Almeida
Christine M. Mackintosh
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone:     (302) 622-7000
Facsimile:     (302) 622-7100

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

By: _____
John P. Coffey (JC-3832)
Salvatore J. Graziano (SG-6854
John C. Browne (JB-0391)
Jeremy P. Robinson
David Webber (DW-3876)
1285 Avenue of the Americas
New York, NY 10019
Telephone:     (212) 554-1400
Facsimile:     (212) 554-1444

*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific Investment Management*
*Company LLC and Co-Lead Counsel for the Putative Class*

310

# EXHIBIT 1

Exhibit 1

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **144A Bonds** | - refers to the $600 million of unregistered 9% Senior Subordinated Notes due in 2012 issued by Refco pursuant to the Offering Memorandum in 2004. |
| **Audit Committee Defendants** | - refers to Defendants O'Kelley, Breitman and Gantcher. |
| **BAS** | - refers to Defendant Banc of America Securities LLC. |
| **BAWAG** | - refers to BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft |
| **Beckenham** | - refers to Beckenham Trading Company, Inc. |
| **Bennett** | - refers to Defendant Phillip R. Bennett. |
| **Bennett Trust** | - refers to Defendant The Phillip R. Bennett Three Year Annuity Trust. |
| **Bond Offering** | - refers to Refco's issuance of the 144A Bonds in August 2004 pursuant to the Offering Memorandum. |
| **Bond Road Show** | - refers to the nationwide road show carried out by Defendants Bennett, Trosten and Jaeckel, together with representatives of the Bond Underwriter Defendants, in July 2004 in an effort to convince investors to purchase the 144A Bonds. |

---

[†] The Glossary of Certain Key Terms is provided for the benefit of the reader only and does not in any way affect the content, meaning or interpretation of the Complaint. To the extent that there is any conflict, inconsistency or difference between statements included in the Glossary of Certain Key Terms and those in the Complaint -- the statements included in the Complaint govern.

## GLOSSARY OF CERTAIN KEY TERMS[†]

**Bond
Registration Statement**        - refers to the Form S-4 Registration Statement that the
                                Company filed with the SEC on October 12, 2004,
                                together with the subsequent amendments through
                                Form S-4/A filings dated December 10, 2004; January
                                12, 2005; February 23, 2005; March 11, 2005; April 5,
                                2005; and April 6, 2005.

**Bond
Underwriter Defendants**        - refers collectively to Defendants Credit Suisse, BAS,
                                and Deutsche Bank.

**Breitman**                    - refers to Defendant Leo R. Breitman.

**CIM Ventures**                - refers to CIM Ventures, Inc., a subsidiary of Ingram

**Class Period**                - refers to the period from July 1, 2004 to October 17,
                                2005.

**Collins**                     - refers to Defendant Joseph P. Collins, the partner at
                                Mayer Brown LLP who provided substantial legal
                                services to Refco and oversaw the Refco account.

**Company**                     - refers to Refco Inc. and all of its predecessors and
                                affiliates, including, but not limited to, Refco Group
                                Ltd., LLC, Refco Finance Holdings LLC, and Refco
                                Finance Inc.

**CMG**                         - refers to Defendant CMG Institutional Trading LLC.

**Credit Suisse**               - refers to Defendant Credit Suisse Securities (USA)
                                LLC (formerly known as Credit Suisse First Boston
                                LLC).

**CS Land**                     - refers to CS Land Management LLC

**Customer X**                  - refers to a third-party customer of Refco, which was
                                involved in the undisclosed related-party transactions
                                with Refco between February 2002 and August 2005.

