# Exhibit 16

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/13/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

AXIS REINSURANCE COMPANY,                    :      No. 07-CV-7924 (GEL)
                                             :
                        Plaintiff,           :
                                             :      **ORDER**
            v.                               :
                                             :
PHILLIP R. BENNETT, et al.,                  :
                                             :
                        Defendants.          :
                                             :
----------------------------------------------------X

In re                                        :      Chapter 11
                                             :
REFCO, INC., et al.,                         :      Case No. 05-60006 (RDD)
                                             :
                        Debtors.             :      Jointly Administered
                                             :
----------------------------------------------------X

AXIS REINSURANCE COMPANY,                    :      Adv. Proc. No. 07-1712-RDD
                                             :
                        Plaintiff,           :
                                             :
            v.                               :
                                             :
PHILLIP R. BENNETT, et al.,                  :
                                             :
                        Defendants.          :
                                             :
----------------------------------------------------X

TONE N. GRANT, et al.,                       :      Adv. Proc. 07-2005-RDD
                                             :
                        Plaintiffs,          :
            v.                               :
                                             :
AXIS REINSURANCE COMPANY,                    :
                                             :
                        Defendant.           :
                                             :
----------------------------------------------------X

[caption continues on next page]

```
------------------------------------------------X
                                                :
LEO R. BREITMAN, et al.,                        :        Adv. Proc. No. 07-2032-RDD
                                                :
                    Plaintiffs,                 :
        v.                                      :
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                    Defendant.                  :
                                                :
                                                :
------------------------------------------------X
                                                :
AXIS REINSURANCE COMPANY,                       :        (1) No. 07-CV-9420-GEL
                                                :        (2) No. 07-CV-9842-GEL
                    Plaintiff,                  :        (3) appeal not yet assigned
        v.                                      :
                                                :
PHILLIP R. BENNETT, et al.,                     :
                                                :
                    Defendants.                 :
                                                :
------------------------------------------------X
                                                :
TONE N. GRANT, et al.,                          :        No. 07-CV-9843-GEL
                                                :
                    Plaintiffs,                 :
        v.                                      :
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                    Defendant.                  :
                                                :
------------------------------------------------X
```

GERARD E. LYNCH, United States District Judge:

In accordance with the Court's oral directions at the November 8, 2007 status conference held in the above-captioned matters:

1.    The appeals now pending before this Court from the decisions of the Bankruptcy Court (some of which have been docketed as Nos. 07-CV-9420-GEL, 07-CV-9842-GEL and 07-

2

CV-9843-GEL, and one of which has not yet been assigned a docket number in this Court) shall be briefed on the following schedule, which has been agreed to by all parties: Appellant Axis Reinsurance Company ("Axis") shall serve and file its opening brief on or before November 28, 2007. Appellees shall serve and file their opposition briefs on or before December 21, 2007. Axis shall serve and file its reply brief, if any, on or before January 9, 2008.

2.     Pursuant to the agreement of the parties and 28 U.S.C. § 157(d), the bankruptcy reference is hereby withdrawn with respect to the remaining claims now pending in the Bankruptcy Court as consolidated adversary proceedings No. 07-1712-RDD, 07-2005-RDD and 07-2032-RDD. The Clerk of the Court is directed to assign such proceedings to this Court with appropriate district court docket numbers. The withdrawal of the reference is without prejudice to any party's rights or position regarding the appropriate venue for future coverage litigation (if any) involving carriers other than Axis.

3.     In the event that Dennis Klejna (or any other party) wishes to file a motion for summary judgment in the cases now docketed as consolidated adversary proceedings No. 07-1712-RDD, 07-2005-RDD and 07-2032-RDD, such motion shall be made to this Court. Absent further order of this Court, no discovery shall take place unless such discovery (a) is stipulated to by the parties making and opposing such motion and (b) affects only the parties to such motion.

4.     The civil action pending before this Court as No. 07-CV-7924-GEL is hereby stayed until 30 days have elapsed from this Court's decision regarding the appeals described in paragraph 1 of this Order.

SO ORDERED this 13th day of November, 2007.

UNITED STATES DISTRICT JUDGE

# Exhibit 17

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN†
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON††
ROCCO B MATRA,◊
JOHN B. MULLAHY*

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN□

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN B. HAMMERMAN
HEATHER LASCHEVER*
CAROL S. DOTY†††
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON*
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD*
LEONARD B. COOPER††
ANDREW R. JONES
JAMES T. DE SILVA

KEITH L. KAPLAN††
VINCENT C. ANSALDI††
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. GRANICK
TRACEY REISER-PEKTOSO††
KATHERINE J. O'BRIEN††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*♦
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊◊
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG

THOMAS L. GALLIVAN
EILEEN R. FULLERTON††
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*
KATHRYN M. WALSH
LAURA B. JUFFA
KATELIN B. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI B. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNING*
THOMAS LOOKSTEIN
MICHAEL NERI
ROBERT E. FEKETE
LORRAINE C. SYLVESTER*
JESSICA MOLINARES

† ALSO ADMITTED IN PA
‡ ALSO ADMITTED IN NJ
§ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
* ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
* ADMITTED IN NJ ONLY
◊ ADMITTED IN CA ONLY
☆ BARRISTER AT LAW
   ADMITTED IN ENGLAND & WALES

December 20, 2007

## VIA FEDERAL EXPRESS

Honorable Gerard E. Lynch
United States District Court for the
Southern District of New York
500 Pearl Street, Room 910
New York, NY 10007

Re:        Axis Reinsurance Company v. Phillip Bennett, et al.
Index Nos.:   07-CV-07924 (GEL); 07-CV-09420 (GEL); 07-CV-09842 (GEL);
           07-CV-9843 (GEL); and 07-CV-10302 (GEL)

Dear Judge Lynch:

As you are aware, this firm represents Axis Reinsurance Company ("Axis") in connection with the captioned matters. We write to request an immediate stay of the Bankruptcy Court Order requiring Axis to advance defense costs, pending this Court's consideration of the appeal of that Bankruptcy Court Order.[1] This request is being made based on the guilty plea entered yesterday by one of the Insureds, Santo Maggio, wherein he admitted to knowledge of the fraud at Refco prior to the underwriting of the Axis Policy. As explained below, given this precipitous development, an immediate stay is necessary to prevent a manifest injustice to Axis, and to prevent the Indicted Insureds from reaping the benefit of their fraud, which has now been admitted in open court by one of the coconspirators.

By way of brief background, Axis denied coverage to all Insureds on March 6, 2007, but on October 19, 2007, Axis was ordered by the Bankruptcy Court for the Southern District of New York to advance defense costs to the Insureds until such time as Axis receives a favorable adjudication of coverage under the Policy, or the $10 million Limit of Liability is exhausted by the defense cost payments subject to the Order. Axis appealed this Order to the District Court

---

[1] Briefing on that appeal will be complete on January 9, 2008.

Ltr. to Honorable Gerard E. Lynch
Page 2 of 3

and briefing on that appeal will be complete on January 9, 2008. During the pendency of this appeal, Axis has been complying with the Order and has paid a total of over $5.2 million in defense costs to the Insureds. Of this amount, over $3.8 million has been paid towards the defense of the Indicted Insureds, $850,000 has been paid towards the defense of the Officer Insureds, and $513,000 has been paid towards the defense of the Director Insureds. In addition to payments already made, Axis is currently processing the next round of payments which total almost $1.9 million, with nearly $1.2 million going towards the defense of the Indicted Insureds, $224,000 going towards the defense of the Director Insureds, and $482,000 going towards the defense of the Officer Insureds. Including the payments being processed, Axis will have paid over $7 million of its $10 million Limit of Liability, with over 70% of that payment going towards the Indicted Insureds – the very same individuals who have now been implicated as coconspirators in Mr. Maggio's guilty plea.

The reason Axis denied coverage is simple. In three separate and distinct documents, the Insureds warranted to Axis that if any of the Insureds knew of anything which might result in a Claim under the Policy, that Claim would be excluded from coverage for all Insureds.[2] Mr. Maggio is an Insured under the Policy and he has now pleaded guilty to, among other things, securities fraud – a count which includes the requirement of scienter. Accordingly, it is now indisputable that the warranty provided to Axis was false and this Claim is excluded from coverage.

As is detailed in the attached allocution, Mr. Maggio admits that from the late 1990s to October 2000, he "participated with others to hide the true financial health of Refco from banks, counter-parties, auditors and investors." Exhibit A, at 17. He further admits that "with my knowledge and active participation Refco's substantial losses were covered up as revenues padded [sic] and certain operating expenses were moved off its book." Exhibit A, at 17-8. Maggio further implicates his coconspirators, Bennett, Trosten and Grant, saying "as a result of my conduct and that of my coconspirators false financial statements were issued. . ." Exhibit A, at 18.

In its appeal, Axis contends that the Bankruptcy Court's Order is contrary to established law and the express contract terms of the Policy. Mr. Maggio's guilty plea serves to establish that Axis's initial coverage disclaimer was correct, as a matter of law. Nevertheless, even if Axis is successful in its appeal, the victory is likely to be hollow. Given the current "burn rate" of over $2 million per month, it is likely that Axis will have been wrongfully ordered to pay nearly its entire $10 million Limit of Liability before it obtains its day in court. This is money that – even if successful on appeal – Axis has very little realistic hope of ever recovering from these Insureds.[3] The most troublesome part of this injustice is that over 70% of the Policy limit will

---

[2] The purpose of these provisions was to ensure that the Policy, which incepted on the same day as the Refco IPO, would only provide coverage from the IPO forward. In other words, the intent was to start with a clean slate.
[3] Despite repeated opportunities to do so, none of the Insureds have asserted that they would be any less capable of defending themselves in the absence of payment by the insurer.

Ltr. to Honorable Gerard E. Lynch
Page 3 of 3

have been paid for the benefit of the very same individuals who victimized Axis and others
through the now-admitted fraud.

Axis requests that this Court exercise its equitable power to lessen this injustice by
staying the Bankruptcy Court Order requiring Axis's further payment of defense costs until this
Court has the opportunity to consider Axis's appeal. The briefing on the appeal will be complete
on January 9, 2008 and the majority of the outstanding invoices are less than 30 days old. A
proposed Order is attached as Exhibit B.[4]

Respectfully,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

Enclosures
cc: all counsel (via email only)

---

[4] Axis contacted opposing counsel and attempted to negotiate a stipulation, or even to draft a joint-letter to Your
Honor. Counsel to Messrs. Trosten, Sexton and Sherer have stated opposition to the lifting of the stay, and one of
Mr. Trosten's attorneys has stated she is unavailable until December 31, 2007.

KAUFMAN BORGEEST & RYAN LLP

7CJAAMAGP.txt

7CJAAMAGP                    Plea                                           1
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4              v.                        07 SD 312 (RLE)
4
5   SANTO C. MAGGIO,
5
6              Defendant.
6
7   ------------------------------x
7
8                                       New York, N.Y.
8                                       December 19, 2007
9                                       11:30 a.m.
9
10
10  Before:
11
11                  HON. RONALD L. ELLIS,
12
12                               Magistrate Judge
13
13
14                      APPEARANCES
14
15  JAMES B. COMEY
15       United States Attorney for the
16       Southern District of New York
16  NEIL BAROFSKY
17  CHRISTOPHER GARCIA
17       Assistant United States Attorney
18
18  PAUL SHECHTMAN
19       Attorney for Defendant Maggio
19
20  SCOTT E. HERSHMAN
20       Attorney for Defendant Maggio
21
22
23
24
25

                                                                           2
7CJAAMAGP                    Plea
1          (Case called)
2          MR. BAROFSKY:   Neil Barofsky and Christopher Garcia
3   for the government.
4          Good morning, your Honor.
5          MR. SCHECTMAN:   Paul Shechtman, for Mr. Maggio, with
6   Scott Hershman, for Mr. Maggio.
7          THE COURT:   Okay.  I understand that he is going to be
8   pleading to an information.
9          MR. SCHECTMAN:   Correct, your Honor.
10         THE COURT:   Has he waived indictment yet?
11         MR. SCHECTMAN:   You have the paperwork.  We're ready
12  to waive.

