# Exhibit 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

AXIS REINSURANCE COMPANY,

              Plaintiff,

              v.

PHILLIP R. BENNETT, LEO R. BREITMAN,
NATHAN GANTCHER, TONE GRANT,
DAVID V. HARKINS, SCOTT L. JAECKEL,
DENNIS A. KLEJNA, THOMAS H. LEE,
SANTO C. MAGGIO, JOSEPH MURPHY,
RONALD L. O'KELLEY,
SCOTT A. SCHOEN, WILLIAM M. SEXTON,
GERALD SHERER, PHILIP SILVERMAN,
ROBERT C. TROSTEN, AND DOES 1 TO 10,

              Defendants.

------------------------------------------------x

Index. No. _____

## COMPLAINT

1.     Axis Reinsurance Company ("Axis"), by and through its undersigned

counsel, as and for its Complaint against defendants Phillip R. Bennett, Leo R. Breitman,

631120_1.DOC           1

Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman, and Robert C. Trosten (collectively "Insureds"), allege as follows upon personal knowledge as to its own acts and status, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

2.    This action concerns an actual controversy between Axis and the Insureds, regarding a contract of excess directors, officers and corporate liability insurance between Axis and the Insureds.

3.    Refco, Inc. ("Refco"),[1] and at least some of its directors and officers, engaged in a massive fraud involving hundreds of millions of dollars. Refco's insurers were also victims of this fraud. The representations and documents Axis relied upon when evaluating the risk and deciding whether or not to insure Refco's directors and officers, turned out to be false.

4.    Axis bound coverage for an excess directors, officers and corporate liability insurance policy issued to Refco for claims made during the period from August 11, 2005 to August 11, 2006 (the "Axis Policy"). The Axis Policy follows the terms and conditions of the primary policy, or more restrictive underlying excess policy. The Axis Policy also contains its own terms and conditions which further restrict coverage otherwise provided by the primary or first excess policies.

---

[1] The name "Refco," as used throughout this complaint, refers to Refco, Inc., the publicly traded company formed pursuant to the August 2005 initial public offering, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO. "Refco" also refers to subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

5.      Since October 11, 2005, various lawsuits, criminal, governmental and/or regulatory investigations (the "Noticed Matters") involving certain individuals insured under the Axis Policy have been instituted and those individuals have sought coverage for the Noticed Matters under the Axis Policy.

6.      Axis denied coverage for the Noticed Matters on March 6, 2006, based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy. For over a year, none of the Insureds responded to Axis's declination of coverage.

7.      Since March 6, 2006, Axis has received notice from certain of the Insureds of several other matters related to the Noticed Matters, and Axis has denied coverage for these other matters (the "Related Matters") based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.

8.      Axis is the third layer of directors, officers and corporate liability insurance coverage. The two layers below Axis have reserved rights, but not declined coverage.

9.      The primary layer has now exhausted its $10 million limit of liability, subject to its reservation of rights, through the payment of Insureds' defense costs. The $7.5 million first excess insurer has also exhausted its limit of liability, subject to its reservation of rights, through payment of Insureds' defense costs.

10.     The Insureds now seek reimbursement of their defense costs and settlements from Axis. However, Axis has denied coverage based, in part, on specific

terms and conditions present in the Axis Policy (including a warranty received during the underwriting of the Axis Policy) not present in the primary or first excess policy.

11.    Axis seeks a declaration that the Axis Policy does not provide coverage to Insureds for the Noticed Matters or the Related Matters. An actual controversy exists between Plaintiff and Defendants, and Plaintiff seeks a declaratory judgment or other relief from the Court resolving this dispute in its favor.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. §1334(a). Axis filed an adversary proceeding at *In re Refco*, Bankr. S.D.N.Y (07-1712 (RDD)). Certain Insureds subsequently filed an adversary proceeding at *In re Refco*, Bankr. S.D.N.Y. (07-2005 (RDD)). Axis has moved by order to show cause to withdraw the reference for Axis's adversary complaint and the Insureds' adversary complaint pursuant to 28 U.S.C. §157(d).

13.    This Court also has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. §1367(a). The instant complaint is related to and supplemental to *In re Refco, Inc. Securities Litigation*, S.D.N.Y. (05-8626 (GEL)).

14.    Finally, this Court has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. § 1367(a). Certain defendants filed counterclaims to Axis's adversary complaint, filed at *In re Refco*, Bankr. S.D.N.Y (07-1712 (RDD)). Axis has moved by order to show cause to withdraw the reference for the counterclaims to Axis's adversary complaint pursuant to 28 U.S.C. §157(d). The instant complaint is related to and supplemental to those counterclaims.

15.   Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

16.   Axis is an insurance company that is organized and exists pursuant to the laws of the state of New York. Axis has its principal place of business in New York.

17.   Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

18.   Defendant Leo R. Breitman ("Breitman") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

19.   Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

20.   Defendant Tone Grant ("Grant") served as President and Chief Executive Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

21.   Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

631120_1.DOC                              5

22.    Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action.    Upon information and belief, Jaeckel is a citizen of Massachusetts.

23.    Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington D.C..

24.    Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action.    Upon information and belief, Lee is a citizen of New York.

25.    Defendant Santo C. Maggio ("Maggio") served as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

26.    Defendant Joseph Murphy ("Murphy") served as Executive Vice President of Refco Group and was responsible for global marketing since 1999.  Murphy was also President of various Refco subsidiaries, including Refco Futures and Westminster Refco at times relevant to this action.  Upon information and belief, Murphy is a citizen of New Jersey.

27.    Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action.    Upon information and belief, O'Kelley is a citizen of Florida.

28.    Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action.    Upon information and belief, Schoen is a citizen of Massachusetts.

631120_1.DOC                          6

29.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Sexton also briefly served as Chief Executive Officer of Refco. Upon information and belief, Sexton is a citizen of Iowa.

30.    Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

31.    Defendant Philip Silverman ("Silverman") served as Secretary of Refco Group Holdings, Inc. at times relevant to this action. Silverman also served as Secretary of various Refco subsidiaries and Controller of Refco Group. Upon information and belief, Silverman is a citizen of New Jersey.

32.    Defendant Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

33.    The true names and capacities of DOES 1 to 10 are currently unknown to Plaintiff, and therefore, Plaintiff sues those Defendants by such fictitious names. Upon information and belief, each fictitiously named Defendant is an Insured which may seek coverage under the Axis Policy. Plaintiff is entitled to the relief sought herein against the fictitious Defendants, and therefore, sues these Defendants by such fictitious names. Plaintiff will seek leave to insert the true names and capacities of these fictitiously named Defendants, together with charging allegations, when obtained, if not already set forth herein.

## THE D&O INSURANCE POLICIES

34.    The Axis Policy is an excess directors, officers and corporate liability policy. It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $17.5 million in underlying insurance. A true, complete and accurate copy of the Axis Policy is attached as Exhibit A.

35.    Various other insurers issued underlying insurance policies to Refco. U.S. Specialty Insurance Company (the "Primary Insurer") issued a primary policy with a limit of liability of $10 million excess of applicable self insured retentions (the "Primary Policy"). A true, complete and accurate copy of the Primary Policy is attached as Exhibit B. Lexington Insurance Company (the "First Excess Insurer") issued a first excess policy with a limit of liability of $7.5 million excess of $10 million (the "First Excess Policy"). A true, complete and accurate copy of the First Excess Policy is attached as Exhibit C.

36.    Axis is aware of other policies issued to Refco which are excess of the Axis Policy. However, the terms and conditions of these policies are not relevant to this action.

37.    In general, the Axis Policy applies "in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to [the First Excess Policy]." Axis Policy, Section 1. However, the Axis Policy also contains its own provisions which further limit or restrict coverage otherwise provided by the Primary Policy or the First Excess Policy. The Axis Policy provides that "[i]n no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable Underlying Insurance." *Id.*

38.    Subject to all of the terms and conditions, the Axis Policy affords five types of specified coverage. First, the Axis Policy insures covered loss incurred by the directors and officers of Refco and its subsidiaries for claims made against them if such loss is not indemnified by Refco. *See* Primary Policy, Insuring Agreement A. Coverage under Insuring Agreement A, and only coverage under Insuring Agreement A, is deemed non-rescindable. *See* Primary Policy, Endorsement 13.

39.    Second, the Axis Policy insures Refco and its subsidiaries to the extent they indemnify any directors or officers for covered loss in connection with claims made against the officers or directors. *See* Primary Policy Insuring Agreement B(1).

40.    Third, the Axis Policy insures Refco and its subsidiaries for covered loss in connection with "Securities Claims" (as defined in the Primary Policy) asserted against them. *See* Primary Policy, Insuring Agreement B(2).

41.    Fourth, the Axis Policy recognizes depletion of the Primary Policy's limit of liability as a result of the Primary Policy's $250,000 sub-limit for "Derivative Demand Investigative Costs" (as defined in the Primary Policy) incurred in connection with any derivative demand received by Refco's Board of Directors. *See* Primary Policy Endorsement No. 11.

42.    Fifth, the Axis Policy insures the "Controlling Shareholder" (defined as Bennett in the Primary Policy) for covered loss incurred in connection with "Securities Claims" (as defined in the Primary Policy) asserted against him, provided one or more other individual insureds and/or Refco are, and remain, co-defendants in such "Securities

631120_1.DOC                                    9

Claim" along with the "Controlling Shareholder." *See* Primary Policy Endorsement No. 15.

43.    The Axis Policy (and the Primary and First Excess Policies) does not provide a duty to defend the insureds against claims made against them. Instead, the Primary Policy provides that the "Insureds must defend any Claim made against them." Primary Policy Condition D(1). The Primary Policy provides that the Primary Insurer will advance <u>covered</u> defense costs on an as-incurred basis in excess of the retention amount. Primary Policy, Condition (D)(2).

44.    Pursuant to the Bankruptcy Court's March 27, 2006 Order in *In re Refco Inc.*, Case No. 05-60006 (Doc. No. 1567, Bankr. S.D.N.Y.), the Primary Insurer has been advancing defense costs to the insureds on an as-incurred basis. The First Excess Insurer has taken the position that the First Excess Policy does not provide coverage for defense costs in connection with claims otherwise covered under the Primary Policy. Nevertheless, the First Excess Insurer has now agreed to advance defense costs, upon exhaustion of the Primary Policy's limit of liability, provided the insureds provide an undertaking – in the event it is determined that the First Excess Policy does not provide coverage for defense costs, each of the insureds must agree to repay defense costs advanced by the First Excess Insurer. *See* July 26, 2006 letter on behalf of Lexington Insurance Company, attached as Exhibit D.

45.    In connection with the underwriting of the Axis Policy, Axis requested and received a warranty letter (the "Warranty") which provides as follows:

> (a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose

might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005.  A true, accurate, and complete copy of the Warranty is attached as Exhibit E.

46.    The Axis Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

47.    The February 8, 2005 application (the "Application") submitted to Axis asks at Question 12:

(a)    Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b)    Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?

___ Yes ___ No

If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the
Insurer will not be liable under any policy that may be issued on the basis of this
Application to make any payment of Loss, including Defense Costs, in connection with
any Claim arising out of, based upon or attributable to any claim, fact, circumstance or
situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Neither box was checked for Questions 12(a) and 12(b). A true and accurate copy of the

February 8, 2005 application (without attachments) is attached as Exhibit F.

