# Exhibit A



**HCC Global Financial Products**
75 Montgomery Street
6th Floor
Jersey City, NJ 07302
United States of America
Tel: +1 (201) 946.6717
Fax: +1 (201) 946-6925
www.hcc-global.com

*via facsimile (212) 345-8491*

August 5, 2004

James C. Schneider
Marsh, Inc. of NY, NY
1166 Avenue of the Americas
New York, NY 10036

Re:  Refco Group Ltd., LLC
      Directors & Officers Liability

Dear James:

HCC Global Financial Products is pleased to present the following confirmation of binding on behalf of U.S. Specialty Insurance Company (Form USSIC 1055 (03/2004)):

**ITEM 1.**   **Name And Principal Address:**
            Refco Group Ltd., LLC
            Newport Tower
            525 Washington Blvd. 36th Fl.
            Jersey City, NJ  07310

**ITEM 2.**   **Policy Number:** 24-MGU-04-A4151

**ITEM 3.**   **Policy Period:**  (a) Inception Date:   8/5/2004
                          (b) Expiration Date:   8/5/2005
                          at 12:01 a.m. at the Principal Address stated in ITEM 1.

**ITEM 4.**   **Limit of Liability (Inclusive of Defense Expenses):**
            $10,000,000

<div align="center">Page 1 of 3</div>

ITEM 5.    **Retentions:**
$        0        Insuring Agreement (A), per Insured Person: Non-indemnifiable L o s s
$500,000        Insuring Agreement (A), Indemnifiable L o s s
$500,000        Insuring Agreement (B)

ITEM 6.    **Premium:** $150,000.00

ITEM 7.    **Endorsements Effective at Inception:**
80016 - Terrorism Coverage (premium allocated: $0 included in above premium)
1055-400 - Errors & Omissions Exclusion
1055-418 - Exclusion of all EPL Claims
1055-428 - Prior Acts Exclusion - effective the date of sale to TH Lee - 6/4/2004
MANU - Amend Securities Exclusion

ITEM 8.    **Commission:** 12.5%

**CONTINGENCIES:**

**Please note that this binder is contingent upon all of the following:**
--Receipt, review, and acceptance of the original and fully completed HCC Global main form D&O application within 10 business days. We reserve the right to modify the above terms if the application received contains additional information that was not previously provided.
--The fully executed Terrorism Disclosure Notice.
Payment of the premium by the date indicated on the attached invoice

**Failure to meet these contingencies may result in coverage being cancelled or voided ab initio.**


Sincerely,



Eric Rush
(201) 946-6791
erush@hcc-global.com

Page 2 of 3



**HCC Global Financial Products**
73 Montgomery Street
6th Floor
Jersey City, NJ 07302
United States of America
Tel: +1 (201) 946.6717
Fax: +1 (201) 946-6925
www.hcc-global.com

August 5, 2004

Marsh, Inc. of NY, NY
1166 Avenue of the Americas
New York, NY 10036

# INVOICE

## PLEASE REMIT YOUR PAYMENT TO:
*Please note our new remit to address:*

**Via Overnight Mail:**
Webster Bank
Attn: Lockbox Department
436 Slater Road
New Britain, CT 06053

**Via Regular Mail:**
HCC Global Financial Products
Dept 630
P.O. Box 150473
Hartford, CT 06115-0473

| | |
|---|---|
| Policy No.: | 24-MGU-04-A4151 |
| Policy Name: | Refco Group Ltd., LLC |
| Effective - Expiration Dates: | 8/5/2004 to 8/5/2005 |
| Insurer: | U.S. Specialty Insurance Company |
| Total Premium: | $150,000.00 |
| Commission Percentage: | 12.5% |
| Broker: | James C. Schneider |
| | |
| **Net Due:** | **$131,250.00** |
| **Payment Due Date:** | **9/5/2004** |

Please remit full amount by the date indicated above.  Failure to do so may result in coverage being cancelled or voided ab initio.  Please feel free to contact our office at (201) 946-6791 with any questions regarding this remittance.

Page 3 of 3

# Exhibit B

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

### DECLARATIONS

### DIRECTORS, OFFICERS AND ORGANIZATION LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-04-A4151             RENEWAL OF: N/A

ITEM 1.    NAMED ORGANIZATION:    Refco Group Ltd., LLC
                                   550 W. Jackson Blvd. Suite 1300
                                   Chicago, IL 60661

**RECEIVED**

**OCT 2 3 2004**

**MARSH**
CHICAGO, ILLINOIS

ITEM 2.    POLICY PERIOD:
           (a) Inception Date:  8/5/2004
           (b) Expiration Date: 8/5/2005
           at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    LIMIT OF LIABILITY (inclusive of Defense Costs):
           $10,000,000 maximum aggregate limit of liability for all Insuring Agreements combined.

ITEM 4.    RETENTIONS: $500,000
           (Provided, the retention is $0, per Claim, for Loss under INSURING AGREEMENT A as to which indemnification by the Insured Organization is not legally permissible.)

ITEM 5.    PREMIUM:  $150,000.00

ITEM 6.    DISCOVERY PERIOD:
           One or two years after the end of the Policy Period, at the election of the Named Organization.

ITEM 7.    ADDITIONAL PREMIUM FOR DISCOVERY PERIOD:
           (a) one-year Discovery Period:    100% of the Annual Premium.
           (b) two-year Discovery Period:    200% of the Annual Premium.

ITEM 8.    NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:
           HCC GLOBAL FINANCIAL PRODUCTS
           P.O. Box 4018
           Farmington, CT 06034
           Attention: Claims Manager

ITEM 9.    ENDORSEMENTS ATTACHED AT ISSUANCE:
           1055-400 1055-418 1055-428 1055-1052 80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

Secretary            President            Authorized Representative

Date: November 1, 2004

USSIC 1056 (04/2002)

# U.S. SPECIALTY INSURANCE COMPANY

# **THE MAG**

## Directors, Officers and Organization Liability Insurance Policy



**HCC Global Financial Products**

8 Forest Park Drive
P.O. Box 4016
Farmington, CT 06034

# U.S. SPECIALTY INSURANCE COMPANY

### THE MAG
DIRECTORS, OFFICERS AND PRIVATE ORGANIZATION LIABILITY
INSURANCE POLICY

**This is a claims made policy. Please read it carefully.**

In consideration of the payment of the premium, and in reliance upon the statements made in the **Application**, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this policy, the Insurer and the **Insureds** agree as follows:

INSURING AGREEMENTS

(A)     The Insurer will pay to or on behalf of the **Insured Persons Loss** arising from **Claims** first made against them during the **Policy Period** or Discovery Period (if applicable) for **Wrongful Acts**.

(B)     The Insurer will pay to or on behalf of the **Insured Organization Loss** arising from **Claims** first made against it during the **Policy Period** or Discovery Period (if applicable) for **Wrongful Acts**.

DEFINITIONS

(A)     **Application** means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)     **Claim** means:

   (1)     any written demand, oral demand or demands for non-monetary relief

   (2)     any civil proceeding commenced by service of a complaint or similar pleading,

   (3)     any arbitration, mediation or other similar dispute resolution proceeding, or

   (4)     any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

U.S. SPECIALTY INSURANCE COMPANY

provided, that any such demand or proceeding will be a **Claim** only if and to the extent that it seeks monetary relief. **Claim** also means any criminal proceeding commenced by the return of an indictment, and any appeal from any proceeding referred to in this DEFINITION (B).

(C)   **Defense Costs** means reasonable legal fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured**, but excluding salaries, wages, benefits or overhead expenses of any **Insured Person**.

(D)   **Discrimination** means:

    (1)   any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

    (2)   any limitation, segregation or classification of any **Employee** or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an **Employee**;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

(E)   **Employee** means any individual whom the **Insured Organization** compensates by salary, wages and/or commissions and whose labor or service is engaged by and directed by the **Insured Organization**, including seasonal, volunteer and part-time employees.

(F)   **Employment Practices Wrongful Act** means any actual or alleged:

    (1)   **Discrimination,**

    (2)   **Retaliation,**

    (3)   **Sexual Harassment,**

    (4)   **Workplace Harassment,**

    (5)   **Workplace Tort,** or

    (6)   **Wrongful Termination.**

(G)   **Insured** means the **Insured Persons** and the **Insured Organization**.

U.S. SPECIALTY INSURANCE COMPANY

(H)   **Insured Organization** means the Named Organization and any **Subsidiary** thereof.

(I)   **Insured Person** means any past, present or future director, officer, managing member, manager or **Employee** of the **Insured Organization**, including any person in a position which is the functional equivalent thereof with respect to any entity included within the definition of **Insured Organization** located outside the United States.

(J)   **Loss** means **Defense Costs** and any damages, settlements, judgments, back pay awards and front pay awards or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that an **Insured** is legally obligated to pay as a result of any **Claim**; provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the Insureds in that regard.

(K)   **Named Organization** means the entity designated as such in Item 1 of the Declarations.

(L)   **Outside Capacity** means service by an **Insured Person** as a director, officer, member, manager or trustee of, or in another equivalent executive position with respect to, an **Outside Entity**, during such time that such service is at the request of the **Insured Organization**.

(M)   **Outside Entity** means any corporation or organization other than the **Insured Organization** which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as the same may be amended from time to time.

(N)   **Policy Period** means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(O)   **Pollutants** means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(P)   **Retaliation** means retaliatory treatment against an **Employee** of the **Insured Organization** on account of such **Employee's** exercise or attempted exercise of his or her rights under law.

U.S. SPECIALTY INSURANCE COMPANY

(Q)  **Sexual Harassment** means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the **Insured Organization**, is used as a basis for employment decisions by the **Insured Organization**, creates a work environment with the **Insured Organization** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

(R)  **Subsidiary** means any entity:

   (1)  during any time on or before the inception of the **Policy Period** in which the **Named Organization** has or controls, either directly or indirectly through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers; or

   (2)  subject to CONDITION (F)(3), created or acquired during the **Policy Period** during any time in which, as a result of such creation or acquisition, the **Named Organization** has or controls, either directly or indirectly through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers.

   An entity ceases to be a **Subsidiary** when the **Named Organization** no longer has or controls, either directly or indirectly through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers. The coverage afforded under this Policy with respect to **Claims** against a **Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts** committed or allegedly committed after the effective time that such entity becomes a **Subsidiary** and prior to the time that such entity ceases to be a **Subsidiary**.

(S)  **Workplace Harassment** means conduct which creates a work environment with the **Insured Organization** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

(T)  **Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the **Insured Organization**.

