DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

*Electronically Filed*

-------------------------------------------------------------- X

AXIS REINSURANCE COMPANY,

                    Plaintiff,

      v.

PHILLIP R. BENNETT, et al.,

                    Defendants.

-------------------------------------------------------------- X

:  No. 07-CV-07924-GEL

In re

REFCO, INC., et al.,

                    Debtors.

-------------------------------------------------------------- X

:  Chapter 11

:  Case No. 05-60006-RDD

:  Jointly Administered

AXIS REINSURANCE COMPANY,

                    Plaintiff,

      v.

PHILLIP R. BENNETT, et al.,

                    Defendants.

-------------------------------------------------------------- X

:  Adv. Proc. No. 07-01712-RDD
:  <u>Reference Withdrawn:</u>
:  No. 08-CV-03242-GEL
:  <u>Appeals:</u>
:  (1) No. 07-CV-09420-GEL
:  (2) No. 07-CV-09842-GEL
:  (3) No. 07-CV-10302-GEL

TONE N. GRANT, et al.,

                    Plaintiffs,

      v.

AXIS REINSURANCE COMPANY,

                    Defendant.

-------------------------------------------------------------- X

:  Adv. Proc. 07-02005-RDD
:  *consolidated with 07-01712-RDD*
:  <u>Reference Withdrawn:</u>
:  No. 08-CV-03243-GEL
:  <u>Appeals:</u>
:  (1) No. 07-CV-09843-GEL
:  (2) No. 07-CV-10302-GEL

LEO R. BREITMAN, et al.,

                    Plaintiffs,

      v.

AXIS REINSURANCE COMPANY,

                    Defendant.

-------------------------------------------------------------- X

:  Adv. Proc. No. 07-02032-RDD
:  *consolidated with 07-01712-RDD*
:  <u>Reference Withdrawn:</u>
:  No. 08-CV-03303-GEL
:  <u>Appeal:</u>
:  (1) No. 07-CV-10302-GEL

## <u>AFFIDAVIT OF STEVEN KANE</u>

State of New York      )
                       )ss:
County of New York    )

STEVEN KANE, being duly sworn, hereby deposes and says:

1.      I am currently an employee of AXIS Reinsurance Company ("AXIS"). My current job title at AXIS is Vice President, Financial Institutions.

2.      I submit this affidavit based on personal knowledge in support of AXIS's opposition to the Summary Judgment Motions filed by Klejna, Sexton, Sherer, Silverman, Breitman, Gantcher, Harkins, Jaeckel, Lee O'Keklley, Schoen, Murphy, and Grant.

3.      Sean Lukac and I were the underwriters responsible for AXIS's underwriting of the AXIS policy at issue in this matter – AXIS Policy No. RNN506300 with a Policy Period from August 11, 2005 to August 11, 2006.

4.      Refco was represented by Marsh USA Inc. ("Marsh") as Refco's agent for purposes of negotiating and securing D&O insurance commencing with the IPO.

5.      AXIS was asked by Marsh to provide quotes for underwriting a D&O policy commencing with the IPO, which was originally scheduled for June 15, 2005.

### Warranty Letter

6.      AXIS was provided with a Warranty Letter, signed by Phillip Bennett on behalf of all Insureds, on January 21, 2005 (the "Warranty Letter"). *See* Exhibit O to the May 2, 2008 Declaration of Joan M. Gilbride (the "Gilbride Decl.").

7.    AXIS relied upon the January 21, 2005 Warranty Letter at all times while making underwriting decisions concerning the proposed policy, which was to commence at the same time the IPO went forward.

8.    At no time did Marsh, or any of the proposed Insureds, renounce the statements made in the January 21, 2005 Warranty Letter.

9.    The most important items upon which AXIS relied were the representations made to AXIS by Refco's management. Reviewing the company's financial statements and receiving an affirmative representation from the President and Chief Executive Officer that none of the proposed Insureds were aware of any matters which might give rise to claims, played a major role in AXIS's decision to underwrite this risk and the premium that AXIS charged.

