# EXHIBIT A

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL R. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER*
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*†‡
JONATHAN B. BRUNO*
PAUL J. COLUCCI

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN◊
MARGARET J. DAVINO*††

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
THOMAS GIBBONS
HEATHER LASCHEWER*
CAROL S. DOTY†††
ADEOLA I. ADELE
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON
ROCCO P. MATRA◊
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
FRANK K. STAIANO††
JACQUELINE B. TOMASSO
JENNIFER PILZ
GINA M. HOGUE*
MICHAEL R. JANES
YAEL WEPMAN*

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

R. EVON HOWARD*◊
LEONARD B. COOPER††
JULIE ANN LEVINSOHN¤
JOHN B. MULLAHY*
JEFFREY C. GERSON††
CATHERINE KELLEHER*
REBECCA GOODMAN
PETER IANNACEI*
ANDREW R. JONES
CHRISTOPHER GOMPRECHT
JAMES T. DE SILVA
KEITH L. KAPLAN††
CLAUDE C. LYNCH*
VINCENT C. ANSALDI††
BRENDA CORREA*
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
KIMBERLY CRESPO
TIMOTHY E. McCARTHY*
JEFFREY A. GRALNICK
TRACEY RESER-PERTOSOFI
KATHERINE J. HOOPER††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◊

MATTHEW M. FERGUSON*
JEANNE M. VALENTINE
EDWARD R. NORIEGA◊
MATTHEW SPERGEL
PAUL T. CURLEY

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN CT
†† ALSO ADMITTED IN CT
‡ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
* ALSO ADMITTED IN FL
¤ ADMITTED IN FL ONLY
* ADMITTED IN NJ ONLY
¤ ADMITTED IN CA ONLY
¤ ADMITTED IN NJ & MA ONLY
* ADMITTED IN CA, VA, DC ONLY
◊ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 6, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe Street
Chicago, IL 60661-3630

| Re: | | | |
|-----|---|---|---|
| | Insured | : | Refco, Inc. |
| | Claimant | : | Various – *See* Exhibit A, attached |
| | Policy No. | : | 506300 |
| | Claim No. | : | BH 9826 |
| | Our File No. | : | 481.001 |

Dear Pam:

As you know, we represent AXIS US Insurance ("Axis"). This is further to our December 16, 2005 letter, wherein we generally reserved all of Axis's rights in law and equity, as well as our March 1, 2006 letter disclosing the issued policy. We are attaching to this letter, as Exhibit A, a schedule of all matters for which Axis has received notice under the captioned policy (the "Noticed Matters"). **We request that you immediately review the attached Exhibit A and advise us if you believe any matter noticed to Axis is not listed.** We again also ask that all communications on this matter be directed to the undersigned, on behalf of Axis.

We are directing this letter to you as the authorized agent of the Insureds, including the individual Insured Persons. To the extent that you are not acting as the authorized representative for any of the Insureds, please immediately advise us of the proper representative for any such Insureds.

The purpose of this letter is to describe the workings of the Axis Policy, to convey Axis's position regarding coverage, and to reserve Axis's rights. Axis has reviewed the Noticed Matters in light of the Policy provisions. Please be aware that we do not

NEW YORK CITY OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-0677

CALIFORNIA OFFICE
CORPORATE CENTER AT MALIBU CANYON
26635 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91302
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0993

NEW JERSEY OFFICE
9 CAMPUS DRIVE
PARSIPPANY, NEW JERSEY 07054
TELEPHONE: 973-451-9600
FACSIMILE: 973-451-0150

attribute any merit to the Noticed Matters, and reference them herein only to describe the matter submitted for coverage. In this letter we also make certain requests for information. Those requests are generally in bold. Should further pertinent information come to light, Axis may revise its position accordingly, and it reserves the right to do so. Nothing in this letter, including any requests for information, is intended to waive any rights Axis may have under the Policy, at law, or in equity, all of which are expressly reserved. Axis's position is necessarily based upon information that has been made available to us at this point. If you have any other information we should consider, please let us know. Axis will reevaluate its coverage position described herein upon the receipt of any relevant information.

We have had the opportunity to review the Noticed Matters, as well as the various coverage letters submitted by the primary carrier, US Specialty Insurance Company ("HCC" and the "Primary Policy") and the first excess carrier, Lexington Insurance Company ("Lexington" and the "Lexington Policy"). For the reasons set forth below, Axis is denying coverage for each of the Noticed Matters. Additionally, Axis expressly reserves its right to rescind the captioned policy and any prior policy.

## THE LITIGATION

### Noticed Matters

To date, Axis has received notice of twenty-four matters. *See* Schedule of Litigation, attached at Exhibit A. The Noticed Matters consist of: (1) federal securities putative class actions; (2) a derivative action; (3) a criminal action; (4) state court tort actions; (4) a breach of contract and fraud action (Sillam); (5) adversary proceedings brought in bankruptcy court; and (6) an action based on fraudulently obtaining a loan (BAWAG).

### Securities Class Actions

1. Frontpoint Financial Services, Inc., et al. v. Refco Inc., et al., No. 05-cv-08663-GEL, complaint filed (S.D.N.Y., 10/11/05);

2. Jonathan Glaubach, et al. v. Refco Inc., et al., No. 05-cv-08692, complaint filed (S.D.N.Y., 10/12/05);

3. Miriam Lieber, et al. v. Refco Inc., et al., No. 05-cv-08667-LAP, complaint filed (S.D.N.Y., 10/12/05);

4. Sandra E. Weiss, et al. v. Refco Inc., et al., No. 05-cv-08691-GEL, complaint filed (S.D.N.Y., 10/12/05);

5. <u>Anthony L. Wakefield, et al. v. Refco Inc., et al.</u>, No. 05-cv-08742-GEL, complaint filed (S.D.N.Y., 10/14/05);

6. <u>Jacob Baker, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-08923, complaint filed (S.D.N.Y., 10/19/05);

7. <u>Craig Becker, et al. v. Refco Inc., et al.</u>, No. 05-cv-08929-GEL, complaint filed (S.D.N.Y., 10/20/05);

8. <u>Bruce Nathanson, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-08926-GEL, complaint filed (S.D.N.Y., 10/20/05);

9. <u>American Financial International Group – Asia, LLC, et al. v. Refco Inc., et al.</u>, No. 05-cv-08988-PKC, complaint filed (S.D.N.Y., 10/21/05);

10. <u>Ravindra Mettupatti, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-09048, complaint filed (S.D.N.Y., 10/24/05);

11. <u>Todd Weiss, et al. v. Phillip R. Bennett and Gerald M. Sherer</u>, No. 05-cv-09126, complaint filed (S.D.N.Y., 10/26/05);

12. <u>Scott K. Weit, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-09611-GEL, complaint filed (S.D.N.Y., 11/11/05);

13. <u>City of Pontiac General Employees' Retirement System, et al. v. Phillip R. Bennett, et al.</u>, No. No. 05-cv-09941, complaint filed (S.D.N.Y., 11/23/05).

**Shareholder Derivative Action**

14. <u>Verun Mehta, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-08748, complaint filed (S.D.N.Y. 10/14/05).

**Criminal Proceedings**

15. <u>United States of America v. Phillip R. Bennett, et al.</u>, No. 05-MAG 1720, complaint filed (S.D.N.Y. 10/12/05).

**State Court Actions**

16. <u>Banesco Holding C.A., et al. v. Refco Inc., et al.</u>, No. 05603681 (Supreme Court of New York, 10/17/05);

17. <u>Miura Financial Services v. Refco Inc., et al.</u>, No. 05603683 (Supreme Court of New York, 10/17/05);

18. Multiplicas Casa De Bolsa v. Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05).

**The Sillam Action**

19. Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC, et al., No. 05603931 (Supreme Court of New York 11/04/05).

**Adversary Actions**

20. Markwood Investments v. Refco Capital Markets, Ltd and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05);

21. Banco De America, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05);

22. BAC International Bank v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05);

23. Reserve Invest (Cyprus) Ltd v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

**The BAWAG Action**

24. BAWAG P.S.K., et al. v. Refco, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

## D&O INSURANCE PROGRAM

Refco, through its broker Marsh, approached various insurers in July 2004 attempting to place a tower of Private Company D&O insurance in anticipation of an eventual public offering. As a result of this solicitation, Refco Group Ltd., LLC was insured by a tower of D&O insurance with a Policy Period from August 5, 2004 to August 5, 2005. This was later extended to August 11, 2005 (the "04/05 Policy"). After the August 11, 2005 IPO, Refco, Inc. ("Refco") was insured by a tower of Public Company D&O insurance with a Policy Period from August 11, 2005 to August 11, 2006 (the "05/06 Policy").

