# EXHIBIT C

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. ● Washington, D.C. 20006-1040 ● *p* (202) 662-2000 *f* (202) 662-2190

**GARY V. DIXON**
DIRECT DIAL: (202) 662-2003
EMAIL: GDIXON@RDBLAW.COM

**LESLIE S. AHARI**
DIRECT DIAL: (202) 662-2036
EMAIL: LAHARI@RDBLAW.COM

November 10, 2005

**VIA FACSIMILE AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

| Re: | Insured: | Refco, Inc. |
|-----|----------|-------------|
| | Policy No.: | 24-MGU-05-A10821 |
| | Claimants: | Various |

Dear Andrea:

This firm represents U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 (the "Policy") issued to Refco, Inc. for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds, including the individual Insured Persons, under the Policy. To the extent that you are not acting as the authorized representative for any of the Insureds, we request that you forward a copy of this letter to that Insured or his or her insurance representative, and advise us with whom we should communicate in the future concerning this matter.

By our October 27, 2005 letter, U.S. Specialty acknowledged receipt of and generally reserved its rights with respect to the complaints filed in the following twelve lawsuits: (1) *Glaubach v. Refco, Inc., et al.*, No. 05 CV 8692 (S.D.N.Y.); (2) *Frontpoint Financial Services, Inc. v. Refco, Inc., et al.*, No. 05 CV 8663 (S.D.N.Y.); (3) *Lieber v. Refco, Inc., et al.*, No. 05 CV 8667 (S.D.N.Y.); (4) *Sandra Weiss v. Refco, Inc., et al.*, No. 05 CV 8691 (S.D.N.Y.); (5) *Mehta v. Bennett, et al.*, No. 05 CV 8748 (S.D.N.Y.); (6) *Wakefield v. Refco, Inc., et al.*, No. 05 CV 8742 (S.D.N.Y.); (7) *Baker v. Bennett, et al.*, No. 05 CV 8923 (S.D.N.Y.); (8) *Becker v. Refco, Inc., et al.*, No. 05 CV 8929 (S.D.N.Y.); (9) *Nathanson v. Bennett, et al.*, No. 05 CV 8926 (S.D.N.Y.); (10) *United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.); (11) *American Financial International Group – Asia, LLC v. Refco, Inc., et al.*, No. 05 CV 8988 (S.D.N.Y.); and (12) *Mettupatti v. Bennett, et al.*, No. 05 CV 9048 (S.D.N.Y.). Following our October 27 letter, U.S. Specialty received the complaint filed in *Todd Weiss v. Bennett, et al.*, No. 05 CV 9126 (S.D.N.Y.). On U.S. Specialty's behalf, this will discuss potential coverage for these matters under the Policy. For the reasons set forth below, U.S. Specialty is proceeding

WASHINGTON ● IRVINE ● SAN DIEGO ● CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 2

subject to a full reservation of its rights to deny and/or limit coverage under the Policy and applicable law with respect to all of these matters.

## I.  The Litigation

### A.  The Securities Class Action Lawsuits

Eleven of the thirteen suits listed above (*Glaubach, Frontpoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, American Financial, Mettupatti,* and *Todd Weiss*) are purported shareholder class actions alleging violations of the securities laws. All of the suits were filed in October 2005 in the federal district court for the Southern District of New York.

Several of the shareholder class action complaints purport to sue on behalf of the class of all purchasers of Refco's publicly traded common stock, while other of the complaints seek to sue on behalf of the purchasers of all of Refco's securities. The alleged class periods in the complaints differ somewhat, with all alleging a beginning class period of August 11, 2005, and the ends of the class periods varying between October 7 and October 18, 2005. Refco, Inc. is named as a defendant in several of the complaints. One or more of the following individuals, who are identified as Refco directors and/or officers, also are named in some or all of the lawsuits: Philip Bennett, Gerald Sherer, Leo Brietman, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, Nathan Gantcher, and Scott Schoen. Various other defendants are named in some of the complaints, including Grant Thornton, Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, Merrill Lynch Pierce Fenner & Smith, Deutsche Bank Securities, J.P. Morgan Securities, Liberty Corner Capital, Sandler O'Neill & Partners, HSBC Securities (USA) Inc., William Blair & Co., Harris Nesbitt Corp., CMG Institutional Trading, Samuel A. Ramirez & Co., Muriel Siebert & Co., The Williams Capital Group, Utendahl Capital Group, Refco Group Holdings Inc., and Refco F/X Associates, LLC.

The class action complaints generally allege that on August 11, 2005, Refco completed its IPO, selling 26.5 million shares of common stock at $22/share for proceeds totaling $538 million. At that time, Mr. Bennett and other Refco insiders allegedly sold 5.375 shares in the IPO, and netted $145 million in personal gross proceeds. Mr. Bennett also allegedly gained from a provision that allowed him and other insiders to divide up the proceeds when the underwriters exercised options to purchase additional shares. In connection with the IPO, Refco filed a Form S-1 Registration Statement and Prospectus in August 2005.

Plaintiffs allege that Refco's Registration Statement and Prospectus were materially false and misleading. The complaints allege that on October 10, 2005, Refco announced that it had discovered a $430 million receivable owed to it by an entity controlled by Mr. Bennett, that Mr. Bennett was stepping down as Refco's Chief Executive Officer, and that Refco's financial statements issued since 2002 could no longer be relied on. By the market's close on October 10, 2005, Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60. The common

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 3

stock fell further on October 11, 2005, after a five hour trading halt on the New York Stock Exchange was lifted, following the additional disclosure that the $430 million receivable was largely comprised of uncollectible debts dating back to 1998. Refco's shares closed at $13.85/share on October 11, 2005. On October 12, 2005, *The Wall Street Journal* reported that an investment firm controlled by Mr. Bennett had paid Liberty Corner Capital to help him hide that he owed Refco hundreds of millions of dollars, and that the Securities Exchange Commission ("SEC") had launched an investigation. That same day, the United States Attorney announced that Mr. Bennett had been arrested and indicted for securities fraud in connection with the IPO. On October 12, 2005, the stock fell further to close at $10.85/share. On October 13, 2005, trading in Refco's stock was delayed at the opening of the market. Later that morning, Refco announced that it had hired advisors and imposed a 15 day moratorium on customer withdrawals at Refco Capital Markets. When the NYSE again halted trading, Refco's stock was trading at $7.90/share. Then, on October 18, 2005, Refco filed for Chapter 11 bankruptcy protection after it negotiated an agreement to sell its primary business to J.C. Flowers & Co.

The securities class action complaints allege violations by the various defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The complaints seek class certification, unspecified damages, and attorneys' fees and costs.

## B. The Shareholder Derivative Action

The *Mehta* lawsuit is a shareholder derivative action filed on October 14, 2005 in federal court in New York. The *Mehta* complaint names as defendants eleven individuals identified as directors and/or offices of Refco: Philip Bennett, William Sexton, Gerald Sherer, Joseph Murphy, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, and Scott Schoen. The *Mehta* complaint also names as defendants Credit Suisse First Boston, Goldman Sachs, Banc of America Securities, Deutsche Bank, J.P. Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, HSBC and Thomas H. Lee Partners. The *Mehta* complaint is based generally on the same allegations contained in the securities class action complaints. It alleges that demand on Refco's board to file suit against the defendants on behalf of the company would be futile. The complaint contains six counts: (1) for breach of fiduciary duty against the individual defendants and Thomas H. Lee Partners; (2) abuse of control against the individual defendants and Thomas H. Lee Partners; (3) gross mismanagement against the individual defendants and Thomas H. Lee Partners; (4) waste of corporate assets against the individual defendants and Thomas H. Lee Partners; (5) unjust enrichment against the individual defendants and Thomas H. Lee Partners; and (6) aiding and abetting against the IPO Underwriter Defendants. The complaint seeks unspecified damages, equitable and/or injunctive relief, the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, restitution, disgorgement, corporate reforms, enhanced shareholder representation on the board of directors, attorneys' fees and costs.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 4

## C. The Criminal Proceedings

On October 12, 2005, the United States of America filed a criminal complaint against Mr. Bennett in federal court in New York, alleging one count for violation of the federal securities laws, 15 U.S.C. §78j(b). *See United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.).

The six page complaint alleges that from at least in or about 2004 up to October 2005, Mr. Bennett hid from investors in the August 2005 IPO the existence of hundreds of millions of dollars of related party transactions between Refco and Refco Group Holdings, Inc. ("RGHI"), a company controlled by Mr. Bennett. The complaint alleges that Mr. Bennett caused Refco to file a false and fraudulent S-1 Registration Statement with the SEC in August 2005 in connection with the IPO. Specifically, the S-1, which contained Refco's audited financial statements as of February 28, 2005 and unaudited financial statements as of May 31, 2005, did not disclose hundreds of millions of dollars of transactions with and debts owed to Refco by RGHI. The complaint asserts that Refco's books show a "multi-hundred million dollar receivable" from RGHI throughout 2005, including in late February 2005, except for quarter-end periods. In this regard, in February 2005, Mr. Bennett allegedly caused Refco to engage in a series of transactions designed to disguise the related-party nature of this $300 million-plus debt owed to Refco by RGHI by temporarily paying off the debt and transferring it from RGHI to another entity unrelated to Mr. Bennett. The complaint alleges that this temporary re-positioning of debt was carried out so that the debt would not appear to be owed by RGHI over Refco's February 28, 2005 fiscal-year end.

More particularly, the complaint alleges that on February 23, 2005, Refco Capital Markets, a subsidiary of Refco, loaned $335 million to a Refco customer unrelated to Mr. Bennett, to be repaid on March 8, 2005. On the same day, the customer loaned $335 million to RGHI, with a March 8, 2005 repayment date. The loan agreement allegedly was executed by Mr. Bennett on behalf of RGHI, and the interest rate was 75 basis points higher than the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit. Also on February 23, 2005, Mr. Bennett allegedly signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., providing assurance that should RGHI default, Refco Group Ltd. would make the customer whole. The $335 million loan to RGHI was used to pay down a portion of the existing RGHI debt to Refco. The result of these transactions was to substitute a $335 million debt to Refco by the customer for a $335 million debt by RGHI. The transactions then were unwound on March 8, 2005, after the end of Refco's fiscal year on February 28, 2005. The complaint further alleges that similar transactions took place at the close of the quarters ended May 31, 2005, November 30, 2004, and August 31, 2004.

Finally, the government's complaint asserts that on October 10, 2005, Refco issued a press release announcing that it had discovered a $430 million debt owed by an entity controlled by Mr. Bennett, and that Mr. Bennett had repaid the entire sum to Refco that day. Following this

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 5

announcement, the market price of Refco's common stock plummeted from its October 7, 2005 closing price of $28.56/share to $13.85/share, its closing price on October 11, 2005, resulting in a market capitalization loss of over $1 billion.

## II.  Coverage Discussion

U.S. Specialty's Policy provides a $10 million maximum aggregate limit of liability, inclusive of **Defense Costs**. *See* Policy Declarations Item 3; Policy Conditions (A)(1), (2). **Defense Costs** are a part of, and not in addition to, the Policy's limit of liability and the payment of **Defense Costs** reduces and may totally exhaust the limit of liability. The Policy provides for a $0 retention under Insuring Agreement (A), and a $500,000 retention applicable to **Securities Claims** under Insuring Agreements (B)(1) and (B)(2), which applies to **Defense Costs**. *See* Policy Declarations Item 4, as amended by Endorsement No. 12; Policy Conditions (A)(2), (4), (5). Pursuant to Policy Condition (A)(3), the $500,000 retention stated in Declarations Item 4(b) applies to **Loss**, including **Defense Costs**, which the insured **Company** is required to pay as indemnification or advancement to or on behalf of the **Insured Persons**, whether or not such **Loss** is actually paid, unless the insured **Company** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency.

Based on the limited information presently available, U.S. Specialty has undertaken a preliminary review of these matters to identify potential coverage issues for the Insureds' guidance in proceeding. The discussion below of the coverage potentially available under the Policy is not intended to be exhaustive or exclusive, and U.S. Specialty reserves the right to raise other defenses to coverage under the Policy and applicable law as additional information becomes available. Please note further that U.S. Specialty's review of these matters necessarily is based on the unsubstantiated allegations in the complaints, and that U.S. Specialty is not expressing any view on the truth of such allegations. U.S. Specialty also invites the Insureds to provide for its consideration any additional information or documentation that they believe may be relevant to the coverage issues discussed below.

The Policy contains four Insuring Agreements potentially applicable here, subject to all of the Policy's other terms and conditions.[1] First, under Insuring Agreement A, U.S. Specialty will pay on behalf of the **Insured Persons** **Loss** arising from **Claims** first made during the **Policy Period** against them for **Wrongful Acts**, except and to the extent that the **Company** (defined by Policy Definition (C) to mean Refco Inc. or any **Subsidiary**) has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement. Second, Insuring Agreement B(1) provides that U.S. Specialty will pay to or on behalf of the **Company** **Loss** arising from **Claims** first made during the **Policy Period** against **Insured Persons** for **Wrongful Acts** if the **Company** has paid such **Loss** to or on their behalf as indemnification or advancement. Third, Insuring Agreement B(2) states that U.S. Specialty will pay to or on behalf

---

[1] Policy Endorsement No. 11 adds a fifth Insuring Agreement in connection with **Derivative Demands**, which is not applicable here.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 7

Second, the Policy defines "Insured Persons" to mean any past, present or future
director or officer of the Company; employees of the Company but only with respect to
Securities Claims; the Insurance Manager and General Counsel; and Employed Lawyers. *See*
Policy Definitions (F), as amended by Endorsement Nos. 3, 5. U.S. Specialty requests that the
insureds verify that Philip Bennett, William Sexton, Gerald Sherer, Joseph Murphy, Leo
Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, and
Scott Schoen each is or was a director, officer, employee, insurance manager, general counsel or
employed lawyer of Refco. Pending receipt of such verification, U.S. Specialty reserves the
right to deny coverage for any person who is not an Insured Person under the Policy.

