# EXHIBIT N

# KAUFMAN BORGEEST & RYAN LLP

### ATTORNEYS AT LAW

**200 SUMMIT LAKE DRIVE**
**VALHALLA, NEW YORK 10595**

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE‡†
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER R. DiGIACINTO*
JONATHAN B. BRUNO‡
PAUL J. COLUCCI
MARGARET J. DAVINO*†‡
JEFFREY C. GERSON†‡
ROCCO P. MATRA◊
JOHN B. MULLAHY*
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON◊
CHRISTINE HEENAN

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN◊

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEVER*
CAROL S. DOTY†††
BARBARA-ANN M. COSTELLO
ELIZABETH O'BRIEN TOTTEN
RICHARD A. FRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL B. JANES
R. EVON HOWARD*
LEONARD B. COOPER†‡
ANDREW R. JONES
KEITH L. KAPLAN††
VINCENT C. ANSALDI††
DAVID J. VARRIALE*††

DOUGLAS J. DOMSKY
TIMOTHY E. McCARTHY*
JEFFREY A. GRAINNCK
TRACEY REISER-PERTOSO††
KATHERINE J. O'BRIEN††
DAMIEN SMITH
ANDREW K. KOPILOWITZ*◊
MATTHEW M. FERGUSON*◊
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON††
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*

KATHRYN M. WALSH
LAURA B. JUFFA
KATELIN B. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI B. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNING*
THOMAS LOOKSTEIN
ROBERT E. FEKETE
JULIE A. MICKIEWICZ*
LORRAINE C. SYLVESTER*
JESSICA MOLINARES
JENNIFER M. HAMILTON

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
♦ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
* ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
● ADMITTED IN CT ONLY
☆ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 12, 2008

**VIA FEDEX and EMAIL**
Honorable Robert D. Drain
United States Bankruptcy Court for the
Southern District of New York
Alexander Hamilton U.S. Custom House,
Room 610
One Bowling Green
New York, NY 10004

|     |                            |   |                                              |
|-----|----------------------------|---|----------------------------------------------|
| Re: | Adversary Proceeding       | : | Grant v. Illinois National Ins. Co., et al.  |
|     | District Court Proceeding  | : | AXIS v. Bennett, et al.                       |
|     | Index Nos.                 | : | 08-1129-RDD and 07-7924-GEL, et al.           |

Your Honor:

        As Your Honor may recall, we represent AXIS Reinsurance Company ("AXIS"). We write to bring to Your Honor's attention the fact that serious and consequential misrepresentations were made to this Court and to AXIS in connection with prior proceedings before Your Honor. It has just come to the attention of AXIS that other counsel misled this Court and AXIS into believing that, absent an immediate injunctive Order requiring AXIS to advance their defense costs, their clients would be without the ability to fund their defense of criminal and civil actions. Two days ago, AXIS learned that this was not true. Based on the complaint filed two days ago in *Grant v. Illinois National Ins. Co., et al.* (Bankr. SDNY, 08-1129-RDD, Doc. 1), AXIS has now learned that, at the time they sought preliminary injunctive relief from this Court, another insurer already had agreed to fund their defense, and counsel withheld this critical information from this Court. Moreover, and regretfully, counsels' misrepresentations were made in order to obtain Orders from this Court that directly and financially benefited counsel and worked a grave injustice to our client, AXIS.

        Throughout the late summer and early fall of 2007, Your Honor was presented with motions for preliminary injunctive relief, and ultimately for permanent injunctive relief through

Refco Insurance Litigation
Page 2 of 5

partial summary judgment.[1]  Over the objections of AXIS, Your Honor ordered AXIS to advance defense costs to the Insureds, including the Indicted Insureds such as Mr. Grant.[2]

The history of the Indicted Insureds' motion for preliminary injunctive relief is well documented.  On September 4, 2007, Mr. Grant and the other Indicted Insureds filed a complaint seeking declaratory and injunctive relief requiring AXIS to advance their defense costs prior to an adjudication of coverage under the AXIS Policy.  The following day, on September 5, 2007, the Indicted Insureds filed a motion for preliminary injunction requiring AXIS to advance their defense costs.  This motion for preliminary injunction was supported by the Declaration of counsel and brought by Order to Show Cause.[3]

An essential prerequisite to obtaining a preliminary injunction in the Second Circuit is, of course, a showing of irreparable harm.  Counsel represented to the Court and to AXIS that, absent an order requiring AXIS to pay their defense costs, the Insureds would left helpless and financially unable to fund the defense of the criminal and civil actions.  The Insureds and their counsel argued they were at the mercy of AXIS and that their very freedom and liberty were at

---

[1] On July 12, 2007, the Officer Insureds filed a motion for preliminary injunction requiring AXIS to advance their defense costs. A hearing was held on that motion on August 30, 2007, and this Court granted the preliminary injunction motion. The Indicted Insureds filed a similar motion for preliminary injunction on September 5, 2007, and a hearing was held on September 11, 2007, where this Court granted the preliminary injunction motion. The Director Insureds filed a complaint seeking similar relief on September 17, 2007. All three dockets were then consolidated and motions for summary judgment seeking a permanent injunction were filed on September 25, 2007. A hearing on the summary judgment motions was held on October 12, 2007, and this Court entered an Order granting summary judgment on October 19, 2007. On November 13, 2007 the District Court (J. Lynch) withdrew the reference to the Bankruptcy Court. AXIS filed appeals of the Bankruptcy Court Orders in the District Court. Those appeals were fully briefed on January 9, 2008, and are currently awaiting a decision by the District Court.

[2] AXIS has now paid its $10 million Limit of Liability to the Insureds, including approximately $2.7 million to Mr. Grant's counsel. A total of approximately $6.7 million was paid to counsel for the Indicted Insureds.

