UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                 :

AXIS REINSURANCE COMPANY,          :
                                                 :

                    Plaintiff,      :         07 Civ. 7924 (GEL)
                                       :         08 Civ. 3242 (GEL)

        -v-                    :

                                                 :         **OPINION AND ORDER**

PHILLIP R. BENNETT et al.,           :

                    Defendants.    :

                                                 :
------------------------------------------------------------x

Wayne E. Borgeest, Joan M. Gilbride, Robert A. Benjamin, Kaufman Borgeest & Ryan LLP, Valhalla, NY, for Plaintiff.

Helen B. Kim, Philip A. Nemecek, Katten Muchin Rosenman LLP, Los Angeles, CA, and New York, NY, for Defendant and Counterclaim Plaintiff Dennis A. Klejna.

Stuart I. Friedman, Ivan Kline, Friedman & Wittenstein, New York, NY, for Defendants and Counterclaim Plaintiffs William M. Sexton and Gerald M. Sherer.

Greg A. Danilow, Michael F. Walsh, Weil, Gotshal & Manges LLP, New York, NY, for Defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen.

Richard Cashman, Haller Ehrman LLP, New York, NY, for Defendant and Counterclaim Plaintiff Philip Silverman.

John J. Jerome, Saul Ewing LLP, New York, NY, for Defendant and Counterclaim Plaintiff Joseph Murphy.

Norman L. Eisen, Thomas G. Macauley, Laura E.
Neish, Zuckerman Spaeder LLP, New York, NY,
and Michael T. Hannafan, Blake T. Hannafan,
Hannafan & Hannafan, Ltd., Chicago, IL, <u>for</u>
<u>Defendant Tone N. Grant</u>.

GERARD E. LYNCH, <u>District Judge</u>:

Certain former officers and directors of Refco (collectively, the "insureds")[1] move for

summary judgment dismissing the complaint against them in <u>Axis Reinsurance Company v.</u>

<u>Bennett et al.</u>, No. 07 Civ. 7924 (GEL) (S.D.N.Y.) (the "district court action"), which seeks a

declaration that plaintiff Axis Reinsurance Company ("Axis") has no obligation to the insureds

under the terms of a 2005-2006 Directors and Officers ("D&O") liability insurance policy it

issued to Refco.  Five of the insureds (the "counterclaim plaintiffs")[2] also move for summary

judgment on their counterclaims in <u>Axis Reinsurance Company v. Bennett et al.</u>, 08 Civ. 3242

(GEL) (S.D.N.Y.) (the "Axis adversary proceeding"), which was originally commenced by Axis

in the bankruptcy court, <u>see</u> Adv. Proc. No. 07-1712 (RDD), before this Court withdrew the

bankruptcy reference.  (Doc. #5, No. 07 Civ. 7924.)  The counterclaim plaintiffs in the Axis

adversary proceeding seek the mirror image of the relief sought by Axis in the district court

action — <u>i.e.</u>, a declaration that Axis's 2005-2006 D&O policy covers them for losses arising out

of various proceedings related to the collapse of Refco.  Axis contends that both motions are

premature because no discovery has occurred in either the district court action or the Axis

---

[1] The defendant insureds are Dennis A. Klejna, William M. Sexton, Gerald Sherer, Joseph Murphy, Philip Silverman, Tone Grant, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen.

[2] The counterclaim plaintiffs are Klejna, Sexton, Sherer, Murphy, and Silverman.

adversary proceeding and that, in any event, numerous issues of material fact exist that preclude

summary judgment. For the reasons stated below, the motions will be granted in part, and

denied in part.[3]

## BACKGROUND

### I. Refco's Collapse and Bankruptcy

Prior to its implosion in the fall of 2005, Refco was one of the world's largest providers

of brokerage and clearing services in the international derivatives, currency, and futures markets.

See In re Refco, Inc. Secs. Litig., No. 07 Civ. 11604, 2008 WL 1827644, at *1 (S.D.N.Y. April

21, 2008). On October 10, 2005, two months after its initial public offering ("IPO"), Refco

announced that it had discovered an undisclosed $430 million receivable due from an entity

controlled by Refco's CEO, Phillip R. Bennett. (Adv. Pro. Compl. ¶¶ 56-57, 59.[4]) As a result,

the company announced that its financial statements for the preceding four years could no longer

be relied upon. (Id. ¶ 57.) Following these disclosures, Refco's stock plummeted and was

---

[3] Klejna, who is both an insured and a counterclaim plaintiff, has reached a settlement with lead plaintiffs in In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.), which the Court preliminary approved in January 2008. (See Doc. #459, No. 05 Civ. 8626.) Although Klejna tendered the settlement to Axis in July 2007, Axis has "consistently refused to consent to or to fund the settlement." (Klejna Mem. 8.) Accordingly, Klejna moved for summary judgment in both the district court action and in the Axis adversary proceeding. Following Klejna's lead, the other insureds subsequently filed their own motions for summary judgment. In response to Axis's opposition to their motions, Klejna and the other insureds (with the exception of defendant Grant) filed a joint reply brief. (Grant filed his own reply brief.) Because the arguments advanced by Klejna and the other insureds in their moving papers are largely identical, and because Klejna joined the other insureds (with the exception of Grant) in filing a single reply brief, this Opinion and Order discusses the motions filed by Klejna and the other insureds in tandem and, unless otherwise noted, makes no distinction between them.

[4] References to "Adv. Pro. Compl." refer to the complaint originally filed in the bankruptcy court in the Axis adversary proceeding. (Kim Decl. Ex. 8.) References to "D. Ct. Compl." refer to the complaint filed in the district court action. (Id. Ex. 20.)

de-listed by the New York Stock Exchange, leading to over $1 billion in lost market capitalization.  See In re Refco, 2008 WL 1827644, at *1.

On or about October 17, 2005, Refco Inc. and many of its subsidiaries (collectively, "Refco") filed for protection under Chapter 11 of Title 11 of the United States Code.  (Adv. Pro. Compl. ¶ 61.)

## II.    The Underlying Actions

The collapse and ensuing bankruptcy of Refco in October 2005 triggered an onslaught of litigation against certain Refco officers and directors (the "Underlying Actions").  Many of the Underlying Actions remain pending before this Court, including In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); American Financial International Group et al. v. Bennett et al., No. 05 Civ. 8988 (GEL) (S.D.N.Y); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); V.R. Global Partners, L.P. v. Bennett et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, L.P. et al., No. 07 Civ. 7074 (GEL) (S.D.N.Y.); Kirschner v. Bennett et al., No. 07 Civ. 8165 (GEL) (S.D.N.Y.); and Kirschner v. Grant Thornton LLP et al., No. 07 Civ. 11604 (GEL) (S.D.N.Y.). The government has also initiated criminal proceedings against several Refco officers, securing three guilty pleas and a conviction following a criminal trial.[5]

---

[5] Specifically, defendants Bennett, Robert C. Trosten, and Santo Maggio, each pleaded guilty to criminal charges arising out of the fraud at Refco.  Defendant Tone E. Grant was convicted by a jury at his criminal trial.  (Axis Mem. 1.)  Only Grant is a movant on the insureds' pending summary judgment motions.