ii

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Delta Flyer** | - refers to Delta Flyer Fund, LLC, a limited liability company organized in Delaware on April 26, 2000. |
| **Deutsche Bank** | - refers to Defendant Deutsche Bank Securities, Inc. |
| **DF Capital** | - refers to DF Capital Inc. DF Capital was incorporated on July 10, 2002 as DF Overseas Inc., with its registered address listed as Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware. Defendant Bennett was the President and Secretary of DF Capital. |
| **EMF** | - refers to EMF Core Fund Limited, an affiliate of hedge fund manager EMF Financial Products, LLC |
| **Exchange Act** | - refers to the Securities Exchange Act of 1934, 15 U.S.C. § 78 et seq. |
| **Exchange Offer** | - refers to Refco's offer to exchange Registered Bonds for the outstanding 144A Bonds |
| **FASCON** | -refers to FASB Concept Statements. |
| **Fiscal Year 2000 (or Fiscal 2000)** | - refers to Refco's fiscal year ending February 29, 2000. |
| **Fiscal Year 2001 (or Fiscal 2001)** | - refers to Refco's fiscal year ending February 28, 2001 |
| **Fiscal Year 2002 (or Fiscal 2002)** | - refers to Refco's fiscal year ending February 28, 2002. |
| **Fiscal Year 2003 (or Fiscal 2003)** | - refers to Refco's fiscal year ending February 28, 2003. |
| **Fiscal Year 2004 (or** | |

iii

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Fiscal 2004)** | - refers to Refco's fiscal year ending February 29, 2004. |
| **Fiscal Year 2005 (or Fiscal 2005)** | - refers to Refco's fiscal year ending February 28, 2005. |
| **Former Refco Officer** | - refers to a former senior operating officer of a Europe-based Refco affiliate. |
| **GAAP** | - refers to generally accepted accounting principles |
| **GAAS** | - refers to generally accepted auditing standards. |
| **Gantcher** | - refers to Defendant Nathan Gantcher. |
| **Goldman Sachs** | - refers to Defendant Goldman, Sachs & Co. |
| **Grant** | - refers to Defendant Tone Grant. |
| **Grant Thornton** | - refers to Defendant Grant Thornton LLP. |
| **Green Shoe Option** | - refers to the option granted to the Stock Underwriter Defendants to purchase additional shares to cover over-subscriptions of shares in connection with the IPO. |
| **Harkins** | - refers to Defendant David V. Harkins. |
| **Harris Nesbitt** | - refers to Defendant Harris Nesbitt Corp. |
| **HSBC** | - refers to Defendant HSBC Securities (USA) Inc. |
| **Ingram** | - refers to Ingram Micro, Inc. an information-technology distributor based in Santa Ana, California. |
| **Inside Defendants** | - refers to the Officer Defendants, Trosten, and the Audit Committee Defendants. |

iv

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **IPO** | - refers to Refco's initial public offering, which took place on or about August 10, 2005. |
| **IPO Prospectus** | - refers to Refco's Form 424B1 prospectus filed in connection with the IPO. |
| **IPO Registration Statement** | - refers to Refco's Form S-1 registration statement dated April 8, 2005, Form-S-1/A registration statement dated May 27, 2005, Form S-1/A registration statement dated July 1, 2005, Form S-1/A registration statement dated July 20, 2005, Form S-1/A registration statement dated July 25, 2005, Form S-1/A registration statement dated August 8, 2005, Form S-1/A registration statement dated August 10, 2005, and Form 424B1 prospectus dated August 10, 2005, which were filed with the SEC. |
| **Jaeckel** | - refers to Defendant Scott L. Jaeckel. |
| **J.P. Morgan** | - refers to Defendant J.P. Morgan Securities, Inc. |
| **Klejna** | - refers to Defendant Dennis A. Klejna. |
| **Koury** | - refers to Paul K. Koury, a former Mayer Brown associate lawyer who worked extensively for Collins and performed substantial legal work for Refco. |
| **LBO** | - refers to the THL Partner Defendants' June 2004 Leveraged Buyout with Refco. |
| **Lee** | - refers to Defendant Thomas H. Lee. |
| **Lind-Waldock** | - refers to Lind-Waldock Securities LLC. |
| **Maggio** | - refers to Defendant Santo C. Maggio, also known as "Sandy" Maggio. |
| **Mayer Brown** | - refers to Mayer Brown LLP, which was Refco's primary outside legal counsel after 1994. |

# GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **McCarthy** | - refers Peter McCarthy, an executive officer of Refco. |
| **Merger Agreement** | - refers to the June 8, 2004 agreement between the THL Partner Defendants, and their passive co-investors, and Refco Group and RGHI. |
| **Merrill Lynch** | - refers to Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated. |
| **Monk** | - refers to Robert Monk, a former Mayer Brown associate lawyer who worked extensively for Collins and performed substantial legal work for Refco. |
| **Murphy** | - refers to Defendant Joseph J. Murphy. |
| **New Refco** | - refers to New Refco Group Ltd., LLC. |
| **NYSE** | - refers to the New York Stock Exchange. |
| **Offering Memorandum** | - refers to the document used to market the 144A Bonds to PIMCO, other Qualified Institutional Buyers and other members of the Class in July 2004. |
| **Officer Defendants** | - refers to Defendants Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, and Klejna. |
| **O'Kelley** | - refers to Defendant Ronald L. O'Kelley. |
| **PCAOB** | - refers to the Public Company Accounting Oversight Board, which was established by the Sarbanes-Oxley Act of 2002. |
| **PIMCO** | - refers to Lead Plaintiff Pacific Investment Management Company LLC. |
| **PIMCO High Yield Fund** | - refers to Plaintiff PIMCO Funds: Pacific Investment Management Series - PIMCO High Yield Fund. |
| **Principal A** | - refers to the founder and principal of Customer X. |

# GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Ramirez & Co.** | - refers to Defendant Samuel A. Ramirez & Company, Inc. |
| **Ramler** | - refers to Mark Ramler, Arthur Andersen's engagement partner for Refco prior to 2002, who took the Refco audit account with him to Grant Thornton in or about 2002. |
| **Refco** | - refers to Refco Inc., and all of its predecessors and affiliates, including, but not limited to, Refco Group Ltd., LLC, Refco Finance Holdings LLC, and Refco Finance Inc. |
| **Refco Capital** | - refers to Refco Capital Markets Ltd. |
| **Refco Finance** | - refers to Refco Finance Inc. |
| **Refco Finance Holdings** | - refers to Refco Finance Holdings LLC. |
| **Refco Futures** | - refers to Refco Managed Futures LLC. |
| **Refco Group** | - refers to Refco Group Ltd., LLC. |
| **Registered Bonds** | - refers to the registered bonds issued by Refco Group and Refco Finance pursuant to the Bond Registration Statement on or about April 13, 2005. |
| **RGHI** | - refers to Defendant Refco Group Holdings, Inc. |
| **RH Capital** | - refers to Lead Plaintiff RH Capital Associates LLC. |
| **RSU** | - refers to Restricted Stock Units, which were granted to the Officer Defendants and the Audit Committee Defendants in connection with the IPO. |
| **SFAS** | - refers to Statements of Financial Accounting Statements. |
| **Sandler O'Neil** | - refers to Defendant Sandler O'Neill & Partners, L.P. |

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Schoen** | - refers to Defendant Scott A. Schoen. |
| **Securities Act** | - refers to the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |
| **Seibert & Co.** | - refers to Defendant Muriel Siebert & Co. Inc. |
| **Sexton** | - refers to Defendant William M. Sexton. |
| **Sherer** | - refers to Defendant Gerald M. Sherer. |
| **Silverman** | - refers to Defendant Phillip Silverman. |
| **Stock Underwriter Defendants** | - refers collectively to Defendants Credit Suisse, BAS, Deutsche Bank, Goldman Sachs, Merrill Lynch, J.P. Morgan, Sandler O'Neill, HSBC, William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl. |
| **THL Complaint** | - refers to the Complaint filed by the THL Partner Defendants on November 14, 2005, and styled <u>Thomas H. Lee Equity Fund V., L.P., et al. v. Phillip R. Bennett, et al.</u>, No. 05 Civ. 9608 (S.D.N.Y.). |
| **THL Defendants** | - refers collectively to the THL Individual Defendants and the THL Partner Defendants. |
| **THL Individual Defendants** | - refers to Defendants Lee, Harkins, Jaeckel and Schoen. |
| **THL Partner Defendants** | - refers to Defendants Thomas H. Lee Partners, THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Acquisition Partners III, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust. |