7CJAAMAGP.txt

13          THE COURT:  We will do those separately.  Treat the
14   waiver as it should be and then I'll consider the taking of the
15   plea.
16          MR. SCHECTMAN:  Sounds right.
17          COURTROOM DEPUTY:  You are Santo Maggio?
18          THE DEFENDANT:  Yes.
19          COURTROOM DEPUTY:  Have you signed this waiver of
20   indictment.
21          THE DEFENDANT:  Yes.
22          COURTROOM DEPUTY:  Before you signed it did you
23   discussion it with your attorney?
24          THE DEFENDANT:  Yes.
25          COURTROOM DEPUTY:  Did he explain it to you?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                  3
7CJAAMAGP           Plea
1           THE DEFENDANT:  Yes.
2           THE COURT:  Do you understand what you are doing?
3           THE DEFENDANT:  Yes.
4           COURTROOM DEPUTY:  Do you understand that you are
5    under no obligation to waive indictment?
6           THE DEFENDANT:  Yes.
7           COURTROOM DEPUTY:  Do you understand that if you do
8    not waive indictment, if the government wants to prosecute you
9    they will have to present this case to a grand jury which may
10   or may not indict you?
11          THE DEFENDANT:  Yes.
12          THE COURT:  Do you realize by that by signing this
13   waiver of indictment you have given up your right to have this
14   case presented to a grand jury?
15          THE DEFENDANT:  Yes, I do.
16          COURTROOM DEPUTY:  Have you seen a copy of the
17   information?
18          THE DEFENDANT:  Yes, I did.
19          THE COURT:  Would you like for me to read it to you?
20          THE DEFENDANT:  No.
21          COURTROOM DEPUTY:  How do you plead?
22          THE DEFENDANT:  Guilty.
23          COURTROOM DEPUTY:  The case has already been assigned
24   to Judge Stein.
25          MR. SCHECTMAN:  Correct.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                  4
7CJAAMAGP           Plea
1           MR. BAROVSKY:  Your Honor, we consent to the defendant
2    being released on his own recognizance.
3           MR. SCHECTMAN:  We don't object to that.
4           THE COURT:  Technically to the information you are
5    supposed to plead "not guilty".
6           MR. SCHECTMAN:  I think that is right and it is my
7    apologies.
8           THE DEFENDANT:  I plead not guilty now and then later
9    of guilty.
10          MR. SCHECTMAN:  Not guilty at this time, your Honor,
11   but we will be entering a guilty plea.
12          THE COURT:  Objection.  All right.  Now, the actual
13   plea has been referred by Judge Stein; is that it?
14          MR. BAROFSKY:  Yes, your Honor.
15          THE COURT:  And how many counts in the information?
16          MR. BAROFSKY:  Your Honor, there are four counts.
17          THE COURT:  What is he pleading to?
                              Page 2

```
                              7CJAAMAGP.txt
18            MR. BAROFSKY:  All four counts, Judge.
19            THE COURT:  Okay.  Mr. Maggio, this matter has been
20   referred to me before Judge Stein for the purpose of taking
21   your plea.  Did you consent to proceed before a United States
22   magistrate judge on your felony plea allocution?
23            THE DEFENDANT:  Yes.
24            THE COURT:  Before you signed it did you discuss it
25   with your attorneys?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    5

```
     7CJAAMAGP              Plea
 1            THE DEFENDANT:  Yes, your Honor.
 2            THE COURT:  Did they explain it to you?
 3            THE DEFENDANT:  Yes.
 4            THE COURT:  Do you understand that you have an
 5   absolute right to have this proceeding before a United States
 6   district judge?
 7            THE DEFENDANT:  Yes, I do.
 8            THE COURT:  You are voluntarily proceeding before a
 9   United States magistrate judge?
10            THE DEFENDANT:  Yes.
11            THE COURT:  Mr. Maggio, you are charged in a four
12   count information.  Count One of the information charges you,
13   well, conspiracy to commit securities fraud, wire fraud, bank
14   fraud and money laundering and to make false filings with the
15   SEC and material misstatements to auditors in violation of
16   Title 18 U.S.C. Sections 371.  This crime carries a maximum
17   sentence of five years imprisonment, a maximum fine which is
18   the greatest of either $250,5000 or twice the gross pecuniary
19   gain derived from the offense or twice the gross pecuniary loss
20   to persons other than yourself as a result of the offense.
21   There is a $100 special assessment and a term of supervised
22   release of three years.
23            Counts Two and Three of the information charge you
24   with securities fraud in violation of Title 15 U.S.C. Section
25   78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    6

```
     7CJAAMAGP              Plea
 1   Regulations Section 240, 10 (B) (5) and each of those counts
 2   carries a maximum sentence of 20 years imprisonment, a maximum
 3   fine which is the greatest of either five million dollars or
 4   twice the gross pecuniary gain derived from the offense and
 5   twice the gross pecuniary loss of persons other than yourself
 6   as a result of the offense.  Each also has a $100 special
 7   assessment and a term of supervised release of three years.
 8            Count four of the information charges you with wire
 9   fraud in violation of Title 18 U.S.C. Section 1343 and carries
10   a maximum sentence of 0 years imprisonment, a maximum fine
11   which is the greatest of either $250,000 or twice the gross
12   pecuniary gain derived from the offense, or twice the gross
13   pecuniary loss to person others than yourself as a result of
14   the offense.  It carries a $100 special assessment and a term
15   of supervised release of three years.
16            A total maximum sentence of incarceration on the
17   information is 65 years imprisonment.  In addition to the
18   foregoing the Court must order restitution with respect to the
19   information and in accordance with U.S.C.
20            In addition, if you are sentenced to any period of
21   supervised release and violate the conditions of your
22   supervised release you may be sentenced to all or part of the
                              Page 3
```

                    7CJAAMAGP.txt
23    supervised release as authorized by statute without any credit
24    for time already served on supervised release.
25            Do you understand that?
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                                    7
      7CJAAMAGP              Plea
1             THE DEFENDANT:  Yes.
2             THE COURT:  So you understand these penalties as I've
3     read them to you?
4             THE DEFENDANT:  Yes, I do.
5             THE COURT:  Have you seen a copy of the information in
6     which the government makes these charges against you?
7             THE DEFENDANT:  Yes, I do.
8             THE COURT:  Have you discussed it with your attorneys?
9             THE DEFENDANT:  Yes, your Honor.
10            THE COURT:  Are you prepared to enter a plea today?
11            THE DEFENDANT:  Yes, I am.
12            THE COURT:  Santo Maggio, how do you plead?
13            THE DEFENDANT:  Guilty.
14            THE COURT:  Mr. Maggio, before I can recommend that
15    your plea be accepted I must determine that you understand the
16    plea and its consequences, that the plea is voluntary and that
17    there's a factual basis for the plea.  For that purpose I must
18    ask you a number of questions and your answers must be under
19    oath.  Do you understand that the answers you give under oath
20    may subject you to prosecution for perjury if you do not tell
21    the truth?
22            THE DEFENDANT:  Yes, I do.
23            THE COURT:  Raise your right hand.
24            (Defendant Santo C. Maggio sworn)
25            THE COURT:  Thank you.  Please state your full name
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                                    8
      7CJAAMAGP              Plea
1     for record.
2             THE DEFENDANT:  Santo C. Maggio.
3             THE COURT:  How far did you go in school?
4             THE DEFENDANT:  I finished high school.
5             THE COURT:  Are you currently being treated by a
6     doctor or psychiatrist for any reason?
7             THE DEFENDANT:  No.
8             THE COURT:  Are you currently on any medications which
9     might effect you in being alert for this proceeding?
10            THE DEFENDANT:  No.
11            THE COURT:  Are you any difficulty seeing, hearing or
12    understanding anything that I am saying?
13            THE DEFENDANT:  No.
14            THE COURT:  Have you had enough time to discuss with
15    your attorneys how you wish to plead?
16            THE DEFENDANT:  Yes.
17            THE COURT:  Are you satisfied with your attorneys?
18            THE DEFENDANT:  Yes.
19            THE COURT:  Do you understand what the government says
20    that you did?
21            THE DEFENDANT:  Yes.
22            THE COURT:  Do you understand that have you a right to
23    plead not guilty?
24            THE DEFENDANT:  Yes.
25            THE COURT:  Do you understand that you have a right to
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                        Page 4

7CJAAMAGP.txt

7CJAAMAGP              Plea                                    9
1   trial by jury on these charges?
2             THE DEFENDANT:  Yes.
3             THE COURT:  Do you understand that if you are to plead
4   not guilty and go to trial you would be presumed innocent until
5   the government proved your guilt beyond a reasonable doubt?
6             THE DEFENDANT:  Yes, I do.
7             THE COURT:  Do you understand that if you were to go
8   to trial you would have a number of important constitutional
9   rights including the right to be represented by counsel and to
10  have counsel appointed for you if you cannot afford an
11  attorney?
12            THE DEFENDANT:  Yes.
13            THE COURT:  Do you understand that at trial you cannot
14  be forced to testify against yourself?
15            THE DEFENDANT:  Yes.
16            THE COURT:  Do you understand at a trial you would
17  have the right to confront and cross-examine witnesses called
18  by the government?
19            THE DEFENDANT:  Yes.
20            THE COURT:  Do you understand that at a trial you
21  would have the right to testify yourself and to call witnesses
22  on your behalf and to compel their attendance by subpoena if
23  necessary?
24            THE DEFENDANT:  Yes.
25            THE COURT:  Do you understand that if your guilty plea
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              10
7CJAAMAGP              Plea
1   is accepted there will be no trial of any kind and the only
2   remaining steps in your case will be a presence report and
3   sentencing by Judge Stein?
4             THE DEFENDANT:  Yes.
5             THE COURT:  Have you discussed with your attorney the
6   role that the sentencing guidelines play in sentencing?
7             THE DEFENDANT:  Yes.
8             THE COURT:  Do you understand that the district judge
9   will retain discretion regardless of what calculations there
10  are under the guidelines?
11            THE DEFENDANT:  Yes.
12            THE COURT:  Do you understand that the calculation
13  under the guidelines will take into account a number of factors
14  including the actual conduct in which you engaged, any victims
15  of the offense, the role that you played in the offense,
16  whether or not you have accepted responsibility for your acts,
17  whether you have any criminal history or whether you have
18  engaged in any obstruction of justice; do you understand that?
19            THE DEFENDANT:  Yes.
20            THE COURT:  Between now and the date of sentencing the
21  probation department will conduct an investigation and will
22  prepare a presence report.  Your attorney, the government
23  and Judge Stein will receive copies.  Both your attorney and
24  the government will have the opportunity to object if they
25  believe anything in the report is inaccurate; do you understand
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              11
7CJAAMAGP              Plea
1   that?
2             THE DEFENDANT:  Yes.
3             THE COURT:  Do you understand that until the
                        Page 5

7CJAAMAGP.txt

```
 4    presentence report is prepared neither your attorney nor the
 5    government, nor Judge Stein will be able to determine precisely
 6    what range of penalties will be calculated under the
 7    guidelines.
 8             THE DEFENDANT:  Yes.
 9             THE COURT:  Do you understand than regardless of
10    calculation and the guidelines your sentence cannot exceed the
11    maximums that I advised you of earlier?
12             THE DEFENDANT:  Yes.
13             THE COURT:  Do you understand that under certain
14    circumstances both you and the government may have the right to
15    appeal the sentence imposed.
16             THE DEFENDANT:  Yes.
17             THE COURT:  Do you understand that if the sentence is
18    more severe than you expected you will be bound by your guilty
19    plea and will not be permitted to withdraw it?
20             THE DEFENDANT:  Yes.
21             THE COURT:  You understand that parole has been
22    abolished and that if you are sentenced to any term of
23    imprisonment you will be required to serve the entire term?
24             THE DEFENDANT:  Yes.
25             THE COURT:  Mr. Maggio, are you a citizen of the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                  12

```
      7CJAAMAGP              Plea
 1    United States?
 2             THE DEFENDANT:  Yes, I am.
 3             THE COURT:  Mr. Maggio, I have been handed up a plea
 4    agreement from your case.  Have you had an opportunity to
 5    review and go over this agreement with your attorneys?
 6             THE DEFENDANT:  Yes.
 7             THE COURT:  Do you understand that one of the
 8    provisions in the plea agreement is that you admit the
 9    forfeiture allegation in the information and that you agree to
10    forfeit to the United States a sum of money equal to two
11    billion, four hundred million dollars?
12             THE DEFENDANT:  Yes.
13             THE COURT:  That is what it says, right?
14             MR. BAROFSKY:  Yes, your Honor, that number is
15    correct.
16             Your Honor, the plea cooperation agreement also
17    provides, however, that in satisfaction of that amount there
18    are certain schedules attached to the plea agreement which the
19    government will accept in satisfaction of that judgment.
20             MR. SCHECTMAN:  We don't have quite that much, your
21    Honor.
22             THE COURT:  Okay.  I thought had I too many zeros
23    myself at first.
24             MR. SCHECTMAN:  No, you read it right.
25             THE COURT:  That represents the amount of the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                  13

```
      7CJAAMAGP              Plea
 1    proceedings obtained as a result of the offense; do you
 2    understand that?
 3             THE DEFENDANT:  Yes.
 4             THE COURT:  You also understand that any forfeiture
 5    would not be treated as satisfaction of any fine, restitution,
 6    cause of imprisonment or any other penalty the Court may
 7    impose?
 8             THE DEFENDANT:  Yes.
                          Page 6
```

7CJAAMAGP.txt
```
 9              THE COURT:  And as indicated in the agreement, there
10    is a scheduled pay of assets.  You have seen the schedule and
11    you have gone over it with your attorneys?
12              THE DEFENDANT:  Yes.
13              THE COURT:  To make sure that it's accurate?
14              THE DEFENDANT:  Yes.
15              MR. SCHECTMAN:  Judge, I might point out for the
16    record there is a Schedule B as well, which are assets that are
17    in Mrs.~Maggio's name that are being forfeited as part of the
18    plea and there is a separate agreement that need not concern
19    your Honor in this matter involving Mrs.~Maggio.
20              THE COURT:  Is that correct, Mr. Maggio, there is also
21    a Schedule B?
22              THE DEFENDANT:  Yes.
23              THE COURT:  That's Mrs.~Maggio's assets?
24              THE DEFENDANT:  Yes.
25              THE COURT:  That is also covered by the agreement that
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

                                                                    14

7CJAAMAGP              Plea
```
 1    you made with the government?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  You are also understand the agreement
 4    provides that you cooperate fully with the United States
 5    attorney's office?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  And that in exchange for that cooperation,
 8    assuming that the office determines that you have made full and
 9    accurate disclosures to them, the government has agreed that it
10    will submit a motion pursuant to Section 5K1.1 of the
11    sentencing guidelines in your favor?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that if for any reason
14    the government determines that it will not file such a motion
15    you will not be allowed to withdraw your plea?
16              THE DEFENDANT:  Yes.
17              THE COURT:  You understand that even if the government
18    files such a motion sentencing will still be at the sole
19    discretion of the Court?
20              THE DEFENDANT:  .Yes, I did.
21              THE COURT:  Is there anything else in the agreement
22    that I might want to highlight?
23              MR. BAROFSKY:  No, your Honor.
24              THE COURT:  All right.  Other than the representations
25    in this agreement, have any promises been made to you by anyone
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

                                                                    15

7CJAAMAGP              Plea
```
 1    to influence you to plead guilty?
 2              THE DEFENDANT:  No.
 3              THE COURT:  This constitutes the sole agreement that
 4    you have?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  Has anyone promised you a specific
 7    sentence if you plead guilty?
 8              THE DEFENDANT:  No.
 9              THE COURT:  Has anyone made any threats to you to
10    influence you to plead guilty?
11              THE DEFENDANT:  No.
12              THE COURT:  Are you making this plea voluntarily of
13    your own freewill and choice?
```
                              Page 7

7CJAAMAGP.txt

14          THE DEFENDANT:  Yes, I am.
15          THE COURT:  The elements of the offense is?
16          MR. BAROFSKY:  Your Honor, for Counts One defendant's
17  is charged with conspiracy.  The government would be required
18  to prove each of the elements beyond a reasonable doubt.
19  First, that there is an assistance of a an agreement or
20  understanding to commit one of the objects charged in the
21  information.
22          Second, the defendant knowingly became a member of
23  that agreement or understanding.
24          And third, that one of the conspirators or
25  coconspirators or Mr. Maggio knowingly committed at least one
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            16
7CJAAMAGP                  Plea
1   overt act in furtherance of the conspiracy during its life.
2           With respect to the securities frauds counts in two
3   and three, first, the defendant in connection with the purchase
4   or sale of securities, here the notes that are described in
5   Count Two and the common stock of Revko that's referenced in
6   Count Three did one or more of the following:  Employed a
7   devise, scheme or artifice to defraud or made an untrue
8   statement of a material fact or admitted to state a material
9   fact which made what was said under the circumstances
10  misleading or engaged in an act, practice or course of business
11  that operated or would operate as a fraud or deceit upon a
12  purchase of a seller for securities.
13          Second the defendant acted knowingly, willfully with
14  the intent to defraud.
15          And third, the defendant used or caused to be used any
16  means or instruments of transportation or communication in
17  interstate commerce or use of the mails in furtherance of that
18  fraudulent conduct.
19          and with respect to the Count Four wire fraud, first,
20  that there was a scheme or artifice to defraud that existence
21  the defendant must have participated in the scheme with the
22  intent to defraud misrepresentations or omissions must have
23  related to a material fact, that the scheme was executed to
24  obtain money or property.
25          And finally, that in execution of the scheme the
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            17
7CJAAMAGP                  Plea
1   defendant used or caused to be used interstate wires or that
2   such use was reasonably foreseeable to him.
3           THE COURT:  Mr. Maggio, did you hear that recitation?
4           THE DEFENDANT:  Yes.
5           THE COURT:  Did you understand that if the government
6   were to proceed to trial against you it would have the burden
7   of proving each element for each offense, that is, each count
8   beyond a reasonable doubt.
9           THE DEFENDANT:  Yes.
10          THE COURT:  Did you commit the offenses for which you
11  have been charged, Mr. Maggio?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Tell me what you did.
14          MR. SCHECTMAN:  Judge, if it's acceptable to you
15  Mr. Maggio has written out a statement that I think speaks to
16  all four crimes.
17          THE COURT:  Considering the complexities here I'll
18  allow him to read and then if it's not he could fill in the
                            Page 8

7CJAAMAGP.txt
19  gaps.
20         THE DEFENDANT:  Your Honor, from the late 1990s to
21  October 2005 I was a senior executive at Revko Ink.  During
22  that period I participated with others to hide the true
23  financial health of Revko from banks, counter-parties, auditors
24  and investors.  With my knowledge and active participation
25  Revko's substantial losses were covered up as revenues padded
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              18
7CJAAMAGP                 Plea
1   and certain operating expenses were moved off its book.  Among
2   the acts I personally engaged in the signing of loan agreements
3   referencing paragraphs 61-D and 61-P of the indictment.
4          As a result of my conduct and that of my
5   coconspirators false financial statements were issued to obtain
6   debt financing from the public including 9 percent senior
7   subordinated notes referenced in Count Two of the indictment.
8          To consummate the sale of 57 percent of Revko to a
9   group headed by Thomas H. Lee in 2004 and to effect the Revko
10  initial public offering in 2005.  Moreover, with my knowledge
11  false financial statements were filed with the SEC including
12  form 10K referencing Count Four.  The mails and interstate
13  wires were used as part of the fraudulent scheme.
14         I deeply regret my conduct and the harm that it has
15  caused.
16         THE COURT:  First of all, with respect to all of the
17  activities that you've indicate you participated in it
18  knowingly?
19         THE DEFENDANT:  Yes.
20         THE COURT:  Okay.  Where did this take place.
21         THE DEFENDANT:  In New York, New York.  Manhattan, New
22  York.
23         THE COURT:  You said coconspirators, so other people
24  had agreed with you to effectuate this scheme?
25                  SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              19
7CJAAMAGP                 Plea
1          THE DEFENDANT:  Yes.
2          THE COURT:  And the intent of this scheme was to
3   defraud?
4          THE DEFENDANT:  Yes.
5          THE COURT:  Now, I know you mentioned the notes and I
6   think you mentioned the 2005 initial offering that was
7   addressed to Count Three of the information, that is, whether
8   or not you had a scheme to defraud people based on the value of
9   the stock?
10         THE DEFENDANT:  Correct, your Honor.
11         THE COURT:  Mr. Maggio?
12         THE DEFENDANT:  Yes.
13         THE COURT:  That did involve false statements?
14         THE DEFENDANT:  Yes.
15         THE COURT:  False filings that you've indicated?
16         THE DEFENDANT:  Yes.
17         THE COURT:  Now, you said you used the mails which
18  interstate -- I mean, you used the mails, a phone?  How did you
19  use --
20         THE DEFENDANT:  Yes, used regular mail.  We used
21  Express Mail.  We used e-mail all to effect the scheme.
22         THE COURT:  You submitted false statements in the
23  mail?
                            Page 9

```
                              7CJAAMAGP.txt
24          THE DEFENDANT:  False statements, loan agreements as
25    referenced here, yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    20
```
      7CJAAMAGP              Plea
 1          THE COURT:  Okay.  Any --
 2          MR. BAROFSKY:  Your Honor, I'll just represent to the
 3    Court that with respect to Count Four, the wire transmission
 4    did in fact originate in the Southern District of New York in
 5    Manhattan and was wired outside of the Southern District to
 6    Virginia.
 7          THE COURT:  Anything else?
 8          MR. SCHECTMAN:  Nothing, your Honor.
 9          MR. BAROFSKY:  No, your Honor.
10          THE COURT:  I am depending on you here.  Does any
11    either counsel know of any reason why I should not recommend
12    that this plea not be accepted?
13          MR. BAROFSKY:  No, your Honor.
14          MR. SCHECTMAN:  No, your Honor.
15          THE COURT:  Based on defendant's allocution and the
16    recommendations by the government I find that the defendant
17    understands the nature, the charges and consequences of his
18    guilty plea.  I also find that the plea is voluntary and that
19    there is a factual basis for the plea.  I, therefore, recommend
20    that the plea be accepted and direct that a presentence report
21    be reaped.
22          Sentencing will take place before Judge Stein on.
23          MR. BAROFSKY:  May 9, at 2 p.m.
24          THE COURT:  Is there anything else that needs to be
25    addressed today.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    21
```
      7CJAAMAGP              Plea
 1          MR. BAROVSKY:  Not from the government, your Honor.
 2          MR. SCHECTMAN:  Not from the offense.
 3          THE COURT:  We are adjourned.
 4                           o O o
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
                                      :
UNITED STATES OF AMERICA              :        INFORMATION
                                      :
        -v-                           :        07 Cr.
                                      :
SANTO C. MAGGIO,                      :
                                      :
                Defendant.            :
                                      :
-------------------------------------x

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

### RELEVANT ENTITIES AND PERSONS

1.  At certain times relevant to this Information,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York. From at least the mid-1990s,

the business of Refco, Inc. and its predecessor entities included

providing execution and clearing services for exchange-traded

derivatives and providing prime brokerage services in the fixed

income and foreign exchange markets. Refco, Inc. held its

initial public offering of common stock on or about August 10,

2005. Prior to on or about August 10, 2005, Refco, Inc.'s

predecessor entities were privately held. Refco, Inc. and its

predecessor entities are referred to herein collectively as

"Refco."

2.  At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At all times relevant to this Information, Bennett had a substantial ownership interest in Refco, directly and indirectly.

3. At certain times relevant to this Information, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco. Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4. At certain times relevant to this Information, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco. From at least in or about 1997 through in or about June 1998, Grant was the President of Refco. At certain times relevant to this Information, Grant indirectly held a significant ownership interest in Refco.

5. At certain times relevant to this Information, SANTO C. MAGGIO, the defendant, held senior management positions at Refco. Among other positions, MAGGIO was an Executive Vice President of Refco, and the President and Chief Executive Officer of Refco Securities LLC, a wholly owned subsidiary of Refco.

6. At all times relevant to this Information, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft, ("BAWAG"), was the fourth largest bank in

2

Austria. BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB). At various times relevant to this Information, BAWAG indirectly held a substantial ownership interest in Refco.

    7.    At all times relevant to this Information, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Information, RGHI was owned in whole or in part by Phillip R. Bennett and Tone N. Grant.

### THE SCHEME TO DEFRAUD

    8.    From at least as early as in or about the late 1990s, SANTO C. MAGGIO, the defendant, at the direction of Phillip R. Bennett and together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the late 1990s, Bennett, MAGGIO, and their coconspirators embarked on a strategy to mask the true performance of Refco's business in order to sell the company for Bennett and MAGGIO's own benefit and that of Refco's owners other than Bennett. To that end, over the ensuing years, Bennett, MAGGIO, and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the

3

company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

9.    In furtherance of this scheme, Phillip R. Bennett, SANTO C. MAGGIO, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC"). The scheme included obtaining, through fraud, the following: lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57 per cent of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

10.    In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by Phillip R. Bennett, Tone N.

Grant and one other partner. As of early 1997, RGHI owed Refco
at least approximately $106 million. Starting later in 1997,
Refco directly and indirectly incurred a series of substantial
trading losses that threatened the continued viability of Refco's
business. In response to these losses, at various times between
in or about May 1997 and in or about October 2005, Bennett, and
later, SANTO C. MAGGIO and their coconspirators, moved losses and
expenses out of Refco and into RGHI, and artificially padded
Refco's revenues at the expense of RGHI, in an effort to hide
Refco's true liabilities, manipulate its reported earnings, and
thereby seek to defraud a purchaser into buying the firm at a
price that would pay off the accumulated debt and ensure a profit
to Refco's owners. This strategy resulted in an enormous
increase in the already large debt from RGHI to Refco that
eventually totaled more than $1 billion (the "RGHI receivable").
The debt by RGHI to Refco, carried on Refco's books as a
receivable from RGHI, was over time comprised of, among other
things, the following principal components: (a) liabilities
incurred by Refco when brokerage customers to whom it had
extended credit defaulted on their obligations, which were later
transferred to RGHI; (b) Refco's proprietary trading losses; (c)
various operating expenses incurred by Refco and paid in the
first instance by Refco but later transferred to RGHI as an
increase in RGHI's debt to Refco; and (d) transactions designed

5

to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

### Historical Losses

11. As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco. In the later 1990s, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco. When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts. Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million. These customer losses included the following:

### Asian Debt Crisis Customers

12. In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis. When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business. By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed

6

market conditions, they totaled approximately $185 million.

Customer 1

13.    In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME"). When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of a short-term loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the loan.

14.    Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO, and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses. In addition, Bennett and others significantly misrepresented the size of the loss to Refco's auditors.

15.    Philip R. Bennett, SANTO C. MAGGIO, and others, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1

7

from the trading losses to be transferred to become a debt from RGHI to Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, Phillip R. Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI.

17.  The result of these actions by Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators was to contribute to the large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett,

MAGGIO, and others caused Refco systematically to fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, approximately $100 million a day. Bennett, MAGGIO, and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

### BAWAG Invests In Refco

19. By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions. In order to address that problem, in or about late 1998, Bennett sought a capital contribution from BAWAG. In a transaction that closed in 1999, BAWAG, through an affiliate, purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

9

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.  At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

10

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|---------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|---------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

11

| Feb. 2004 | $720 million | $250 million | $970 million |
|-----------|--------------|--------------|--------------|
| May 2004  | $700 Million | $0           | $700 million |

24.    These transactions typically followed standard patterns.  For example, in or about February 2000, SANTO C. MAGGIO, Phillip R. Bennett and others caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were reversed, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar

12

to the agreements that follow:

(i).      On or about February 25, 2000,
Refco Capital Markets, Ltd. a Bermuda corporation controlled by
Refco, loaned Customer 2, one of the Three Customers,
approximately $150 million.  The loan was to be repaid on March
9, 2000.

(ii).      On or about the same day, February
25, 2000, Customer 2 loaned approximately $150 million to RGHI.
The repayment date was on or about March 9, 2000.  The loan
agreement for this loan was executed by Bennett on behalf of
RGHI.  The interest rate on this loan was 15 basis points higher
than the interest rate on the loan from Refco Capital Markets to
Customer 2, thereby assuring Customer 2 a profit.

(iii).      On or about the same date, Bennett
signed a letter of guaranty to Customer 2 on behalf of Refco
Group, Ltd., assuring Customer 2 that, should RGHI default on its
approximately $150 million obligation to Customer 2, Refco Group,
Ltd. would make Customer 2 whole.

b.    At or around the same time as the
transactions with the Three Customers, BAWAG loaned RGHI $300
million in cash.  RGHI then used the $300 million to pay off $300
million of its debt to Refco, and Refco then loaned to BAWAG $225
million, using the remaining $75 million to fund its operations.
In or about March 2000, the transaction was reversed.  Refco lent

13

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI. RGHI then used the $300 million to pay off the loan from BAWAG.

25. In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

26. At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI. In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.    Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.    Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems.  In or

15

about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through Bennett and MAGGIO to hold in an account at Refco certain worthless bonds and other investments that Refco, at Bennett and MAGGIO's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett caused Refco to hire an investment bank (the "Investment Bank"), to assist in selling Refco.  Bennett asked the Investment Bank to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, Bennett directed the Investment Bank to look for other purchasers for the company, with the understanding that it would be taken public.

30.  In connection with Phillip R. Bennett's plan to sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational

16

problems at the company.

### The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C.
MAGGIO, and others began negotiations with Thomas H. Lee
Partners, a private equity fund, regarding that entity's possible
purchase of a controlling stake in Refco as part of a leveraged
buyout transaction.  As ultimately carried out on or about August
5, 2004, the leveraged buyout was structured as follows:  Thomas
H. Lee Partners, through an affiliate, purchased a 57 percent
ownership interest in Refco, in return for approximately $507
million of new capital; simultaneously, Refco sold $600 million
in notes and obtained $800 million in financing from a syndicate
of banks.

*Lies To Thomas H. Lee Partners*

32.    In connection with the leveraged buyout
transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others
caused Refco's audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  Those
audited financial statements were false and misleading in the
following respects, among others:

a.    The financial statements hid the size of the
related party receivable from RGHI, which at the end of February
2004 was, but for the cover-up loan transactions, at least
approximately $1 billion, whereas the financial statements

17

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.    The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

33.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

*Lies To The Note Purchasers*

34.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b.    Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

18

fact, caused the Asian Debt Crisis Customer Losses; and

      c.   Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

    *Lies To The Bank Syndicate*

    35.  In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

      a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

      b.   Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

      c.   Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

19

RGHI for the purpose of hiding them.

36.   The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.   Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

### Bennett Plans To Take Refco Public

37.   After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

38.   Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

20

continued their manipulation of Refco's finances:  At each quarter and year-end period, Bennett and MAGGIO caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett and MAGGIO continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  Bennett and MAGGIO caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

39.  Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, Bennett and MAGGIO caused the following transactions, among others, to artificially inflate Refco's revenues:

a.   On or about February 11, 2005, Bennett and

21

MAGGIO caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

b.    On or about February 17, 2005, Bennett and MAGGIO caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a result of the transactions. The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

40.    In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

41.    On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

22

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K.  Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York.  Bennett also signed two certifications regarding the annual report.  In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company."  As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43.  On or about August 8, 2005, Refco filed an S-1

23

registration statement with the SEC in connection with its initial public offering of common stock.  Phillip R. Bennett signed that registration statement on or about August 8, 2005, in New York, New York.

44.  The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years.  These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

45.  The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above.  In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party

24

transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

46.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

47.  In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

### Public Disclosure Of The Related Party Debt

48.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

25

2005, having received an emergency loan in that approximate amount from BAWAG.

49. On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

50. Following Refco's announcement, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

51. On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York. Refco's common stock was subsequently delisted by the New York Stock Exchange.

### THE CONSPIRACY

52. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere,

26

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

27

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.   It was a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings - Exchange Act

54.   It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and

28

documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

55.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

### Wire Fraud

56.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

29

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Material Misstatements To Auditors

57.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

58.  It was further a part and object of the conspiracy

30

that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

59.    It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

60.    Among the means and methods by which SANTO C. MAGGIO, the defendant, and others known and unknown, and their co-conspirators would and did carry out the conspiracy were the

following:

    a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

    b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

    c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

    d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

    e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

    f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

### Overt Acts

61.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and Tone N. Grant misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett and Tone N. Grant signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

33

d.   On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

e.   On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

f.   On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g.   On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

h.   On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

i.   On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

j.   On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

34

$12 million.

        k.   On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

        l.   On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

        m.   On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

        n.   On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

        o.   On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

        p.   On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

        q.   On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

35

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

63.  From in or about the late 1990s up to in or about 2004, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

36

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The United States Attorney further charges:

64.  The allegations contained in paragraphs 1 through

51, 60 and 61 of this Information are repeated and realleged as

if fully set forth herein.

65.  From in or about the late 1990s up to in or about

October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, unlawfully, willfully, and

knowingly, directly and indirectly, by the use of means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ,

in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

37

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67.  On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

(Title 18, United States Code, Sections 1343 and 2).

38

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68.   As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5, as alleged in Counts One, Two and Three; and wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Four of this Information, SANTO C. MAGGIO shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following: At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendant is jointly and severally liable.

### SUBSTITUTE ASSETS PROVISION

69.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)   cannot be located upon the exercise of due diligence;

(ii)   has been transferred or sold to, or deposited with, a third party;

39

(iii)   has been placed beyond the jurisdiction of
the court;

(iv)   has been substantially diminished in value;
or

(v)   has been commingled with other property which
cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18,
United States Code, Section 982 and Title 21, United States Code,
Section 853(p), to seek forfeiture of any other property of said
defendants up to the value of the forfeitable property described
above.

(Title 18, United States Code, Sections 371, 981, 982; 1343;
Title 15, United States Code, Sections 78j(b), 78ff; Title 17,
Code of Federal Regulations, Sections 240.10b-5; Title 21, United
States, Section 853(p); and Title 28, United States Code, Section
2461.)

MICHAEL J. GARCIA
United States Attorney

40

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v -

## SANTO C. MAGGIO,

Defendant.

## INFORMATION

07 Cr.

(18 USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR § 240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR, §240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18 USC 1343, 2; 15 U.S.C. §78m and 78ff; 17 CFR §240.13b2-2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- X
                                                        :
AXIS REINSURANCE COMPANY,                                :         No. 07-CV-7924 (GEL)
                                                        :
                          Plaintiff,                     :
            v.                                           :
                                                        :
PHILLIP R. BENNETT, et al.,                              :
                                                        :
                          Defendants.                    :
                                                        :
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- X
                                                        :
In re                                                    :         Chapter 11
                                                        :
REFCO, INC., et al.,                                     :         Case No. 05-60006 (RDD)
                                                        :
                          Debtors.                       :         Jointly Administered
                                                        :
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- X
                                                        :
AXIS REINSURANCE COMPANY,                                :         Adv. Proc. No. 07-1712-RDD
                                                        :
                          Plaintiff,                     :
            v.                                           :
                                                        :
PHILLIP R. BENNETT, et al.,                              :
                                                        :
                          Defendants.                    :
                                                        :
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- X
                                                        :
TONE N. GRANT, et al.,                                   :         Adv. Proc. 07-2005-RDD
                                                        :
                          Plaintiffs,                    :
            v.                                           :
                                                        :
AXIS REINSURANCE COMPANY,                                :
                                                        :
                          Defendant.                     :
                                                        :
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- X
                                                        :
LEO R. BREITMAN, et al.,                                 :         Adv. Proc. No. 07-2032-RDD



Plaintiffs,

v.

AXIS REINSURANCE COMPANY,

Defendant.

-------------------------------------------------- X

AXIS REINSURANCE COMPANY,          (1) No. 07-CV-9420-GEL
                                   (2) No. 07-CV-9842-GEL
              Plaintiff,           (3) No. 07-CV-10302-GEL

v.

PHILLIP R. BENNETT, et al.,

              Defendants.

-------------------------------------------------- X

TONE N. GRANT, et al.,             No. 07-CV-9843-GEL

              Plaintiffs,

v.

AXIS REINSURANCE COMPANY,

              Defendant.

-------------------------------------------------- X

## [proposed] ORDER

The October 19, 2007 Order entered by the Bankruptcy Court for the Southern
District of New York, requiring, among other things, Axis to advance, subject to a
complete reservation of rights, privileges, and defenses of the parties under the Axis
Policy, Defense Costs incurred by the Insureds in defense of the various matters asserted
against them related to the demise of Refco, Inc. (the "Claim"), unless and until: (1) there

is a final determination that (a) the Claim is not covered by the Axis Policy, or (b) such

Defense Costs are not covered under the Axis Policy; or (2) the Limit of Liability of the

Axis Policy ahs been exhausted, is hereby STAYED, pending entry of this Court's

decision on Axis's appeal of that Order.


       SO ORDERED this ____ day of December, 2007.


 

                            _____

                               GERARD E. LYNCH

                        UNITED STATES DISTRICT JUDGE

# Exhibit 18

# KAUFMAN BORGEEST & RYAN LLP

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE B. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
JONATHAN S. BRUNO‡
PAUL J. COLUCCI
MARGARET J. DAVINO*‡‡
JEFFREY C. GERSON‡‡‡
ROCCO B. MATRA◊
JOHN B. MULLAHY*
MELINDA R. MARGOLIES‡
JEFFREY S. WHITTINGTON◊
CHRISTINE HEENAN

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN‡

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEWER*
CAROL S. DOTY‡‡‡
BARBARA-ANN M. COSTELLO
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
BELINDA DODDS-MARSHALL‡‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL B. JANES
R. EVON HOWARD‡‡
LEONARD B. COOPER‡‡
ANDREW R. JONES
KEITH L. KAPLAN‡‡
VINCENT C. ANSALDI‡‡‡
DAVID J. VARRIALE*‡‡

ATTORNEYS AT LAW

**200 SUMMIT LAKE DRIVE**
**VALHALLA, NEW YORK 10595**

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

DOUGLAS J. DOMSKY
TIMOTHY E. McCARTHY *
JEFFREY A. GRALNICK
TRACEY REISER-PERTOSO‡‡
KATHERINE J. O'BRIEN‡‡
DAMIEN SMITH
ANDREW S. KOWLOWITZ*♦
MATTHEW M. FERGUSON♦
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA‡‡
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA‡‡
ELAN R. KANDEL*‡‡
BRIAN M. SHEX*
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON‡‡
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*

KATHRYN M. WALSH
LAURA B. JUFFA
KATELIN B. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI B. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNING‡
THOMAS LOOKSTEIN
ROBERT E. FEKETE
JULIE A. MICKIEWICZ*
LORRAINE C. SYLVESTER*
JESSICA MOLINARES
JENNIFER M. HAMILTON

‡ ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
‡‡ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
♦ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
♦ ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
♦ ADMITTED IN CT ONLY
☆ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

February 19, 2008

**VIA FEDERAL EXPRESS**
Honorable Gerard E. Lynch
United States District Court for the
Southern District of New York
500 Pearl Street, Room 910
New York, NY 10007

|       |                                                                |
|-------|----------------------------------------------------------------|
| Re:   | *Axis Reinsurance Company v. Phillip Bennett, et al.*          |
| Index Nos.: | 07-CV-07924 (GEL); 07-CV-09420 (GEL); 07-CV-09842 (GEL); 07-CV-9843 (GEL); and 07-CV-10302 (GEL) |

Dear Judge Lynch:

As you are aware, this firm represents Axis Reinsurance Company ("Axis") in connection with the captioned matters. We write in furtherance of Axis's Appeal of the Bankruptcy Court's Advancement Order and Axis's Motion to Stay the Bankruptcy Court's Advancement Order, both of which have been fully briefed and are pending before the Court.

On Friday, February 15, 2008, Mr. Bennett pleaded guilty to each of the counts in the 20-count criminal indictment pending against him. A full copy of the February 15, 2008 transcript is attached.

Respectfully,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

Enclosure
cc: all counsel (via email only)

82FVBENP.txt

1

82FVBENP                    Plea
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4              v.                    05 CR 001192 (NRB)
4
5  PHILLIP BENNETT,
5
6                  Defendant.
6
7  ------------------------------x
7
8                                    New York, N.Y.
8                                    February 15, 2008
9                                    5:40 p.m.
9
10
10  Before:
11
11                  HON. NAOMI REICE BUCHWALD,
12
12                                    District Judge
13
13
14                      APPEARANCES
14
15  MICHAEL J. GARCIA
15      United States Attorney for the
16      Southern District of New York
16  NEIL M. BAROFSKY
17  CHRISTOPHER L. GARCIA
17      Assistant United States Attorneys
18
18  KRAMER LEVIN NAFTALIS & FRANKEL
19      Attorneys for Defendant
19  GARY P. NAFTALIS
20  DAVID S. FRANKEL
20  ADAM C. FORD
21  DARREN A. LAVERNE
21
22  ALSO PRESENT:   WILLIAM JOHNSON, Postal Inspector
22                  KRIS MOON, Postal Inspector
23                  ANNE RAILTON, Law Student
23
24
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

0

2

82FVBENP                    Plea
1          (In open court)
2          (Case called)
3          THE DEPUTY CLERK:  The case is United States against
4  Phillip Bennett; docket number 05 CR 1192.  Is the government
5  ready to proceed?
6          MR. BAROFSKY:  Yes.  Neil Barofsky for the government.
7  With me at counsel table, with your Honor's permission, is
8  Christopher Garcia of our office, our postal inspectors on the
9  case, William Johnson and Kris Moon, as well as our legal
                          Page 1

82FVBENP.txt
```
10    intern, Annie Railton, who's been assisting the trial of this
11    matter.  Good evening, your Honor.
12              MR. GARCIA:  Good evening, your Honor.
13              THE DEPUTY CLERK:  Is the defense ready to proceed?
14              MR. NAFTALIS:  Yes, we are.  Gary Naftalis for
15    Mr. Bennett, along with David Frankel.
16              THE COURT:  Mr. Naftalis?
17              MR. NAFTALIS:  Your Honor, we have an application on
18    behalf of Mr. Bennett to withdraw his plea of not guilty to the
19    charges in the indictment and to offer to plead guilty to the
20    charges in the indictment.
21              THE COURT:  All right.  Mr. Bennett, would you stand
22    please.  Would you raise your right hand.
23              (Defendant sworn)
24              THE COURT:  And would you state your full name for me
25    please.
```

82FVBENP                           Plea
```
 1              THE DEFENDANT:  Phillip Roger Bennett.
 2              THE COURT:  And Mr. Bennett, how old are you?
 3              THE DEFENDANT:  59, your Honor.
 4              THE COURT:  Why don't you sit down.  Mr. Bennett, what
 5    was the highest grade in school that you completed?
 6              THE DEFENDANT:  University.  Grade, twelfth grade, I
 7    think it is, your Honor.
 8              THE COURT:  You have the equivalent of a college
 9    degree.
10              THE DEFENDANT:  Yes, master of arts.
11              THE COURT:  And are you now or have you currently been
12    under the care of a doctor or psychiatrist?
13              THE DEFENDANT:  No, your Honor.
14              THE COURT:  And have you ever been hospitalized or
15    treated for alcoholism or narcotics addiction?
16              THE DEFENDANT:  No, your Honor.
17              THE COURT:  Are you under the influence of any drug or
18    alcohol today?
19              THE DEFENDANT:  I'm not, no, your Honor.
20              THE COURT:  And how are you feeling physically today?
21              THE DEFENDANT:  Fine, your Honor.  Thank you.
22              THE COURT:  Mr. Bennett, have you had the opportunity
23    to review the charges against you and your plea with
24    Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as
25    well?
```

82FVBENP                           Plea
```
 1              THE DEFENDANT:  I have, your Honor, yes.
 2              THE COURT:  And have you been satisfied with the
 3    advice and counsel that Messrs. Naftalis and Frankel have given
 4    to you?
 5              THE DEFENDANT:  I have, yes.
 6              THE COURT:  Are you ready to change your plea at this
 7    time?
 8              THE DEFENDANT:  I am, your Honor.
 9              THE COURT:  And what is your plea at this time, guilty
10    or not guilty?
11              THE DEFENDANT:  It's guilty, your Honor.
12              THE COURT:  Mr. Bennett, in order to determine whether
13    your plea is voluntary and made with a full understanding of
14    the charges against you and the consequences of your plea, I
```

82FVBENP.txt

15  will make certain statements to you and I will ask you certain
16  questions.  I want you to understand that I need not accept
17  your plea unless I am satisfied that you are, in fact, guilty,
18  and that you fully understand your rights.  I'm tempted to ask
19  the government to pick a few favorite charges instead of all of
20  these, but, okay.
21       Mr. Bennett, you've been charged in the 20-count
22  indictment.
23       The first count charges you with a conspiracy to
24  commit securities fraud, wire fraud, bank fraud, and money
25  laundering, and to make false filings to the SEC.  This crime

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

82FVBENP     Plea

1  carries a maximum sentence under the law of five years
2  imprisonment, a maximum fine of the greatest of $250,000 or
3  twice the gross pecuniary gain derived from the offense or
4  twice the gross pecuniary loss to persons other than yourself
5  as a result of the offense, and a $100 special assessment, and
6  a maximum term of supervised release of three years.
7       Do you understand that these are the charges in Count
8  One of the indictment and the maximum statutory penalties
9  applicable to those charges?
10      THE DEFENDANT:  I do, your Honor, yes.
11      THE COURT:  Counts Two and Three of the indictment
12  charge you with securities fraud.  Each of these counts carries
13  a maximum sentence of 20 years in prison, a maximum fine of
14  $5,000,000 or twice the gross pecuniary gain derived from the
15  offense or twice the gross pecuniary loss to a person other
16  than yourself as a result of the offense, a $100 special
17  assessment, and a maximum term of supervised release of three
18  years.
19      Do you understand that those are the charges in Counts
20  Two and Three and the maximum penalties under law for those
21  charges of securities fraud?
22      THE DEFENDANT:  I do, your Honor.
23      THE COURT:  Count Four charges you with making a false
24  filing with the Securities and Exchange Commission.  And this
25  crime carries a maximum statutory penalty of 20 years in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

82FVBENP     Plea

1  prison, a maximum fine of the greatest of $5,000,000 or twice
2  the gross monetary gain derived from the offense or twice the
3  gross monetary loss to a person other than yourself as a result
4  of the offense, a $100 special assessment, and a maximum term
5  of supervised release of three years.
6      Do you understand that those are the charges in Count
7  Four and the maximum penalties applicable to those charges?
8      THE DEFENDANT:  I do, your Honor.
9      THE COURT:  Counts Five and Six of the indictment
10  charge you with making a false filing with the Securities and
11  Exchange Commission -- excuse me, with the Securities and
12  Exchange Commission.  Each of these counts carries a maximum
13  sentence under the law of five years imprisonment, a maximum
14  fine of the greatest of $250,000 or twice the gross pecuniary
15  gain derived from the offense or twice the gross pecuniary loss
16  to a person other than yourself as a result of the offense, and
17  a $100 special assessment, and a maximum supervised release
18  term of three years.  Do you understand that those are the
19  charges in Counts Five and Six of the indictment and the

Page 3

82FVBENP.txt
```
20    maximum penalties provided for by law for those crimes?
21              THE DEFENDANT:  Yes, I do, your Honor.
22              THE COURT:  And Counts Seven through Thirteen of the
23    indictment charge you with wire fraud.  Each of these counts
24    carries a maximum possible sentence of 20 years in prison, a
25    maximum fine of the greatest of $250,000 or twice the gross
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    7

82FVBENP          Plea
```
 1    pecuniary gain derived from the offense or twice the gross
 2    pecuniary loss to a person other than yourself as a result of
 3    the offense, a $100 special assessment, and a maximum term of
 4    supervised release of three years.
 5              Do you understand that those are the charges in Counts
 6    Seven through Thirteen, and the maximum penalties under the
 7    statute for those charges?
 8              THE DEFENDANT:  Yes, I do, your Honor.
 9              THE COURT:  All right.  Count Fourteen charges you
10    with making material misstatements to auditors.  And this crime
11    carries a maximum sentence of 20 years imprisonment, a maximum
12    fine of $5,000,000 or twice the gross pecuniary gain derived
13    from the offense or twice the gross pecuniary loss to a person
14    other than yourself as a result of the offense, a $100 special
15    assessment, and a maximum term of supervised release of three
16    years.
17              Do you understand that that is the crime charged in
18    Count Fourteen of the indictment, and the maximum penalty
19    provided for by statute for Count Fourteen?
20              THE DEFENDANT:  Yes, I do, your Honor.
21              THE COURT:  Count Fifteen of the indictment charges
22    you with bank fraud.  And this crime carries a maximum sentence
23    of 30 years in prison, a maximum fine of the greatest of
24    $1,000,000 or twice the gross pecuniary gain derived from the
25    offense or twice the gross pecuniary loss to a person other
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    8

82FVBENP          Plea
```
 1    than yourself as a result of the offense, a $100 special
 2    assessment, and a maximum term of supervised release of five
 3    years.
 4              Do you understand that that is the charge in Count
 5    Fifteen, and that those are the maximum penalties provided for
 6    by law?
 7              THE DEFENDANT:  Yes, your Honor.  Forgive me, yes,
 8    your Honor.
 9              THE COURT:  Counts Sixteen through Twenty charge you
10    with money laundering.  Each of these counts carries a maximum
11    possible sentence of ten years imprisonment, a maximum fine of
12    the greatest of $250,000, twice the gross pecuniary gain
13    derived from the offense or twice the gross pecuniary loss to a
14    person other than yourself as a result of the offense, and a
15    $100 mandatory special assessment, and a maximum supervised
16    release term of five years.
17              Do you understand that those are the crimes charged in
18    Counts Sixteen through Twenty, and the maximum possible penalty
19    provided by law?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  Do you also understand that the Court must
22    impose an order of restitution by law?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  And do you understand that you are also
```
                                Page 4

82FVBENP.txt

subject to mandatory asset forfeiture?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

82FVBENP          Plea
1           THE DEFENDANT: Yes, your Honor.
2           THE COURT: And do you understand that you have the
3  right to plead not guilty and the right to a trial on the
4  charges against you and, in fact, the right to a jury trial?
5           THE DEFENDANT: Yes, your Honor.
6           THE COURT: At this time, I'd ask the government to
7  recite the elements of the crimes charged.
8           MR. BAROFSKY: Yes, your Honor. For Count One,
9  conspiracy, the government would have to prove the following
10 elements:
11          First, that an agreement or understanding existed to
12 commit the objects charged in the indictment. Second, the
13 defendant knowingly became a member of that agreement or
14 understanding. And third, that one of the conspirators
15 knowingly committed at least one overt act in furtherance of
16 the conspiracy during the life of the conspiracy.
17          With respect to Counts Two and Three, securities
18 fraud, the government would have to prove, first, that Bennett,
19 in connection with the purchase or sale of securities, and for
20 Count Two, that would be the notes described in the indictment,
21 and in Count Three, the common stock of Refco described in the
22 indictment, he did one or more of the following: He either
23 employed a device, scheme, or artifice to defraud or made an
24 untrue statement of a material fact or omitted to state a
25 material fact which made what was said under the circumstances
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

82FVBENP          Plea
1  misleading or engage in an act, practice, or course of business
2  that operated or would operate as a fraud or deceit on a
3  purchaser or seller. Second, that Bennett acted knowingly,
4  willfully, and with intent to defraud. And, third, that he
5  used or caused to be used any means or instruments of
6  transportation or communication in interstate commerce, but he
7  used the mails in furtherance of the fraudulent conduct.
8           With respect to Count Four, which charges false filing
9  under the Exchange Act, the first element the government would
10 have to prove is that Refco was required by the Securities
11 Exchange Act of 1934 to file the 10-K that's described in Count
12 Four. And, second, that the defendant knowingly and willfully made
13 or caused to be made a materially false or misleading statement
14 in that document or omitted to state any material fact required
15 to be stated therein or necessary to make the statements
16 therein not misleading.
17          With respect to Counts Five and Six, false filings
18 under the Securities Act, the government would have to prove,
19 again, first, that Refco was required under the Securities Act
20 of 1933 to file the S4, which is described in Count Five, and
21 the S1 registration statement described in Count Six. And,
22 second, that Bennett knowingly and willfully made or caused to
23 be made a materially false or misleading statement in those
24 documents or omitted to state any material fact required to be
25 state therein or necessary to make the statements therein not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

82FVBENP          Plea
                  Page 5

82FVBENP.txt

1  misleading.
2         With respect to Counts Seven through Thirteen of wire
3  fraud, the government would have to prove, first, that a scheme
4  to defraud must have existed; that Bennett must have
5  participated in the scheme with intent to defraud; that
6  misrepresentations or omissions must have related to material
7  facts were made in furtherance of the fraud; that the scheme
8  was executed to obtain money or property; and that in the
9  execution of the scheme, Bennett used or caused to be used the
10 interstate wires listed in the indictment. And here for Count
11 Seven is the June 22nd of 2004 email from Robert Trosten; in
12 Count Eight, the August 3, '04 email from Robert Trosten; in
13 Count Nine, the April 6, '05 transmission of the S4 from New
14 York to Virginia; in Count Ten, the July 19th, 2005
15 transmission of 10-K from New York to Virginia; in Count
16 Eleven, the August 5th, 2004 transmission of $4,000,000 from
17 New York to Illinois; in Count Twelve, the August 5th, 2004
18 transmission of $40,000,000 from New York to Illinois; and in
19 Count Thirteen, the August 8th, 2005 transmission of the S1
20 registration statement from New York to Virginia.
21        For Count Fourteen, material misstatements to
22 auditors, the government would have to prove, first, that Refco
23 was a public company that was required to submit financial
24 statements to the SEC; second, that Bennett was a
25 director/officer of Refco; third, Bennett knowingly and
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                        12
82FVBENP              Plea
1  willfully made, caused to be made, a materially false or
2  misleading statement or omitted to state a material fact
3  necessary order to make the statements made in light of the
4  circumstances under which such statements were made not
5  misleading to an accountant, and that the statement was made in
6  connection with the audit or examination of the financial
7  statements of Refco required to be made pursuant to the Act.
8         Count Fifteen charges the defendant with bank fraud.
9  And specifically, that on August 5th, 2004, defrauded HSBC.
10 And the government would have to prove, first, there was a
11 scheme to defraud a bank by means of materially false or
12 fraudulent pretenses, representations, or promises; second,
13 that Bennett executed or attempted to execute the scheme with
14 intent to defraud the bank, here, again, HSBC; and third, at
15 the time of the execution of the scheme, HSBC had its deposits
16 insured by the FDIC. And I'll represent to the Court that at
17 the relevant time periods, HSBC's deposits were insured by the
18 FDIC.
19        And finally, Counts Sixteen through Twenty charge the
20 defendant with money laundering. And the government would have
21 to prove, first, that Bennett engaged or attempted to engage in
22 monetary transactions involving criminally derived property of
23 a value greater than $10,000; second, that the property
24 involved in the monetary transaction was, in fact, derived and
25 specified unlawful activity; third, that Bennett acted
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                        13
82FVBENP              Plea
1  knowingly. And for these purposes, wire fraud, bank fraud, and
2  securities fraud are all specified unlawful activities and
3  would have to prove each of the transactions listed in the
4  indictment in Counts Sixteen through Twenty, basically the wire
5  transactions which are described therein.
                   Page 6

82FVBENP.txt
```
6        THE COURT:  Mr. Bennett, do you understand that if you
7   pled not guilty and went to trial, that the burden would be on
8   the government to prove each and every element of every crime
9   charged beyond a reasonable doubt in order to convict you of
10  that crime?
11       THE DEFENDANT:  I do, your Honor.
12       THE COURT:  Do you understand that at a trial you
13  would have the right to be represented by an attorney at all
14  stages of the proceeding and, if necessary, an attorney would
15  be appointed for you?
16       THE DEFENDANT:  Yes, I do.
17       THE COURT:  And do you understand that at a trial you
18  would have the right to confront and cross-examine witnesses
19  and the right not to be compelled to incriminate yourself?
20       THE DEFENDANT:  I do, your Honor.
21       THE COURT:  And do you understand that at a trial you
22  would be presumed innocent until such time, if ever, the
23  government established your guilt by competent evidence to the
24  satisfaction of the trier of fact beyond a reasonable doubt?
25       THE DEFENDANT:  Yes, your Honor.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

82FVBENP              Plea
```
1        THE COURT:  And do you understand that at a trial you
2   would have the right to testify and would also be entitled to
3   compulsory process; in other words, the right to call other
4   witnesses on your behalf?
5        THE DEFENDANT:  Yes, your Honor.
6        THE COURT:  And do you understand that if your plea is
7   accepted, that there will be no further trial of any kind, so
8   that by pleading guilty, you are waiving your right to a trial?
9        THE DEFENDANT:  I do understand that, your Honor, yes.
10       THE COURT:  And do you understand that if you are
11  sentenced to a period of supervised release, and if you violate
12  the terms of your supervised release, that an additional period
13  of jail time may be imposed without credit for the time that
14  you've previously spent on supervised release?
15       THE DEFENDANT:  Yes, your Honor.
16       THE COURT:  Do you understand that in connection with
17  your plea of guilty, that the Court may ask you certain
18  questions about the offense to which you have pled; and if you
19  answer those questions under oath and on the record and in the
20  presence of your counsel, that your answers are false may later
21  be used against you in a prosecution against you for perjury or
22  false statement?
23       THE DEFENDANT:  Yes, your Honor.
24       THE COURT:  And I recall, Mr. Bennett, you're a
25  citizen of Great Britain.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

82FVBENP              Plea
```
1        THE DEFENDANT:  I am, your Honor, yes.
2        THE COURT:  Do you understand that following any
3   sentence that you receive, that you will likely be deported?
4        THE DEFENDANT:  That is my understanding, your Honor,
5   yes.
6        THE COURT:  And do you understand that in determining
7   your sentence, that the Court is obligated to calculate the
8   applicable sentencing guidelines range, and to consider that
9   range and any possible departures under the guidelines and
10  other sentencing factors under the statute which entitles the
```
Page 7

82FVBENP.txt
11  Court to consider the nature and circumstances of the offense
12  and the history and characteristics of the defendant?
13          THE DEFENDANT:  Yes, your Honor.
14          THE COURT:  And have you reviewed with your counsel
15  the government's letter to them of yesterday which explains the
16  government's position as to the sentence that you face if the
17  sentencing guidelines are applied to your case?
18          THE DEFENDANT:  I have reviewed it, your Honor,
19  correct.
20          THE COURT:  Actually, that was said very badly.  Let
21  me just try it again so that there's no confusion.
22          Have you reviewed that letter with your lawyers which
23  sets forth the government's calculation of the sentence that
24  you face under the sentencing guidelines?
25          THE DEFENDANT:  I have reviewed it.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                16
82FVBENP                      Plea
1           THE COURT:  And do you understand that the government
2   calculates that under the guidelines, that you face a sentence
3   of life imprisonment; and that it has calculated that the
4   maximum possible statutory sentence is 315 years; and that the
5   fine range is from 25,000 to $5,000,000?
6           THE DEFENDANT:  I understand that, your Honor,
7   correct.
8           THE COURT:  And do you understand that that
9   calculation by the guidelines -- that by the government is just
10  based on the information they currently have?
11          THE DEFENDANT:  Yes, your Honor.
12          THE COURT:  And do you further understand that the
13  government's letter doesn't bind either the Court or the
14  probation department, and that ultimately the sentence that you
15  receive will be determined by the Court?
16          THE DEFENDANT:  Yes, your Honor.
17          THE COURT:  Mr. Bennett, have any threats or promises
18  been made to you to make you plead guilty?
19          THE DEFENDANT:  No, your Honor.
20          THE COURT:  Have any understandings or promises been
21  made to you concerning the sentence that you will receive?
22          THE DEFENDANT:  None.
23          THE COURT:  Is your plea voluntary?
24          THE DEFENDANT:  It is, your Honor.
25          THE COURT:  Mr. Bennett, did you commit the crimes
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                17
82FVBENP                      Plea
1   that you've been charged with in the indictment?
2           THE DEFENDANT:  I did, your Honor.
3           THE COURT:  Would you tell me in your own words what
4   you did?
5           THE DEFENDANT:  Your Honor, during the period that I
6   served as CEO of Refco, I agreed with other Refco executives to
7   enter into a series of transactions at the end of Refco's
8   financial reporting periods to make it appear as if a
9   receivable due to Refco from Refco Upholdings, Inc., a related
10  party, was instead due from an independent third-party
11  customer.
12          The IGHI receivable was composed of, amongst other
13  things, historical customer losses, bad debts, and expenses
14  that IGHI had incurred on behalf of Refco.
15          I, along with other Refco executives, have caused
                        Page 8

82FVBENP.txt

16  Refco to enter into these transactions in order to conceal the
17  size and nature of the IGHI receivable.  We concealed the
18  receivable from, amongst others, Refco's auditors, Thomas H.
19  Lee Partners, various lenders who, in 2004, participated in
20  Refco's senior secured credit facility, and the issuance of 9
21  percent senior subordinated notes, and also investors in
22  Refco's common stock.
23           Among the lenders to whom I knowingly caused the IGHI
24  receivable to be misrepresented was HSBC Bank, referenced in
25  Count Fifteen of the indictment.  I and other Refco executives

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

82FVBENP          Plea

1  also used the interstate wires to accomplish these acts within
2  this district, as referenced in Counts Seven through Thirteen.
3  Furthermore, I caused funds obtained from the transaction with
4  Thomas H. Lee Partners, referenced in paragraph 34 of the
5  indictment, to be wired to various parties receiving proceeds
6  from the transaction, as referenced in Counts Sixteen through
7  Twenty, knowing that this money had been unlawfully obtained.
8           The IGHI receivable and related party transaction used
9  to conceal it were material information that Refco investors
10  and lenders would have wanted to have known prior to investing
11  in or lending money to Refco.  While I believed that I would be
12  able to pay the IGHI receivable down over time, and did, in
13  fact, ultimately pay off the receivable balance in its
14  entirety, I knew that failing to disclose the receivable was
15  wrong; I knew that obtaining funds from Refco's investors and
16  lenders based on misleading financial statements was also
17  wrong.
18           I also caused Refco to file documents with the SEC,
19  namely S1, S4, and 10-K that did not disclose the full extent
20  of the IGHI receivable or the transactions used to conceal it;
21  and, thus, were false and misleading with respect to material
22  facts.  I knew that failing to disclose these facts in public
23  filings and in connection with Refco's sale and registration of
24  Refco's notes and common stock was wrong, and I deeply regret
25  having done so.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

82FVBENP          Plea

1          Your Honor, I take full responsibility for my actions.
2  I wish to publicly apologize to my family and to all of those
3  who have been harmed by my conduct.  Thank you, your Honor.
4          THE COURT:  Mr. Barofsky, is there anything else you
5  would want me to ask the defendant?
6          MR. BAROFSKY:  Your Honor, can we just have a moment
7  to review?  There's a lot of elements.  Thank you, your Honor.
8          THE COURT:  Certainly.
9          (Pause)
10          MR. BAROFSKY:  Your Honor, just a couple of areas for
11  clarification.  First, if you can please ask the defendant to
12  confirm that he was a director or officer of Refco during this
13  relevant time period.  Should I go one-by-one?
14          THE COURT:  Mr. Bennett, can you confirm that?
15          THE DEFENDANT:  I was, your Honor.
16          MR. BAROFSKY:  Second, your Honor, that the
17  misstatements made about Refco's auditor was in connection with
18  the auditor's preparation of a financial statement, and that
19  occurred after April of 2005.
20          THE COURT:  Can you confirm that?

Page 9

82FVBENP.txt
```
21          THE DEFENDANT:  That's correct, your Honor.
22          MR. BAROFSKY:  Your Honor, and if you can ask the
23     defendant to confirm he made reference to various wire
24     transfers and wire communications, as well as certain filings
25     in the indictment, if you could please confirm with the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

82FVBENP                    Plea
```
 1     defendant that those acts occurred on or about the dates set
 2     forth in the indictment.
 3          THE DEFENDANT:  They did, your Honor.
 4          MR. BAROFSKY:  And finally, your Honor, as I noted
 5     earlier, I will represent to the Court that HSBC was --
 6     deposits were insured by the FDIC during the relevant time
 7     period; and also that Refco was an entity that was required to
 8     file the various reports and documents and registration
 9     statements under the Exchange Acts of 1933 and 1934, as well as
10     to file financial statements with respect to the 10-K and the
11     misstatement to auditors account. Thank you, your Honor.
12          THE COURT:  Mr. Bennett, do you still wish to plead
13     guilty?
14          THE DEFENDANT:  I do, your Honor, yes.
15          THE COURT:  Mr. Naftalis, do you know of any reason
16     that Mr. Bennett ought not plead guilty?
17          MR. NAFTALIS:  No, your Honor.
18          THE COURT:  Mr. Bennett, I'm satisfied that you
19     understand the nature of the charge against you and the
20     consequences of your plea; and that your plea is made
21     voluntarily and knowingly; and that there is a factual basis
22     for it. Accordingly, I will accept your plea of guilty and
23     direct that a presentence report be prepared.
24          THE DEFENDANT:  Thank you, your Honor.
25          THE COURT:  As for a sentencing date, can I just
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

82FVBENP                    Plea
```
 1     basically count out the requisite number of days or does the
 2     government have a view that it should be maybe a little bit
 3     more off into the future in light of the trial that's still
 4     upcoming?
 5          MR. BAROFSKY:  Your Honor, we think we can be prepared
 6     in three months.
 7          THE COURT:  All right. Why don't we set sentencing
 8     for May 20th at 4 o'clock. And since I would anticipate some
 9     significant presentence submissions, I think we should set a
10     schedule for that. Why don't we say that the government's
11     submission is due -- the defense submission is due on May 6th,
12     and the government's on May 13th.
13          MR. BAROFSKY:  That's fine, your Honor.
14          MR. NAFTALIS:  Your Honor, if there are things in the
15     government submission that we want to respond to, that's sort
16     of --
17          THE COURT:  Doesn't give you quite enough time.
18          MR. NAFTALIS:  We don't have -- you're having us
19     first, so we don't really sort of provide -- they could go
20     first, we could go second; we wouldn't object to that.
21          MR. BAROFSKY:  We could do simultaneous submissions,
22     as well, your Honor, on the 6th and then we could each respond.
23          THE COURT:  Sounds like fun.
24          MR. BAROFSKY:  Okay.
25          MR. NAFTALIS:  It's a living.
```
Page 10

82FVBENP.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

82FVBENP                    Plea
1    THE COURT:  Let's not go there.  Okay?  Are we done?
2    MR. BAROFSKY:  No, your Honor.  There is the issue of
3  bail.  And at this time, your Honor, the government does
4  request that defendant be remanded.  And if your Honor will let
5  me, I would like to speak briefly on the topic.
6    THE COURT:  Okay.
7    MR. BAROFSKY:  Obviously the standard has changed
8  under the Bail Act under 3143.  Before when we appeared before
9  your Honor several years ago, the burden was ours to prove the
10  defendant was a risk of flight.  Now, of course, it is the
11  defendant's burden to prove by clear and convincing evidence
12  that he is not likely to flee.  And respectfully, we submit
13  that there have been some extremely significant changed
14  circumstances, that we respectfully submit the defendant cannot
15  meet the burden in this case.
16    First of all, under the current bond, which, as your
17  Honor may recall, is a $50,000,000 bond, secured by $5,000,000
18  in cash and two properties, that security is now essentially
19  worthless; it's essentially an unsecured bond, because all of
20  those properties and that money are subject to asset
21  forfeiture.  The $5,000,000 we have traced as direct proceeds
22  from the IPO, which the defendant has just admitted was money
23  that was fraudulently obtained, and we already have lis pendens
24  on both of the properties, because basically under substitute
25  assets, we'd be able to take those, as well.  Those are all
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

82FVBENP                    Plea
1  subject to asset forfeiture and, therefore, don't provide any
2  security for the existing bond.
3    Secondly, the defendant is facing a $2.4 billion asset
4  forfeiture.  We don't think he has $2.4 billion, but we do
5  believe that will essentially -- through proceeds and
6  substitute assets, once this conviction is final -- will
7  basically deprive the defendant of all of his assets.  We have
8  restrained a number of his assets pretrial, but we have not
9  been able to restrain assets that we haven't been able to prove
10  are directly traceable.  And we don't know the exact amount of
11  those items, but we believe that they are in the $20,000,000
12  range, which would certainly facilitate the ability of the
13  defendant to flee.
14    Third, and I guess the most obvious point, is the
15  defendant now faces an advisory guideline range of 315 years of
16  imprisonment.  And that obviously changes the calculus a lot
17  from when we last appeared before your Honor.  We're not
18  suggesting that your Honor is going to --
19    THE COURT:  He always faced that, right?
20    MR. BAROFSKY:  Yes, your Honor; but before,
21  pretrial -- I'm sorry, pre-guilty plea, there was no certainty
22  that he was necessarily going to be convicted in this case.
23  Now, jail is an inevitability.  And I don't mean to presume
24  what the ultimate sentence will be in this case, because
25  there's obviously no way to predict what the precise sentence
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

82FVBENP                    Plea
1  will be, but the best guess, I think, from anyone's
Page 11

82FVBENP.txt
2  perspective, is that it will be a substantial prison sentence.
3  And for this defendant -- he is now with certainty facing such
4  a sentence that has -- under the guidelines is the equivalent
5  of a life sentence.
6      Defendant is 59 years old.  A sentence of -- a
7  significant sentence in this case may very well prove to be the
8  equivalent of a life sentence.  The defendant is facing certain
9  deportation after he serves that sentence.
10     THE COURT:  Not to a bad place though.
11     MR. BAROFSKY:  Not to a bad place, your Honor.  But it
12 does give the defendant a tremendous incentive to self-deport.
13 In other words, to flee the jurisdiction really with -- unlike
14 most cases, with very little downside.  The worse that happens
15 if he flees and gets caught is he's brought back to the United
16 States and does a jail sentence that probably will be the rest
17 of his life.  If he stays, he's facing pretty much the prospect
18 of the same result, a sentence that may, in fact, result in him
19 being in jail for the rest of his life, given his age.
20     And, your Honor, we respectfully submit that given the
21 shifting of the burden in these really remarkable circumstances
22 of a defendant who's not a U.S. citizen, who's facing the
23 equivalent of a life sentence, and who's now basically would be
24 free on an unsecured bond, that the circumstances dictate the
25 defendant should start serving his sentence, in effect,
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

                                                          25
                     82FVBENP        Plea
1  immediately.  And the defendant should be remanded on the
2  grounds that he cannot meet his burden of demonstrating by
3  clear and convincing evidence that he is not a risk of flight.
4      THE COURT:  Mr. Naftalis.
5      MR. NAFTALIS:  Most respectfully, I find this
6  application most surprising and a baseless one.  And I say it
7  with -- most advisedly.
8      You have a situation here where our client, for almost
9  two and-a-half years, has met every single condition of the
10 bond that was set here.  Your Honor got a report today from the
11 office of pretrial services, which we were given a copy of when
12 we entered the room, in which the office of pretrial services
13 has pointed out that he has complied with the terms of his bail
14 all the way through.
15     And I can sort of punctuate that a little bit because,
16 in fact, if you check with Officer Forelli, who he deals with
17 in pretrial services, you could hear anecdotal information such
18 as Mr. Bennett was the one who has set up the monitoring system
19 in the house in New Jersey because, whatever, I guess they're
20 technophobes, like I, the marshals service, he actually set up
21 the monitoring service which passed their muster in the
22 electronic stuff.  Once, when his bracelet broke down, he
23 immediately reported it to Officer Forelli that it was
24 malfunctioning and he went in.  He's been meticulous in
25 reporting to these people.
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

                                                          26
                     82FVBENP        Plea
1      And secondly, something that the government
2  consciously avoided bringing to your attention, his bond is
3  signed by the three immediate members of his family.  The three
4  of them who are American citizens:  His wife, his daughter, and
5  his son.  They have signed a $50,000,000 bond on his behalf,
6  and these are people with roots in the community.  The daughter
                          Page 12

82FVBENP.txt

7  is a lawyer, works at a law firm; the son is an investment
8  banker with a leading firm. The notion that he would run away
9  and do that to his family, I mean, is incomprehensible. And
10  all we have is rhetoric from the government there.
11        You also have the strict monitoring conditions in
12  which he's under and which he's faithfully complied with for
13  the last two and-a-half years. Of course, he has no passport;
14  his wife has given up his passport; he has no effective way of
15  leaving the country.
16        And with respect to other situations, in other
17  situations in high-profile cases where people were facing
18  enormous sentences, no such applications were ever granted.
19  For example, the Computer Associates case, where the CEO of
20  Computer Associates, Mr. Kumar, who, under the guidelines which
21  were then in effect, more applicable now, after the Gall case,
22  the guidelines are just, you know, one ingredient in the soup
23  for your Honor to consider under 3533. He faced life
24  imprisonment under his guidelines. After pleading guilty, he
25  continued to be free on bond, even though there were admissions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

82FVBENP           Plea
1  of obstruction of justice in that case.
2        After Kumar was sentenced or he got a 12-year
3  sentence, he continued to be allowed to be -- remained free on
4  bond to work out various issues of restitution and the like.
5        In the case in front of Judge Sand, the Adelphia case,
6  which is one of the cases, the Rigases, who got 15 and 20-year
7  sentences, one of them was an eighty -- somewhere in his
8  eighties, they were allowed to remain free on bond pending
9  appeal, even though they had the same sort of issues. Even
10  Mr. Ebbers, who received the largest sentence in history I've
11  ever heard of, a real outlier sentence, 25 years, he was
12  allowed to remain free on bond pending appeal and the like.
13        And apart from the fact that there is not the
14  slightest bit of evidence for this most unfair application,
15  it's also prejudicial. As your Honor knows, we have to put in
16  sentencing submissions. And under 3533, your Honor has a lot
17  of things which you can properly consider in determining in
18  your best judgment what's a fair and just sentence under the
19  case here. And obviously it's very prejudicial to us in being
20  able to work with our client, who for the last two and-a-half
21  years has been coming to our office every day on a daily basis
22  to work on the case with us. So I don't see any good-faith
23  basis for any change in bond here whatsoever.
24        THE COURT: Mr. Barofsky.
25        MR. BAROFSKY: Your Honor, if there's any specific

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

82FVBENP           Plea
1  points you'd like me to respond to. The ones that jump out to
2  me is, I mean the notion that a defendant can't chronically
3  prepare for sentencing when he's incarcerated, obviously your
4  Honor knows countless defendants who are able to prepare for
5  sentencing when they are incarcerated; and having spent so much
6  time with Mr. Naftalis, I think they are pretty much -- I'm
7  sure they have contemplated this before, this is not the first
8  time.
9        As opposed to those other cases, defendants who are
10  released pending appeal after they've been convicted at trial
11  is a different situation. There's obviously provisions within

Page 13

82FVBENP.txt
12  3143 when there are issues on appeal that the judge finds are
13  significant issues that need to be considered and possibly
14  could result in the reversal of a conviction.  That's a
15  different -- those are different facts, and that's a different
16  standard.  Here, we have a guilty plea.  I don't think that
17  Mr. Bennett is going to be challenging his conviction in this
18  case.  He just gave a very detailed guilty plea.
19          With respect to his assurances to his family, I don't
20  mean to minimize the bond between Mr. Bennett and his family,
21  but on the flip side, we're looking at a man who just admitted
22  to telling a series of lies to a large number of victims that
23  resulted in the defrauding of $2.4 billion.  1.7 or 8 billion,
24  which we will show for restitution at the time of sentencing,
25  has not been collected.  People are out all of this money.
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            29
82FVBENP                    Plea
1           So this man maybe may have some allegiance to his
2   family, but I think you have to look at the flip side as to how
3   strong that may be by a man if he is willing to tell whatever
4   lie is necessary to -- you know, on proportions that are
5   mind-boggling, in the billions of dollars.
6           So we would respectfully submit that -- and we don't
7   contest the fact, by the way, to be clear, that Mr. Bennett has
8   complied with the conditions.  And that is certainly a relevant
9   factor that Mr. Naftalis points out and we don't contest it.
10  We just don't think that that's enough to meet his burden,
11  given his changed circumstances.  And that to allow a defendant
12  like this, who's also not a U.S. citizen, unlike those
13  individuals, out on what is essentially an unsecured bond, it
14  simply isn't the right course of action here.
15          MR. NAFTALIS:  Just one small point, which they
16  reminded me to mention.  Although Mr. Bennett never changed his
17  citizenship, like his wife, or became an American citizen like
18  his children, he's lived in the United States for more than 30
19  years; so it's not like he has any roots anyplace else.  So
20  it's a little unfair for this eleventh-hour application which
21  we heard about today to suggest as if he had someplace to go
22  to.
23          And the government ignored the situation in the Kumar
24  case.  He said that all these other cases where people were on
25  appeal.  In the Kumar case it was a plea of guilty with someone
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            30
82FVBENP                    Plea
1   facing, if one took the government's view of the thing, a life
2   sentence.  And he was allowed out, and he showed up.  Even
3   after he got his sentence of 12 years he remained out on bond
4   to work out the restitution things.
5           And we don't necessarily agree at all with the amount
6   of the forfeiture issues here.  I mean there's a forfeiture
7   issue in the case, but the numbers he tosses around are not
8   numbers that we have stipulated to or agreed to by any stretch
9   of the imagination, and he throws them around.
10          That's the only point I wanted to make.
11          THE COURT:  All right.  I'm not going to remand
12  Mr. Bennett, although I do think I can modify his bail
13  conditions to create greater security.  And I'm not going to do
14  so for a number of reasons, the most important of which is that
15  this indictment was filed in 2005.
16          If Mr. Bennett had wanted to flee, he should have fled
                            Page 14

82FVBENP.txt

17  before he paid his lawyers all the money, and kept it, and gone
18  to an appealing location.  In fact, having pled guilty, to
19  leave now, extraditing him will be much easier.  So there's a
20  balance there.
21          In addition, I note that just by statute, to release
22  someone on appeal requires the same finding as the finding now.
23  The judicial officer has to be persuaded by clear and
24  convincing evidence that the person is not likely to flee.
25  That's half of the standard.  The appellate issue is the other
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              31
82FVBENP              Plea
1   half, so it's the same standard.
2           And I also think that -- and I want to make it
3   clear -- that I don't make any prejudgments about the substance
4   of the case, but this is a case in which there has been a lot
5   of information, publicly, at least, from the bankruptcy
6   proceeding, and so this is a situation in which Mr. Bennett has
7   had the opportunity to see an examiner put the evidence
8   together.  This is not a situation where as the case approaches
9   trial, the government finally turns over information.  I think
10  Mr. Bennett has had a pretty good idea of the nature of the
11  case and the evidence for at least some time, which makes the
12  fact that he stays more significant.
13          The pretrial officer tells me that it would be easier
14  and more effective to monitor Mr. Bennett if he stayed in one
15  home or the other.  And, I guess -- and tells me that basically
16  the minute he leaves home they know about it.  So given that it
17  would take some time to -- since make an escape without a
18  passport, I think that if we modified the bail conditions to
19  limit his location, pretrial tells me that makes it a more
20  secure situation.  In addition, if the government has any
21  particular practical economic conditions that you can think of,
22  I'm always willing to listen to those.
23          MR. BAROFSKY:  Your Honor, the posting of additional
24  assets by the defendant, they are largely forfeitable assets,
25  but to the extent that there are assets that have not been --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              32
82FVBENP              Plea
1   as I said, we estimate that it's in the range of approximately
2   $20,000,000.  If we could at least secure those assets, these
3   are assets that we've not yet secured by having him posted for
4   the bond.
5           In addition, because, frankly, we're going to get
6   those assets anyhow at the conclusion of this case, perhaps the
7   posting the requiring of assets from the children.  He
8   mentioned that the children are successful, one's an investment
9   banker.  And if they have property, that may increase the
10  incentive for Mr. Bennett to stay.
11          THE COURT:  I think it's enough that he's -- the bond
12  mortgages their future if he flees.  We're not taking his kids'
13  money.
14          MR. BAROFSKY:  We aren't.  I wouldn't suggest that we
15  would take it other than if he fled.  We would only be posting
16  whatever interest.  Because really right now the problem, your
17  Honor, and I hear what your Honor is saying, is that he has an
18  unsecured bond, and that just causes us a great deal of
19  concern.  I don't know what the circumstances are in Kumar or
20  Ebbers, but this is a situation if there is a third party
21  posting collateral --
                        Page 15

```
                              82FVBENP.txt
22          THE COURT:  For all those people, the bottom line is
23   that for any defendant who was older and who was facing
24   sentencing, in, lets call it, the post-Enron era, the situation
25   was the same as for Mr. Bennett.  The possibility that their
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    33

```
     82FVBENP                    Plea
1    sentence would be -- that their residence in the Bureau of
2    Prisons was the last residence they are going to have.
3          So I don't think this is really dramatically
4    different.  And I don't think the fact that he's a British
5    citizen changes the situation, that he has to -- I think he
6    gets the credit for having complied with all of his bail
7    conditions and having had two and-a-half years to reflect.
8          MR. BAROFSKY:  Your Honor, to be clear, I wasn't
9    rearguing the bail application.  I was merely trying to respond
10   to your Honor's question whether there were additional economic
11   circumstances.
12         THE COURT:  I'm not asking his children, okay?
13         MR. BAROFSKY:  Well, your Honor, then I would ask that
14   in the alternative, if the defendant could post additional
15   property or money that has not been seized or frozen by the
16   government to secure this bond to at least increase so that
17   there's some notional security of the bond.  And I would ask
18   for a number of $10,000,000 in cash or property.
19         MR. NAFTALIS:  Your Honor, I just think there is no
20   basis whatsoever for the application.  His children, the most
21   important things in the world, are on the hook for $50,000,000
22   if he were to leave.  As they've indicated, they don't have any
23   evidence of anything that he's ever done anything which would
24   indicate he would leave.  As your Honor said, quite correctly,
25   we've known about the evidence in this case; your Honor
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    34

```
     82FVBENP                    Plea
1    remembers the litigation with respect to the bankruptcy trusts,
2    these report the motion practice there.  There's no secret
3    about that.  He's showed up all the time; he's complied with
4    all the conditions.  And there's not a reason in the world and
5    there's not a basis in the world for any change here
6    whatsoever.
7          MR. BAROFSKY:  Your Honor, respectfully, I don't see
8    any harm in having him post additional property that could only
9    be used at this time for the purposes to facilitate flight.  He
10   can't transfer these properties without violating the money
11   laundering laws at this point, and I don't see -- I don't even
12   understand how upping the collateral so as to prevent him from
13   fleeing prejudices him in any way.  And we're not asking even
14   for all of the money that we believe is out there, we're asking
15   for $10,000,000 to provide some additional security on what is
16   now an essentially an uncollateralized bond.  It doesn't really
17   move the ball tremendously for us, but it helps.  And at least
18   it would limit his ability to flee, should he make that
19   decision, that it makes more sense to self-deport, since he's
20   going to be going back to England anyhow before he has to face
21   the sentence.  I don't think the government's request is
22   shocking or surprising or terribly dramatic, but we do think it
23   would help, given the situation.
24         MR. NAFTALIS:  They have not shown anything for this
25   eleventh-hour request.  It's totally and absolutely baseless.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           Page 16
```

82FVBENP.txt
(212) 805-0300

35

82FVBENP                        Plea
1   And I don't think -- I don't know what property may or may not
2   exist, but I don't think that there's any justification. And
3   they just can't come into court without any basis whatsoever
4   and allege things where all the evidence shows that this
5   application is frivolous.
6           MR. BAROFSKY: Your Honor, I've listened to this for a
7   fair amount of time now. And to characterize our application
8   as frivolous and baseless and eleventh-hour I think is unfair.
9           THE COURT: At least the eleventh hour.
10          MR. BAROFSKY: I don't know when we were supposed to
11  have made this application. I don't know if Mr. Naftalis would
12  have had us make it when he notified us about the intent to
13  change his plea yesterday afternoon, I don't think so. I think
14  the only time we can make a plea based on the changed
15  circumstance of the defendant entering a guilty plea is after
16  he enters the guilty plea.
17          As far as it being baseless, the notion that a
18  defendant who's facing 315 years of prison time --
19          THE COURT: He wishes.
20          MR. BAROFSKY: -- is -- that it's baseless to seek his
21  remand when he is an English citizen subject to deportation --
22          THE COURT: Excuse me. We're not -- we're sending him
23  to one of the most civilized countries in the world. It's not
24  punishment to live in England, all right?
25          MR. BAROFSKY: Exactly, your Honor, which is why we
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

36

82FVBENP                        Plea
1   would ask for additional collateral.
2           THE COURT: And there is an extradition treaty between
3   the United States and Great Britain, so...
4           MR. BAROFSKY: Your Honor, I just don't understand the
5   harm --
6           THE COURT: Because I'm not sure that the purpose of
7   bail is to help you collect, you know, whatever you claim is
8   your eventual restitution.
9           MR. BAROFSKY: Your Honor, if I wasn't clear on this
10  argument, I apologize. The reason why we're asking for this is
11  to assure the defendant's appearance. If that money is posted
12  as a bond, it's not so that we can eventually seize it. If
13  it's posted as a bond, it's not available for him to use to
14  facilitate flight. It's also to secure the bond. This
15  original bond was issued because it was secured by money and
16  property. Right now it's essentially not secured by money and
17  property.
18          THE COURT: But that argument applies to any
19  additional money that he would put up. You would say it was
20  just as forfeitable to you. So it then becomes unsecured, the
21  same way.
22          MR. BAROFSKY: But it's unrestrained property, Judge,
23  that's the difference. This property is actually restrained on
24  top of the fact that it's -- because it's their direct
25  proceeds.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

37

82FVBENP                        Plea
1           What I'm suggesting, these are other properties that
2   have not been restrained, because we're not able to restrain
                        Page 17

82FVBENP.txt
3 certain properties that are not proceeds. So this is money
4 that is available to the defendant for use if he wants to
5 facilitate flight.
6   The purpose of a bond, obviously security of a bond,
7 and why your Honor endorsed the order of a secured bond, was
8 because more security means less likelihood of flight. And all
9 we're suggesting is taking this property that is now available
10 to the defendant and posting it as security for the bond. And
11 obviously if we are unable to prove, as Mr. Naftalis suggests,
12 that this is property that's subject to asset forfeiture or
13 restitution, he'll get it back when -- at the time of his
14 sentencing or the time that he reports.
15   So we're not taking anything; we're not putting our
16 hands on stuff that we're not entitled to; we're just asking
17 that this bond be really secured, because right now we're
18 basically -- it's the exact same situation we had in October of
19 2005, when he's going out on the same conditions, it's
20 essentially an unsecured bond. And I don't think that your
21 Honor would have ordered an unsecured bond back then, and we're
22 just asking for some additional security: Money that is
23 available for the defendant or property, and that we have that
24 to secure the bond in case the defendant flees, and to
25 encourage him not to flee.
      SOUTHERN DISTRICT REPORTERS, P.C.
       (212) 805-0300

                    38

82FVBENP     Plea
1   MR. NAFTALIS: Apart from the fact that the government
2 has proffered not a single fact that anything has changed, I
3 don't agree with the notion that this bond is unsecured. One
4 of the homes which is securing the bond -- there's $5,000,000
5 cash, there's two residences, one is in a trust. So without going
6 through all the legalities, I don't think it's so quickly
7 forfeitable, as they say.
8   And the notion of ignoring -- and that will be worked
9 out; we're not here to litigate that issue, but I just -- and
10 the notion that they can continue to ignore the fact that his
11 wife and children have signed a $50,000,000 bond that they will
12 be on the hook for and their lives will be ruined, the notion
13 there's not the slightest reason to suppose that he would do
14 this to his children, he never has, and I have nothing else to
15 say.
16   THE COURT: I think $50,000,000 is a lot of money.
17 And it does directly affect wife, children, inheritances. So
18 what about the issue of where he's going to live?
19   MR. NAFTALIS: If your Honor wants -- feels it would
20 be better, pretrial services --
21   THE COURT: That's what pretrial tells me.
22   MR. NAFTALIS: I think he would -- there's a residence
23 in New York and a residence in New Jersey. I think he would
24 prefer to be in New Jersey where his wife is, and then subject
25 to the fact he could just come to our offices and work with us,
      SOUTHERN DISTRICT REPORTERS, P.C.
       (212) 805-0300

                    39

82FVBENP     Plea
1 which I think he's allowed to do, I think that would be his
2 preference in terms of the quality of the life until the
3 sentence, if that's --
4   THE COURT: I get the high sign from pretrial; so
5 he'll stay in New Jersey.
6   MR. NAFTALIS: Okay.
7   THE COURT: Other than when he goes to you and also
        Page 18

```
                            82FVBENP.txt
 8   when you have to get him to pretrial for -- to probation for
 9   his interview.
10           MR. NAFTALIS:  Yes.
11           THE COURT:  which we do need to do within the two
12   weeks so that the sentencing schedule can proceed.  And the
13   same is true for the government's description of the crimes.
14           Okay?  I think we're done then.
15           MR. NAFTALIS:  Thank you, your Honor.
16           MR. BAROFSKY:  Thank you, your Honor.
17           MR. GARCIA:  Thank you, your Honor.
18           THE DEFENDANT:  Thank you, your Honor.
19                           *    *    *
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# Exhibit 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                                              :
AXIS REINSURANCE COMPANY,                                     :
                                                              :
                              Plaintiff,                      :
                                                              :
            -v-                                               :
                                                              :
PHILIP R. BENNETT et al.,                                     :
                                                              :
                              Defendants.                     :
                                                              :
--------------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/19/08
```

07 Civ. 10302 (GEL)

**ORDER**

GERARD E. LYNCH, District Judge:

       On January 2, 2008, this Court denied Axis Reinsurance's motion for a stay of the
October 19, 2007, Order of the Bankruptcy Court requiring Axis to advance defense costs
pending this Court's consideration of that Order. On January 14, 2008, Axis submitted a second
motion for a stay of the Order.

       Having carefully considered the parties' supplementary briefing on Axis's motion for a
stay, and the briefs on the merits of Axis's appeals from the Bankruptcy Court, Axis's motion
for a stay is denied.


SO ORDERED.

Dated: New York, New York
       February 19, 2008

                                               _____
                                                     GERARD E. LYNCH
                                               United States District Judge