48.    The Application was signed by Phillip Bennett on February 8, 2005.

Under Bennett's signature, the following words appear, "Note: This Application must be

signed by the President and/or CEO of the Applicant acting as the authorized agent of

the persons and entity(ies) proposed for this insurance." (emphasis added).

49.    The Axis Policy also contains a Knowledge Exclusion Endorsement at

Endorsement 6 which states:

In consideration of the premium charged, it is agreed that this Policy does not respond to
Claims based upon, arising out of, directly or indirectly resulting from, in consequence
of, or in any way involving any fact, circumstance, situation, transaction, or event, which
as of the inception date of the Policy Period, any Insured had knowledge and had reason
to suppose might give rise to a Claim that would fall within the scope of the insurance
afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

50.    The Axis Policy provides, at Clause XI:

The Insurer shall not be liable for any amount in any Claim taking place during the Policy
Period and arising under any Insurance Product, which is based upon, arising out of,
directly or indirectly resulting from, in consequence of or in any way involving:

A.    Any demand, suit or other proceeding pending, or order, decree of judgment
entered, against any Insured on or prior to the Pending or Prior Claim Date set forth in
Item 7 of the Declarations [June 4, 2004] or any wrongful act, fact, circumstance or
situation underlying or alleged therein; or

B.    Any other wrongful act, fact, circumstance or situation whenever occurring,
which together with a wrongful act, fact, circumstance or situation described in (a) above
are causally or logically interrelated by a common nexus.

51.    On March 6, 2006, Axis disclaimed coverage for the Noticed Matters based on: (1) the Warranty; (2) the Manuscript Application Endorsement and question 12 of the Application; (3) the Knowledge Exclusion Endorsement; and (4) the claim made date.  A true, accurate, and complete copy of the March 6, 2006 letter denying coverage is attached as Exhibit G.

52.    At various times after March 6, 2006, Insureds provided Axis with notices of the Related Matters and Axis responded that each was related to the Noticed Matters for which Axis denied coverage.  Axis's response to each of the Related Matters was to incorporate the March 6, 2006 letter.

<u>THE REFCO SCANDAL</u>

53.    The Axis Policy incepted on August 11, 2005.  On the same day, Refco conducted its initial public offering.

54.    Two months later, on October 10, 2005, Refco issued a press release.  The press release announced that Refco had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett.  Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible."  Moreover, Refco stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet", the receivable "was not shown as a related party transaction in any such financials.  For that

631120_1.DOC                    13

reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

55.    Many of these financial statements were part of the application Axis expressly relied upon when deciding whether or not to enter into the insurance contract.

56.    On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

57.    On October 11, 2005, Refco filed the October 10, 2005 and October 11, 2005 press releases with the U.S. Securities and Exchange Commission (the "SEC").

58.   On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code.

59.   On November 10, 2005, Bennett was indicted on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Bennett Indictment") is attached as Exhibit H.

60.   According to the Bennett Indictment, Bennett "sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC]." Bennett Indictment, at ¶ 4.

61.   The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading. When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Bennett directed the transfer of those losses to an entity called Refco Group Holdings, Inc. ("RGHI"), which he controlled. As a result, Refco's balance sheet showed a receivable from RGHI.

62.   According to the Bennett Indictment, beginning in or around 1999, Bennett took steps to hide the RGHI receivable from Refco's auditors. Specifically,

Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

63. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer. On the same day, the customer loaned $720 million to RGHI. RGHI then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end.

64. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, ltd. would repay the customer $720 million if RGHI defaulted.

65. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions)". On or about February 23, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end.

631120_1.DOC                    16

66. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

67. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then used the $450 million pay down its debt to Refco. These loans were unwound on or about June 6, 2005, after Refco's fiscal first quarter-end.

68. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

69. On October 24, 2006, Trosten was indicted on charges of conspiracy, securities fraud, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Trosten Indictment") is attached as Exhibit I.

70. According to the Trosten Indictment, Trosten "lied to Refco's auditors about the existence and size of related party debts and transactions between RGHI and Refco."

71.    According to the Trosten Indictment, Trosten "concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers:"

72.    According to the Trosten Indictment, on or about April 27, 2004, Trosten "signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors." Nevertheless, on or about August 5, 2004, Bennett transferred approximately $48 million from RGHI to Trosten.

73.    In addition to the foregoing, Bennett and Trosten were not the only people at Refco who knew of the ongoing fraud. On January 16, 2007, Grant was indicted on charges of conspiracy, securities fraud, wire fraud, bank fraud, and money laundering. A true, accurate, and complete copy of the publicly available indictment (the "Grant Indictment") is attached as Exhibit J.

74.    On March 30, 2007, the government filed a memorandum of law detailing some of the evidence the government expected to introduce against Grant at trial. A true, accurate, and complete copy of the government's memorandum of law (the "Grant Memo") is attached as Exhibit K.

75.    According to the Grant Memo, "by February 1999, prior to the close of Refco's fiscal year, Grant was fully briefed, in Refco's offices on the core issues of the fraud: the round-trip loan transactions set forth in the Indictment; that Refco had covered up several of the large losses set forth in the Indictment; and that Refco had been moving

expenses (including a large portion of its computer expenses) off of Refco's books and on to the parent company's books."

76.    According to the Grant Memo, "[d]urring the interval between 1999 and 2004, the evidence will show that Grant continued to discuss with Sandy Maggio, a Refco executive, the continuing financial problems at Refco, including continued rolling fails, where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors."

77.    According to the Grant Memo, "in May 2004, prior to the LBO, Bennett met with Grant for the purpose of fully discussing with him the structure of the LBO and how, through the LBO, Bennett and Grant were going to deal with the more than $1 billion debt that they (as owners of RGHI) owed to Refco."

78.    According to the Grant Memo, "Grant was a knowing and active participant from as early as 1997, had full knowledge of the means used to hide Refco's losses as of at least February 1999, and stood to reap a 50% share of the rewards of the fraud if it were successful. Between 1999 and 2004, while Grant had no day-to-day role in running Refco, he was intermittently briefed by Bennett and Santo Maggio, another Refco executive, on the status of Refco's ongoing economic troubles, including on the status of the massive debt from RGHI to Refco."

79.    The Grant Memo further notes that Grant "was not on the periphery of the fraud, he was a founding member and had full knowledge of its methods by 1999."

80.    According to the Grant Memo, the government expects Maggio to testify that "on several occasions prior to the May 2004 meeting between Grant and Bennett,

Maggio expressed concern to Bennett about the increasingly dire financial circumstances at Refco. In response, Bennett told Maggio, in substance and in part, that he was keeping Grant abreast of ths [sic] situation at Refco (including that the company's situation was not as reflected on its books), and that Maggio was not alone in that he, Grant and Bennet [sic] were /in [sic] it together.6 [sic] Bennett further stated, in substance, that if the fraud were to be discovered, Bennett told Grant that Bennett was not going to be alone (e.g., Grant would be responsible as well)."

81.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the May 2005 Transactions, the allegations in the Trosten Indictment and the allegations in the Grant Memo, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

82.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the allegations in the Trosten Indictment, and the allegations in the Grant Memo, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

83.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the allegations in the Trosten

Indictment, and the allegations in the Grant Memo, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

## THE NOTICED MATTERS

84.     Beginning on October 11, 2005, various lawsuits were filed against the Defendants.

85.     On October 13, 2005, Axis received notice of <u>Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co.</u>, No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

86.     On October 13, 2005, Axis received notice of <u>Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen</u>, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

87.     On October 13, 2005, Axis received notice of <u>Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank</u>

631120_1.DOC                        21

Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

88.    On October 13, 2005, Axis received notice of United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

89.    On October 27, 2005, Axis received notice of Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

90.    On October 18, 2005, Axis received notice of Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

91.    On October 18, 2005, Axis received notice of Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blaire &

Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A.
Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P.,
and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

92.    On October 28, 2005, Axis received notice of Banesco Holding C.A.,
Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco
Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No.
05603681 (Supreme Court of New York, 10/17/05).

93.    On October 28, 2005, Axis received notice of Miura Financial Services v.
Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New
York, 10/17/05).

94.    On October 28, 2005, Axis received notice of Multiplicas Casa De Bolsa
v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New
York, 10/17/05).

95.    On October 21, 2005, Axis received notice of Jacob Baker, Individually
and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M.
Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

96.    On October 21, 2005, Axis received notice of Craig Becker, On Behalf of
Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M.
Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.
O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC,
Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco
Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

97.    On October 21, 2005, Axis received notice of Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

98.    On October 25, 2005, Axis received notice of American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

99.    On October 25, 2005, Axis received notice of Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

100.    On October 27, 2005, Axis received notice of Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

101.    On November 21, 2005, Axis received notice of <u>Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al.</u>, No. 05603931 (Supreme Court of New York 11/04/05).

102.    On November 21, 2005, Axis received notice of <u>Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P.,</u>

Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc.,
No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

103.    On November 30, 2005, Axis received notice of Bawag P.S.K. Bank Für
Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco,
Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust;
Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck
& Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco
Administration LLC; Refco Capital LLC; Refco Capital Holdings LLC; Refco Capital
Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial
LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global
Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco
Global Holdings LLC; Refco Information Services LLC; Refco Mortgage Securities,
LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities
LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations
1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr.
S.D.N.Y., 11/16/05).

104.    On November 30, 2005, Axis received notice of Markwood Investments v.
Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr.
S.D.N.Y., 11/17/05).

105.    On November 30, 2005, Axis received notice of Banco De America
Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y.,
11/18/05).

106.    On November 30, 2005, Axis received notice of <u>BAC International Banks,</u>
<u>Inc. v. Refco Capital Markets, Ltd.</u>, No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

107.    On November 30, 2005, Axis received notice of <u>Reserve Invest (Cyprus)</u>
<u>Ltd. v. Refco Capital Markets. Ltd., Michael W. Morrison, and Richard Heis, Michael W.</u>
<u>Morrison, and Richard Heis</u>, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

108.    On November 30, 2005, Axis received notice of <u>City of Pontiac General</u>
<u>Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v.</u>
<u>Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer,</u>
<u>Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche</u>
<u>Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First</u>
<u>Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities,</u>
<u>Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill</u>
<u>Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC</u>
<u>Holdings plc and Grant Thornton LLP</u>, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

109.    Axis responded to each of the notices received in paragraphs 85 to 108
(the "Noticed Matters") by letter from Axis's counsel on March 6, 2006. A true, accurate
and complete copy of this letter was previously attached as Exhibit G.

110.    The March 6, 2006 letter noted that the Noticed Matters were interrelated,
as that term is defined in Condition (C) of the Primary Policy, because all of the Noticed
Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others
whereby unreported loans were made between various entities in an effort to disguise

financial losses. Accordingly, the Noticed Matters constitute a single "claim," as that term is defined in the Primary Policy.

111.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the January 14, 2005 Warranty.

112.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the Manuscript Application Endorsement and question 12 of the Application.

113.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the Knowledge Exclusion Endorsement in the Axis Policy.

114.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the claim made date.

115.    The March 6, 2006 letter reserved the right to rescind the Axis Policy and an earlier D&O policy issued by Axis to Refco.

116.    The March 6, 2006 letter reserved the right to deny coverage based on various other terms and conditions of the Axis Policy.

117.    After denying coverage for the Noticed Matters on March 6, 2006, Axis continued to receive notice of additional matters related to the Noticed Matters.

### THE RELATED MATTERS

118.    On March 14, 2006, Axis received notice of <u>Klaus Gensheimer, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Credit</u>

Suisse First Boston LLC, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Grant Thornton LLP, Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Deutsche Bank Securities Inc., Deutsche Bank AG, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC, Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co. Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital Strategies LLC, and Refco Group Holdings, Inc., No. 05-cv-10318 (S.D.N.Y. 12/8/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

119.    On March 14, 2006, Axis received notice of Teachers' Retirement System of the State of Illinois, Bumper Fund L.P., Irwin Geduld IRA, as Trustee and as Partner of Geduld Capital Management, Brookstreet Securities Corp., and City of Pontiac General Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated v. Thomas H. Lee, Scott A. Schoen, David V. Harkins, Ronald L. O'Kelley, Scott L. Jaeckel, Thomas H. Lee Partners, L.P., Phillip R. Bennett, Refco Group Holdings, Inc., Gerald M. Sherer, Dennis A. Kleina, Robert Trosten, Nathan Gantcher, Leo R. Breitman, William M. Sexton, Santo Maggio, Liberty Corner Advisors, Liberty Corner Capital, Liberty Corner Capital Strategies, Terry Pigott, Grant Thornton

LLP, Mark A. Ramler, Banc of America Securities LLC, Bank of America Corp.,
eutsche Bank Securities Inc., Deutsche Bank AG, Credit Suisse First Boston LLC,
Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P.
Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co.,
Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc,
Joseph P. Collins, and Mayer Brown, Rowe & Maw, LLP., No. 05-cv-10403 (S.D.N.Y.
12/12/05). On March 27, 2006, Axis denied coverage for this matter noting that it was
interrelated, as that term is defined in Condition (C) of the Primary Policy, with the
Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying
coverage for the Noticed Matters.

120. On May 10, 2006, Axis received notice of Global Management
Worldwide Limited, Individually and on Behalf of All Others Similarly Situated v.
Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L.
Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A.
Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio,
Dennis Klejna, Perry Rotkowitz, Thomas H. Lee Partners, L.P., Thomas H. Lee Equity
Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman)
Fund V, L.P., Credit Suisse Group, Credit Suisse First Boston, Goldman Sachs & Co.,
Goldman Sachs Group Inc., Banc of America Securities LLC, Bank of America Corp.,
Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Grant Thornton
LLP, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners,
L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC,

Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company,
Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., and Refco
Securities LLC, No. 06-cv-00643, (S.D.N.Y. 1/26/06).  On July 10, 2006, Axis denied
coverage for this matter noting that it was interrelated, as that term is defined in
Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by
reference the March 6, 2006 letter denying coverage for the Noticed Matters.

     121.    On May 10, 2006, Axis received notice of In re Refco Inc., et al. - Leo A.
Breitman Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis
denied coverage for this matter noting that it was interrelated, as that term is defined in
Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by
reference the March 6, 2006 letter denying coverage for the Noticed Matters.

     122.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - David
V. Harkins Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis
denied coverage for this matter noting that it was interrelated, as that term is defined in
Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by
reference the March 6, 2006 letter denying coverage for the Noticed Matters.

     123.    On May 10, 2006, Axis received notice of In re Refco Inc., et al. - Ronald
O'Kelley Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis
denied coverage for this matter noting that it was interrelated, as that term is defined in
Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by
reference the March 6, 2006 letter denying coverage for the Noticed Matters.

124.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - Nathan Gatcher Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

125.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - Scott L. Jaeckel Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

126.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - Scott A. Schoen Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

127.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - Thomas H. Lee Partners, L.P. Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

128.    On May 10, 2006, Axis received notice of <u>In the Matter of Refco Inc. -</u> <u>Subpoena of Thomas H. Lee Partners, L.P. for Production of Documents Pursuant to</u> <u>Rule 8</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

129.    On May 10, 2006, Axis received notice of <u>Global Management</u> <u>Worldwide Limited v. Refco Capital Markets, Ltd.</u>, No. 05-03144 (Bankr. S.D.N.Y 11/11/05). On May 15, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

130.    On June 16, 2006, Axis received notice of the amended complaint in <u>In re</u> <u>Refco, Inc. Securities Litigation</u>, No. 05-cv8626 (S.D.N.Y. 5/5/06).  On June 5, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

131.    On June 26, 2006, Axis received notice of <u>Gary L. Franzen v. IDS Futures</u> <u>Corporation, Refco Commodity Management, Inc.</u>, No. 06-cv-03012 (N.D.Ill. 6/1/06). On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.

Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

132.    On March 9, 2006, Axis received notice of <u>Arch Insurance Company v. Phillip R. Bennett, Leo R. Breitman, Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Perry Rotkowitz, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten</u>, No. 600805/06 (N.Y. Supp. 3/9/06). On October 12, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

133.    On November 3, 2006, Axis received notice of an SEC inquiry into Refco, Inc.  On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

134.    On November 3, 2006, Axis received notice of <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation</u>, No. 06-cv-0643 (S.D.N.Y. 1/26/06). On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

631120_1.DOC                    34

135.   On November 3, 2006, Axis received notice of <u>Thomas H. Lee Equity</u> <u>Fund V, LP et al</u>, No. 05-cv-09608 (S.D.N.Y. 11/14/05).  On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

136.   On January 27, 2007, Axis received notice of <u>United States of America v.</u> <u>Phillip R. Bennett, Robert C. Trosten and Tone N. Grant</u>, No. S3 05-cr-1192 (S.D.N.Y. 1/16/07).  On February 20, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

137.   Each of the matters identified in paragraphs 118 through 136 (the "Related Matters") is interrelated, as that term is defined in the Primary Policy, with each of the other Related Matters and with the Noticed Matters.  Axis has denied coverage for each of the Related Matters based on the same reasons enumerated in the March 6, 2006 letter.

### PRIOR LITIGATION

138.   Refco was previously involved in litigation involving the same scheme of improperly shifting client funds between related party accounts – the same type of transactions that Refco allegedly used to hide the fraud alleged in the Noticed Matters and the Related Matters.

139.   Refco was involved in a CFTC enforcement action which alleged that Refco used funds in client accounts to pay off its own debts (the "1994 CFTC Action").

631120_1.DOC                      35

In 1994, the CFTC fined Refco $1.2 million and Refco promised to stop unlawfully commingling funds. As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital.

### COUNT I

### DECLARATORY JUDGMENT THAT THE AXIS WARRANTY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

140.    Axis incorporates by reference each of the allegations contained in paragraphs 1 through 139 above.

141.    As alleged herein, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

142.    The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arise therefrom.

143.    The Warranty provides that "It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance." (emphasis added). Accordingly, Bennett's knowledge excludes coverage for all Insureds.

144.    Axis seeks a declaration that as a result of the Axis Warranty, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT II

### DECLARATORY JUDGMENT THAT THE AXIS MANUSCRIPT APPLICATION ENDORSEMENT AND QUESTION 12 OF THE APPLICATION BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

145.    Axis incorporates by reference each of the allegations contained in paragraphs 1 through 144 above.

146.    As alleged herein, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

147.    The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arising out of, based upon or attributable to such facts, circumstances or situations.

148.    The Application notes that it "must be signed by the President and/or CEO of the Applicant acting as authorized agent of the persons and entity(ies) proposed for this insurance." (emphasis added).    Accordingly, Bennett's knowledge, and failure to make the necessary disclosures pursuant to Question 12 of the Application, exclude coverage for all Insureds.

149.   Axis seeks a declaration that as a result of Axis Manuscript Application Endorsement and question 12 of the Application, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT III

### DECLARATORY JUDGMENT THAT THE AXIS KNOWLEDGE EXCLUSION ENDORSEMENT BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

150.   Axis incorporates by reference each of the allegations contained in paragraphs 1 through 149 above.

151.   As alleged herein, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

152.   The Noticed Matters and the Related Matters consist of "claims" (as that term is defined in the Primary Policy) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving such facts, circumstances, situations, transactions or events.

153.   The Knowledge Exclusion excludes coverage for "claims" (as that term is defined in the Primary Policy) based upon, etc. "which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy." (emphasis added). Accordingly, Bennett's knowledge, or the knowledge of *any* insured, excludes coverage for all insureds.

631120_1.DOC                    38

154. Axis seeks a declaration that as a result of the Axis Knowledge Exclusion Endorsement, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

### COUNT IV

### DECLARATORY JUDGMENT THAT CLAUSE XI OF THE AXIS POLICY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

155. Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 154 above.

156. As alleged herein, Clause XI of the Axis Policy excludes coverage for any "claim" (as that term is defined in the Primary Policy) based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving, any demand, suit or other proceeding, on or prior to June 4, 2004, or any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation occurring on or prior to June 4, 2004, are causally or logically interrelated by a common nexus.

157. The Noticed Matters and the Related Matters allege many of the same wrongful acts previously alleged in the 1994 CFTC Action.

158. Axis seeks a declaration that, as a result of Clause XI, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

### OTHER COVERAGE DEFENSES/RESCISSION

159.   Other Axis Policy terms, conditions and endorsements may ultimately be implicated. Axis has reserved the right to disclaim coverage for the Noticed Matters and the Related Matters based on various terms, conditions and endorsements of the Axis Policy. Nothing in this Adversary Complaint is intended to waive any rights Axis may have in the Axis Policy, at law or in equity, including the right to rescind the Axis Policy and prior policies issued by Axis to Refco, its subsidiaries or predecessors, based on material misrepresentations in the applications for such other policies. Axis reserves the right to raise such other coverage defenses as appropriate and/or to seek rescission.

WHEREFORE, Axis requests that the Court enter a declaration and final judgment in its favor:

(A)   Declaring that, for the reasons set forth in Count I, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(B)   Declaring that, for the reasons set forth in Count II, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(C)   Declaring that, for the reasons set forth in Count III, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(D)   Declaring that, for the reasons set forth in Count IV, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

631120_1.DOC                              40

(E)    Awarding Axis such other and additional relief as shall be found to be

reasonable; and

(F)    Awarding Axis its fees and costs incurred in prosecuting this action.

Dated: September 7, 2007

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

By: _____

Wayne E. Borgeest
Joan M. Gilbride
Ann Marie Collins
Robert A. Benjamin

200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
acollins@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Plaintiff*
*Axis Reinsurance Company*

631120_1.DOC

# EXHIBIT A



### SECUREXCESS DECLARATIONS

SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

| COMPANY: Axis Reinsurance Company | POLICY NUMBER: RNN 506300 |
|---|---|

| Item 1. Policyholder:<br>Refco, Inc.<br>550 West Jackson Boulevard<br>Suite 1300<br>Chicago, IL 60661 | Item 2. Policy Period:<br>a. Inception Date: August 11, 2005<br>b. Expiration Date: August 11, 2006<br><br>Both dates at 12:01 a.m. at the<br>address listed in Item 1 |
|---|---|

Item 3. Limits of Liability (inclusive of defense costs):
    a. Each Claim                        $ 10,000,000
    b. Maximum aggregate Limit of Liability for all Claim(s)
       During the Policy Period of all Insurance Products   $ 10,000,000

Item 4. Underlying Insurance and Insurance Products:  See Endorsement No. 1

Item 5. Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

| Item 6. Notices to Insurer:<br>Notice of Claim(s) To Be Sent To:<br>Axis Financial Insurance Solutions Claims<br>Address: Connell Corporate Park<br>    Three Connell Drive<br>    P.O. Box 357<br>    Berkeley Heights, NJ 07922-0357 | All Other Notices To Be Sent To:<br>Axis Financial Insurance Solutions<br>Address: Connell Corporate Park<br>    Three Connell Drive<br>    P.O. Box 357<br>    Berkeley Heights, NJ 07922-0357 |
|---|---|

| Item 7. Pending and Prior Claim Date: 06/04/04 | Item 8. Terrorism Coverage Premium:<br>$10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_Dead Lukas_                       _2/1/05_
Authorized Representative              Date

_Kevin D. McJean_                 _Michael E. Toniel_

      Secretary                          President

SE 0100 (Ed. 02 03)          Page 1 of 1             Printed in U.S.A.



PLAINTIFF'S EXHIBIT

## SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the Underlying Insurance and all information provided to the Insurer and any or all of the Underlying Insurers, and subject to the provisions of this Policy, the Insurer and the Policyholder, on its own behalf and on behalf of all Insureds, agree as follows.

I.  INSURING AGREEMENT

With respect to each Insurance Product, the Insurer shall provide the Insureds with insurance during the Policy Period excess of all applicable Underlying Insurance. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other applicable Underlying Insurance. In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable Underlying Insurance.

The insurance afforded under this Policy shall apply only after all applicable Underlying Insurance with respect to an Insurance Product has been exhausted by actual payment under such Underlying Insurance, and shall only pay excess of any retention or deductible amounts provided in the Primary Policy and other exhausted Underlying Insurance.

II. DEFINITIONS

A.  Claim(s) means the event(s) which take place during the Policy Period and which trigger(s) coverage under the Insuring agreement(s) of the Underlying Insurance.

B.  Insurance Product means each separate type of insurance identified as an "Insurance Product" in Endorsement No. 1 to this Policy.

C.  Insured(s) means any person(s) or entity(ies) that may be entitled to coverage under the Primary Policy at its inception.

D.  Insurer means the company identified as "Insurer" in the Declarations.

E.  Policy Period means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

F.  Policyholder means the person(s) or entity(ies) identified in Item 1. in the Declarations.

G.  Primary Policy means the specific policy identified as the "Primary Policy" under the applicable Insurance Product listed in Endorsement No. 1 to this Policy.

H.  Sublimit means any Underlying Limits which:

1.  applies only to a particular grant of coverage under such Underlying Insurance; and
2.  reduces and is part of the otherwise applicable limits of liability of such Underlying Insurance set forth in Item 4 of the Declarations.

I.  Underlying Insurance means each insurance policy which constitutes all or part of an Insurance Product, as scheduled in Endorsement No. 1 to this Policy.

J.  Underlying Insurers means any or all of the companies who issued the policies of Underlying Insurance.

K.  Underlying Limits means, with respect to each Insurance Product, an amount equal to the aggregate of all limits of liability for each Insurance Product stated in Endorsement No. 1 to this Policy, plus the

SE 0001 (Ed. 02 03)                    Page 1 of 4                    Printed in U.S.A.

uninsured retention or deductible, if any, applicable to the Primary Policy under such Insurance Product.

III. CONDITIONS OF COVERAGE

A. For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

1. All of the Underlying Insurance in effect as of the inception date of the Policy Period shall be maintained in full effect with solvent insurers throughout the Policy Period except for any reduction or exhaustion of the Underlying Limits as provided in Section IV. below; and

2. All Insureds shall comply fully with all of the provisions of this Policy.

B. As a condition precedent to coverage under this Policy, the Insured shall give to the Insurer as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any Underlying Insurance, ii) any Underlying Insurance not being maintained in full effect during the Policy Period, or iii) an Underlying Insurer becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

C. If during the Policy Period the provisions of the Primary Policy are changed in any manner, as a condition precedent to coverage under this Policy, the Insured shall give written notice to the Insurer of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change. No amendment to any Primary Policy or Underlying Insurance during the Policy Period shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Insurer so agrees in writing. The Insurer may, in its sole discretion, condition its agreement to follow any changes to the Primary Policy or the Underlying Insurance on the Insured paying any additional premium required by the Insurer for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the Policyholder must give the Insurer written notice of any additional or return premiums charged or allowed in connection with any Underlying Insurance.

IV. REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A. If the Underlying Limits are partially reduced solely due to actual payment under the Underlying Insurance, this Policy shall continue to apply as excess insurance over the remaining Underlying Limits.

B. If the Underlying Limits are wholly exhausted solely due to actual payment under the Underlying Insurance, this Policy shall continue to apply as primary insurance with respect to the applicable Insurance Product(s) and the retention or deductible, if any, applicable under the Primary Policy(ies) shall apply under this Policy.

C. If any Underlying Limits are subject to a Sublimit then coverage hereunder shall not apply to any Claim which is subject to such Sublimit, provided however, that the Underlying Limit shall be recognized hereunder as depleted to the extent of any payment of such Claim subject to such Sublimit.

V. LIMITS OF LIABILITY

A. The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the Insurer's liability for each Claim under the applicable Primary Policy, and shall be the maximum amount payable by the Insurer under this Policy for a single Claim, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

B. The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the Insurer under this Policy with respect to all Claims during the Policy Period for all Insurance Products.

C. This Policy does not provide coverage for any Claim not covered by the Underlying Insurance, and shall drop down only to the extent that payment is not made under the Underlying Insurance solely by reason of exhaustion of the Underlying Insurance through payments thereunder, and shall not drop down for any other reason. If any Underlying Insurer fails to make payments under such Underlying Insurance for any reason whatsoever, including without limitation the insolvency of such Underlying Insurer, then the Insureds shall be deemed to have retained any such amounts which are not so paid. If the Underlying Insurance is not so maintained, the Insurer shall not be liable under this Policy to a greater extent than it would have been had such Underlying Insurance been so maintained.

D. Payment by the Insurer of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

VI. SETTLEMENTS AND DEFENSE

A. No Insured under this Policy may, without the Insurer's prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

B. The Insurer may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable Underlying Insurance has been exhausted.

C. The Insured, and not the Insurer, has the duty to defend all Claims under this Policy.

VII. SUBROGATION

A. In the event of payment under this Policy, the Insurer shall be subrogated to all rights of recovery of each and all Insureds against any person or organization, and the Insureds shall do whatever is necessary to secure those rights to the satisfaction of the Insurer, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of such Insureds.

B. Any amount recovered after payment under this Policy and any Underlying Insurance policies shall be apportioned among the Insurer and the Underlying Insurers net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the Policyholder shall be the sole agent of all Insureds with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

IX. NOTICE

A. With respect to any Claim, situation that could give rise to a Claim, or other matter as to which insurance may be sought under this Policy, the Policyholder or any Insured must give the Insurer written notice contemporaneously with and in the identical manner required by the applicable Primary Policy.

B. All notices under this Policy shall be sent to the Insurer at the address set forth in Item 6. in the Declarations.

X.  MODIFICATION, CANCELLATION AND NONRENEWAL

A.  No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the Insurer.

B.  The Policyholder may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

C.  The Insurer may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the Policyholder written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the Policy Period shall terminate at the date and hour specified in the notice.

D.  The Insurer shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the Policyholder.

E.  The Insurer shall have no obligation to renew this Policy upon its expiration. If the Insurer decides not to renew this Policy, the Insurer shall provide written notice to the Policyholder by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

F.  Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any Underlying Insurance is rescinded by agreement or legal process for fraud or other material misrepresentation by the Policyholder or any of the Insureds, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any Insurance Product containing such rescinded Underlying Insurance.

XI.  EXCLUSIONS

The Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

A.  Any demand, suit or other proceeding pending, or order, decree or judgment entered; against any Insured on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

B.  Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. 1

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

The Schedule of Underlying Insurance and Insurance Products is as follows:

A. Insurance Product:   Directors and Officers Liability

1.   Primary Policy

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

2.   Other Underlying Policies

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/06 |

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    9/11/05

SE 10 00 (Ed. 02 03)                    Page 1 of 1                    Printed in U.S.A.

Endorsement No. 2

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 596300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ 07922-0357
Fax No.: 1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

Endorsement No. 3

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## ILLINOIS AMENDATORY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

1. Section X., MODIFICATION, CANCELLATION AND NONRENEWAL, paragraph C. is amended by deleting the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that provision.

2. Section X., MODIFICATION, CANCELLATION AND NONRENEWAL, paragraph F. is deleted. Provided, however, the Insureds and the Insurer hereby agree that the Insurer shall have the same rights under law to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    9/1/05

SE 0522 (Ed. 0205)                                    Printed in U.S.A.

Endorsement No. 4

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company                .

## PRIOR NOTICE EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that the Insurer shall not be liable for any amount
from any Claim which is based upon, arising from, or attributable to or in consequence of any fact,
circumstance or situation which has been the subject of any written notice given under any other policy of
insurance.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

SE1010 0203

Endorsement No. 5

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

In consideration of the premium charged, it is agreed by the Insurer and Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

Date   9/14/05

MU1032 2/2003

Endorsement No. 6

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

Knowledge Exclusion

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the Inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the Insurance afforded by this Policy.

All other provisions remain unchanged.

_____
Authorized Representative

_____9/11/05_____
Date

Page 1 of 1

# EXHIBIT B

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821     RENEWAL OF: N/A

ITEM 1.    NAMED CORPORATION:    Refco Inc.
                                   550 W. Jackson Blvd., Suite 1300
                                   Chicago, IL 60661

ITEM 2.    POLICY PERIOD:    (a) Inception Date: 8/11/2005
                           (b) Expiration Date: 8/11/2006
                           at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    LIMIT OF LIABILITY (inclusive of Defense Costs):
         $10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.    RETENTIONS:
         (a) INSURING AGREEMENT A:      $0 or minimum required under applicable law, if any
         (b) INSURING AGREEMENT B(1):    $300,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(3))
         (c) INSURING AGREEMENT B(2):    $500,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(3))

ITEM 5.    PREMIUM: $395,000.00

ITEM 6.    NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:

         HCC GLOBAL FINANCIAL PRODUCTS
         P.O. Box 4018
         Farmington, CT 06034
         Attention: Claims Manager

ITEM 7.    DISCOVERY PERIOD:
         (a) Premium: 150% of the Annual Premium
         (b) Duration: 365 days

ITEM 8.    ENDORSEMENTS ATTACHED AT ISSUANCE:
         1115C-IL   991-301   991-302   991-319   991-322   991-412   991-415   991-442   991-444 991-701
         991-804 991-830   991-851   991-876   991-1122   80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

_Michael L. Schell_
Secretary

President

_Authorized Representative_

Date: September 23, 2005

USSIC-090 (04/2002)

PLAINTIFF'S EXHIBIT

# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

#### This is a claims made policy. Please read it carefully.

In consideration of the payment of the premium, and in reliance upon the statements made in the Application, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the Insureds agree as follows:

### INSURING AGREEMENTS

(A)    The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B)    The Insurer will pay to or on behalf of the Company Loss arising from:

(1)    Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

(2)    Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

### DEFINITIONS

(A)    Application means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)    Claim means:

(1)    any written demand for monetary or non-monetary relief,

(2)    any civil proceeding commenced by service of a complaint or similar pleading,

(3)    any arbitration, mediation or other similar dispute resolution proceeding,

(4)    any criminal proceeding commenced by return of an indictment,

(5)    the receipt by an Insured Person of a target letter or similar document in connection with a criminal investigation of such Insured Person, or

(6)    any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

including any appeal from any such proceeding.

(C)    Company means the Named Corporation and any Subsidiary thereof.

(D)    Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSURANCE COMPANY 

      adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims, against any Insured), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the Company.

(E)     Insured means the Insured Persons and the Company.

(F)     Insured Person means:

    (1)    any past, present or future director or officer of the Company, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of Company or Outside Entity located outside the United States, and

    (2)    with respect only to Securities Claims, any past, present or future employee of the Company.

(G)    Loss means Defense Costs and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

    (1)    an Insured Person is legally obligated to pay as a result of any Claim, or

    (2)    the Company is legally obligated to pay as a result of any Securities Claim;

      provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.

(H)    Named Corporation means the entity designated as such in Item 1 of the Declarations.

(I)     No Liability means all defendant Insureds obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)     Outside Capacity means service by an Insured Person as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an Outside Entity, during such time that such service is at the request of the Company.

(K)    Outside Entity means any not-for-profit corporation, association, organization or entity.

(L)     Policy Period means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)    Pollutants means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)    Securities Claim means a Claim which:

    (1)    is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or

U.S. SPECIALTY INSURANCE COMPANY

    (2)   arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

(O)   Subsidiary means any entity:

    (1)   during any time on or before the inception of the Policy Period in which the Named Corporation owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

    (2)   created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, the Named Corporation owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when the Named Corporation ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy with respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective time that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

(P)   Wrongful Act means any:

    (1)   actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:

        (a)   by an Insured Person in his or her capacity as such, including in an Outside Capacity, or

        (b)   with respect only to Securities Claims, by the Company; or

    (2)   matter claimed against an Insured Person solely by reason of his or her service in such capacity or in an Outside Capacity.

## EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with a Claim:

(A)   arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage;

(B)   arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted;

(C)   for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY 

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to Securities Claims;

(D) for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, that this EXCLUSION (D) will not apply to Securities Claims;

(E) for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to Claims involving employee pension or welfare benefit plans organized or sponsored by the Company for its own employees, and will not apply to Securities Claims;

(F) brought by or on behalf of, or in the name or right of, the Company, whether directly or derivatively, or any Insured Person, unless such Claim is:

(1) brought and maintained independently of, and without the solicitation, assistance or active participation of, the Company or any Insured Person, or

(2) for an actual or alleged wrongful termination of employment, or

(3) brought or maintained by an Insured Person for contribution or indemnity and directly results from another Claim covered under this Policy, or

(4) brought and maintained by an employee of the Company solely to enforce his or her rights as a holder of securities issued by the Company;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the Company;

(G) by or on behalf of, or in the name or right of, any Outside Entity, whether directly or derivatively, against an Insured Person for a Wrongful Act in his or her Outside Capacity with respect to such Outside Entity, unless such Claim is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Outside Entity, the Company or any Insured Person;

(H) arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I) arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act and, except for Wrongful Acts of the Company's chairman of the board, chief executive officer, president, chief financial officer or general counsel, no Wrongful Act of any Insured Person will be imputed to the Company.

DISCOVERY PERIOD

If the Insurer or the Named Corporation fails or refuses to renew this Policy or if the Named Corporation cancels this Policy, any Insured will have the right, upon payment of the Discovery Period Premium set

USSIC 991 (04/2002)
Page 5 of 11

U.S. SPECIALTY INSURANCE COMPANY 

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any Wrongful Act actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

## EXTENSIONS

(A)     Subject to its terms and conditions, this Policy will afford coverage for Claims for Wrongful Acts of an Insured Person if such Claims are made against the estates, heirs, legal representatives or assigns of an Insured Person who is deceased or against the legal representatives or assigns of an Insured Person who is incompetent, insolvent or bankrupt, to the extent that such Claims would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)     Subject to its terms and conditions, this Policy will afford coverage for Claims for Wrongful Acts of an Insured Person if such Claims are made against the Insured Person's lawful spouse solely by reason of such spouse's legal status as a spouse of the Insured Person or such spouse's ownership interest in property which the claimant seeks as recovery for alleged Wrongful Acts of the Insured Person. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such Claim will be treated as Loss which the Insured Person is legally obligated to pay on account of the Claim made against the Insured Person. This coverage extension does not apply, however, to the extent the Claim alleges any wrongful act or omission by the Insured Person's spouse.

## CONDITIONS

(A)     Limit of Liability and Retention

(1)     The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)     Defense Costs will be part of and not in addition to the Limit of Liability, and payment of Defense Costs will reduce the Limit of Liability. Defense Costs, as incurred, will also be applied against the retention.

(3)     The retention stated in Item 4(b) of the Declarations will apply to Loss, including Defense Costs, which the Company is required or permitted to pay as indemnification or advancement to or on behalf of the Insured Persons, whether or not such Loss is actually paid, unless the Company is unable to pay such Loss as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the Named Corporation, each Subsidiary and each Outside Entity, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the Insured Persons to the fullest extent permitted by law.

(4)     The Insurer will be liable only for the amount of Loss in connection with any Claim, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the Insureds and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY

apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

(5)   Notwithstanding the foregoing, with respect to Securities Claims the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to Defense Costs; provided, that if a Securities Claim is finally resolved by a determination of No Liability, no retention will apply to such Securities Claim even as respects Defense Costs and the Insurer will thereupon reimburse Defense Costs within the retention which shall already have been paid by the Insureds.

(6)   One retention amount will apply to the covered portion of each and every single Claim. If a single Claim is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the Claim covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single Claim, which in total will not exceed the largest of the applicable retentions.

(B)   Notice of Claims and Reporting Provisions

(1)   The Insureds must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any Claim as soon as practicable after it is made.

(2)   If written notice of a Claim has been given to the Insurer pursuant to CONDITION (B)(1) above, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, will be considered to have been made at the time such notice was given.

(3)   If, during the Policy Period or the Discovery Period (if applicable), the Insureds become aware of any circumstances which may reasonably be expected to give rise to a Claim against the Insureds and if, before the end of the Policy Period or the Discovery Period (if applicable), the Insureds give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such Wrongful Act, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4)   All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C)   Interrelationship of Claims

All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

(D)   Defense Costs, Settlements, Allocation of Loss, Priority of Payments

USSIC 991 (04/2002)
Page 7 of 11

U.S. SPECIALTY INSURANCE COMPANY 

   (1)   The Insurer will have no duty under this Policy to defend any Claim. The Insureds must defend any Claim made against them. The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlements, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

   (2)   The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.

   (3)   If Loss covered by this Policy and loss not covered by this Policy are both incurred in connection with a single Claim, either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insured Persons (or, with respect only to Securities Claims, against Insureds) and against others not included within the definition of Insured Person (or, with respect only to Securities Claims, the definition of Insured), the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the Claim and the relative benefits to be obtained by the resolution of the Claim. The Insurer will be obligated to pay only those amounts or portions of Loss allocated to covered matters claimed against Insured Persons (or, with respect only to Securities Claims, against Insureds). If the Insureds and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute.

   (4)   If the Insurer is obligated to pay Loss, including Defense Costs, under more than one INSURING AGREEMENT, whether in connection with a single Claim or multiple Claims, the Insurer will first pay any Loss payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all Loss, including Defense Costs, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any Loss payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of Loss under INSURING AGREEMENT (A). If no Loss is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such Loss as it is required to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple Claims, apportioned among such Claims as the Named Corporation shall direct in writing.

(E)   Cancellation or Nonrenewal

   (1)   The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the Named Corporation at its last known address. The Insurer may not otherwise cancel this Policy.

   (2)   The Named Corporation may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the Named Corporation may not cancel this Policy after the effective date of any acquisition of the Named Corporation as described in CONDITION (F) below. If the Named Corporation cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3)   If the Insurer elects not to renew this Policy, the Insurer must give the Named Corporation notice of non-renewal no less than sixty (60) days before the end of the Policy Period.

(4)   If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)   Changes in Control

(1)   If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to the Named Corporation:

(a)   the Named Corporation merges into or consolidates with another entity such that the Named Corporation is not the surviving entity, or

(b)   another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Named Corporation, or

(c)   a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Named Corporation;

then coverage under this Policy will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)   If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to a Subsidiary:

(a)   the Subsidiary ceases to be a Subsidiary, or

(b)   a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Subsidiary;

then coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person thereof will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person thereof will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter.

(G)   Other Insurance and Other Indemnification

(1)   Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

USSIC 991 (04/2002)
Page 9 of 11

U.S. SPECIALTY INSURANCE COMPANY 

    (2)    All coverage for Loss from Claims against Insured Persons for Wrongful Acts in their Outside Capacities will be specifically excess of, and will not contribute with,

        (a)    any other insurance available to such Insured Persons by reason of their service in Outside Capacities, and

        (b)    any indemnification available to such Insured Persons in connection with their service in Outside Capacities from any source other than the Company, including but not limited to Outside Entities.

(H)    Cooperation and Subrogation

    (1)    In the event of any notice under CONDITION (B) of a Claim or of circumstances which may reasonably be expected to give rise to a Claim, the Insureds will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the Insureds' rights of recovery, including without limitation the Insured Persons' rights to indemnification or advancement from the Company. The Insureds must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)    No Action against the Insurer

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against an Insured after actual trial or by written agreement of the Insured, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insurer's liability; nor may the Insurer be impleaded by the Insureds or their legal representatives in any such action.

(J)    Notices and Authority

By acceptance of this Policy, the Insureds agree that the Named Corporation may act on behalf of all Insureds with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)    Assignment

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)    Titles and Headings

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)    Representations and Severability

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

U.S. SPECIALTY INSUR: CE COMPANY 

No knowledge or information possessed by any Insured will be imputed to any other Insured except for material facts or information known to the person or persons who signed the Application. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth or to whom such knowledge is imputed.

(N)  Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)  Entire Agreement

By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

(P)  Territory

This Policy applies to Wrongful Acts actually or allegedly taking place or Claims made anywhere in the world.

(Q)  Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                    President

.:S. SPECIALTY INSURANCE COI..ANY

ENDORSEMENT NUMBER: 1

ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No.
24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) Defense Costs of the policy has been amended to read:

Defense Costs means reasonable fees, costs and expenses consented to by the
Insurer (including premiums for any appeal bond, attachment bond or similar
bond) resulting from the investigation, adjustment, defense or appeal of a Claim
against an Insured Person (or, with respect to Securities Claims, against any
Insured), but excluding salaries, wages, benefits or overhead expenses of
directors, officers or employees of the Company or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

If the Insurer or the Named Corporation fails or refuses to renew this Policy or if
the Named Corporation cancels this Policy, any Insured will have the right,
upon payment of the Discovery Period Premium set forth in Item 7(a) of the
Declarations, to an extension of the coverage granted by this Policy for the period
set forth in Item 7(b) of the Declarations following the effective date of such
cancellation or non-renewal (the "Discovery Period"), but only with respect to
any Wrongful Act actually or allegedly taking place before the date of such
cancellation or non-renewal. A written request for this extension, together with
payment of the Discovery Period Premium, must be made within thirty (30) days
after the effective date of cancellation or non-renewal of the Policy. Such
Discovery Period Premium will be deemed to be fully earned as of the inception
of the Discovery Period.

CONDITIONS (G)(1) Other Insurance and Other Indemnification of the policy has been
amended to read:

(1)     Such insurance as is provided by this Policy will share proportionately
        with similar coverages provided under any other valid and collectible
        insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

USSIC 1117C-IL (06/04)                    Page 1 of 1

ENDORSEMENT NUMBER: 2

EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)    DEFINITION (P) Wrongful Act is amended to include any Employment Practices Wrongful Act by an Insured Person in his or her capacity as such.

(2)    DEFINITION (F) Insured Person, subsection (2) is amended to read:

    (2)    with respect only to Securities Claims and Claims for Employment Practices Wrongful Acts, any past, present or future employee of the Company.

(3)    The following DEFINITIONS are added to the Policy:

Discrimination means:

    (1)    any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

    (2)    any limitation, segregation or classification of any employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

Employment Practices Wrongful Act means any actual or alleged:

    (1)    Discrimination,
    (2)    Retaliation,
    (3)    Sexual Harassment,
    (4)    Workplace Harassment,
    (5)    Workplace Tort, or
    (6)    Wrongful Termination.

Retaliation means retaliatory treatment against an employee of the Company on account of such employee's exercise or attempted exercise of his or her rights under law.

Sexual Harassment means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the Company, is used as a basis for employment decisions by the

991-301                Page 1 of 2
Ed (01/03)

Company, creates a work environment with the Company that interferes with performance, or creates an intimidating, hostile or offensive working environment.

Workplace Harassment means conduct that creates a work environment with the Company that interferes with performance, or creates an intimidating, hostile or offensive working environment.

Workplace Tort means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the Company.

Wrongful Termination means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)    EXCLUSION (C) will not apply to Loss for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an Employment Practices Wrongful Act.

(5)    EXCLUSION (F), subsection (2) is amended to read as follows:

   (2)    for an actual or alleged Employment Practices Wrongful Act;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

By:_____

           Attorney-in-fact

991-301          Page 2 of 2
Ed (01/03)

ENDORSEMENT NUMBER: 3

ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) "Insured Person" is
amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To
Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
           Attorney-in-Fact

991-302
Ed (05/00)                    Page 1 of 1

ENDORSEMENT NUMBER: 4

AMEND "LOSS" TO INCLUDE PRE-JUDGMENT
AND POST-JUDGMENT INTEREST

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) Loss is amended to read as
follows:

(G)     Loss means Defense Costs and any damages, settlements, judgments, pre-
judgment interest, post-judgment interest, or other amounts (including
punitive or exemplary damages and the multiplied portion of any
multiplied damage award, if and where insurable by law) that:

(1)     an Insured Person is legally obligated to pay as a result of
any Claim, or

(2)     the Company is legally obligated to pay as a result of any
Securities Claim;

provided, that Loss will not include wages, fines, taxes or penalties or
matters which are uninsurable under the law pursuant to which this Policy
is construed. For purposes of determining whether punitive or exemplary
damages or the multiplied portion of any multiplied damage award arising
from any Claim shall be insurable by law, the Insurer agrees to abide by
the law of whichever jurisdiction is applicable to such Claim and is most
favorable to the Insureds in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
Attorney-in-Fact

991-319                          Page 1 of 1
Ed (06/03)

ENDORSEMENT NUMBER: 5

EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)    DEFINITION (F) Insured Person is amended to include any Employed Lawyer.

(2)    DEFINITION (P) Wrongful Act is amended to include any act, error, misstatement,
       misleading statement, omission or breach of duty by an Employed Lawyer, in his or her
       capacity as such, in the rendering or failure to render professional legal services for the
       Company; provided, that Wrongful Act shall not include any act, error, misstatement,
       misleading statement, omission or breach of duty by such Employed Lawyer in
       connection with any activities: (1) that are not related to such Employed Lawyer's
       employment with the Company; (2) that are not rendered on the behalf of the Company
       at the Company's written request; or (3) that are performed by the Employed Lawyer
       for others for a fee.

(3)    The following DEFINITION is added to the Policy:

       Employed Lawyer means any past, present or future full-time, salaried employee of the
       Company who is admitted to practice law and who is employed at the time of any
       alleged Wrongful Act as a lawyer full-time for and salaried by the Company.

(4)    The EXCLUSIONS section of the Policy is amended by the addition of the following:

       The Insurer will not be liable to make any payment of Loss in connection with any
       Claim made against an Employed Lawyer:

       (a)    alleging, arising out of, based upon or attributable to any Wrongful Act
              occurring at a time when such Employed Lawyer was not employed as a lawyer
              by the Company;

       (b)    alleging, arising out of, based upon or attributable to any Claim made or any
              prior or pending litigation as of 8/11/05, or alleging or derived from the same
              facts or circumstances as alleged in such pending or prior litigation;

       (c)    alleging, arising out of, based upon or attributable to any Wrongful Act, if as of
              8/11/05, such Employed Lawyer knew or could have reasonably foreseen that
              such Wrongful Act could give rise to a Claim;

       (d)    alleging, arising out of, based upon or attributable to any activities by such
              Employed Lawyer as an officer or director of any entity other than the
              Company.

(5)    For purposes of the applicability of the coverage provided by this endorsement, the
       Company will be conclusively deemed to have indemnified the Employed Lawyer to
       the extent that the Company is permitted or required to indemnify him or her pursuant to

991-322                                          Page 1 of 1
(Ed. 09/03)

law, common or statutory, or contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The Company hereby agrees to indemnify the Employed Lawyer to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)   The coverage provided by this endorsement shall apply only to Claims made against an Employed Lawyer, provided that, and only for so long as, one or more Insured Persons (other than such Employed Lawyer) are and remain co-defendants in the proceeding along with such Employed Lawyer.

(7)   The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)   Solely for purposes of the coverage provided under this endorsement:

(a)   The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)   A retention of $100,000 shall apply to Loss resulting from each Claim; provided, such retention shall not apply to Loss incurred by any Employed Lawyer if indemnification of such Loss by the Company is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                        Attorney-in-Fact

991-322
(Ed. 09/03)

Page 1 of 1

ENDORSEMENT NUMBER: 6

ERRORS AND OMISSIONS EXCLUSION
WITH MANAGEMENT CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to
make any payment of Loss in connection with a Claim arising out of, based upon or
attributable to any actual or alleged rendering of or failure to render, whether by the
Company or by any Insured Person, any service for others for a fee; provided, that this
exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in
connection with the management or supervision of the Company or any division or
group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
     Attorney-in-Fact

991-412                    Page 1 of 1
Ed (09/00)

ENDORSEMENT NUMBER: 7

SPECIFIC LITIGATION EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with any Claim arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                      Attorney-in-Fact

991-415
Ed. 09/05

Page 1 of 1

ENDORSEMENT NUMBER: 8

AMEND POLLUTION EXCLUSION ENDORSEMENT
(A-SIDE CARVEBACK)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, that this EXCLUSION (D) will not apply to Securities Claims; provided further, that this EXCLUSION (D) will not apply to Claims for Loss payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

991-442                    Page 1 of 1
Ed (05/04)

ENDORSEMENT NUMBER: 9

AMEND EXCLUSION (C) ENDORSEMENT –
A-SIDE CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in
its entirety as follows:

(C)     for any actual or alleged bodily injury, sickness, mental anguish, emotional
distress, disease or death of any person or damage to or destruction of any
tangible property, including the loss of use thereof, or for injury from any
actual or alleged libel, slander, defamation or disparagement or violation of a
person's right of privacy; provided, that this EXCLUSION (C) will not apply
to:

(1)     Securities Claims, or

(2)     Claims for Loss payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By:_____
                        Attorney-in-Fact

991-444
Ed. (01/05)                    Page 1 of 1

ENDORSEMENT NUMBER: 10

FULL SEVERABILITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) Representations and Severability is amended to read as follows:

(M)     Representations and Severability

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                Attorney-in-Fact

991-701                         Page 1 of 1
Ed (09/03)

ENDORSEMENT NUMBER: 11

DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-AJ0821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     INSURING AGREEMENTS is amended by the addition of the following:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit.

(2)     DEFINITIONS is amended by the addition of the following:

Derivative Demand means a written demand by one or more shareholders of the Company made upon its Board of Directors to bring a civil proceeding in a court of law against an Insured Person for a Wrongful Act.

Derivative Demand Investigation Costs means reasonable fees, costs and expenses (including but not limited to attorneys' fees and experts' fees) incurred in connection with the investigation or evaluation of any Derivative Demand, but excluding wages, salaries, fees, benefits or overhead expenses of any Insured Person.

Derivative Demand Investigation Costs Sub-Limit means $250,000.

(3)     The Insurer's maximum aggregate liability for Derivative Demand Investigation Costs resulting from all Derivative Demands shall be the amount set forth in the definition of Derivative Demand Investigation Costs Sub-Limit, regardless of the number of Derivative Demands received during the Policy Period or the Discovery Period, if purchased. The Derivative Demand Investigation Costs Sub-Limit shall be part of and not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and payment of such Derivative Demand Investigation Costs shall reduce such Limit of Liability.

(4)     There shall be no retention applicable to Derivative Demand Investigation Costs.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-804                        Page 1 of 1
Ed (05/00)

ENDORSEMENT NUMBER: 12

SEPARATE RETENTION FOR SECURITIES CLAIMS
UNDER INSURING AGREEMENT (B)(1)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of Loss payable
under INSURING AGREEMENT (B)(1) arising from any Securities Claim, the retention stated
in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

991-830
Ed. 07/05                                Page 1 of 1

ENDORSEMENT NUMBER: 13

NON-RESCINDABLE:
INSURING AGREEMENT (A) ONLY

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                Attorney-in-Fact

991-861                    Page 1 of 1
 · Ed (04/04)

ENDORSEMENT NUMBER: 14

SPECIFIC EVENT(S) EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make
any payment of Loss in connection with a Claim arising out of, based upon or attributable to any
event described hereunder.

Excluded Event(s):
Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By: _____
                    Attorney-in-Fact

991-876
Ed. (05/05)                    Page 1 of 1

ENDORSEMENT NUMBER: 15

CONTROLLING SHAREHOLDER COVERAGE –
SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 14-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)    The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a
Securities Claim first made during the Policy Period or the Discovery Period (if
applicable) against such Controlling Shareholder for Wrongful Acts, provided, that
one or more Insured Persons and/or the Company are and remain co-defendants in such
Securities Claim along with such Controlling Shareholder.

(2)    The following DEFINITION is added to the Policy:

Controlling Shareholder means the following person(s):

Philip Bennett

(3)    DEFINITION (E) Insured is amended to read as follows:

(E)    Insured means: (1) the Insured Persons; (2) the Company; or (3) the
Controlling Shareholder but only with respect to Securities Claims.

(4)    DEFINITION (G) Loss, subsection (2), is amended to read as follows:

(2)    the Company or Controlling Shareholder is legally obligated to pay as a
result of any Securities Claim;

(5)    DEFINITION (P) Wrongful Act, subsection (1)(b), is amended to read as follows:

(b)    with respect only to Securities Claims, by the Company or by the
Controlling Shareholder in his or her capacity as such or any matter
claimed against such Controlling Shareholder by reason of his or her status
as such; or

(6)    EXCLUSION (F) is amended to read as follows:

(F)    brought by or on behalf of, or in the name or right of, the Company, whether
directly or derivatively, or any Insured Person or Controlling Shareholder,
unless such Claim is:

(1)    brought and maintained independently of, and without the
solicitation, assistance or active participation of, the Company or
any Insured Person, or

991-1122                                      Page 1 of 2
Ed. 09/05

(2)    for an actual or alleged wrongful termination of employment, or

(3)    brought or maintained by an Insured Person or a Controlling Shareholder for contribution or indemnity and directly results from another Claim covered under this Policy, or

(4)    brought and maintained by an employee of the Company solely to enforce his or her rights as a holder of securities issued by the Company;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the Company;

(7)    A retention of $300,000 will apply to Loss resulting from each Claim for which coverage is provided under this endorsement; provided, however, that such retention will apply only to Defense Costs and will not apply to any other Loss.

(8)    CONDITION (F) Changes in Control, subsection (2), is amended to read as follows:

(2)    If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to a Subsidiary:

(a)    the Subsidiary ceases to be a Subsidiary, or

(b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Subsidiary;

then coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person or Controlling Shareholder thereof will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person or Controlling Shareholder thereof will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
              Attorney-in-Fact

991-1122                    Page 2 of 2
Ed. 09/05

ENDORSEMENT NUMBER: 16

POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States — (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

80016
Ed (04/03)

Page 1 of 1

ENDORSEMENT NUMBER: 17

EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed
Lawyers Extension (Separate Limit and Retention") as of the effective date of this
endorsement.

In consideration of the premium charged:

(1)     DEFINITION (F) Insured Person is amended to include any Employed Lawyer.

(2)     DEFINITION (P) Wrongful Act is amended to include any act, error, misstatement,
        misleading statement, omission or breach of duty by an Employed Lawyer, in his or her
        capacity as such, in the rendering or failure to render professional legal services for the
        Company; provided, that Wrongful Act shall not include any act, error, misstatement,
        misleading statement, omission or breach of duty by such Employed Lawyer in
        connection with any activities: (1) that are not related to such Employed Lawyer's
        employment with the Company; (2) that are not rendered on the behalf of the Company
        at the Company's written request; or (3) that are performed by the Employed Lawyer
        for others for a fee.

(3)     The following DEFINITION is added to the Policy:

        Employed Lawyer means any past, present or future full-time, salaried employee of the
        Company who is admitted to practice law and who is employed at the time of any
        alleged Wrongful Act as a lawyer full-time for and salaried by the Company.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

        The Insurer will not be liable to make any payment of Loss in connection with any
        Claim made against an Employed Lawyer:

        (a)     alleging, arising out of, based upon or attributable to any Wrongful Act
                occurring at a time when such Employed Lawyer was not employed as a lawyer
                by the Company;

        (b)     alleging, arising out of, based upon or attributable to any Claim made or any
                prior or pending litigation as of 8/11/05, or alleging or derived from the same
                facts or circumstances as alleged in such pending or prior litigation;

        (c)     alleging, arising out of, based upon or attributable to any Wrongful Act, if as of
                8/11/05, such Employed Lawyer knew or could have reasonably foreseen that
                such Wrongful Act could give rise to a Claim;

991-322                           Page 1 of 3
(Ed. 09/03)

    (d)    alleging, arising out of, based upon or attributable to any activities by such Employed Lawyer as an officer or director of any entity other than the Company.

(5)    For purposes of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the Employed Lawyer to the extent that the Company is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The Company hereby agrees to indemnify the Employed Lawyer to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)    The coverage provided by this endorsement shall apply only to Claims made against an Employed Lawyer, provided that, and only for so long as, one or more Insured Persons (other than such Employed Lawyer) are and remain co-defendants in the proceeding along with such Employed Lawyer.

(7)    The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)    Solely for purposes of the coverage provided under this endorsement:

    (a)    The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

    (b)    A retention of $100,000 shall apply to Loss resulting from each Claim; provided, such retention shall not apply to Loss incurred by any Employed Lawyer if indemnification of such Loss by the Company is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:    8/11/2005

By _____
    Attorney-in-Fact

991-322
(Ed. 09/03)              Page 1 of 1

# EXHIBIT C

## LEXINGTON INSURANCE COMPANY
Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103
(hereinafter called the Company)

DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY
Declarations
EXCESS LIABILITY POLICY – FOLLOW FORM

THIS IS A CLAIMS-MADE POLICY. PLEASE READ CAREFULLY.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY
AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL
BE APPLIED AGAINST THE DEDUCTIBLE OR RETENTION AMOUNT.

Policy Number: 1620924                                   Renewal of: NEW

NAMED CORPORATION:      REFCO LLC
MAILING ADDRESS:        55 W JACKSON BLVD
                        SUITE 1300
                        CHICAGO    IL  60661

STATE OF INCORPORATION OF NAMED CORPORATION: ILLINOIS

SECTION I-EXCESS INSURANCE

(a)     POLICY PERIOD:
        FROM:      08/11/05    TO:    08/11/06
        (12:01 A.M. Standard Time at the address stated in Item I)

(b)     Coverage:        Follow Form - Excess Directors and Officers Liability
(c)     Limits of Liability:      $7,500,000 Excess of $10,000,000
(d)     Premium:         Annual Minimum Premium            Minimum Earned Premium At Inception
                         $251,813                          $38,135
(e)     Retroactive Date:
(f)     Endorsements:    SEE ATTACHED FORMS SCHEDULE

SECTION II-UNDERLYING INSURANCE

(a)     Endorsements made part of this Policy:
(b)     Coverage:        Directors & officers Liability Insurance Policy
        Underlying Company:    HCC Global Financial
        Policy Number:         24-MGU-05-A10821
        Policy Limit:          $10,000,000
        Policy Period:         from: 08/11/05   to:    08/11/06
        Retroactive Date:

Total Limits of all underlying insurance including the underlying policies in excess of which this policy applies, whether recoverable
or not  $10,000,000  each policy year, subject to retentions of            per loss Corporation Reimbursement,    per Director or
Officer, subject to a maximum of   per loss.

_____
Authorized Representative
Countersignature (In states where applicable)

LEX-DO-CMPF(Ed.2/91)

LX004


PLAINTIFF'S
EXHIBIT

10/25/2005  01:47  617-338-8332          AIG                    PAGE  02

## FORMS SCHEDULE

Named Insured:  REFCO LLC

Policy No:  1620924                               Effective Date:  08/11/2005

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| LEXDOCMFF | 05/04 | 00 | CLAIMS MADE DO EXCESS FF DEC |
| LEXDOCMFFT | 02/91 | | CLAIMS MADE DO EXCESS FF TXT |
| LX0940 | 05/96 | 1 | DISCOVERY CLAUSE-AMENDED |
| LX0958 | 05/96 | 2 | MINIMUM EARNED PREMIUM END |
| LX7100 | 02/02 | 3 | NUCLEAR ENERGY EXCL CU 21 23 |
| LX9827 | 01/05 | 4 | TERRORISM PREMIUM CHARGE END |
| FSE073 | 02/91 | 5 | PRIOR/PENDING LIT. HIGHER LIM. |

DOC018(Ed.1287)
LX0295

10/25/2005  01:47     617-338-8332               AIG                    PAGE   03

# LEXINGTON INSURANCE COMPANY

Administrative Offices: 100 Summer Street, Boston, Massachusetts 021 10-2103
(hereinafter called the Company)

### Following Form - Excess Liability Policy

I.    **Insuring Agreements**

Lexington Insurance Company (hereinafter called the "Company") in consideration of the payment of premium
and in reliance upon the statements in the Declarations made a part thereof, hereby agrees to indemnify the In-
sured named in the Declarations (hereinafter called the "Insured") in accordance with the applicable insuring
agreements, terms, conditions and exclusions of the Underlying Policy (and renewals thereof on the same basis)
specified in Section II(a) of the Declarations (hereinafter called the "Underlying Policy") to the extent not incon-
sistent with the exclusions, conditions and other terms of this policy or endorsement(s) attached hereto, which
shall prevail in the event and to the extent of any such inconsistency, against "loss" which is excess of the total
limit(s) of all Underlying Insurance specified in Section II(b) of the Declarations subject to the limit of liability
stated in Section I(c) of the Declarations.

The provision of the Underlying Policy.

except as regards the premium, the obligation to investigate and defend (and for costs and expenses inci-
dent to the same), the amount and limits of liability, the renewal agreement, if any, additional coverage pro-
vided by a discovery period provision, and any other provision therein inconsistent with this policy.

are hereby incorporated as part of this policy.

Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying
Insurance has paid or has been held liable to pay the total applicable underlying limits.

II.   **EXCLUSIONS - This policy does not apply:**

A) 1) to bodily injury, personal injury or property damage which would not have occurred in whole or part but for
the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants
at any time.

2) to any loss, costs or expense of any nature, arising out of any:

a) request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat,
detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b) claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring,
cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or as-
sessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes,
acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

B) Nuclear Energy Liability Exclusions:
1) Under any Liability Coverage, to injury, sickness disease, death or destruction:

a) with respect to which an Insured under the policy is also an Insured under a nuclear energy liability
policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Under-
writers or Nuclear Insurance of Canada, or would be an Insured under any such policy but for its ter-
mination upon exhaustion of its limit of liability; or

b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or
organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or

- 1 -

LEX-DO-CM-FFT(Ed.2/91)
LX2957

10/25/2005  01:47    617-338-8332              AIG                        PAGE  04

any law amendatory th. .of, or (2) the insured is, or had this polc,  .ot been issued would be, entitled to indemnify from the United States of America, or agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2) Under any Medical Payments Coverage, or under any Supplementary Payments provisions relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of a nuclear facility by any person or organization.

3) Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

a) the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of an insured, or (2) has been discharged or dispersed therefrom;

b) The nuclear material is contained in spent fuel or waste at any time possessed, handled, used. processed, stored, transported or disposed of by or on behalf of an insured; or

c) The injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possession or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear materials" means source material, special nuclear material or by-product material;

"source material", "special nuclear material" and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed, primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means:

a) any nuclear reactor,

b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling. processing or packaging waste,

c) any equipment or device used for the processing, fabrication or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

C) to any liability of the insured due to war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization

- 2 -

LEX-DO-CM-FFT(Ed.2/91)
DO057

or requisition or destruction c  _amage to property by or under the order   any government or public or local authority.

D) 1) to any liability for property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, or

2) to any obligation of the insured to indemnify any party because of damages arising out of such property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3) to any obligation to defend any suit or claim against the insured alleging bodily injury or property damage and seeking damages, if such suit or claim arises from bodily injury or property damage resulting from or contributed to, by any and all manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

III.  LIMITS OF LIABILITY

Regardless of the number of insureds under this policy, persons or organization who sustain injury or damage, or claims made or suits brought on account of injury or damage covered hereby, the Company's limit of liability for "loss" excess of the Underlying insurance shall be limited to the amount stated in Section I (c) of the Declarations as applicable to "each occurrence" or "each claim"; provided, however, that the Company's liability shall be further limited to the amount stated in Section I (c) of the Declarations stated as "aggregate" with respect to "loss" excess of the Underlying insurance which occurs during each annual period while this policy is in force.

IV.  INSURED'S DUTIES

The insured named in the Declarations hereby agrees to promptly furnish the Company with a copy of the Underlying Policy and all endorsements thereto which in any way effect this excess insurance. Written notice of any "loss" likely to give rise to a claim hereunder shall be given to the Company by or on behalf of the insured named in the Declarations, containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstance of the "loss"

V.  SETTLEMENT AND DEFENSE

Anything in the Underlying Insurance to the contrary notwithstanding, the Company shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the insured, but the Company, at its option but not being required to, shall have the right and be given the opportunity to associate with the insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding. In the event costs are incurred by the Company with respect to such claim, suit or proceeding, the Company shall pay it incurred costs and such expenses incurred by the insured with the approval of the Company.

VI.  MAINTENANCE OF UNDERLYING INSURANCE

The underlying insurance referred to in paragraph (b) of Section II of the Declarations page and renewal or replacement thereof on terms and conditions not more restrictive, shall be maintained by the Named Insured in full effect during the currency of this policy without such alteration of terms or conditions except for any reduction of the aggregate limit of limits contained therein solely by payment of claims. Failure of the Named Insured to comply with the foregoing shall not invalidate the policy, but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Named Insured so maintained such underlying insurance.

Further, the receivership, the insolvency and/or inability to pay by an underlying insurer for any reason shall not be deemed to render the funds which would have been otherwise available from an underlying insurer to be unavailable, unrecoverable, reduced or exhausted for the purposes of determining the Company's liability under this policy, it being understood that the liability of the Company under this policy shall in no way be increased or expanded as a result of such receivership, insolvency or inability to pay underlying insurer.

- 3 -

LEX-OO-CM-FFT(Ed.2/91)
LX2057

### VII.  AGGREGATE POLICY PERIOL

If the period of the Underlying Insurance is not concurrent with the policy period of this policy, it is agreed that for the purpose of determining the Company's liability for "loss" excess of the aggregate limits of the Underlying Insurance, only "loss" or "losses" which take place during the policy period of this policy shall be included.

### VIII. SUBROGATION

In the event of any payment under this policy, the Company may participate with the Insured in the exercise of all the Insured's rights of recovery against any person or organization liable therefor.

### IX.  PREMIUM

It is agreed that should any alteration be made in the premium for the Underlying Policy during the period of this policy, or if there is an increase in the risk assumed by the Company, then the premium hereon may be adjusted accordingly.

If this policy is subject to audit adjustment, the premium will be based upon the rating base as set forth in the Declarations. Upon notice to the Named Insured of the earned premium due, such premium in excess of the advance premium shall become due and payable. If the total earned premium is less than the premium previously paid, the Company shall return to the Insured the unearned portion paid by the Insured, subject however to any minimum premium stated in the Declarations.

### X.  CANCELLATION

It is understood and agreed that the terms of Condition X, Cancellation, of this policy are deleted in their entirety and are replace by the following:

This policy may be cancelled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective. The policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective; provided, however, if such cancellation is for non-payment of premium, the Company is required to give only at least ten (10) days notice. Proof of the mailing of the notice shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing. If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure for the period this policy is in effect, applied to the premium developed in accordance with the Premium Condition of this policy, subject to the short rate amount of the Minimum Annual Premium stated in this policy but in no event shall the earned premium be less than the Minimum Earned Premium stated in this policy. If the Company cancels, earned premium shall be computed pro rata of the premium developed in accordance with the Premium Condition of this policy subject to the pro rata amount of the Minimum Annual Premium stated in this policy; provided, however, if the Company cancels for non-payment of premium, the premium shall be computed on the same basis as if the Named Insured cancels.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. The check of the Company mailed or delivered, shall be sufficient tender of any refund due the Named Insured.

If this policy insures more than one Named Insured, cancellation may be effected by the one first named for the account of all Insureds. Notice of cancellation by the Company to such first Named Insured shall be notice to all Insureds. Payment of any unearned premium to such first Named Insured shall be for the account of all Insureds.

### XI.  SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United states. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA 02110-2103,

- 4 -

LEX-DO-CM-FFT(Ed.2/91)
LX2057

10/25/2005  01:47    617-338-8332                   AIG                        PAGE  07

or his or her representative, and, .at in any suit instituted against the Com, .y upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successoror successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this policy of insurance, and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XII.  DEFINITIONS

The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs.

The work "Costs" shall be understood to mean interest on judgements, investigations, adjustments and legal expenses (excluding all expenses for salaried employees of the insured or any of the Underlying Insurer's permanent employees).

The term "Underlying Policy" shall be understood to mean the policy indicated in Section II(a) of the Declarations.

The term "Underlying Insurance" shall be understood to mean the total limits of all insurance including the Underlying Policy and/or any self-insured retentions excess of which this policy is written, whether recoverable or not recoverable.

The term "Insured" shall be understood to mean the insured named in the Declarations, any insured under the Underlying Policy, and any additional insured added to the policy by endorsement attached hereto.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.

_Elizabeth M. Tuck_                                    _L. H. Cullen_

    Secretary                              Chairman of the Board and CEO

LEX-DO-CM-FFT(Ed.2/91)
LX2057

`,10/25/2005  01:47    617-338-8332                AIG                    PAGE  08`

ENDORSEMENT # 1

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### DISCOVERY CLAUSE-AMENDED

In consideration of the premium charged, it is understood and agreed that Section 10, Discovery Clause, is deleted in its entirety and replaced with the following:

If the Insurer or the Named Corporation shall cancel or refuse to renew this policy,  the Named Corporation shall have the right, upon payment of an additional premium of 150%    of the one year premium, to a period of  365  days following the effective date of such  cancellation or non-renewable (herein  referred to as the Discovery Period) in which to give written notice to the Insurer of claim(s) first made against the Insured(s) during said Discovery Period for any Wrongful Act  committed before the effective date of such cancellation or non-renewal and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within ten (10) days of the effective date of cancellation or non-renewal. The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. If the policy is cancelled due to nonpayment of premium, the Insured(s) and/or the Company shall not have the option to purchase the Discovery Period described above.

The offer by the Insurer of renewal terms, conditions, the Limit of Liability and/or premiums different from those of the expiring policy shall not constitute non-renewal.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (in states where applicable)

LX0940 (05/95)

.10/25/2005  01:47    617-330-8332          AIG                    PAGE  89

ENDORSEMENT # 2

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.: 1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

## MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is terminated or cancelled prior to the  expiration of the policy period for any reason other than cancellation by the Insurer, it is agreed that the premium charged shall be $ 88,135 earned upon the inception of the policy or computed in accordance  with the customary short-rate table and procedure, whichever is greater.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (in states where applicable)

LX0958 (05/96)

.10/25/2005  01:47     617-330-8332     ATG     PAGE  10

POLICY NUMBER:  1620924     ENDORSEMENT # 3     CU 21 23 02 02

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

I. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereof.

II. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

Includes copyrighted information of the Insurance Services Offices, Inc., with its permission. All rights reserved.

10/25/2005  01:47     617-338-6332                    AIG                          PAGE  11

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Includes copyrighted information of the Insurance Services Offices, Inc., with its permission.  All rights reserved.

CU 21 23 02 02      □

10/25/2005  01:47     617-338-6332                  AIG                              PAGE  12

ENDORSEMENT # 4

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

## TERRORISM PREMIUM CHARGE ENDORSEMENT

The "Terrorism" charge is $4,938        and is included in the Policy Premium shown on the Declarations Page of this policy.

DEFINITION - The following definition of terrorism shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

    (1) A government;
    (2) The civilian population of a country, state or community; or
    (3) To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the "Act") is in effect, "Terrorism" includes a certified act of terrorism defined by Section 102 Definitions, of the Act and any revisions or amendments thereto.

All other terms and conditions of the policy are the same.

_____
Authorized Representative OR
Countersignature (in states where applicable)

LX9827 (01/05)

10/25/2005  01:47    617-338-8332              AIG                      PAGE  13

ENDORSEMENT # 5

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

PENDING AND PRIOR LITIGATION EXCLUSION FOR HIGHER LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with respect to the Limit of Liability $7,500,000    excess of $10,000,000    , exclusion 4(h) is amended to indicate that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers alleging, arising out of, based upon or attributable to any pending or prior litigation as of JUNE 4, 2004     or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (in states where applicable)

FSE073(Ed.2/91)
LX2029

# Exhibit 21



SERVICES    PROGRAMS    PRESS    PUBLICATIONS    DEPARTMENTS    CONTACT

## CORPORATION FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| **Entity Name** | REFCO, INC. | **File Number** | 49538723 |
| **Status** | MERGE/CONSOLIDATED | | |
| **Entity Type** | CORPORATION | **Type of Corp** | DOMESTIC BCA |
| **Incorporation Date (Domestic)** | 08/05/1969 | **State** | ILLINOIS |
| **Agent Name** | UNITED STATES CORPORATION CO | **Agent Change Date** | 07/02/1985 |
| **Agent Street Address** | 33 NORTH LASALLE STREET | **President Name & Address** | PHILLIP BENNETT 200 LIBERTY STREET NEW YORK NY 10281 |
| **Agent City** | CHICAGO | **Secretary Name & Address** | MERGED OR CONSOLIDATED 07 12 01 DE LLC |
| **Agent Zip** | 60602 | **Duration Date** | PERPETUAL |
| **Annual Report Filing Date** | 00/00/0000 | **For Year** | 2001 |
| **Old Corp Name** | 06/30/1981 - RAY E FRIEDMAN & COMPANY | | |

**Return to the Search Screen**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# Exhibit 22

Division of Corporations - General Information - Entity Details                    Page 1 of 2

Frequently Asked Questions   View Search Results   Summary of Charges   Logout

## Entity Details

| File Number: | 3354103 | Incorporation Date / Formation Date: | 02/07/2001 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | REFCO, LLC | | |
| Entity Kind: | LIMITED LIABILITY COMPANY (LLC) | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |
| Status: | CEASED GOOD STANDING | Status Date: | 06/01/2006 |

**TAX INFORMATION**

| Last Annual Report Filed: | NO REPORTS ON FILE | Tax Due: | $ 744.00 |
|---|---|---|---|
| Annual Tax Assessment: | $ 200.00 | Total Authorized Shares: | 0 |

**REGISTERED AGENT INFORMATION**

| Name: | THE CORPORATION TRUST COMPANY | | |
|---|---|---|---|
| Address: | CORPORATION TRUST CENTER 1209 ORANGE STREET | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19801 |
| Phone: | (302)658-7581 | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0250S | Merger; Survivor | 2 | 08/31/2001 | 12:00 | 08/31/2001 |
| 2 | 0250S | Merger; Survivor | 2 | 07/12/2001 | 11:00 | 07/12/2001 |
| 3 | 0240 | Amendment; Domestic | 1 | 03/23/2001 | 12:00 | 03/23/2001 |
| | Former Name: | REFCO (NEWCO) LLC | | | | |
| 4 | 0102Y | Register L.L.C. | 1 | 02/07/2001 | 16:30 | 02/07/2001 |