(U)  **Wrongful Act** means:

   (1)  any **Employment Practices Wrongful Act** (a) by the **Insured Organization**, or (b) by an **Insured Person** in his or her capacity as a

U.S. SPECIALTY INSURANCE COMPANY

director, officer, member, manager or **Employee** of the **Insured Organization**;

(2)    any other actual or alleged act, error, misstatement, misleading statement, omission or breach of duty (a) by the **Insured Organization**, or (b) by an **Insured Person** in his or her capacity as a director, officer, member, manager or **Employee** of the **Insured Organization** or in an **Outside Capacity**; or

(3)    any matter claimed against an **Insured Person** solely by reason of his or her service (a) as a director, officer, member, manager or **Employee** of the **Insured Organization**, or (b) in an **Outside Capacity**.

(V)    **Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any **Employee**, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim**:

(A)    arising out of, based upon or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, that this EXCLUSION (A) will apply to an **Insured** only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** gained such a profit or advantage;

(B)    arising out of, based upon or attributable to the commission by any **Insured** of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply to an **Insured** only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

(C)    for any actual or alleged:

(1)    bodily injury, sickness, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof; or

(2)    mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy; provided, that this EXCLUSION (C)(2) will not apply to any **Claim** for an **Employment Practices Wrongful Act**;

U.S. SPECIALTY INSURANCE COMPANY

(D)     for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants;

(E)     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulations or any other actual or alleged Wrongful Act in the administration of employee benefits;

(F)     brought by or on behalf of, or in the name or right of, the Insured Organization, whether directly or derivatively, or any Insured Person, unless such Claim is:

      (1)     brought and maintained independently of, and without the solicitation, assistance or active participation of, the Insured Organization or any Insured Person,

      (2)     brought or maintained by an Insured Person for contribution or indemnity and directly results from another Claim covered under this Policy, or

      (3)     for an actual or alleged Employment Practices Wrongful Act;

(G)     by or on behalf of, or in the name or right of, any Outside Entity, whether directly or derivatively, against an Insured Person for a Wrongful Act in his or her Outside Capacity with respect to such Outside Entity, unless such Claim is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Outside Entity, the Insured Organization or any Insured Person;

(H)     arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time;

(I)     arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation;

(J)     as a result of any portion of a Claim seeking relief or redress in any form other than money damages; or

(K)     brought about or contributed to by any willful violation of any law, statute, rule or regulation by any Insured; provided, that this EXCLUSION (K) will not apply to any Claim for an Employment Practices Wrongful Act;

U.S. SPECIALTY INSURANCE COMPANY

(L)    for any actual or alleged violation of any provision of the Fair Labor Standards Act other than the Equal Pay Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, any workers' compensation, unemployment insurance, social security or disability benefits law or any amendments thereto, or any other similar provisions of any federal, state or local statutory or common law or any rules and regulations promulgated under any of the foregoing; provided, that this EXCLUSION (L) shall not apply to any **Claim** for any actual or alleged **Retaliation**;

(M)    for the actual, alleged or threatened discharge, dispersal, release or escape of nuclear reaction, nuclear radiation, radioactive contamination or any radioactive substance;

(N)    for any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, any rule or regulation promulgated under any of the foregoing, or any other provision of federal, state or common law imposing liability in connection with the registration, offer, sale or purchase of securities; provided, that this EXCLUSION (N) shall not apply to any **Claim** arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933; and provided, further, that if at least thirty (30) days prior to any initial public offering of stock of the **Named Organization** or any **Subsidiary** or any purchase or sale, or any offer to purchase or sell, any debt securities of the **Named Organization** or any **Subsidiary**, the **Insured Organization** gives the Insurer written notice thereof together with any information with respect thereto as the Insurer may request, the Insurer will offer a proposal to provide coverage with respect to such event, subject to such additional terms, conditions and limitations of coverage and such additional premium as the Insurer may require;

(O)    for any actual or alleged:

  (1)    infringement of any patent, copyright or trademark, or

  (2)    unauthorized taking or use of any trade name, service mark, service name, mask work, title, slogan, trade secret, know-how or confidential or proprietary business information or other material or information in violation of any right under any patent, copyright or trademark registration, license, lease, franchise, permit, authorization or agreement (including secrecy and non-disclosure agreements);

including any actual or alleged violation of any law, statute, rule or regulation or any provision of the common law imposing liability in connection therewith;

U.S. SPECIALTY INSURANCE COMPANY

provided, that this EXCLUSION (O) will apply only to **Claims** against the **Insured Organization**; or

(P)    arising out of any actual or alleged breach of contract or agreement; provided, that this EXCLUSION (P) will not apply to otherwise covered **Defense Costs** incurred in connection with any such **Claim** and provided, further, that this EXCLUSION (P) will not apply to any **Claim** for an **Employment Practices Wrongful Act**.

No conduct of any **Insured** will be imputed to any other **Insured** to determine the application of any of the above EXCLUSIONS.

DISCOVERY PERIOD

If the Insurer or the **Named Organization** fails or refuses to renew this Policy or if the **Named Organization** cancels this Policy, any **Insured** will have the right, upon payment of the respective Discovery Period Premium set forth in Item 7 of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 6 of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

EXTENSIONS

(A)    Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, to the extent that such **Claims** would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)    Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the **Insured Person's** lawful spouse solely by reason of such spouse's legal status as a spouse of the **Insured Person** or such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Persons**. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such **Claim** will be treated as **Loss** which the **Insured Person** is legally obligated to pay on account of the claim made against the **Insured Person**. This coverage extension does not apply, however, to the

U.S. SPECIALTY INSURANCE COMPANY

extent the **Claim** alleges any wrongful act or omission by the **Insured Person's** spouse.

CONDITIONS

(A)    Limit of Liability and Retention

(1)    The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)    **Defense Costs** will be part of and not in addition to the Limit of Liability, and payment of **Defense Costs** will reduce the Limit of Liability. **Defense Costs**, as incurred, will also be applied against the retention.

(3)    The retention stated in Item 4 of the Declarations will apply to **Loss**, including **Defense Costs**:

(a)    which the **Insured Organization** is obligated to pay as a result of **Claims** against it, or

(b)    which the **Insured Organization** is required or permitted to pay as indemnification or advancement to or on behalf of the **Insured Persons** as a result of **Claims** against them, whether or not such **Loss** is actually paid, unless the **Insured Organization** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency.

For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the **Named Organization** and each **Subsidiary**, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the **Insured Persons** to the fullest extent permitted by law.

(4)    The Insurer will be liable only for the amount of **Loss** in connection with any **Claim** which is in excess of the retention stated in Item 4 of the Declarations, if applicable. Such retention is to be borne by the **Insureds** and remain uninsured. A single retention will apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

(5)    One retention amount will apply to the covered portion of each and every single **Claim**.

U.S. SPECIALTY INSURANCE COMPANY

(B)    Notice of Claims and Reporting Provisions

    (1)    The Insureds must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any Claim as soon as practicable after it is made.

    (2)    If written notice of a Claim has been given to the Insurer pursuant to CONDITION (B)(1) above, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, will be considered to have been made at the time such notice was given.

    (3)    If, during the Policy Period or the Discovery Period (if applicable), the Insureds become aware of any circumstances which may reasonably be expected to give rise to a Claim against the Insureds and if, before the end of the Policy Period or the Discovery Period (if applicable), the Insureds give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such Wrongful Act, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act described in such notice will be considered to have been made at the time such notice of circumstances was given.

    (4)    All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 8 of the Declarations.

(C)    Interrelationship of Claims

All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

U.S. SPECIALTY INSURANCE COMPANY

(D)    Defense Costs. Settlements, Allocation

    (1)    The Insurer will have no duty under this Policy to defend any **Claim**. The **Insureds** must defend any **Claim** against them. The **Insureds** may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the Insurer's prior written consent, which consent may not be unreasonably withheld. Only those settlements, stipulated judgments and **Defense Costs** to which the Insurer has consented will be recoverable as **Loss** under the Policy. The Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**.

    (2)    The Insurer will pay covered **Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by the Insurer are not covered under this Policy, the **Insureds** agree to repay such non-covered **Defense Costs** to the Insurer.

    (3)    If **Loss** covered by this Policy and loss not covered by this Policy are both incurred in connection with a single **Claim**, either because the **Claim** includes both covered and uncovered matters, or because the **Claim** is made both against **Insureds** and against others not included within the definition of **Insured**, the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the **Claim** and the relative benefits to be obtained by the resolution of the **Claim**. The Insurer will be obligated to pay only those amounts or portions of **Loss** allocated to covered matters claimed against **Insureds**. If the **Insureds** and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of **Loss**, including **Defense Costs**, which the parties agree is not in dispute.

    (4)    The Insurer will have no obligation to pay **Loss**, including **Defense Costs**, after the Insurer's maximum aggregate limit of liability, as set forth in Item 3 of the Declarations, has been exhausted by the payment of **Loss**, including **Defense Costs**. If the Insurer's maximum aggregate limit of liability, as set forth in Item 3 of the Declarations, is exhausted by the payment of **Loss**, including **Defense Costs**, the premium will be fully earned.

U.S. SPECIALTY INSURANCE COMPANY

(E)   Cancellation or Nonrenewal

  (1)   The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days' notice to the **Named Organization** at its last known address. The Insurer may not otherwise cancel this Policy.

  (2)   The **Named Organization** may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the **Named Organization** may not cancel this Policy after the effective date of any acquisition of the **Named Organization** as described in CONDITION (F)(1) below. If the **Named Organization** cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

  (3)   If the Insurer elects not to renew this Policy, the Insurer must give the **Named Organization** notice of non-renewal no less than sixty (60) days before the end of the **Policy Period**.

  (4)   If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)   Changes in Exposure

  (1)   If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to the **Named Organization**:

    (a)   the **Named Organization** merges into or consolidates with another entity such that the **Named Organization** is not the surviving entity, or

    (b)   another entity, person or group of entities and/or persons acting in concert acquires the right to elect, appoint or designate more than 50% of the directors or managers of the **Named Organization**, or

    (c)   a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Named Organization**;

    then coverage under this Policy will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts**

U.S. SPECIALTY INSURANCE COMPANY

committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)    If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

    (a)    the **Subsidiary** ceases to be a **Subsidiary**, or

    (b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar office is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

(3)    If, during the **Policy Period**, the **Insured Organization** acquires any assets and/or liabilities, acquires a **Subsidiary** or acquires any entity by merger and, at the time of such transaction, the assets and/or liabilities so acquired or the assets and/or liabilities of the entity so acquired exceed twenty-five (25%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent audited consolidated financial statements, such entity will be included with the term "**Subsidiary**" for a period of ninety (90) days after the date of such transaction. There will be no coverage under this Policy in respect of any **Claim** against the **Insureds** which is first made more than ninety (90) days after the effective date of the transaction described in this CONDITION (F)(3) unless the **Insurer** has received written notice containing full details of such transaction and the **Insurer** has agreed to provide such coverage. No coverage will be available under this policy for **Loss**, including **Defense Expenses**, from any **Claim** against any entity, or the **Insured Persons** of any entity, included with the term "**Subsidiary**" by reason of this CONDITION (F)(3) for any **Wrongful Act** committed or allegedly committed before the date of such transaction.

U.S. SPECIALTY INSURANCE COMPANY

(G)  Other Insurance and Other Indemnification

   (1)  Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

   (2)  All coverage for Loss from Claims against Insured Persons for Wrongful Acts in their Outside Capacities will be specifically excess of, and will not contribute with, any other insurance available to such Insured Persons by reason of their service in Outside Capacities, and any indemnification available to such Insured Persons in connection with their service in Outside Capacities from any source other than the Insured Organization, including but not limited to Outside Entities.

(H)  Cooperation and Subrogation

   (1)  In the event of any notice under CONDITION (B) of a Claim or of circumstances which may reasonably be expected to give rise to a Claim, the Insureds will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

   (2)  In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the Insureds' rights of recovery, including without limitation the Insured Persons' rights to indemnification or advancement from the Insured Organization. The Insureds must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)  No Action against the Insurer

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against an Insured after actual trial or by written agreement of the Insured, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insurer's liability; nor may the Insurer be impleaded by the Insureds or their legal representatives in any such action.

(J)  Notices and Authority

By acceptance of this Policy, the Insureds agree that the Named Organization may act on behalf of all Insureds with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the

U.S. SPECIALTY INSURANCE COMPANY

cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)    Assignment

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)    Titles and Headings

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)    Representations and Severability

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured except for material facts or information known to the person or persons who signed the Application. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth or to whom such knowledge is imputed.

(N)    Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)    Entire Agreement

By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement the parties with respect to this insurance.

U.S. SPECIALTY INSURANCE COMPANY

(P)     Territory

This Policy applies to **Wrongful Acts** actually or allegedly taking place or **Claims** made anywhere in the world.

(Q)     Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                           President

ENDORSEMENT NUMBER: 1

**SCHEDULED ERRORS AND OMISSIONS EXCLUSION
(BROAD FORM)**

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged, the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged rendering of or failure to render any professional services in connection with any of the businesses or operations of the **Insured Organization** set forth below:

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
            Attorney-in-Fact

1055-400
(Ed 11/99)

ENDORSEMENT NUMBER: 2

## DELETE EMPLOYMENT PRACTICES COVERAGE

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1) The Insurer will not be liable to make any payment for **Loss** in connection with any **Claim** for an **Employment Practices Wrongful Act.**

(2) DEFINITION (U) is amended to read as follows:

    (U)   **Wrongful Act** means:

        (1)   any actual or alleged act, error, misstatement, misleading statement, omission or breach of duty (a) by the **Insured Organization**, or (b) by an **Insured Person** in his or her capacity as a director, officer, member, manager or **Employee of the Insured Organization** or in an **Outside Capacity**, or

        (2)   any matter claimed against an **Insured Person** solely by reason of his or her service (a) as a director, officer, member, manager or **Employee of the Insured Organization**, or (b) in an **Outside Capacity**;

        provided, however, that **Wrongful Act** will not include any **Employment Practices Wrongful Act.**

(3) EXCLUSION (C)(2) is amended by deleting the words "provided, that this EXCLUSION (C)(2) will not apply to any **Claim** for an **Employment Practices Wrongful Act.**"

(4) EXCLUSION (F)(3) is deleted in its entirety.

(5) EXCLUSION (K) is amended by deleting the words "provided, that this EXCLUSION (K) will not apply to any **Claim** for an **Employment Practices Wrongful Act.**"

(6) EXCLUSION (L) is amended by deleting the words "provided, that this EXCLUSION (L) shall not apply to any **Claim** for any actual or alleged **Retaliation.**"

1055-418
Ed (02/00)

(7)    EXCLUSION (P) is amended by deleting the words "and provided, further, that
this EXCLUSION (P) will not apply to any **Claim** for an **Employment Practices
Wrongful Act.**"

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____

           Attorney-in-Fact

1055-418
Ed (02/00)

ENDORSEMENT NUMBER: 3

**PRIOR ACTS EXCLUSION**

      To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any **Wrongful Act** committed or allegedly committed prior to 6/4/04.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                        Attorney-in-Fact

ENDORSEMENT NUMBER:  4

## AMEND SECURITIES EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (N) is amended to read as follows:

(N)    for any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, any rule or regulation promulgated under any of the foregoing, or any other provision of federal, state or common law imposing liability in connection with the registration, offer, sale or purchase of securities; provided, however, that this EXCLUSION (N) shall not apply to any **Claim** arising out of:

(1)    any private placement of any debt or equity securities;

(2)    any placement of the **Insured Organization's** securities exempted from registration under the Securities Act of 1933; or

(3)    any **Wrongful Act** relating to the **Insured Organization's** preparation for any public offering of the **Insured Organization's** securities, including but not limited to any "road show," if such public offering does not occur;

provided, further, that if at least thirty (30) days prior to any initial public offering of stock of the **Insured Organization** or any purchase or sale, or any offer to purchase or sell, any debt securities of the **Insured Organization**, the **Insured Organization** gives the Insurer written notice thereof together with any information with respect thereto as the Insurer may request, the Insurer will offer a proposal to provide coverage with respect to such event, subject to such additional terms, conditions and limitations of coverage and such additional premium as the Insurer may require;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

1055-1052                          Page 1 of 1
Ed (11/04)

ENDORSEMENT NUMBER: 5

**POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE**

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States --- (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

ENDORSEMENT NUMBER:  7

**INVERTED WARRANTY**

  To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, the Insurer shall not be liable to make any payment of **Loss** in connection with any **Claim** arising out of, based upon or attributable to any actual or alleged fact, circumstance, situation or **Wrongful Act** that occurred prior to 8/5/2004, if as of that date, any **Insured** knew or could have reasonably foreseen that such fact, circumstance, situation or **Wrongful Act** could give rise to a **Claim** against an **Insured** for a **Wrongful Act**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:  8/5/2004

    By:  _____
       Attorney-in-Fact

# Exhibit C

# U.S. SPECIALTY INSURANCE COMPANY

HCC Global Financial Products

8 Forest Park Drive
P.O. Box 4016
Farmington, CT 06034

## THE MAG
### APPLICATION FOR DIRECTORS, OFFICERS AND PRIVATE ORGANIZATION LIABILITY COVERAGE (INCLUDING EMPLOYMENT PRACTICES LIABILITY)

NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ALL OF ITS TERMS, CONDITIONS AND LIMITATIONS, ONLY TO CLAIMS MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

The term "Applicant" means the Named Organization and all Subsidiaries.

1. (a) Named Organization:  Refco Group Ltd., LLC
        Address:           200 Liberty Street, Tower A
        City, State, Zip Code:       New York, NY 10281
   (b) Name and title of the officer of the Applicant designated as the representative to
        receive all notices from the Insurer on behalf of all persons and entities proposed
        for this insurance:  Ellen Brooks
        E-mail address:     BBrooks@Refco.com
   (c) The Named Organization has been in continuous operation since: 1985

2. Please identify each Subsidiary and the date on which it became a Subsidiary:
   Schedule Attached

3. Please provide the following information regarding the outstanding common stock of the
   Named Organization and of each Subsidiary, if any common stock thereof is held by
   any person(s) or entity (ies) other than the Named Organization or another Subsidiary:
   (a) Total number of voting shares outstanding? 100,000,000
   (b) Total number of voting shareholders: 2
   (c) Total number of voting shares owned by the Applicant's Directors & Officer:
        43,124,430.25
   (d) Are 5% or more of the Applicant's voting shares owned, directly or beneficially,
        by any single shareholder or group of shareholders?          ☒Yes
                                                                       ☐No
        If yes, please provide names and percentages of holdings by such shareholders or
        groups: Refco Group Holdings, Inc. 43%, TH Lee 57%

4. Have any of the Applicant's current D&O or EPL carriers indicated an intent not to offer
   renewal terms?                                                     ☐Yes ☒No
        If yes, please provide complete details: _____
        (QUESTION NO. 4 NOT APPLICABLE TO MISSOURI INSUREDS)

## U.S. SPECIALTY INSURANCE COMPANY

5. Have there been any changes in the Applicant's board of directors or within the Applicant's senior management during the past 3 years for any reason other than death or retirement? ☒Yes ☐No
   If yes, please provide complete details as an attachment.

6. Have the Applicant's outside auditors stated that there are no material weaknesses in the Applicant's system of internal controls? (see below *) ☒Yes ☐No
   If no, please provide the latest CPA letter to management and management response thereto.

7. Within the last 36 months, has the Named Organization or any Subsidiary completed or agreed to any of the following, whether or not any such transaction was completed?

   (a) merger or consolidation with or acquisition of another entity whose consolidated assets exceeded 25% of the Applicant's consolidated assets? ☐Yes ☒No
   (b) sale, distribution or divestiture of any assets or stock in an amount exceeding 25% of the Applicant's consolidated assets? ☐Yes ☒No
   (c) registration for public offering of securities? ☒Yes ☐No
   (d) private placement of securities? ☒Yes ☐No
   (e) reorganization or arrangement with creditors under federal or state law? ☐Yes ☒No

   If yes to any of the foregoing, please provide complete details (use a separate sheet of paper, if necessary):

8. Please give details of the present insurance. If none, so state:

| | Insurer | Limit | Premium |
|---|---|---|---|
| D&O | HCC, BLU XL, AXIX | $30,000,000 | $393,593.00 |
| EPL (if separate) | AIG, STARR EXCELL | $10,000,000 | $195,500.00 |
| GL | The HARTFORD | $ 1,000,000 | $ 42,441.36 |

9. (a) Total number of employees: Current 1,738 1 year ago 1,725
   (b) How many employees have been terminated during the past 2 years? 492

10. Does the Applicant anticipate any plant, facility, branch or office closing, consolidations or layoffs with the next 24 months? ☐Yes ☒No
    If yes, please provide complete details (use a separate sheet of paper, if necessary): _____

* Point 6. The question is poorly worded. The auditors would only issue a statement if there were material weaknesses. The auditors made no such statement to management.

U.S. SPECIALTY INSURANCE COMPANY

11.  Does the Applicant:
   (a)  Have a full-time human resources coordinator?  ☒Yes ☐No
   (b)  Have a written policy with respect to sexual harassment?  ☒Yes ☐No
   (c)  Have written annual evaluations for employees?  ☒Yes ☐No
   (d)  Have a written policy with respect to progressive discipline
        for employees?  ☒Yes ☐No
   (e)  Have a written policy for Family Medical Leave?  ☒Yes ☐No
   (f)  Have a written human resources manual or equivalent
        written guidelines?  ☒Yes ☐No
   (g)  Use outside counsel for employment advice?  ☐Yes ☒No

        District of Columbia – refer to 3 years:

12.  (a)  Have any claims been made during the last 5 years against any person or entity
          proposed for this insurance in his or her capacity as a director, officer or trustee of
          any corporation or organization?  ☐Yes ☐No
          If yes, please provide complete details (use a separate sheet of paper, if
          necessary):


     (b)  Is any person or entity proposed for this insurance aware of any fact,
          circumstance or situation involving the Applicant or any Insured Person or
          Organization which he, she or it has reason to believe might result in a claim
          being made?
                                                          ☐Yes ☐No
          If yes, please provide complete details (use a separate sheet of paper, if
          necessary):


Without prejudice to any other rights of the Insurer, it is understood and agreed that the
Insurer will not be liable under any policy that may be issued on the basis of this
Application to make any payment of Loss, including Defense Costs, in connection with any
Claim arising out of, based upon or attributable to any claim, fact, circumstance or
situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

13.  Documents Required:

     Please submit one copy of each of the following documents, all of which will be deemed
     to be attached to and to be a part of this Application.
     (a)  Attachments providing complete details and/or additional information where
          required as a result of the Applicant's response to questions in this Application.
     (b)  The Applicant's most recent Annual Report (including complete audited
          financial statements for the last 2 years).
     (c)  Any registration statements filed with the SEC or any private placement
          memoranda within the last 12 months.
     (d)  Audited financial statements with any notes and schedules.

**U.S. SPECIALTY INSURANCE COMPANY**

(e)     Summary and status of any litigation filed within the last 24 months against any person or entity proposed for this insurance (including any litigation that has been resolved).

FOR PURPOSES OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF ALL PERSONS AND ENTITIES PROPOSED FOR THIS INSURANCE DECLARES THAT, TO THE BEST OF HIS/HER KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS CONTAINED HEREIN, AND IN ANY ATTACHMENTS HERETO, ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. ACCEPTING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE INFORMATION CONTAINED IN AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND IS CONSIDERED TO BE PHYSICALLY ATTACHED TO AND PART OF THIS APPLICATION. THE APPLICATION, INCLUDING ALL ATTACHMENTS THERETO, WILL BE CONSIDERED TO BE PHYSICALLY ATTACHED TO ANY POLICY ISSUED ON THE BASIS OF THIS APPLICATION AND WILL BECOME PART OF ANY SUCH POLICY. THE INSURER WILL HAVE RELIED UPON THIS APPLICATION, INCLUDING ALL ATTACHMENTS THERETO, IN ISSUING ANY SUCH POLICY.

IF ANY INFORMATION IN THIS APPLICATION, INCLUDING ANY ATTACHMENT THERETO, CHANGES MATERIALLY BEFORE THE EFFECTIVE DATE OF THE POLICY FOR WHICH APPLICATION IS MADE, THE APPLICANT MUST NOTIFY THE INSURER, AND THE INSURER MAY MODIFY OR WITHDRAW ANY QUOTATION.

NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING,

**U.S. SPECIALTY INSURANCE COMPANY**

INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO APPLICANTS OF FLORIDA, KENTUCKY, MINNESOTA, NEW JERSEY, OHIO AND OKLAHOMA: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUDS OR DECEIVES ANY INSURER OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, IS GUILTY OF A FELONY AND IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO APPLICANTS OF VIRGINIA, MAINE AND NEW MEXICO: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.
IF DISCOVERY IS ELECTED THE LIMIT WILL NOT BE REINSTATED.
MATERIALS SUBMITTED IN CONNECTION WITH THE APPLICTION WILL FORM A PART OF THE POLICY.

NOTICE TO APPLICANTS OF TENNESSEE: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

WARNING TO APPLICANTS OF DISTRICT OF COLUMBIA: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

| APPLICANT: | | | |
|---|---|---|---|
| BY: | _signature_ | TITLE: Pres. + Ceo. | DATE: 2/8/05. |

Note: This Application must be signed by the President and/or CEO of the Applicant acting as the authorized agent of the persons and entity(ies) proposed for this insurance.

Companies House Direct

 **COMPANIES HOUSE**

 HELP COMPANY SELECTION DIR/SEC ENQUIRIES DOCUMENT DOWNLOAD MONITOR SERVICE MENU

Directors & Secretary enquiries
PERSONAL APPOINTMENTS WITH
LIMITED COMPANIES

Go Back

| | |
|---|---|
| **Name:** | PHILLIP ROGER BENNETT |
| **Nationality:** | BRITISH |
| **Latest Address:** | 125 COLT LANE |
| | GLADSTONE |
| | NEW JERSEY 07934 USA |

**Date of Birth:** 22/07/1948          Company Appointments: Current: 5

To view company details, click on the appropriate company number.
Click HERE to include Resigned and Dissolved appointments

**DIRECTOR**
Occupation:                    Appointed: pre 16/08/1992
                               FINANCIER
Company Number:                01579187
Company Name:                  REFCO EUROPE LIMITED
                               Active

**DIRECTOR**
Occupation:                    Appointed: pre 14/07/1992
                               FINANCIER
Company Number:                00784882
Company Name:                  REFCO OVERSEAS LIMITED
                               Active

**DIRECTOR**
Occupation:                    Appointed: 22/08/1998
                               FINANCIER
Company Number:                02853891
Company Name:                  TILNEY HOLDINGS LIMITED
                               Active

**DIRECTOR**
Occupation:                    Appointed: 21/03/2003
                               FINANCIER
Company Number:                04696772
Company Name:                  REFCO TRADING SERVICES (UK) LIMITED
                               Active

**DIRECTOR**
Occupation:                    Appointed: 03/10/2003
                               FINANCIER
Company Number:                04920915
Company Name:                  WESTMINSTER CLEARING LIMITED
                               Active

*This screen does not include appointments with LLP's or European Companies.*

UK  COMPANIES  ONLY

NWS  7/1/05

# Exhibit D

 *Financial Institutions*

August 5, 2004

James Schneider
Marsh
1166 Avenue of the Americas
New York, NY 10036

Re:   **Refco Group, Ltd, LLC**
      SecurExcess Directors and Officers Liability Binder Bill

Dear Jim:

Thank you for thinking of Axis Financial Institutions. We are pleased to offer the following Conditional Binder for the above captioned account:

| | |
|---|---|
| Insurer: | Axis Reinsurance Company |
| Parent Company and Address: | Refco Group, Ltd., LLC<br>Newport Tower<br>525 Washington Blvd. 36th Floor<br>Jersey City, NJ 07310 |
| Policy Number: | RNN 503865 |
| Policy Form: | Axis SecurExcess Form |
| Line of Business: | Directors and Officers Liability |

Policy Period:
From 12:01 AM (Local time at the address stated in Item 1) on August 5, 2004
To 12:01 AM (Local time at the address stated in Item 1) on August 5, 2005

Limits / Premium:

| Limit of Liability*: | Policy Period Premium**: | Additional Premium For Terrorism Coverage | Total Policy Period Premium |
|---|---|---|---|
| $10,000,000 excess of $20,000,000 | $103,375 | $5,000 | $108,375 |

*Equals Maximum aggregate Limit of Liability for all Claims

Confidential
M-CHI 003484

Underlying Insurance:

| Carrier | Limit of Liability (aggregate; inclusive of Defense Costs) | Retention (each Loss) / Attachment Point | Premium |
|---------|------------------------------------------------------------|------------------------------------------|---------|
| HCC | $10,000,000 | $500K (SIR) | $150,000 |
| XL | $10,000,000 | $10,000,000 | $127,500 |

Prior and Pending Claim Date:   August 5, 2004

Endorsements Effective at Inception
1. Schedule of Underlying Insurance; √
2. State Amendatories (if applicable);
3. Prior acts exclusion dated 8/5/04 (this date will be changed to 6/4/04 upon receipt of Axis warranty);
4. Reliance endorsement (e.g. on the primary carrier's application). √

Commission Payable is  12.5%.

Receipt, review and acceptance in writing by Axis underwriters of the following additional information must occur prior to 8/15/04:
1. Underlying policies, but note that these are due when available;
2. Copy of primary carrier's application;
3. Signed Axis warranty.

If any of the above requested items are not received, reviewed, and accepted by Axis underwriters, and acknowledge as such in writing, by the above specified date then this Conditional Binder and any policy issued pursuant thereto will be automatically deemed null and void *ab initio* (as if it had never existed) and have no effect. The payment of premium or the issuance of any policy shall not serve to waive the above requirements.

Further, a condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder and the inception of the proposed Policy Period. In the event of such change of risk, or any change in the above outline of Underlying Insurance including but not limited to any change in terms, conditions, premium or the deletion, replacement or removal of a scheduled layer of insurance, the Insurer may in its sole discretion, modify and/or withdraw this Insurance.

Premiums must be remitted within thirty (30) days of the Policy effective date.

This Conditional Binder is valid thru one hundred eighty (180) days from the date of this document.

Please consider this your invoice for accounting purposes.  Premium payment is due 9/5/04.

Confidential
M-CHI 003485

Remit payment to:
**Address for Payments by U.S. Mail:**
AXIS U.S. Insurance
Wachovia Bank
P.O. Box 932745
Atlanta, GA 31193-2745
Attn: [insert insured Name and Policy Number here]

**Shipping Address for Payments by Overnight Delivery:**
Wachovia Bank
3585 Atlanta Avenue
Hapeville, GA 30354
Attn: Lockbox 932745 re: [insert Policy Number here]

**Wire Transfer Information:**
Wachovia Bank, N.A.
Charlotte, NC
ABA Routing Number: 061000227
Account Name: AXIS U.S. Insurance
Account Number: 2000015141499
Reference: [insert insured Name and Policy Number here]

Thank you for all of your hard work and support. It is greatly appreciated.

Kind regards,

Steven Kane
Senior Underwriter
New York Office

Confidential
M-CHI 003486

## IMPORTANT NOTICE CONCERNING
## THE TERRORISM RISK INSURANCE ACT OF 2002

The Terrorism Risk Insurance Act of 2002 establishes a mechanism by which the federal government will share, with the insurance industry, in losses arising out of "acts of terrorism" certified as such by the Secretary of the Treasury. Certified acts of terrorism are defined as events that cause more than $5 million in losses and:

1.  Are violent or dangerous to human life, property, or the infrastructure;
2.  Result in damage within the United States, on a United States mission, or to a United States aircraft or vessel; and
3.  Are committed by individuals, acting on behalf of foreign persons or interests, as part of an effort to coerce the civilian population of the United States or to influence the policies or conduct of the United States Government.

The Act specifies that coverage for certified acts of terrorism must be made available in commercial property and casualty policies of insurance, and it requires insurers to disclose any applicable premium charges and the federal share of compensation. We are making these disclosures in strict compliance with the Act.

### Disclosure of Availability of Coverage for Terrorism Losses

Coverage for losses resulting from certified acts of terrorism is being made available to you on terms, amounts, and limitations generally applicable to losses resulting from perils other than acts of terrorism.

### Disclosure of Federal Share of Compensation for Terrorism Losses

The federal government will pay a 90% share of an insurer's terrorism losses once the insurer has satisfied a significant aggregate annual deductible. For terrorism losses occurring in 2002, that deductible is 1% of the insurer's 2001 direct earned premium. For losses occurring in 2003, 2004 and 2005, the annual insurer deductibles are 7%, 10% and 15% of the prior year's direct earned premium, respectively. The Act provides that neither insurers nor the federal government are responsible for losses associated with certified acts of terrorism once aggregate annual insured losses exceed $100 billion.

### Disclosure of Terrorism Insurance Premium

The premium charge under your policy for coverage for certified acts of terrorism is specifically disclosed, by coverage, in our quote or insurance proposal.

Confidential
M-CHI 003487

# Exhibit E



Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

a. No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

_See attached_

b. No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: _Refco Group STD. LLC_

Signature: _____

Title: _PRESIDENT & CEO._
(Chairman of the Board or President)

Date: _Jan 21, 2005._

Confidential
M-CHI 003224

**MEMORANDUM**

TO:       Phillip Bennett

FROM:     Ellen Brooks

SUBJECT:  Directors and Officers Coverage

DATE:     January 14, 2005


Axis Reinsurance Company is one of three insurance carriers for our present D&O coverage that was placed August 5, 2004. Due to the $30,000,000 total limit that T.H. Lee required us to purchase, we had to layer the coverage. Axis is the 2nd layer with $10,000,000 limit. They are requiring you to sign a warranty letter confirming that we currently do not have a claim against our D&O policy.

We did not reveal this case at the time the Axis underwriter was reviewing our application, therefore, they are now asking for a copy of the complaint and also a copy of the court filing of the dismissal. The complaint is attached, but we are still waiting on the court to send Herrick, Feinstein LLP the dismissal order.

If you have any questions, please do not hesitate to give me a call.

Thank you.

Confidential
M-CHI 003225

# HERRICK, FEINSTEIN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP INCLUDING NEW YORK PROFESSIONAL CORPORATIONS

104 CARNEGIE CENTER
PRINCETON, N.J. 08540-6232

2 PENN PLAZA
NEWARK, N.J. 07105-2245

2 PARK AVENUE
NEW YORK, NY 10016-9301

TELEPHONE: (212) 592-1400
FACSIMILE: (212) 592-1500

WEB: www.herrick.com

WRITER'S DIRECT DIAL:

(212) 592-1533

E-MAIL: score@herrick.com

January 14, 2005

BY E-MAIL

Ms. Ellen Brooks
Refco, LLC
550 West Jackson Boulevard
Suite 1300
Chicago, Illinois 60661

Re:    Louis Capital Markets, L.P., v. Refco Group Ltd., LLC, et al.

Dear Ms. Brooks:

Pursuant to your request to Therese Doherty for the status of the above-referenced litigation, please be advised of the following:

This matter is pending in the Supreme Court of the State of New York, County of New York, and is filed under Index No. Case No. 04601028/04. On April 14, 2004, plaintiff filed a complaint against Refco Group ltd., LLC, an employee of Refco Securities SA, and four registered representatives and employees of Refco Securities, LLC. The complaint arises out of the termination of employment by four of the individual defendants with plaintiff and alleges that Refco Group Ltd., LLC, "acting through its subsidiaries" and "their agents," (a) tortiously interfered with contractual relationships between plaintiff and several of its employees; (b) aided and abetted breach of fiduciary duty by each of several former employees of plaintiff; (c) committed unfair business practices; (d) breached an implied-in-fact contract with plaintiff; and (e) tortiously interfered with plaintiff's economic advantage. The complaint seeks damages as follows: (a) on the first three causes of action, "not less than $4.5 million per year in lost profits" plus 9% interest, as well as future profits to be determined; (b) on the fourth cause of action, "not less than $4.5 million per year" plus 9% interest per year; and (c) on the fifth cause of action, "an amount in excess of $18 million"; together with 9% interest, punitive damages and other relief. On September 23, 2004, the court granted the defendants' motion to dismiss the complaint. We have been advised by the Court to expect an order to be issued before the next conference date of January 27, 2005.

HFNY2: #509103 v.1 #05704-0000

Confidential
M-CHI 003226

HERRICK, FEINSTEIN LLP

Ms. Ellen Brooks
January 14, 2005
Page 2

As you requested, we have attached a copy of the complaint with exhibits. We will forward to you a copy of the court order as soon as we receive it. Please feel free to contact me if we can be of further assistance.

Very truly yours,

Grant R. Cornehls

cc:     Therese M. Doherty

IFNY2: #509103 v.1 F05704-0000

Confidential
M-CHI 003227

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART

————————————————————————x

LOUIS CAPITAL MARKETS, LP, Successor to
LOUIS CAPITAL MARKETS, LLC,

           Plaintiff,

— against —

REFCO GROUP LTD., LLC, ALAIN FELLOUS,
MICHAEL BENISTY, HENRI CONDRON,
BENJAMIN CHOUCHANE, LIONEL MELLUL and
MARCOS PAGANI,

           Defendants.

————————————————————————x

**ORIGINAL**

Index No.

04601028

COMPLAINT

Plaintiff, LOUIS CAPITAL MARKETS, LP, successor to LOUIS

CAPITAL MARKETS, LLC ("LCM"), by its attorneys Bolin & Boone, for its Complaint

alleges as follows:

**FILED**

APR 14 2004

NEW YORK
COUNTY CLERK'S OFFICE

## THE NATURE OF THE ACTION

1.    This is an action for: (1) tortious interference with employment

agreements, (2) aiding and abetting the breach of LCM's employees' fiduciary duties to

LCM; (3) unfair business practices; (4) breach of implied-in-fact contract; and (5)

tortious interference with LCM's expectancy of an economic advantage, against REFCO

Group Ltd., LLC, (acting through its subsidiaries, such as Refco Overseas Ltd., and

Refco Securities Paris, S.A., and their agents, such as Alain Fellous) (the "REFCO

Defendants"); and for: (6) conversion and misappropriation of intangible business assets

1

Confidential
M-CHI 003228

and opportunities, (7) breach of agreement, and (8) breach of fiduciary duties by and among LCM's former employees (the "Former LCM Employees").

2.     The action arises out of the REFCO defendants' attempts in 2001 to form a business combination with LCM, and the REFCO defendants' scheme, deliberately and methodically carried out over the ensuing years, to steal LCM's proprietary business through corporate espionage, to interfere with LCM's agreements with its Former Employees, and to misappropriate through them and by other means LCM's trade secrets and business opportunities.

## THE PARTIES

3.     Louis Capital Markets, LP is a limited partnership organized in 2003 and existing under the laws of the State of New York. It is the successor to Louis Capital Markets LLC (collectively "LCM"). LCM is a broker-dealer registered with the Securities and Exchange Commission (the "SEC") and it is a member of the National Association of Securities Dealers, Inc. It is principally engaged in retailing corporate equity securities "over-the-counter." Its principal place of business is located at 67 Wall Street, New York, New York.

4.     Upon information and belief, REFCO Group Ltd., LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. It is a global financial giant which offers a broad range of financial products and services through its subsidiaries and affiliates

2

Confidential
M-CHI 003229

throughout the world including Refco Overseas Ltd. and REFCO Securities Paris, S.A.
(collectively "REFCO").

5.    At all relevant times, Alain Fellous was President of REFCO
Securities Paris, S.A., which, upon information and belief, is owned or controlled by
REFCO.Group Ltd., LLC.

6.    Michael Benisty is now employed by REFCO as an Executive
Vice President in New York. Before 2002, he was also employed by REFCO. In
February 5, 2002, he resigned from REFCO and started work as a Senior Vice President
at LCM. As alleged in the paragraphs that follow, Benisty was a corporate "mole" or spy
for RECFO while he was employed at LCM. He was fired by LCM on December 6,
2002, after LCM discovered he intended to return to REFCO to set up and duplicate
LCM's unique equity trading business for REFCO in New York City.

7.    Benjamin Chouchane was hired by LCM on May 20, 2002 as a
Sales Assistant. On December 9, 2002, he suddenly resigned from LCM to join Benisty
at REFCO.

8.    Henri Condron was hired by LCM on March 24, 2002 as a Middle
and Front Office Operator. On December 31, 2002, he suddenly resigned from LCM to
join Benisty and Chouchane at REFCO.

9.    Lionel Melhul was hired by LCM on July 1, 2002, as a Vice
President. On February 14, 2003, he accepted the offer from LCM to become a Senior
Vice President to develop LCM's Institutional Sales Department. On February 4, 2004,
he suddenly resigned from LCM to join Benisty and the other Former LCM Employees at

3

Confidential
M-CHI 003230

REFCO the next day. A copy of Mellul's Employment Agreement with LCM is attached as Exhibit "A."

10. Marcos Pagani was hired by LCM in August 2001. On February 14, 2003, he accepted the offer from LCM to become a Director to develop its Institutional Sales Office. On February 4, 2004, he suddenly resigned with Mellul to join the other Former Employees at REFCO the next day. A copy of Pagani's Employment Agreement with LCM is attached as Exhibit "B."

## THE FACTS

11. Success in the business of trading securities or commodities of any kind depends in large measure on two key capabilities: (a) cultivation and maintenance of relationships with customers; and (b) familiarity with specific markets and the development and execution of trading strategies carefully tailored to those markets. Both capabilities are intangible. But both capabilities constitute crucial components of the intellectual capital employed by Firms engaged in the trading business. Like any other service business, this intellectual "know how" is usually the decisive key to success or failure in the trading industry.

12. Prior to 2000, REFCO was best known in the financial community as a global giant in the international commodities markets. In particular, REFCO was (and is) known as a dominant presence in the trading of such commodities as metals, agricultural products, energy, and currencies — and with instruments and contracts related to the exchange of such commodities.

4

Confidential
M-CHI 003231

13.     Prior to 2000, REFCO had only a relatively small presence and participation (and then only derivatively) in the markets for equity securities – especially the equity markets in the United States.

14.     Prior to 2000, REFCO participated in the U.S. equity markets primarily through its relationship with Raymond James & Company.

15.     In or about August 2000, defendant Fellons, then President of Refco Securities, S.A., met with Michael Benamhou, one of the Managing Partners of LCM, during a dinner in Saint Tropez.

16.     Over the following months, the relationship begun in August 2000 between the principals of LCM and Fellons ripened and grew.

17.     Upon information and belief, in or about March 2001, REFCO terminated its relationship with Raymond James.

18.     The growing relationship between LCM and REFCO culminated in a "Piggy Back" Clearing Agreement on about March 27, 2001, between REFCO and LCM in which LCM agreed to handle and execute equity security transactions for REFCO's European customers.

19.     LCM and REFCO began conducting business under their Clearing Agreement and asked their attorneys to draw up papers to formalize their agreement.

20.     During the following year and a half, the attorneys for LCM and REFCO exchanged many drafts of a definitive Introducing Broker Agreement (the "Broker Agreement") to formalize and fill in the details of the then existing Clearing Agreement under which LCM and REFCO were conducting their business relationship.

21.     Prominent among the drafts of the Broker Agreement exchanged

5

Confidential
M-CHI 003232

between the parties' attorneys for many months was a non-solicitation clause in which REFCO agreed not "...to hire, contract with, or solicit to hire or contract with, any person who has performed services..." by LCM for REFCO under the Broker Agreement.

22.     By November 19, 2001, REFCO itself requested a reciprocal "non-solicitation/non-compete" clause from LCM regarding REFCO's clients introduced to LCM by REFCO.

23.     The mutual "non-solicitation/non-compete" clauses were intended to memorialize and confirm a vital and essential aspect of the business relationship and business practices then existing between REFCO and LCM which LCM honored in all respects.

REFCO's New Overtures to LCM in 2001

24.     The new business relationship between REFCO and LCM proved to be mutually gratifying, so much so, that during the months while negotiations regarding the definitive Broker Agreement were still in progress, Fellous floated the idea that LCM and REFCO might form a Joint Venture under LCM's name to give REFCO an even more direct presence in the U.S. equity securities markets in order to better service REFCO's European accounts.

25.     The principals of LCM did not greet this overture with unbridled enthusiasm. They saw the overture as a proposal to take over LCM. They wanted, instead, to maintain LCM's independence as entrepreneurial equity traders on Wall Street with a growing reputation for success in the domestic securities industry. Nevertheless, the principals at LCM and Fellous discussed the idea of some sort of Joint Venture on

6

Confidential
M-CHI 003233

many occasions over the following months, but the discussions of such an arrangement essentially ended by December 2001.

### REFCO's "Mole" Benisty

26. At about the same time in the winter of 2001, while negotiations of the definitive Broker Agreement were still in progress, Benisty (who was then employed as a sales representative at Refco Securities Paris, S.A.) approached LCM about the possibility of employment with LCM in New York. Benisty professed to have a strong interest in leaving France and working in the equity securities business in New York City.

27. The principals of LCM immediately told Benisty they could not even begin to entertain such an idea because it would violate the terms of the draft Broker Agreement as well as the spirit of LCM's existing business relationship with REFCO.

28. Surprisingly, Fellous called LCM shortly afterwards in early 2002 and urged LCM to employ Benisty in New York, ostensibly so that Benisty would not accept other employment in New York City and "go to work for the competition."

29. As an accommodation to Fellous, LCM hired Benisty on February 5, 2002, as Senior Vice President as alleged before.

30. After he was hired in 2002, Benisty acquired first hand knowledge of LCM's trading strategies, became well acquainted with LCM's key marketing and operations employees, and he thereby acquired essentially all of the "intellectual capital" of LCM's business.

7

Confidential
M-CHI 003234

31. Upon information and belief, throughout 2002, however, Benisty maintained almost daily contact with Fellous at REFCO (although none of his responsibilities at LCM required any such contact with Fellous).

32. Upon information and belief, Fellous and REFCO were plotting throughout 2002 to duplicate for themselves LCM's equity trading business in New York City.

33. By early December 2002, Benisty had so insinuated himself into the heart of LCM's business and had so gained the trust of the principals of LCM that decided to offer him a partnership interest in the Firm.

34. In the meantime, negotiations regarding the Broker Agreement finally concluded after more than 18 months, and LCM sent REFCO the final execution copy of the Broker Agreement for signature on or about December 3, 2002.

35. After over eighteen months of negotiations, LCM assumed the signing would be perfunctory.

36. To the astonishment of LCM, however, Fellous and REFCO refused to sign the final definitive Broker Agreement, primarily because of the "non-solicitation/non-compete" clause which, by then, had been included in the drafts of the Broker Agreement previously exchanged between the parties' attorneys for months.

37. Three days later, Benisty was forced to reveal to the principals of LCM that REFCO intended to essentially duplicate LCM's business in New York City.

38. LCM fired Benisty on the spot on December 6, 2002. A copy of LCM's termination letter to Benisty, dated December 6, 2002, stating the reasons for his termination is attached as Exhibit "C."

8

Confidential
M-CHI 003235

### REFCO Completes its Theft of LCM's Business

39.     As alleged before, throughout 2002, REFCO through Benisty essentially was engaged in corporate espionage and theft against LCM by appropriating LCM's intellectual capital.

40.     The remaining step in the scheme involved REFCO's systematic recruitment of LCM's marketing staff – the individuals whose job it was to develop and maintain LCM's account relationships and who were, for all practical business purposes, LCM's public "face" to its accounts and customers.

41.     Almost immediately after LCM discovered REFCO's plot and fired Benisty on December 6, 2002, REFCO recruited two of LCM's key employees: Benjamin Chouchane was hired by REFCO three days later on December 9, 2002 and Henri Condron was hired within the month on December 31, 2002. Both quit LCM and went directly to REFCO.

42.     To say the least, LCM was alarmed at the discovery of the REFCO plot and quickly acted to require its other key employees (such as Melhul and Pagani) including all of its seven sales traders and 14 other employees to sign new employment agreements to try to stop the raid in progress by REFCO.

43.     The employment agreements were specifically intended to stop the raid as clearly shown by Exhibits "A" and "B" under the first heading entitled "Terms and Conditions of Employment with LCM" and elsewhere in other provisions of the agreements.

44.     It was now obvious that REFCO intended to buy the remaining part of LCM's business it had not already stolen from LCM by offering LCM's already

9

Confidential
M-CHI 003236

well-compensated employees extraordinarily lucrative compensation packages (all out of proportion to their nominal jobs) instead of forthrightly offering to buy the business directly and outright from LCM's owners.

45.    Upon information and belief, REFCO quickly learned about the new employment agreements and temporarily suspended its raid.

46.    After a relatively brief interval, presumably for cosmetic purposes, REFCO resumed its raid on LCM employees in early February 2004. It began by hiring both Mellul and Pagani on February 5, 2004.

47.    Since the departure of Benisty and the other key LCM employees, LCM has lost many of its accounts and untold opportunities to further grow their business.

48.    Before Benisty's termination and the beginning of REFCO's raid of LCM's employees, LCM's operating income had grown at an over accelerating annual rate of over 35% per year. Within two weeks of the sudden departure of Mellul and Pagani, LCM's weekly operating income plunged by more than 50%.

49.    The REFCO Defendants deceptive acts and practices in the conduct of their business violate the New York State General Business Law §349, especially §§349(a) and (h).

## AS AND FOR A FIRST CAUSE OF ACTION
(Tortious Interference With Contractual Relations
Against the REFCO Defendants and Benisty)

50.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 49.

10

Confidential
M-CHI 003237

51.    As alleged before, the REFCO defendants and Benisty were well aware and knew of the employment agreements between LCM and its employees. In fact, Benisty knew all about the agreements first hand.

52.    The REFCO defendants and Benisty nevertheless actively enticed, encouraged, and ultimately succeeded in the causing the defendants Melhul and Pagani to breach their employment agreements with LCM.

53.    As a result of these defendants' interference with LCM's contractual relationships, LCM has sustained and will continue to sustain pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

## AS AND FOR A SECOND CAUSE OF ACTION
(Aiding and Abetting the Breach of Fiduciary Duties
Against the REFCO Defendants and Benisty)

54.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 53.

55.    At all relevant times, the Former LCM Employees, including Benisty, were privy to the private and confidential workings of LCM's business.

56.    At the time of their employment with LCM, the Former LCM Employees (including Benisky) stood in a fiduciary relationship with their employer, LCM, and at all times they owed LCM the duty of loyalty and the duty of utmost good faith and fair dealing.

57.    By deserting LCM and absconding with its confidential information, the Former LCM Employees breached their fiduciary duties to LCM.

11

Confidential
M-CHI 003238

58.     The REFCO defendants and Benisty knowingly and deliberately encouraged, enticed, aided and abetted the Former LCM Employees to breach their fiduciary duties to LCM.

59.     As a result of these defendants' acts, LCM has suffered and will continue to suffer lost revenue, the benefit of the loyalty of its key employees and their productivity, has lost business opportunities, has incurred costs and has otherwise been damaged while the Former LCM Employees and the REFCO defendants continue to benefit from their wrongful acts, all to LCM's injury and detriment.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unfair Business Practices Against the REFCO Defendants and Benisty)

60.     LCM repeats and realleges the allegations contained in ¶¶ 1 through 59.

61.     The REFCO Defendants' acts alleged before, including most particularly their deliberate piracy of the Former LCM employees *en masse* as a means of appropriating to themselves LCM's business, constitute devious, malicious, unscrupulous and Unfair Business Practices, crippling LCM's business in the process.

62.     LCM has suffered and will continue to suffer ever-mounting damage to its business as a result, including, but not limited to, lost profits now flowing to the REFCO defendants which must be disgorged, as well as lost business opportunities.

12

Confidential
M-CHI 003239

## AS AND FOR A FOURTH CAUSE OF ACTION
(Breach of Implied-In-Fact Contract Against the REFCO Defendants)

63.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 62.

64.    As alleged before, the successive drafts of the Broker Agreement prepared and exchanged by the parties' attorneys over the course of many months accurately reflected the actual agreement and business practices carried on between LCM and REFCO.

65.    Central to the business arrangement and practice between LCM and REFCO was the agreement not to "poach" or solicit employees or business from one another.

66.    By their consistent course of conduct and dealing spanning many months, LCM and REFCO manifested their agreement and confirmed its existence in fact.

67.    REFCO's piracy of LCM's employees, and through them a substantial portion of LCM's business, constituted a breach of their long-standing, implied-in-fact agreement.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Tortious Interference with an Economic Advantage Against the REFCO Defendants)

68.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 67.

13

Confidential
M-CHI 003240

69.    Founded in April 1999, LCM until February 2002, had quickly established itself on Wall Street as a thriving, prospering, and rapidly growing entrepreneurial broker dealer.

70.    Since its operations began in February 2002, LCM experienced accelerating operating income growth, almost doubling every year.

71.    LCM had every reason to expect to continue maintain its revenue and income growth derived from its brokerage business at comparable or accelerating rates well into the future, having survived the costs and dangers typical of a small business in its "start up" stages, and LCM was finally poised and well-positioned to begin to compound the rate of its income growth based upon the solid revenue base it had developed.

72.    LCM had developed and established a customer base and a reputation for their skills and savvy in the equity markets that appeared to assure that the Firm would meet or surpass its expectations for business growth.

73.    In addition to, and to the piracy of the Former LCM Employees, its violations of New York General Business Law §349, and other malicious and wrongful acts, the REFCO Defendants tortiously interfered with LCM's customer base and intentionally undermined the financial underpinnings of its anticipated business growth, a collateral effect of which will be to deprive LCM of future opportunities for business growth.

74.    As a result of these defendants' wrongful conduct, LCM has suffered and will continue to suffer pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

14

Confidential
M-CHI 003241

## AS AND FOR A SIXTH CAUSE OF ACTION
(Conversion of Intangible Business Assets and Property
Against the Former LCM Employees and Benisty)

75.     LCM repeats and realleges the allegations contained in ¶¶ 1 through 74.

76.     As alleged more extensively before, the Former LCM Employees and Benisty during the course of their employment at LCM were exposed and thus came into possession of valuable intangible intellectual property including customer and account relationships and LCM's trading and other business strategies (collectively, the "Assests").

77.     The Former LCM Employees and Benisty appropriated the Assests to their own use and effectively sold them to REFCO in exchange for lucrative employment arrangements with REFCO which the could nver have obtained without having first appropriated and offered the Assets to REFCO.

78.     The Former LCM Employees and Benisty thus converted the Assets to their own personal use and benefit.

79.     As a result of the conversion of LCM's Assets by the Former LCM Employees and Benisty to their own use and benefit, those benefits must be disgorged and surrendered to LCM in their entirety.

15

Confidential
M-CHI 003242

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Breach of Agreements Against Defendants Mellul and Pagani)

80.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 79.

81.    Defendants Mellul and Pagani voluntarily signed agreements (Exhibits "A" and "B") with LCM and agreed to abide by "The Terms and Conditions of Employment with LCM," as well as the other provisions contained in the agreements.

82.    By suddenly quitting work at LCM and immediately accepting "employment" with REFCO (in addition to appropriating LCM's Assets for themselves), Mellul and Pagani knowingly and deliberately breached their agreements with LCM, including the provisions of ¶¶ 1, 2, 3 and 4 thereof.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(Breach of Fiduciary Duties Against the Former LCM Employees and Benisty)

83.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 82.

84.    As alleged before, the Former LCM Employees and Benisty as employees stood in a fiduciary relationship with LCM and owed to LCM the duty of the utmost good faith and fair dealing.

85.    As alleged more extensively before, the Former LCM Employees and Benisty breached their duties of loyalty, good faith and fair dealing, and instead they deliberately betrayed the trust reposed in them for their own selfish gains and benefit all to the great damage of LCM.

16

Confidential
M-CHI 003243

APR-18-04 12:50 FROM/DENNIS KLEJHA                ID:1212300050              PAGE  5/13

## ∧ LOUIS  CAPITAL  MARKETS,  LLC

NUMBER X:45/0/55

Monday, ~~July 31st 2002~~  Feb 14th, 2003    VK

Attention: Lionel Mellul

Dear Lionel:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

Your Compensation and Benefits are as follows:

1. A minimum draw against future commission of $10,000 per month (up to march 31st 2003);

2. An incentive of 25% of the gross commissions generated by the customers you will bring in to LCM (with a minimum of 1.25c/ share to be eligible);

3. An incentive of 35% of the net profit you will bring to your department;

4. A fully paid health insurance plan[1];

5. A fully paid dental insurance plan[2]; and

6. Two weeks of vacation per year the first year, three weeks after two years of employment.

---

[1] Does not include a family plan

[2] Does not include a family plan

11225212

87 WALL STREET, SUITE 1808 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 509-4400, FACSIMILE (212) 509-9374

Confidential
M-CHI 003244

### Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

11225423

Confidential
M-CHI 003245



APR-10-04 12:57 PROM:DINO'S ELEJNA          ID:12123990668          PAGE  6/11

1.    Non-Solicitation.  For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.    Nondisclosure of Confidential Information.  Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries.  You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1125822



Confidential
M-CHI 003246

APR-18-04 12:57 FROM:DENNIS KLEJNA          ID:12123080850          PAGE 8/11

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.    Non-Compete.    While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.    Work Product/Business Opportunities.    You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

11223521



Confidential
M-CHI 003247

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.    Protection of Company's Name.  You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

3122382.2

Confidential
M-CHI 003248



without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122522

Confidential
M-CHI 003249

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A", and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

11325?2.2

Confidential
M-CHI 003250

APR-10-04 12:50 FROM:DENNIS KLEJNA          ID:1212206006          PAGE 10/11

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Bonhamou
    Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____          07.20.2003
Signature                        Date

D223217

Confidential
M-CHI 003251

APR-19-84 12:59 FROM:DENNIS KLEJNA          ID:12123980069          PAGE 11/11

## EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

Marie-Laure HERVET (CIC)          _____

Nicolas MERCIER (CIC)            _____

Patrice FLAMBA (CIC)             _____

Chafik YASSINE (CIC)             _____

Younis BOUBA (CIC)               _____

Karim Benguigui (Bpe Vatsy)      _____

Christian FLEURY (Bque Vor Say)   _____

Michel Garyoussef (First BY)     _____

Dan LANG (First BY)              _____

Michel CALAUTE (First BY)        _____

Marc de Lisih (First BY)         _____

Roger MUELLER (Sudafed)          _____

Stephane Raffein (SBE-BEE)       _____

_____                  _____

_____                  _____

_____                  _____

_____                  _____

_____                  _____

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible
for introducing to Louis Capital Markets, LLC.

MELLUL Louise          _____

(Name of Employer)          Date

1125K12

Confidential
M-CHI 003252



APR-10-04 13:01 FROM:DENNIS KLEINA          ID:12123506550          PAGE  3/11

# L O U I S   C A P I T A L   M A R K E T S,   L L C

MEMBER NASD/SIPC

Monday November 17th 2002   ~~Monday November 17th 2002~~  Feb 14th, 2005   *MS*

Attention: Mr. Marcos Pagani-Toledano

Dear Mr. Pagani-Toledano:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

Your Compensation and Benefits are as follows:

- A guaranteed draw against commission of $10,000/month until the end of 2003

- An incentive of 25% of the gross commission generated by the customers you will bring in to LCM

- An incentive of 35% of the net profit generated on mark-up

- A fully paid health insurance plan[1]: (eligible after 2 months)

- A fully paid dental insurance plan[2]: (eligible after 2 months)

- Three weeks of vacation per year

- An E2 working permit

- Sponsorship for Series 7 & 63

---

[1] Does not include a family plan

[2] Does not include a family plan

1125822

*MS*   *MP*

67 WALL STREET, SUITE 1605 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 509-4400. FACSIMILE (212) 509-9374

Confidential
M-CHI 003253

APR-19-04 13:01 FROM-DENNIS KLEJNA                    ID:12123000000            PAGE  4/11

## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge; contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including in contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that

1125822

Confidential
M-CHI 003254

APR-19-04 13:91 FROM:DENNIS KLEJNA                ID:12123980050              PAGE  6/11



1.   **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.   **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries. You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

102530.2

Confidential
M-CHI 003255



APR-10-04 13:02 FROM:DENNIS KLEJNA   ID:12123060069   PAGE 8/11

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.   **Non-Compete.**   While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries), previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.   **Work Product/Business Opportunities.**   You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

1122582.2



Confidential
M-CHI 003256

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.  **Protection of Company's Name.** You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Lotus Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

11225022

Confidential
M-CHI 003257

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

112252.2

Confidential
M-CHI 003258

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

11225832.2

Wh MP

APR-10-04 13:04 FROM:DENNIS KLEJNA                    ID:12123080050                 PAGE  10/11

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
Managing Member

I accept the above offer and have received a copy of this letter for my files.

Signature

02/15/03
Date

11225122

Confidential
M-CHI 003260

APR-10-04 13:04 FROM:DENNIS KLEJNA     ID:12123000060     PAGE 11/11

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____
_____     _____

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible
for introducing to Louis Capital Markets, LLC.

_____     _____
(Name of Employee)            Date

1122S122

Confidential
M-CHI 003261

APR-10-04 13:05 FROM:DENNIS KLEJNA     ID:12123928058     PAGE 3/3



## Louis Capital Markets, LLC

To: Michael Braaley
530 Park Avenue Apt. 11C
New York N.Y. 10021

December 6, 2002

As of today Friday December 6th 2002, I Laurent Imbert Managing Partner of Louis Capital Markets, LLC. Here by inform Michael Braaley he is immediately terminated. We cannot carry on our business relationship since we found out Mr. Braaley is in the process of setting up a competing business and has taken proprietary and confidential information out of the office for that purpose. Moreover, his attitude has been unprofessional and contrary to Louis Capital Markets policies.

Laurent B. Imbert
Managing Member
Louis Capital Markets, LLC

Confidential
M-CHI 003262

# Exhibit F



### SECUREXCESS DECLARATIONS

SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

| COMPANY: Axis Reinsurance Company | POLICY NUMBER: RNN 503865 ✓ |
|---|---|

**Item 1. Policyholder:**
Refco Group, Ltd., LLC
Newport Tower
525 Washington Blvd. 36ᵗʰ Floor
Jersey City, NJ 07310          — wrong

**Item 2. Policy Period:**
a. Inception Date: August 5, 2004 ✓
b. Expiration Date: August 5, 2005 ✓
Both dates at 12:01 a.m. at the address listed in Item 1

**Item 3.** Limits of Liability (inclusive of defense costs):
a. Each Claim
b. Maximum aggregate Limit of Liability for all Claim(s) During the Policy Period of all Insurance Products

$10,000,000 ✓
$10,000,000 ✓

M A R S H
GLOBAL BROKING
CHICAGO, ILLINOIS

MAY 0 3 2005

RECEIVED

**Item 4.** Underlying Insurance and Insurance Products:  See Endorsement No. 1

**Item 5.** Endorsements Attached at Inception: SE 1000 & MU 1032

**Item 6.** Notices to Insurer:
Notice of Claim(s) To Be Sent To:
Axis Financial Insurance Solutions Claims
Address:   Connell Corporate Park
           Three Connell Drive
           P.O. Box 357
           Berkeley Heights, NJ 07922-0357

All Other Notices To Be Sent To
Axis Financial Insurance Solutions
Address:   Connell Corporate Park
           Three Connell Drive
           P.O. Box 357
           Berkeley Heights, NJ 07922-0357

| Item 7. Pending and Prior Claim Date: 8/5/04 ✓ | Item 8. Terrorism Coverage Premium: $5,000 ✓ |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_____
Authorized Representative

_____
Date     4/25/05

Kevin D. McLean

Michael E. Morriel

Secretary

President

SE 0100 (Ed. 02 03)

Page 1 of 1

Printed in U.S.A.

COPY

Confidential
M-CHI 003489

# SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the Underlying Insurance and all information provided to the Insurer and any or all of the Underlying Insurers, and subject to the provisions of this Policy, the Insurer and the Policyholder, on its own behalf and on behalf of all Insureds, agree as follows.

**I.  INSURING AGREEMENT**

With respect to each Insurance Product, the Insurer shall provide the Insureds with insurance during the Policy Period excess of all applicable Underlying Insurance. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other applicable Underlying Insurance. In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable Underlying Insurance.

The insurance afforded under this Policy shall apply only after all applicable Underlying Insurance with respect to an Insurance Product has been exhausted by actual payment under such Underlying Insurance, and shall only pay excess of any retention or deductible amounts provided in the Primary Policy and other exhausted Underlying Insurance.

**II.  DEFINITIONS**

A.  **Claim(s)** means the event(s) which take place during the Policy Period and which trigger(s) coverage under the insuring agreement(s) of the Underlying Insurance.

B.  **Insurance Product** means each separate type of insurance identified as an "Insurance Product" in Endorsement No. 1 to this Policy.

C.  **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the Primary Policy at its inception.

D.  **Insurer** means the company identified as "Insurer" in the Declarations.

E.  **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

F.  **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

G.  **Primary Policy** means the specific policy identified as the "Primary Policy" under the applicable Insurance Product listed in Endorsement No. 1 to this Policy.

H.  **Sublimit** means any Underlying Limits which:

1.  applies only to a particular grant of coverage under such Underlying Insurance; and
2.  reduces and is part of the otherwise applicable limits of liability of such Underlying Insurance set forth in Item 4 of the Declarations.

I.  **Underlying Insurance** means each insurance policy which constitutes all or part of an Insurance Product, as scheduled in Endorsement No. 1 to this Policy.

J.  **Underlying Insurers** means any or all of the companies who issued the policies of Underlying Insurance.

K.  **Underlying Limits** means, with respect to each Insurance Product, an amount equal to the aggregate of all limits of liability for each Insurance Product stated in Endorsement No. 1 to this Policy, plus the



Printed in U.S.A.

Confidential
M-CHI 003490

uninsured retention, or deductible, if any, applicable to the Primary Policy under such Insurance Product.

### III. CONDITIONS OF COVERAGE

A. For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

1. All of the Underlying Insurance in effect as of the inception date of the Policy Period shall be maintained in full effect with solvent insurers throughout the Policy Period except for any reduction or exhaustion of the Underlying Limits as provided in Section IV. below; and

2. All Insureds shall comply fully with all of the provisions of this Policy.

B. As a condition precedent to coverage under this Policy, the Insured shall give to the Insurer as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any Underlying Insurance, ii) any Underlying Insurance not being maintained in full effect during the Policy Period, or iii) an Underlying Insurer becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

C. If during the Policy Period the provisions of the Primary Policy are changed in any manner, as a condition precedent to coverage under this Policy, the Insured shall give written notice to the Insurer of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change. No amendment to any Primary Policy or Underlying Insurance during the Policy Period shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Insurer so agrees in writing. The Insurer may, in its sole discretion, condition its agreement to follow any changes to the Primary Policy or the Underlying Insurance on the Insured paying any additional premium required by the Insurer for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the Policyholder must give the Insurer written notice of any additional or return premiums charged or allowed in connection with any Underlying Insurance.

### IV. REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A. If the Underlying Limits are partially reduced solely due to actual payment under the Underlying Insurance, this Policy shall continue to apply as excess insurance over the remaining Underlying Limits.

B. If the Underlying Limits are wholly exhausted solely due to actual payment under the Underlying Insurance, this Policy shall continue to apply as primary insurance with respect to the applicable Insurance Product(s) and the retention or deductible, if any, applicable under the Primary Policy(ies) shall apply under this Policy.

C. If any Underlying Limits are subject to a Sublimit then coverage hereunder shall not apply to any Claim which is subject to such Sublimit, provided however, that the Underlying Limit shall be recognized hereunder as depleted to the extent of any payment of such Claim subject to such Sublimit.

### V. LIMITS OF LIABILITY

A. The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the Insurer's liability for each Claim under the applicable Primary Policy, and shall be the maximum amount payable by the Insurer under this Policy for a single Claim, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.



Confidential
M-CHI 003491

B. The amount stated in item 3.b. in the Declarations shall be the maximum aggregate amount payable by the Insurer under this Policy with respect to all Claims during the Policy Period for all Insurance Products.

C. This Policy does not provide coverage for any Claim not covered by the Underlying Insurance, and shall drop down only to the extent that payment is not made under the Underlying Insurance solely by reason of exhaustion of the Underlying Insurance through payments thereunder, and shall not drop down for any other reason. If any Underlying Insurer fails to make payments under such Underlying Insurance for any reason whatsoever, including without limitation the insolvency of such Underlying Insurer, then the Insureds shall be deemed to have retained any such amounts which are not so paid. If the Underlying Insurance is not so maintained, the Insurer shall not be liable under this Policy to a greater extent than it would have been had such Underlying Insurance been so maintained.

D. Payment by the Insurer of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI. SETTLEMENTS AND DEFENSE

A. No Insured under this Policy may, without the Insurer's prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

B. The Insurer may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable Underlying Insurance has been exhausted.

C. The Insured, and not the Insurer, has the duty to defend all Claims under this Policy.

## VII. SUBROGATION

A. In the event of payment under this Policy, the Insurer shall be subrogated to all rights of recovery of each and all Insureds against any person or organization, and the Insureds shall do whatever is necessary to secure those rights to the satisfaction of the Insurer, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of such Insureds.

B. Any amount recovered after payment under this Policy and any Underlying Insurance policies shall be apportioned among the Insurer and the Underlying Insurers net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the Policyholder shall be the sole agent of all Insureds with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX. NOTICE

A. With respect to any Claim, situation that could give rise to a Claim, or other matter as to which insurance may be sought under this Policy, the Policyholder or any Insured must give the Insurer written notice contemporaneously with and in the identical manner required by the applicable Primary Policy.

B. All notices under this Policy shall be sent to the Insurer at the address set forth in item 6. in the Declarations.

SE 0001 (Ed. 02 03)          Page 3 of 4          COPY          Printed in U.S.A.

Confidential
M-CHI 003492

## X.  MODIFICATION, CANCELLATION AND NONRENEWAL

A. No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the Insurer.

B. The Policyholder may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

C. The Insurer may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the Policyholder written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the Policy Period shall terminate at the date and hour specified in the notice.

D. The Insurer shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the Policyholder.

E. The Insurer shall have no obligation to renew this Policy upon its expiration. If the Insurer decides not to renew this Policy, the Insurer shall provide written notice to the Policyholder by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

F. Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any Underlying Insurance is rescinded by agreement or legal process for fraud or other material misrepresentation by the Policyholder or any of the Insureds, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any Insurance Product containing such rescinded Underlying Insurance.

## XI.  EXCLUSIONS

The Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

A. Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any Insured on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

B. Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

SE 0001 (Ed. 02 03)                     Page 4 of 4          COPY          Printed in U.S.A.

Confidential
M-CHI 003493

Endorsement No. 1

Effective date of this endorsement: 12:01 a.m. on: <u>August 5, 2004</u>
To be attached to and form part of Policy Number: <u>RNN 503865</u>
Issued to: <u>Refco Group, Ltd., LLC</u>
By: <u>Axis Reinsurance Company</u>

# SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

The Schedule of Underlying Insurance and Insurance Products is as follows:

A. **Insurance Product:** <u>Directors and Officers Liability</u>

1. **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| U.S. Specialty Insurance Company | 24-MGU-04-A4151 | $10,000,000 | 08/05/04-08/05/05 |

2. **Other Underlying Policies**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Greenwich Insurance Company | ELU086772-04 | $10,000,000 | 08/05/04-08/05/05 |

All other provisions remain unchanged.



Authorized Representative

Date  4/25/05

SE 1000 (Ed. 02 03)             Page 1 of 1             COPY             Printed in U.S.A.

Confidential
M-CHI 003494

Endorsement No. 2

Effective date of this endorsement:  12:01 a.m. on: August 5, 2004
To be attached to and form part of Policy Number: RNN 503865
Issued to: Refco Group, Ltd., LLC
By: Axis Reinsurance Company

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### SECUREXCESS

In consideration of the premium charged, it is agreed by the Insurer and Insured's that the application or proposal dated February 8, 2005 and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date  4/25/05

MU1032 (11/2001)

COPY

Confidential
M-CHI 003495

Endorsement No. 3

Effective date of this endorsement: 12:01 a.m. on August 5, 2005
To be attached to and form part of Policy Number: RNN 503865
Issued to: Refco Group, Ltd., LLC
By: Axis Reinsurance Company

## POLICY PERIOD EXTENSION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### Securexcess

It is agreed that Item 2. Policy Period of the Declarations is deleted and amended to read in its entirety as follows:

Item 2.  Policy Period:
From 12:01 AM (Local time at the address stated in Item 1.) on *August 5, 2004*
To 12:01 AM (Local time at the address stated in Item 1.) on *August 11, 2005*

It is further understood and agreed that the Limits of Liability for the Policy Period set forth above shall remain unchanged and that this extension of the Policy Period shall not operate in any way to increase the Limits of Liability as stated in Item 3 of the Declarations.

All other provisions remain unchanged.

_____
Authorized Representative

AUG 1 7 2005
_____
Date

COPY

MU1033 2/2003

Confidential
M-CHI 003488