10.    Although the IPO was scheduled to go forward in June 2005, it was delayed to August 11, 2005.

11.    Accordingly, and subject to the issues discussed below, AXIS agreed to issue a Binder to provide D&O coverage to Refco which would commence with the IPO on August 11, 2005.

12.    None of the information upon which AXIS relied when making underwriting decisions concerning the proposed policy disclosed the "round trip loan transactions" which were first publicly disclosed shortly after the IPO.

13.    Had AXIS been aware of these "round trip loan transactions," AXIS would have made substantially different decisions when underwriting the proposed policy.

14.    The effect of a false Warranty Letter is exclusion of such a Claim for all Insureds, including any Insureds who did not have personal knowledge that such a Claim might be made.

### Application

15.     AXIS, an excess insurer, often accepts the application submitted to the primary insurer in lieu of requiring its own application.

16.     The Primary Insurer, U.S. Specialty (a/k/a HCC), received an application in connection with the pre-IPO policy. *See* Exhibit J to the Gilbride Decl.

17.     This Application was signed by Phillip Bennett, the President and CEO of Refco, on February 8, 2005, as agent for all Insureds proposed for the insurance.

18.     The Application specifically asks, at question 12(b) if any of the proposed insureds are "aware of any fact, circumstance or situation involving the Application or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?" Nothing was disclosed in response to this question. Following the question, the Application provides that "the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b)."

19.     Based on the absence of any response to this question, AXIS understood that if any of the proposed Insureds were aware of anything which might eventually give rise to a Claim under the proposed insurance, that Claim would be excluded from coverage for all Insureds under the proposed policy, including any Insureds who did not personally have such knowledge that a Claim might be made.

20.    In an August 11, 2005 email from Marsh, the Insured agreed to reaffirm the contents of the same Application as an application for the post-IPO policy. *See* Exhibit C, a true and accurate copy of the August 11, 2005 email.

21.    As it did with the prior pre-IPO policy, AXIS agreed to accept the HCC application signed by Philip Bennett as agent for all Insureds on February 8, 2005, as an application for the excess AXIS post-IPO policy.

22.    The fact that nothing was disclosed in response to question 12(b) of the Application provided assurance to AXIS that senior Refco management knew of nothing which might result in a claim.

### Knowledge Exclusion

23.    AXIS wanted to start the post-IPO Policy with a "clean slate." That is, AXIS did not want to insure risk associated with any problems with the insured entity, which management knew about, before the IPO. To accomplish this goal, one of two procedures could be followed. Refco's management could execute a "fresh" warranty letter – warranting the additional period between the January 21, 2005 Warranty Letter and the IPO, or a "Knowledge Exclusion" could be added to the proposed post-IPO policy.

24.    Although AXIS had received a warranty letter signed by Phillip Bennett on behalf of all Insureds on January 21, 2005, AXIS was told by Marsh that Refco would not be updating the warranty statement in connection with the underwriting for the August 11, 2005 IPO. I understood from this statement by Marsh that the January 21, 2005 Warranty Letter still applied to the post-IPO Policy, but that Refco would not execute a new warranty statement to warrant new things that management learned of from January 21, 2005 through the IPO.

25.    The IPO was originally scheduled for June 15, 2005, but was delayed until August 11, 2005. Instead of an updated warranty statement, Marsh agreed on behalf of Refco that an "inverted warranty endorsement" could be part of the post-IPO policy. *See* Exhibit A, a true and accurate copy of the August 9, 2005 email.

26.    Based on my knowledge and experience, an "inverted warranty" is another name for a "knowledge exclusion." It is a term of art in the insurance industry and understood by those involved in the directors' and officers' arena. Whether called an inverted warranty or a knowledge exclusion, both involve an exclusion for any claim that the insureds had reason to believe may be made as of the inception of the policy. This differs from a warranty letter which exists separate and apart from the policy, but excludes coverage under a proposed policy for any claim the insureds had reason to believe may be made as of the date of the warranty.

27.    The primary insurer, US Specialty, was also the primary on the pre-IPO policy.

28.    Refco completed an application in connection with the pre-IPO policy which AXIS received in February 2005. *See* Exhibit J to the Gilbride Decl.

29.    This application contained warranty language (at question 12(b)), and AXIS expected that Refco would be completing a new application for the post-IPO policy.

30.    AXIS expected the application for the post-IPO policy would contain essentially the same questions contained in the pre-IPO policy – specifically, the warranty language at question 12(b).

31.    On August 10, 2005, AXIS issued a binder for a post-IPO policy incepting on August 11, 2005. *See* Exhibit B, a true and accurate copy of the August 10, 2005 AXIS binder.

32.    The August 10, 2005 binder, among other things, includes a list of endorsements that AXIS would place on its policy and a list of items that AXIS must receive, review and accept, as a pre-condition to the effectiveness of the binder. The items that AXIS must receive, review and accept as a pre-condition to the effectiveness of the binder are known in the industry as "subjectivities."

33.    One of the endorsements listed on the August 10, 2005 binder is "Reliance endorsement (e.g. on the primary carrier's application)." This reliance endorsement was listed because AXIS expected a new application would be completed which would include a warranty statement and AXIS wanted to incorporate and adopt that application directly as an application for the AXIS post-IPO policy. (AXIS already knew from Marsh's August 9, 2005 email, Exhibit A, that Refco would not update its January 21, 2005 Warranty Letter. Accordingly, AXIS was prepared to rely on the warranty contained within the primary application in addition to the January 21, 2005 Warranty Letter.)

34.    In conjunction with the reference to the "Reliance endorsement (e.g. on the primary carrier's application)," the August 10, 2005 binder also listed "Copy of the primary carrier's application" as one of the items that AXIS must receive, review and accept as a pre-condition to the effectiveness of the August 10, 2005 binder (a subjectivity).

35.    The August 10, 2005 binder was sent to Kenny Li at Marsh.

36.    On August 11, 2005 (the next day), AXIS received an email from Kenny Li at Marsh, forwarding an email from another Marsh employee (Senior Vice President, Pamela Sylwestrzak) sent to Mr. Li earlier on August 11, 2005. *See* Exhibit C.

37.    Mr. Li's August 11, 2005 email simply stated "Please see below and confirm that this will satisfy the application subjectivities."

38.    Ms. Sylwestrzak's August 11, 2005 email stated "With respect to the open subjectivities, here is a copy of the HCC long form application submitted for the 8/4/04 placement. HCC did not require a new application for the 8/11/05 binding of the IPO. You will note the warranty is not signed. It was agreed by HCC to accept the app as is *and to add on the inverted warranty statement to the policy.*" (emphasis added). US Specialty, the primary insurer, is also known by the name HCC.

39.    Based on Marsh's written representation, as Refco's agent, that the primary post-IPO policy would have an inverted warranty, AXIS was satisfied that the policy to which the AXIS excess policy would follow form, would contain an inverted warranty.

40.    AXIS understood, based on Marsh's written representation, that the Knowledge Exclusion would be a term of the AXIS Post-IPO Policy.

41.    To AXIS, the presence of a Knowledge Exclusion was a material term of the insurance contract, because the risk AXIS sought to insure did not include matters already known to senior management which might result in a claim.

42.    Based upon Marsh's representation, AXIS issued a revised binder on August 11, 2005. *See* Exhibit D, a true and accurate copy of the August 11, 2005 binder.

43.    The only difference between the August 10, 2005 and August 11, 2005 binders is that AXIS removed the subjectivity regarding the receipt of the primary application from the August 11, 2005 binder.

44.    AXIS removed this subjectivity based on Marsh's written representation that the Primary Policy, which policy's terms are incorporated into the AXIS Policy, would contain a Knowledge Exclusion.

45.    Because AXIS expected the Knowledge Exclusion to be included in the Primary Policy, there was absolutely no reason to include reference to the Knowledge Exclusion in the August 11, 2005 binder.    To do so would be contrary to established underwriting practices. Excess insurers do not list the terms and conditions of underlying policies in their own binders.

46.    For reasons unknown to AXIS, the primary policy was ultimately issued without the inclusion of a Knowledge Exclusion.

47.    On March 1, 2006, AXIS issued the post-IPO policy and included its standard form Knowledge Exclusion endorsement.    *See* Exhibit E to the Gilbride Decl.

48.    AXIS included the Knowledge Exclusion endorsement in the AXIS Policy because it was agreed by Refco's agent (Marsh) that one of the terms of the AXIS policy would be a Knowledge Exclusion.

49.    The effect of the Knowledge Exclusion is to exclude coverage for all Insureds based on the knowledge of any single Insured.    This exclusion applies to any Insureds who did not personally have knowledge that such a Claim might be made.    The reason for this broad exclusion, applicable to Insureds that arguably did not have the requisite knowledge, is because such a Claim is not the risk AXIS desired to insure.

**Prior Litigation**

50.    I am aware that the post-IPO Refco evolved from earlier entities with similar names dating back to 1969. Although the business form, or legal classification, of each entity might have changed over the years, these Refco entities are each the same core company.

51.    I am aware that over the years, Refco has been the subject of various allegations, regulatory actions and lawsuits stemming from its business activities.

_____

STEVEN KANE

Sworn to before me and subscribed
in my presence this _1st_ day of ~~April,~~ 2008.
                                    May

_____
Notary Public
Reg. No. 02 GI 4943914
Qualified in Westchester County through 11/7/10

# EXHIBIT A

**Lukac, Sean**

| | |
|---|---|
| From: | KENNY.LI@marsh.com |
| Sent: | Tuesday, August 09, 2005 10:15 AM |
| Subject: | Refco - warranty |

Refco prefers not to sign any warranties. Should you need one to bind, please include an inverted warranty endorsement on your revised quote.

kl

Kenny Li
Marsh USA Inc.
Private Equity and Mergers & Acquisitions Svcs.
1166 Avenue of the Americas - 38th Floor
New York, NY 10036
Phone: 212-345-1989   Fax: 212-345-8491
Email: Kenny.Li@marsh.com

1

# EXHIBIT B

 *Financial Institutions*

August 10, 2005

Kenny Li
Marsh
1166 Avenue of the Americas
New York, NY 10036

Re:  **Refco Inc.**
SecurExcess Directors and Officers Liability Binder Bill

Dear Kenny:

Thank you for thinking of Axis Financial Institutions. We are pleased to offer the following Conditional Binder for the above captioned account:

Insurer:                                        Axis Reinsurance Company

Parent Company and Address:          **Refco Inc.**
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661

Policy Number:                              TBD

Policy Form:                                 Axis SecurExcess Form

Line of Business:                           Directors and Officers Liability

Policy Period:
From 12:01 AM (Local time at the address stated in Item 1) on August 11, 2005
To 12:01 AM (Local time at the address stated in Item 1) on August 11, 2006

Limits / Premium:

| Limit of Liability*: | Policy Period Premium**: | Additional Premium For Terrorism Coverage | Total Policy Period Premium |
|---|---|---|---|
| $10,000,000 excess of $17,500,000 | $292,176 | $10,000 | $302,176 |

*Equals Maximum aggregate Limit of Liability for all Claims

Underlying Insurance:

| Carrier | Limit of Liability (aggregate; inclusive of Defense Costs) | Retention (each Loss) / Attachment Point | Premium |
|---------|-----------------------------------------------------------|------------------------------------------|---------|
| HCC | $10,000,000 | $500K (SIR) | $395,000 |
| Lexington | $7,500,000 | $10,000,000 | $251,813 |

Prior and Pending Claim Date:    06/04/04

Endorsements Effective at Inception
1. Schedule of Underlying Insurance;
2. IL State Amendatory Endorsements;
3. Prior Notice of Claim Exclusion;
4. Reliance endorsement (e.g. on the primary carrier's application).

Commission Payable is 12.5%.

Receipt, review and acceptance in writing by Axis underwriters of the following additional information must occur prior to 8/11/05:
1. Underlying policies, but note that these are due when available;
2. Copy of primary carrier's application;
3. Repsonse to Cargill acquisition inquiry.

If any of the above requested items are not received, reviewed, and accepted by Axis underwriters, and acknowledge as such in writing, by the above specified date then this Conditional Binder and any policy issued pursuant thereto will be automatically deemed null and void ab initio (as if it had never existed) and have no effect. The payment of premium or the issuance of any policy shall not serve to waive the above requirements.

Further, a condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder and the inception of the proposed Policy Period. In the event of such change of risk, or any change in the above outline of Underlying Insurance including but not limited to any change in terms, conditions, premium or the deletion, replacement or removal of a scheduled layer of insurance, the Insurer may in its sole discretion, modify and/or withdraw this insurance.

Premiums must be remitted within thirty (30) days of the Policy effective date.

This Conditional Binder is valid thru one hundred eighty (180) days from the date of this document.

Please consider this your invoice for accounting purposes. Premium payment is due 9/11/05.

Remit payment to:

**Address for Payments by U.S. Mail:**
AXIS U.S. Insurance
Wachovia Bank
P.O. Box 932745
Atlanta, GA 31193-2745
Attn: [insert Insured Name and Policy Number here]

**Shipping Address for Payments by Overnight Delivery:**
Wachovia Bank
3585 Atlanta Avenue
Hapeville, GA 30354
Attn: Lockbox 932745 re: [insert Policy Number here]

**Wire Transfer Information:**
Wachovia Bank, N.A.
Charlotte, NC
ABA Routing Number: 061000227
Account Name: AXIS U.S. Insurance
Account Number: 2000015141499
Reference: [insert Insured Name and Policy Number here]

Thank you for all of your hard work and support. It is greatly appreciated.

Kind regards,
*Sean Lukac*
Underwriter
New York Office

## IMPORTANT NOTICE CONCERNING
## THE TERRORISM RISK INSURANCE ACT OF 2002

The Terrorism Risk Insurance Act of 2002 establishes a mechanism by which the federal government will share, with the insurance industry, in losses arising out of "acts of terrorism" certified as such by the Secretary of the Treasury.  Certified acts of terrorism are defined as events that cause more than $5 million in losses and:

1.  Are violent or dangerous to human life, property, or the infrastructure;
2.  Result in damage within the United States, on a United States mission, or to a United States aircraft or vessel; and
3.  Are committed by individuals, acting on behalf of foreign persons or interests, as part of an effort to coerce the civilian population of the United States or to influence the policies or conduct of the United States Government.

The Act specifies that coverage for certified acts of terrorism must be made available in commercial property and casualty policies of insurance, and it requires insurers to disclose any applicable premium charges and the federal share of compensation.  We are making these disclosures in strict compliance with the Act.

### Disclosure of Availability of Coverage for Terrorism Losses

Coverage for losses resulting from certified acts of terrorism is being made available to you on terms, amounts, and limitations generally applicable to losses resulting from perils other than acts of terrorism.

### Disclosure of Federal Share of Compensation for Terrorism Losses

The federal government will pay a 90% share of an insurer's terrorism losses once the insurer has satisfied a significant aggregate annual deductible.  For terrorism losses occurring in 2002, that deductible is 1% of the insurer's 2001 direct earned premium.  For losses occurring in 2003, 2004 and 2005, the annual insurer deductibles are 7%, 10% and 15% of the prior year's direct earned premium, respectively.  The Act provides that neither insurers nor the federal government are responsible for losses associated with certified acts of terrorism once aggregate annual insured losses exceed $100 billion.

### Disclosure of Terrorism Insurance Premium

The premium charge under your policy for coverage for certified acts of terrorism is specifically disclosed, by coverage, in our quote or insurance proposal.

# EXHIBIT C

**Lukac, Sean**

| | |
|---|---|
| **From:** | KENNY.LI@marsh.com |
| **Sent:** | Thursday, August 11, 2005 10:12 AM |
| **Subject:** | Fw: REFCO - HCC application |



refco hcc app
signed 04 05.pdf...
       Please see below and confirm that this will satisfy the application
subjectivities. _____
Kenny Li
Marsh USA Inc.
Private Equity and Mergers & Acquisitions Svcs.
1166 Avenue of the Americas - 38th Floor
New York, NY 10036
Phone: 212-345-1989   Fax: 212-345-8491
Email: Kenny.Li@marsh.com

```
----- Forwarded by Kenny Li/NYC-NY/US/Marsh/MMC on 08/11/2005 09:04 AM
-----
```

```
            Pamela M
            Sylwestrzak/CHI-I
            L/US/Marsh/MMC                              To
                         Kenny Li/NYC-NY/US/Marsh/MMC@MMC
            08/10/2005 06:56
            PM                                          cc

                                              Subject
                         REFCO - OPEN SUBJECTIVITIES
```

Kenny:

With respect to the open subjectivities, here is a copy of the HCC long form application
submitted for the 8/4/04 placement.  HCC did not require a new application for the 8/11/05
binding of the IPO.  You will note the warranty is not signed.  It was agreed by HCC to
accept the app as is and to add on the inverted warranty statement to the policy.

(See attached file: refco hcc app signed 04 05.pdf)

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe
Chicago, IL  60661
Phone (312)627-6215
Fax (312_627-6272
email: pamela.sylwestrzak@marsh.com

```
To:     Kenny Li/NYC-NY/US/Marsh/MMC@MMC
cc:
From:   Pamela M Sylwestrzak/CHI-IL/US/Marsh/MMC
```

# EXHIBIT D

 *Financial Institutions*

August 11, 2005

Kenny Li
Marsh
1166 Avenue of the Americas
New York, NY 10036

Re:   **Refco, Inc.**
      SecurExcess Directors and Officers Liability Binder Bill

Dear Kenny:

Thank you for thinking of Axis Financial Institutions. We are pleased to offer the following Conditional Binder for the above captioned account:

Insurer:                           Axis Reinsurance Company

Parent Company and Address:        **Refco, Inc.**
                                   550 West Jackson Boulevard
                                   Suite 1300
                                   Chicago, IL 60661

Policy Number:                     **RNN 506300**

Policy Form:                       Axis SecurExcess Form

Line of Business:                  Directors and Officers Liability

Policy Period:
From 12:01 AM (Local time at the address stated in Item 1) on August 11, 2005
To 12:01 AM (Local time at the address stated in Item 1) on August 11, 2006

Limits / Premium:

| Limit of Liability*: | Policy Period Premium**: | Additional Premium For Terrorism Coverage | Total Policy Period Premium |
|---|---|---|---|
| $10,000,000 excess of $17,500,000 | $292,176 | $10,000 | $302,176 |

*Equals Maximum aggregate Limit of Liability for all Claims

Underlying insurance:

| Carrier | Limit of Liability (aggregate; inclusive of Defense Costs) | Retention (each Loss) / Attachment Point | Premium |
|---|---|---|---|
| HCC | $10,000,000 | $500K (SIR) | $395,000 |
| Lexington | $7,500,000 | $10,000,000 | $251,813 |

Prior and Pending Claim Date:   06/04/04

Endorsements Effective at Inception
1. Schedule of Underlying Insurance;
2. IL State Amendatory Endorsements;
3. Prior Notice of Claim Exclusion;
4. Reliance endorsement (e.g. on the primary carrier's application).

Commission Payable is 12.5%.

Receipt, review and acceptance in writing by Axis underwriters of the following additional information must occur prior to 8/11/05:
1. Underlying policies, but note that these are due when available;
2. Repsonse to Cargill acquisition inquiry.

If any of the above requested items are not received, reviewed, and accepted by Axis underwriters, and acknowledge as such in writing, by the above specified date then this Conditional Binder and any policy issued pursuant thereto will be automatically deemed null and void *ab initio* (as if it had never existed) and have no effect. The payment of premium or the issuance of any policy shall not serve to waive the above requirements.

Further, a condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder and the inception of the proposed Policy Period. In the event of such change of risk, or any change in the above outline of Underlying Insurance including but not limited to any change in terms, conditions, premium or the deletion, replacement or removal of a scheduled layer of insurance, the insurer may in its sole discretion, modify and/or withdraw this insurance.

Premiums must be remitted within thirty (30) days of the Policy effective date.

This Conditional Binder is valid thru one hundred eighty (180) days from the date of this document.

Please consider this your invoice for accounting purposes.  Premium payment is due 9/11/05.

Remit payment  to:
**Address for Payments by U.S. Mail:**
AXIS U.S. Insurance
Wachovia Bank
P.O. Box 932745
Atlanta, GA 31193-2745
Attn: [insert Insured Name and Policy Number here]

**Shipping Address for Payments by Overnight Delivery:**
Wachovia Bank
3585 Atlanta Avenue
Hapeville, GA 30354
Attn: Lockbox 932745 re: [insert Policy Number here]

**Wire Transfer Information:**
Wachovia Bank, N.A.
Charlotte, NC
ABA Routing Number: 061000227
Account Name: AXIS U.S. Insurance
Account Number: 2000015141499
Reference: [insert Insured Name and Policy Number here]

Thank you for all of your hard work and support.  It is greatly appreciated.

Kind regards,

*Sean Lukac*
Underwriter
New York Office

## IMPORTANT NOTICE CONCERNING
## THE TERRORISM RISK INSURANCE ACT OF 2002

The Terrorism Risk Insurance Act of 2002 establishes a mechanism by which the federal government will share, with the insurance industry, in losses arising out of "acts of terrorism" certified as such by the Secretary of the Treasury. Certified acts of terrorism are defined as events that cause more than $5 million in losses and:

1. Are violent or dangerous to human life, property, or the infrastructure;
2. Result in damage within the United States, on a United States mission, or to a United States aircraft or vessel; and
3. Are committed by individuals, acting on behalf of foreign persons or interests, as part of an effort to coerce the civilian population of the United States or to influence the policies or conduct of the United States Government.

The Act specifies that coverage for certified acts of terrorism must be made available in commercial property and casualty policies of insurance, and it requires insurers to disclose any applicable premium charges and the federal share of compensation. We are making these disclosures in strict compliance with the Act.

### Disclosure of Availability of Coverage for Terrorism Losses

Coverage for losses resulting from certified acts of terrorism is being made available to you on terms, amounts, and limitations generally applicable to losses resulting from perils other than acts of terrorism.

### Disclosure of Federal Share of Compensation for Terrorism Losses

The federal government will pay a 90% share of an insurer's terrorism losses once the insurer has satisfied a significant aggregate annual deductible. For terrorism losses occurring in 2002, that deductible is 1% of the insurer's 2001 direct earned premium. For losses occurring in 2003, 2004, and 2005, the annual insurer deductibles are 7%, 10% and 15% of the prior year's direct earned premium, respectively. The Act provides that neither insurers nor the federal government are responsible for losses associated with certified acts of terrorism once aggregate annual insured losses exceed $100 billion.

### Disclosure of Terrorism Insurance Premium

The premium charge under your policy for coverage for certified acts of terrorism is specifically disclosed, by coverage, in our quote or insurance proposal.