### Private Company Policy Tower – The 04/05 Policy

**HCC Primary** – The Primary Policy on the 04/05 Policy tower (the "04/05 Primary") was written by HCC. The 04/05 Primary provided a $10 million Limit of Liability, excess a retention of $500,000. This 04/05 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

(B) The Insurer will pay to or on behalf of the Insured Organization Loss arising from Claims first made against it during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

The 04/05 Primary excluded Claims based on Wrongful Acts allegedly committed prior to June 4, 2004. Coverage for E&O clams also was excluded.

**Greenwich First Excess** – The Greenwich first excess layer to the 04/05 Policy tower (the "Greenwich 04/05 Policy") insured $10 million excess of the $10 million 04/05 Primary. The Greenwich 04/05 Policy followed form to the terms and conditions of the 04/05 Primary Policy.

The Greenwich 04/05 Policy included a Pending and/or Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending prior to August 5, 2004.

**Axis Second Excess** – The Axis second excess layer to the 04/05 Policy tower (the "Axis 04/05 Policy") insured $10 million excess of the $20 million in Underlying Limits. The Axis 04/05 Policy followed form to the 04/05 Primary, or any more restrictive Underlying Policy. The Axis 04/05 Policy repeats the exclusion for Pending and/or Prior Litigation as of August 5, 2004.

The Axis 04/05 Policy also contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 2 is marked effective August 5, 2004 and is dated April 25, 2005.

**Public Company Policy Tower – The 05/06 Policy**

**HCC Primary** – The Primary Policy on the 05/06 Policy tower (the "05/06 Primary") was written by HCC. The 05/06 Primary provided a $10 million Limit of Liability, excess retentions of nil/$500,000/$500,000. This 05/06 Primary provided coverage pursuant to two Insuring Agreements:

   (A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

   (B) The Insurer will pay to or on behalf of the Company Loss arising from:

      (1) Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

      (2) Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

Coverage also was extended pursuant to Endorsement 11, to include Derivative Demand Investigative Costs:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit [$250,000].

Coverage was further extended pursuant to Endorsement 15, to include Controlling Shareholder Coverage:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a Securities Claim first made during the Policy Period or the Discovery Period (if applicable) against such Controlling Shareholder for Wrongful Acts, provided, that one or more Insured Persons and/or the Company are and remain co-defendants in such Securities Claim along with such Controlling Shareholder.

Phillip Bennett was defined as the Controlling Shareholder. A $300,000 retention was to apply to Defense Costs under this coverage extension, but did not apply to any other Loss under the extension.

**Lexington First Excess** – The Lexington first excess layer to the 05/06 Policy tower (the "Lexington 05/06 Policy") insures $7.5 million excess of the $10 million 05/06 Primary. The Lexington 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy.

The Lexington 05/06 Policy also includes a Pending and Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending on or prior to August 4, 2004.

**Axis Second Excess** – The Axis second excess layer to the 05/06 Policy tower (the "Axis 05/06 Policy") provides a Limit of Liability of $10 million excess of $17.5 million in Underlying Limits. The Axis 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy, or any more restrictive Underlying Policy.

The Axis 05/06 Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

> In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy also contains a Knowledge Exclusion Endorsement at Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy notes a Prior and Pending Claim Date of June 4, 2004.

**February 8, 2005 HCC Application**

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. This application asks at Question 12:

(a) Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b) Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Bennett did not check either box for Questions 12(a) and 12(b).

**January 14, 2005 Axis Warranty**

Axis requested and received a warranty (the "Axis Warranty"). The Axis Warranty states:

(a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Axis Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005.

## COVERAGE DISCUSSION

The Noticed Matters are excluded from coverage under both the Axis 04/05 Policy and the Axis 05/06 Policy based on: (1) the Axis Warranty; and (2) the Application for the Axis 04/05 Policy and the Axis 05/06 Policy. Moreover, the Noticed Matters are additionally excluded under the Axis 05/06 Policy based on: (1) the Claim made date; and (2) the Knowledge Exclusion. Axis also reserves its rights to rescind both Policies based on material misrepresentation in the application. Finally, additional terms and conditions further serve to exclude or limit coverage if coverage were otherwise available, which it is not. All of the foregoing is detailed below.

Each of the Noticed Matters is excluded from coverage under the Axis 04/05 Policy and the Axis 05/06 Policy pursuant to the Axis Warranty, attached at Exhibit B. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. It is inconceivable that Mr. Bennett was not aware of the alleged fraud when he executed the Axis Warranty "on behalf of all Insureds under the Policy." The Axis Warranty explicitly excludes coverage for all Insureds for any Claim arising from the undisclosed knowledge. Accordingly, each of the Noticed Matters is excluded from coverage for all Insureds and Axis hereby denies coverage.

Each of the Noticed Matters also is excluded from coverage based on the Application for the Axis 04/05 Policy and the Axis 05/06 Policy.[1] Question 12(b) to the Application required disclosure of any known "fact, circumstance or situation. . . [which]

---

[1]    The Axis 04/05 Policy contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

The Axis 05/06 Policy also contains similar wording at Endorsement 5. Accordingly, the February 8, 2005 application was explicitly incorporated as the application for the Axis 04/05 Policy (Private Company) and again when Axis issued the Axis 05/06 Policy (Public Company).

might result in a claim being made." The Application further states that Axis will not be "liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b)." Mr. Bennett had a duty to disclose the alleged financial fraud in answer to Application question 12(b). His failure to disclose such fraud excludes coverage for any Claim brought in connection with the financial fraud. Accordingly, Axis is further denying coverage for each of the Noticed Matters because each is brought in connection with information which should have been disclosed in Application question 12(b).

We note that the Axis Warranty and the Application do not contain an adjudication requirement. We further note that Axis's denial of coverage on these two grounds is as to all Insureds. The Axis Warranty and the Application were filed on behalf of all Insureds. Accordingly, Axis denies coverage for each of the Noticed Matters because each of the Noticed Matters arises out of information which was known to Mr. Bennett, and others, at the time he completed the Axis Warranty and the Application, on behalf of all Insureds.

In addition to the Axis Warranty and the Application, Axis separately denies coverage under the Axis 05/06 Policy for each of the Noticed Matters because each is a Claim first made before the inception of the Axis 05/06 Policy, on August 11, 2005. The Noticed Matters are interrelated, as defined in Condition (C) of the 05/06 Primary Policy.[2] All of the Noticed Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others whereby unreported loans were made between various entities in an effort to disguise financial losses. This alleged fraud was reflected in the financial statements which are the subject of the Noticed Litigation. Additionally, the BAWAG action concerns Mr. Bennett's loan transactions in connection with the alleged fraud. The bankruptcy court adversary proceedings and state court tort actions arise from Refco customers' inability to access assets held by Refco – which assets were inaccessible due to the alleged fraud. Finally, the Sillam action alleged fraud in the Refco financial statements issued in connection with the IPO. Accordingly, each of the Noticed Matters is connected to the allegedly fraudulent scheme to manipulate Refco's financial results and Axis is treating each of the Noticed Matters as a single interrelated Claim. The Noticed Matters are deemed a Claim first made on the date the first such Noticed Matter was made. The Sillam action raised related allegations in its earlier June 30, 2005 complaint. This places a Claim made date for the Noticed Matters at least as early as June 30, 2005.[3] As this is prior to the August 11, 2005 inception of the Axis 05/06

---

[2] Condition (C) of the 05/06 Primary Policy states:

> All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

[3] The Sillam action references an earlier September 8, 2004 complaint which would also potentially bring the Claim Made date prior to the inception of the Axis 05/06 Policy.

Policy, the Noticed Matters would constitute a Claim Made prior to the Axis 05/06 Policy Period.

Axis further denies coverage under the Axis 05/06 Policy based on the Knowledge Exclusion Endorsement. The Knowledge Exclusion Endorsement excludes coverage for any Claims based on facts any Insured had knowledge of at the inception of the Policy. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. As with the Axis Warranty, we think it inconceivable that Mr. Bennett was not aware that his actions "might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy" on the inception date of the Axis 05/06 Policy, August 11, 2005. Coverage on this basis is not only denied as to Mr. Bennett, but also as to all Insureds under the Policy.

In addition to the above grounds for denial of coverage for the Noticed Matters, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy on the basis of fraud in the Application. The Application required Refco to attach, as part of the Application, audited financial statements for the two years preceding the Application. Refco has since admitted that its financial statements from 2002 through 2005 cannot be relied on. As noted above, both the Axis 04/05 Policy and the Axis 05/06 Policy were issued in material reliance upon the Insured's representations in all parts of the Application, including the attached financial statements. Accordingly, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy. Axis explicitly reiterates our March 1, 2006 letter wherein Axis issued the Axis 05/06 Policy, which letter is hereby incorporated by reference. In that letter Axis noted that the issuance and delivery of the Axis 05/06 Policy should not be interpreted as a ratification of the existence of a valid insurance contract.

*     *     *

While the foregoing is dispositive of Axis's coverage responsibilities in connection with the Noticed Matters, additional terms and conditions would serve to limit or exclude coverage if the Noticed Matters were not excluded in their entirety, which they are. For the sake of completeness, we will detail those terms and conditions which would also limit or exclude coverage of the Noticed Matters.[4]

---

The Sillam action further references an earlier April 25, 2003 complaint brought in France. We do not currently have a translated version of this April 25, 2003 complaint, but it may contain related allegations which would dictate a Claim Made date for the Noticed Matters of April 25, 2003, prior to the inception of the 04/05 Policy. Accordingly, coverage would also be denied under the Axis 04/05 Policy.

[4] The Noticed Matters have only been submitted to Axis for coverage under the Axis 05/06 Policy. Accordingly, our discussion in this section focuses only on the Axis 05/06 Policy. Axis has herein denied coverage for the Noticed Matters under the Axis 04/05 Policy, but other coverage limitations may exist if coverage were otherwise afforded under the Axis 04/05 Policy, which it is not. Axis will provide a more detailed coverage analysis under the Axis 04/05 Policy if Insureds were to submit the Noticed Matters for coverage under the Axis 04/05 Policy. Axis reserves all rights available in the Axis 04/05 Policy, in law, and in equity, including, but not limited to, the right to rescind the Axis 04/05 Policy.

The Axis 05/06 Policy follows form to the Primary Policy, or more restrictive Underlying Insurance. Axis directs your attention to the definition of Loss in the Lexington 05/06 Policy. The Lexington 05/06 Policy does not include Defense Costs. within its definition of Loss. Accordingly, Axis adopts this more restrictive definition of Loss. As such, Defense Costs are not covered by the Axis 05/06 Policy.

The Axis 05/06 Policy, at Clause IX(A), requires that the Insured give notice of any Claim to Axis contemporaneously and in the same manner as notice is required to be given to HCC. The Primary Policy, at Condition B(1) and (4), requires that notice of Claims be given as soon as practicable, in writing, and by certified mail. To the extent that Axis did not receive notice as soon as practicable and in the prescribed manner, Axis reserves its rights.

As noted above, the 05/06 Primary Policy only insures the Refco entity (and Refco Subsidiaries) for Securities Claims and Derivative Demand Investigative Costs. Certain of the Noticed Matters do not name individual defendants and do not qualify as Securities Claims. The 05/06 Primary Policy, at Condition D(3), provides for an allocation where a Claim contains covered and non-covered matters. Axis reserves its right to exclude from coverage any Claims that are not Securities Claims against Refco or any of its Subsidiaries.

The 05/06 Primary Policy provides coverage pursuant to Insuring Agreements A and B(1) for Insured Persons. Insured Persons is defined to include present and past directors or officers of Refco, and employees solely with respect to Securities Claims. **For each individual named as a defendant in the Noticed Matters at Exhibit A, please identify: (1) current position, if currently employed; (2) date the current position was assumed; (3) any prior positions and dates prior positions were held; and (4) whether Refco will be indemnifying the individual. If Refco is permitted or required to indemnify and/or if Refco has determined that it will or will not indemnify any of the individual defendants, please provide us with a copy of the Board resolution providing such indemnification decision.**

The 05/06 Primary Policy also provides coverage based on Refco Subsidiaries. Subsidiary is defined at Definition (O) of the 05/06 Primary Policy as any entity:

(1) during any time on or before the inception of the Policy Period in which [Refco Inc] owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

(2) created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, [Refco Inc.] owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent

thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when [Refco Inc.] ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or legal equivalent thereof), wither directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy will respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective date that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

**For each entity named as a defendant in any of the Noticed Matters at Exhibit A, please identify: (1) whether such entity is or ever was a Subsidiary; (2) the effective date such entity became a Subsidiary; and (3) if applicable, the effective date such entity ceased to be a Subsidiary.** Axis reserves its right to deny coverage for any entity named as a defendant in the Noticed Matters which is not Refco Inc. or a Subsidiary, as defined above.

Endorsement 15 of the 05/06 Primary Policy extends coverage to Philip Bennett as Controlling Shareholder for Securities Claims where he is co-defendant with another Insured Person or the Company. To the extent that certain of the Noticed Matters are not Securities Claims, coverage would not be available under this Endorsement. Also, even if certain of the Noticed Matters are Securities Claims, coverage under this Endorsement 15 would only be available where, and so long as, another Insured Person and/or the Company is a co-defendant with Mr. Bennett. Axis also notes Clause (8) of Endorsement 15 which amends the Change in Control section of the 05/06 Primary Policy. This change limits coverage under Endorsement 15 to Wrongful Acts allegedly committed prior to Refco's bankruptcy filing on October 17, 2005. Axis reserves its rights to deny coverage under this Endorsement 15 for any Claims based on Wrongful Acts allegedly committed on or after October 17, 2005.

Additionally, the definition of Loss is limited to amounts insurable by law. It is well-settled that Loss does not include the restoration or disgorgement of ill-gotten gain. Thus, insurance cannot be used to pay an Insured for amounts an Insured wrongfully acquires or is forced to return, or to pay the corporate obligations of the Insured. Accordingly, pursuant to the well-known <u>Vigilant</u>, <u>Conseco</u>, and Level 3 cases, any amounts eventually sought as disgorgement would not be recoverable as Loss.

Exclusion (A) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a

final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage

To the extent that any Insured is subject to a final adjudication establishing that the Insured received any profit or advantage to which such Insured was not legally entitled, Axis reserves the right to deny coverage for such Insured.

Exclusion (B) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted

To the extent that any Insured is subject to a final adjudication establishing that the Insured committed a criminal or deliberately fraudulent or dishonest act, Axis reserves the right to deny coverage for such Insured.

Axis has not yet identified and established the relationship between or among each of the parties to each of the Noticed Matters. The "Insured vs. Insured" exclusion at Exclusion (F) of the 05/06 Primary Policy, as modified by Endorsement 15, may serve to exclude certain of the Noticed Matters from coverage. Axis reserves its rights accordingly.

Further to Axis's above denial based on the Claim made date of this interrelated Claim, Axis specifically notes Exclusion (H) of the 05/06 Primary Policy which excludes Claims:

Arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time

**Please provide us with copies of any notices of claims or circumstances sent in respect of any policy of which this Policy is a renewal or replacement, including, but not limited to, the 04/05 Policy tower.** Axis reserves its rights to deny coverage for any matters excluded subject to this Exclusion (H).

The Axis 05/06 Policy only applies excess of and does not contribute with any other valid and collectable insurance, pursuant to Condition (G)(1) of the 05/06 Primary Policy. **Please provide us with a schedule of any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons which is not otherwise noted in**

**this letter.** To the extent that other insurance is available to such Insureds, Axis reserves it right to deny coverage.

Certain of the Noticed Matters allege that Refco improperly denied access to customer accounts as a result of the alleged fraud orchestrated by Mr. Bennett, and others. Endorsement 6 to the 05/06 Primary Policy excludes Claims, in relevant portion:

> Arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the Company or by any Insured Person, any service for others for a fee; provided, that this exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in connection with the management or supervision of the Company or any division or group therein.

Axis reserves its right to deny coverage for any matter properly excluded by this Endorsement 6.

Refco has been the subject of a well-publicized SEC investigation.[5] Endorsement 14 to the 05/06 Primary Policy notes that the "Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any [Wells Notice or SEC Investigation]." It appears that several of the Noticed Matters are based upon the SEC Investigation. Accordingly, any Claim "arising out of, based upon or attributable to" the SEC Investigation would be excluded and Axis reserves its rights.

Axis reminds Insureds of Condition (D)(1) of the 05/06 Primary Policy which states, in relevant part:

> The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlement, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

No settlement of a covered Claim will be binding upon Axis without Axis's express consent and Axis reserves its rights accordingly. Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent.

Axis further reminds Insureds, especially given the Insured's bankruptcy posture, of Condition (K) to the 05/06 Primary Policy which states that "[n]o assignment of

---

[5] We are also aware that Refco received a Wells Notice during the Policy Period, but are not privy to the subject matter thereof. **Please provide us with a copy of the Wells Notice and any response thereto.** Axis reserves its rights in connection with this Wells Notice accordingly.

interest under this Policy will bind the Insurer without the Insurer's written consent." Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent and Axis specifically reserves its rights in this regard.

Finally, Axis notes Condition (H)(1) to the 05/06 Primary Policy which notes, in relevant part, that "the Insureds will give the Insurer all information, assistance and cooperation that the Insurer my reasonably request."

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions or exclusions of the Axis 04/05 Policy or the Axis 05/06 Policy. Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the Axis 04/05 Policy or the Axis 05/06 Policy, at law, or in equity, all of which are expressly reserved. Axis reserves the right to alter, supplement or modify this statement of its coverage position as other and additional information may become available. Axis's denial of coverage of the Noticed Matters is necessarily based upon information that has been made available at this point. If you have any other information we should consider, please let us know.

If you have any questions in connection with the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest

Enclosures
Exhibit A – Noticed Matters
Exhibit B – Axis Warranty

cc:
Tracy Forsyth, Axis
Leslie Ahari, Ross Dixon & Bell LLP, Counsel to US Specialty
Barbara Seymour, D'Amato & Lynch, Counsel to Lexington

## EXHIBIT A

### Schedule of Noticed Litigation

1. Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

2. Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

3. Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

4. United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

5. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

6. Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

7. Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill

& Partners, L.P., HSBC Securities (USA) Inc., William Blaire & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

8. Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

9. Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

10. Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

11. Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

12. Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

13. Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

14. American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

15. Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L.

O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

16. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

17. Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al., No. 05603931 (Supreme Court of New York 11/04/05).

18. Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of    America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG   Institutional Trading LLC, Samuel  A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

19. Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holidings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco

Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

20. Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

21. Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

22. BAC International Banks, Inc. v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

23. Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

24. City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v. Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer, Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrilly Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc and Grant Thornton LLP, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

**EXHIBIT B**

Axis Warranty[1]



Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

    a.  No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

          *See attached*

    b.  No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: *Refco Group STD. LLC*

Signature: _____

Title:       *President & CEO.*
    (Chairman of the Board or President)

Date:     *Jan 21, 2005.*

---

[1] Also attached to the Axis Warranty, but not included here are: (1) a January 14, 2005 memo from Ellen Brooks to Phillip Bennett requesting Bennett complete the warranty; and (2) a January 14, 2005 letter from Grant Cornehls to Ellen Brooks describing and attaching the Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al. suit. It appears the letter and suit were both attached to the memo sent to Bennett. Axis does not contend that the Luis Capital Markets suit is related to the Noticed Matters.

# EXHIBIT B

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   -------------------------------------X
                                         :
 4   In Re:                              :  Case No. 05-60006
                                         :
 5        REFCO, INC.,                   :
                                         :
 6              Debtor.                  :
                                         :
 7   -------------------------------------X
     AXIS REINSURANCE COMPANY,           :  07-0712-RDD
 8
                    Plaintiff,           :
 9
                    v.                   :  One Bowling Green
10                                       :  New York, New York
     BENNETT, et al.,                    :
11                                       :  October 24, 2007
                    Defendants.          :
12   -------------------------------------X

13

14      TRANSCRIPT OF HEARING ON REQUEST ON BEHALF OF DENNIS KLEJNA
           FOR A CONFERENCE ON WHETHER TO PROCEED WITH
15                    MOTION FOR SUMMARY JUDGMENT
             BEFORE THE HONORABLE ROBERT D. DRAIN
16                UNITED STATES BANKRUPTCY JUDGE

17   APPEARANCES:

18   For Axis Reinsurance:      JOAN M. GILBRIDE, ESQ.
                                ROBERT A. BENJAMIN, ESQ.
19                              Kaufman, Borgeest & Ryan LLP
                                200 Summit Lake Drive
20                              Valhalla, New York  10595

21   For Dennis Klejna,         HELEN B. KIM, ESQ.
       Gerald Sherer,           Baker & Hostetler LLP
22     William Sexton,          12100 Wilshire Boulevard, 15th Floor
       and Philip Silverman:    Los Angeles, California  90025-7120

23

24

25


                      (Appearances continue on next page.)
```

```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    APPEARANCES CONTINUED:

4    For Tone Grant:          NORMAN EISEN, ESQ.
                              Zuckerman, Spaeder LLP
5                             1800 M Street NW
                              Washington, D.C.  20036-5802
6

7

8

9    Court Transcriber:       RUTH ANN HAGER
                              TypeWrite Word Processing Service
10                            356 Eltingville Boulevard
                              Staten Island, New York 10312
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

3

1   (Proceedings began at 2:18 p.m.)

2           THE COURT:  I kept you all waiting because

3   apparently there was some other party in the consolidated

4   adversary proceeding that wanted to be hooked in by phone and I

5   believe a number of them are at this point.  But this is really

6   Ms. Kim's request on behalf of Mr. Klejna for a conference on

7   whether to proceed with a motion for summary judgment, so I

8   have Ms. Kim and Ms. Gilbride in front of me.

9           I had a couple of questions before we get further

10  into this.  What is currently before Judge Lynch in respect of

11  insurance coverage litigation?

12          MS. GILBRIDE:  Your Honor, Axis -- after Your Honor

13  dismissed Axis's complaint, Axis filed a declaratory judgment

14  complaint essentially identical to what was pending in this

15  court.

16          THE COURT:  Okay.

17          MS. GILBRIDE:  And that's what's pending.

18  Additionally, we've just received notice I think yesterday that

19  one of our appeals was assigned to Judge Lynch as well.

20          THE COURT:  Okay.  Has there been any activity in

21  connection with the declaratory judgment action?

22          MS. GILBRIDE:  There has been some letter writing

23  back and forth.

24          THE COURT:  Why am I not surprised?

25          MS. GILBRIDE:  In fact, some of the parties thought

4

1  that Judge Lynch would refer that complaint back to Your Honor,

2  but other than that there's been no activity.  In fact, the

3  complaint hasn't even been served as yet.

4            THE COURT:  Okay.  So there's been no ans --

5  there's obviously been no answer or motion or anything like

6  that.

7            MS. GILBRIDE:  Not as yet, no.  We were --

8            THE COURT:  Was the letter-writing activity to

9  Judge Lynch or was it just between the parties or among the

10 parties?

11           MS. GILBRIDE:  It was to Judge Lynch.

12           THE COURT:  Okay.  And he hasn't responded?

13           MS. GILBRIDE:  We had a call from his clerk who

14 wanted to make sure that all the letters were done, but as of

15 yet there's been nothing official from the Court, no.

16           THE COURT:  Okay.  And the motion to withdraw the

17 reference was just filed the other day.  There's been nothing

18 on that?

19           MS. GILBRIDE:  Yeah, we wrote a letter to Judge --

20 what happened was we had made a motion to withdraw the

21 reference and Judge Koeltl issued an order saying -- denying

22 the motion --

23           THE COURT:  Right.

24           MS. GILBRIDE:  -- without prejudice to renewing it

25 if this court determined that there was still additional

5

1    issues, other than advancement, before this court, so we wrote

2    a letter to Judge Koeltl just letting him know that, in fact,

3    that might perhaps be happening.  We haven't even actually made

4    the motion --

5                THE COURT:  Oh, okay.

6                MS. GILBRIDE:  -- the particular motion.

7                THE COURT:  All right.

8                MS. GILBRIDE:  Although, you know, it is a letter

9    request that the Court considered --

10               THE COURT:  All right.

11               MS. GILBRIDE:  -- could consider as a motion.

12               THE COURT:  Okay.

13               MS. KIM:  If I might just add to that, with respect

14   to the --

15               THE COURT:  Why don't you bring the microphone

16   forward because there are some people on the phone.

17               MS. KIM:  Oh, this is Helen Kim, Your Honor, on

18   behalf of Mr. Klejna.  The letter request to Judge Lynch, which

19   was submitted by Barbara Moses on behalf of all of the

20   defendants was to request Judge Lynch to refer the case to this

21   court, the newly-filed complaint to this court pursuant to the

22   standing order which would require any action related to the

23   bankruptcy proceedings to be referred to this court, so there

24   have been letters back and forth and as Ms. Gilbride noted

25   there has been no action taken by Judge Lynch to date.

1            THE COURT:  Okay.

2            MS. KIM:  And with respect to the letter yesterday

3    to Judge Koeltl, my understanding was that it was a request for

4    a conference, a premotion conference similar to the request

5    that I made of this court, and there has been no response by

6    Judge Koeltl to that request either.

7            THE COURT:  Okay.  All right.  Well, why don't we

8    turn to the request?  As you know from the tail end of the last

9    hearing I was somewhat skeptical about it and I want to make

10   sure I understand clearly what it is that you want to have

11   ruled on as far as summary judgment is concerned.

12           MS. KIM:  Well, Your Honor, as this court noted at

13   the August 30 hearing, the difference -- the distinction

14   between the counterclaim plaintiffs' complaint and the

15   complaint filed by Axis is that in order for Axis to prevail,

16   they have to show two parts.  They have to show that the

17   relevant exclusion exists, whether it's the warranty letter,

18   the exclusion or whatever it is, and that, second, that it has

19   been triggered.

20           With respect to the counterclaim plaintiffs,

21   however, and I speak solely on behalf of Mr. Klejna, our

22   position is that we only have to show that the exclusion

23   doesn't exist.  If we show that, for example, that the prior

24   knowledge exclusion was slapped on in March of '06 in violation

25   of the policy binder, to us it is absolutely irrelevant as a

7

1    matter of law what Mr. Bennett knew and when, so as a matter of

2    law it would be our position that there is no prior knowledge

3    exclusion and, therefore, the issue of whether it was triggered

4    or not is irrelevant.

5            And the ground for our motion for summary judgment

6    is that with respect to each of the grounds asserted by Axis

7    for disclaiming coverage that they don't operate as a matter of

8    law, specifically because there is a nonimputation or

9    severability provision in the underlying -- the primary policy

10   that limits any exclusion to Mr. Bennett and does not operate

11   as to the knowledge of others.

12           THE COURT:  Well, but isn't there still going to be

13   the issue of whether Mr. Klejna had knowledge or Mr. Klejna was

14   aware of issues that would have led to a breach of the warranty

15   or the application?

16           MS. KIM:  Well, Axis has never asserted that

17   Mister -- if you read their complaint and even their amended --

18   their new complaint against Mister -- against -- that's pending

19   before Judge Lynch at the moment, there's never been any

20   allegation that Mr. Klejna had any knowledge.  The entire

21   complaint rests on the knowledge and intent of Mr. Bennett.

22           MS. GILBRIDE:  Your Honor --

23           THE COURT:  I have to say, I mean, that's not --

24   that's certainly not -- I didn't -- I'll have to move back and

25   look at their complaint, but I didn't --

8

1            MS. KIM:  Yeah, I --

2            THE COURT:  -- read it that way.

3            MS. KIM:  Yes, I --

4            THE COURT:  I mean, I understand that it was

5    easiest for them to argue Bennett because he's along with --

6    you know, he's under a criminal indictment, but --

7            MS. KIM:  Well, Your Honor, while looking at their

8    complaint here it is clearly all along Mr. Bennett,

9    Mr. Bennett, Mr. Bennett, Mr. Bennett, and Mr. Klejna is not

10   among the indicted individuals.  The only complaint that he has

11   been named at all and there are now umpteen different

12   complaints with Mr. Kirschner's complaints and all, the only

13   complaint against him is the securities action.  There's

14   absolutely nothing else.

15           And yeah, Your Honor, we have been proceeding on

16   the assumption that Axis has never asserted the knowledge or

17   intent of anyone other than Mr. Bennett.

18           THE COURT:  Is that right, Ms. Gilbride?

19           MS. GILBRIDE:  Your Honor, it's our position that,

20   of course, it would be easier if -- just to show Mr. Bennett's

21   knowledge, but with respect to any of the insureds if any of

22   the insureds had knowledge that that would bar them from

23   coverage under the complaint -- under the policy.  I have to go

24   back and look at the complaint, but that's certainly been the

25   position we've advocated all along.  It was in our coverage

9

1   letter, our denial letter, and it's the way that the knowledge

2   exclusion works, frankly.  If any insured has knowledge that

3   any claim arising out of that knowledge would be precluded

4   under the policy.

5           MS. KIM:  Well, Your Honor, if the knowledge

6   exclusion doesn't exist, I guess it wouldn't matter, would it?

7           THE COURT:  Well, yes and no,  I mean, I -- I broke

8   it down this way when I was looking at your letters and whether

9   summary judgment would be useful or serve a proper purpose

10  here.  As far as whether the knowledge exclusion was improperly

11  added or is not properly a part of the policy, it's not clear

12  to me whether there's a factual dispute as to that issue.  I

13  don't know and I want to hear about that, I guess.

14          Secondly, there may or may not be a factual dispute

15  preceeding that.  There may or may not be a legitimate

16  ambiguity, but there may or may not be a factual dispute as to

17  the severability issue when applied to the warranty and the

18  application.  I understand how -- I understand the argument as

19  it applies to the knowledge issue.

20          MS. KIM:  Yeah, Your Honor.  Well, I'm --

21          THE COURT:  But then let me just go through it so I

22  can put some structure around this.

23          And then finally, there was the issue as to whether

24  even if one -- even if you were successful in knocking the

25  knowledge exclusion, are you still right in the middle of the

10

1    overlap doctrine because of the application and, arguably, the

2    warranty?

3             MS. KIM:   Okay.   Well, Your Honor, first of all, I

4    just wanted -- with respect to what the complaint asserts, I

5    have a copy of the Axis complaint and I'm relying specifically

6    on counts one, two, three, and four where paragraph 144 it

7    specifically alleges just Bennett's knowledge.   I apologize if

8    I misread this before, but it certainly says under count one,

9    paragraph 144, "As alleged herein as of January 14, 2005,

10   Bennett possessed knowledge of facts, circumstances,

11   situations, acts, errors," blah, blah, blah, blah, "such as

12   would fall within the scope of the Axis policy, so it rests

13   solely on the knowledge of Bennett.

14            Similarly, count two, paragraph 149, "As alleged

15   herein as of February 8, 2005 Bennett was aware of facts,

16   circumstances or situations involving Refco, which Bennett had

17   reason to believe might result in a claim as that term is

18   defined in the primary policy being made."   Again, absolutely

19   no notice to any of the other defendants with respect to any

20   alleged knowledge or information by any other defendant

21   insureds.

22            Similarly, count three, paragraph 154, again "As

23   alleged herein as of August 11, 2005 Bennett possessed

24   knowledge of facts, circumstances, situations," et cetera.

25            So, Your Honor, you know, we approached this

11

1    complaint and Axis's position based upon the pleadings that

2    they filed in this court and I apologize if there's been some

3    misunderstanding, but certainly our --

4              THE COURT:  Yeah, I guess what I'm getting it from,

5    I was focusing on their coverage letter and I know they're not

6    specific in it, but they refer to in a couple of places the

7    alleged -- this a quote -- "alleged financial fraud

8    orchestrated by Mr. Bennett among others."  Now, it's

9    conceivable the "among others" could be, you know, the people

10   at BAWAG, but --

11             MS. KIM:  Well, Your Honor, even with respect to

12   the --

13             THE COURT:  Even to say it was, you know,

14   disguised -- what was Mr. Klejna's job?

15             MS. KIM:  He was the general counsel, Your Honor.

16   And certainly even with respect to the application, which was

17   one of the issues Your Honor just raised, I believe in the

18   Kozlowski [Ph.] case, the courts there specifically said that

19   absent any evidence that Mr. Kozlowski was involved in the

20   application process that any statements in the application

21   would -- could not be imputed to him.

22             So it would be if -- in opposing a motion for

23   summary judgment, it would be Axis's burden to come forward and

24   show that Mr. Klejna had some involvement in filling out that

25   application, Your Honor.  We believe that on the summary --

12

1   motion for summary judgment they would not be able to sustain
2   that burden.
3              As to the warranty letter, we believe that the
4   warranty --
5              THE COURT:  But aren't they -- I mean, aren't
6   they -- aren't we kind of jumping the gun here, though?  I
7   mean, I understand the issue on the advancement of the fees,
8   which was really dealt with on an expedited basis, but for
9   these types of things, like who was involved in preparing the
10  application and who was involved or what was involved with the
11  addition of the knowledge exclusion and even, you know -- I
12  have to confess I was really focusing on the exclusion letter
13  as opposed to the complaint filed by Axis, since that complaint
14  isn't before me anymore, so all I really have is the letter,
15  which is what's referenced in your complaint -- you know,
16  unless they're going to stand up in front of me and say that
17  they're relying only on Bennett's alleged fraud and not on
18  Klejna's, it would seem to me that we have to -- we'd be back
19  at taking (a) discovery as to the facts as to whether the
20  knowledge exclusion could be excised from the policy and
21  whether the application is not attributable to anyone other
22  than Bennett and what that means.  And then (b) again, unless
23  they're going to stand up and say that they are relying only on
24  Bennett's fraud and nothing done by Klejna, even if you win on
25  those points you still have issues as to his role in the

13

1  alleged fraud that they're relying on.

2      MS. KIM:  Well, Your Honor, I -- may I address

3  those points one by one?

4      THE COURT:  Okay.

5      MS. KIM:  Okay.  Starting with the prior knowledge

6  exclusion, we believe that we can show that as a matter of law

7  that because the prior knowledge exclusion conflicts with a

8  policy binder that was issued by Axis on the inception date of

9  the policy on August 11, 2005 that the policy binder is what

10 controls the issue of whether the exclusion exists or not.

11 There's plenty of case law including the recent <u>World Trade</u>

12 <u>Center</u> cases about what is the operative document.

13      And therefore, if we prevail on that issue that the

14 prior knowledge exclusion is not even part of the policy as a

15 matter of law, we don't believe we need to get into what

16 Mr. Klejna knew or didn't know.  As a matter of law, the

17 exclusion would be irrelevant.  I would not be a part of the

18 policy.

19      Going to the second issue on the issue of the

20 application, their position is that because the application is

21 incomplete that that somehow negates coverage, but we believe

22 that as a matter of law, that's not true.  There's plenty of

23 cases that say that where an application is incomplete and that

24 issuer goes ahead and issues the policy in the face of an

25 incomplete application, it is the issuer that assumes the risk

14

1   of liability because the issuer had notice when it received the

2   application that there was information that had not been

3   completed.

4           So even -- again, even if Mr. Klejna had some

5   role -- so even assuming everything in their favor as a matter

6   of law the -- it would be -- the risk would have been assumed

7   by Axis and not by any of the individual insureds.

8           So then I don't even have to get to the --

9           THE COURT:  Even if the application is included and

10  referred to specifically in the policy?

11          MS. KIM:  That's right, Your Honor.  We cited those

12  cases in our preliminary injunction briefs when we dealt with

13  the issue of likelihood of success on the merits, Your Honor.

14          And as to the warranty letter, Your Honor, we

15  believe the warranty letter frankly speaks for itself and makes

16  clear that the warranty letter was issued in connection with

17  the policy for the prior year in 2004 and 2005, not in

18  connection with the application in 2005 to 2006.  Even if we

19  were wrong about that, Your Honor, there is a provision in the

20  underlying policy that was conditioned, oh, which defines what

21  is and is not a part of the 2005-2006 policy.

22          So again, Mr. Klejna's knowledge is absolutely

23  irrelevant as a matter of law.  So we believe that we have an

24  opportunity and should have the opportunity to show that on a

25  motion for summary judgment that never ever touches the issue

15

1    of intent or knowledge and I'm certainly cognizant of the line

2    that this court has drawn with respect to the overlapping --

3    substantial overlapping issues.  We have no intention of

4    touching any of those issues, Your Honor.

5              THE COURT:  What do you think Ms. Gilbride?

6              MS. GILBRIDE:  Well, Your Honor, we certainly were

7    understanding after the August 30th hearing that the narrow

8    issue that this court kept before it was the issue of

9    advancement.  Maybe we were incorrect in that understanding

10   that that was, you know, as I reread the transcript and reread

11   the ruling that that was my understanding of the position that

12   was being advanced by all of the insureds if that was the only

13   issue -- that was the pressing issue, they had a financial need

14   for advancement of defense costs, and that was the issue that

15   didn't overlap with any of the issues in the underlying case

16   and that was the issue that this court determined it should

17   keep.

18             So I think as a threshold matter that was certainly

19   how we were proceeding all along.  It's why we didn't ask for

20   any discovery on these other issues that Ms. Kim has raised,

21   but certainly it would be our position that if the Court is

22   going to proceed with these other issues that there are factual

23   disputes as to, I think, each of the issues that were raised by

24   Ms. Kim.

25             With respect to the knowledge exclusion, certainly

16

1   it's our position in the first instance that it's part of the

2   policy, but there's an issue raised as to the binder.  If we

3   get into the binder then the court has to look at all of the

4   extraneous negotiations that went on in connection with the

5   binder.  There are negotiations back and forth between the

6   broker.  I -- we don't know yet because we haven't taken any

7   discovery what role all of the individual insureds played in

8   that process, but we certainly believe that that information

9   would be relevant to the Court's determination whether or not

10  the prior knowledge -- the knowledge exclusion was a part of

11  the policy.

12          With respect to the warranty letter, I don't know

13  how we get around the fact that --

14          THE COURT:  Can we stop on the knowledge exclusion

15  for a second?  As I understand Ms. Kim's position it's

16  essentially that -- correct me if I'm wrong -- that Axis

17  slipped this in?

18          MS. KIM:  Yes, Your Honor, that it is not in the

19  policy binder that would --

20          THE COURT:  But --

21          MS. KIM:  Which lists the exclusions.

22          THE COURT:  I mean, but didn't --

23          MS. GILBRIDE:  It's in the policy.

24          THE COURT:  But I mean, Refco got the policy,

25  right?  I mean, it didn't --

1              MS. KIM:  In March of '06.  This policy started

2    in --

3              THE COURT:  Did it ever protest and say, this isn't

4    part of the deal or anything like that?

5              MS. GILBRIDE:  Not to my knowledge, Your Honor.

6              MS. KIM:  Well, Your Honor, the policy binder was

7    issued in August of '05.

8              THE COURT:  Right.

9              MS. KIM:  It lists the exclusions, that those

10   exclusions do not include the prior knowledge of it.

11             THE COURT:  No, I understand that, but --

12             MS. KIM:  The policy was issued in March of '06

13   with a cover letter from Axis stating that it was subject to

14   rescission, so we were in a dispute from the get-go.  This

15   was -- the policy was issued after the claims had already been

16   tendered and made.

17             MS. GILBRIDE:  Your Honor, just to back date the

18   history of the negotiations, if you look at the underwriting

19   file and the broker's file, what happened here was that that

20   Axis asked for a knowledge exclusion.  They were told that the

21   primary carrier was going to include that exclusion in their

22   policy.  Based upon that representation by the broker, Axis

23   issued a binder.  As the Axis carrier, it wouldn't have that

24   provision in its binder.

25             When the primary policy was issued without the

18

1    knowledge exclusion, Axis issued a knowledge exclusion, because

2    that was the representation that was made to it by the broker

3    on behalf of the insured.  So there's certainly factual issues

4    and it's certainly --

5              THE COURT:  Okay.

6              MS. GILBRIDE:  -- not Axis's position that it's

7    lifted anything in.

8              THE COURT:  So I interrupted you.  You were going

9    on to the next issue.

10             MS. GILBRIDE:  Yes.  With respect to the warranty

11   letter, Your Honor, it's our position that the warranty letter

12   was signed by Mr. Bennett on behalf of all insureds.  We

13   don't -- our position is that the severability or imputation

14   language does not apply to that warranty letter and if there

15   are any factual issues with respect to the warranty letter as

16   raised by Ms. Kim, it would be -- we would need to take

17   discovery to find out what the insured intended that warranty

18   letter to mean, and that would be Mr. Bennett.

19             It's Mr. Bennett who signed that warranty.  It's

20   Mr. Bennett who could answer the question of what it was

21   intended to -- whether it was intended to apply to this policy

22   or to something else.  You know, there's no issue as a matter

23   of law.  There's certainly a factual dispute as to what that

24   warranty letter applies to.  There's no issue that the Court

25   can determine as a matter of law.

19

1          THE COURT:  The application is referred to

2     expressly in the policy; the warranty letter isn't.  Am I right

3     on that?

4          MS. GILBRIDE:  Yes, Your Honor.

5          MS. KIM:  And, in fact, the second page of the

6     warranty letter said that -- refers explicitly to the policy,

7     our present D&O coverage that was placed August 5, 2004.

8          MS. GILBRIDE:  The warranty letter refers to the

9     proposed insurance, which the proposed insurance at that point

10    in time was the policy that incepted in August of 2006.  And

11    all of this just shows that there are disputed issues of

12    fact --

13         MS. KIM:  Well, in that case, Your Honor --

14         MS. GILBRIDE:  -- with respect to this.

15         THE COURT:  Well, I'm sorry.  Just --

16         MS. KIM:  -- I'll renew my motion -- oh.

17         THE COURT:  Just a minute.  I'm just looking at the

18    severability provision.  Okay.  What were you saying, Ms. Kim?

19         MS. KIM:  What I was saying, Your Honor, I did not

20    understand this to be a full-blown motion.

21         THE COURT:  No, no, but it -- I -- I was just

22    trying to see --

23         MS. KIM:  It just means that I'll lose my motion if

24    they can raise -- if they can show the genuine -- the existence

25    of genuine issues of material fact --

20

1          THE COURT:  But we haven't had any discovery yet.
2    I mean, I think what I'm trying to figure out is whether this
3    is something, as often happens with insurance policies, that
4    you can do on the document itself or whether you have to have a
5    reasonable period for discovery because it's not really the
6    document itself that controls.  It's what people did with and
7    to or in connection with the documents, *i.e.,* did they sneak in
8    a provision without Refco knowing or was there a history there
9    that --
10          MS. KIM:  Well, Your Honor, we both have the
11    underwriting files.  I've got the underwriting files --
12          THE COURT:  Well --
13          MS. KIM:  -- from [inaudible].  They've got the
14    underwriting files.  I mean, we -- it's not like we're
15    litigating on a blank slate here.
16          THE COURT:  Well, I know.  That did -- but all that
17    says is there's a source for discovery.
18          MS. GILBRIDE:  And, Your Honor, if I just may raise
19    a fundamental issue here is that there are all -- other parties
20    to this dispute and those other parties are not before the
21    Court, but they are before the Court in the coverage action
22    that we filed.
23          So, you know, pursuant to the federal rules there
24    are necessary parties to this dispute who are not before Your
25    Honor and they are parties to the contract.  Whatever Your

1  Honor rules is going to affect their rights one way or the
2  other and I think that's a fundamental issue that we have to
3  deal with.

4           MS. KIM:  Well, that last point, Your Honor, I
5  don't understand.  It's my understanding that's why everyone is
6  on the phone is they have an interest in this policy, but I
7  think there is no -- I think everyone understands that not
8  everybody -- not all of the insureds stand in the same
9  position.  I have no doubt, for example, that there are certain
10 defendants who want nothing but the advancement with respect to
11 defense costs to be paid out ad infinitum.  And there are
12 others who want to be able to settle out of this litigation,
13 but who aren't able to settle out because there is a dispute
14 with respect to the fundamental issue of coverage and --

15          THE COURT:  Let me tell you, this is where I'm
16 coming out.  It seems to me that it is conceivable that the
17 points raised by Ms. Kim on behalf of Mr. Klejna could fall
18 outside the overlap rule.

19          However, I think to properly and fairly determine
20 whether that's the case the parties would have to have a
21 period -- an appropriate period to engage in discovery, *i.e.*,
22 Mr. Klejna's contention is that at the end of the day the bases
23 for Axis's denial of coverage can be overcome on arguments that
24 go to the -- to what's in the policy or what's properly in the
25 policy and that if he's successful on that point, there won't

22

1    need to be -- because it would be irrelevant -- an inquiry into

2    Mr. Klejna's own knowledge of fraud, wrongdoing, or whatever,

3    and it's that issue, the issue of knowledge of fraud or

4    wrongdoing or the like that is the basis for the overlap with

5    the District Court actions.

6           But to get to that point, unlike simply reading the

7    provisions of the policies as they pertain to defense cost

8    advancement, I think you -- there are currently credible

9    nonspeculative contentions by Axis that there are factual

10   issues, *i.e.,* did it sneak it in, *i.e.,* did it sneak in the

11   endor -- the prior knowledge endorsement or was that something

12   that was understood with the broker and/or Refco from the get-

13   go or was it agreed upon at some point in the middle of the

14   process?

15          Similarly, as far as the application is concerned,

16   since I think that the argument ultimately depends upon a

17   theory of waiver, I could envision there being factual issues

18   as to that point.

19          And finally, as to the argument that the warranty

20   doesn't apply except as to Mr. Bennett, I think your strongest

21   argument by far on that point is that the warranty doesn't

22   apply to this policy at all in the first place, but even that,

23   I believe, is a factual issue given the language of the

24   warranty.  If it does arguably apply to this policy, the

25   severability provision doesn't refer to it -- it refers to the

23

1 | application, so I would assume that Axis would need a suitable

2 | period to take discovery as to -- and you would, too -- as to

3 | what the warranty was meant to apply to.

4 | And all of that suggests that after that discovery

5 | process, assuming that one or more district judges hasn't

6 | decided that the matter is properly before him, you'll be back

7 | here asking for summary judgment, but I don't think it's right

8 | to schedule summary judgment at this point. I think you needed

9 | to go through discovery.

10 | MS. KIM: Your Honor, if I may just address the

11 | point of discovery, Your Honor. We were here at a status

12 | conference in July and --

13 | THE COURT: I know, but that's not the issue.

14 | MS. KIM: No. But -- well, then in all fairness --

15 | THE COURT: That's not really fair. The focus on

16 | that was first and foremost the dispositive motion to dismiss

17 | Axis's complaint, and obviously there wasn't going to be

18 | discovery while that was pending.

19 | MS. KIM: No, the understanding based on the July

20 | status conference was that 21 days after the Court's ruling --

21 | August 30 ruling, they would be entitled to proceed with

22 | discovery. And even in the face of the motion for summary

23 | judgment in which they --

24 | THE COURT: But they don't -- but their complaint

25 | was dismissed.

24

1              MS. GILBRIDE:  But all the plaintiffs, they had --

2              MS. KIM:  But our --

3              THE COURT:  But --

4              MS. KIM:  But our counterclaims were not dismissed.

5    The pleadings were there.  It's not like anyone was surprised.

6              THE COURT:  No, but, Ms. Kim, the whole -- I mean,

7    I think -- and I -- you know, I look at people from the bench

8    and except for you everyone in the courtroom was surprised at

9    the end of the last hearing when you stood up and said, "we

10   want to move for summary judgment on another issue."  I mean,

11   no one contemplated --

12             MS. KIM:  That's --

13             THE COURT:  -- I believe -- and certainly I

14   didn't -- that there would be any more activity in this

15   litigation beyond the ruling on discovery costs and --

16             MS. KIM:  If I may, Your Honor, it appears --

17             THE COURT:  I just don't think it's fair to say

18   that Axis's time to conduct discovery is gone.

19             MS. KIM:  I'm not saying -- Your Honor, I'm not

20   suggesting that their time to conduct discovery is gone.  I do

21   think, though, that, Your Honor, a properly briefed motion for

22   summary judgment it is their burden to show what questions of

23   fact would exist and whether discovery would address them, and

24   I think that --

25             THE COURT:  Well, no, they --

```
 1                 MS. KIM:  And --
 2                 THE COURT:  I don't agree with that.  I think we
 3      have this conference to see whether there needs to be any
 4      discovery in the first place or whether this is really a
 5      documentary case or the parties basically agree on the facts
 6      and the like, but if I believe that there's a reason to have
 7      discovery, I'm going to let people have discovery.  I just --
 8                 MS. KIM:  That's right.  And I don't object to them
 9      having discovery, Your Honor, but I do want to address this
10      issue of Mr. Klejna being the only one.  There is a reason for
11      that.  Mr. Klejna is the only one --
12                 THE COURT:  No, I'm not bothered by that.
13                 MS. KIM:  Right.  I mean, he's the only one that --
14                 THE COURT:  Axis can make a motion or if
15      somebody -- one of the other parties can make a motion on that
16      point, but I'm not going to deal with that today as to who may
17      be or may not be a necessary party on this issue.
18                 MS. KIM:  Oh, no, not a question of unnecessary --
19                 THE COURT:  That's not --
20                 MS. KIM:  -- party.  It's a question of why
21      Mr. Klejna stands differently --
22                 THE COURT:  But either way he has a settlement.
23                 MS. KIM:  He's got a settlement, exactly.  Here
24      nobody else does.
25                 THE COURT:  But that may not be at the end of the
```

26

1    day, but I understand why he's different, but that ultimately

2    may not be -- I'm not ruling today that that's a meaningful

3    distinction.  I understand why you're making the motion and I

4    understand that in that sense he is different, but I certainly

5    am not ruling out the possibility that someone may make a

6    motion to the effect that, you know, this has to involve

7    everybody or shouldn't go forward or the like.  I mean --

8              MS. KIM:  Well, Your Honor, we're happy to -- if

9    the Court will permit discovery --

10             THE COURT:  But, you know, I -- that -- I'm not

11   going to send people -- people know how to do those types of

12   motions and they can do them if they think it's appropriate.

13   You know, I'm not sure it would be, ultimately.  I don't know

14   who other than Axis would be affected parties, but --

15             MS. KIM:  Well, of course, any motion would be

16   subject to notice by everyone --

17             THE COURT:  Yes.

18             MS. KIM:  -- but I would just at this point, Your

19   Honor, since the Court believes that discovery is appropriate,

20   I would like to proceed with discovery, and then come back at

21   the conclusion of discovery, and be able to come back again to

22   request a briefing schedule if it looks appropriate at that

23   time, but that's limited to the issue of what's part and parcel

24   of this policy, Your Honor.

25             THE COURT:  Okay.  Well, on that score what I'm

27

1   going to suggest is as follows.  The same issue ultimately has

2   been raised before Judge Lynch and he's going to have to decide

3   or perhaps Judge Koeltl will decide what to do about that.

4          I would assume that Axis is not trying to start

5   fresh in this matter, since its also appealed my ruling, but

6   this issue -- when I say "fresh," start fresh with Judge Lynch

7   and ignoring the earlier rulings I made as to overlap -- the

8   first ruling -- and then the last ruling as to the defense

9   costs, but this issue is not something I've ruled on, the issue

10  you've raised as to coverage and he may or may not decide that

11  it's related.  I mean, that's -- or he may say Judge Koeltl

12  should deal with it first.

13         So what I'd like you to do is to meet and confer,

14  you and Ms. Gilbride, as to a suitable discovery schedule and

15  come back to me in sufficient time to give the district judge

16  some -- judge or judges -- some time to think about this.  They

17  may be perfectly happy to have me deal with this issue or they

18  may think at this point it's more efficient to keep it at

19  their -- you know, in the District Court's bailiwick.  I

20  understand that they're very busy and it may take them a little

21  while to rule on it and I'm trying to weigh that with a

22  plaintiff who has a settlement's desire to get on with life.

23  So I think you should come back to me and report in two weeks

24  about where things stand in the District Court and propose a

25  discovery cutoff date.

28

1          MS. KIM:  Will do, Your Honor.

2          THE COURT:  And I sincerely hope you'll agree on

3    that.  I think you will.  You're both professionals and you

4    pretty much know what sorts of documents the witnesses will

5    look at, and obviously as with any discovery schedule there's

6    going to be some play in it based upon unexpected twists and

7    turns in the discovery as far as whether a new witness gets

8    identified as a result of the depositions or a document along

9    the way.

10          So I can schedule something, although I'd be just

11    as happy to hear about it in a letter from the two of you

12    together as opposed to separate dueling letters.

13          MS. KIM:  I'm sorry?

14          THE COURT:  As opposed to dueling letters.  And, of

15    course, we have -- so that would be the 7th or 8th.  The 7th

16    would work better for me.

17          MS. GILBRIDE:  Your Honor, I have another

18    obligation on the 7th unfortunately.

19          THE COURT:  Okay.

20          MS. GILBRIDE:  I apologize.

21          MS. KIM:  Your Honor, the 8th is fine with me, Your

22    Honor.

23          MS. GILBRIDE:  It's a three-day out-of-town trip

24    actually, 7th, 8th, and 9th.

25          THE COURT:  Yeah.  No, the 8th doesn't work for me.

1    Let's do it, then, November 14th.  But again, it's the type of

2    thing that I would think you could just as easily handle in a

3    letter to the Court.

4              MS. KIM:  Yeah, why don't we report jointly by

5    letter?

6              THE COURT:  So I'm just leaving that date in case

7    you need to hear from me on some basis, but --

8              MS. KIM:  I have to -- can't do the 14th, Your

9    Honor.

10             THE COURT:  In all likelihood, it will be in the

11   form of a letter.

12             MS. KIM:  Yeah, Your Honor, I --

13             THE COURT:  Memorializing a discovery cutoff date,

14   assuming that the District Court, one of them, hasn't done

15   something about it in the meantime, which I'd also like you to

16   let me know about.  And you should copy in on that letter the

17   other parties to these -- this proceeding.

18             MS. KIM:  Your Honor, I'm actually not available

19   November 14th, but I'm actually being installed as an NAPABA

20   president in Las Vegas November 14th, 15th.

21             THE COURT:  Installed as a what?

22             MS. KIM:  The president of the National Asian

23   Pacific American Bar Association.

24             THE COURT:  Oh, okay.  I just heard the Las Vegas

25   part.  I didn't hear the --

30

1           MS. KIM:  Oh, yeah.  It happens to be in Las Vegas.
2   The convention starts that day.

3           THE COURT:  All right.

4           MS. KIM:  But I'm sure we can work it out, Your
5   Honor, by letter.

6           THE COURT:  If you need a date, then just get it
7   from my courtroom deputy.

8           MS. KIM:  I'll do that, Your Honor.

9           MS. GILBRIDE:  Your Honor, I just wanted to clarify
10  one thing for the record, because I think it's important
11  enough.  The Court is aware of this.

12          Based upon Your Honor's ruling with respect to
13  advancement of defense costs, the proposed settlement exceeds
14  our policy limits, so I just think that needs to be clear on
15  the record.

16          MS. KIM:  Well, Your Honor, I think it's also clear
17  on the record that if it turns out we're right on the coverage
18  issue and they have advanced defense costs and paid it out to
19  everybody, it turns out that our settlement was -- had priority
20  because it was submitted earlier, we believe they're on the
21  hook.

22          THE COURT:  If.

23          MS. KIM:  So, if.  That's right.  Big "if."

24          THE COURT:  So maybe that's the only issue for
25  summary judgment, for you, Ms. Gilbride?

31

1               MS. KIM:  That's right, Your Honor.

2               MS. GILBRIDE:  I tried to raise priority a few

3  times, but --

4               THE COURT:  Well --

5               MS. GILBRIDE:  -- unsuccessfully.

6               MS. KIM:  Well, Your Honor --

7               MS. GILBRIDE:  I don't think it's the final

8  obligation.  It's not actually a settlement.  It's a

9  conditional -- it's never been raised to any other party to any

10  court.

11              MS. KIM:  Well, Your Honor, we all understand this

12  is all if, if, if, but since the process starts with consent by

13  the carrier and we understand that the carrier understands the

14  risk, that's fine.  They can go ahead and pay with the

15  understanding that the risk they incur is that if they're wrong

16  on the coverage issue they're going to come --

17             THE COURT:  Well, there is -- let me just -- this

18  is --

19              MS. KIM:  We can't ignore the Court's --

20             THE COURT:  This is not going to change what I've

21  just gone through.  There is additional excess insurance,

22  right?  There is --

23              MS. KIM:  Yes, Your Honor.

24             THE COURT:  -- other excess coverage.

25             MS. KIM:  But those are subject to different

32

1    conditions and the other policies, I'm not aware of a position

2    where anyone saying their prior knowledge exclusion doesn't

3    exist unlike here.  So if it turns out that the other carriers

4    have a basis to --

5            THE COURT:  Well, I was going to say have the

6    other --

7            MS. KIM:  -- deny, but may do not.

8            THE COURT:  Have the other -- the other carriers

9    have not --

10           MS. KIM:  They've all --

11           THE COURT:  -- said anything --

12           MS. KIM:  No --

13           THE COURT:  -- as to whether they're going to pay

14   or not pay?

15           MS. KIM:  They've all denied -- well, first of

16   all --

17           THE COURT:  They've all denied coverage?

18           MS. KIM:  They've all denied coverage and, more

19   importantly, they take the position that because Axis's

20   coverage has not been exhausted, any obligation, even if it

21   existed hasn't been triggered so, you know, we're basically

22   caught between a rock and a hard place.

23           MS. GILBRIDE:  Well, so are we because we have a

24   court order that says we have to advance defense costs and we

25   can't exceed our policy limits by doing something beyond those

33

1    limits.  I'm sure you're not suggesting that we ignore the

2    Court's order.

3              MS. KIM:  No, of course, we're not suggesting that

4    they ignore the Court's order, but the Court doesn't -- the

5    Court's order doesn't say that they're entit -- that the order

6    takes them off the hook.

7              THE COURT:  I was going in a different direction,

8    which is maybe your fight is with another insurer who's maybe

9    not willing to fight with -- maybe happy not to fight with you,

10   but it sounds like they're going to fight with you, too, so --

11             MS. KIM:  They're going to fight, Your Honor,

12   and --

13             THE COURT:  And including based on provisions of

14   the Axis policy, including the prior knowledge exclusion.

15             MS. KIM:  But no, they have their own separate

16   exclusions, Your Honor.

17             THE COURT:  They're on separate --

18             MS. KIM:  They have their own separate exclusions

19   and those were a part of their policy binders, unlike the Axis

20   policy which -- where there is a dispute, I guess, as to

21   whether --

22             THE COURT:  Okay.

23             MS. KIM:  -- it was, so we --

24             THE COURT:  Well, then I'll repeat.  Maybe,

25   Ms. Gilbride, you have a potential for summary judgment, too,

34

1    because remember what that order said, is that it's meant not

2    making any ruling as to priority.  I didn't rule on your

3    motion, so that's not -- the order is not res judicata on that

4    point by any means.

5              MS. GILBRIDE:  No, I understand.  No, I --

6              THE COURT:  You know, you could make some sort of

7    motion, too, if you wanted to.

8              MS. GILBRIDE:  We'll try to be creative.

9              THE COURT:  Well, I'm not sure I recommend going

10   that far, but --

11             MS. GILBRIDE:  Okay.

12             THE COURT:  Okay.

13             MR. EISEN:  Your Honor, it's Norman Eisen,

14   Mr. Bennett's [inaudible].  Would this be an appropriate time

15   for me to raise a perhaps related question?

16             THE COURT:  Okay.

17             MR. EISEN:  We had understood based on the Court's

18   previous ruling following the other complaints in the federal

19   District Court and court's order that the -- you know, we had

20   [inaudible] permanent, I believe at the moment with this court.

21   There are -- there is, however, a counterclaim, which Axis has

22   filed against the three criminal defendants [inaudible] and we

23   had -- we're perfectly prepared to -- of course, still trying

24   to act on structuring a response date.  I thought that may be

25   due as --

35

1          THE COURT:  Let me cut through.  Are you going

2    forward with the counterclaim or --

3          MS. GILBRIDE:  No, Your Honor.  I apologize if

4    Mr. Eisen didn't get a copy of the letter, but we've agreed to

5    voluntarily dismiss the counterclaims based on the Court's

6    prior rulings.

7          THE COURT:  Okay.  Did you hear --

8          MS. GILBRIDE:  So we are --

9          THE COURT:  Did you hear that, Mr. Eisen?

10          MR. EISEN:  I did and it is -- Ms. Gilbride, that's

11   [inaudible] did not get a copy of the letter or if I did it

12   hasn't made its way to me, so my understanding, then, is that

13   once there's no -- nothing left for us to plead in response to

14   those Axis claims in Bankruptcy Court, I think it's

15   [inaudible].

16          MS. GILBRIDE:  Yes, that's correct.

17          MR. EISEN:  Thanks.

18          THE COURT:  Okay.  All right.  Anything else?

19   Okay.  Thank you.

20          MR. EISEN:  Okay.

21          MS. GILBRIDE:  Thank you, Your Honor.

22          (Proceedings concluded at 3:06 p.m.)

23                    *  *  *  *  *  *

24

25

36

1                          * * * * * *

2              I certify that the foregoing is a court transcript

3      from an electronic sound recording of the proceedings in the

4      above-entitled matter, except where, as indicated, the Court

5      has modified the transcript.

6

7

8                              _____

9                                      Ruth Ann Hager

10     Dated:   October 25, 2007

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25