Third, the only entities that are Insureds under the Policy are Refco Inc. and its
Subsidiaries. *See* Policy Definitions (E), (H). As stated more fully in the Policy, "Subsidiary"
means an entity in which Refco Inc. owns more than 50% of the issued and outstanding
securities representing the right to vote for the election of the entity's directors, either directly or
indirectly through one or more other Subsidiaries. *See* Policy Definitions (O). U.S. Specialty
requests that Refco advise us whether Refco Group Holdings Inc. and/or Refco F/X Associates
LLC are Subsidiaries of Refco – that is, does Refco owns more than 50% of the issued and
outstanding securities representing the right to vote for those entities' directors. Pending receipt
and review of this information, U.S. Specialty reserves the right to deny coverage as to Refco
Group Holdings and Refco F/X Associates LLC. In addition, and other than Refco Inc., the
Policy does not provide coverage for any of the other entities named as defendants in the
lawsuits, including Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America
Securities, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith, Sandler O'Neill &
Partners, Thomas H. Lee Partners, Grant Thornton, Deutsche Bank Securities, J.P. Morgan, J.P.
Morgan Securities, Liberty Corner Capital, HSBC Securities (USA) Inc., William Blair & Co.,
Harris Nesbitt Corp., CMG Institutional Trading, Samuel A. Ramirez & Co., Muriel Siebert &
Co., The Williams Capital Group, and Utendahl Capital Group.

Fourth, potential coverage under all of the Insuring Agreements is limited to "Loss,"
which the Policy defines as Defense Costs, and any damages, settlements, judgments, pre-
judgment interest, post-judgment interest or other amounts (including punitive or exemplary
damages and the multiplied portion of a multiplied damage aware if and where insurable by law),
that the Insureds are legally obligated to pay for a covered Claim or Securities Claim.
However, "Loss" does not include wages, fines, taxes or penalties, nor matters which are
uninsurable under the law pursuant to which the Policy is construed. *See* Policy Definitions (G),
as amended by Endorsement Nos. 4, 15. In this regard, U.S. Specialty reserves its right to deny
coverage for any amount that does not constitute "Loss" under the Policy or is uninsurable as a
matter of law, including but not limited to amounts paid as restitution or disgorgement, amounts
attributable to intentional wrongdoing and/or intentional harm, and taxes, fines or penalties. U.S.
Specialty further reserves the right to deny coverage for punitive, exemplary or multiplied
damages if uninsurable under the law of the jurisdiction applicable to the Claim.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 8

Fifth, "Wrongful Act" means, in pertinent part, any actual or alleged act, error, misstatement, misleading statement, omission or breach of duty by (a) any **Insured Person** while acting in his or her capacity as such, including in an **Outside Capacity**; (b) with respect to **Securities Claims**, by the **Company** or the **Controlling Shareholder** in his capacity as such or by reason of his status as such. *See* Policy Definitions (P), as amended by Endorsement No. 15. Thus, there is no coverage for **Loss** resulting from actual or alleged wrongful acts undertaken in an Insured's personal capacity or other than undertaken in an insured capacity as set forth above. In this regard, and by way of example, the various complaints allege that certain of the defendants engaged in trading of their personally held Refco shares and engaged in other transactions in which they had a financial interest, which may result in damages, settlements and/or defense expenses that are excluded from coverage.

Sixth, the Policy contains various exclusions to coverage, including the profit and fraud exclusions. Specifically, Exclusions A and B provide that U.S. Specialty will not be liable to make payment for **Loss** in connection with a **Claim** –

(A) arising out of, based upon or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, that this Exclusion (A) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** gained such a profit or advantage;

(B) arising out of, based upon or attributable to the commission by any **Insured** of any criminal or deliberately fraudulent or dishonest act; provided, that this Exclusion (B) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

Policy Exclusions (A), (B). The Policy further provides, for purposes of determining the applicability of the exclusions, that the **Wrongful Act** of any **Insured Person** will not be imputed to other **Insured Persons** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Act**. Further, except for **Wrongful Acts** of the **Company's** chairman of the board, chief executive officer, president, chief financial officer or general counsel, no **Wrongful Act** of an **Insured Person** will be imputed to the **Company**. In this case, the complaints expressly allege that various of the defendants committed criminal, fraudulent and/or dishonest acts, and further allege that certain of the defendants gained a profit or advantage to which they were not entitled. U.S. Specialty therefore reserves the right to deny coverage as to any **Insured Person** finally adjudicated to have engaged in conduct within the scope of Exclusions (A) and (B). U.S. Specialty further reserves the right to deny coverage pursuant to these exclusions with respect to other **Insured Persons** who had actual knowledge or participated in such conduct, and with respect to Refco, if any of the designated executive officers engaged in such conduct.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 9

Seventh, Policy Exclusion (F) provides that U.S. Specialty will not be liable to make payment for Loss in connection with a Claim brought by or on behalf of, or in the name or right of, the Company, whether directly or derivatively, or any Insured Person or Controlling Shareholder, subject to certain exceptions, including the exception for a Claim that is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Company or any Insured Person. Policy Exclusions (F). If it is determined that the *Mehta* action, or any other derivative claim, is not brought or maintained independently of any insured, there would be no coverage under the Policy.

Eighth, Endorsement No. 14 to the Policy provides that U.S. Specialty will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to certain excluded events, that is, a Wells Notice and SEC Investigation. Pending further factual development in the litigation, U.S. Specialty reserves its right to deny or limit coverage pursuant to this exclusion.

Ninth, U.S. Specialty calls to the insureds' attention the Policy's Other Insurance clause, which provides that coverage thereunder is excess to any other valid and collectible insurance. *See* Policy Conditions (G). Please provide us with copies of any other insurance policies which potentially may provide coverage for the matters about which notice has been provided, and all correspondence exchanged with any insurers concerning coverage for this matter. Without limitation of the foregoing, please provide information concerning insurance for the Refco directors affiliated with Thomas H. Lee Partners.

Tenth, under Policy Condition (D)(3), an allocation may be required if Loss covered by the Policy and loss not covered by the Policy are both incurred in connection with a single Claim, either because a Claim contains both covered and uncovered matters, or because a Claim is made both against Insured Persons (or, with respect to Securities Claims, against Insureds) and against others not insured. U.S. Specialty reserves its right with respect to requiring such an allocation in connection with the defense or settlement of any Claim and to deny coverage for any amount allocated to uncovered matters or uncovered persons or entities.

Without prejudice to the foregoing reservations of rights, please note that under the Policy, it is the duty of the Insureds, and not of U.S. Specialty, to defend Claims. *See* Policy Condition (D)(1). No Insured may incur any Defense Costs or admit or assume liability for, enter into any settlement agreement, stipulate to any judgment, or without U.S. Specialty's consent. Such consent will not be unreasonably withheld, provided that U.S. Specialty is entitled to effectively associate in the defense and the negotiation of any settlement of a Claim. *Id.*

In this regard, please advise us of the identities of the law firms and hourly billing rates of each of the assigned attorneys who will be representing the Insureds in the lawsuits. After receipt and review of this information, U.S. Specialty will advise whether it consents to the proposed defense arrangements. Please note further that "Defense Costs" is means "reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 10

of a **Claim** against an **Insured Person**" or a **Securities Claim** with respect to Refco, but excludes salaries, wages, benefits or overhead expenses of directors, officers or employees of Refco. *See* Policy Definitions (D), as amended by Endorsement No. 1.

Subject to all of the Policy's terms and conditions, U.S. Specialty will pay covered **Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by U.S. Specialty are not covered under the Policy, the **Insureds** agree to repay such non-covered **Defense Costs** to U.S. Specialty. *See* Policy Conditions (D)(1). Because Refco currently is in bankruptcy, before making any payment under the Policy, U.S. Specialty will seek a ruling from the bankruptcy court to the effect that the automatic stay provision, 11 U.S.C. § 362, either is not applicable to the Policy and its proceeds or, if the stay is deemed applicable, granting relief from the stay in order to permit the advancement of **Defense Costs** under the Policy. Before making advancement, U.S. Specialty also will request the Insureds to execute an advancement agreement and undertaking of repayment.

As noted above, the Policy's maximum aggregate limit of liability is $10 million. **Defense Costs** are a part of the Limit of Liability and the payment thereof by U.S. Specialty will reduce the Limit of Liability. Policy Condition (A)(1). After payment of its Limit of Liability, U.S. Specialty shall have no further obligation under the Policy. In this case, it is possible that the $10 million Limit of Liability will be insufficient to satisfy the Insureds' **Loss**, including **Defense Costs**, in the matters about which notice has been provided, and the **Insureds** may incur loss in excess of the Limit of Liability. *Please let us know immediately if Refco or any Insured Person objects to U.S. Specialty making payments for Defense Costs for any of the Insureds under the Policy, which payments will deplete the available Limit of Liability.*

With respect to billing, it will be necessary to provide to us copies of all of defense counsel's statements for services rendered. Defense counsel's bills should specify the time spent on each of the tasks performed on a daily basis, the hourly rates being applied, and itemize the expenses incurred. Block billing is not acceptable.

U.S. Specialty requests that we be kept informed of all significant developments in the litigation, and provided on a prompt basis with all substantive pleadings, orders and briefs filed in the lawsuits. U.S. Specialty wishes to exercise its right under the Policy to effectively associate in the defense and the negotiation of any settlement of a **Claim** pursuant to Policy Condition (D)(1).

Please direct all further communications concerning this matter to us, except for any notices of new claims, which should be sent to U.S. Specialty as specified in Item 6 of the Policy Declarations. We request that you also provide us with a copy of any such notice and new complaints in order to expedite our review of such materials.

This letter is not intended to be exhaustive or exclusive with respect to the defenses to coverage that U.S. Specialty may assert, and we will supplement this letter concerning U.S. Specialty's views on coverage as additional information becomes available or as developments warrant. U.S. Specialty also appreciates that the insureds likewise reserve their rights. Please

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 11

feel free to contact us if you have any questions concerning the Policy or this letter. We look forward to working cooperatively with you and defense counsel in these matters.

Sincerely,

ROSS, DIXON & BELL, LLP

By _____

Gary V. Dixon
Leslie S. Ahari

cc:    R. Damian Brew, Esq. (by email)
Wayne E. Borgeest, Esq. (by email)
Daniel J. Standish, Esq. (by email)
John D. Hughes, Esq. (by email)
Cecilia W. Kaiser, Esq. (by email)
Barbara Seymour, Esq. (by email)
John Tolan, Esq. (by email)

327793 v 1

# ROSS, DIXON & BELL, LLP

**GARY V. DIXON**
DIRECT DIAL:  (202) 662-2003
EMAIL: GDIXON@RDBLAW.COM

2001 K Street, N.W. • Washington, D.C. 20006-1040 • *p* (202) 662-2000  *f* (202) 662-2190

**LESLIE S. AHARI**
DIRECT DIAL:  (202) 662-2036
EMAIL: LAHARI@RDBLAW.COM

November 10, 2005

**VIA FACSIMILE AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

　　　　Re:　**Insured:**　　Refco, Inc.
　　　　　　**Policy No.:**　24-MGU-05-A10821
　　　　　　**Claimants:**　*Banseco Holding, et al. v. Refco, Inc., et al.; Miura Financial*
　　　　　　　　　　　　　*Services v. Refco, Inc., et al.; Multiplicas Casa De Bolsa v.*
　　　　　　　　　　　　　*Refco Inc., et al.*

Dear Andrea:

　　　　This firm represents U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 issued to Refco, Inc. for the claims-made period August 11, 2005 to August 11, 2006 (the "Policy"). We are directing this letter to you as the authorized insurance representative for all of the Insureds. To the extent that you are not acting as the authorized representative for any of the Insureds, we request that you forward a copy of this letter to that Insured or his or her insurance representative, and advise us with whom we should communicate in the future concerning this matter.

　　　　On U.S. Specialty's behalf, this will acknowledge receipt of Marsh's October 28, 2005 letter, enclosing the complaints filed in the following three matters: (1) *Banseco Holding C.A., et al. v. Refco, Inc., et al.*, Index No. 05603681 (Supreme Court, New York Cty., NY); (2) *Miura Financial Services v. Refco, Inc., et al.*, Index No. 05603682 (Supreme Court, New York Cty., NY); and (3) *Multiplicas Casa De Bolsa v. Refco, Inc., et al.*, Index No. 05603683 (Supreme Court, New York Cty., NY). For the reasons detailed below, U.S. Specialty must respectfully deny coverage for these lawsuits.

## I.　　The Lawsuits

　　　　The complaints in the *Banseco Holding, Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits all were filed on October 17, 2005 in New York Supreme Court. Refco Inc. and Refco Capital Markets, Ltd. – referred to collectively in the complaints as "Refco" – are the only two

WASHINGTON • IRVINE • SAN DIEGO • CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 2

named defendants in each of the three lawsuits. The plaintiffs in each of the lawsuits identify themselves as owners of brokerage accounts with Refco.

The three complaints, which are substantially similar to each other, allege that pursuant to separate brokerage agreements between plaintiffs and Refco, Refco was obligated to invest, transfer and return funds and investments in plaintiffs' accounts as instructed by plaintiffs. Each of the complaints alleges that on or about October 12, 2005, plaintiffs instructed Refco to transfer the funds in their accounts to other institutions, but that Refco failed and/or refused to do so, and instead announced a "moratorium" on account withdrawals. Each of the complaints contains four causes of action: (1) breach of contract; (2) conversion; (3) imposition of a constructive trust; and (4) unjust enrichment. Plaintiffs each seek compensatory damages in excess of the amounts in their respective Refco accounts (which vary from $2.5 million to $50 million), the imposition of a constructive trust over the funds in the accounts, punitive damages in excess of $100 million, attorneys' fees and costs, and pre-judgment interest.

## II.  Coverage Discussion

The Policy provides a $10 million maximum aggregate limit of liability, inclusive of Defense Costs. U.S. Specialty has reviewed the lawsuits for potential coverage under the Policy based on the information that the insureds have made available to it. Based on that information and as explained below, U.S. Specialty is denying coverage for two reasons. First, potential coverage for claims asserted against Refco under the Policy is limited to "Securities Claims," and none of the three lawsuits is a Securities Claim. Second, even assuming the lawsuits were potentially within the scope of any of the Insuring Agreements, coverage would be excluded by the Policy's Errors and Omissions Exclusion.

The Policy contains five Insuring Agreements which address the scope of potential coverage thereunder, subject to all of the Policy's terms, conditions, and exclusions. Here, none of the Insuring Agreements is implicated by the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions, and thus the suits are not within the scope of potential coverage under the Policy.

First, Insuring Agreements (A) and (B)(1) are not implicated here because no individual director, officer or employee is named as a defendant in the three suits. Specifically, Insuring Agreement (A) provides that U.S. Specialty will pay on behalf of "Insured Persons" Loss arising from Claims first made during the Policy Period against them for Wrongful Acts, except and to the extent that the Company (defined by Policy Definitions (C) to mean Refco Inc. and any Subsidiary) has paid such Loss on their behalf as indemnification or advancement. Insuring Agreement B(1) states that U.S. Specialty will pay to or on behalf of the Company Loss arising from Claims first made during the Policy Period against the "Insured Persons" for Wrongful Acts if the Company has paid such Loss to or on their behalf as indemnification or advancement. *See* Policy Insuring Agreements (A), (B)(1). In this regard, the Policy defines

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 3

"**Insured Person**" to mean any past, present or future director or officer of the **Company**; employees of the **Company** with respect to Securities Claims and Claims for **Employment Practices Wrongful Acts** only; and certain other designated individual persons. *See Policy* Definitions (F), as amended by Endorsement Nos. 2 ¶ (2); 3; 5 ¶ (1). Thus, neither Insuring Agreement (A) or (B)(1) is applicable to the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions because no **Insured Persons** are named as defendants in any of the suits.

Second, Insuring Agreement (B)(2) provides that U.S. Specialty will pay to or on behalf of the **Company** Loss arising from "**Securities Claims**" first made during the **Policy Period** against the Company for **Wrongful Acts**. *See* Policy Insuring Agreements (B)(2). The Policy defines "**Securities Claim**" to mean a Claim which —

    (1)    is brought by or on behalf of one or more securities holders of the **Company** in their capacity as such, or

    (2)    arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

Policy Definitions (N). Here, the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions are not "**Securities Claims**" as defined by the Policy because the suits were neither brought by or on behalf of securities holders of Refco or a Subsidiary, nor arise from the purchase or sale of securities issued by Refco or a **Subsidiary**. Therefore, Insuring Agreement (B)(2) is inapplicable to the lawsuits.

Third, pursuant to Endorsement No. 11, U.S. Specialty will pay to or on behalf of the **Company** all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing during the Policy. "**Derivative Demand**" means a written demand by one or more shareholders of the **Company** made upon its Board of Directors to bring a civil proceeding against an **Insured Person** for a **Wrongful Act**. *See* Policy Endorsement No. 11. This Insuring Agreement is not implicated here because the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions do not constitute **Derivative Demands**.

Fourth, pursuant to Endorsement No. 15, U.S. Specialty will pay to or on behalf of the **Controlling Shareholder** (defined to mean Philip Bennett) Loss arising from **Securities Claim** first made during the **Policy Period** against such **Controlling Shareholder** for **Wrongful Acts** so long as one or more **Insured Persons** or the **Company** are co-defendants in such Securities **Claim**. This Insuring Agreement also is not implicated here because the suits are not Securities **Claims** and Mr. Bennett is not a named defendant in any event.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 4

Even assuming arguendo that the *Banseco Holding*, *Miura Financial* or *Multiplicas Casa De Bolsa* actions were within the scope of any of the Policy's Insuring Agreements (which they are not), coverage would be excluded in any event by the Errors and Omissions Exclusion, which provides:

> In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the **Company** or by any **Insured Person**, any service for others for a fee; provided, that this exclusion will not apply to a **Claim** against an **Insured Person** for a **Wrongful Act** in connection with the management or supervision of the **Company** or any division or group therein.

Policy Endorsement No. 6. Therefore, even assuming coverage otherwise was potentially available, the Errors and Omissions exclusion would bar coverage here because each of the three lawsuits arises out of, is based upon, and is attributable to the rendering or failure to render services to others for a fee.

Based on the foregoing, U.S. Specialty is denying coverage for the *Banseco Holding*, *Miura Financial* or *Multiplicas Casa De Bolsa* actions. Without prejudice to its denial of coverage, U.S. Specialty further reserves its right to raise other Policy terms and conditions as defenses to coverage.

Please let us know if the insureds have any question concerning this matter.

Sincerely,

ROSS, DIXON & BELL, LLP

By _____
     Gary V. Dixon
     Leslie S. Ahari

cc:    R. Damian Brew (by email)
       Wayne E. Borgeest (by email)
       Daniel J. Standish (by email)
       John D. Hughes (by email)
       Cecilia W. Kaiser (by email)
       Barbara Seymour (by email)
       John Tolan (by email)

328223 v 1

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. • Washington, D.C. 20006-1040 • *p* (202) 662-2000 *f* (202) 662-2190

**GARY V. DIXON**
DIRECT DIAL:   (202) 662-2003
EMAIL·  GDIXON@RDBLAW.COM

**LESLIE S. AHARI**
DIRECT DIAL   (202) 662-2036
EMAIL  LAHARI@RDBLAW COM

October 10, 2006

<u>**VIA FACSIMILE AND CERTIFIED**</u>
<u>**MAIL, RETURN RECEIPT REQUESTED**</u>

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

| | | |
|---|---|---|
| **Re:** | **Insured:** | **Refco, Inc.** |
| | **Policy No.:** | **24-MGU-05-A10821** |
| | **Matter:** | **In Re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation** |

Dear Andrea:

As indicated in our previous letters, we represent U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 (the "Policy") issued to Refco, Inc. ("Refco") for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for the Insureds under the Policy. We are forwarding copies of this letter to counsel for those individual Insureds involved in the above-referenced matter about whom we are aware.

On U.S. Specialty's behalf, this will acknowledge receipt of the Consolidated Amended Complaint filed on September 5, 2006 in *In re Refco Capital Markets Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (GEL) (S.D.N.Y.) (the "*RCM Brokerage Customer* Action"). We understand that the *RCM Brokerage Customer* Action previously was captioned *Global Management Worldwide Limited v. Bennett, et al.*, which was one of the matters discussed in our March 28, 2006 letter to you. U.S. Specialty continues to proceed subject to a full reservation of its rights to deny and/or limit coverage under the Policy and applicable law with respect to this suit and all of the matters about which it has received notice.

Our March 28, 2006 letter to you discussed the January 26, 2006 complaint filed by Global Management Worldwide Limited. A copy of that letter is enclosed for your convenience. Based on the information we have received, we understand that Global Management subsequently was appointed as lead plaintiff in the case, and on September 5, 2006, filed the Consolidated Amended Complaint. The Consolidated Amended Complaint was filed on behalf

---

WASHINGTON • IRVINE • SAN DIEGO • CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
October 10, 2006
Page 2

of a class of all securities brokerage customers of Refco Capital Markets LTD. ("RCM") who at
any time from October 17, 2000 to October 17, 2005 placed securities or held securities at RCM
and/or Refco Securities LLC ("RSL") directly or indirectly, as custodian or broker for safe-
keeping, trading or other purposes, and continued to hold positions with RCM on October 17,
2006 or thereafter. The complaint names the following eight directors and officers as
defendants: Mr. Bennett, Mr. Sherer, Mr. Sexton, Mr. Maggio, Mr. Murphy, Mr. Silverman, Mr.
Trosten and Mr. Grant. The complaint also names Thomas H. Lee Partners, L.P. and ten of its
affiliated entities as defendants. Lastly, the complaint names RSL and Grant Thornton as
defendants. Thus, compared to the January 2006 complaint, the amended complaint has dropped
Messrs. Breitman, Harkins, O'Kelley, Gantcher, Klejna and Rotkowitz as defendants, and added
Messrs. Grant and Silverman.

The Consolidated Amended Complaint generally alleges that the suit arises out of an
undisclosed fraudulent scheme to steal billions of dollars in RCM customer assets. The alleged
purpose of the scheme was to conceal undisclosed losses at Refco and to fund Refco's
operations. In that regard, plaintiffs allege that dating back to the late 1990's, certain Refco
customers sustained large trading losses and were unable to pay their debts to Refco. Plaintiffs
claim that Messrs. Bennett and Grant devised a scheme to hide these uncollectible debts and
thereby deceive RCM's customers as to the true financial condition of Refco and RCM. Messrs.
Bennett and Grant allegedly sought to hide the bad debt in order to monetize their equity
interests in Refco.

Plaintiffs claim that the scheme to defraud RCM's brokerage customers had two
components. First, plaintiffs allege that from 1999 to 2005, there were a series of fraudulent
"round robin" transactions between Refco and Refco Group Holdings Inc. ("RGHI"), whereby
RGHI's receivables owed to Refco were temporarily paid off at the end of each accounting
period and replaced on the books with receivables from unrelated entities. These transactions
were then unwound at the beginning of the next period. Second, plaintiffs claim that during the
class period, defendants engaged in a ponzi scheme pursuant to which securities held by RCM on
behalf of its customers were secretly sold, either outright or subject to an agreement to
repurchase, in order to raise cash. The proceeds from such sales allegedly were diverted from
RCM and used to prop up Refco's daily operations, pay down Refco's debt and fund
acquisitions. Plaintiffs assert that the theft of RCM customer assets was accomplished through a
series of intercompany transactions mischaracterized as loans.

In October 2005, after disclosure of the hundreds of millions in dollars of uncollectible
receivables owed by RGHI, Refco imposed a moratorium on customer withdrawals at RCM.
However, plaintiffs claim that without the continued availability of RCM customer assets, Refco
collapsed and filed for bankruptcy on October 17, 2005. By that time, approximately $2.6
billion in RCM customer assets allegedly were missing, and replaced on the books with
uncollectible intercompany receivables owed to RCM by insolvent Refco affiliates. Plaintiffs
claim that Refco's officers benefited from these schemes through both the June 2004 LBO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
October 10, 2006
Page 3

involving the TH Lee Partner defendants and in the August 2005 Refco IPO. Based on subsequent disclosures filed in the bankruptcy court, plaintiffs allege that about $2.25 billion in RCM customer assets are missing.

The Consolidated Amended Complaint contains two causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 by all defendants; and (2) violation of Section 20(a) of the Securities Exchange Act by the individual defendants, RSL and the TH Lee Control Group Defendants. Plaintiffs seek unspecified compensatory damages, interest, fees and costs.

In view of the similarities between the January 2006 complaint and the September 2006 Consolidated Amended Complaint, we refer you to the coverage discussion and reservation of rights contained in our previous letters to you, including our November 10, 2005 letter, our December 7, 2006 letter concerning the *Weit* and *City of Pontiac* Actions, and our March 28, 2006 letter, all of which are incorporated herein by reference. U.S. Specialty reiterates its prior requests that the individuals named as defendants in the *RCM Brokerage Customer* Action or their counsel provide us with confirmation that each of them is or was a director, officer, employee, insurance manager or general counsel of Refco or a Subsidiary of Refco. Without limitation of U.S. Specialty's reservation of rights, please note specifically that for the reasons set forth in our March 28, 2006 letter, none of the TH Lee related entities are insureds under the Policy, and there is no coverage for any loss or defense costs incurred by or allocable to them. The Policy further does not provide coverage to acts undertaken by any of the individual defendants in a capacity other than as "Insured Persons" of Refco and its Subsidiaries. There also is no coverage under the Policy for RSL, as the *RCM Brokerage Customer* Action is not a "Securities Claim" and therefore is not within the scope of Insuring Agreement B(2).

As noted in our previous letters, U.S. Specialty requests that we be kept informed of all significant developments in the litigation, and provided on a prompt basis with all substantive pleadings, orders and briefs filed in the lawsuits.

This letter is not intended to be exhaustive or exclusive with respect to the defenses to coverage that U.S. Specialty may assert, and we will supplement this letter concerning U.S. Specialty's views on coverage as additional information becomes available or as developments warrant. U.S. Specialty continues to reserve all of its rights under the Policy and applicable law about all of the matters for which notice has been provided, including but not limited to on the bases discussed in all of our previous letters to you and the various insureds, which are incorporated herein by reference.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
October 10, 2006
Page 4

Please feel free to contact us if you have any questions concerning this matter.

Sincerely,

ROSS, DIXON & BELL, LLP

By _____

Gary V. Dixon
Leslie S. Ahari

cc:    R. Damian Brew, Esq. (by email, w/encl.)
       Wayne E. Borgeest, Esq. (by email, w/encl.)
       Daniel J. Standish, Esq. (by email, w/encl.)
       John D. Hughes, Esq. (by email, w/encl.)
       Cecilia W. Kaiser, Esq. (by email, w/encl.)
       James E. Tolan, Esq. (by email, w/encl.)
       Jeffery T. Golenbock, Esq. (by email, w/encl.)
       Paul Ferrillo, Esq. (by email, w/encl.)
       Matthew J. Sava, Esq. (by e-mail, w/encl.)
       Scott Hershman, Esq. (by email, w/encl.)
       Ivan Kline, Esq. (by email, w/encl.)
       Holly Kulka, Esq. (by email, w/encl.)
       Joseph L. Chairez, Esq (by email, w/encl.)
       Blake Hannafan, Esq. (by email, w/encl.)
       Chris Morvillo, Esq. (by email, w/encl.)

327793 v 7

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. • Washington, D.C. 20006-1040 • *p* (202) 662-2000  *f* (202) 662-2190

**GARY V. DIXON**
DIRECT DIAL:   (202) 662-2003
EMAIL:  GDIXON@RDBLAW.COM

**LESLIE S. AHARI**
DIRECT DIAL:   (202) 662-2036
EMAIL:  LAHARI@RDBLAW.COM

March 28, 2006

**<u>VIA FACSIMILE AND CERTIFIED</u>**
**<u>MAIL, RETURN RECEIPT REQUESTED</u>**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

Re:  **Insured:**  Refco, Inc.
   **Policy No.:**  24-MGU-05-A10821
   **<u>Claimants:</u>**  <u>Various</u>

Dear Andrea:

As indicated in our previous letters, we represent U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 (the "Policy") issued to Refco, Inc. for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for the Insureds under the Policy. We are forwarding copies of this letter to those counsel for various of the Insureds about whom we are aware. Please forward copies of this letter to Refco and to the representatives of any other Insureds about whom you are aware.

On U.S. Specialty's behalf, this will acknowledge receipt of the complaints filed against various insureds in the following actions: (1) *Teachers' Retirement System of Illinois, et al. v. Thomas H. Lee, et al.*, (S.D.N.Y.) (the "*Teachers'* Action"); (2) *Gensheimer v. Bennett, et al.*, No. 05 CV 10318 (S.D.N.Y.) (the "*Gensheimer* Action"); (3) *Fine v. Bennett, et al.*, No. 05CV8701 (S.D.N.Y.) (the "*Fine* Action"); and (4) *Global Management Worldwide Limited v. Bennett, et al.*, No. 06 CV 0643 (S.D.N.Y.) (the "*Global Management* Action"). U.S. Specialty is proceeding subject to a full reservation of its rights to deny and/or limit coverage under the Policy and applicable law with respect to these suits and all of the matters about which it has received notice.

WASHINGTON • IRVINE • SAN DIEGO • CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 2

## I. The Lawsuits

### A. The *Teachers'* Action and the *Gensheimer* Action

The *Teachers'* Action, filed in December 2005, and the *Gensheimer* Action, filed on December 8, 2005, are purported shareholder class actions alleging violations of the securities laws. The plaintiffs in *Teachers'* purport to sue on behalf of the class of all purchasers of Refco's 9% bonds in the August 2004 bond offering and all persons who purchased common stock during the class period August 11, 2005 to October 18, 2005. In the *Gensheimer* Action, plaintiff purports to sue on behalf a class of purchasers of all of Refco's common stock in the August 11, 2005 IPO, and all persons who purchased bonds pursuant to the August 2004 offering, and who purchased bonds pursuant to the April 13, 2005 prospectus. The *Gensheimer* Action also purports to sue on behalf of all purchasers of securities between August 5, 2004 and October 18, 2005. One or both complaints name as defendants the following individuals who are identified as directors, officers or employees of Refco, Inc. and/or a Refco subsidiary: Phillip Bennett, Gerald Sherer, Thomas Lee, Scott Schoen, Leo Breitman, David Harkins, Scott Jaeckel, Ronald O'Kelley, Nathan Gantcher, Dennis Klejna, Santo Maggio, Robert Trosten, William Sexton, Joseph Murphy, and Perry Rotkowitz. One or both complaints also name as defendants Thomas H. Lee Partners, LP, Credit Suisse First Boston and related entities, Goldman Sachs & Co. and related entities, Grant Thornton LLP, Mark Ramler, Banc of America Corp. and related entities, Merrill Lynch Pierce Fenner & Smith, Inc. and related entities, Deutsche Bank and related entities, J.P. Morgan Chase & Co. and related entities, Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc. and related entities, Liberty Corner Capital and related entities, Terry Pigott, William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, Refco Group Holdings Inc., Mayer Brown & Rowe & Maw, and Joseph Collins.

Like the various securities class action complaints discussed in our November 10, 2005 and December 7, 2005 letters to you, the *Teachers'* and *Gensheimer* complaints generally allege that Refco's registration statements issued in connection with the company's August 11, 2005 IPO and the offering statement issued in connection with the August 2004 bond offering, were false and misleading, and that the defendants made false and misleading statements during the class periods. Plaintiffs allege that on October 10, 2005, Refco announced that it had discovered a $430 million receivable owed to it by an entity controlled by Mr. Bennett, that Mr. Bennett was stepping down as Refco's Chief Executive Officer, and that Refco's financial statements issued since 2002 could no longer be relied on. By the market's close on October 10, 2005, Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60. On October 12, 2005, Mr. Bennett was arrested and charged with securities fraud. On October 13, 2005, Refco announced that it had hired advisors and imposed a 15 day moratorium on customer withdrawals at Refco Capital Markets. When the NYSE halted trading, Refco's stock was trading at $7.90. On October 17, 2005, Refco filed for Chapter 11 bankruptcy. The *Teachers'* complaint contains

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 3

four counts alleging violations by the various defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The *Gensheimer* Action contains five counts, for violations of Section 11, Section 12(a)(2), Section 15, Section 10(b) and Section 20(a). The complaints seek class certification, unspecified compensatory damages, restitution, and attorneys' fees and costs.

### B. The *Fine* Action

On October 13, 2005, David Fine filed a Verified Shareholder Derivative Complaint against the following eleven directors and officers of Refco: Mr. Bennett, Mr. Sexton, Mr. Sherer, Mr. Murphy, Mr. Breitman, Mr. Gantcher, Mr. Harkins, Mr. Jaeckel, Mr. Lee, Mr. O'Kelley and Mr. Schoen. The complaint also names as defendants Credit Suisse, Goldman Sachs, Bank of America Securities, Deutsche Bank Securities, JP Morgan, Merrill Lynch, Sandler O'Neill, HSBC and Thomas H. Lee Partners, L.P. Like the derivative complaint in *Mehta*, discussed in our November 10, 2005 letter to you, the complaint in the *Fine* Action alleges wrongdoing during the period from August 2005 to the present in connection with Refco's August 5, 2005 IPO, the alleged misrepresentations of Refco's financial condition, the October 2005 disclosures concerning the $430 million in previously concealed debt, and Mr. Bennett's arrest and indictment. The *Fine* complaint contains six counts: (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) waste of corporate assets; (5) unjust enrichment; and (6) aiding and abetting against the underwriter defendants. The complaint seeks unspecified damages, injunctive relief, restitution, attorneys' fees and costs.[1]

### C. The *Global Management* Action

On January 26, 2006, Global Management Worldwide Limited filed a class action complaint. The suit is on behalf of a class of all brokerage customers of Refco Capital Markets ("RCM") who, at any time between October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC as custodian and broker for safe-keeping, and who continued to hold positions with RCM on October 17, 2005 or thereafter. The complaint names 38 defendants, including the following fourteen individuals identified as directors, officers or managers of Refco and/or its subsidiaries: Mr. Bennett, Mr. Sherer, Mr. Breitman, Mr. Harkins, Mr. Jaeckel, Mr. Lee, Mr. O'Kelley, Mr. Schoen, Mr. Gantcher, Mr. Murphy, Mr. Sexton, Mr. Maggio, Mr. Klejna, and Mr. Rotkowitz. Also named as defendants are five Lee Partners entities, including Thomas H. Lee Partners, L.P., Thomas H. Lee Equity (Cayman) Fund, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P. The complaint further names various securities firms and underwriters as defendants, including entities related to Credit Suisse, Goldman Sachs, Bank of America, Merrill Lynch, J.P. Morgan Chase, Sandler O'Neill, HSBC, William Blair & Co.,

---

[1] We understand that the complaints in both *Mehta* and *Fine* were dismissed by the Court by order dated March 13, 2006.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 4

Harris Nesbitt, CNG Institutional Trading, Samuel A. Ramirez, The Williams Capital Group, and Utendahl Capital. The complaint also names Refco Securities LLC ("RSL") as a defendant.

The complaint alleges that the suit arises out of a scheme to steal assets belonging to RCM's customers in order to cover up billions of dollars of fraudulently undisclosed losses incurred by Refco. Plaintiff alleges that during the class period, RCM and RSL engaged in a practice of surreptitiously selling securities held by RCM in custody for customers with the undisclosed intent to misappropriate the proceeds. Such sales allegedly occurred without the customers' knowledge or consent. Defendants allegedly transferred the proceeds to other Refco affiliates through improper and undisclosed intercompany transactions in order to offset losses which were being incurred by Refco's operating subsidiaries and which were fraudulently omitted from Refco's financial statements during the class period. As part of the alleged scheme, RSL failed to comply with SEC rules and failed to properly maintain and segregate assets belonging to RCM's customers. Plaintiff asserts that Refco's financial statements issued during the class period were false and misleading because they fraudulently failed to disclose that RCM had transferred more than $2 billion in customer assets to Refco affiliates to cover losses. These omissions were material because the $2 billion dwarfed Refco's reported capital.

The complaint further alleges that on October 13, 2005, Refco announced a freeze on RCM customer accounts. On October 17, 2005, Refco and various of its subsidiaries filed for Chapter 11 bankruptcy. On or about December 5, 2005 and later in January 2006, Refco acknowledged the scheme by disclosing that RCM did not have or control more than $2 billion in customer securities that it had represented to customers that it was holding on their behalf. The complaint alleges that whether the securities entrusted to RCM are property of the bankruptcy estate or belong to the customers is now an issue in the bankruptcy proceedings, as Refco claims that the assets are part of the debtors' estate and that the RCM customers must wait in line with other creditors seeking repayment. The December 5, 2005 disclosure further indicated that RCM had held about $1.905 billion in assets, against which there were customer claims of about $3.675 billion, resulting in a $1.77 billion shortfall. The majority of this shortfall was in the form of intercompany IOUs owed to RCM by other Refco affiliates. Thereafter, on December 30, 2005, Refco disclosed that it in fact owes customers $4.16 billion, making the actual shortfall $2.25 billion. Plaintiff claims that the intercompany transfers were part of a scheme to hide losses being incurred at the Refco affiliates and were routine. On December 9, 2005, Refco disclosed that even after the bankruptcy filing, it transferred $170 million in securities from RCM customer accounts to another subsidiary and later sold such securities, in violation of an agreement entered into in connection with the Chapter 11 filing.

The complaint then details the assertion that Refco's financial statements issued during the class period were false and misleading, including the statements issued in connection with the October 2004 registration of senior subordinated notes, the statements issued in connection with the August 2005 IPO Registration Statement and Prospectus, and the statements filed in the June 2005 Form 10-K.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 5

Based on the foregoing, the *Global Management* complaint contains two counts: (1) violation of Section 10(b) of the Exchange Act against all defendants; (2) violation of Section 20(a) of the Exchange Act against the individual defendants and the Lee Partners entities. The complaint seeks compensatory damages, attorneys' fees and costs.

## II. Coverage Discussion

Because of the similarities between the *Teachers'*, *Gensheimer*, *Fine* and *Global Management* Actions with the various securities class action and derivative lawsuits discussed in our November 10, 2005 letter and our December 7, 2005 letter concerning the *Weit* and *City of Pontiac* Actions, we incorporate those letters and the reservations of rights stated therein by reference. U.S. Specialty continues to reserve all of its rights and defenses to coverage under the Policy and applicable law with respect to the *Teachers'*, *Gensheimer*, *Fine* and *Global Management* Actions, and all of the various suits about which notice has been provided, on the grounds discussed in all of our prior coverage letters.

Moreover, in connection with these actions, please note that only certain of the persons named as defendants in the lawsuits appear to be "Insured Persons" under the Policy, and that many of the other persons and entities named as defendants are neither "Insured Persons" nor "Insureds." Potential coverage under the Policy is not available for any person or entity who is not an "Insured Person" or an "Insured." In this regard, the Policy defines "Insured" to mean the "Insured Persons" and the "Company." *See* Policy Definitions (E). "Company" means Refco, Inc. and any Subsidiary thereof. *See* Policy Definitions (C), (H), (O), Policy Declarations Item 1. "Insured Persons" means any past, present or future director or officer of the Company; employees of the Company but only in connection with Securities Claims; the insurance manager and general counsel; and Employed Lawyers. *See* Policy Definitions (F), as amended by Endorsement Nos. 3, 17.

In light of the foregoing and based on the allegations of the complaints, it presently appears that only the following individuals named as defendants are potentially within the scope of Insureds and Insured Persons under the Policy: Mr. Bennett, Mr. Sherer, Mr. Lee, Mr. Schoen, Mr. Breitman, Mr. Harkins, Mr. Jaeckel, Mr. O'Kelley, Mr. Gantcher, Mr. Klejna, Mr. Maggio, Mr. Trosten, Mr. Sexton, Mr. Murphy, and Mr. Rotkowitz. With respect to these individuals listed above who appear to be Insured Persons, U.S. Specialty requests that they or their respective counsel provide us with confirmation that each of them is or was either a director, officer, employee, insurance manager or general counsel of Refco or a Subsidiary of Refco.

However, none of the following persons or entities appear to be either Insureds or Insured Persons: Thomas H. Lee Partners, LP, Thomas H. Lee Equity (Cayman) Fund, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P., Credit Suisse First Boston and related entities, Goldman Sachs & Co. and related entities, Grant Thornton LLP, Mark Ramler, Banc of America Corp. and related

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 6

entities, Merrill Lynch Pierce Fenner & Smith, Inc. and related entities, Deutsche Bank and related entities, J.P. Morgan Chase & Co. and related entities, Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc. and related entities, Liberty Corner Capital and related entities, Terry Pigott, William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, Refco Group Holdings Inc., Mayer Brown & Rowe & Maw, and Joseph Collins. The Policy therefore does not provide coverage for any of them.

With respect to Refco Securities LLC, which is a named defendant in the *Global Management* Action, there is no coverage under the Policy because the suit is not a "Securities Claim" and therefore is not within the scope of Insuring Agreement B(2). Specifically, "Securities Claim" means a Claim which is brought by or on behalf of securities holders of Refco or arises from the purchase or sake of securities issued by Refco. *See* Policy Definitions (N). The *Global Management* Action is therefore not a "Securities Claim" because it is not a suit by the holders of Refco securities and further does not concern the purchase or sale of Refco securities.

U.S. Specialty further calls to the Insureds' attention the Policy's change of control provision, Policy Conditions (F). As more fully stated in that section, in the event that a trustee in bankruptcy, receiver or similar official is appointed with respect to Refco or a Subsidiary, coverage under the Policy continues in force until the end of the Policy Period but is limited to Claims for Wrongful Acts committed before the effective date of such change of control. In this regard, we understand that bankruptcy trustees have been appointed for Refco LLC and RCM. U.S. Specialty fully reserves the right to deny or limit coverage for Claims for Wrongful Acts that post-date such changes of control.

In our prior letters, we have asked for information concerning the defense arrangements for the various Insured Persons. To date, we have been in contact with counsel for some, but not all, of the Insured Persons. Specifically, we are aware of the following counsel arrangements: Kramer Levin and Golenbock Eiseman for Mr. Bennett; Weil Gotshal for Messrs. Lee, Harkins, Jaekel, Schoen, O'Kelley, Gantcher and Breitman; Shapiro Forman for Messrs. Sherer and Murphy; and Baker Hostetler for Mr. Klejna. We have not been contacted by representatives for Messrs. Maggio, Trosten, Sexton, Grant or Rotkowitz. U.S. Specialty requests that Marsh, as agent for the Insureds under the Policy, provide us with contact information for these persons or ask such persons or their representatives to contact us.

Finally, while we previously have provided U.S. Specialty's Defense Counsel Guidelines to various of the insureds and/or their counsel, we are enclosing another copy with this letter. Counsel for the insureds again are requested to review and comply with the Guidelines.

This letter is not intended to be exhaustive or exclusive with respect to the defenses to coverage that U.S. Specialty may assert, and we will supplement this letter concerning U.S. Specialty's views on coverage as additional information becomes available or as developments

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 7

warrant. U.S. Specialty further appreciates that the Insureds likewise reserve their rights under the Policy.

Please feel free to contact us if you have any questions concerning this matter.

Sincerely,

ROSS, DIXON & BELL, LLP

By _Gary Dixon_

Gary V. Dixon
Leslie S. Ahari

Enclosure

cc:    R. Damian Brew, Esq. (by email, w/ encl.)
       Wayne E. Borgeest, Esq. (by email, w/ encl.)
       Daniel J. Standish, Esq. (by email, w/ encl.)
       John D. Hughes, Esq. (by email, w/ encl.)
       Cecilia W. Kaiser, Esq. (by email, w/ encl.)
       James E. Tolan, Esq. (by email, w/ encl.)
       Debora K. Grobman, Esq. (by email, w/ encl.)
       Jeffery T. Golenbock, Esq. (by email, w/ encl.)
       Matthew J. Sava, Esq. (by e-mail, w/ encl.)
       Paul A. Ferrillo, Esq. (by e-mail, w/ encl.)
       Joseph L. Chairez, Esq. (by email, w/ encl.)

327793 v 4

# HCC GLOBAL FINANCIAL PRODUCTS LLC

## DEFENSE COUNSEL GUIDELINES

HCC Global Financial Products LLC ("HCC Global") expects to work closely with counsel and the insured to achieve the best result for the insured in an efficient and cost-conscious manner consistent with counsel's ethical obligations. Defense expenses should accurately reflect the reasonable cost of the work necessary to defend and resolve the claim. Only those reasonable and necessary costs allocable to a covered claim will be considered for payment or used to satisfy any deductible/retention provisions. These Guidelines set forth HCC Global's expectations regarding cooperation and communication as well as explain generally what fees and costs are considered reasonable and necessary. Nothing contained herein is intended to restrict counsel's independent exercise of professional judgment in rendering legal services for the insured or otherwise interfere with any ethical directive governing the conduct of counsel. Any questions regarding these Guidelines should be directed to the HCC Global claims professional as soon as possible.

## I. COMMUNICATION WITH THE INSURER

Timely and thorough communication among the insured, counsel and the insurer is the key to obtaining resolution of claims on the best terms for all parties involved. Knowledge of critical facts, developments and circumstances concerning a claim should be communicated to and discussed with the claims professional promptly. To that end, HCC Global requires counsel to furnish the reports set forth below. The use of e-mail is encouraged whenever possible to provide reports and other pertinent documents. These reports are also subject to revision as the case requires and are not meant to strictly bind counsel.

    **A.     Litigation Plan and Budget.** Counsel must submit a substantive *Litigation Plan and Budget* within sixty (60) days of the initial communication between insurer and counsel. The Litigation Plan should not include an extensive recitation of the facts of the case or prior documents submitted in the claim. Rather, the *Litigation Plan* is intended to give the claims professional insight into counsel's overall view of the claim, including resolution strategy, valuation and timing. At a minimum, the *Litigation Plan* should include a substantive assessment of liability and potential damages, the likelihood and estimated value of early settlement, and the possibility of pursuing alternative dispute resolution (arbitration, mediation, etc.).

The *Budget* is intended to provide the claims professional a preliminary view of the estimated fees and costs to be incurred through counsel to resolve the claim. The *Budget* should reflect all significant stages and tasks anticipated by counsel in connection with defending the claim, including estimated fees and costs for each.

The *Litigation Plan and Budget* should be viewed as a fluid document that is subject to revision as the claim develops over time. Significant deviations from the original *Litigation Plan and Budget* should be discussed in detail with the claims professional as they are recognized.

**B.    Interim Status Reports.** A status report should be provided whenever there is a significant development in the case. The form of the report will be left to the discretion of counsel and should be based on the significance and complexity of the development, but as noted above, the use of e-mail is encouraged. Please advise the claims professional promptly of all procedural requirements, including critical deadlines and whether the claims professional is required to participate in any event.

Copies of all significant documents in the case, including all pleadings, judgments, orders, etc., should be forwarded to the insurer. It is not necessary or desired that discovery documents be provided, unless otherwise directed by the claims professional. If legal privilege, confidentiality agreement or other protection may preclude sharing certain documents with the insurer, that should be discussed in detail with the claims professional.

**C.    Trial Reports:**      The claims professional should be notified as soon as a trial/arbitration date is set, including any changes to that date. Sixty (60) to ninety (90) days prior to the scheduled trial/arbitration date, counsel should provide a comprehensive pre-trial /pre-arbitration report to the claims professional, which must include a discussion of the significant risk factors in connection with the trial/arbitration (for example, the judge/arbitrator, venue, jury composition, likely ruling on pre-trial motions, the probability of an adverse verdict and the likely range of any monetary award, etc.). Unless directed otherwise, counsel should keep the claims professional informed on a daily basis during the course of any trial/arbitration. We expect to be advised of the results immediately following the trial/arbitration, and if adverse, your recommended course of action.

## II.    CASE MANAGEMENT

**A.    Staffing.** Unless otherwise agreed to in writing with the claims professional, it is expected that counsel will staff each case with no more than one partner, one associate and one paralegal. Any request for additional staffing should be made to the claims professional by e-mail. The request should state the reason and indicate the designation and billing rates for the additional staff.    Counsel should advise the claims professional promptly after initial communication which lawyers and paralegals will be working on the claim, including each person's level of experience and hourly billing rates. No changes to the amount of staff or billing rates will be permitted without prior consultation with the claims professional. Legal assistants, secretaries and other administrative personnel are not considered billable timekeepers.

To maximize efficiency, the responsibilities of the staff members should be appropriate to each individual's level of experience. More experienced lawyers should delegate work to lesser experienced lawyers or paralegals wherever possible without compromising quality. Duplication of effort within the firm should be avoided.

**B.    Billing.** All invoices must identify each person who has billed time to the case, his or her hourly rate, every task performed by each timekeeper and the time billed for each task. Work should be described specifically, including the subject of telephone calls and correspondence. Time must be billed in .10 of an hour increments. Block billing is not

permitted. All disbursements and out of pocket expenses must be paid directly by the law firm and itemized on the bill.

Unless otherwise agreed to in writing with the claims professional, counsel must submit invoices monthly. Covered fees and costs will be reimbursed through HCC Global on a quarterly basis.

   **C.    Legal Research.** Counsel should not charge for routine legal research or research of matters of common knowledge among reasonable experienced counsel in the same geographical location. Where circumstances exist that enable you to use your research data banks or brief banks, counsel should charge only for updating of this previously researched material. Lexis, Westlaw or similar database research charges are not reimbursable. All research entries should state the specific research issue.

   **D.    Costs/Activities Requiring Prior Consultation.    When seeking prior consultation, e-mail is encouraged, when appropriate. The e-mail should set forth all the information that the claims professional would need to consent to the cost/activity.** The following are costs/activities about which counsel should consult with the claims professional prior to incurring or engaging in, so as to avoid or minimize disputes regarding whether such cost/activities are reasonable and necessary:

- Initiating discovery, motions or other significant tasks not previously discussed with the claims professional or included in the *Litigation Plan*
- Hiring outside professionals or vendors (e.g., consultants, investigators, temporary attorneys, outside paralegals, etc.)
- Filing an appeal
- Joining other parties
- Filing cross or counterclaims or third party claims
- Travel expenses attendant to travel exceeding 75 miles in each direction
- Overnight stays
- Overnight/expedited delivery charges

   **E.    Non-reimbursable fees/expenses.** The following is a list of examples of tasks and expenses that are generally not reimbursable. This list is not intended to be exhaustive. If counsel wishes to be reimbursed for any task or expense on this list, he or she must obtain specific written consent from the claims professional in advance.

- Duplication of effort
- More than one individual charging for internal conferences or attendance at the same event
- Overhead and administrative costs, such as:
  - Secretarial and clerical activities, regardless of who performs the task. Clerical tasks include but are not limited to the following: receipt and distribution of mail, new file set up, maintenance of office and attorney calendars, copying, faxing, inserting or retrieving documents from file, file maintenance, stamping documents, tabbing, indexing, or assembling materials, scheduling or adjourning meetings or depositions.

- o  Non-professional time (individuals not included in the staffing agreement)
- o  Overtime charges
- o  Entertainment expenses
- o  Internal photocopy charges in excess of $0.10 per page
- o  Local telephone or fax charges
- o  Ordinary postage
- o  Travel expenses within 75 miles in each direction (tolls, taxis, mileage, meals etc.)
- o  Late fee charges
- o  Office supplies, books, subscriptions, educational expenses or professional association memberships
- o  Preparation and review of counsel's own invoices

## III.    BILL AND FILE REVIEW

HCC Global will review all invoices submitted by counsel for reasonableness and compliance with these Guidelines. HCC Global reserves the right to audit any file maintained by counsel in connection with which we have paid and/or are paying counsel's fees and costs. File audits are conducted in order to assess the quality and efficiency of counsel's representation and to verify the accuracy of invoices fees and expenses. In the event of such audit, HCC Global will work with counsel and the insured to ensure that the audit is performed in a manner that does not compromise any legal privilege or client confidences that may attach to any of the information within the scope of the audit.

If the insurer declines to pay or seeks reductions and/or refunds with respect to charges made by counsel, full explanation of such action shall be given by the insurer, and counsel shall be given the opportunity to explain the disputed items and appeal such declinations to the claims professional. The insurer will pay the undisputed portion of any legal bill in the interim.

## IV.    MEDIA POLICY

If you are contacted by any member of the press regarding a case in which HCC Insurance Holdings Inc., HCC Global Financial Products LLC or any of their subsidiaries, affiliates or related organizations ("HCC") is a party or is an insurer of any party, no comment should be made on behalf of, or that could be fairly attributed to, HCC. We ask that any such inquiry involving HCC be referred immediately to the HCC Global claims professional assigned to that matter.

# D'AMATO & LYNCH

## LAWYERS

GEORGE D. D'AMATO
LUKE D. LYNCH (1999)
KENNETH R. SAGAT
LUKE D. LYNCH, JR.
ROBERT E. KUSHNER
RICHARD F. RUSSELL
RONALD H. ALENSTEIN
HARRY J. ARNOLD, JR.
ROBERT W. LANG
NEAL M. GLAZER
ANDREW R. SIMMONDS
JOHN P. HIGGINS
THOMAS F. BREEN
ALFRED A. D'AGOSTINO, JR.
WILLIAM P. LARSEN, III
ROBERT D. LANG
DAVID A. BOYAR
MARY JO BARRY
BARBARA R. SEYMOUR
HARVEY GARRISON

WILLIAM C. BURTON
CHARLES BRANHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. MANIRE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
STEPHEN F. WILLIG
DEBORAH H. COLLINS
NEIL R. MORRISON
PETER A. STROILI
FRANCES BUCKLEY
DAVID J. KUFFLER

LLOYD J. HERMAN
KEVIN P. CARROLL
LAURIE P. BEATUS
LIZA A. CHAFIIAN

70 PINE STREET

NEW YORK, N.Y. 10270-0110

TELEPHONE 212-269-0927
WWW.DAMATO-LYNCH.COM
CABLE ADDRESS
DAMCOSH
TELEX 960085 DCOS UI NYK
TELECOPIER: 212-269-3559

LONDON OFFICE

LLOYD'S

ONE LIME STREET
LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7887
Direct Dial: (212) 909-2052
E-Mail: JTolan@damato-lynch.com

JAN H. DUFFALO
JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD M. ROTH
MARIA T. EHRLICH
RICHARD F. FERRIGNO
DEEANNA M. GALLA
JUDY Y. CHUNG
R. DAVID ADES
JONATHAN L. KRANZ
ARTURO M. BOUTIN
WENDY J. KALNICK

JOHN C. MUGGIFORI
HOLLY Z. BROWN
MAXINE K. NAKAMURA
GERARDO LAPETINA
LAURA S. WEINER
DAVID BERGENFELD
E. REYNOLDS WILSON
JASON B. GRANT
GAVIN J. CURLEY
BRIAN M. MARGOLIES
ASSAF RONEN
ALEXANDER M. RAZI
ANITA G. BAKER
BOTHEARY JOHNNAR
MELEENA M. BOWERS

COUNSEL

ROBERT H. MAKLA
ALBERT B. LEWIS
PETER J. THUMSER

VICTOR F. HUSTELIER
ROBERT GILROY
RICHARD G. McGAHREN

**October 20, 2006**

Via Facsimile (312)-627-6272 and Regular Mail
Ms. Andrea Lieberman
Marsh USA Inc.
500 West Monroe Street
Chicago, IL 60661

|       |       |                                                                                          |
|-------|-------|------------------------------------------------------------------------------------------|
| Re:   |       | Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy |
|       | Insured | : Refco, LLC ("REFCO")                                                                  |
|       | Matter  | : In Re Refco Capital markets, LTD Brokerage Customer Securities Litigation             |
|       | Lexington Policy No. | : 162 0924                                                                  |
|       | Our File No. | : 108-73096                                                                        |

Dear Ms. Lieberman:

As you know we have been retained by Lexington Insurance Company ("Lexington") in connection with the above-referenced matter. We are in receipt of U.S. Specialty's letter dated October 10, 2006 issued by Ross, Dixon & Bell and we have had the opportunity to conduct a review of the coverage position taken by the primary carrier U.S. Specialty Insurance Company ("U.S. Specialty") with respect to its policy number 24-MGU-05-A10821 (the "Primary Policy") to which the Lexington's Excess Directors and Officers Liability and Corporation Reimbursement Policy No. 162-0924 (the "Lexington Excess Policy") is excess to. The October 10, 2006 letter issued by Ross, Dixon & Bell is issued with respect to the filing of the Consolidated Amended Complaint filed on September 5, 2006 in the In Re Refco Capital Markets Ltd. Brokerage Customer Securities Litigation, No. 06 Civ 643 (GEL) (S.D.N.Y.) (the "RCM Brokerage Customer Action"). U.S. Specialty has advised that the RCM Brokerage Customer Action was previously captioned Global Management Worldwide Limited v. Bennett,

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 2

et al. 06 Civ 00564 (GEL) (the "Global Complaint"). In its October 10, 2006 letter U.S. Specialty has advised that the Global Complaint and the RCM Brokerage Customer Action make basically the same allegations. U. S. Specialty therefore refers to its coverage letters previously issued with respect to the Global Complaint.

Lexington reserves all its rights, privileges and defenses under the Lexington Excess Policy and at law at this time. Nonetheless, we would like to make the following general comments. In doing so, we do not wish to imply that we believe the allegations in the RCM Brokerage Customer Action to be true. To the extent that discovery or other developments in these matters may later indicate that the application of certain exclusions or provisions in the Lexington Excess Policy not discussed herein is appropriate, Lexington reserves the right to do so.

Please be advised that Lexington adopts the coverage position of the primary carrier U.S. Specialty as set forth by U.S. Specialty in its October 10, 2006 letter, as well as incorporating all the reservations of rights set forth in the letters it references therein dated November 10, 2005, December 7, 2006 and March 28, 2006 regarding the Global Complaint and the now amended RCM Brokerage Customer Action with the exception of any specific Lexington reservations or applicable Lexington Excess Policy provisions noted in this letter or Lexington's earlier letters.

Otherwise Lexington adopts all of the specific reservations of rights set forth in U.S. Specialty's October 10, 2006 letter and earlier letters referenced herein. Additionally, without waiver of any of the other reservations set forth by U.S. Specialty, Lexington adopts the coverage position set forth by U.S. Specialty that there is no coverage for the TH Lee related entities or for Refco Securities, LLC named in the RCM Brokerage Customer Action under either the U.S. Specialty Policy or the Lexington Excess Policy.

As a reminder please note that in its letter dated January 12, 2006 Lexington noted that the various securities class actions contain allegations that REFCO issued false financial statements and that the prospectus in connection with its IPO was materially false and misleading. The current RCM Brokerage Customer Action contains similar allegations. Additionally, REFCO itself has came out and advised that its financial statements for the period of 2002 to 2005 could no longer be relied upon. Lexington issued its Excess Policy based upon the REFCO financial statements provided to Lexington during the underwriting process. Also, as part of the Lexington underwriting process, as a condition to Lexington issuing its Excess Policy, REFCO had agreed to provide a copy of the U.S. Specialty application that was acceptable to Lexington. To date REFCO has failed to provide the Primary Policy application to Lexington. In this regard, and based upon REFCO's admissions that their financial statements for the time frame of 2002 to 2005 cannot be relied upon, Lexington reserved all of its rights to void the Lexington Excess Policy ab initio or rescind the Lexington Excess Policy in its entirety or at least with respect to the Company and those individual directors and officers responsible for disseminating the false financial documents to the public and Lexington and/or deny coverage based on REFCO's misrepresentations and conduct with respect to its false financial statements. Lexington continues to reserve its rights in that regard.

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 3

Additionally, Lexington earlier noted that pursuant to the Clause XII. Definitions, Loss does not include legal expenses. As such Defense Costs were not considered included within the Lexington Excess Policy's Limit of Liability and are not covered by the Lexington Excess Policy. At the request of the insurance broker, on behalf of its client, Lexington had been asked to review its position on Defense Costs coverage under its Lexington Excess Policy. As you know, Lexington, subject to a full reservation of rights has agreed to advance Defense Costs once the U. S. Specialty Policy primary limit of liability is eroded and subject to the Insured agreeing to repay any amounts not determined to be owed as set forth in our letter to Damian Brew dated July 26, 2006, which you were previously copied on.

**The Lexington's Excess Directors and Officers Liability Policy Number 1620924**

Lexington issued to REFCO its Excess Directors and Officers Liability and Corporate Reimbursement policy number 1620924 defined above as the Lexington Excess Policy with a Policy Period[1] of August 11, 2005 through August 11, 2006 and a Limit of Liability of $7,500,000, excess of $10 Million and the Primary Policy retentions of $0 for Insuring Agreement A, $300,000 for Insuring Agreement B(1) and $500,000 for Insuring Agreement B(2). Please be advised that the Lexington Excess Policy is an indemnity policy and not a defense policy. The Lexington Excess Policy does not contain a duty to defend on the part of Lexington. Please note that pursuant to the Clause XII. Definitions, Loss does not include legal expenses. As such Defense Costs are not included within the Lexington Excess Policy's Limit of Liability and are not covered by the Lexington Excess Policy.

The $10 Million of underlying coverage is comprised of the following policy:

a.    Primary layer – $10 Million – U.S. Specialty Insurance Company ("U.S. Specialty") policy number 24-MGU-05-A10821 Directors, Officers and Corporate Liability Insurance Policy (the "Primary Policy");

The Lexington Excess Policy follows form to the Primary Policy.

Lexington directs your attention to the definition of Loss, located in the Definitions Clause (G) to the Primary Policy as amended by Endorsement Number 4. Potential coverage is limited to Loss as defined by the Primary Policy with the exception of Defense Costs for the Lexington Excess Policy as discussed above. Additionally, to the extent that the RCM Brokerage Customer Action seeks restitution and/or disgorgement of profits, Lexington notes that such damages may constitute uninsurable Loss and reserves its rights accordingly.

Lexington reserves all of its rights with respect to any other insurance available to the Insureds under the Primary Policy and has reserved its rights with respect to its Other Insurance Clause. Lexington also reserves its rights to an allocation for Loss for any covered and uncovered claims and for Loss attributable to uninsured persons. Lexington also reserves its

---

[1] All capitalized terms are defined in the Policy unless otherwise noted herein.

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 4

rights to deny coverage for any amount allocated to uncovered claims or uncovered persons and
entities.

### Summary

Lexington continues to reserve all its rights, defenses and privileges under the U.S.
Specialty Primary Policy, the Lexington Excess Policy, at law and in equity, including the right
to apply other exclusions, endorsements or provisions of the Lexington Excess Policy as
appropriate, supplement this coverage letter, deny coverage in the future, and recover any
payments which may later be made under the Lexington Excess Policy to the extent not covered
as the facts and law warrant and it will continue to monitor events in this litigation as they occur.

In view of the above, it is neither necessary nor appropriate to discuss all of the
Lexington Excess Policy's potentially applicable limitations and exclusions at this time. This
letter is not intended to be exhaustive or exclusive with respect to the coverage defenses that
Lexington may assert.

Notwithstanding our preliminary analysis, please also provide us with an update on the
present status RCM Brokerage Customer Action and continue to keep us informed of all
significant developments in the litigation. Please provide us with copies of all future
correspondence with U.S. Specialty relating to coverage for this matter under the Primary Policy.
In addition, please provide us with copies of all correspondence with every other insurance
carrier involved in this matter, including any general liability insurer(s) that may provide
coverage for this matter. Please provide us with any notice of claim letters sent to any such
carriers and any responses received thereto. In this regard, Lexington reserves all rights available
to it under the Lexington Excess Policy. Please also provide Lexington with copies of any other
pleadings or other pertinent documents related to the above referenced complaint.

Should you have any questions or comments regarding the foregoing, please do not
hesitate to contact the undersigned.

Very truly yours,

James E. Tolan

JET/sdv

cc:  **Via Email**
     Daniel J. Standish, Esq.
     Wiley Rein & Fielding LLP
     1776 K Street, N.W.
     Washington, D.C. 20006

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 5


**Via Email**
John D. Hughes, Esq.
Edwards Angell Palmer & Dodge LLP
101 Federal Street
Boston, Massachusetts 02110-1800

**Via Email**
Robert Benjamin
Kaufman Borgeest & Ryan LLP
200 Summit Lake Drive
Valhalla, NY 10595

#202033v1

# D'AMATO & LYNCH

LAWYERS

70 PINE STREET

NEW YORK, N.Y. 10270-0110

TELEPHONE 212-269-0927
WWW.DAMATO-LYNCH.COM
CABLE ADDRESS
DAMCOSH
TELEX 960085 DCOS UI NYK
TELECOPIER 212-269-3559

LONDON OFFICE

LLOYD'S

ONE LIME STREET

LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7257
Direct Dial: (212) 909-2052
E-Mail: JTolan@damato-lynch.com

GEORGE G. D'AMATO
LUKE D. LYNCH (1999)
KENNETH A. SAGAT
LUKE D. LYNCH, JR.
ROBERT E. KUSHNER
RICHARD F. RUSSELL
RONALD H. ALENSTEIN
HARRY J. ARNOLD, JR.
ROBERT W. LANG
NEAL M. GLAZER
ANDREW R. SIMMONDS
JOHN P. HIGGINS
THOMAS F. BREEN
ALFRED A. D'AGOSTINO, JR
WILLIAM P. LARSEN, III
ROBERT D. LANG
DAVID A. BOYAR
MARY JO BARRY
BARBARA R. SEYMOUR
HARVEY GARRISON

WILLIAM C. BURTON
CHARLES BRAMHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. HANINE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
STEPHEN F. WILLIG
DEBORAH M. COLLINS
NEIL R. MORRISON
PETER A. STROILI
FRANCES BUCKLEY
DAVID J. KUFFLER

LLOYD J. HERMAN
KEVIN P. CARROLL
LAURIE F. BEATUS
LIZA A. CHAFIIAN

JAN H. DUFFALO
JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD H. ROTH
MARIA T. EHRLICH
RICHARD F. FERRIGNO
DEEANNA M. GALLA
JUDY Y. CHUNG
R. DAVID ADES
JONATHAN L. KRANZ
ARTURO M. BOUTIN
WENDY J. KALNICK

JOHN C. NUCCIFORI
HOLLY Z. BROWN
MAXINE K. NAKAMURA
GERARDO LAPETINA
LAURA S. WEINER
DAVID BERGENFELD
E. REYNOLDS WILSON
JASON S. GRANT
GAVIN J. CURLEY
BRIAN N. MARGOLIES
ASSAF RONEN
ALEXANDER H. RAZI
ANITA G. BAKER
SOTHEARY JOHNNAR
NELEENA M. BOWERS

COUNSEL

ROBERT M. MAKLA
ALBERT B. LEWIS
PETER J. THUMSER

VICTOR F. MUSTELIER
ROBERT GILROY
RICHARD G. McGAHREN

**February 15, 2007**

Via Email and Regular Mail
Ivan Kline, Esq.
Friedman & Wittenstein
600 Lexington Avenue
New York, NY 10022

Via Email and Regular Mail
Joseph L. Chairez, Esq.
Helen B. Kim, Esq.
Baker Hostetler
600 Anton Boulevard
Suite 900
Costa Mesa, CA 92626-7221

Via Email and Regular Mail
Blake T. Hannafan, Esq.
Hannafan & Hannafan, LTD.
One East Wacker Drive
Suite 1206
Chicago, IL 60601

Via Email and Regular Mail
Debra K. Grobman, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036-2714

Via Email and Regular Mail
Holly Kulka, Esq.
Heller Ehrman, L.L.P.
Times Square Tower
7 Times Square
New York, NY 10036-6524

Via Email and Regular Mail
Christopher J. Morvillo, Esq.
Morvillo, Abramowitz, Grand,
Iason, Anello & Bohrer
565 Fifth Avenue
New York, NY 10071

Via Email and Regular Mail
Scott Hershman
Hunton & Williams
200 Park Avenue
New York, NY 10166

Via Email and Regular Mail
Paul Ferrillo, Esq.
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

Via Email and Regular Mail
Jeffrey T. Golenbock, Esq.
Golenbock, Eiseman, Assor, Bell
& Pekoe, LLP
437 Madison Avenue
New York, NY 10022

Via Email and Regular Mail
Matthew J. Sava, Esq.
Shapiro Forman Allen Sava &
McPherson, LLP
380 Madison Avenue
New York, NY 100177

#257143v1

February 15, 2007
Page 2

Re:    Directors and Officers Liability and Corporation Reimbursement
       Follow Form Excess Liability Policy
       Insured            : Refco, LLC ("REFCO")
       Claimants           : Various
       Lexington Policy No. : 162 0924
       Our File No.        : 108-73096

Dear Counsel:

I write on behalf of Lexington Insurance Company ("Lexington") in connection with the above-referenced matter. As we all know the U.S. Specialty $10 million Primary Policy is quickly eroding. In light of the fact that it appears that the U.S. Specialty Primary Policy $10 million limit of liability will be fully eroded within the next two months, Lexington wanted again to make sure all Insureds were clear on Lexington's position with respect to the advancement of otherwise covered defense costs under the Lexington Excess Directors and Officers Liability and Corporation Reimbursement Policy No. 162-0924 (the "Lexington Excess Policy") issued to Refco. The Lexington Excess Policy is 1st layer excess to the U.S. Specialty Primary Policy.

As a follow up to Lexington's letter dated July 26, 2006, Lexington has received feedback from some of the directors and officers of Refco who are willing to sign an interim funding agreement in order to receive advancement of otherwise covered defense costs. Lexington again wants to make sure all insured directors and officers are aware that Lexington will advance otherwise covered defense costs under the Lexington Excess Policy subject to the Insured's signing the interim funding agreement discussed below.

It is Lexington's position, as outlined in its July 26, 2006 letter, that subject to Lexington's reservations of rights, and subject to Bankruptcy Court approval, upon the complete erosion of the U.S. Specialty Primary Policy, Lexington will advance otherwise covered defense costs relating of the underlying litigations against the directors and officers under the Lexington Excess Policy to any director or officer of Refco who seeks advancement under the Lexington Excess Policy as long as such director or officer signs an interim funding agreement whereby the director or officer agrees to repay to Lexington any advanced defense costs which are later determined not to be owed or covered under either the U.S. Specialty Primary Policy or the Lexington Excess Policy. Lexington will not advance any legal fees incurred by the Insureds with respect to the Arch Declaratory Judgment action nor any fees incurred for any coverage work done on behalf of the Insureds, which fees are not covered under the Lexington Excess Policy or the U.S. Specialty Primary Policy. Lexington is not requiring all directors and officers to sign an interim funding agreement in order for any one director or officer who executes an interim funding agreement to receive advancement of defense costs. However, Lexington will not advance any defense costs for any individual director or officer who does not sign an interim funding agreement with Lexington whereby the director or officer agrees to repay any such advanced defense costs which are later determined not to be covered under either the U.S. Specialty Policy or the Lexington Excess Policy. Lexington will be filing a motion to lift the bankruptcy stay for purposes of advancing defense costs under its Excess Policy similar to the motion filed by U.S. Specialty. Any advancement of defense costs under the Lexington Excess Policy is of course subject to Bankruptcy Court approval lifting the stay in order for

February 15, 2007
Page 3

---

Lexington to advance defense costs under its Excess Policy.     If any insured has any questions or comments, please do not hesitate to contact me.   Additionally, we will shortly be forwarding interim funding agreements for your review.

    Lexington continues to reserve all its rights, defenses and privileges under the U.S. Specialty Primary Policy, to which the Lexington Excess Policy follows form with certain exceptions, and the Lexington Excess Policy, at law and in equity. Lexington also reserves its right to apply other exclusions, endorsements or provisions of the Lexington Excess Policy as appropriate and supplement this coverage letter in the future as the facts and law warrant, and Lexington incorporates all its rights expressed in all the letters it has previously issued to the Insureds. Additionally, Lexington continues to reserve its rights with respect to the specific reservations expressed by the primary carrier U.S. Specialty.

    Should you have any questions or comments regarding the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

James E. Tolan

JET/sdv
cc:    **Via Email**
    Leslie Ahari
    Ross, Dixon & Bell, LLP
    2001 K Street, N.W.
    Washington, D.C. 20006

    **Via Email**
    Daniel J. Standish, Esq.
    Wiley Rein & Fielding LLP
    1776 K Street, N.W.
    Washington, D.C. 20006

    **Via Email**
    John D. Hughes, Esq.
    Edwards Angell Palmer & Dodge LLP
    101 Federal Street
    Boston, Massachusetts 02110-1800

    **Via Email**
    Robert Benjamin
    Kaufman Borgeest & Ryan LLP
    200 Summit Lake Drive
    Valhalla, NY 10595

#257143v1

# EXHIBIT D

## INTERIM FUNDING AGREEMENT

This Interim Funding Agreement ("Agreement") is made and entered into this ___

day of June 2006, by and between U.S. Specialty Insurance Company ("U.S. Specialty"),

and Dennis Klejna (the "Insured").

### W I T N E S S E T H:

WHEREAS, U.S. Specialty issued Directors, Officers and Corporate Liability Insurance

Policy No. 24-MGU-05-A10821 (the "Policy") to Refco, Inc. ("Refco") for the claims-made

period August 11, 2005 to August 11, 2006;

WHEREAS, subject to its terms, conditions, and limitations, the Policy affords coverage

for Loss resulting from Claims made against Insured Persons for Wrongful Acts;

WHEREAS, on or about December 8, 2005, the Insured was named with other Insured

Persons as a defendant in <u>Gensheimer v. Bennett, et al.</u> and <u>Teachers' Retirement System of the</u>

<u>State of Illinois v. Lee, et al.</u>, which suits subsequently were consolidated into <u>In re Refco, Inc.</u>

<u>Securities Litigation</u>, No. 05-CV-08626-GEL (S.D.N.Y.) (collectively the "<u>Refco Securities</u>

<u>Litigation</u>");

WHEREAS, on January 26, 2006, a complaint was filed against the Insured and others,

including other Insured Persons, in <u>Global Management Worldwide Limited v. Bennett, et al.</u>,

No. 06 CV 0643 (S.D.N.Y.) (the "<u>Global Management</u> Action");

WHEREAS, on April 13, 2006, a complaint was filed against the Insured and others,

including other Insured Persons, in <u>American Financial International Group – Asia, LLC v.</u>

<u>Bennett, et al.</u>, No. 05 CV 8988 (S.D.N.Y.) (the "<u>American Financial</u> Action");

WHEREAS, the <u>Refco Securities Litigation,</u> the <u>Global Management</u> Action and the

<u>American Financial</u> Action are collectively referred to herein as the "Litigation";

WHEREAS, the Insured has requested coverage under the Policy with respect to the Litigation and advancement by U.S. Specialty of reasonable and necessary Defense Costs to defend the Litigation;

WHEREAS, the Insured has retained the law firm of Baker & Hostetler LLP and the Nathan Law Office (collectively, "Defense Counsel") to represent him in the Litigation;

WHEREAS, U.S. Specialty has reserved its rights generally and on certain specific grounds with respect to the Litigation;

WHEREAS, pursuant to Policy Conditions (D), U.S. Specialty has agreed to advance reasonable Defense Costs incurred by or allocable to the Insured in connection with the Litigation without waiver of any of its rights under its Policy or applicable law, including with respect to the applicability of the retentions under the Policy and allocation for uncovered matters or entities, and further subject to continued approval of such advancement by the United States Bankruptcy Court in the matter In re Refco, Inc., Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases;

NOW, THEREFORE, in consideration of the mutual promises, covenants, agreements and other undertakings herein, and for other good and valuable consideration, the adequacy and receipt of which consideration is hereby acknowledged, the parties agree as follows:

1.     **Advancement of Defense Costs**

Subject to the approval of the Bankruptcy Court in In re Refco, Inc., Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases, and any terms and conditions of any applicable orders entered by such Court, and further subject to the Policy, this Agreement, and compliance by the Insureds and Defense Counsel with U.S. Specialty's Defense Counsel Guidelines (the "Guidelines"), U.S. Specialty will advance reasonable and necessary Defense Costs incurred by

and allocable to the Insured in defense of the Litigation. Work by Defense Counsel shall be performed by the designated attorneys and paralegal(s) at hourly rates not to exceed the rates set forth below:

**CORE**
<u>Nathan Law Office</u>

| | |
|---|---|
| R.E. Nathan | $400 Principal (Securities, Futures and Derivatives) |

<u>Baker & Hostetler LLP</u>

| | |
|---|---|
| H.B. Kim | $475 Securities Partner – Overall Responsibility |
| M.D. Powers | $575 Securities Partner – local NY for filings |
| Ona Wang | $375 Jr. Securities Partner – Section 10b-5 |
| Lisa Carteen | $385 Jr. Securities Partner – Global Mgmt, AFIC cases |
| Antonio Villegas | $235 Securities Associate – Section 15, 20(a) claims |
| Lisa Lawrence | $235 Securities Associate – Section 15, 20(a) claims |
| Terry Blaber | $170 NY Paralegal |

**SUPPORT**

| | |
|---|---|
| J.J. Carney | $525 White Collar Partner |
| Andrew Reich | $385 Securities Counsel – Section 10b-5 |
| J.M. Grippo* | $275 Securities Associate – Section 11 claim |
| Justin Shigemi | $240 Securities Associate – Section 15, 20(a) claims |
| J.L. Chairez | $435 Litigation and Insurance Partner |
| F.R. Cabezas | $385 Litigation and Insurance Associate |
| E. Divok | $195 Litigation and Insurance Paralegal |
| F. Frank | $235 Litigation and Insurance Associate |
| W. Gibson | $375 Bankruptcy Partner |
| S. Maxwell | $130 Bankruptcy Paralegal |

* leaving Baker & Hostetler 7/10/06

The addition of any attorneys or law firms other than those listed above to work on the defense of the Litigation and/or any increase in hourly rates must be approved in advance by U.S. Specialty.

2.    <u>**Submission and Review of Statements**</u>

Defense Counsel shall, on a monthly basis, submit all statements for services directly to counsel for U.S. Specialty, Ross, Dixon & Bell, LLP. Each statement shall comply with Section

II(B) of the Guidelines. Each statement shall provide sufficient detail of the work performed so that U.S. Specialty can perform a meaningful review to determine whether the charges are reasonable and necessary, and performed in defense of a covered Claim under the Policy. Defense Counsel shall issue separate invoices for the <u>Refco Securities Litigation</u>, <u>Global Management</u> Action and <u>American Financial</u> Action. U.S. Specialty shall have the right to make reasonable inquiries regarding all statements submitted for advancement. In the event that a submitted statement or any part thereof is not approved for advancement by U.S. Specialty, the parties hereto agree to use their best efforts and good faith to resolve any issues raised by such statement. In the event that an agreement cannot be reached, U.S. Specialty shall advance those items submitted that are not in dispute, and the parties will reserve all rights with regard to the items not advanced.

### 3.    Bi-Monthly Advancements

Subject to the terms and conditions of any order entered by the Bankruptcy Court in <u>In re Refco, Inc.</u>, Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases, and following the initial payment of fees and expenses, U.S. Specialty shall advance payment of Defense Costs in accordance with the terms and conditions of this Agreement on a bi-monthly basis.

### 4.    Agreement to Avoid Unreasonable and Unnecessary Fees and Costs and Duplication of Effort

Defense Counsel shall avoid incurring unreasonable and unnecessary legal fees and costs and shall avoid duplication of effort and expense.

### 5.    Advancements Credited Against Policy Limits

The Insured acknowledges and agrees that advancements of Defense Costs under this Agreement are made pursuant to the Policy and properly are credited by U.S. Specialty against the $10 million aggregate Policy limit and shall be applied toward exhaustion of such Policy

limit unless and until repayment to U.S. Specialty actually is made of any amount previously advanced.

### 6.    Undertaking of Repayment

Pursuant to Policy Conditions (D)(2), the Insured undertakes and agrees to repay U.S. Specialty any and all amounts, including Defense Costs, paid on his behalf in connection with the Litigation if it is finally determined that such amounts are not covered under the Policy.

### 7.    No Objection to Advancement of Defense Costs for Other Insureds

The Insured hereby agrees that he does not object to U.S. Specialty's advancement of Defense Costs under the Policy to any other person named as a defendant in the Litigation or in other lawsuits or proceedings and who is an "Insured Person" as that term is defined by the Policy. The Insured understands and agrees that advancements by U.S. Specialty to counsel for him and to counsel for other Insured Persons under the Policy will reduce and may exhaust the Policy's limit of liability, and that U.S. Specialty will process the invoices received from defense counsel for all Insured Persons in the order such invoices are received. In the event there are insufficient funds left in the Policy limit to pay all invoices in full, the Insured understands and agrees that U.S. Specialty is obligated to pay only that amount remaining under the Policy's limit of liability and that invoices from Defense Counsel may not be paid in full.

### 8.    U.S. Specialty's Reservation of Rights

U.S. Specialty is advancing Defense Costs pursuant to this Agreement on an interim basis, subject to a full and complete reservation of rights. Such reservation of rights may be amended or revised from time to time as circumstances warrant. Nothing herein shall constitute or be construed as a waiver or estoppel, either express or implied, of U.S. Specialty's rights under the Policy or applicable law. U.S. Specialty expressly reserves its rights with respect to the

applicability of the retentions under the Policy and the payment thereof by Refco, Inc.; provided,

however, that U.S. Specialty agrees that it will not seek payment of the retentions from the

Insured's personal assets, nor deny coverage for Defense Costs or other Loss under the Policy for

the Litigation solely on the basis of Refco's failure to satisfy the retention should payment by

Refco not be made. Nothing herein shall be construed as a waiver or limitation of U.S.

Specialty's subrogation rights under the Policy or at law, including with respect to Refco's

indemnification obligations. U.S. Specialty also reserves the right at the conclusion of the

Litigation, or at any prior time, to contest the reasonableness or necessity of Defense Costs, and

the fact that U.S. Specialty may have advanced such Defense Costs shall not be construed as an

admission or waiver with respect to their reasonableness or necessity, or as to coverage under the

Policy.

### 9.    Mutual Reservation of Rights

Except as otherwise specified in this Agreement, in entering into this Agreement, each of

the parties hereto expressly reserves all rights it or he may have to make any contention

whatsoever concerning the Policy, its coverage or scope, U.S. Specialty's duty, if any, to make

interim advancements of Defense Costs, and all other matters connected with the Policy and the

claims submitted thereunder.

### 10.    Termination

U.S. Specialty may terminate any or all payments under this Agreement thirty (30) days

after written notice to Defense Counsel, which notice shall state the reason for such termination;

provided, however, that U.S. Specialty's obligation to advance Defense Costs under this

Agreement shall terminate immediately in the event that the $10 million Policy limit of liability

is exhausted, including with respect to any unpaid fees or costs already incurred.

335501 v 1                    - 6 -

11.    **Construction of Agreement**

This Agreement is the result of negotiations among the parties, each of whom is

represented by or has access to counsel. This Agreement shall not be construed against any party

on the ground that counsel for that party drafted the Agreement or any provision thereof, and

shall not be construed against U.S. Specialty because it is an insurance company. The terms

"Defense Costs," "Loss," "Claim," and "Insured Persons" shall have the same meanings herein

as defined by the Policy.

12.    **Successors and Assigns**

This Agreement shall be binding upon the parties hereto and their respective heirs,

successors, and assigns. This Agreement shall not be assignable by any party without the prior

written consent of the other parties hereto.

13.    **Authority**

The undersigned signature and execution of this Agreement is made and undertaken by

individuals duly authorized to execute this Agreement.

14.    **Execution In Counterparts**

This Agreement may be executed in counterparts, each of which shall constitute an

original and all of which, when taken together, shall constitute one and the same instrument, and

any of the parties hereto may execute this Agreement by signing any such counterpart.

15.    **Entire Agreement**

This Agreement shall supersede any prior understandings and agreements, either written

or oral, between the parties (except for the Policy) and shall, along with the Policy, constitute the

entire agreement of the parties with respect to the matters contained herein.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

**U.S. SPECIALTY INSURANCE COMPANY**

By:_____

Title:_____


**DENNIS KLEJNA**

_____


DEFENSE COUNSEL:


By:_____
    Joseph L. Chairez


By:_____
    Richard E. Nathan

335501 v 1

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

U.S. SPECIALTY INSURANCE COMPANY

By:_____

Title:_____


DENNIS KLEJNA

_____

DEFENSE COUNSEL:


By:_____
　　Joseph L. Chairez

By:_____
　　Richard E. Nathan

335501 v 1

- 8 -

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed

on their behalf as of the date set forth above.

**U.S. SPECIALTY INSURANCE COMPANY**

By:_____

Title:_____

**DENNIS·KLEJNA**

_____

DEFENSE COUNSEL:

By:_____
    Joseph L. Chairez

By:_____
    Richard E. Nathan

335901 v 1

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed

on their behalf as of the date set forth above.

U.S. SPECIALTY INSURANCE COMPANY

By: _____

Title: Claims Counsel _____

**DENNIS KLEJNA**

_____

DEFENSE COUNSEL:

By: _____
    Joseph L. Chairez

By: _____
    Richard E. Nathan

335501 v 1

335501 v 1                    - 8 -

### Interim Funding Agreement

This Interim Funding Agreement ("Agreement") is made and entered into this _____ day of June, 2007, by and between Lexington Insurance Company ("Lexington") and Dennis Klejna ("Mr. Klejna").

WHEREAS, Lexington issued a Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 (the "Policy") to Refco,LLC ("Refco") for the claims-made period August 11, 2005 to August 11, 2006;

WHEREAS, subject to its terms, conditions, and limitations, the Policy affords coverage for Loss resulting from Claims made against Insured Persons for Wrongful Acts;

WHEREAS, Mr. Klejna has been named as a defendant, along with other Insured Persons, or is otherwise involved with, at least the following action: *In re Refco, Inc. Securities Litigation*, Master File No. 05-cv-8626 (GEL) (S.D.N.Y.), , ( the "Litigation");

WHEREAS, Mr. Klejna has been issued a subpoena in the In re Refco, LLC, Case No. 05-60134 (RDD) (Bankr. S.D.N.Y.) "In re Refco LLC" ;

WHEREAS, Mr. Klejna was dismissed without prejudice from the following actions: *In re Refco Capital Markets Ltd. Brokerage Customer Securities Litigation*, Case No. 06-cv-0643 (GEL)(S.D.N.Y.), *American Financial International Group-Asia, LLC v. Bennett, et al.,No. 05-*

1

*CV 8988 (S.D.N.Y.),* and thus should not have any more Defense Costs in connection with said actions.

WHEREAS, Mr. Klejna has requested coverage under the Policy with respect to the Litigation and advancement by Lexington of reasonable and necessary Defense Costs to defend the Litigation;

WHEREAS, Mr. Klejna has retained the law firms of Baker & Hostetler, LLP and the Nathan Law Office (collectively or individually, "Defense Counsel") to represent him in the Litigation;

WHEREAS, Lexington has reserved its rights generally and on certain specific grounds with respect to the Litigation ;

WHEREAS, pursuant to the terms of the Policy and, to the extent not contradicted by the Policy, the terms of the immediate underlying policy issued to Refco, Inc. by U.S. Specialty Insurance Company for the same period (U.S. Specialty Policy No. 24-MGU-05-A10821, the "Underlying Policy"), specifically Underlying Policy Conditions (D), Lexington has agreed to advance reasonable Defense Costs incurred by or allocable to Mr. Klejna in connection with the Litigation without waiver of any of its rights under its Policy or applicable law, including with respect to the applicability of the retentions under the Policy and allocation for uncovered matters or entities, and further subject to continued approval of such advancement by the United

2

States Bankruptcy Court in the matter *In Re Refco, Inc.*, Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases (collectively the "*Refco* Bankruptcy");

WHEREAS, U. S. Specialty Insurance Company, pursuant to the Underlying Policy, has been advancing Defense Costs to Mr. Klejna and other Insured Persons defending against or otherwise involved in the Litigation, and the Underlying Policy's limits of liability have been completely exhausted by payment of defense costs;

NOW THEREFORE, in consideration of the mutual promises, covenants, agreements and other undertakings herein, and for other good and valuable consideration, the adequacy and receipt of which is hereby acknowledged, the parties agree as follows:

1.    Advancement of Defense Costs

Subject to the approval of the Bankruptcy Court in the *Refco* Bankruptcy, which Lexington agrees to promptly seek, and any terms and conditions of any applicable orders entered by such Court, and further subject to the Policy, the Underlying Policy (to the extent not contradicted by the Policy), this Agreement, and compliance by Mr. Klejna and Defense Counsel with U.S. Specialty Defense Counsel Guidelines (the "U.S. Specialty Guidelines"), Lexington will advance reasonable and necessary Defense Costs incurred by and allocable to Mr. Klejna in defense of the Litigation. Defense Costs shall be construed as defined by the Underlying Policy in Definitions (D). Defense Costs shall not include payment for any attorney's fees, costs, or other expenses incurred in connection with: 1) prosecution of any affirmative claims in the Litigation or otherwise, except with respect to proofs of claim and the preservation of any

3

indemnification rights against Refco or any Refco affiliate thereof, which may preserve Lexington and/or U.S. Specialties' subrogation or indemnification rights, and except with the written consent of Lexington; 2) any other fees or expenses not properly chargeable to the defense of the Litigation. Work by Defense Counsel shall be performed by the designated attorneys and paralegal(s) at hourly rates not to exceed the rates set forth below:

Nathan Law Office

| | |
|---|---|
| R.B. Nathan | $450.00 |

Baker & Hostetler, LLP

| | |
|---|---|
| H.B. Kim | $520.00 |
| M.D. Powers | $600.00 |
| Ona Wang | $445.00 |
| Lisa Carteen | $395.00 |
| Antonio Villegas | $265.00 |
| Lisa Lawrence | $265.00 |
| Terry Blaber | $200.00 |
| Sarah Poster | $230.00 |

Support

| | |
|---|---|
| J.L. Chairez | $480.00 |
| J.J. Carney | $625.00 |
| F.R. Cabezas | $410.00 |
| B. Dviok | $225.00 |
| B. Frank | $260.00 |

4

| | |
|---|---|
| W. Gibson | $400.00 |
| S. Maxwell | $140.00 |
| Matthew Goldman | $610.00 |
| Kelly S. Burgan | $250.00 |

The addition of any attorneys or law firms other than those listed above to work on the defense of the Litigation and/or any increase in hourly rates must be approved in advance by Lexington.

2.    Submission and Review of Statements

Defense Counsel shall, on a monthly basis, submit all statements for services directly to counsel for Lexington, D'Amato & Lynch. Each statement shall comply with U.S. Specialty Guidelines . Each statement shall provide sufficient detail of the work performed so that Lexington can perform a meaningful review to determine whether the charges are reasonable and necessary, and performed in defense of the Litigation for which Lexington has reserved its rights under the Policy or with respect to proofs of claim and the preservation of any indemnification rights against Refco or any Refco affiliate thereof, which may preserve Lexington and/or U.S. Specialties' subrogation or indemnification rights. Defense Counsel shall issue separate statements for their work on each case included in the Litigation. Lexington shall have the right to make reasonable inquiries regarding all statements submitted for payment. In the event that a submitted statement or any part thereof is not approved for payment by Lexington, the parties hereto agree to use their best efforts and good faith to resolve any issues raised by such statement. In the event that an agreement cannot be reached, Lexington shall advance those items submitted that are not in dispute, and the parties will reserve all rights with regard to the items not advanced.

5

3.    **Bi-Monthly Advancements**

Subject to the terms and conditions of any order entered in the *Refco* Bankruptcy, and following the initial payment of fees and expenses, Lexington shall advance payment of Defense Costs in accordance with the terms and conditions of the Agreement on a bi-monthly basis.

4.    **Agreement to Avoid Unreasonable and Unnecessary Fees and Costs and Duplication of Effort**

Defense Counsel shall avoid incurring unreasonable and unnecessary legal fees and costs and shall avoid duplication of effort and expense.

5.    **Advancements Credited Against Policy Limits**

Mr. Klejna acknowledges and agrees that advancements of Defense Costs under this Agreement are made pursuant to the Policy and are properly credited by Lexington against the $7.5 million aggregate limit of liability of the Policy, and shall be applied toward exhaustion of the Policy limit.

6.    **Repayment**

Pursuant to the conditions and terms of the Policy and the Underlying Policy, specifically Underlying Policy Conditions (D)(2) (to the extent not contradicted by the Policy), Mr. Klejna agrees to repay Lexington any and all amounts, including Defense Costs, paid on his behalf in connection with the Litigation if it is finally determined that such amounts are not covered either under the Policy or the Underlying Policy. Such final determination includes but is not limited to the final determination, including any appeals, in the action styled substantially Joseph Murphy

6

and Dennis Klejna v. Lexington Insurance Company et al., filed in the Superior Court of New Jersey Law Division: Hudson County Civil Action Docket No. L-5004-06 (the "Murphy Action").

7.    **No Objection to Advancement of Defense Costs for Other Insured Persons**

Mr. Klejna hereby agrees that he does not object to Lexington's advancement of Defense Costs under the Policy, pursuant to substantially the same terms contained in this Agreement, to any other person who is named as a defendant in the Litigation or in other lawsuits or proceedings and who is an Insured Person under the Policy as that term is defined in the Policy. Mr. Klejna understands and agrees that the advancements by Lexington to Defense Counsel and to counsel for other Insured Persons under the Policy will reduce and may exhaust the Policy's limit of liability, and that Lexington will process the invoices received from defense counsel for all Insured Persons in the order such invoices are received. In the event there are insufficient funds left in the Policy limit to pay all invoices in full, Mr. Klejna understands and agrees that Lexington is obligated to pay only that amount remaining under the Policy's limit of liability, and that invoices from Defense Counsel may not be paid in full.

8.    **Lexington's Reservation of Rights**

Lexington is advancing Defense Costs pursuant to this Agreement on an interim basis, subject to a full and complete reservation of rights, including its reservation of rights with respect to whether the Policy provides coverage for Defense Costs. Such reservation of rights may be amended or revised from time to time as circumstances warrant. Nothing herein shall constitute or be construed as a waiver or estoppel, either express or implied, of Lexington's rights under the

7

Policy, the Underlying Policy or applicable law. Lexington expressly reserves its rights with respect to the applicability of the retentions under the Underlying Policy and the Policy and the payment thereof by Refco; provided, however, that Lexington agrees that it will not seek payment of the retentions from the Mr. Klejna's personal assets, nor deny coverage for Defense Costs or other Loss under the Policy for the Litigation solely on the basis of Refco's failure to satisfy the retention should payment by Refco not be made. Nothing herein shall be construed as a waiver or limitation of Lexington's subrogation rights under the Policy or at law, including with respect to Refco's indemnification obligations. Lexington also reserves the right at the conclusion of the Litigation, or at any prior time, to contest the reasonableness or necessity of Defense Costs, and the fact that Lexington may have advanced Defense Costs shall not be construed as an admission or waiver with respect to their reasonableness or necessity, or as to coverage under the Policy.

9.    **Mutual Reservation of Rights**

Except as otherwise specified in this Agreement, in entering into this Agreement, each of the parties expressly reserves all rights it or he may have to make any contention whatsoever concerning the Underlying Policy, the Policy, its coverage or scope, Lexington's duty, if any, to make interim advancements of Defense Costs, and all other matters connected with the Policy and the claims submitted thereunder.

10.    **Termination**

Lexington may not terminate  payment under this Agreement , unless there has been a final judgment of liability adverse to Mr. Klejna in the litigation and for which it is found there is

8

no indemnity coverage, or a final judgment in favor of Lexington in the Murphy Action;
provided, however, that Lexington's obligation to advance Defense Costs under this Agreement
shall terminate immediately without notice in the event that the $7.5 million Policy's limit of
liability is exhausted, including with respect to any unpaid fees or costs already incurred.

11.    Construction of Agreement

This Agreement is the result of negotiations among the parties, each of whom is
represented by or has access to counsel. This Agreement shall not be construed against any party
on the ground that counsel for that party drafted the Agreement or any provision thereof, and
shall not be construed against Lexington because it is an insurance company. Capitalized terms
not defined herein shall have the same meanings as defined by the Policy or, to the extent not
contradicted by the Policy, the Underlying Policy, except that nothing in this Agreement binds
either party to the meaning or interpretation of the terms "Loss" or "Costs" as used in the Policy
until there is a final determination of the meaning of said terms

12.    Successors and Assigns

This Agreement shall be binding upon the parties hereto and their respective heirs,
successors, and assigns. This Agreement shall not be assignable by any party without the prior
written consent of the other parties hereto.

13.    Confidentiality of Statements

(a)    Defense Counsel's submission of statements for professional fees and
costs to Lexington for payment and correspondence relating to or transmitting the statements
shall be CONFIDENTIAL and will not constitute a waiver of the Insured's attorney-client or

9

work product privilege with Defense Counsel. Lexington will treat such statements and letters as confidential and will not share them with third parties without the Insured's express written consent. Provided, however, that nothing herein will preclude Lexington from disclosure of such statements to its outside counsel, experts or consultants retained by Lexington or its outside counsel, any representative of an insurance commissioner or regulator, or department of insurance, or any auditor or reinsurer. Provided, further, however, that nothing in this Agreement will preclude Lexington from disclosing to third parties: (1) the dollar amount(s) of professional fees and/or disbursements reflected in the statements for Defense counsel; (2) the dollar amount(s) for professional fees and/or disbursements advanced by Lexington to Defense Counsel; (3) information that Lexington is required to disclose pursuant to the March 27, 2006 Order concerning the Policy entered in In re Refco, Inc., Case No. 05-60006 (RDD) (Bankr. S.D.N.Y.) and any subsequent orders and/or amendments entered by the Court in that matter concerning the Policy; and (4) information that Lexington obtains from persons other than the Insured or Defense Counsel.

(b)    In the event that Lexington receives a subpoena, document request, information request, demand, or any other legal process requiring the disclosure of the statements or information contained therein, it shall, to the extent permitted by law, provide written notice as soon as possible to Defense Counsel. The Insured may take such steps as he deems appropriate to protect his interest concerning disclosure of the Statements at his own expense. In no event shall Lexington have any obligation to incur legal fees or costs in connection with any efforts by the Insured to prevent, limit or condition disclosure of the statements or take any action that could expose Lexington to contempt or other sanctions.

10

(c)     The Parties acknowledge that no attorney-client relationship exists between the Insured and Lexington and/or Lexington's counsel, and nothing herein shall be construed as creating any such attorney client relationship between the Insured and Lexington. The Parties further acknowledge and agree that neither Lexington nor its counsel is representing or providing legal counsel to the Insured, and that it has no duty to defend the Insured in the Litigation.

14.     **Authority**

The undersigned signature and execution of this Agreement is made and undertaken by individuals duly authorized to execute this Agreement.

15.     **Execution in Counterparts**

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart. Facsimiles or scanned versions of signatures by the parties shall be treated as originals.

16.     **Entire Agreement**

This Agreement shall supersede any prior understandings and agreements, either written or oral, between the Parties, except for the Policy and, to the extent not contradicted by the Policy, the Underlying Policy.  Together with the Policy and the Underlying Policy, this Agreement shall constitute the entire agreement of the parties with respect to the matters contained herein.

11

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

LEXINGTON INSURANCE COMPANY

By: _Roger H Randall_

Title: _Financial Institutions_
_Professional Liability_

DENNIS KLEJNA

_____

DEFENSE COUNSEL:

By: _____
Helen Kim

By: _____
Richard B. Nathan

12

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

LEXINGTON INSURANCE COMPANY

By: _____

Title: _____

DENNIS KLEJNA

_____

DEFENSE COUNSEL:

By: _____
Helen Kim

By: _____
Richard B. Nathan

12

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

LEXINGTON INSURANCE COMPANY

By: _____

Title: _____

DENNIS KLEJNA

_____

DEFENSE COUNSEL:

By: _____
Helen Kim

By: _____
Richard B. Nathan

12