[3] In addition to misrepresenting a necessary basis for injunctive relief, counsel also misrepresented the basis upon which this Court granted the Order to Show Cause. Norman Eisen, counsel to Mr. Grant, filed a Declaration supporting the Order to Show Cause which asserted, under penalty of perjury:

> Good reason exists for the Court to shorten the notice period so that the Motion may be heard on September 11, 2007: 1) the Moving Defendants are confronting not only civil proceedings but also a criminal trial, and so face an even more **urgent need for resolution** of advancement issues than did the Counterclaim Defendants; 2) that urgency is heightened because the previous layer of coverage has now been fully exhausted and **Axis' delay is presently disrupting the defense of the criminal and civil matters**; and 3) the issues presented by the Motion have already been extensively briefed, argued, and ruled upon, so expedited treatment will not prejudice Axis. Declaration of Norman L. Eisen, at p. 2 (07-2005-RDD, doc. 4) (emphasis added).

Importantly, Mr. Eisen also signed the complaint filed two days ago. In that complaint, Mr. Eisen asserts that "By letter dated June 8, 2007, Illinois National acknowledged its duty to advance defense costs for [Mr. Grant's] defense to the Underlying Actions."   Complaint, at p. 5 (08-1129-RDD, doc. 1) (hereinafter "Grant Complaint"). Accordingly, it appears that the Declaration made by Mr. Eisen under penalty of perjury in support of the Order to Show Cause was untrue, because, at the time he filed the declaration, Mr. Eisen was well aware that another insurer had already agreed *in writing* to pay Mr. Grant's defense costs.

KAUFMAN BORGEEST & RYAN LLP

Refco Insurance Litigation
Page 3 of 5

issue.[4] This was not true. In fact, as AXIS and the Court learned two days ago, counsel were well aware that another insurer (the primary insurer in a different tower of D&O insurance) had already agreed in writing to fund their defense. In truth, counsel to the Indicted Insureds *knew* – at the time of the hearings – that if this Court did not require AXIS to pay their defense costs, those defense costs would have been paid by another insurer. Counsels' material misrepresentations to this Court and to AXIS provided the basis for the relief granted by this Court (the payment of millions of dollars to counsel by AXIS).

The evidence of counsels' misrepresentations during the various hearings led Your Honor to believe that if AXIS did not provide them with payment of their defense costs, they had nowhere else to turn for payment of their fees. Counsel to the Indicted Insureds led Your Honor to believe that, absent payment from AXIS, their clients would not receive a defense in their criminal trials. The litigation they have now filed against Illinois National Ins. Co. makes clear that "since mid-2007, Illinois National had agreed to advance fees for [the criminal] trial." Grant Complaint at 1. Mr. Eisen, counsel for Mr. Grant and *speaking for all of the Indicted Insureds at the hearing*, knew that another insurer had already agreed in writing to pay his defense costs when he stood before Your Honor on September 11, 2007, seeking emergency relief – based on irreparable harm – requiring AXIS to pay Mr. Grant's defense costs.

Examples of such misrepresentations in the September 11, 2007 preliminary injunction hearing transcript abound (07-2005-RDD, Doc. 22, Exhibit C) (hereinafter, "September 11 Tr."):

- On the balance of the harms, we would submit that, again, as noted by the Court the harms are even more severe because the criminal defendants are facing trial; it's not merely a question of a risk of financial loss, it is a liberty interest and the most serious liberty interest and **any disruption in the preparation for trial as the Court noted is a very, very serious harm indeed**. September 11 Tr. at p.4 (emphasis added).

- Indeed, for the criminal defendants it is crucial because the pipeline is building up and we have so much work to do and **the consequences are so great**. September 11 Tr. at p.7 (emphasis added).

- Your Honor, the criminal defendants, though, would submit to the Court that there are different **exigencies that apply to our need** and if I may the clients will be facing the prospect of uncertainty as you've heard from Axis very substantial August bills on top of very substantial September bills. It's not just the question of Axis having agreed to pay and waiting a reasonable amount of time for the invoice to be honored, it is th [sic] uncertainty and **the precise chilling effect on the ability to defend the case** that the

---

[4] Throughout the proceedings on the motion for preliminary injunctive relief, AXIS argued that the Insureds were obligated under Second Circuit law to make an evidentiary showing of irreparable harm – to wit – that they would be unable to fund their criminal and civil defense absent payment from AXIS, who had denied any coverage obligation. This Court did not require the Insureds to present any evidence of irreparable harm as part of the preliminary injunction proceedings. It now is apparent that the Indicted Insureds (at least) would have been completely unable to make such a showing, because they already had received a written commitment from another insurer promising to pay their defense costs. That fact was concealed from this Court and from AXIS.

KAUFMAN BORGEEST & RYAN LLP

*Worldcom* Court was concerned with when it balanced the harms. September 11 Tr. at p. 16 (emphasis added).

Your Honor summarized counsel's argument:

- They also contend that given the amount of defense costs that have been incurred to date and the fact that they are criminal defendants subject to freeze orders the failure to advance the defense costs **irreparably harms them in that it impairs their ability to mount an effective defense in this case of a criminal indictment**. September 11 Tr. at p. 54 (emphasis added).

Counsel also made material misrepresentations in their pleadings wherein they sought a preliminary injunction requiring AXIS to pay their defense costs:

- Absent preliminary and permanent injunctive relief, **Plaintiffs face an imminent risk of irreparable harm**, including but not limited to the risk of an adverse outcome in the Criminal Action or the Civil Actions caused by their **inability to mount an adequate defense**. Complaint, at p. 12 (07-2005-RDD, doc 1) (emphasis added).

- There is an **urgent need** for the relief sought, as the policies underlying Axis's policy have been exhausted, the Moving Insureds are incurring significant defense costs. . .. Preliminary Injunction Motion, at p. 1 (07-2005-RDD, doc 3) (emphasis added).

- The balance of the hardships tips decidedly in the Moving Insureds' favor because, *inter alia*, **their ability to access defense cost reimbursements will jeopardize their ability to maintain an effective defense**, resulting in a materially heightened risk of an adverse result in the Criminal Action or the other Underlying Actions. . . Such harm would of course be irreparable. Preliminary Injunction Motion, at p. 9 (07-2005-RDD, doc 3) (emphasis added).

- As set forth above, the Lexington Policy has been exhausted, and **the Moving Insureds are now forced to shoulder the burden of their own defense unless Axis is ordered to advance defense costs**. This is a serious blow to the ability of the Moving Insureds to protect heir interests -- including, in the case of the Criminal Action, their liberty as well as their financial and reputational interests. Preliminary Injunction Motion, at p. 14 (07-2005-RDD, doc. 3) (emphasis added).

- [I]nsureds such as **the Moving Insureds face irreparable harm absent an advancement order**, as they may otherwise be unable to effectively defend themselves in the underlying actions against them. Preliminary Injunction Motion, at p. 14 (07-2005-RDD, doc. 3) (emphasis added).

- [I]f convicted in the Criminal Action, the Moving Insureds face possible sentences of lifetime imprisonment under the Sentencing Guidelines if they are convicted. Accordingly, **they must be able to fund an adequate defense**. At the August 30, 2007

KAUFMAN BORGEEST & RYAN LLP

Refco Insurance Litigation
Page 5 of 5

hearing, this Court recognized that "**the risk of not having counsel proceed or to substantially cut back on their efforts because of unpaid bills** is a tremendous potential harm particularly in a criminal context." Preliminary Injunction Motion, at p. 15 (07-2005-RDD, doc. 3) (emphasis added).

- [B]ecause of the **urgency of receiving payments**, the Moving Insureds wish to obtain an order confirming that no obstacles exist to such payment. Preliminary Injunction Motion, at p. 16 (07-2005-RDD, doc. 3) (emphasis added).

All the while, counsel knew that another D&O insurer already had committed in writing to pay their defense costs. Counsel also concealed from AXIS and from this Court the existence of the Illinois National Ins. Co. policy, and the fact that Illinois National had agreed to pay their defense costs. This, despite AXIS's specific written request more than a year earlier (by letter dated March 6, 2006) that the Insureds disclose to AXIS "any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons." None of the Insureds responded to AXIS about other insurance, nor did they apprise this Court about this other D&O insurance.

Most troublesome about counsels' misrepresentations is that it was counsel themselves – and not just their clients – that reaped the direct economic benefit from their repeated misrepresentations to this Court. For example, Mr. Eisen's firm was paid over $1.9 million by AXIS. Of course, AXIS also was victimized by these misrepresentations because AXIS was ordered to pay millions that should have been paid by another insurer. Adding to this injury, it is unclear whether AXIS ever will be able to recoup the monies expended because the Indicted Insureds, on whose behalf AXIS was ordered to advance approximately $6.7 million, have had their assets frozen and there are competing demands by creditors and litigants.

AXIS is not requesting any relief in this letter. We simply write, as officers of the Court, to bring these material misrepresentations to the Court's attention. Please do not hesitate to contact us if we can provide the Court with any further information or be of any assistance.

Respectfully,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Joan M. Gilbride
Robert A. Benjamin

cc:    all counsel (via email only)
       Hon. Gerard E. Lynch (via overnight delivery)

KAUFMAN BORGEEST & RYAN LLP

# EXHIBIT O

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com



January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

a. No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

_See attached_

b. No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: _Refco Group LTD. LLC_

Signature: _Nip Bu_

Title: _PRESIDENT & CEO._
(Chairman of the Board or President)

Date: _JAN 21. 2005._

# MEMORANDUM

TO:        **Phillip Bennett**

FROM:      **Ellen Brooks**

SUBJECT:   **Directors and Officers Coverage**

DATE:      **January 14, 2005**

Axis Reinsurance Company is one of three insurance carriers for our present D&O coverage that was placed August 5, 2004. Due to the $30,000,000 total limit that T.H. Lee required us to purchase, we had to layer the coverage. Axis is the 2nd layer with $10,000,000 limit. They are requiring you to sign a warranty letter confirming that we currently do not have a claim against our D&O policy.

We did not reveal this case at the time the Axis underwriter was reviewing our application, therefore, they are now asking for a copy of the complaint and also a copy of the court filing of the dismissal. The complaint is attached, but we are still waiting on the court to send Herrick, Feinstein LLP the dismissal order.

If you have any questions, please do not hesitate to give me a call.

Thank you.

# HERRICK, FEINSTEIN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP INCLUDING NEW YORK PROFESSIONAL CORPORATIONS

2 PARK AVENUE
NEW YORK, NY 10016-9301

TELEPHONE: (212) 592-1400
FACSIMILE: (212) 592-1500

WEB: www.herrick.com

104 CARNEGIE CENTER
PRINCETON, N.J. 08540-6232

2 PENN PLAZA
NEWARK, N.J. 07105-2245

WRITER'S DIRECT DIAL:

(212) 592-1588

E-MAIL: gcoen@herrick.com

January 14, 2005

BY E-MAIL

Ms. Ellen Brooks
Refco, LLC
550 West Jackson Boulevard
Suite 1300
Chicago, Illinois 60661

Re:     Louis Capital Markets, L.P., v. Refco Group Ltd., LLC, et al.

Dear Ms. Brooks:

Pursuant to your request to Therese Doherty for the status of the above-referenced litigation, please be advised of the following:

This matter is pending in the Supreme Court of the State of New York, County of New York, and is filed under Index No. Case No. 04601028/04. On April 14, 2004, plaintiff filed a complaint against Refco Group ltd., LLC, an employee of Refco Securities SA, and four registered representatives and employees of Refco Securities, LLC. The complaint arises out of the termination of employment by four of the individual defendants with plaintiff and alleges that Refco Group Ltd., LLC, "acting through its subsidiaries" and "their agents," (a) tortiously interfered with contractual relationships between plaintiff and several of its employees; (b) aided and abetted breach of fiduciary duty by each of several former employees of plaintiff; (c) committed unfair business practices; (d) breached an implied-in-fact contract with plaintiff; and (e) tortiously interfered with plaintiff's economic advantage. The complaint seeks damages as follows: (a) on the first three causes of action, "not less than $4.5 million per year in lost profits" plus 9% interest, as well as future profits to be determined; (b) on the fourth cause of action, "not less than $4.5 million per year" plus 9% interest per year; and (c) on the fifth cause of action, "an amount in excess of $18 million"; together with 9% interest, punitive damages and other relief. On September 23, 2004, the court granted the defendants' motion to dismiss the complaint. We have been advised by the Court to expect an order to be issued before the next conference date of January 27, 2005.

HFNY2: #809103 v.1 #05704-0000

HERRICK, FEINSTEIN LLP

> Ms. Ellen Brooks
> January 14, 2005
> Page 2

       As you requested, we have attached a copy of the complaint with exhibits. We will forward to you a copy of the court order as soon as we receive it. Please feel free to contact me if we can be of further assistance.

                            Very truly yours,

                            Grant R. Cornehls

cc:    Therese M. Doherty

HFNY2: #809103 v.1 #05704-0000

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART

**ORIGINAL**

LOUIS CAPITAL MARKETS, LP, Successor to
LOUIS CAPITAL MARKETS, LLC,

                  Plaintiff,

Index No.

               04601028

- against -

           **COMPLAINT**

REFCO GROUP LTD., LLC, ALAIN FELLOUS,
MICHAEL BENISTY, HENRI CONDRON,
BENJAMIN CHOUCHANE, LIONEL MELLUL and
MARCOS PAGANI,

                Defendants.

           Plaintiff, LOUIS CAPITAL MARKETS, LP, successor to LOUIS

CAPITAL MARKETS, LLC ("LCM"), by its attorneys Bolin & Boone, for its Complaint

alleges as follows:

**FILED**

**APR 14 2004**

**NEW YORK
COUNTY CLERK'S OFFICE**

## THE NATURE OF THE ACTION

    I.    This is an action for: (1) tortious interference with employment

agreements, (2) aiding and abetting the breach of LCM's employees' fiduciary duties to

LCM; (3) unfair business practices; (4) breach of implied-in-fact contract; and (5)

tortious interference with LCM's expectancy of an economic advantage, against REFCO

Group Ltd., LLC, (acting through its subsidiaries, such as Refco Overseas Ltd., and

Refco Securities Paris, S.A., and their agents, such as Alain Fellous) (the "REFCO

Defendants"); and for: (6) conversion and misappropriation of intangible business assets

1

and opportunities, (7) breach of agreement, and (8) breach of fiduciary duties by and among LCM's former employees (the "Former LCM Employees").

2.    The action arises out of the REFCO defendants' attempts in 2001 to form a business combination with LCM, and the REFCO defendants' scheme, deliberately and methodically carried out over the ensuing years, to steal LCM's proprietary business through corporate espionage, to interfere with LCM's agreements with its Former Employees, and to misappropriate through them and by other means LCM's trade secrets and business opportunities.

<u>THE PARTIES</u>

3.    Louis Capital Markets, LP is a limited partnership organized in 2003 and existing under the laws of the State of New York. It is the successor to Louis Capital Markets LLC (collectively "LCM"). LCM is a broker-dealer registered with the Securities and Exchange Commission (the "SEC") and it is a member of the National Association of Securities Dealers, Inc. It is principally engaged in retailing corporate equity securities "over-the-counter." Its principal place of business is located at 67 Wall Street, New York, New York.

4.    Upon information and belief, REFCO Group Ltd., LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. It is a global financial giant which offers a broad range of financial products and services through its subsidiaries and affiliates

2

throughout the world including Refco Overseas Ltd. and REFCO Securities Paris, S.A. (collectively "REFCO").

5.     At all relevant times, Alain Fellous was President of REFCO Securities Paris, S.A., which, upon information and belief, is owned or controlled by REFCO Group Ltd., LLC.

6.     Michael Benisty is now employed by REFCO as an Executive Vice President in New York. Before 2002, he was also employed by REFCO. In February 5, 2002, he resigned from REFCO and started work as a Senior Vice President at LCM. As alleged in the paragraphs that follow, Benisty was a corporate "mole" or spy for RECFO while he was employed at LCM. He was fired by LCM on December 6, 2002, after LCM discovered he intended to return to REFCO to set up and duplicate LCM's unique equity trading business for REFCO in New York City.

7.     Benjamin Chouchane was hired by LCM on May 20, 2002 as a Sales Assistant. On December 9, 2002, he suddenly resigned from LCM to join Benisty at REFCO.

8.     Henri Condron was hired by LCM on March 24, 2002 as a Middle and Front Office Operator. On December 31, 2002, he suddenly resigned from LCM to join Benisty and Chouchane at REFCO.

9.     Lionel Melful was hired by LCM on July 1, 2002, as a Vice President. On February 14, 2003, he accepted the offer from LCM to become a Senior Vice President to develop LCM's Institutional Sales Department. On February 4, 2004, he suddenly resigned from LCM to join Benisty and the other Former LCM Employees at

3

REFCO the next day. A copy of Mellul's Employment Agreement with LCM is attached as Exhibit "A."

10.    Marcos Pagani was hired by LCM in August 2001. On February 14, 2003, he accepted the offer from LCM to become a Director to develop its Institutional Sales Office. On February 4, 2004, he suddenly resigned with Mellul to join the other Former Employees at REFCO the next day. A copy of Pagani's Employment Agreement with LCM is attached as Exhibit "B."

## THE FACTS

11.    Success in the business of trading securities or commodities of any kind depends in large measure on two key capabilities: (a) cultivation and maintenance of relationships with customers; and (b) familiarity with specific markets and the development and execution of trading strategies carefully tailored to those markets. Both capabilities are intangible. But both capabilities constitute crucial components of the intellectual capital employed by Firms engaged in the trading business. Like any other service business, this intellectual "know how" is usually the decisive key to success or failure in the trading industry.

12.    Prior to 2000, REFCO was best known in the financial community as a global giant in the international commodities markets. In particular, REFCO was (and is) known as a dominant presence in the trading of such commodities as metals, agricultural products, energy, and currencies – and with instruments and contracts related to the exchange of such commodities.

4

13.     Prior to 2000, REFCO had only a relatively small presence and participation (and then only derivatively) in the markets for equity securities – especially the equity markets in the United States.

14.     Prior to 2000, REFCO participated in the U.S. equity markets primarily through its relationship with Raymond James & Company.

15.     In or about August 2000, defendant Fellous, then President of Refco Securities, S.A., met with Michael Benamhou, one of the Managing Partners of LCM, during a dinner in Saint Tropez.

16.     Over the following months, the relationship begun in August 2000 between the principals of LCM and Fellous ripened and grew.

17.     Upon information and belief, in or about March 2001, REFCO terminated its relationship with Raymond James.

18.     The growing relationship between LCM and REFCO culminated in a "Piggy Back" Clearing Agreement on about March 27, 2001, between REFCO and LCM in which LCM agreed to handle and execute equity security transactions for REFCO's European customers.

19.     LCM and REFCO began conducting business under their Clearing Agreement and asked their attorneys to draw up papers to formalize their agreement.

20.     During the following year and a half, the attorneys for LCM and REFCO exchanged many drafts of a definitive Introducing Broker Agreement (the "Broker Agreement") to formalize and fill in the details of the then existing Clearing Agreement under which LCM and REFCO were conducting their business relationship.

21.     Prominent among the drafts of the Broker Agreement exchanged

5

between the parties' attorneys for many months was a non-solicitation clause in which REFCO agreed not "...to hire, contract with, or solicit to hire or contract with, any person who has performed services..." by LCM for REFCO under the Broker Agreement.

22.    By November 19, 2001, REFCO itself requested a reciprocal "non-solicitation/non-compete" clause from LCM regarding REFCO's clients introduced to LCM by REFCO.

23.    The mutual "non-solicitation/non-compete" clauses were intended to memorialize and confirm a vital and essential aspect of the business relationship and business practices then existing between REFCO and LCM which LCM honored in all respects.

## REFCO's New Overtures to LCM in 2001

24.    The new business relationship between REFCO and LCM proved to be mutually gratifying, so much so, that during the months while negotiations regarding the definitive Broker Agreement were still in progress, Fellous floated the idea that LCM and REFCO might form a Joint Venture under LCM's name to give REFCO an even more direct presence in the U.S. equity securities markets in order to better service REFCO's European accounts.

25.    The principals of LCM did not greet this overture with unbridled enthusiasm. They saw the overture as a proposal to take over LCM. They wanted, instead, to maintain LCM's independence as entrepreneurial equity traders on Wall Street with a growing reputation for success in the domestic securities industry. Nevertheless, the principals at LCM and Fellous discussed the idea of some sort of Joint Venture on

6

many occasions over the following months, but the discussions of such an arrangement essentially ended by December 2001.

<u>REFCO's "Mole" Benisty</u>

26.    At about the same time in the winter of 2001, while negotiations of the definitive Broker Agreement were still in progress, Benisty (who was then employed as a sales representative at Refco Securities Paris, S.A.) approached LCM about the possibility of employment with LCM in New York.  Benisty professed to have a strong interest in leaving France and working in the equity securities business in New York City.

27.    The principals of LCM immediately told Benisty they could not even begin to entertain such an idea because it would violate the terms of the draft Broker Agreement as well as the spirit of LCM's existing business relationship with REFCO.

28.    Surprisingly, Fellous called LCM shortly afterwards in early 2002 and urged LCM to employ Benisty in New York, ostensibly so that Benisty would not accept other employment in New York City and "go to work for the competition."

29.    As an accommodation to Fellous, LCM hired Benisty on February 5, 2002, as Senior Vice President as alleged before.

30.    After he was hired in 2002, Benisty acquired first hand knowledge of LCM's trading strategies, became well acquainted with LCM's key marketing and operations employees, and he thereby acquired essentially all of the "intellectual capital" of LCM's business.

31.    Upon information and belief, throughout 2002, however, Benisty maintained almost daily contact with Fellous at REFCO (although none of his responsibilities at LCM required any such contact with Fellous).

32.    Upon information and belief, Fellous and REFCO were plotting throughout 2002 to duplicate for themselves LCM's equity trading business in New York City.

33.    By early December 2002, Benisty had so insinuated himself into the heart of LCM's business and had so gained the trust of the principals of LCM that decided to offer him a partnership interest in the Firm.

34.    In the meantime, negotiations regarding the Broker Agreement finally concluded after more than 18 months, and LCM sent REFCO the final execution copy of the Broker Agreement for signature on or about December 3, 2002.

35.    After over eighteen months of negotiations, LCM assumed the signing would be perfunctory.

36.    To the astonishment of LCM, however, Fellous and REFCO refused to sign the final definitive Broker Agreement, primarily because of the "non-solicitation/non-compete" clause which, by then, had been included in the drafts of the Broker Agreement previously exchanged between the parties' attorneys for months.

37.    Three days later, Benisty was forced to reveal to the principals of LCM that REFCO intended to essentially duplicate LCM's business in New York City.

38.    LCM fired Benisty on the spot on December 6, 2002. A copy of LCM's termination letter to Benisty, dated December 6, 2002, stating the reasons for his termination is attached as Exhibit "C."

8

REFCO Completes its Theft of LCM's Business

39.     As alleged before, throughout 2002, REFCO through Benisty essentially was engaged in corporate espionage and theft against LCM by appropriating LCM's intellectual capital.

40.     The remaining step in the scheme involved REFCO's systematic recruitment of LCM's marketing staff – the individuals whose job it was to develop and maintain LCM's account relationships and who were, for all practical business purposes, LCM's public "face" to its accounts and customers.

41.     Almost immediately after LCM discovered REFCO's plot and fired Benisty on December 6, 2002, REFCO recruited two of LCM's key employees: Benjamin Chouchane was hired by REFCO three days later on December 9, 2002 and Henri Condron was hired within the month on December 31, 2002. Both quit LCM and went directly to REFCO.

42.     To say the least, LCM was alarmed at the discovery of the REFCO plot and quickly acted to require its other key employees (such as Mellul and Pagani) including all of its seven sales traders and 14 other employees to sign new employment agreements to try to stop the raid in progress by REFCO.

43.     The employment agreements were specifically intended to stop the raid as clearly shown by Exhibits "A" and "B" under the first heading entitled "Terms and Conditions of Employment with LCM" and elsewhere in other provisions of the agreements.

44.     It was now obvious that REFCO intended to buy the remaining part of LCM's business it had not already stolen from LCM by offering LCM's already

9

well-compensated employees extraordinarily lucrative compensation packages (all out of proportion to their nominal jobs) instead of forthrightly offering to buy the business directly and outright from LCM's owners.

45.   Upon information and belief, REFCO quickly learned about the new employment agreements and temporarily suspended its raid.

46.   After a relatively brief interval, presumably for cosmetic purposes, REFCO resumed its raid on LCM employees in early February 2004. It began by hiring both Mellul and Pagani on February 5, 2004.

47.   Since the departure of Benisty and the other key LCM employees, LCM has lost many of its accounts and untold opportunities to further grow their business.

48.   Before Benisty's termination and the beginning of REFCO's raid of LCM's employees, LCM's operating income had grown at an ever accelerating annual rate of over 35% per year. Within two weeks of the sudden departure of Mellul and Pagani, LCM's weekly operating income plunged by more than 50%.

49.   The REFCO Defendants deceptive acts and practices in the conduct of their business violate the New York State General Business Law §349, especially §§349(a) and (h).

## AS AND FOR A FIRST CAUSE OF ACTION
### (Tortious Interference With Contractual Relations
### Against the REFCO Defendants and Benisty)

50.   LCM repeats and realleges the allegations contained in ¶¶ 1 through 49.

10

51.    As alleged before, the REFCO defendants and Benisty were well aware and knew of the employment agreements between LCM and its employees. In fact, Benisty knew all about the agreements first hand.

52.    The REFCO defendants and Benisty nevertheless actively enticed, encouraged, and ultimately succeeded in the causing the defendants Mellul and Pagani to breach their employment agreements with LCM.

53.    As a result of these defendants' interference with LCM's contractual relationships, LCM has sustained and will continue to sustain pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Aiding and Abetting the Breach of Fiduciary Duties
### Against the REFCO Defendants and Benisty)

54.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 53.

55.    At all relevant times, the Former LCM Employees, including Benisty, were privy to the private and confidential workings of LCM's business.

56.    At the time of their employment with LCM, the Former LCM Employees (including Benisky) stood in a fiduciary relationship with their employer, LCM, and at all times they owed LCM the duty of loyalty and the duty of utmost good faith and fair dealing.

57.    By deserting LCM and absconding with its confidential information, the Former LCM Employees breached their fiduciary duties to LCM.

11

58.     The REFCO defendants and Benisty knowingly and deliberately encouraged, enticed, aided and abetted the Former LCM Employees to breach their fiduciary duties to LCM.

59.     As a result of these defendants' acts, LCM has suffered and will continue to suffer lost revenue, the benefit of the loyalty of its key employees and their productivity, has lost business opportunities, has incurred costs and has otherwise been damaged while the Former LCM Employees and the REFCO defendants continue to benefit from their wrongful acts, all to LCM's injury and detriment.

## AS AND FOR A THIRD CAUSE OF ACTION
(Unfair Business Practices Against the REFCO Defendants and Benisty)

60.     LCM repeats and realleges the allegations contained in ¶¶ 1 through 59.

61.     The REFCO Defendants' acts alleged before, including most particularly their deliberate piracy of the Former LCM employees *en masse* as a means of appropriating to themselves LCM's business, constitute devious, malicious, unscrupulous and Unfair Business Practices, crippling LCM's business in the process.

62.     LCM has suffered and will continue to suffer ever-mounting damage to its business as a result, including, but not limited to, lost profits now flowing to the REFCO defendants which must be disgorged, as well as lost business opportunities.

12

## AS AND FOR A FOURTH CAUSE OF ACTION
(Breach of Implied-In-Fact Contract Against the REFCO Defendants)

63.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 62.

64.    As alleged before, the successive drafts of the Broker Agreement prepared and exchanged by the parties' attorneys over the course of many months accurately reflected the actual agreement and business practices carried on between LCM and REFCO.

65.    Central to the business arrangement and practice between LCM and REFCO was the agreement not to "poach" or solicit employees or business from one another.

66.    By their consistent course of conduct and dealing spanning many months, LCM and REFCO manifested their agreement and confirmed its existence in fact.

67.    REFCO's piracy of LCM's employees, and through them a substantial portion of LCM's business, constituted a breach of their long-standing, implied-in-fact agreement.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Tortious Interference with an Economic Advantage
Against the REFCO Defendants)

68.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 67.

13

69.     Founded in April 1999, LCM until February 2002, had quickly established itself on Wall Street as a thriving, prospering, and rapidly growing entrepreneurial broker dealer.

70.     Since its operations began in February 2002, LCM experienced accelerating operating income growth, almost doubling every year.

71.     LCM had every reason to expect to continue maintain its revenue and income growth derived from its brokerage business at comparable or accelerating rates well into the future, having survived the costs and dangers typical of a small business in its "start up" stages, and LCM was finally poised and well-positioned to begin to compound the rate of its income growth based upon the solid revenue base it had developed.

72.     LCM had developed and established a customer base and a reputation for their skills and savy in the equity markets that appeared to assure that the Firm would meet or surpass its expectations for business growth.

73.     In addition to, and to the piracy of the Former LCM Employees, its violations of New York General Business Law §349, and other malicious and wrongful acts, the REFCO Defendants tortiously interfered with LCM's customer base and intentionally undermined the financial underpinnings of its anticipated business growth, a collateral effect of which will be to deprive LCM of future opportunities for business growth.

74.     As a result of these defendants' wrongful conduct, LCM has suffered and will continue to suffer pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

14

## AS AND FOR A SIXTH CAUSE OF ACTION
(Conversion of Intangible Business Assets and Property
Against the Former LCM Employees and Benisty)

75.    LCM repeats and realleges the allegations contained in ¶¶ 1
through 74.

76.    As alleged more extensively before, the Former LCM Employees
and Benisty during the course of their employment at LCM were exposed and thus came
into possession of valuable intangible intellectual property including customer and
account relationships and LCM's trading and other business strategies (collectively, the
"Assests").

77.    The Former LCM Employees and Benisty appropriated the Assests
to their own use and effectively sold them to REFCO in exchange for lucrative
employment arrangements with REFCO which the could nver have obtained without
having first appropriated and offered the Assets to REFCO.

78.    The Former LCM Employees and Benisty thus converted the
Assets to their own personal use and benefit.

79.    As a result of the conversion of LCM's Assets by the Former LCM
Employees and Benisty to their own use and benefit, those benefits must be disgorged
and surrendered to LCM in their entirety.

15

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Breach of Agreements Against Defendants Mellul and Pagani)

80.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 79.

81.    Defendants Mellul and Pagani voluntarily signed agreements (Exhibits "A" and "B") with LCM and agreed to abide by "The Terms and Conditions of Employment with LCM," as well as the other provisions contained in the agreements.

82.    By suddenly quitting work at LCM and immediately accepting "employment" with REFCO (in addition to appropriating LCM's Assets for themselves), Mellul and Pagani knowingly and deliberately breached their agreements with LCM, including the provisions of ¶¶ 1, 2, 3 and 4 thereof.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(Breach of Fiduciary Duties Against the Former LCM Employees and Benisty)

83.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 82.

84.    As alleged before, the Former LCM Employees and Benisty as employees stood in a fiduciary relationship with LCM and owed to LCM the duty of the utmost good faith and fair dealing.

85.    As alleged more extensively before, the Former LCM Employees and Benisty breached their duties of loyalty, good faith and fair dealing, and instead they deliberately betrayed the trust reposed in them for their own selfish gains and benefit all to the great damage of LCM.

16

APR-19-04 12:58 FROM:DENNIS KLEJNA          ID:12123898850          PAGE    3/11



# LOUIS CAPITAL MARKETS, LLC

Monday, ~~July 31st 2002~~  Feb 14th, 2003    VK

Attention: Lionel Mellul

Dear Lionel:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

## Your Compensation and Benefits are as follows:

1. A minimum draw against future commission of $10,000 per month (up to march 31st 2003);

2. An incentive of 25% of the gross commissions generated by the customers you will bring in to LCM (with a minimum of 1.25¢/ share to be eligible);

3. An incentive of 35% of the net profit you will bring to your department;

4. A fully paid health insurance plan[1];

5. A fully paid dental insurance plan[2]; and

6. Two weeks of vacation per year the first year, three weeks after two years of employment.

---

[1] Does not include a family plan

[2] Does not include a family plan

1122582.2

87 WALL STREET, SUITE 1805 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 509-4400, FACSIMILE (212) 509-8274

## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment.  You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM.  Accordingly you expressly acknowledge and agree that:

11225822



1.   **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.   **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries.  You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

APR-18-04  12:57 FROM:DENNIS KLEJNA                ID:12123888850              PAGE    8/11

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

   3.   Non-Compete.   While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other than Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

   4.   Work Product/Business Opportunities.   You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

11223822

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.     **Protection of Company's Name.**  You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement.  You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party.  This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement.  This letter agreement shall be binding upon, and inures to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005.  We recommend that you retain a copy for your own personal information.

1122581.2

APR-19-04  12.59  FROM:DENNIS KLEJNA                    ID:12123908850              PAGE  19/11

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
      Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____          02.20.2003
Signature                                     Date

11223522

APR-19-04  12:59  FROM:DENNIS KLEJNA                    ID:12123888850                    PAGE  11/11

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

Marie - Laure HERVET (CIC) _____

Nicolas MERCIER  CCIC) _____

Patrice FLAMBA  ccic) _____

Chafik  YASSINE(CIC) _____

Younis BOUBA CCIC) _____

Karin Benguigui (Bque N'assy) _____

Christian FLEURY (Bque NORSay) _____

Michael IBRAYOUSSEF (Fint NY) _____

Dan LANE  (Fint NY) _____

Michael GALANTE (Fint NY) _____

Marc de LIMA (First NY) _____

Roger MUELLER (Sudamfid) _____

Stephane ROFFLER (INE-BBL) _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible
for introducing to Louis Capital Markets, LLC.

MELLUL  LIONEL  _____

(Name of Employee)                    Date

11225822

APR-15-04 13:01 FROM:DENNIS KLEJNA          ID:12123808850          PAGE  3/11



# L O U I S   C A P I T A L   M A R K E T S ,   L L C

### M E M B E R  N A S D / S I P C

~~Monday November 17th 2002~~  Feb 14th, 2005   MB

Attention: Mr. Marcos Pagani-Toledano

Dear Mr. Pagani-Toledano:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

Your Compensation and Benefits are as follows:

- A guaranteed draw against commission of $10,000/month until the end of 2003

- An incentive of 25% of the gross commission generated by the customers you will bring in to LCM

- An incentive of 35% of the net profit generated on mark-up

- A fully paid health insurance plan[1]; (eligible after 2 months)

- A fully paid dental insurance plan[2]; (eligible after 2 months)

- Three weeks of vacation per year

- .An  E2 working permit

- Sponsorship for Series 7 & 63

---

[1] Does not include a family plan

[2] Does not include a family plan                                    MB      MP

1122582.2

67 WALL STREET, SUITE 1605 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 509-4400, FACSIMILE (212) 509-8274



APR-19-04 13:01 FROM:DENNIS KLEJNA          ID:12123B0B860          PAGE  4/11

## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter  collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment.  You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM.  Accordingly you expressly acknowledge and agree that:

11225822



APR-18-04 13:01 FROM:DENNIS KLEJNA            ID:12123500850            PAGE 5/11

1.    **Non-Solicitation.**  For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.    **Nondisclosure of Confidential Information.**  Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries.  You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.    Non-Compete.    While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.    Work Product/Business Opportunities.    You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

11225822

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.    Protection of Company's Name.  You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2

APR-18-04 13:03 FROM:DENNIS KLEJNA          ID:12123000050          PAGE 8/11

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

11225R2.2

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
    Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____          02/18/03
Signature                          Date

1122582.2

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible for introducing to Louis Capital Markets, LLC.

(Name of Employee)                    Date

1122582.2

APR-19-04 '13:05 FROM-DENNIS KLEJNA                ID:12123908650              PAGE 3/3



## Louis Capital Markets, LLC

To: Michael Beniry
530 Park Avenue Apt. 11C
New York N.Y. 10021

December 6, 2002

As of today Friday December 6th 2002, I Laurent Imbert Managing Partner of Louis Capital Markets, LLC. Here by inform Michael Beniry he is immediately terminated. We cannot carry on our business relationship since we found out Mr. Beniry is in the process of setting up a competing business and has taken proprietary and confidential information out of the office for that purpose. Moreover, his attitude has been unprofessional and contrary to Louis Capital Markets policies.

Laurent B. Imbert
Managing Member
Louis Capital Markets, LLC

# EXHIBIT P

# VEDDERPRICE

JOHN H. EICKEMEYER
212-407-7760
jeickemeyer@vedderprice.com

VEDDER PRICE P.C.
1633 BROADWAY, 47TH FLOOR
NEW YORK, NEW YORK 10019
212-407-7700
FAX: 212-407-7799

CHICAGO • NEW YORK CITY • WASHINGTON, DC • ROSELAND, NJ

April 17, 2008

**BY HAND**

Hon. Helen E. Freedman
New York County Supreme Court, Commercial
Division
60 Centre Street
New York, NY 10007

> Re:    Arch Insurance Company v. Agoglia, et al.; Index No. 08/600029

Your Honor:

We represent plaintiff Arch Insurance Company in the above action and enclose a courtesy copy of a Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett ("Bennett") executed by counsel for plaintiff and Bennett, with annexed proposed Judgment Against Bennett, filed earlier today with the Clerk of the Court.

We ask that the Court review the enclosed and, if they meet with your satisfaction, So Order the Stipulation and direct that the Clerk enter the Judgment.

We thank the Court for its consideration in this matter.

Respectfully submitted,

John H. Eickemeyer

Enclosure
cc:    Cara Tseng Duffield (by electronic mail)
       Marc E. Rindner (by electronic mail)
       Daniel J. Standish (by electronic mail)

       All Defense Counsel (by electronic mail)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,                    )
                                            )
              Plaintiff,                    )        Index No.: 08/600029
                                            )
v.                                          )
                                            )
JOHN D. AGOGLIA, et al.,                    )        **STIPULATED ORDER FOR ENTRY**
                                            )        **OF JUDGMENT AGAINST**
              Defendants.                   )        **DEFENDANT PHILLIP R. BENNETT**
                                            )
                                            )
_____)

Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R. Bennett ("Bennett"), by and through their undersigned attorneys, jointly file this Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett.

**WHEREAS**, Bennett previously sought coverage under the "Arch Policy" for the "Underlying Matters," as those terms are defined in the First Amended Complaint for Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

**WHEREAS**, Bennett has since acknowledged that he is not entitled to any coverage under the Arch Policy for the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

**NOW, THEREFORE,** Arch and Bennett stipulate and agree as follows:

1.    Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2.    Bennett stipulates and agrees that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3.   Bennett stipulates, agrees and consents to the entry of judgment against him on Counts I and II of the FAC in the form annexed hereto as Exhibit A;

4.   Bennett waives any right to appeal the judgment entered against him pursuant to this stipulation;

5.   Arch and Bennett stipulate and agree that each party is to bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Date:  April 17, 2008                        Respectfully submitted,

Jeffrey T. Golenbock                         John H. Eickemeyer
GOLENBOCK EISMAN ASSOR BELL                  Daniel C. Green
& PESKOE                                     VEDDER PRICE P.C.
437 Madison Avenue                           1633 Broadway, 47th Floor
New York, NY  10022                          New York, New York 10019
(212) 907-7373                               (212) 407-7700

*Attorneys for Defendant Phillip R. Bennett*

                                             Daniel J. Standish
                                             Marc E. Rindner
                                             Cara Tseng Duffield
                                             WILEY REIN LLP
                                             1776 K Street, N.W.
                                             Washington, D.C. 20006
                                             (202) 719-7000

                                             *Attorneys for Plaintiff Arch Insurance Company*


**SO ORDERED, this ____ day of _____, 2008**


**By:** _____


-2-