### III. Refco's D&O Liability Insurance

A.  <u>The 2004-2005 Policy Period</u>

For the period from August 5, 2004, to August 11, 2005 (the "2004-2005 Policy Period"), Refco Group Ltd. ("RGL"), then Refco's parent company, obtained a "tower" of D&O liability insurance consisting of a primary policy and two excess policies totaling $30 million of coverage (the "2004-2005 Program").  Specifically, U.S. Specialty Insurance Company ("U.S. Specialty") provided $10 million of primary coverage (the "2004-2005 Primary Policy"); Greenwich Insurance Company provided the first excess layer of $10 million in excess of $10 million; and Axis provided the second excess layer of $10 million in excess of $20 million (the "2004-2005 Axis Policy").  (Sylwestrzak Decl. ¶ 3.)

1.  <u>The 2004-2005 Primary Policy</u>

In connection with the 2004-2005 Primary Policy and pursuant to U.S. Specialty's August 5, 2004, policy binder (<u>id.</u> Ex. A), RGL submitted a "long form" application to U.S. Specialty that was executed by Bennett on behalf of RGL (the "Application").[6]  (<u>Id.</u> ¶ 6 and Ex. C.)  U.S. Specialty issued the 2004-2005 Primary Policy to RGL on or about October 23, 2004. (<u>Id.</u> ¶ 5.)

2.  <u>The 2004-2005 Axis Policy</u>

As noted above, Axis provided the second excess layer of coverage to RGL.  In issuing the 2004-2005 Axis Policy, Axis did not require an application of its own, relying instead on the

---

[6] An "insurance binder is a temporary or interim policy until a formal policy is issued." <u>Springer v. Allstate Life Ins. Co. of New York</u>, 94 N.Y.2d 645, 649 (N.Y. 2000).  U.S. Specialty's August 5, 2004, policy binder was contingent upon the "receipt, review, and acceptance" of the Application from Refco.  (Sylwestrzak Decl. Ex. A.)

Application that RGL had submitted to U.S. Specialty.  (Id. ¶ 9.)  The Axis policy binder issued

to Refco, dated August 5, 2004, expressly conditioned the validity of the binder on the receipt of,

*inter alia*, a "[s]igned Axis warranty."  (Id. Ex. D; see id. ¶ 8).  According to the insureds, a

"Warranty Letter" executed by Bennett and submitted to Axis on or about January 21, 2005, "on

behalf of all Insureds under the Policy" served to satisfy this condition.  (Id. ¶ 10 and Ex. E; see

Brooks Decl. ¶ 3.)  The Warranty Letter stated:

> No person(s) or entity(ies) proposed for this insurance is cognizant
> of any fact, circumstance, situation, act, error or omission which
> he/she/it has reason to suppose might afford grounds for any
> Claim, as such term is defined within the Policy, such as would fall
> within the scope of the proposed insurance . . . .  [I]f such
> knowledge exists, any claim arising therefrom is excluded from the
> proposed insurance.

(Sylwestrzak Decl. Ex. E.)  Refco did not submit the Warranty Letter to U.S. Specialty, nor was

it ever made a part of the Application.  (Id. ¶ 11.)

On or about April 25, 2005, Axis issued the 2004-2005 Axis Policy to RGL.  (Id. ¶ 12

and Ex. F.)  None of the insureds has requested coverage under the 2004-2005 Axis Policy.

B.     The 2005-2006 Policy Period

In advance of its August 2005 IPO, Refco obtained D&O insurance for the period from

August 11, 2005, to August 11, 2006 (the "2005-2006 Policy Period").  Refco's insurance was

again structured as a tower, consisting of a primary policy and five excess policies totaling $70

million in coverage (the "2005-2006 Program").  (Id. ¶ 14.)  U.S. Specialty again provided $10

million of primary coverage (the "2005-2006 Primary Policy"); Lexington Insurance Company

("Lexington") provided the first excess layer of $7.5 million in excess of $10 million (the

"Lexington Policy"); Axis provided the second excess layer of $10 million in excess of $17.5

million (the "2005-2006 Axis Policy"); Allied World Assurance Company provided the third

excess layer of $12.5 million in excess of $27.5 million; Arch Insurance Company provided the

fourth excess layer of $10 million in excess of $40 million; and XL Specialty Insurance

Company provided the fifth excess layer of $20 million in excess of $50 million.  (Id.)

        1.    The 2005-2006 Primary Policy

In issuing the 2005-2006 Primary Policy, U.S. Specialty did not require a new application

from Refco, but instead relied upon the Application submitted by RGL for the 2004-2005 Policy

Period.  (Id. ¶ 16.)  The 2005-2006 Primary Policy defines an "Insured Person" as "any past,

present or future director or officer" of Refco Inc. "and any Subsidiary thereof."  (Id. Ex. G, at

Definitions (C), (F).)  The Policy provides Insured Persons with coverage for "Loss arising from

Claims . . . against the Insured Persons for Wrongful Acts."  (Id. Ex. G, at Insuring Agreement

(A)).  "Loss" is defined under the Policy to include, *inter alia*, "[d]efense [c]osts and any

damages, settlements, judgments or other amounts" that "an Insured Person is legally obligated

to pay as a result of any Claim."  (Id. Ex. G, at Definition (G).)  Axis concedes that "most" of the

Underlying Actions are "Claims" for "Wrongful Acts" as defined in the 2005-2006 Primary

Policy.  (P. Rule 56.1 Stmt. ¶ 24.)

The 2005-2006 Primary Policy also contains two severability provisions.  With regard to

exclusions, the Policy states, in relevant part:

> For purposes of determining the application of the above
> EXCLUSIONS, no Wrongful Act of any Insured Person will be
> imputed to any other Insured Person who did not have actual
> knowledge of, or directly participate in the commission of, such
> Wrongful Act . . . .

(Sylwestrzak Decl. Ex. G, at 5.) The 2005-2006 Primary Policy also contains a "Full Severability" Endorsement, which provides:

> The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

(Id. Ex. G, at Endorsement No. 10.)

Following the initiation of the Underlying Actions following Refco's collapse, the insureds requested coverage from U.S. Specialty under the 2005-2006 Primary Policy. U.S. Specialty agreed to advance their defense costs, subject to full repayment should it be determined that no coverage exists under the 2005-2006 Primary Policy. (See Adv. Pro. Compl. ¶ 8; Gilbride Decl. Ex. D.) The $10 million liability limit of the 2005-2006 Primary Policy was exhausted in 2007. (See Adv. Pro. Compl. ¶ 9.)

### 2. The Lexington Policy

After the 2005-2006 Primary Policy was exhausted, Lexington, the first excess insurer, also agreed to advance the defense costs of the insureds, subject to repayment if appropriate after a final determination of coverage. (See Gilbride Decl. Ex. D.) The $7.5 million limit in the Lexington Policy was exhausted in July 2007. (See Kim Decl. Ex. 3.)

### 3. The 2005-2006 Axis Policy

As with the 2004-2005 Axis Policy, Axis did not require its own application for the 2005-2006 Axis Policy, but instead relied on the Application that RGL had previously submitted

to U.S. Specialty in connection with the 2004-2005 Primary Policy.  (Sylwestrzak Decl. Ex. J at Endorsement 5.)  Axis provided Refco with a policy binder on August 11, 2005, pursuant to which Axis agreed to provide $10 million in coverage in excess of the liability limits in the 2005-2006 Primary Policy and the Lexington Policy.  (Sylwestrzak Dec. ¶ 18 and Ex. I.)  Axis subsequently issued the 2005-2006 Axis Policy on March 1, 2006.  (Id. ¶¶ 19-20.)

The 2005-2006 Axis Policy "follows the form" of the underlying insurance policies (i.e., the 2005-2006 Primary Policy and the Lexington Policy), meaning that it provides coverage "in conformance with the provisions of" the underlying insurance, except to the extent that the 2005-2006 Axis Policy contains limitations or restrictions on coverage beyond the underlying insurance.  (Id. Ex. J, at (I) (Insuring Agreement).)  The 2005-2006 Axis Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the 2005-2006 Primary Policy and defines "Claim(s)" as "event(s) which take place during the Policy Period and which trigger(s) coverage under the insuring agreement(s) of the Underlying Insurance." (Id. Ex. J at (II), Definitions (A) and (C).)  Accordingly, a "Claim" for a "Wrongful Act" brought against the insureds that falls within the 2005-2006 Primary Policy also falls within the 2005-2006 Axis policy.

The 2005-2006 Axis Policy (as issued in March 2006) added as a final endorsement a "Knowledge Exclusion," which provides:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

(Id. Ex. J, at Endorsement No. 6.)  Axis's August 11, 2005, policy binder did not make reference to the inclusion of the Knowledge Exclusion in the 2005-2006 Axis Policy.  (Id. Decl. Ex. I.)

## IV.  Axis's Initial Denial of Coverage

By letter dated March 6, 2006 (the "Denial Letter"), Axis denied coverage to the insureds for "Claims" made against them for "Wrongful Acts" as defined in the 2005-2006 Primary Policy.  (Id. Ex. L.)  The Denial Letter asserted several grounds for denying coverage.

First, Axis relied upon the Warranty Letter that was signed by Bennett and submitted to Axis "on behalf of all Insureds under the Policy."  (Sylwestrzak Decl. Ex. E.)  According to Axis, the Warranty Letter was submitted, not in connection with the 2004-2005 Axis Policy (as the insureds contend), but rather, in conjunction with the 2005-2006 Axis Policy.  Given Bennett's guilty plea to charges arising out of the fraud at Refco, Axis contended that Bennett's false representations in the Warranty Letter entitled Axis to deny coverage to all insureds under the 2005-2006 Axis Policy.

Second, Axis relied upon Bennett's failure to answer a question in the Application to U.S. Specialty.  (Id. Ex. L, at 9-10.)  Specifically, Question 12(b) of the Application asked whether any proposed insured was "aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he has reason to believe might result in a claim being made."  (Id. Ex. C, at 3.)  Immediately following Question 12(b) was a disclaimer stating:

> [I]t is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to question[] . . . 12(b).

(Id.)  The Denial Letter asserted that Bennett's failure to disclose the alleged fraud at Refco in the answer to Question 12(b) resulted in the Underlying Actions being excluded from coverage. (Id. Ex L., at 10.)

Axis also cited the Knowledge Exclusion included in the 2005-2006 Axis Policy.  (Id. Ex. L, at 9.)  The Denial Letter asserted that, pursuant to that Exclusion, Bennett's knowledge, when the 2005-2006 Axis Policy was issued, of facts that might give rise to claims under the Policy barred coverage not only for Bennett, but also for all other insureds.  (Id. Ex. L, at 9, 11.)[7]

## V.     The Axis Adversary Proceeding

On or about May 24, 2007, Axis commenced an adversary proceeding in the bankruptcy court for the Southern District of New York seeking a declaration that the 2005-2006 Axis Policy does not provide coverage for the insureds for losses arising out of the Underlying Actions.  (Kim Decl. ¶ 10 and Ex. 8.)  Counts I, II, and III of Axis's complaint in the adversary proceeding largely track the Denial Letter, relying upon the Warranty Letter, Bennett's failure to answer Question 12(b) of the Application, and the purported Knowledge Exclusion, respectively, to deny coverage.  Count IV of the adversary proceeding complaint cites Clause XI of the 2005-2006 Axis Policy (the "Prior Acts Exclusion"), which excludes coverage for "any claim arising out of the same circumstances as those underlying any action or proceeding against any Insured that was pending on or prior to June 4, 2004."  (Klejna Mem. 8; see Sylwestrzak Decl. Ex. J, at (XI) Exclusions.)  Axis asserts that wrongful acts alleged in a 1994 enforcement action brought

---

[7] The Denial Letter also advanced a fourth ground for denying coverage based on the purported relationship between the Underlying Actions and an action filed by the Bankruptcy Trust of Gerard Sillam (the "Sillam Action") (Sylwestrzak Decl. Ex. L, at 10-11), but Axis's complaints in both the adversary proceeding and the district court action do not cite the Sillam Action as a ground for denying coverage.

against Refco by the Commodities Futures Trading Commission ("CFTC") are also alleged in the Underlying Actions, and thus pursuant to the Prior Acts Exclusion, the 2005-2006 Axis Policy does not provide coverage for those Actions.

On or about July 12, 2007, five of the insureds answered the complaint in the Axis adversary proceeding and filed counterclaims seeking a declaration of coverage (Count I) under the 2005-2006 Axis Policy and an injunction (Count II) to compel Axis to pay losses, including defense costs, in the Underlying Actions. (See Kim Decl. ¶ 14.) The counterclaim plaintiffs also moved for a preliminary injunction to compel Axis to advance defense costs under the Policy. (See Kim Decl. Ex. 9; Kline Decl. ¶ 4 and Exs. 1, 2.) The other insureds subsequently moved to dismiss the Axis adversary proceeding. (See Kline Decl. ¶ 8.)

On August 30, 2007, the bankruptcy court both granted the counterclaim plaintiffs' motion for a preliminary injunction and dismissed the complaint (but not the counterclaims) without prejudice on the ground that the factual issues raised in the adversary proceeding overlapped with the underlying tort and criminal proceedings pending in this Court. (See Kim Decl. Ex. 13; Gilbride Decl. Ex. S.)

On or about September 25, 2007, the insureds moved for summary judgment and a permanent injunction compelling Axis to pay defense costs as incurred, pending a final determination of coverage under the 2005-2006 Axis Policy, or until that policy was exhausted.[8]

---

[8] The insureds (other than the counterclaim plaintiffs) had commenced two separate adversary proceedings — Grant v. Axis Reinsurance Co., Adv. Proc. No. 07-2005 (RDD) (Bankr. S.D.N.Y.) and Breitman v. Axis Reinsurance Co., Adv. Proc. No. 07-2032 (RDD) (Bankr. S.D.N.Y,) — seeking advancement of defense costs under the 2005-2006 Axis Policy. The bankruptcy court subsequently consolidated these proceedings with the Axis adversary proceeding. This Court withdrew the bankruptcy reference for the consolidated adversary proceedings in November 2007. (See Doc. #5, No. 07 Civ. 7924.)

In an Order dated October 19, 2007, as amended on October 22, 2007, the bankruptcy court granted the motions for summary judgment in their entirety. (Kim Decl. ¶ 20 and Ex. 15.) Axis filed an appeal from the bankruptcy court's October 19, 2007, Order requiring the advancement of defense costs, which is currently pending before this Court. (Id. ¶ 20.)

Following the summary judgment order, Axis advanced the insureds' defense costs in connection with the Underlying Actions until the 2005-2006 Axis Policy was exhausted. Axis has steadfastly maintained its right to recoup defense payments made to the insureds. (See Kim Decl. ¶ 26; Kline Decl. ¶ 10.)

## VI. The District Court Action and Withdrawal of the Bankruptcy Reference

On September 10, 2007, shortly after the dismissal of its complaint in the Axis adversary proceeding, Axis filed a nearly identical complaint in this Court. Counts I, II, III, and IV of the district court complaint again rely, respectively, on the Warranty Letter, Bennett's failure to answer Question 12(b) of the Application, the purported Knowledge Exclusion, and the Prior Acts Exclusion. The complaint seeks a determination that no coverage exists for any of Refco's former officers or directors in connection with the Underlying Actions.

By agreement of the parties and pursuant to this Court's Order of November 13, 2007 (Doc. #5, No. 07 Civ. 7924), the Court withdrew the bankruptcy reference for the consolidated adversary proceedings so that all coverage issues could be determined in this Court. (Kim Decl. ¶ 21 and Ex. 16.)

The insureds now move for summary judgment dismissing Axis's complaint against them in the district court action.[9]  The counterclaim plaintiffs also move for summary judgment on Count I of their counterclaims in the Axis adversary proceeding, seeking a declaration that they are covered by the 2005-2006 Axis Policy for losses arising out of the Underlying Actions.

## DISCUSSION

### I.  Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party.  Id. at 254-55.  However, summary judgment may be granted "[i]f the evidence is merely colorable, or is not significantly probative."  Id. at 249 (citations omitted).

---

[9] On November 13, 2007, this Court imposed a stay in the district court action "until 30 days have elapsed from this Court's decision regarding" Axis's appeals from various orders of the bankruptcy court, which are currently pending before this Court.  (See Doc. #5, No. 07 Civ. 7924.)  The insureds request that the Court lift the stay to allow them to proceed with their summary judgment motion.  (Ins. Mem. 1 n.1.)  Axis contends that the insureds filed their motion "in violation of the litigation stay," but requests that the Court lift the stay to permit it to file its opposition to the insureds' motion.  (P. Mem. 32 n.15.)  Because the parties' arguments regarding coverage (or lack thereof) in the district court action are virtually identical to those advanced in the Axis adversary proceeding, and because a lifting of the stay will allow the eight defendant insureds who (unlike the counterclaim plaintiffs) have no counterclaims pending in the Axis adversary proceeding to also move for summary judgment regarding coverage, the insureds' request to lift the stay in the district court action is granted for the limited purpose of resolving the pending motions for summary judgment.

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. Id. at 248.

While Rule 56 permits a party to move for summary judgment "at any time," Fed. R. Civ. P. 56(b), pre-discovery summary judgment is the exception rather than the rule and will be granted "only in the clearest of cases." Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (internal quotation marks omitted); see Hellstrom v. United States Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery."). "The nonmoving party must have . . . the opportunity to discover information that is essential to his opposition to the motion for summary judgment." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (internal quotation marks omitted). However, where it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery. See Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996).

Rule 56(f) gives the court discretion to deny or defer an otherwise supported motion for summary judgment to allow for further discovery if the nonmoving party "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition" to the motion

for summary judgment.  Fed. R. Civ. P. 56(f).  Under the rule, the affidavit must explain: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort . . . has [been] made to obtain them, and (4) why [those efforts have been] unsuccessful."  Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir.1999) (internal quotation marks omitted); see Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).  In addition, a court deciding whether to grant summary judgment in the absence of discovery must also consider whether the lack of discovery was in any way due to fault or delay on the part of the nonmovant, and whether the nonmovant has provided any basis for its belief that further discovery would alter the outcome of the summary judgment motion.  See Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

## II.    The Summary Judgment Motions

The insureds seek summary judgment dismissing the complaint in the district court action and in favor of Count I of their counterclaims in the Axis adversary proceeding.  The insureds' requested relief in both proceedings is essentially identical — i.e., a determination that the 2005-2006 Axis policy provides coverage to the insureds for any losses, including defense costs, arising out of the Underlying Actions.  In both proceedings, Axis has advanced four grounds to deny coverage: the Warranty Letter, Bennett's failure to answer Question 12(b) of the Application, the purported Knowledge Exclusion, and the Prior Acts Exclusion.  The insureds contend that all of Axis's grounds for denying coverage should be rejected as a matter of law. Each of these grounds will be examined below.

A.    The Warranty Letter

1.    Inclusion in 2005-2006 Axis Policy

The insureds contend that Axis cannot rely upon the Warranty Letter to deny coverage

under the 2005-2006 Axis Policy because the Letter was executed by Bennett in connection with

the 2004-2005 Axis Policy, and the Warranty Letter is "simply not part of the 2005-2006 Axis

Policy."  (Ins. Mem. 14.)  The insureds cite a memorandum contemporaneous to the Warranty

Letter in which Refco employee Ellen Brooks advised Bennett that "Axis . . . is one of three

insurance carriers for our *present D&O coverage that was placed August 5, 2004*. . . .  They are

requiring you to sign a warranty letter confirming that we do not currently have a claim against

our D&O policy."  (Brooks Decl. Ex. A (emphasis added).)  The insureds also attach a

declaration from Pamela Sylwestrzak, Senior Vice President at Marsh USA, Inc. ("Marsh"),

Refco's insurance broker, stating that the validity of the 2004-2005 Axis policy binder "was

subject to receipt by Axis of," *inter alia*, "a warranty letter to Axis," and that the Warranty Letter

satisfied this condition.  (Sylwestrzak Decl. ¶¶ 8, 10.)[10]  The insureds further point to a merger

clause in the 2005-2006 Primary Policy,[11] contending that since the Warranty Letter was never

attached to the Application or otherwise submitted to U.S. Specialty, Axis is precluded from

treating the Warranty Letter as part of the 2005-2006 Primary Policy.

---

[10] In her reply declaration, Sylwestrzak reiterates that the Warranty Letter "was explicitly requested by Axis, and was supplied by [RGL], solely in connection with the Axis 2004-2005 Policy."  (Sylwestrzak Reply Decl. ¶ 2.)

[11] The merger clause provided: "By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute *the entire agreement* between the parties with respect to this insurance."  (Sylwestrzak Decl. Ex. G, at Condition (O) (emphasis added).)

Axis vigorously disputes the insureds' contentions and asserts that the Warranty Letter is properly part of the 2005-2006 Axis Policy. According to an affidavit by Stephen Kane, Axis's underwriter, "Axis relied upon the January 21, 2005 Warranty Letter at all times while making underwriting decisions concerning the [2005-2006 Axis] policy, which was to commence at the same time the IPO went forward." (Kane Aff. ¶ 7.) Kane's affidavit explains that,

> [a]lthough Axis had received a warranty letter signed by Phillip Bennett on behalf of all insureds on January 21, 2005, Axis was told by Marsh that Refco would not be updating the warranty statement in connection with the underwriting for the August 11, 2005 IPO. I understood from this statement by Marsh that *the January 21, 2005 Warranty Letter still applied to the post-IPO Policy* [i.e., the 2005-2006 Axis Policy], but that Refco would not execute a new warranty statement to warrant new things that management learned of from January 21, 2005 through the IPO.

(Id. ¶ 24 (emphasis added).) Based on Kane's affidavit, Axis contends that Refco, through Marsh, represented that the Warranty Letter would "still appl[y]" to the 2005-2006 Axis Policy to the extent that it barred claims arising from any insured's knowledge, prior to January 21, 2005, of any fact or circumstance of which any insured had reason to suppose might afford grounds for such a claim. (Id.)

Axis also points to the express language of the Warranty Letter, which repeatedly references the "*proposed* insurance." (Sylvestrzak Decl. Ex. E (emphasis added).) Although the insureds claim that Refco did not even begin the process of seeking insurance for the 2005-2006 Policy Period until after the April 2005 announcement that Refco planned an IPO for later that year (Brooks Decl. ¶ 4; Sylwestrzak Decl. ¶ 13), Axis asserts that the 2005-2006 Axis Policy had already been proposed by the time Refco executed the Warranty Letter in January 2005. (See Axis Mem. 9). According to Axis, the reference to "proposed insurance" in the Warranty Letter

thus refers, not to the 2004-2005 Axis Policy, but rather, to the 2005-2006 Axis Policy. See Axis Add'l Rule 56.1 Stmt. ¶ 21 ("[T]he Warranty Letter was provided to Axis as part of the underwriting of the '2005-2006 Policy Period,'" citing Kane Aff. ¶ 7). Furthermore, Axis cites the language in the preamble of the 2005-2006 Axis Policy stating that the Policy is issued "in reliance on . . . *all information* provided to [Axis]." (Sylwestrzak Decl. Ex. J (emphasis added).) Axis contends that "all information" includes the Warranty Letter, and that, accordingly, notwithstanding the merger clause in the 2005-2006 Primary Policy, the Warranty Letter is a valid ground upon which to deny coverage to the insureds.

As the parties' competing arguments make clear, genuine issues of material fact abound as to whether the Warranty Letter is properly part of the 2005-2006 Axis Policy. Given that the insureds' motions were made prior to discovery, Axis needs only to provide some basis for its belief that further discovery would alter the outcome of the motions in order to survive summary judgment. See Berger, 87 F.3d at 65. Axis has clearly met this minimal burden. Kane's statements regarding his reliance on Marsh's representations concerning the Warranty Letter, coupled with the "proposed insurance" language in the Warranty Letter itself and Axis's purported reliance on the Letter in issuing the 2005-2006 Axis Policy, together provide a sufficient basis to believe that additional discovery would yield material facts regarding whether the parties intended the Warranty Letter to be part of the 2005-2006 Axis Policy.

None of the insureds, moreover, suggests that the lack of discovery up to this point is due to any fault or delay on the part of Axis. On the contrary, in its Rule 56(f) affidavit, Axis explains that despite numerous requests for information both prior and subsequent to the start of litigation, "[n]one of the [i]nsureds [has] responded to any of Axis's . . . requests." (Gilbride

Decl. ¶ 26.) Indeed, the affidavit notes that the insureds "rely heavily on the factual Declarations of Ellen Brooks [and] Pamela Sylwestrzak," and yet neither declarant "has been subject to cross-examination by Axis," nor "produced a single document for Axis's review." (Id. ¶ 31.) Because the insureds' position depends critically on these declarants, Axis "must have . . . the opportunity" to depose and obtain relevant documents from them "to discover information that is essential to [its] opposition." Trebor Sportswear, 865 F.2d at 511 (internal quotation marks omitted) (noting that summary judgment is inappropriate where the nonmoving party shows that it "cannot at the time present facts essential to justify [its] opposition" (internal quotation marks omitted)).

### 2. Applicability of Severability Provision

Even if the Warranty Letter is properly part of the 2005-2006 Axis Policy, however, the insureds contend that the severability provision contained at Endorsement No. 10 of the 2005-2006 Primary Policy nevertheless prevents Axis from relying on the Warranty Letter to bar coverage for the insureds. Specifically, the insureds assert that the severability provision operates as a general non-imputation clause that bars Axis from imputing Bennett's knowledge of the alleged Refco fraud to the other insureds and using the Warranty Letter to deny them coverage on that basis.

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted). For the purposes of a summary judgment motion, the Court must decide "whether significant contractual ambiguity exists." Echelon Int'l Corp. v. America West Airlines, 85 F. Supp. 2d

313, 317 (S.D.N.Y.2000).  If the language of the contract is "unambiguous and conveys a

definite meaning," then the interpretation of the contract is a question of law for the court.

Bourne v. Walt Disney Co., 68 F.3d 621, 629 (2d Cir. 1995) (citations omitted).  If the terms are

not clear, the interpretation of the contract becomes a question of fact for the jury and extrinsic

evidence of the parties' intent is admissible.  Id.

As noted above, Endorsement No. 10 provides:

> The Insureds represent that the particulars and statements
> contained in the Application are true, accurate and complete and
> are deemed material to the acceptance of the risk assumed by the
> Insurer under this Policy.  This Policy is issued in reliance upon
> the truth of such representations.  *No knowledge or information*
> *possessed by any Insured will be imputed to any other Insured.*  If
> any of the particulars or statements in the Application is untrue,
> this Policy will be void with respect to any Insured who knew of
> such untruth.

((Sylwestrzak Decl. Ex. G, at Endorsement No. 10 (emphasis added).)  The insureds assert that

the severability provision is comprised of the italicized language, and that the provision operates

as a general non-imputation clause applicable without restriction.  As Axis persuasively argues,

however, when the severability provision is read, "not as if isolated from the context, but in the

light of the [Endorsement] as a whole," Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir.

2002), it is clear that the scope of the provision is limited to the statements Refco made in the

Application it submitted to U.S. Specialty.  Indeed, the opening clauses of Endorsement No. 10

specifically limit the scope of the representations made by the insureds, and the insurer's reliance

upon those representations, to the "particulars and statements contained in the Application."

(Id.)  Similarly, the clause immediately following the severability provision voids the 2005-2006

Primary Policy only "with respect to any Insured" who knows of any "untruth[s]" in the

"particulars or statements in the Application." (Id.) Accordingly, even though the severability provision itself contains no restrictive language, when read in context with the surrounding clauses, the provision "admits of only one reasonable interpretation" — i.e., that it extends only to the statements Refco made in the Application.[12] American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765 (2d Cir. 1984). The severability provision thus has no bearing on whether Axis may rely on the Warranty Letter to deny coverage to the insureds.[13]

In sum, because genuine issues of material fact clearly exist as to whether the Warranty Letter is part of the 2005-2006 Axis Policy, and because the severability provision at Endorsement No. 10 does not preclude Axis from denying coverage based on the Warranty Letter, summary judgment must be denied as to Count I of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

B.     Bennett's Failure to Answer Question 12(b) on the Application

As noted above, Question 12(b) of the Application to U.S. Specialty inquired as to whether any proposed insured was "aware of any fact, circumstance or situation involving the

_____

[12] Because the severability provision is unambiguous, "the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning." American Home, 748 F.2d at 765.

[13] The Warranty Letter itself, moreover, bars coverage for "any claim" arising from any fact or circumstance of which any insured had reason to suppose might afford grounds for such a claim. (Sylwestrzak Decl. Ex. E.) See American Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp., No. 94 Civ. 2727, 1997 WL 906427, at *1, n.3, 9-10 (S.D.N.Y. Sept. 12, 1997) (interpreting "any claim" language to exclude coverage for innocent co-insureds). Accordingly, even if the severability provision extends beyond the "particulars or statements in the Application" to function as a general non-imputation clause, the express terms of the Warranty Letter, assuming that the Letter is properly part of the 2005-2006 Axis Policy, would override that provision. (See Sylwestrzak Ex. J, at (I) (Insuring Agreement) (noting that the 2005-2006 Axis Policy provides coverage "in conformance with the provisions of" the underlying insurance policies "*[e]xcept as specifically set forth in the provisions of this Policy*") (emphasis added).)

Applicant or any Insured Person or Organization which he has reason to believe might result in a claim being made." (Sylwestrzak Decl. Ex. C, at 3.) Immediately following Question 12(b) was a disclaimer stating:

> [I]t is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to question[] . . . 12(b).

(Id.) Bennett failed to check either the "yes" or "no" box in the answer to Question 12(b).

Axis concedes that no factual dispute exists regarding the omission of an answer to Question 12(b), and that the parties' sole disagreement concerns the legal consequences of Bennett's failure to answer. (See Axis Mem. 16.) Axis contends that the insureds owe a duty of candor when applying for insurance, and that Bennett's failure to answer constitutes a material misrepresentation barring coverage for any claim by any insured that was "required to be disclosed" in response to Question 12(b). (Sylwestrzak Decl. Ex. C, at 3; see Axis Mem. 15.)

As the insureds correctly contend, however, "[i]t is well-settled that 'where upon the face of [an insurance] application, a question appears to be *not answered at all*, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they *waive the want or imperfection in the answer,* and render the omission to answer more fully immaterial.'" Philadelphia Indem. Ins. Co. v. Horowitz, Greener & Stengel, LLP, 379 F. Supp. 2d 442, 453 (S.D.N.Y. 2005) (emphasis added), quoting Phoenix Mut. Life Ins. Co. v. Raddin, 120 U.S. 183, 190 (1887);[14] see Justofin v. Metro. Life Ins. Co. 372 F.3d 517, 525 (3d Cir. 2004) (noting that

---

[14] Axis contends that the holding of Raddin "has been distinguished in instances, such as here, where the application asks for disclosure of a pre-existing condition and the lack of an

under Pennsylvania law, "when a policy is issued on an application containing an ambiguous, unresponsive or incomplete answer[,] the insurer waives the right to assert the falseness or materiality of the question and answer" (internal quotation marks omitted) (alteration in original)); see also Am. Jur. 2d Insurance § 1603 ("An insurer's issuance of a policy in the face of what appears to be a lack of sufficient information to allow the insurer to determine its risks . . . estops the insurer from, or waives the insurer's right to, cite that lack of information as a ground for avoiding coverage.").

In light of this longstanding legal principle, Axis's decision to issue its 2005-2006 Policy without challenging the omission of an answer to Question 12(b) constituted a waiver of any objection to coverage based upon Bennett's failure to answer. Accordingly, summary judgment

---

answer constitutes non-disclosure of that condition." (Axis Mem. 15.) However, the two cases Axis cites for this proposition, Moriarty v. Metropolitan Life Insurance Co., 202 S.W. 630, 631 (Ky. App. 1918), and Home Life Insurance Co. v. Myers, 112 F. 846, 852 (D. Kan. 1901), are entirely inapposite. Indeed, Moriarty expressly recognized that,

> where the application asks a question in regard to a material fact, but no answer by the insured appears in the application, the courts generally hold that no case of fraudulent representation is presented, because the insured neither admitted nor denied the existence of the fact concerning which the inquiry was made.

202 S.W. at 631, citing Raddin, 120 U.S. 183. The principle established in Raddin was held inapplicable to the facts of Moriarty because the insurance application in that case expressly set forth declarations that "were true without exception . . . unless the insured desired to qualify the declaration." Id. The insured's failure to provide any answer or response following a declaration that he had never suffered from consumption (when, in fact, he had) thus constituted a material misrepresentation entitling the insurer to deny coverage on that ground. Id. Similarly, Home Life distinguished Raddin on the ground that the insured in that case gave "neither a truthful nor an imperfect answer," but rather, "a *false* answer which, by the terms of the contract, avoids the policy." 112 F. at 852 (emphasis added).

must be granted to the insureds as to Count II of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

C.  The Knowledge Exclusion

1.  Inclusion in 2005-2006 Axis Policy

As with the Warranty Letter, the insureds contend that Axis cannot rely upon the Knowledge Exclusion to deny coverage because the Exclusion is not properly a part of the 2005-2006 Axis Policy.  According to the insureds, between August 11, 2005, the date the Axis policy binder was issued to Refco, and March 1, 2006, the date the 2005-2006 Axis Policy was formally issued, the Axis policy binder served as the operative insurance contract.  That binder, however, did not list the Knowledge Exclusion as an endorsement to be added to the 2005-2006 Axis Policy, and the insureds contend that Marsh never authorized Axis to add the Knowledge Exclusion to the 2005-2006 Axis Policy.  (Sylwestrzak Decl. ¶ 21.)  Because Axis did not issue the 2005-2006 Axis Policy until March 1, 2006, "months after the alleged fraud was revealed at Refco in October 2005 and months after claims were made on the basis of the Axis [policy binder]," the insureds claim that "Axis unilaterally changed the terms of the 2005-2006 Axis Policy after learning of events that would give rise to a claim under the Policy so as to provide grounds for denying coverage."  (Id. at 19-20.)  The insureds thus contend that Axis's attempt to deny coverage on the basis of the Knowledge Exclusion should be rejected as a matter of law.

Although acknowledging that the Knowledge Exclusion was not included in the policy binder it issued to Refco in August 2005, Axis contends that the Exclusion was properly added to the 2005-2006 Axis Policy because "it was agreed by Refco's agent (Marsh) that one of the terms of the Axis policy would be a Knowledge Exclusion."  (Kane Aff. ¶ 48.)  To support this

contention, Axis relies heavily on Kane's affidavit, which describes the events leading up to Axis's inclusion of the Knowledge Exclusion in its 2005-2006 Policy in considerable detail.

Kane's affidavit states that prior to Axis's issuance of the policy binder for the 2005-2006 Policy, Marsh informed Axis that Refco "would not be updating the [Warranty Letter] in connection with the underwriting for the August 11, 2005 IPO" (id. ¶ 24), and that if Axis needed a warranty to bind the Policy, it should "include an inverted warranty endorsement on [its] revised quote" (id. Ex. A). According to Kane, an "inverted warranty" is simply another name for a "knowledge exclusion." (Id. ¶ 26.) On August 10, 2005, Axis issued a policy binder to Refco that included, *inter alia*, a list of items that Axis must receive, review, and accept as pre-conditions to the effectiveness of the binder (the "subjectivities"), as well as a list of endorsements. (Id. ¶ 32.) One of the endorsements was a "Reliance endorsement (e.g. on the primary carrier's application)," which, according to Kane, was included because Axis expected that Refco would be submitting a new application to U.S. Specialty for the 2005-2006 Policy Period, and "Axis wanted to incorporate and adopt that application directly as an application for the Axis [2005-2006] policy." (Id. ¶ 33.) In conjunction with the "Reliance endorsement," the August 10, 2005, policy binder also required Refco to submit a "Copy of the primary carrier's application" as a subjectivity to the policy binder. (Id. ¶ 34.) Kane's affidavit explains that Axis expected the new application to "contain essentially the same questions contained" in the prior Application submitted to U.S. Specialty, including the warranty language at Question 12(b). (Id. ¶ 30.)

On August 11, 2005, Axis received an email from Kenny Li, an employee at Marsh, forwarding an email that Vice President Sylwestrzak had sent to Li earlier that day.[15]  (Id. ¶ 36.) Sylwestrzak's email to Li stated:

> With respect to the open subjectivities, here is a copy of the [U.S. Specialty] long form application submitted for the 8/4/04 placement.  [U.S. Specialty] did not require a new application for the 8/11/05 binding of the IPO.  You will note the warranty is not signed.  *It was agreed by [U.S. Specialty] to accept the app as is and to add on the inverted warranty statement to the policy.*

(Id. Ex. C (emphasis added).)  In light of Marsh's earlier representation that an "inverted warranty endorsement" could be part of the 2005-2006 Axis Policy, Kane interpreted the final sentence in Sylwestrzak's email to mean that U.S. Specialty had agreed to add an inverted warranty to the 2005-2006 Primary Policy in lieu of a new application containing a new warranty statement.  (Id. ¶¶ 25, 39-40.)

Based on this purported representation by Marsh that the 2005-2006 Primary Policy would include an inverted warranty, and the fact that Axis's 2005-2006 Policy would "follow the form" of the 2005-2006 Primary Policy, Axis issued a revised policy binder on August 11, 2005, which removed the subjectivity regarding receipt of the primary carrier's application, but did not include the Knowledge Exclusion.  (Id. ¶ 42-43.)  According to Kane,

> [b]ecause Axis expected the Knowledge Exclusion to be included in the Primary Policy, there was absolutely no reason to include reference to the Knowledge Exclusion in the August 11, 2005 binder.  To do so would be contrary to established underwriting practices.  Excess insurers do not list the terms and conditions of underlying policies in their own binders.

---

[15] Li's email simply stated: "Please see below and confirm that this will satisfy the application subjectivities."  (Kane Aff. Ex. C.)

(Id. ¶ 45.)  When the 2005-2006 Primary Policy was subsequently issued without the inclusion of the inverted warranty, however, Axis proceeded to add the Knowledge Exclusion to the 2005-2006 Axis Policy, which it issued on March 1, 2006.  According to Axis, it was justified in adding the Knowledge Exclusion because Refco's agent (Marsh) had agreed that one of the terms of the 2005-2006 Primary Policy would be an inverted warranty, and the addition of the Knowledge Exclusion to the Axis 2005-2006 Policy, after the 2005-2006 Primary Policy failed to include an inverted warranty, simply effectuated the parties' intent.  (Axis Mem. 21.)

In their reply brief, the insureds argue that Axis fundamentally misconstrues the final sentence of Sylwestrzak's August 11, 2005, email to Li.  According to the insureds, Sylwestrzak's email merely transmitted the 2004-2005 Application to U.S. Specialty and explained that, with regard to that Application, the warranty had not been signed.  As a result, the insureds contend that rather than representing that U.S. Specialty had agreed to "add on the inverted warranty statement to the [2005-2006 Primary P]olicy" (Kane Aff. Ex. C), the final sentence of Sylwestrzak's email simply clarifies that U.S. Specialty had added an inverted warranty endorsement to the *2004-2005* Primary Policy (Sylwestrzak Decl. Ex. B, at Endorsement 7), a fact that Axis knew or should have known since it was also an excess carrier for the 2004-2005 Program.  (Ins. Reply Mem. 12.)

Although the insureds may ultimately prevail on their interpretation of Sylwestrzak's email, the extensive recitation of events in Kane's affidavit nevertheless suffices to raise genuine issues of material fact regarding whether the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy.  Indeed, at the very least, Kane's affidavit demonstrates that the final sentence of Sylwestrzak's email to Li is ambiguous on its face as to whether it constituted a representation

by Marsh that an inverted warranty would be added to the 2005-2006 Primary Policy, or whether it merely explained that an inverted warranty had been added to the 2004-2005 Primary Policy. Kane's affidavit provides a sufficient basis to believe that further discovery would yield material facts shedding light on Sylwestrzak's email, which is critical to Axis's contention that the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy. Axis should thus be afforded the opportunity to gather extrinsic evidence and depose witnesses to clarify the parties' intent concerning the Knowledge Exclusion.[16] See Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 (2d Cir. 1983) ("[S]ummary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information.").

## 2. Applicability of Severability Provision

The insureds additionally contend that even if the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy, two severability provisions in the 2005-2006 Primary Policy prevent Axis from relying on the Knowledge Exclusion to bar coverage for all insureds based on Bennett's knowledge of the alleged fraud at Refco. As explained above, however, the first of these provisions, contained at Endorsement No. 10, is limited to statements contained in the Application submitted to U.S. Specialty. See supra at 21-22. Accordingly, that provision has no

---

[16] Although the insureds note that Axis had already received U.S. Specialty's final policy binder (dated August 10, 2005) by the time Axis issued its revised August 11, 2005, policy binder to Refco (Sylwerstrzak Reply Decl. ¶¶ 4-5), this fact is not dispositive as Axis contends that Li's August 11, 2005, email (forwarding Sylwestrzak's email) was a representation by Marsh that an inverted warranty would subsequently be added to the 2005-2006 Primary Policy, which was not issued until months later (see id. Ex. G.) The insureds' argument that Axis violated the automatic stay of the Bankruptcy Code, 11 U.S.C. § 362(a), by making a "unilateral" post-petition change to debtor's insurance is similarly unavailing because it is unclear at this stage of the litigation whether Axis's addition of the Knowledge Exclusion was a unilateral act. (Ins. Mem. 20 n.11; Klejna Mem. 19.)

bearing on Axis's ability to impute Bennett's knowledge to all insureds and deny coverage through the Knowledge Exclusion.[17]  Similarly, the express terms of the second severability provision, located at the end of the "Exclusions" section in the 2005-2006 Primary Policy, limit its application to "the above EXCLUSIONS."[18]  (Sylwestrzak Decl. Ex. G, at 5.)  The Knowledge Exclusion, which was added by Axis to its own 2005-2006 Policy, is not one of "the above EXCLUSIONS" contained in the 2005-2006 Primary Policy.  Accordingly, that severability provision also does not preclude Axis from relying on Bennett's knowledge of the Refco fraud to bar coverage for all insureds pursuant to the Knowledge Exclusion.

### 3.  Interpretation of Knowledge Exclusion

The insureds further contend that even if the Knowledge Exclusion is fully applicable, the reference to "any Insured" in the Knowledge Exclusion should "be read as an exclusion of coverage for 'any insured' who had the relevant knowledge," rather than, "as Axis suggests, an

---

[17] As explained below, moreover, the Knowledge Exclusion specifically excludes coverage for any claims of which *any Insured* had knowledge."  (Sylwestrzak Ex. J, at Endorsement No. 6 (emphasis added).)  See State Farm Fire & Cas. Co. v. Wolford, 498 N.Y.S.2d 631, 632 (4th Dep't 1986) (applying "any insured" exclusion to bar coverage for innocent insured).  Accordingly, even if the severability provision in Endorsement No. 10 extends beyond the "particulars or statements in the Application" to operate as a general non-imputation clause (Sylwestrzak Decl. Ex. G, Endorsement No. 10), the express terms of the Knowledge Exclusion, assuming that the Exclusion is properly part of the 2005-2006 Axis Policy, would override that provision.  See supra note 13.

[18] The second severability provision provides, in relevant part:

> For purposes of determining the application of the above EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act . . . .

(Sylwestrzak Decl. Ex. G, at 5.)

exclusion of coverage for any *other* insured." (Klejna Mem. 21 (emphasis added); <u>see</u> Ins. Mem. 22-23.) As described above, the "Knowledge Exclusion" provides, in its entirety:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, *any Insured* had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

(Sylwestrzak Decl. Ex. J, at Endorsement No. 6 (emphasis added).)

As Axis correctly contends, it is well established that "[t]he language 'any insured' has been consistently interpreted as expressing a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured." <u>McCauley Enters., Inc. v. New Hampshire Ins. Co.</u>, 716 F. Supp. 718, 721 (D. Conn. 1989) (collecting cases). Indeed, "unlike the phrase 'the insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured." <u>Sales v. State Farm Fire and Cas. Co.</u>, 849 F.2d 1383, 1385 (11th Cir. 1988); <u>see</u> <u>State Farm Fire & Cas. Co. v. Wolford</u>, 498 N.Y.S.2d 631, 632 (4th Dep't 1986) (applying "any insured" exclusion to bar coverage for innocent insured); <u>see also</u> <u>Allstate Ins. Co. v. Mugavero</u>, 79 N.Y.2d 153, 164 (1992) (contrasting exclusionary clauses barring coverage for "*an* insured" versus "*the* insured"). By its express terms, the Knowledge Exclusion specifically excludes coverage for any "Claims" of which "*any Insured* had knowledge." (Sylwestrzak Decl. Ex. J, at Endorsement No. 6 (emphasis added).) Accordingly, if the Knowledge Exclusion is part of the 2005-2006 Axis Policy, Axis may properly impute Bennett's knowledge of the fraud at Refco to all insureds and use the Knowledge Exclusion to deny coverage to them.

In sum, because genuine issues of material fact exist as to whether the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy, and because neither the severability provisions in the 2005-2006 Primary Policy nor the Knowledge Exclusion itself precludes Axis from imputing Bennett's knowledge of the fraud to Refco to all insureds and denying coverage to them pursuant to the Exclusion, summary judgment must be denied as to Count III of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

D.    The Prior Acts Exclusion

Axis's final ground for denying coverage to the insureds is based on the Prior Acts Exclusion in the 2005-2006 Axis Policy, which excludes coverage for any claim arising out of:

> A.    Any demand, suit or other proceeding, pending, or order, degree or judgment entered, against any insured on or prior to [June 4, 2004] . . . ; or
>
> B.    Any other wrongful act, fact, circumstances or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

(Sylwestrzak Decl. Ex. J, at (XI) Exclusions.) Axis asserts that a 1994 enforcement action brought against Refco by the CFTC (the "1994 CFTC action") constitutes a prior claim that is "causally or logically interrelated by a common nexus" with the "wrongful act, fact, circumstance or situation" alleged in each of the Underlying Actions. (D. Ct. Compl. ¶¶ 138-39, 155-58.) Accordingly, Axis contends that the Prior Acts Exclusion precludes coverage for the insureds for losses arising from those Actions.

The insureds fiercely deny any "common nexus" between the 1994 CFTC action and the Underlying Actions, asserting that (1) the CFTC action alleged violations of the Commodity

Exchange Act, 7 U.S.C. § 1 et seq., whereas none of the Underlying Actions allege any violations of that statute or any other statute that the CFTC has authority to enforce; (2) the events alleged in the CFTC complaint occurred in 1990 and 1991, while the conduct at issue in the Underlying Actions is alleged to have begun no earlier than 1997; and (3) the "Refco Inc." named in the CFTC proceeding is not the same "Refco Inc." formed in 2005 that is involved in the Underlying Actions.  (Ins. Reply Mem. 16.)

Although the limited evidentiary record at this stage of the proceedings appears to tilt significantly in favor of the insureds' position, Axis has nevertheless alleged in its district court complaint that the 1994 CFTC action "involv[ed] the same scheme of improperly shifting client funds between related party accounts — the same type of transactions that Refco allegedly used to hide the fraud alleged" in the Underlying Actions.  (D. Ct. Compl. ¶ 138.)  Indeed, Axis has set forth specific allegations that "Refco improperly availed itself of as much as $123 million in client funds on an almost daily basis in order to pay off debts owed by Refco Capital."  (D. Ct. Compl. ¶ 139 (internal quotation marks omitted).)  Although a district court may deny a request for additional discovery if the request is "based on speculation as to what potentially could be discovered," National Union Fire Ins. Co. v. Stroh Cos., Inc., 265 F.3d 97, 117 (2d Cir. 2001) (internal quotation marks omitted), Axis's allegations regarding the 1994 CFTC action are sufficiently specific to justify further targeted discovery into whether the claims asserted in the CFTC action are "causally or logically" related to the Underlying Actions.  (Sylwestrzak Decl. Ex. J, at (XI) Exclusions.)  Summary judgment must therefore be denied as to Count III of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

## CONCLUSION

In sum, the insureds have largely failed to demonstrate that this case falls within the ambit of the "rarest of cases" in which "summary judgment [may] be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." Hellstrom, 201 F.3d at 97. Accordingly, for the reasons stated above, the insureds' and counterclaim plaintiffs' motions for summary judgment are granted with respect to Count II of Axis's complaint in Axis Reinsurance Company v. Bennett et al., No. 07 Civ. 7924 (GEL) (S.D.N.Y.), and on the corresponding portion of Count I of the counterclaims in Axis Reinsurance Company v. Bennett et al., 08 Civ. 3242 (GEL) (S.D.N.Y.), and denied in all other respects.

SO ORDERED.

Dated: New York, New York
June 18, 2008

GERARD E. LYNCH
United States District Judge