## GLOSSARY OF CERTAIN KEY TERMS[†]

**THL Managers**         - refers to THL Managers V, LLC, of which Thomas H. Lee Partners is the Managing Member.

**Thomas H. Lee Partners**       - refers to Defendant Thomas H. Lee Partners, L.P.

**Trosten**         - refers to Defendant Robert C. Trosten.

**Utendahl**         - refers to Defendant Utendahl Capital Partners, L.P.

**Westminster-Refco**        - refers to Westminster-Refco Management LLC.

**William Blair**         - refers Defendant William Blair & Company, L.L.C.

**Williams Capital**        - refers to Defendant The Williams Capital Group, L.P.

# EXHIBIT 2

**Exhibit 2**
(Reference Chart for Claims)[1]

| Count | I | II | III | IV | V | VI | VII | VIII | IX | X | XI | XII | XIII | XIV | XV | XVI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Officer Defendants* | | | | | | | | | | | | | | | | |
| Bennett | X | X | X | X | X | X | | X | X | | | X | X | X | | X |
| Sherer | | | | X | X | X | | X | X | | | | X | X | | |
| Sexton | | X | X | X | | X | | X | X | | | X | X | X | | |
| Maggio | | X | X | X | | X | | X | X | | | X | X | X | | |
| Murphy | | X | X | X | | X | | X | X | | | X | X | X | | |
| Silverman | | X | X | X | | | | X | X | | | X | X | X | | |
| Klejna | | | X | X | | X | | X | X | | | | X | X | | |
| *Bennett Shell-Entity Defendants* | | | | | | | | | | | | | | | | |
| RGHI | | X | | X | | X | | | | X | | X | X | X | | |
| Bennett Trust | | | | X | | X | | X | | | | | X | X | | |
| *Mayer Brown Defendants* | | | | | | | | | | | | | | | | |
| Mayer Brown | | | | | | | | | X | | X | | | | X | |
| Joseph Collins | | | | | | | | | X | | X | | | | | |
| *Audit Committee Defendants* | | | | | | | | | | | | | | | | |
| O'Kelley | | | X | X | X | X | | X | X | | | | X | X | | |
| Breitman | | | X | X | X | X | | X | X | | | | X | X | | |
| Gantcher | | | X | X | X | X | | X | X | | | | X | X | | |
| *THL Defendants* | | | | | | | | | | | | | | | | |
| Thomas H. Lee Partners | | | | X | | X | | X | X | | | | X | X | | |
| THL Partner Defendants | X | X | | X | | X | | X | X | | | X | X | X | | X[2] |
| THL Individual Defendants | | | | X | | X | | X | X | | | | X | X | | |
| Lee | | X | X | X | X | X | | X | X | | | X | X | X | | |
| Harkins | | | X | X | X | X | | X | X | | | | X | X | | |
| Jaeckel | X | | X | X | X | X | | X | X | | | | X | X | | |
| Schoen | | | X | X | X | X | | X | X | | | | X | X | | |
| *Other Defendants* | | | | | | | | | | | | | | | | |
| Stock Underwriter Defs. | | | | X | | | X | | | | | | | | | |
| Bond Underwriter Defs. | X | | X | | | | | | | | | | | | | |
| Trosten | X | X | | | | | | | X | | | X | X | | | |
| Grant Thornton | | | X | | X | | | | X | | | | | | | |
| Grant | | X | | | | | | | | | | X | | | | |

| *Securities Act* | *Exchange Act* |
|---|---|
| Count I    Section 12(a)(2) (144 A Bonds) | Count IX    Section 10b-5(b) |
| Count II    Section 15 (144 A Bonds) | Count X    Section 10b-5(a) and (c) (RGHI) |
| Count III    Section 11 (Registered Bonds) | Count XI    Section 10b-5(a) and (c) (MB and Collins) |
| Count IV    Section 15 (Registered Bonds) | Count XII    Section 20(a) (144 A Bonds) |
| Count V    Section 11 (IPO) | Count XIII    Section 20(a) (Bonds between Bond Offering and IPO) |
| Count VI    Section 15 (IPO) | Count XIV    Section 20(a) (Bonds or Stock after IPO) |
| Count VII    Section 12 (a)(2)(IPO) | Count XV    Section 20(a) (MB) |
| Count VIII    Section 15 (IPO) | Count XVI    Section 20A (Stock) |

---

[1] This chart is provided solely as a reference aid for the reader of the Second Amended Consolidated Class Complaint (the "Complaint"), and is not intended to modify the Complaint. If there are any conflicts between this chart and the Complaint, the Complaint shall control.
[2] This Claim is brought only against the following THL Partner Defendants: Thomas H. Lee Equity Fund V., L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership.